UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 05-386 (ESH) |
| | : | |
| v. | : | |
| | : | |
| ANTOINE JONES | : | |
|     Defendant. | : | |
| | : | |

**GOVERNMENT'S SUPPLEMENTAL OPPOSITION TO DEFENDANT'S
MOTION FOR MODIFICATION OF CONDITIONS OF RELEASE**

The United States, by its counsel, the United States Attorney for the District of Columbia, opposes the defendant's motion to modify his conditions of release and says as follows:

**FACTUAL BACKGROUND**

Jones is charged with Conspiracy to Distribute and to Possess with the Intent to Distribute 5 Kilograms or More of Cocaine, and 50 Grams or More of Cocaine Base. An extensive recitation of the facts in this case has already been supplied to the Court and counsel. That proffer is attached to this pleading in the unlikely event the Court or counsel needs to print another copy.

In brief summary, in 2004, several confidential sources began telling law enforcement that Antoine Jones, who operated the nightclub Levels, in Northeast, Washington, D.C., was distributing multiple-kilogram quantities of cocaine to several customers in the greater Washington, D.C., area. The informants reported that Jones was supplied by "Mexicans" and that he was very cautious when speaking on the phone, almost invariably using coded conversations.

Various techniques were employed by law enforcement to investigate Jones's illicit

activities, including in person and video surveillance, review of pen register data, interviews of additional confidential sources and witnesses, a review of available subscriber information and pen-register data, a review of stored text-messages on the cellular telephones of Antoine Jones and his right-hand associate, Lawrence Maynard, obtained via search warrant, and ultimately a Title III wire interception on Antoine Jones's cellular telephone, which ran from September 2, 2005, through the date that these defendants were arrested, October 24, 2005. Search warrants executed on the day of the arrests provided significant additional evidence.

The confidential sources were corroborated at an early stage of the investigation on April 5, 2005 when the Highway Interdiction Unit of the Durham, North Carolina Police Department conducted a traffic stop of a 1997 Honda Odyssey mini-van bearing Maryland tags 273M195, operated by Lawrence Maynard. The vehicle was registered to Jones at one of his residences, 12221 Brandywine Road, Brandywine, Maryland. A drug dog alerted on the right rear passenger area of the mini-van. A search revealed a hidden compartment in the van, containing six white plastic Target shopping bags, inside the bags was a total of $67,115.00 in U.S. currency. When interviewed, both Maynard and the passenger in the van denied any knowledge of the secret compartment and the money. The Honda Odyssey was impounded, and the $67,115.00, was seized as evidence. Maynard received a warning ticket and was released without further charges.

Additional investigation prior to the intercept also tended to confirm what the informants had disclosed about Jones patterns of behavior and associates. From the very early days of the wire interception, a clear pattern of suspicious telephone contacts was established between Jones and various individuals, whom investigators identified over time through telephone toll records, license plate numbers, and surveillance. In those calls, Jones and his coconspirators discussed

the timing and location of meetings, without any other substantive content. This was consistent with what the confidential sources indicated was Jones' practice: short conversations setting up meetings to drop off money and pick up cocaine, without any further discussion on the telephone, for fear of being intercepted by law enforcement.

Jones uniformly spoke in code throughout the interception period. For example, he and his drug-trafficking associates frequently mention the need for, and delivery of, "tickets," which was a reference to wholesale quantities of cocaine. They spoke, too, of "VIP tickets" (larger quantities), and occasionally of "flyers." While also consistent with nightclub business - and thus a good cover - the conversations quickly became apparent as code, based on, among other things, the occasional slip-up, e.g., a request by a customer for a "half ticket," or a query by Jones to one of his customers as to whether he still needed "that little ticket."

Also, there were occasions when Jones's supply of "tickets" was obviously getting low, and when he was scrambling to redistribute them to other customers. For example, on one occasion, September 13, 2005, after speaking with another customer, John Adams about what he needed, Jones called Demetris Johnson and left a message saying that he needed "those two tickets back." Jones then called Adams back and told him that he thought that "Youngin" (a reference to Johnson) had already sold some of his "tickets," and then continued to discuss with Adams how many tickets various people have and need.

Within the first few weeks of the wire interception, it became obvious that Jones was being supplied by Hispanic-sounding males, some of whom had cellular telephones with exchanges in McAllen, Texas, a major point-of-entry of cocaine into the United States. Throughout the course of the interception period, Jones spoke with at least three different

3

Hispanic-sounding males - it was confirmed through pen register data that they were all in contact with each other - about the timing of shipments of "tickets," "music," and other references to cocaine. Based on the content of some of these calls, and surveillance investigators established that Jones was frequently meeting with one of these men, later identified as co-defendant Roel Bremea, Jr., at a suspected stash location in Ft. Washington, Maryland.

During the course of the interception investigators concluded that Jones received periodic large shipments of drugs. This resulted in a kind of cycle in the conversations. In the time before a shipment was due to arrive Jones would frequently be low on product, attempting to juggle his customers. There would also be conversations with the sources about when something, clearly the next delivery, was going to occur. Once the delivery date was set Jones would begin to communicate with his customers about when the upcoming event was to occur. When the drugs arrived Jones would begin to call his main customers..

In telephone conversations during the third week in October, 2005, Jones discussed with the McAllen-based Hispanic male the fact that the "party" would happen on "Friday," (October 21, 2005). Others conversations suggested that Jones was low on drugs and that he expected a new supply in the near future. Given that, the investigators obtained numerous search warrants for the residences of some of the customers identified on the intercept, along with Jones's two residences, the nightclub Levels, and the suspected stash house located at 9508 Potomac Drive, Ft. Washington, Maryland. On Sunday October 23, Jones made a series of calls to his main customers indicating that drugs were available.

In the early morning hours of October 24, 2005, teams of agents executed the search warrants and found approximately 97 kilograms of cocaine, three kilograms of crack cocaine, and

in excess of $800,000.00, at the Potomac Drive stash house. Arrested at that location were defendants Bremea, Alberto Rollando Carrillo-Montelongo, and Ricardo Sanchez-Gonzales. Recovered from various other search locations were smaller, but still-wholesale quantities of cocaine, crack cocaine, large amounts of cash, and several weapons. In excess of $69,000.00 in cash was found in Jones' jeep.

After Jones' arrest and detention a confidential source unrelated to this investigation reported that it was rumored that "the guys from Levels" thought they had figured out that a particular person was cooperating and that they were trying to find someone to kill the suspected cooperator. A review of Jones' telephone conversations include one in which he is trying to find the location of a coconspirator who had been incarcerated in early October on other charges but not yet indicted in this case. A search of Jones's jail cell resulted in the recovery of a letter from one of Jones' girlfriends in which, apparently in response to a request from Jones, she supplies the location of the coconspirator. The same letter reports that another individual is "on the street" and supposed to be "hot". Also recovered from the cell was what appears to be a list of suspected cooperators.

## **PROCEDURAL HISTORY**

When the case of defendant Jones was presented to Magistrate Judge Deborah Robinson she held him without bond pursuant to 21 U.S.C. § 3142(e), finding that no combination of conditions of release would reasonably assure the safety of the community and the defendant's appearance for trial.. A copy of Magistrate Judge Robinson's finding are available as document 22 in the case file. The defendant filed his bond review motion on December 19, 2005, and the government responded that same day. At a hearing that afternoon, this Court asked the

government to provide more detail regarding the case against Jones, which is set forth above.

## ARGUMENT

As an initial matter, defendant Jones has been indicted for a violation of the Controlled Substances Act carrying a maximum penalty in excess of 10 years incarceration, which triggers a rebuttable presumption in favor of detention. Because the defendant has failed to articulate facts to overcome the presumption, detention is the only appropriate option. Jones' conduct since being arrested only adds to the concerns that already existed about the danger he poses to the community.

The charged conspiracy involved an enormous amount of cocaine; indeed, taken from the organizations's stash house, to which Jones was a consistent visitor, were 97 kilograms of cocaine and 3 kilograms of cocaine base, along with in excess of $800,000 in cash. This is no small drug operation, but rather a wide-ranging multi-jurisdictional drug-trafficking operation, with direct links to Mexican suppliers.

The strength of the evidence against Jones in particular is compelling. It is Jones' phone which was intercepted and he is a party to every one of the drug related conversations. And while the defendant may attempt to argue that the intercepted call are ambiguous, the result of the searches on October 24, give extraordinary support to the conclusion that these are drug discussions.

Against these facts, the defendant relies on community ties to overcome the presumption that he should be detained pending trial. The framers of the 1984 Bail Reform Act felt differently. "The Committee also notes with respect to the fact of community ties that it is aware of the growing evidence that the presence of this factor does not necessarily reflect a likelihood

of appearance, and **has no correlation with the question of the safety of the community.**" S.Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S.Code Cong. & Ad. News 3182, 3207 (emphasis added). Nor is it clear why community ties, which did not at all stop this defendant from selling drugs, as described above, now will keep him from doing so again.

The case for Jones' pretrial detention is made even more compelling by a review of his full criminal record., which was not available at the time of the detention hearing. Jones has two felony drug convictions. He thus has a consistent pattern of being unable to refrain from trafficking in controlled substances. Jones record will also subject him to a mandatory life without parole sentence if convicted of a conspiracy involving the quantity of drugs charged. A potential sentence of that magnitude only heightens his incentive to flee.

WHEREFORE, the government requests that the Court deny the defendant's Motions for Modification of Conditions of Release.

Respectfully submitted,

Kenneth L. Wainstein
United States Attorney
D.C. Bar No. 451058

_____
John V. Geise
Assistant United States Attorney
D.C. Bar No. 358-267
Organized Crime and Narcotics Trafficking
555 4th Street, N.W., Room 4820
Washington, D.C. 20530
(202) 353-8055; Fax: 514-8707

CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that I served a copy of the foregoing by ECF upon counsel for the defendant, this 27th day of December, 2005.

                                          _____
                                          John V. Geise