## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Case No. 05-CR-386(1) (ESH)** |
| | : | |
| **ANTOINE JONES** | : | |

### DEFENDANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED FROM INTERCEPTION OF WIRE COMMINICATIONS AND SEIZURE OF ELECTRONIC COMMUNICATIONS; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEROF

DEFENDANT Antoine Jones ("Jones"), by and through undersigned counsel, and

pursuant to 18 U.S.C. § 2518(10), Rule 12(b)(3)(c) of the Federal Rules of Criminal Procedure,

and the Fourth Amendment to the United States Constitution, hereby respectfully moves the

Honorable Court to suppress the contents of all intercepted wire communications and seized

electronic communications, and all evidence derived from them.  Pursuant to Franks v.

Delaware, 438 U.S. 154 (1978), Jones requests a hearing on this motion.

In support of this motion, Jones states as follows:

### I.    STATEMENT OF FACTS

#### A.    Text Message Warrant Application

On August 10, 2005, the Government, through Federal Bureau of Investigation

("FBI") Special Agent Stephanie Yanta ("Yanta"), sought an Order from the Honorable Alan

Kay for authorization to search and seize text messages held in storage by Sprint Spectrum LP

for cellular telephone number (301) 613-6293 subscribed to in the name of Lawrence Maynard;

and to search and seize text messages held in storage by Cingular Wireless for cellular telephone

number (202) 538-3946 subscribed to in the name of Denise Jones.[1]  Based upon Agent Yanta's

Affidavit dated August 10, 2005 ("August 10 Affidavit"; attached as Exhibit 1), Magistrate

Judge Kay issued a warrant for the search and seizure of "text messages in electronic storage that

were sent to and from cellular telephone assigned to the number (301) 613-6293, Electronic

Serial Number 2D4A0A90."[2]

On August 18, 2005, Agent Yanta once again sought a warrant from Magistrate

Judge Kay seeking the same information.  (see "August 18 Affidavit"; attached as Exhibit 2).

Agent Yanta notes in the August 18 Affidavit that as a result of the first warrant, Sprint

Spectrum LP provided the government with 180 text messages from cellular telephone number

(301) 613-6293 (Maynard).  (see Exhibit 5 (Sprint text messages)).  She further notes that

Cingular Wireless had not yet returned the requested text messages for (202) 538-3946 (Jones).

(see August 18 Affidavit at 28-29).[3]  Sometime after Agent Yanta sought the warrants, Cingular

Wireless also disclosed approximately forty-six pages of text messages to and from (202) 538-

3946 (Jones).  (see Exhibit 6).

**B.    Wire Intercept Applications**

On September 2, 2005, Agent Yanta submitted an affidavit ("September 2

Wiretap Affidavit"; attached as Exhibit 3) in support of an order from the Honorable Paul L.

Friedman for authorization to intercept communications occurring to and from the cellular

---

1 According to the August 10, 2005 Affidavit, Agent Yanta believed that Jones had used and was continuing to use the cellular telephone subscribed to by his wife, Denise Jones.

2 Counsel has reviewed the discovery provided by the government and cannot locate signed a warrant issued for the text messages held by Cingular Wireless.  Counsel has been able to locate an unsigned warrant for same.  (see Exhibit 7).  Counsel has requested that the government provide executed copies of all affidavits and warrants related to this case.  In the event that no warrant was issued with respect to Cingular Wireless, Jones reserves the right to move to suppress the relevant text messages.

3 Again, counsel has reviewed the discovery provided thus far and has not been able to locate warrants signed by Magistrate Judge Kay as a result of the second application on August 18, 2005.  Again, Jones reserves the right to move to suppress the relevant interceptions in the event that no warrant was issued.

telephone number (202) 538-3946, used by Jones (hereinafter "Jones Wiretap").  On that same

day, Judge Friedman granted the Order for wiretap interception for a period of thirty days.  On

September 30, 2005, Agent Yanta submitted another affidavit requesting an extension of the

Jones Wiretap ("September 30 Wiretap Affidavit"; attached as Exhibit 4).  The Jones Wiretap

was continued by extension Orders for another thirty days.[4]

Jones moves to suppress all evidence obtained by the government as a result of

the warrants obtained via the August 10 Affidavit; the August 18 Affidavit; the September 2

Wiretap Affidavit and the September 30 Wiretap affidavit on the grounds that the affidavits on

their face did not meet the requirement of necessity for the issuance of a warrant to seize either

the text messages or to intercept wire communications; that Agent Yanta intentionally misled the

approving court and demonstrated a reckless disregard for the truth in omitting certain unhelpful

facts while touting other facts for the sole purpose of falsely enhancing the showing of probably

cause and misleading the approving court into approving the interceptions; and that the

government failed to minimize the intercepted wire communications.

## II.    ARGUMENT

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §

510 et seq., authorizes the district court to approve an application for the interception of certain

wire, oral, or electronic communications.  See 18 U.S.C. § 2518.  The wiretap statute requires

that an application for a wiretap shall be in writing, under oath, and shall contain certain

information including "a full and complete statement of the facts and circumstances relied upon

---

4 The September 30 Wiretap Affidavit sought the interception of wire communications to and from cellular
telephone number (202) 746-0470, also in subscribed to in the name of Denise Jones.  According to the September
30 Wiretap Affidavit, Jones changed his cellular telephone number on September 10, 2006.

by the applicant[ ] to justify his belief that an order should be issued." Id. § 2518(1).   On the basis of the facts submitted by the applicant, the district court may authorize a wiretap upon finding that (1) probable cause exists to believe that an individual has committed or is about to commit one of certain enumerated offenses;  (2) probable cause exists to believe that "particular communications concerning that offense will be obtained" through an interception;  (3) "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried";  and (4) probable cause exists to believe that the communication facility sought to be wiretapped "[is] being used, or [is] about to be used, in connection with the commission of [the] offense." Id. § 2518(3)(a-d);  see United States v. Donovan, 429 U.S. 413, 435 (1977).

The determination that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous," 18 U.S.C. §  2518(3)(c), is referred to as the "necessity requirement," and it is the "keystone of congressional regulation of electronic eavesdropping."  United States v. Williams, 580 F.2d 578, 587-588 (D.C. Cir. 1978).

Section 2518(10)(a) of Title 18, United States Code, permits any "aggrieved person" to move to suppress evidence derived from electronic surveillance. The definition of an aggrieved person in Section 2510(11) is: "a person who was a party to any intercepted wire, oral or electronic communication or a person against whom the interception was directed," and is also a definition of standing for purposes of Title III.  United States v. Bellosi,  501 F.2d 833, 841-42 (1974).  Section 2518(10) (a) provides that the aggrieved person may move to suppress the contents of any intercepted wire or oral communication, or evidence derived there from, on the grounds that "the communication was unlawfully intercepted"; "the order of authorization or approval under which it was intercepted is insufficient on its face"; or "the interception was not

4

made in conformity with the order of authorization or approval". 18 USC § 2518(10).

Additionally, although there is a presumption of validity with respect to the affidavit supporting search warrants, to obtain an evidentiary hearing on a motion to suppress, a defendant must allege deliberate falsehood or reckless disregard for the truth. See Franks v. Delaware, 438 U.S. 154, 171 (1978). They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. If these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Id.

In the present case, the government seized text messages to and from (202) 538-3946 (Jones) and (301) 613-6293 (Maynard). Therefore, the text messages constitute electronic communications for the purpose of the statute and are subject to suppression. The government further intercepted wire communications to and from Jones' numbers. Consequently, he is an aggrieved party with standing to move to suppress the seized communications and the evidence derived from the seizure. Further, many courts have extended standing to include anyone implicated by information obtained from tapes or electronic surveillance as having an apparent additional right to suppress the implicating information. See United States v. Gambals, 610 F. Supp. 1515, 1521 ( D. Mass, 1985). See generally, James Carr, The Law of Electronic Surveillance, 2nd Edition, (Clark Boardman Company, N.Y. 1996), Vol. 2, Section 6.2 (b) (4). On these grounds, Jones also has standing to challenge the seizure of text messages from Maynard's cellular telephone that relate to Jones, see Alderman v. United States, 394 U.S. 165 (1969); United States v. Williams, 580 F. 2d 578 (D.C. Cir. 1978), cert denied, 439 U.S. 832

(1979) and all evidence derived from the seizures.

> ### A.    The Fourth Amendment's Prohibition Against Unreasonable Searches and Seizures Applies to Interception of Electronic Communication.

In Berger v. New York, 388 U.S. 41 (1967), the Court struck down a statute authorizing eavesdropping of wire and telecommunications as a violation of the Fourth and Fourteenth Amendments to the United States Constitution. That statute permitted issuance of a warrant for eavesdropping upon oath "that there is reasonable ground to believe that evidence of crime may be thus obtained..." The court held: "the broad sweep of the statute is immediately observable and such a requirement raises a serious probable cause question under the Fourth Amendment." Id. at 54, 55. As the court stated:

> Where the facts and circumstances within the affiant's knowledge, and of which he has reasonably trustworthy information, are sufficient unto themselves to warrant a man of reasonable caution to believe that an offense has been or is being committed...The need for particularity and evidence of reliability in the showing required when judicial authorization is sought is especially great in the case of eavesdropping. By its very nature eavesdropping involves an intrusion on privacy that is broad in scope.

Id. at 55, 56.

The court thus condemned the New York statute as constituting little more than a general warrant to seize any and all conversations of the named persons whose communications were to be intercepted and established. Consequently, the probable cause standard for seizing telephone conversations is high for Fourth Amendment purposes. In this regard, 18 U.S.C.§ 2516 (b) more particularly states the probable cause requirement as:

> a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including details as to the particular offense that has been, is being, or is about to be committed . . . .

Further, the statutory requirement of probable cause in the application for the wiretap also

6

requires as part of the Fourth Amendment protection against seizures that each application must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c).

It is clear that the failure to meet these requirements under the Fourth Amendment, as more particularly set forth in 18 U.S.C. § 2518(1)(c) and 3(c), if not fully established by the Government's affidavit and application for an order, is a failure to establish probable cause vitiating any order of approval. Jones submits that normal investigatory procedures were producing results, that the techniques had not been exhausted, and that Agent Yanta's conclusion at page 51, paragraph 93 of the September 2 Wiretap Affidavit that "normal investigative procedures have been tried and have failed, [and] appear reasonably unlikely to succeed if tried or continued, or are too dangerous to employ in this investigation to date" is unsupported by the affidavit itself, which details that the procedures were producing results and had not grounded to a halt such that the statutory requirements for probable cause for issuance of the wiretap order were not met.

**B.    The Government's Failure to Show Normal
Investigating Procedures Have Been Exhausted as Part
of Probable Cause Showing to Support Issuance of the
Warrants Renders Them Unconstitutional;
additionally, Agent Yanta intentionally misled the court
and demonstrated a reckless disregard for the truth in
setting forth the factual allegations of the affidavits**

Each application for an order authorizing interception of oral or wire

communications requires an independent showing of probable cause.  See 18 U.S.C. § 2518(1).

Any evidence gathered pursuant to prior unlawful government conduct cannot serve as probable

cause to support extensions of previously unlawful interceptions.  See United States v. Giordano,

416 U.S. 505 (1974).  Consequently, any subsequent authorization and all subsequent extensions

are invalid since they incorporated and were based on the first affidavit.

**1.    August 10, 2005 Affidavit**

Agent Yanta's August 10, 2005, Affidavit indicates that the government had used

the following as investigative techniques:

**a.    oral and written law enforcement reports
regarding this and other investigations**

The August 10 Affidavit is devoid of mention of any evidence that was obtained

from oral or written law enforcement reports regarding the instant or other investigations.

**b.    physical surveillance**

The August 10 Affidavit touts the supposedly suspicious activity observed outside

the Levels Nightclub ("Levels") beginning in the fall of 2004.  The activity includes:

i)      Maynard and Jones opening the door to Levels with a key (See August 10

        Affidavit at 21) – Agent Yanta intentionally misleads the court and shows

        a reckless disregard for the truth by minimizing the fact that Maynard was

        the manager of Levels.  Thus, his presence at the club and possession of a

club key is not at all indicative of criminality. Of course, Jones himself was known to be the owner of the club and his presence there again is also not indicative of criminality.

ii)     <u>A number of known and unknown vehicles coming and going to Levels during daytime hours when Levels was not open for business</u> (<u>See</u> August 10 Affidavit at 21) – again, Yanta intentionally and knowingly misled the court and had a reckless disregard for the truth because she failed to state that there were at least two restaurants (one next door and one inside) in Level's vicinity that drew many patrons during hours that the club was closed. Additionally, as an ongoing business, Levels often received deliveries from various vendors who usually made these deliveries during Levels' off-hours. Thus, that there were "known and unknown" vehicles coming to and from Levels is not indicative of criminality.

iii)     <u>Substantial foot traffic into and out of Levels during daytime hours</u> (<u>See</u> August 10 Affidavit) – once again, Agent Yanta cherry picks facts out of context to make certain conduct appear illegal. As described above, there were two restaurants operating in the immediate vicinity of Levels. The August 10 Affidavit further describes the foot traffic as "consists of both men and women, and occasionally small children, entering and exiting the establishment, often carrying over-the-shoulder bags, shopping bags, diaper bags, and backpacks." (<u>See</u> Id. at 21).

iv)     <u>Nicholas Jones going into and coming out of Levels on several occasions during hours when the business is purportedly closed</u> (<u>See</u> August 10

9

Affidavit at 22) – again, Agent Yanta intentionally misleads the court by minimizing certain facts and maximizing others to make it appear that suspicious activity is taking place. Nicholas Jones' presence during the off-hours is not suspicious in the least. The Affidavit recklessly states that according to information on file with the District of Columbia Alcoholic Beverages Regulatory Agency, Nicholas Jones had no known business relationship to Levels. This statement is misleading because Nicholas Jones did not have to be registered with that agency if his involvement with Levels did not involve alcohol. In fact, had the government done minimal investigation it could easily have found out that Nicholas Jones worked at Levels. The Affidavit further points out that Nicholas Jones' vehicles were seen outside the club, a fact that is not at all out of the ordinary since he worked there. Finally, the Affidavit notes that Nicholas Jones was known to CS-1 (discussed, <u>infra</u>) to sell both heroin and cocaine. This information is completely irrelevant to the issue of probable cause and misleading to the court because the government had no evidence that Nicholas Jones and Antoine Jones were engaged in any type of illegal activity.

v)  <u>Adrian Jackson's vehicles seen at Levels several times</u> (<u>See</u> August 10 Affidavit at 24-25) – Agent Yanta intentionally misleads the court and displays a reckless disregard for the truth by failing to mention that Adrian Jackson was an owner/manager of Levels and the presence of his vehicles outside Levels was not indicative of drug activity.

vi)   <u>Jeep Cherokee registered to Denise Jones present at Levels</u> – again, this information is at best superfluous given that Jones used this vehicle and was the owner of Levels.  Jones' presence there is indicative of nothing to inform probable cause.

Notwithstanding this bounty of evidence gathered from surveillance, there were other surveillance that the government could have performed to gather additional evidence regarding members of the alleged conspiracy and its workings.  For example, rather than limiting its surveillance only to the exterior of Levels, the government could have conducted surveillance inside Levels by introducing cooperators or undercover officers into the club itself.  The August 10 Affidavit is devoid of any mention this.  Considering that Levels was a business open to the public, it would have been very easy for the government to send in cooperating individual, special employee, undercover officer or any other personnel to gather evidence inside Levels.  Additionally, the government failed to conduct any surveillance at the homes of Jones or Maynard or surveillance of any of their known associates.

### c.   review of dialed number recorder date (pen registers)

In an attempt bolster weak facts, the August 10 Affidavit states that from January 20, 2005 until July 29, 2005, Maynard's cellular telephone (301) 613-6293 had a total of 17,908 activations.[5]  Agent Yanta goes on to make a baseless allegation that "based on the affiant's experience and training, even after accounting for calls to friends and family, the volume of calls is consistent with the use of a cellular telephone to facilitate narcotics trafficking."  (August 10 Affidavit at 23).  Agent Yanta's assertions are intentionally misleading and reckless.  First, the

---

5 In January 2005, Agent Yanta obtained a pen register on 301-613-9263 (Maynard's cellular telephone).  She then obtained a pen register on Jones' phone (202-538-3946) in June 2005.

total number of "activations" includes calls hang-ups, dropped calls, calls to voice mail and other

non-conversational calls.  There is no information provided by Agent Yanta as to how many of

these activations actually resulted in some communication between Maynard and others.

Second, even if the total activations resulted in actual communications, the period described

covers 190 days, resulting in an average of 94 activations per day.  Basic investigation by the

government (including information available to its informants) would have informed it that

Maynard used his cell phone for business as well as personal calls.  Thus, the large number of

activations is not indicative of any illegal activity.

      Specifically, the August 10 Affidavit states that during relevant period (January

20, 2005 to July 29, 2005) there were:

    i.    <u>a total of 225 activations between Maynard's number (301) 613-6293 and</u>

        <u>Level's number (202) 269-0100</u> (<u>See</u> August 10 Affidavit at 23) – there is

        nothing unusual about this given that Maynard worked at Levels as a

        manager.  In any event, this amounts to a little over 1 call per day.  Again

        though, there is no information presented about how many of these were

        actual calls.

    ii.    <u>were a total of 1,477 activations between Maynard's and Jones' cellular</u>

        <u>telephones</u> (<u>See</u> August 10 Affidavit at 24) – again, there is no information

        as to how many of these calls actually were completed nor, more

        specifically, how many activations Jones' telephone had in total.

        Furthermore, even taking the total at face value, it only averages about 7.7

        calls per day between Jones and Maynard, who had an employer-

        employee relationship and were also personal friends.

iii.  <u>a total of 593 activations between Maynard's cellular telephone and Adrian Jackson's telephone (202-426-0020)</u> (<u>See</u> August 10 Affidavit at 24) – this averages to less than three calls per day between Maynard and Jackson, another Levels owner/manager.

iv.  <u>a total of 147 activations between Jones' and Jackson's telephones</u> (<u>See</u> August 10 Affidavit at 25) – Jones and Jackson were business partners and often talked on the telephone. Communications between the two are not unusual and do not inform probable cause.

v.  <u>a total of 68 activations between Jones and Donald Hunter and 22 activations between Maynard and Donald Hunter</u> (<u>See</u> August 10 Affidavit at 25) – Hunter was a sometime employee of Levels and these scant communications between the three men raise no specific inferences.

vi.  <u>Two activations between Jones and a number in Jamaica; two activations between Jones and a number in Texas</u> – out of the thousands of activations involving Jones' telephone, four calls hardly make out probable cause. Furthermore, the August 10 Affidavit fails to state how long these activations lasted or in any other manner indicate whether any communication actually took place.

> **d.  review of vehicle registration records and licenses**

The only information provided by the August 10 Affidavit regarding vehicle registrations involve the revelation that Jones', Nicholas Jones', and Adrian Jackson's vehicles were seen at Levels. Again, each of these men had a connection to Levels and the presence of their vehicles there does not inform probable cause.

e.    review of criminal history records

The August 10 Affidavit states that Jones' last conviction occurred in 1994 and that Maynard had no convictions. The only other mention of prior criminal history related to Donald Hunter and Adrian Jackson. Their histories have nothing to do whether there existed probable cause that Jones and Maynard were involved in criminal activity.

f.    debriefing of confidential informants.

From the face of the August 10 Affidavit it is evident that various cooperating individuals, CS-1, CS-2 and CS-3 provided information to the government. CS-1 and CS-2 claimed to have purchased cocaine from Jones in the past. At some point CS-1 was arrested and charged with narcotics offenses. Agent Yanta states in the August 10 Affidavit that Jones was somehow aware of the arrest and rebuffed CS-1 when he made an attempt to reestablish contact with Jones in the hopes of engaging in a controlled drug buy. (See August 10 Affidavit at 12 n.2). CS-1 claims to have had a drug relationship with Jones from the summer of 2003 until the fall of 2004.

CS-2 apparently also was arrested and charged with narcotics offenses. In fact, he was arrested in 2004 "with a large wholesale quantity of cocaine that CS-2 had recently purchased from Jones." (Id. at 14-15). However, there is no mention in the August 10 Affidavit that Jones was aware of CS-2's arrest, thereby preventing the use of CS-2 to make controlled buys from Jones. Thus, the government could have used the services of CS-2 to make further purchases from Jones or made efforts to maker larger purchases requiring meeting the source of supply or at least, identification of higher echelon individuals. As an experienced drug dealer, CS-2 would have had the experience for doing so. This is supported by the fact that the August 10 Affidavit states that CS-2 bought kilogram quantities of cocaine from Jones approximately

ten times between 2003 and 2004. Additionally, CS-2 had clearly gained Jones' trust in that Jones allegedly fronted CS-2 at least $120,000 worth of cocaine. (See August 10 Affidavit at 15).

CS-3 told the government that it had heard from Anthony Koonce that Koonce was buying large quantities of cocaine from the owner of Levels. The August 10 Affidavit fails to mention whether CS-3 ever purchased narcotics from Koonce or whether any attempt was made to buy directly from Jones. Additionally, the affidavit fails to state whether CS-3 ever even attempted to purchase drugs from Jones.

In fact, the August 10 Affidavit is devoid of any facts indicating that the government sought to make any undercover buys. There is scant support for the claim that the efforts were unsuccessful to work up the ladder, if that was the purpose of seeking the wiretap. There were no efforts to try and learn the sources through further surveillance or undercover purchases. Thus, based on the allegations contained in the August 10 Affidavit, the government has failed to demonstrate that normal investigative procedures had been tried and failed. Rather, the government sought to short-circuit normal investigation and went right for the most intrusive methods without the requisite showing of necessity for such warrants.

### 2. August 18 Affidavit

The August 18 Affidavit executed by Agent Yanta is for the most part a word-for-word rehashing of the August 10 Affidavit. The only new information provided in the August 18 Affidavit is that pen-register data disclosed that Jones telephone received two calls from a number in Uzbekistan (998-885-3310). These two calls lasted a total of zero and nine seconds respectively. The August 18 Affidavit further states that the same Uzbekistan number called Maynard's telephone for a period of almost seven-and-one-half minutes. Agent Yanta

misleadingly states that Uzbekistan is a major exporter of poppy, from which opium and heroin

is derived.  What that information has to do with Jones' alleged cocaine business is anybody's

guess.

        Finally, the August 18 Affidavit states that Maynard's telephone received three

text messages stating: "I need ice 4my beer," "2 cokes & Malibu, pls. Ka[$]h Money," and

"working with a monster."  Agent Yanta explains that in her training and experience narcotics

dealers are known to use innocuous terms to refer to narcotics and narcotics transactions. (Id. at

28).  Agent Yanta is deliberately misleading in mentioning these text messages without further

context.  The first two texts are from a Levels employee requesting supplies for the club.  The

third text message, when read in the context of other messages, is clearly sexual in nature. (see

discussion of text messages, infra).

        Based on the allegations contained in the August 18 Affidavit, which rehashes the

allegations contained in the August 10 Affidavit, the government again failed to demonstrate that

normal investigative procedures had been tried and failed and failed to show the requisite

showing of necessity for such warrants.  Additionally, her misleading and reckless assertions

were necessary for a finding of probable cause.

        **3.**      **the September 2 Wiretap Affidavit**

        Agent Yanta's September 2 Wiretap Affidavit is generally a rehashing of the

allegations contained in the August 10 and August 18 Affidavits and indicates that the

government had used the following as investigative techniques:

a.     <strong><u>oral and written law enforcement reports<br>regarding this and other investigations</u></strong>

The September 2 Wiretap Affidavit is devoid of any facts to support probable cause that were obtained from oral or written law enforcement reports regarding the instant or other investigations.

b.     <strong><u>physical surveillance</u></strong>

The September 2 Wiretap Affidavit presents an identical recitation of activity observed at Levels. The only exception is that it mentions that another vehicle associated with Nicholas Jones was seen there as well as a vehicle associated with Carolynette Waddell. Agent Yanta is again misleading in the presentation of facts because she fails to mention that Waddell was a Levels employee and thus her presence there is of no moment and surely not indicative of illegal activity.

From August 10, 2005, the date of the first Affidavit, until September 2, 2005, it appears that the government failed to attempt any of the normal means of investigation, such as surveillance inside Levels or surveillance of the targets' homes or workplaces to try to gather evidence of illegal activity.

c.     <strong><u>review of dialed number recorder data<br>(pen registers)</u></strong>

This section of the September 2 Wiretap Affidavit is also an identical recital of the earlier affidavits, with few exceptions. The differences were:

i.     <u>an additional 12 activations between Maynard's number (301) 613-6293 and Level's number (202) 269-0100</u>

ii.     <u>a total of 7,452 activations on Jones' telephone</u> – this includes numerous activations between Jones' telephone and one associated with Kirk Carter.

17

Agent Yanta misleadingly notes Carter's past criminal record but fails to state the relevance of those calls.  (See § II(b)(1)(c)).

iii.    an additional 549 calls between Jones and Maynard from the beginning of June 2005 until August 18, 2005 – again, Agent Yanta intentionally misleads when she fails to note that Jones and Maynard have a legitimate business and personal relationship, not just an alleged drug connection.

iv.    a total of 200 activations between Jones' and Adrian Jackson's telephones – again, Agent Yanta intentionally misleads by failing to note Jones' and Jackson's business and personal relationship that explains the calls between the two men.

v.    an additional 43 activations between Maynard's cellular telephone and Adrian Jackson's telephone - Agent Yanta intentionally misleads by failing to note Maynard's and Jackson's business and personal relationship that explains the calls between the two men.

vi.    a total of 147 activations between Jones' and Jackson's telephones – Jones and Jackson were business partners and often talked on the telephone. Communications between the two are not unusual and do not inform probable cause.

vii.    an additional 12 activations between Jones' telephone and Donald Hunter's telephone

viii.    a total of 96 activations between Diane Bushrod's telephone and Jones' telephone and 5 activations between Bushrod's telephone and Maynard's telephone – Agent Yanta plants another red herring by mentioning

18

Bushrod's past criminal history and misleads yet again by failing to state

that Bushrod was a promoter of events at Levels. Thus, the relatively

small number of calls involving her hardly inform probable cause.

The listing of these new and additional activations is of no moment given the

entirely innocuous nature of the contacts. Agent Yanta deliberately provided misleading

information by cherry-picking information and stating certain facts out without context.

### d.    review of vehicle registration records and licenses

The September 2, Wiretap Affidavit does not state any new information relating

to this topic and it appears that between August 10 and September 2, the government stopped

conducting normal investigative techniques.

### e.    review of criminal history records

With the exception of mentioning the criminal histories of some of the listed

targets of the interceptions, the September 2 Wiretap Affidavit does not add any new information

to the prior affidavits' allegations nor explains how these criminal histories relate to Jones and

his alleged activities.

### f.    debriefing of confidential informants

The September 2 Wiretap Affidavit provides scant new information from CS-1.

In particular it states that Donald Hunter told CS-1 that Hunter had purchased a "half a brick" of

cocaine from Jones and that Hunter encouraged CS-1 to get back in the game and buy drugs

from Jones and even offered to be a middleman between CS-1 and Jones. Agent Yanta claims

that it would have been impossible for CS-1 to buy from Jones because of Hunter's and CS-1's

shared customer base. (See September 2 Wiretap Affidavit at 21 n.4). This explanation fails

because CS-1 could easily have made a controlled purchase of drugs from Jones via Hunter. CS-

1 could then just as easily could have claimed to sell the narcotics to "new" customers unknown

to Hunter.  This was a golden opportunity for the government to make controlled buys from

Jones, yet it failed to so in favor of seeking the more expedient wiretap.

### g.     text messages

Having obtained a warrant for Jones' and Maynard's text messages, Agent Yanta

mentions several of them in the September 2 Wiretap Affidavit and remarks on their

"suspicious" nature.  Agent Yanta is misleading in that she pulls several messages out of context

and fails to mention that the large portion of Maynard's text messages are of a sexual nature.

For example, Agent Yanta notes a text message from Maynard to number (301) 536-0913 on

August 5, 2005, that stated "My man is working with a big monster –back up working with a

monster."  (Id. at 26).  Agent Yanta fails to note, however, that this message includes a "smiley

face" at the end depicted as "):-)" and that other messages between Maynard number and that

same number include: "thank you baby . . . You're a very good lover," (August 4, 2005, at

21:57:57); "how are you feeling?" (August 4, 2005, at 22:26:27); "You enjoy being teased and

pleased" (August 5, 2005, at 06:07:49); "No is-your-wife a good --- [thank you baby . . . You're

a very good lov[er]" (August 5, 2005, at 06:10:13).  (See Exhibit 5; Maynard's text messages).

As further evidence of drug activity, Agent Yanta further notes another series of

messages between Maynard's telephone and number (301) 379-4141, purportedly registered to

Wallace Ward.  For example, on August 4, 2005, Maynard allegedly sent a text message to

Wallace Ward again stating "My man is back up working with a monster."  (September 2

Wiretap Affidavit at 25).  Agent Yanta misleads once again because that particular message

actually states "Back up working with a monster ):-)" with a smiley face and makes no mention

of "my man." (See Exhibit 5; August 4, 2005, at 22:27:58.  Additionally, other messages

between the two numbers at around the same time include: "I'm sleepy," (August 4, 2005, at 22:48:10); "That's why you should come let me finish you off" (August 4, 2005, at 23:09:27); "so you can sleep well" (August 4, 2005, at 23:11:26) and "kisses." (August 5, 2005, at 00:46:47).

      Had the government bothered to perform basic surveillance, it would have discovered that Wallace Ward is a tall, large male and that Maynard was most likely not having a "text message" romance with him.  In fact, a cursory review of the text messages involving Maynard around the same time as the messages highlighted by Agent Yanta clearly indicates that Maynard was engaged in sexually-related texting with various women and not engaging in narcotics related coded messages.  For example, "Love you baby :-D" (August 5, 2005, at 08:16:13; the character ":-D" is related to a smiley face except that it is a face with a tongue sticking out); "Morning honey!  I just woke up, I had a gooood dream about us.  Now I'm wet and hot."  (August 5, 2005; at 08:16:55); "Hmmmm . . . let me taste" (August 5, 2005, at 08:18:41); "Lick it, Lick it Good" (August 5, 2005; at 08:55:28); and "My clit is throbbing, i need u" (August 5, 2005, at 14:01:43).  It is a wonder that Agent Yanta did not try to allege that these messages were also coded narcotics conversations.

      **h.**     **other investigative techniques**

      Besides cursorily stating that normal investigatory procedures will be or have been unsuccessful or will be too dangerous to employ, Agent Yanta fails to adequately describe why this is so.  She merely states that "the interception of wire communications is the only available investigative technique which has a reasonable likelihood of revealing and securing admissible evidence" against Jones and the target subjects.  (September 2 Wiretap Affidavit at 51).  She further states that "[n]ormal investigative techniques have been tried and have failed,

appear reasonably unlikely to success if tried or continued, or are too dangerous to employ in this investigation to date . . . ." (Id.).  Her explanations are baldly conclusory and insufficient. See United States v. Spagnuolo, 549 F.2d 705 (9th Cir. 1979); United States v. Lilla, 699 F.2d 99 (2nd Cir. 1983);  United States v. Mondragon, 52 F.3d 291 (10th Cir. 1995).

Agent Yanta notes that physical surveillance had been tried and was of limited success.  However, as stated previously, the government never attempted to perform surveillance inside the Levels nightclub, an easy enough task given that the club was open to the public. Furthermore, the government apparently never attempted to perform surveillance of the homes or employment sites of the targets.  Agent Yanta also notes that "prolonged or regular surveillance of the movement of the suspects would most likely be noticed" – yet, she fails to note that surveillance of Levels began in the fall of 2004 and lasted until August 2005, without any apparent discovery by the targets.  Continued surveillance of the targets, including the use of pole cameras and roving surveillance, and the surveillance of homes and workplaces, would have provided the government with much more information about the movements of the targets and their associations, without the need to resort to electronic surveillance.

Agent Yanta notes that Jones was very secretive and that the government knew of "no source who is in a position to be able to purchase narcotics from Jones or to make an introduction of an undercover officer for that purpose."  (September 2 Wiretap Affidavit at 53). This assertion of secrecy is belied by the alleged fact that "CS-2 was present and observed the transaction in which the middleman purchased cocaine from [Jones] on behalf of CS-2."  (See August 10 Affidavit at 15; September 2 Affidavit at 33).  How secretive could Jones have really been if he is making a sale through a middleman in the presence of the ultimate buyer?

As discussed previously, both CS-1 and CS-2 were in positions to purchase narcotics from Jones. That that government chose not to use them for this purpose does not mean that electronic surveillance was needed to obtain further evidence.  Agent Yanta also cryptically states that "CS-2 and CS-3 are unavailable to law enforcement."  Presumably this means that CS-2 is detained.  However, as the court is well-aware, the government routinely requests the release of cooperators for investigative purposes, something that could have been done here. What the unavailability of CS-3 means is another matter considering that Agent Yanta states that CS-3 was released into the community after pleading guilty.  Finally, the government made no attempt to introduce an undercover officer or informant to any of the other targets in an attempt to get to Jones.

As for Agent Yanta's conclusions that search warrants would have been unproductive, would have tipped off the organization, that the warrants would not give the historical records and physical evidence sufficient to show the extent of the organization, or how proceeds are disposed of, part of this could have been accomplished through the grand jury, which the agent also did not adequately explain its non-use.  As the grand jury proceedings are secret, records of banks could have been obtained through non-disclosure subpoenas.  Witnesses could have been interviewed in the grand jury and while it might not have revealed each and every member of the conspiracy, coupled with search warrants and other records and surveillance would have done so.

For Agent Yanta to also argue that pen registers and the analysis of them were of no further use is also seen as a baseless and boilerplate statement. Her affidavit noted that the analysis was providing investigative leads and intelligence, producing contact numbers and was useful in identifying alleged co-conspirators.  The complaint was not that the method was not

providing information but that it was not producing "real time information." However, the method should have been exhausted, as required by the necessity showing for a wiretap, to verify that all of the members of the alleged conspiracy could not be identified. These leads from the pen registers had not been exhausted by physical surveillance. All of the other techniques listed by the agent continued to produce results and appear to have so overwhelmed the government with information that they could not fully utilize it. Thus, the government out of expediency rather than necessity sought to obtain the wiretap.

If one would simply state Agent Yanta' affidavit concisely, the investigation had been going for only a short period of time and had not reached an impasse with traditional law enforcement techniques. The results of these techniques continued to grow exponentially and had not been exhausted.

<strong>C.    The Government has failed to comply with its burden to establish that it has minimized interceptions as required by Title III.</strong>

Title III specifies that judicial orders contain specific provisions, including a requirement that the government minimize the interception of communications unrelated to the illegal activity specified in the application. See 18 U.S.C. § 2518(5); United States v. Killingsworth, 117 F.3d 1159, 1162 (10th Cir.), cert. denied, 522 U.S. 961 (1997). All wiretap orders are valid for no more than thirty days, but a court may extend its order upon an application for extension. An extension is granted only if the application meets all the same requirements demanded of the original application and the court makes all the same findings required for the initial order.

In the instant case, Agent Yanta has made intentional false statements and with a reckless disregard for the truth in her various affidavits, including that various communications between Jones and others were of a criminal nature, while ignoring that these persons had legitimate business reasons to communicate often with one another.  Since the government knew that conversation between Jones and others (including, but not limited to, Adrian Jackson and Lawrence Maynard) it had the obligation to minimize all conversations between them pertaining to their joint business ventures as well as social or other matters unrelated to a drug distribution conspiracy.

In <u>United States v. Wright</u> , 121 F. Supp2d 1344 ( D. Kansas 2000) the District Court summarized the law on minimization with regard to Title III:

> Pursuant to the minimization requirement, "[i]ntercepts must be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this c h a p t e r . . . . " <u>United States v. Earls, 42 F.3d 1321, 1325 (10th Cir.1994) (quoting 18 U.S.C. § 2518(5)),</u> cert. denied, <u>514 U.S. 1085, 115 S.Ct. 1800, 131 L.Ed.2d 727 (1995).</u>  This requirement does not mean the government must eliminate altogether the interception of non-pertinent calls.  <u>Scott v. United States, 436 U.S. 128, 140, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978).</u>  "The Supreme Court has held that this provision does not create an inflexible rule of l a w , b u t rather demands an evaluation of the facts and circumstances of each case. "  <u>United States v. Killingsworth, 117 F.3d at 1165</u> (quoting <u>Scott v. United States, 436 U.S. at 139-40, 98 S.Ct. 1717).</u>  The "[d]etermination of proper minimization is analyzed under a reasonableness standard." <u>Earls, 42 F.3d at 1325</u> (citing <u>Scott v. United States, 436 U.S. at 137, 139-40, 98 S.Ct. 1717).</u>  Specifically, the court examines "the reasonableness of the agent's efforts to refrain from monitoring conversations deemed nonpertinent to the investigation." <u>United States v. Willis, 890 F.2d 1099, 1101 (10th Cir.1989).</u>

<u>Id</u>. at 1348. In <u>Wright</u>, the Court noted that the Tenth Circuit established a procedure for determining the government's reasonable efforts to minimize monitoring. Of particular significance is that burden initially lies with the government:

The Tenth Circuit articulated in <u>Willis</u> the procedure for determining the

reasonableness of efforts made to avoid monitoring non-pertinent calls. The government initially makes a prima facie showing of reasonable minimization. If accomplished, the burden "shifts to the defendant to show more effective minimization could have taken place." 890 F.2d at 1102. Courts apply a similar shifting burden procedure in deciding whether to conduct an evidentiary hearing: "[w]here the government makes a prima facie showing of compliance with the statute, and defendant fails to overcome that showing by demonstrating that a substantial number of nonpertinent conversations [have] been intercepted unreasonably, courts generally will deny a minimization hearing." United States v. Pichardo, 1999 WL 649020, at *5 (quoting United States v. Cirillo, 499 F.2d 872, 881 (2nd Cir.), cert. denied, 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974)); see United States v. Parks, No. 95-CR-510, 1997 WL 136761, at *16 (N.D. Ill. Mar.24, 1997) (citing United States v. Angiulo, 847 F.2d 956, 980 (1st Cir.), cert. denied, 488 U.S. 928, 109 S.Ct. 314, 102 L.Ed.2d 332 (1988); United States v. Giacalone, 853 F.2d 470, 482-83 (6th Cir.), cert. denied, 488 U.S. 910, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988)), aff'd, 207 F.3d 910 (7th Cir.2000), petition for cert. filed, --- U.S.L.W. ---- (Jun. 19, 2000) (No. 99-10055).

United States v Wright, 121 F.Supp2d at 1348-1349. Jones submits that in the instant case the government must make a prima facie showing that minimization was complied with respecting conversations between Jones and others. If such a showing is made, Jones will then have an opportunity to rebut the showing and obtain a hearing on this issue.

## III.    CONCLUSION

Jones submits that the government's affidavits offered in support of surveillance of electronic and wire communications and purporting to show that "normal investigative procedures have been tried and have failed" was inadequate and did not meet the requirements of the statute. The explanations of why normal investigative procedures and alternatives were not available were conclusory; and, to the contrary, showed that normal investigatory methods were continually and successfully being implemented with significant results. Accordingly, the government's applications did not contain sufficient facts to satisfy 18 U.S.C. § 2518 (1)(c) and support the issuing court's § 2518(3)(c) findings. Additionally, Jones submits that Agent Yanta

intentionally misled the approving court and displayed a reckless regard for the truth by omitting

certain facts and noting others out of context to enhance the allegations, which were essential to

a finding of probable cause.

Based on the foregoing, Defendant Jones respectfully requests this Honorable

Court to enter an Order suppressing from use at trial all evidence that was obtained directly or

indirectly as a result of the unlawful interceptions.

Dated:  Washington, DC
       July 11, 2006                    Respectfully submitted,

**LAW OFFICE OF A. EDUARDO BALAREZO**


By: _____
      A. Eduardo Balarezo (Bar # 462659)
      400 Fifth Street, NW; Suite 300
      Washington, DC  20001
      (202) 639-0999

      *Counsel for Antoine Jones*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 12th day of July 2006, I caused a true and correct copy of the foregoing Defendant Jones' Motion to Suppress Evidence Obtained from Interception of Wire Communications and Seizure of Electronic Communications and Incorporated Memorandum of Points and Authorities in Support Thereof to be delivered to the parties in this matter via Electronic Case Filing (ECF).

_____
A. Eduardo Balarezo