unredacted

8/8/05

Text Messages appears

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

## AFFIDAVIT
### IN SUPPORT OF SEARCH WARRANTS FOR COMPUTER NETWORKS MAINTAINED BY ELECTRONIC COMMUNICATIONS SERVICE PROVIDERS SPRINT SPECTRUM LP, AND CINGULAR WIRELESS

I, Stephanie E. Yanta, Special Agent with the Federal Bureau of Investigation (FBI), Washington Field Office, Washington, D.C., (hereinafter affiant) being duly sworn, depose and state as follows:

This affidavit is being submitted in support of a search warrant for text messages presently held in storage by

1/ Electronic service provider **SPRINT SPECTRUM LP**, 6480 Sprint Parkway, Overland Kansas, 66251 for the cellular telephone which is subscribed to in the name of **LAWRENCE MAYNARD**, at 1960 Montana Avenue, Washington, D.C., and which is assigned the telephone number the telephone number **(301) 613-6293**, and the **Electronic Serial Number (ESN) 361321CC,** and

2 / Electronic service provider **CINGULAR WIRELESS**, P.O. Box 24679, West Palm Beach, Florida, 33416-4679 for the cellular telephone which is subscribed a cellular telephone subscribed to by **DENISE JONES, a.k.a. DENIECE JONES,** 12221 Brandywine Road, Brandywine, Maryland and assigned the telephone number **(202) 538-3946**, the **International Mobile Systems Identification Number (IMSI) 310380137358344**, and the **International Mobile Systems Identification Electronic Serial Number (IMSI/ESN) 010330005007579.**

# INTRODUCTION

I have been a Special Agent with the FBI since March 1998. I am currently assigned to the Safe Streets Task Force, which is tasked with the investigation of violent narcotics traffickers in the District of Columbia and elsewhere. I have previously participated in investigations that led to the arrest and conviction of narcotics dealers. Since 1998, I received training and experience in interviewing and interrogation techniques, arrest procedures, search and seizure, narcotics, white collar crimes, search warrant applications, and various other crimes. In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. In the course of conducting these investigations, your affiant has been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; conducting short-term and long-term undercover operations, including reverse undercover drug operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; conducting court-authorized electronic surveillance; and preparing and executing search warrants which have led to substantial seizures of narcotics, firearms and other contraband.

Through instruction and participation in investigations, your affiant has become familiar with the manner in which narcotics traffickers conduct their illegal business and the methods, language, and terms that are used to disguise conversations about their narcotics activities. From experience and training, your affiant has learned, among other things, that:(a) drug traffickers virtually never expressly refer to cocaine or other illegal drugs by name; instead to conceal the

2

true nature of their illegal activities and to thwart detection by law enforcement, they refer to the drugs and drug quantities using seemingly innocent terms; (b) narcotics traffickers frequently use electronic paging devices, commonly referred to as pagers or beepers, cellular telephones, digital telephones, and other communications devices to further their illegal activities by, among other things, remaining in constant or ready communication with one another without restricting either party to a particular telephone or location at which they might be the subject of physical surveillance by law enforcement authorities; and (c) narcotics traffickers frequently transmit pre-arranged numerical codes to pagers or telephones to identify themselves or to otherwise communicate information, such as price or quantity of drugs, to the person in possession of the pager.

Throughout this investigation, your affiant has worked with other Special Agents (SAs) of the FBI, and members of the Washington, D.C. Metropolitan Police Department (MPD) assigned to the Safe Streets Task Force. This affidavit is based on my personal knowledge derived from my participation in this investigation, as well as speaking with other law enforcement officers assigned to this investigation, and includes, but is not limited to, the following information: (a) oral and written law enforcement reports regarding this and other related investigations; (b) physical surveillance; (c) review of dialed number recorder data (pen register records) and telephone toll records; (d) review of vehicle registration records and licenses; (e) review of criminal history records; and (f) debriefings of confidential informants.

Based on the affiant's investigation and for the reasons that are set forth herein, there is probable cause to believe that the **LAWRENCE MAYNARD** has used, and is continuing to use the telephone which is presently assigned the cellular telephone number **(301) 613-6293**, and that

**ANTOINE JONES** has used, and is continuing to use the cellular telephone subscribed to by **DENISE JONES, a.k.a. DENIECE JONES**, 12221 Brandywine Road, Brandywine, Maryland and assigned the telephone number **(202) 538-3946** in connection with the above offenses. Your affiant knows that **DENISE JONES, a.k.a. DENIECE JONES**, the subscriber to the cellular telephone **(202) 538-3946**, is the wife of **ANTOINE JONES**. Additionally, there is probable cause to believe that evidence of such criminal communications will be obtained through review of previously sent electronic communications in the form of text messages that were sent to and from those telephones.

I have participated in the investigation of the offenses set forth in this affidavit. As a result of my participation in this investigation, and through interviews with other law enforcement agents and analyses of reports submitted by other special agents of the FBI and officers of the MPD, I am familiar with all aspects of this investigation. On the basis of this familiarity, and on the basis of other information which I have reviewed and determined to be reliable, I allege the facts to show that:

(a) there is probable cause to believe that the **LAWRENCE MAYNARD, ANTOINE JONES** and others have committed violations of (i) possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1), and conspiracy to commit such offenses, in violation of 21 U.S.C. § 846; (ii) use of communication facilities to facilitate the commission of the above offenses involving controlled substances, in violation of 21 U.S.C. § 843(b); and (iii) the laundering of proceeds of specified unlawful activity, to wit, possession with intent to distribute and distribution of controlled substances, in violation of 18 U.S.C. § 1956 & 1957;

4

(b)  there is probable cause to believe that electronic communications, specifically text messages sent  to and from the cellular telephones assigned the telephone numbers **(301) 613-6293** and  **(202) 538-3946** contain information concerning the  specifics of the above offenses, including:  (i) the nature and extent of the narcotics trafficking and other illegal activities of the individuals identified herein during the commission of the aforementioned offenses; (ii) the methods of operation and procedures of the individuals identified herein during the commission of the aforementioned offenses, including but not limited to the means and manner by which individuals are obtaining and redistributing large quantities of cocaine in various locations in the United States; (iii) the identities and roles of participants in the illegal activities, including accomplices, aiders and abettors, co-conspirators and other participants in their illegal activities; (iv) the source of the controlled substances, primarily cocaine; (v) the manner in which these illegal activities are being conducted, including the methods of distribution and possession of said controlled substances and transfer of the contraband and money involved in those activities; (vi) other locations utilized in furtherance of these illegal activities; (vii) the methods of operation of laundering proceeds of illegal drug sales; (viii) the existence and location of records; (ix) the location and source of the resources used to finance their illegal activities; (x) the location and disposition of the proceeds from those activities; and (xi) the locations and items used in furtherance of those activities.  In addition, there is probable cause to believe these electronic communications will constitute admissible evidence of the above-described offenses.

**LAWRENCE MAYNARD** was born on August 21, 1961.  He is described as approximately 6'2" tall and 240 pounds, with a Social Security Number of 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. **MAYNARD** resides at 7711 Greanleaf Road, Hyattsville, Maryland.  A search of FBI criminal

history records for **MAYNARD** (FBI #512598TA1) revealed the following:  1993, District of Columbia, Distribution of Cocaine, found not guilty.

**ANTOINE JONES, a/k/a ANTONIO JONES, a/k/a/ "TOINE"** was born on February 25, 1960.  He is described as 6'2" tall and approximately 220 pounds, with a Social Security Number of 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.  **JONES** resides at 10870 Moore Street, Waldorf, Maryland, with a second address of 12221 Brandywine Road, Brandywine, Maryland.  A search of FBI criminal history records for **JONES** (FBI# 901461KA2) revealed the following: 1994, District of Columbia, Conspiracy to Distribute 50 Grams or More of Cocaine Base, Possession with Intent to Distribute 50 Grams or More of Cocaine Base, and Possession with Intent to Distribute Cocaine, guilty, sentenced to ten years' imprisonment, placed on supervised release until April 25, 2007; 1989, District of Columbia, Carrying a Pistol Without a License and Disorderly Conduct, dismissed; 1991, Arlington, Virginia, Selling Cocaine, Guilty; 1993, District of Columbia, Possession of an Unregistered Firearm and Possession with Intent to Distribute Cocaine, dismissed.

In October, 2004, the FBI obtained information that a large narcotics trafficking organization was operating in the greater Metropolitan Washington, D.C., area and elsewhere.[1]  This organization, which is headed by **ANTOINE JONES,** is responsible for the distribution of cocaine.

Based on information obtained from confidential sources and corroborated by physical surveillance, analysis of telephone records and pen registers, and other investigative techniques, the FBI has learned that **JONES** is the main supplier of large quantities of cocaine, including kilogram quantities, for the drug trafficking organization. Investigation into **JONES'** background revealed that

---

[1]This summary is intended to give the reader an overview of the investigation.  The details of the investigation to support the accompanying application for the order authorizing the interceptions requested are more fully set forth herein.

he has an extensive history of trafficking in narcotics, particularly cocaine. **JONES** was arrested in 1993 and charged with Possession with Intent to Distribute 50 Grams or More of Cocaine Base, and Using and Carrying a Firearm During a Drug Trafficking Offense, in connection with a cocaine distribution scheme that moved numerous kilograms of cocaine through the Washington, D.C. area. In that case, **JONES** was released on personal recognizance pending trial. After having been indicted, and while still on release, **JONES** was arrested in possession of over 600 grams of cocaine, charges to which he eventually pled guilty. **JONES** now maintains a discreet operation, and limits his contacts to individuals known to him personally, or introduced to him by trusted, well known associates. When he does engage in drug transactions, he does so almost exclusively with the assistance of his right-hand associate, **LAWRENCE MAYNARD,** one of the few people with whom he will deal directly.

**ANTOINE JONES** is the sole proprietor of a nightclub named "**LEVELS,**" which is located at 1960 Montana Avenue, N.E., Washington, D.C. Investigators believe that **JONES** uses his business as a location where he can conduct his drug trafficking activities, as well as launder drug trafficking proceeds. **MAYNARD** is listed as the "A.B.C. manager" of the nightclub in the records on file with the District of Columbia Alcoholic Beverage Regulatory Agency (ABRA).

According to information provided by confidential sources, and confirmed through various law enforcement means, **MAYNARD** undertakes many tasks on behalf of **JONES'** narcotics trafficking organization, including but not limited to being a primary point of contact between **JONES** and his drug suppliers. On what investigators believe is a monthly basis, **MAYNARD** drives a vehicle that is usually supplied by **JONES** to unknown locations outside of the District of Columbia where he meets with an unknown supplier(s), exchanges large quantities of U.S. currency for

7

8/18
text messaging
Affidavit

kilogram quantities cocaine, and then transports the cocaine back to the greater Washington D.C. area for redistribution.

As set forth in more detail below, there is probable cause to believe that **MAYNARD** has used the cellular telephone assigned the telephone number **(301) 613-6293** the to facilitate and conduct **JONES'** illegal drug business, to include, *inter alia*: (a) arranging for receipt of large, multiple-kilogram quantities of cocaine from suppliers; (b) arranging for the re-distribution to customers of smaller quantities of cocaine up to and including several kilogram quantities; (c) contacting other members of the narcotics trafficking organization; (d) keeping **JONES** informed regarding all aspects of the drug business; (e) facilitating the interstate transportation of illegal narcotics and money; and (f) monitoring law enforcement activities.

During the course of this investigation, three confidential sources, who are cooperating with law enforcement, have provided details regarding **JONES'** large-scale narcotics trafficking organization. The information provided by these confidential sources has been corroborated by independent investigation, including but not limited to surveillance, search warrants, debriefings of additional confidential sources and witnesses and a review of available subscriber information and pen-register data.

### Confidential Source Number One

Confidential Source Number One, hereinafter referred to as CS-1, was arrested on narcotics-related offenses and entered into a plea agreement which requires him to cooperate with the government in exchange for the possibility of a reduced sentence. CS-1 has provided reliable information concerning **ANTOINE JONES'** organization and other significant narcotics traffickers in the District of Columbia area. CS-1's information has been corroborated by other sources of

8

information, such as pen register data and physical surveillance, other evidence gathered during this investigation, and other investigations conducted by law enforcement. CS-1 has never been known to provide false or inaccurate information. Moreover, CS-1 has provided information in other investigations which has been verified by law enforcement as being accurate.

CS-1 has known **ANTOINE JONES, a/k/a "TOINE,"** since sometime in the summer of 2003. CS-1 met **MAYNARD,** through **JONES,** sometime thereafter. CS-1 has identified photographs of **ANTOINE JONES** and **LAWRENCE MAYNARD.** CS-1 met **JONES** in ANNETTE BIGESBY's shop, DE ANJA's HAIR SALON, 1116 H Street, N.E., Washington. CS-1, who is a close associate of BIGESBY, is familiar with her narcotics trafficking activity and knows that she often used the hair salon as a location for narcotics distribution. In the summer and fall of 2003, CS-1 would often see **JONES** leaving BIGESBY's shop.

Based on its contacts with BIGESBY, CS-1 knows that for a time in approximately 2004, BIGESBY was selling heroin out of a house in the District of Columbia. CS-1 said that in addition, BIGESBY used an apartment on Kenilworth Avenue, N.E., Washington, D.C. as a stash location as well as to cook and bag up cocaine which CS-1 believed she purchased from **JONES**. CS-1 said that BIGESBY made threats to disrupt his drug business to **JONES** in the fall of 2004, over a drug-related business dispute.

In 2002, before CS-1 met **JONES**, CS-1 always obtained wholesale quantities of cocaine with other individuals, including DONALD ADRIAN HUNTER, a/k/a TERRY SAMUEL, who, CS-1 learned, in turn purchased cocaine directly from **JONES**. A short time after personally meeting **JONES** at BIGESBY's hair salon in the summer of 2003, CS-1 began buying multiple kilogram quantities of cocaine directly from **JONES**.

9

CS-1 estimated having purchased in excess of fifty (50) kilograms of cocaine directly from **JONES** over the course of their drug business relationship which extended from the summer of 2003 until the fall of 2004.

CS-1 knows several other individuals throughout the greater Washington, D.C. area who also were buying cocaine from **JONES** during the period during which CS-1 purchased cocaine from **JONES** because, as CS-1 described, **JONES'** prices were good; he usually charged CS-1 $20,000.00 per kilogram.  On numerous occasions during 2004, CS-1 saw a number of persons known to it to be wholesale narcotics distributors at special events nights at **JONES'** club **LEVELS**, located at 1960 Montana Avenue, N.E., Washington, D.C.  According to CS-1, **JONES** often "fronted," i.e., sold on consignment, multiple kilograms of cocaine to CS-1.  At one point during their drug relationship, CS-1 owed **JONES** over $500,000.00 for cocaine, which CS-1 paid back in installments.  CS-1 said it was not uncommon for it to owe **JONES** large sums of money for consigned cocaine.

CS-1 reported that, based on its conversations with **JONES** and **MAYNARD**, **JONES** and **MAYNARD** traveled out of the Metropolitan Washington, D.C. area near the end of each month to obtain multiple-kilogram quantities for cocaine for redistribution.  While CS-1 does not know precisely where **JONES** and **MAYNARD** traveled to pick up the narcotics, it recalled hearing **JONES** state that they were "goin' down the road" and refer to "Carolina."  Further, CS-1 noted that **MAYNARD** and **JONES** always returned from their trip to obtain narcotics within 24 hours of departing, and often called CS-1 during the trips from **MAYNARD**'s cellular phone, **(301) 613-6293,** or a pre-paid disposable cellular phone, which CS-1 referred to as a "throw away phone".  In the background of such telephone calls, the most recent of which took place in fall 2004, CS-1, who is familiar with money counting machines,  occasionally heard the distinctive sound of a money-

10

counting machine. CS-1 additionally reported that, while it was not aware of the specific identity of **JONES'** narcotics supplier, it recalled **JONES** or **MAYNARD** mention narcotics coming from "the Mexicans" and "Texas."

CS-1 reported further that **JONES** stated that **MAYNARD** always drove the vehicle for these trips to obtain narcotics because **JONES** is on Supervised Release for his previous narcotics convictions. According to CS-1, **MAYNARD** received $250.00 for every half-kilogram and $500.00 per kilogram of cocaine that he transported. Based on surveillance throughout this investigation and continuing up until the present, and other investigation, it appears that **JONES** no longer accompanies **MAYNARD** on every trip.

CS-1's information is corroborated by a traffic stop of **MAYNARD** on April 5, 2005. As set forth more fully on page 18, on that date, the Highway Interdiction Unit of the Durham, North Carolina Police Department conducted a traffic stop of a 1997 Honda Odyssey mini-van bearing Maryland tags 273M195, operated by **MAYNARD** and also occupied by DERRICK GORDON in the vehicle front passenger seat. Their investigation revealed that this car was registered to **JONES**, with a date of birth of February 25, 1960, and to one of his residences, 12221 Brandywine Road, Brandywine, Maryland. In the course of further investigation, the interdiction unit canine alerted on the right rear passenger area of the mini-van. A search of the mini-van revealed a hidden compartment in the van, which contained six white plastic Target shopping bags, containing a total of $67,115.00 in U.S. currency, in various denominations, held together by rubber bands. In addition, both **MAYNARD** and **GORDON** had in their possession well in excess of $1,000.00, which totaled just under $5,000.00. When interviewed by the Interdiction Unit, **MAYNARD** and **GORDON** both denied any knowledge of the secret compartment and the money contained therein. The Honda

11

Odyssey was impounded, the $67,115.00, was seized as evidence, **MAYNARD** and **GORDON** received a warning ticket, and then were released without additional charges.

During the course of its drug trafficking relationship with **JONES** in 2003 and 2004, CS-1 met **JONES** at various locations throughout the Washington, D.C. Metropolitan area to conduct transfers of both money and drugs. In order to arrange where to meet with **JONES**, CS-1 sometimes would call **JONES** on a prepaid disposable cellular phone. However, because **JONES** quickly discarded such telephones to avoid detection by law enforcement, CS-1 frequently contacted **MAYNARD** on **MAYNARD**'s cellular phone, **(301) 613-6293**, in order to contact **JONES** to arrange a narcotics transaction. CS-1 reported that, although **JONES** rapidly discarded such phones, **MAYNARD**'s cellular phone number, **(301) 613-6293**, has remained the same since CS-1 began its dealings with **JONES** and **MAYNARD** in 2003, up to an including its last contact with the **target telephone** in fall, 2004.[2]  Investigation has revealed that **(301) 613-6293** remains the cellular telephone number **MAYNARD** uses to the present day. On other occasions, CS-1 would contact **JONES** on the landline telephone at **LEVELS**, (202) 269-0100, to arrange a time and place for the drug transaction.

Typically, prior to receiving the drugs from **JONES**, CS-1 would often take the "drug payment money," in varying amounts, ranging from $10,000 to in excess of $100,000, to **JONES** at

---

[2]      In March, 2005, CS-1 made in-person efforts to reestablish contact with **JONES**, in the hopes of making controlled purchases of narcotics from him; however, **JONES** has rebuffed it, stating that "no one has been doing anything since [CS-1] got locked up" that his wife was "picking up the slack" with her real estate business, and that "everyone still has their guards up." This conversation, which by its thinly-veiled references to past illicit activity further confirms CS-1's claims of a drug-trafficking relationship with **JONES**, was recorded on a body wire.

his club, **LEVELS**, located at 1960 Montana Avenue, N. E., where it would give the money directly to **JONES**. CS-1 would then arrange for pickup of the narcotics, as described below. At other times, **JONES** would front the cocaine to CS-1, for later payment. On a few occasions, CS-1 gave money to **JONES** at the same time that it received cocaine.

On one occasion, CS-1 met **JONES** at "DENO's," a nightclub located in the 2300 block of Bladensburg Road, N.E., Washington, D.C., and obtained cocaine directly from **JONES**. CS-1 reported that it and **JONES** also met at various locations in Maryland and bought cocaine from **JONES** there.

CS-1 reports that **JONES** drove several different vehicles when making deliveries of cocaine to CS-1, including a white van, and a gold, or champagne-colored Jeep Cherokee. Surveillance of **LEVELS**, over a several-month span in 2004 and 2005, revealed that a white Plymouth van, with Maryland registration 097M893, was parked outside the club on several occasions.

From time to time, CS-1 also went to **JONES'** club **LEVELS** to pick up the cocaine it had ordered. CS-1 would sometimes drop a bag, such as a department store bag, a grocery store bag or a dark colored backpack containing money at a designated location within the club. **JONES** would then direct CS-1 to his truck, described as a gold or champagne-colored Jeep Cherokee, that was parked outside the night club. **JONES** would unlock the truck for CS-1 using the automatic key remote and CS-1 would retrieve the designated number of kilograms of cocaine from the cocaine stored in the vehicle.

Surveillance conducted by law enforcement at **LEVELS**, over a several-month span in 2005, revealed that a champagne-colored Jeep Grand Cherokee, Maryland tag number M667480, registered in the name of Deneice Jones, 12221 Brandywine Road, Brandywine, Maryland, was parked at the

13

club over 25 times. Deneice Jones is the wife of **ANTOINE JONES**.

According to CS-1, **JONES** often had bags, including duffel bags and over the shoulder bags, full of kilograms of cocaine when CS-1 went to pick up the drugs that it had ordered. CS-1 described the kilograms as packages of powder, sealed in black wrapping material. CS-1 said that each package of cocaine had an "emblem" on it. CS-1 described some of the emblems as 4's, stars, jokers, butterflies or funny faces.

Sometime in 2005, CS-1 saw **MAYNARD** upstairs at **LEVELS**, carrying a dark-colored backpack. CS-1 became suspicious because this bag looked similar to the types of bags **JONES** and **MAYNARD** used when transporting their narcotics.

On May 20, 2005, CS-1 positively identified from Metropolitan Police Department and Department of Motor Vehicles photographs several persons, including: **ANTOINE JONES** and **LAWRENCE MAYNARD**.

<u>Confidential Source Number Two</u>

Confidential Source Number Two (CS-2) intends to plead guilty to narcotics trafficking charges in the United States District Court for the District of Columbia and has provided information to the FBI concerning narcotics trafficking in the Washington, D.C. area. CS-2 has provided reliable information concerning **JONES'** organization and other significant narcotics traffickers in the District of Columbia area. CS-2's information has been corroborated by other sources of information, other evidence gathered during this investigation, and other investigations conducted by law enforcement. CS-2 has never been known to provide false information.[3]

---

[3] There is no known business or personal relationship between CS-1 and CS-2. Moreover, to the best of your affiant's knowledge, they do not know each other, or know of each

14

In 2003 and 2004, CS-2 bought kilogram quantities of powder cocaine approximately ten times from **JONES.** CS-2 was arrested in 2004 with a large wholesale quantity of cocaine that CS-2 had recently purchased from **JONES**.

CS-2 met **JONES** sometime around November, 2003, through a person with whom CS-2 dealt on a regular basis. This person told CS-2 that it had a long-term drug business relationship with **JONES**.  For several months in late 2003 and early 2004, CS-2 purchased cocaine from **JONES** through this middleman in quantities ranging from an eighth of a kilogram  to a kilogram. CS-2 was present and observed the transactions in which the middleman purchased cocaine from **JONES** on behalf of CS-2.  In late 2003 or early 2004, CS-2 and **JONES** began to transact business in person, without the aid of a middle-man, in larger, multiple-kilogram quantities.

According to CS-2, **JONES** sells high quality cocaine at a reasonable price. **JONES** initially charged CS-2 $23,000.00 per kilogram of cocaine; but, he eventually lowered the price to $21,000.00 per kilogram.

CS-2 reported that **JONES** distributes large quantities of cocaine. For example, in the early days of CS-2's business relationship with **JONES**, CS-2 combined money with several other people and bought three (3) kilograms of cocaine from **JONES**.  CS-2 said that, initially, they paid **JONES** all of the money at the time they purchased kilograms of cocaine from **JONES**.  However, CS-2 said that eventually **JONES** would provide CS-2 and its associates with kilograms on consignment and they would pay him for the remaining kilograms of cocaine when they were sold to other distributors. On another occasion, CS-2 ordered five (5) kilograms of cocaine and, in exchange for approximately

---

other.

15

$120,000.00, was fronted an additional five (5) kilograms.

CS-2 heard from the middleman described above, and other sources, that **JONES** purchased a warehouse on a corner off Bladensburg Road, near the Fifth Police District, which **JONES** began operating as a nightclub. These sources told CS-2 that **JONES** invested a lot of money into the club. Although invited, CS-2 never went inside of the club.  However, CS-2 has spoken with other drug dealers with whom it associated who told it that they purchased cocaine from **JONES** inside the club, including multiple-kilogram quantities of cocaine.  Investigation has determined that in May 2004, **JONES** leased the night club **LEVELS** located at 1916 Montana Avenue, N.E. for the period May 2004, until May 2014.

CS-2 said that the beginning of each month is the best time to purchase cocaine from **JONES** because CS-2 believes this is when **JONES** receives his supply of cocaine.  According to CS-2, during the period when he was buying cocaine from **JONES** the kilograms of cocaine were wrapped in multiple layers of saran wrap and there were generally two (2) wrapped together. Once taken apart, CS-2 said the kilograms were individually wrapped in what CS-2 described as some kind of wax material.  CS-2 reported that the individual kilograms were then stamped with distinctive marks such as crosses or two cars.

When CS-2 arranged to purchase cocaine from **JONES**, it would meet **JONES** in various locations in the Washington, D.C. metropolitan area.  On these occasions, CS-2 observed **JONES** driving a white Dodge Caravan and a Champagne colored Jeep.

As noted above, surveillance conducted by law enforcement at **LEVELS**, between 2004 and 2005, revealed that a champagne-colored Jeep Grand Cherokee, bearing Maryland tag number M667480, registered in the name of the wife of **ANTOINE JONES**, DENIECE JONES, 12221

Brandywine Road, Brandywine, Maryland, was parked at the club in excess of 25 times.

Like CS-1, CS-2 also stated that **JONES** transported the cocaine in shopping bags or backpacks which **JONES** had stored in the back of his vehicle. Whenever CS-2 met **JONES**, **JONES** was always by himself and wore sunglasses and a hat. CS-2 would make payments in the same way, transporting the cash payment in a shopping bag or backpack.

<u>Confidential Source Number Three</u>

In 2002, Confidential Source Number Three, hereinafter referred as CS-3, pled guilty to narcotics trafficking charges in the United States District Court for the District of Columbia, was released into the community, and began providing to the FBI information concerning narcotics and firearms traffickers in the Washington, D.C., area. CS-3's information has been corroborated by other sources of information, other evidence gathered during this investigation, and other investigations conducted by the FBI. CS-3 has never been known to provide false information.[4]

According to CS-3, **ANTHONY KOONCE** is buying five (5) to ten (10) kilograms of cocaine at a time from a person who owns the club **LEVELS**, which is located near the Fifth Police District in the District of Columbia. Your affiant notes that the Fifth Police District Headquarters is located at 1805 Bladensburg Road, N.E., and is directly across the street from **LEVELS**. According to CS-3, **KOONCE** pays $18,000.00 or $19,000.00 for each kilogram of cocaine from this supplier. CS-3 has learned this information regarding **KOONCE's** cocaine supplier through conversations both with **KOONCE** himself and with a mutual friend of CS-3 and **KOONCE**, another drug trafficker who has purchased cocaine directly from **KOONCE** in early 2005.

---

[4] Similarly, CS-3 has no known business or personal relationship with CS-1 or CS-2, but rather is an independent source.



CS-3 heard from various sources, including **KOONCE** himself, that **KOONCE** was arrested on March 23, 2005.

The investigation has revealed that **KOONCE** in fact was arrested on March 23, 2005, in the 400 block of W Street, N.W., Washington, D.C., in possession of approximately 18 grams of crack cocaine, 11 grams of heroin, and a small quantity of marijuana. He was charged in the Superior Court of the District of Columbia with Possession with Intent to Distribute Cocaine, Possession with Intent to Distribute Heroin, and Possession of Marijuana, and was remanded to a halfway house pending trial. Further investigation revealed that a subsequent indictment for these offenses was brought against **KOONCE** in United States District Court for the District of Columbia in June 2005, and the parallel Superior Court charges were dismissed.

<u>Durham, North Carolina Interdiction Team Traffic Stop</u>

On Tuesday, April 5, 2005, at approximately 2:25 p.m., officers from the Highway

18

Interdiction Unit of the Durham Police Department, Special Operations Division conducted a

traffic stop on a 1997 Honda Odyssey mini-van bearing Maryland registration 273M195, because

it was exceeding the speed limit.  A database check revealed that the vehicle is registered to

**ANTOINE JONES**, DOB 02/25/1960 of 12221 Brandywine Road, Brandywine, Maryland

20613.

The driver was identified as **LAWRENCE MAYNARD,** who told the officer that he and

his passenger were traveling to an unidentified town in South Carolina from the Washington,

D.C./Maryland area to pick up a disc jockey for an upcoming event at his club back in

Washington.

Officers then spoke with the passenger, who provided identification in the name of

DERRICK C. GORDON.  GORDON told law enforcement officers that he and **MAYNARD**

were traveling from the Washington, D.C. area in route to Atlanta, Georgia, to visit family and

hang out with some girls they had met on a previous visit.

Officers issued a warning ticket to **MAYNARD** for the speeding infraction and then,

based upon the inconsistent stories and suspicious actions of the minivan's occupants, called for a

canine officer to arrive at the scene.  In the meantime, officers asked **MAYNARD** if he was

transporting any large sums of U.S. currency and/or narcotics or illegal weapons.  When

**MAYNARD** denied this, the officers asked him for permission to search his person and the van

for weapons and contraband.  **MAYNARD** agreed to the requested searches.  A search of

**MAYNARD** revealed a large sum of U.S. currency, in excess of $1,000.00.  A subsequent

consensual search of GORDON revealed a similarly large quantity of U.S. currency which, when

taken together with **MAYNARD's** money, totaled close to $5,000.00.

19

Shortly thereafter, a canine arrived on the scene, and conducted a free air sniff of the minivan. After the canine alerted on the right rear passenger side of the minivan, the officers located a hidden compartment in the van. Inside the hidden compartment they found six (6) Target store bags containing $67,115.00, in multiple denominations of U.S. currency, bound together by rubber bands. Both **MAYNARD** and GORDON denied knowledge of the money and the secret compartment.

A review of pen-register data pertaining to the telephone **(301) 613-6293**, from the day of the stop, April 5, 2005, revealed an unusual pattern of activity. Between the hours of 7:02 a.m. and 9:54 a.m., there were a total of 25 activations to and from the telephone. Of those communications, ten were text-messages between the target telephone and unknown numbers.[5] Thereafter, there was not another text-message until 11:52 p.m., though there are 39 telephone communications. Among the first outgoing calls that **MAYNARD** made from this telephone after he was released from the police station was to ADRIAN JACKSON, who has convictions for narcotics and weapons offenses, as recently as 2004, and whose vehicles have been spotted outside of **LEVELS** in excess of 18 times during the surveillance period. These calls are followed by five hours of all incoming activations. Many of these telephone activations to and from the telephone **(301) 613-6293** on that day involved numbers with unknown subscribers, a characteristic of pre-paid cellular phones, which **JONES** is known to use. Then, on April 6, 2005, there are two more incoming calls from ADRIAN JACKSON to the telephone, **(301) 613-**

---

[5]        On pen-register records, the phone number associated with the text message remains blank, and the duration of the activation is listed as "00:00:00," and there is no data in the raw data line.

6293. Based on the above, investigators believe that these telephone calls made by **MAYNARD** are related to drug trafficking, in particular to the money that was seized from the hidden compartment in **JONES'** minivan which **MAYNARD** was driving.

Further, surveillance of **LEVELS** revealed that the following morning, April 6, 2005, **MAYNARD** arrived back at the club, in a white truck registered to **ANTOINE JONES**.

<u>Physical Surveillance</u>

Law enforcement conducted physical surveillance of **JONES'** night club **LEVELS** between the fall of 2004 and the present ("the surveillance period"). In the course of that period, various law enforcement personnel conducted both on-scene personal surveillance and video surveillance of the club, both during business hours and during off-hours.[6] In addition, investigators reviewed documents pertaining to **LEVELS** on file with the District of Columbia Alcoholic Beverages Regulatory Agency (ABRA), including the club's liquor license, and learned that the hours of operation for food and alcohol are: 11:00 a.m. through 2:00 a.m., Sunday through Thursday, and until 3:00 a.m. Friday and Saturday. For entertainment, hours of operation are 9:00 p.m. through 2:00 a.m., Sunday through Thursday, and until 3:00 a.m. on Friday and Saturday.

On numerous occasions during the surveillance period, investigators observed both **MAYNARD** and **JONES** use keys to lock and unlock the outer door to **LEVELS**.

During this time period, investigators observed a number of known and unknown vehicles coming and going from the **LEVELS** nightclub, at 1960 Montana Avenue, N.E., during

---

[6]    The observations noted herein do not include all vehicle and foot traffic at **LEVELS** during the whole of the surveillance period. It was not practicable to review in real-time in excess of six months of surveillance. Instead, the investigators reviewed videotapes and personal notes, the results of which are described in this section of the affidavit.

daytime hours when the club is not open for business. In addition, investigators have observed substantial foot traffic into and out of **LEVELS**, during daytime hours. This observed foot traffic consists of both men and women, and occasionally small children, entering and exiting the establishment, often carrying over-the-shoulder bags, shopping bags, diaper bags, and backpacks.

Surveillance conducted by law enforcement during the surveillance period showed NICHOLAS JONES, a/k/a TOBY, going into and coming out of **LEVELS** on several occasions, during hours when the business is purportedly closed. Similarly, surveillance revealed that a white Ford Bronco, with District of Columbia tags BR3315, registered to NICHOLAS JONES, at 563 23rd Place, N.E., Washington, D.C., was parked outside of **LEVELS** on at least nine occasions during the same surveillance period. According to information on file with the District of Columbia Alcoholic Beverages Regulatory Agency (ABRA), NICHOLAS JONES has no known business relationship with **LEVELS**. CS-1 has known TOBY to sell both heroin and cocaine for the past several years.

Surveillance conducted by law enforcement during the surveillance period at **JONES'** nightclub **LEVELS**, revealed the presence of the champagne-colored Jeep Cherokee, Maryland registration M667480, registered to DENIECE JONES, wife of **ANTOINE JONES**, at this location in excess of 25 times.

Surveillance conducted by law enforcement at **JONES'** nightclub **LEVELS** during the surveillance period revealed the presence of the 1997 Honda Odyssey mini-van bearing Maryland registration 273M195, registered to **JONES**, at this location four times, all in the month of March, 2005, a month prior to the interdiction stop of that vehicle in North Carolina on April 5, 2005. Additionally, on at least one occasion, both the Honda Odyssey and the champagne colored Jeep

22

were observed at **LEVELS** at the same time during the surveillance period.

Surveillance conducted by law enforcement at **JONES' nightclub LEVELS** during the surveillance period revealed the presence of the white Ford Bronco truck, bearing D.C. registration BR3315, registered to NICHOLAS JONES, at this location in excess of ten times.

<div align="center">Pen Register and Call Data</div>

In January of 2005, your affiant obtained a pen register in U.S. District Court signed by Magistrate Judge Facciola for the telephone **(301) 613-6293**, a Sprint PCS cellular telephone. This cellular account is listed in the name of **LAWRENCE MAYNARD**, 1960 Montana Avenue, Washington, D.C. 20002, the address of **LEVELS**.

An analysis of the air-time records for this cellular account for the period from January 20, 2005 until July 29, 2005 ("the pertinent time period"), identified a total of 17,908, activations.[7]  Your affiant notes that this is an inordinately high number of activations for a cellular telephone in that time period.  Based on the affiant's experience and training, even after accounting for calls to friends and family, the volume of calls is consistent with the use of a cellular telephone to facilitate narcotics trafficking.[8]  Pursuant to administrative subpoenas to various telephone companies, including Sprint Spectrum LP, Cingular Wireless, Verizon, and Phone Tech, investigators obtained subscriber information for the most frequently-called

---

[7]  This affidavit refers to "activations" to encompass all interceptions from the telephone (301)613-6293 to include telephone calls and text-messages.

[8]  Telephone numbers (301) 773-4065 and (301) 773-0709 are listed to JOYCE MAYNARD, who is the wife of **LAWRENCE MAYNARD**, at 7711 Greanleaf Road, Hyattsville, Maryland.  Records reflect a total of 1043 activations between the telephone number (301)613-6293 and these numbers during the pertinent time period.  ((301) 773-4065, Date last dialed: July 29, 2005; (301) 773-0709, Date last dialed: June 3, 2005)

numbers. The most frequently-called numbers are associated with individuals who have narcotics trafficking convictions.

Telephone number (202) 269-0100 is listed to **LEVELS** nightclub at 1960 Montana Avenue, Northeast, Washington, D.C. Records reflect a total of 225 activations between this number and the telephone **(301) 613-6293** during the pertinent time period (Date last dialed: July 26, 2005).

In addition, in June 2005, your affiant obtained a second pen register in U.S. District Court, ordered by Magistrate Judge Facciola, for the telephone number **(202) 538-3946**, a cellular telephone subscribed to by **DENIECE JONES** (wife of **ANTOINE JONES**), 12221 Brandywine Road, Brandywine, Maryland. A review of the pen-register records pertaining to **(202) 538-3946**, which is believed to be used by **JONES**, demonstrated a similar pattern of contacts with telephones associated with individuals who have narcotics trafficking convictions. Indeed, as set forth more fully below, several of the telephone numbers called by **MAYNARD** were also called by telephones associated with **JONES** during the relevant pen register periods. The following is a synopsis of the call data for some of the telephone numbers in contact with **MAYNARD's** cellular phone, **(301) 613-6293**, and the last date of pen register activity for each:

Records reflect a total of 1,477 activations between **(301) 613-6293**, the telephone subscribed to by **LAWRENCE MAYNARD** and **(202) 538-3946**, the number of the cellular telephone believed to be used by **JONES.** (Date last dialed: July 28, 2005).

Telephone number (202) 436-0020 is listed to JOZEF W. HAWKINS and the Service User is ADRIAN JACKSON. Records reflect a total of 593 activations between **(301) 613-6293** and this number during the pertinent time period (Date last dialed: July 29, 2005). Shortly after

24

being stopped by the Highway Interdiction Unit of the Durham Police Department, Special

Operations Division on April 5, 2005, **MAYNARD's** telephone made a telephone call to this

number. As previously set forth ADRIAN JACKSON has convictions for narcotics and weapons

offenses  JACKSON has two vehicles registered in his name which have been observed at

**LEVELS**, 1960 Montana Avenue, N.E., Washington, D.C. during the surveillance period: a

Chrysler 300M, which has been observed at the aforementioned location in excess of 16 times,

and a 1995 Chevy van, which has been observed there in excess of two times.  Records revealed

147 activations between **(202) 538-3946**, the cellular telephone believed to be used by **JONES**,

and (202) 436-0020, the telephone believed to be used by JACKSON, between June 23, 2005,

and July 29, 2005.

Further comparison of pen register data from the cellular telephone subscribed to by

**MAYNARD, (301) 613-6293** to **(202) 538-3946**, believed to be in use by **JONES** between June 23,

2005, and July 29, 2005, shows at least six commonly-called telephone numbers, in addition to that

of ADRIAN JACKSON, as set forth above.  The following is a synopsis of the call data for each of

the pertinent numbers and the last date of pen register activity for each:

Telephone number (202) 380-2139 is listed to DONALD HUNTER at 3202 Curtis Drive,

Apartment 708, Temple Hills, Maryland.  Investigators conducted various database checks which

indicate that DONALD ADRIAN HUNTER, has numerous narcotics-related arrests and several

convictions, including a federal court narcotics conviction, which resulted in a sentence of

incarceration.  Records show a total of 68 activations between telephone number **(202) 538-3946**,

which is associated with **JONES** and this number (date last dialed: July 29, 2005), and a total of 22

activations between the **(301) 613-6293**, the cellular telephone subscribed to by **MAYNARD** and this

25

number (Date last dialed: July 7, 2005), during the relevant pen register periods.

Further analysis of recent pen register data pertaining to **(301) 613-6293,** subscribed to by

**MAYNARD** and **(202) 538-3946,** the phone believed to be used by **JONES,** reveals an unusual

pattern of activity, which is consistent with the reports of CS-1 and CS-2 that **JONES** and

**MAYNARD** obtain shipments of cocaine towards the end of the month into the beginning of the

following month, and consistent with CS-1's report that the source of supply of **JONES'** cocaine is

"Texas" and "the Mexicans." For example, at approximately 10:30 a.m. on July 25, 2005, **JONES'**

telephone received a call from (876) 539-2380, a phone number listed in Jamaica. Two hours later,

**JONES'** telephone received a call from (210) 528-1460, a phone number listed in McAllen, Texas,

a town which borders Mexico, and which is known to be a point of entry for narcotics into the United

States. At 12:49 p.m., **JONES'** telephone called the number in McAllen, Texas. Thereafter, in the

23 minutes between 1:37 p.m. and 2:00 p.m., there are a total of 24 activations between the telephone

believed used **JONES** and **(301) 613-6293,** the telephone subscribed to by **MAYNARD.**



Text Messages

In addition, analysis of pen register data pertaining to both **(301) 613-6293,** and **(202) 538-3946**

reveals that over the course of the past week, both telephones have begun to use the text-messaging function with increasing frequency. Beginning on July 25, 2005, well over half of all activations were in the form of text-messages, and as of July 29, 2005, close to 90% were in text-messaging form. Of wire communications during this period, many were between **(301) 613-6293,** the telephone subscribed to by **MAYNARD,** and **(202) 538-3946,** the phone believed to be used by **JONES,** most recently on August 4, 2005, and between the **(301) 613-6293** and (202) 269-0100, the phone number for **LEVELS,** most recently on August 3, 2005. Investigation has further confirmed that while the technology exists to capture the actual content of these text messages, such technology has only become available to law enforcement within recent weeks. Thus, investigators believe that **JONES, MAYNARD,** and their associates likely are unaware of this recent advance in technological capability, and may be communicating in this fashion as a further means of concealing their illegal narcotics-trafficking operation.

Finally, analysis of pen register data pertaining to both **(301) 613-6293** and **(202) 538-3946** reveals recent contact between both of these telephones and (998) 885-3310. Specifically, on July 26, 2005, **(202) 538-3946,** the telephone believed to be used by **JONES,** received a call from that number at 2:06:45 p.m., with a duration of zero seconds. At 2:07:05 p.m., the same telephone received another call from that number, with a duration of nine seconds. Approximately five seconds later, **(301) 613-6293** received a phone call lasting seven minutes and 29 seconds from the same number, (998) 885-3310. The subscriber information pertaining to this telephone is unknown, but analysts have confirmed that the (998) prefix is the international calling code for the country of Uzbekistan. Given that these contacts between the telephone subscribed to by **MAYNARD,** the telephone believed to be used by **JONES,** and Uzbekistan took place within the

27

same time frame as the contacts between the above-described telephones and the telephone in

McAllen, Texas, a common point of entry of cocaine into the United States, together with the shift

to far greater use of the text-messaging function by **MAYNARD's** telephone and the telephone

associated with **JONES,** investigators believe that these contacts with Uzbekistan pertain to the

illegal activities of **JONES** and **MAYNARD.** Additionally, your affiant knows that, among other

countries in that region, Uzbekistan is a major exporter of poppy, from which opium and heroin are

derived.

On August 10, 2005, Magistrate Judge Alan Kay, of United States District Court for the

District of Columbia, signed two warrants ordering **SPRINT SPECTRUM, LP** and **CINGULAR**

**WIRELESS,** respectively, to provide stored text messages for **(301) 613-6293** and **(202) 538-**

**3946.** On August 12, 2005, **SPRINT SPECTRUM, LP** provided approximately 180 text

messages from cellular telephone **(301) 613-6293.** Among the 180 text messages, your affiant

believes several contained suspicious content. Specifically, one text message to **(301) 613-6293**

states, "I need ice 4my beer." Another text message to the aforementioned target telephone stated,

"2 cokes & malibu, pls. Ka$h Money." There are also a number of text messages that refer to

"working with a monster." In your affiant's training and experience, it is common for narcotics

traffickers to use seemingly innocuous terms to refer to narcotics and narcotics transactions. It is

your affiant's conclusion that the aforementioned text messages are in fact encrypted messages

relating to narcotics trafficking.

Based upon these text messages and cell site information, your affiant knows that

**LAWRENCE MAYNARD,** within the last week, was in the Jacksonville, Florida area. Since

returning to the Washington, D.C. area, there has been a marked increase in cell phone activity, to

include what are believed to be text messages. Additionally, surveillance at the night club, LEVELS, there has shown a noted increase in vehicular and foot traffic at this location since MAYNARD's return to the Washington, D.C. area..

CINGULAR WIRELESS has not yet returned the requested text messages for **(202) 538-3946.**

Your affiant has learned that **SPRINT SPECTRUM LP**, the electronic service provider for the cellular telephone subscribed to by **LAWRENCE MAYNARD** and assigned the telephone number **(301) 613-6293** that there currently are text messages sent to and from that cellular telephone in electronic storage maintained by **SPRINT SPECTRUM LP.** On August 17, 2005 your affiant caused to be sent to **SPRINT SPECTRUM LP** and **CINGULAR WIRELESS,** by facsimile, a request pursuant to 18 U.S.C. §2703(f)(1) that the text messages sent to and from cellular telephone **(301)613-6293** and **(202) 538-3946,** respectively, that currently are in electronic storage be preserved pending issuance of the search warrant requested herein.

For the reasons set forth herein, your affiant believes that **LAWRENCE MAYNARD** and **ANTOINE JONES,** have used, and are continuing to use the text messaging features of cellular telephones assigned the numbers **(301) 613-6293** and **(202) 538-3946** to facilitate the commission of offenses within the District of Columbia and elsewhere and that text messages that were sent to and from those cellular telephones and that are currently maintained in electronic storage by the electronic service providers for those cellular telephones, **SPRINT SPECTRUM LP** and **CINGULAR WIRELESS,** respectively, will constitute evidence of those offenses. Accordingly, your affiant requests that warrants be issued authorizing the searches of computer networks maintained by the electronic service providers for the stored text messages described herein.

29

Your affiant further requests that pursuant to 18 U.S.C. § 2705(a)(1)(A) the Court order that notice to the subscribers of cellular telephones and customers of the cellular telephones **(301) 613-6293** and **(202) 538-3946,** of the issuance of the warrants requested herein, and disclosure of the stored text messages pursuant to the search warrants be delayed for a period of 90 days on the ground that there is reason to believe that notification would have an adverse result on the on going investigation in this case in that disclosure is likely to result in the targets of the investigation fleeing from prosecution, destroying evidence, and otherwise seriously jeopardizing the investigation by taking additional steps to avoid detection of their illegal activities.

STEPHANIE E. YANTA
Special Agent
Federal Bureau of Investigation


Sworn to and subscribed before me
this ___ day of _____ 2005 in
the District of Columbia.

AUG 1 3 2005

UNITED STATES DISTRICT JUDGE
ALAN KAY
U.S. MAGISTRATE JUDGE

30

AO93(Rev.5/85)Search Warrant

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

In the Matter of the Search of
(Name, address or brief description of person or property to be searched)

COMPUTER NETWORK MAINTAINED BY
SPRINT SPECTRUM LP
6480 SPRINT PARKWAY
OVERLAND KANSAS 66251

**SEARCH WARRANT**

CASE NUMBER **05 - 0 4 6 8 M - 0 1**

TO: _____ and any Authorized Officer of the United States

Affidavit(s) having been made before me by _Special Agent STEPHANIE E. YANTA_ who has reason to believe
that ☐ on the person or ☒ on the premises known as (name, description and or location)

COMPUTER NETWORK MAINTAINED BY THE ELECTRONIC COMMUNICATIONS SERVICE PROVIDER
SPRINT SPECTRUM LTD. m

there is now concealed a certain person or property, namely (describe the person or property)

TEXT MESSAGES IN ELECTRONIC STORAGE THAT WERE SENT TO AND FROM CELLULAR
TELEPHONE ASSIGNED THE NUMBER _(301)613-6293_, ELECTRONIC SERIAL NUMBER _361321CC_
DURING THE PERIOD AUGUST 11, 2005 THROUGH THE PRESENT

I am satisfied that the affidavits(s) and any recorded testimony establish probable cause to believe that the person or
property so described is now concealed on the person or premises above-described and establish grounds for the
issuance of this warrant.

**YOU ARE HEREBY COMMANDED** to search on or before _2 7 AUG 200-_   _2 7 AUG 2005_
                                                                                      (Date)
(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and
making the search ☑ (in the daytime - 6:00 A.M. to 10:00 P.M.) ☐ (at any time in the day or night as I find reasonable
cause has been established) and if the person or property be found there to seize same, leaving a copy of this warrant and
receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly
return this warrant to the undersigned U.S. Judge/U.S. Magistrate Judge, as required by law.
Pursuant to 18 U.S.C. 2703(f) the presence of an officer is not required for service or execution of this warrant.

AUG 1 8 2005   **ALAN KAY**                          at Washington, D.C.
Date and Time Issued   **U.S. MAGISTRATE JUDGE**

_____              _____
Name and Title of Judicial Officer                Signature of Judicial Officer