9/2/05 Title III affidavit unredacted or partially unredacted pages - 18-37, 41, 43, 48, 49, 51-53, 56-57

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IN THE MATTER OF THE APPLICATION OF ) | | Misc. No. |
| THE UNITED STATES OF AMERICA FOR AN ) | | |
| ORDER AUTHORIZING THE INTERCEPTION ) | | |
| OF WIRE COMMUNICATIONS TO AND FROM ) | | |
| MOBILE CELLULAR TELEPHONE NUMBER ) | | FILED UNDER SEAL |
| (202) 538-3946, ESN 010330005007579 ) | | |

## AFFIDAVIT

I, Stephanie E. Yanta, Special Agent with the Federal Bureau of Investigation (FBI),

Washington Field Office, Washington, D.C., (hereinafter affiant) being duly sworn, depose and

state as follows:

### A. INTRODUCTION

1. I am "an investigative or law enforcement officer" of the United States within the

meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States

who is empowered by law to conduct investigations of and to make arrests for offenses

enumerated in Section 2516 of Title 18, United States Code.

2. I have been a Special Agent with the FBI since March 1998. I am currently assigned

to the Safe Streets Task Force, which is tasked with the investigation of violent narcotics

traffickers in the District of Columbia and elsewhere. I have previously participated in

investigations that led to the arrest and conviction of narcotics dealers. Since 1998, I received

training and experience in interviewing and interrogation techniques, arrest procedures, search

and seizure, narcotics, white collar crimes, search warrant applications, and various other crimes.

In the course of my training and experience, I have become familiar with the methods and

techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the

organization of drug conspiracies. In the course of conducting these investigations, your affiant has been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; conducting short-term and long-term undercover operations, including reverse undercover drug operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; conducting court-authorized electronic surveillance; and preparing and executing search warrants which have led to substantial seizures of narcotics, firearms and other contraband.

3. Through instruction and participation in investigations, your affiant has become familiar with the manner in which narcotics traffickers conduct their illegal business and the methods, language, and terms that are used to disguise conversations about their narcotics activities. From experience and training, your affiant has learned, among other things, that:(a) drug traffickers virtually never expressly refer to cocaine or other illegal drugs by name; instead to conceal the true nature of their illegal activities and to thwart detection by law enforcement, they refer to the drugs and drug quantities using seemingly innocent terms; (b) narcotics traffickers frequently use electronic paging devices, commonly referred to as pagers or beepers, cellular telephones, digital telephones, and other communications devices to further their illegal activities by, among other things, remaining in constant or ready communication with one another without restricting either party to a particular telephone or location at which they might be the subject of physical surveillance by law enforcement authorities; and (c) narcotics traffickers frequently transmit pre-arranged numerical codes to pagers or telephones to identify themselves or to otherwise communicate information, such as price or quantity of drugs, to the

person in possession of the pager.

4. Throughout this investigation, your affiant has worked with other Special Agents (SAs) of the FBI, and members of the Washington, D.C. Metropolitan Police Department (MPD) assigned to the Safe Streets Task Force. This affidavit is based on my personal knowledge derived from my participation in this investigation, as well as speaking with other law enforcement officers assigned to this investigation, and includes, but is not limited to, the following information: (a) oral and written law enforcement reports regarding this and other related investigations; (b) physical surveillance; (c) review of dialed number recorder data (pen register records) and telephone toll records; (d) review of vehicle registration records and licenses; (e) review of criminal history records; and (f) debriefings of confidential informants.

5. Since this affidavit is being submitted for the limited purpose of seeking authorization for the interception of wire communications, your affiant has not set forth each and every fact learned during the course of this investigation.

## B. TARGETS AND OFFENSES

6. This affidavit is submitted in support of an application for an order authorizing the interception of wire communications, including and background conversations intercepted while the telephone is off hook or otherwise in use by: **ANTOINE JONES, a/k/a "TOINE"; LAWRENCE MAYNARD; NICHOLAS JONES, a/k/a "TOBY"; ANTHONY KOONCE, a/k/a "TONY" a/k/a "LAMONT"; DERRICK GORDON; BRADFORD WADDELL; ANNETTE BIGESBY;  DONALD ADRIAN HUNTER, a/k/a TERRY SAMUEL; DIANE BUSHROD, a/k/a DIANE SMITH; ADRIAN JACKSON; TERRENCE DIXON, a/k/a NIMROD BABYLON, KIRK R. CARTER, WALLACE WARD, DAMIEN BROUSSARD,**

3

**TYMIRA HUNTER, TWANDA CAMPBELL, FNU, LNU a/k/a/ KARISSA JONES, NITA WORLEY, a/k/a GENNELL ANITA WORLEY,** and others not yet fully identified (hereinafter referred to as the **"Target Subjects"**) to and from mobile cellular telephone number **(202) 538-3946,** which is subscribed to DENISE JONES, a/k/a, DENICE JONES, a/k/a DENIECE JONES, and believed to be used by her husband, **ANTOINE JONES.**

7. There is probable cause to believe that these communications will concern violations of the Controlled Substances Act, Title 21, United States Code, Section 801, et seq., including: (a) the possession with intent to distribute and distribution of controlled substances, in violation of Title 21 United States Code (USC) §§ 841(a)(1); (b) conspiracy to commit such offenses, in violation of 21 U.S.C. §§ 846; and (c) use of communications facilities to facilitate the commission of the above offenses involving controlled substances, in violation of 21 USC § 843(b); and (d) the laundering of proceeds of specified unlawful activity, such as the distribution of controlled substances, in violation of 18 U.S.C. §§ 1956 and 1957.

### C. Target Telephone

8. Based on the affiant's investigation and for the reasons which are set forth herein, there is probable cause to believe that the **Target Subjects** and others as yet unidentified, have used, are using, and will continue to use the telephone which is presently assigned cellular telephone number **(202) 538-3946,** (**"the target telephone"**) in connection with the above offenses. Additionally, there is probable cause to believe that evidence of such criminal communications will be obtained through interceptions of wire communications made to and from the **target telephone**. Telephone number **(202) 538-3946** is a mobile cellular telephone with service provided by Cingular Wireless, P.O. Box 24679, West Palm Beach, FL, 33416-

4679, and is subscribed to in the name of DENISE JONES, a/k/a DENIECE JONES, a/k/a

DENICE JONES (wife of **ANTOINE JONES**), 12221 Brandywine Road, Brandywine,

Maryland, and is assigned the **Electronic Serial Number 010330005007579**.  While the **target**

**telephone** is not subscribed to in the name of **ANTOINE JONES**, but rather in the name of his

wife, investigation has confirmed that he is the user of that facility.  As an initial matter,

investigators first determined that **(202) 538-3946** is the telephone that **ANTOINE JONES** uses

because, as set forth more fully at paragraph 81-86 *infra*, it appeared with great frequency in pen

register data on the telephone listed to his right-hand associate **LAWRENCE MAYNARD**.

Further, investigation confirmed that 12221 Brandywine Road, Brandywine, Maryland, is an

address that **ANTOINE JONES** has used for many years, as far back as 1994.  Finally, both pen

register data pertaining to the **target telephone**, as set forth more fully at paragraphs 84-91 *infra*,

and the content of text-messages, obtained via a search warrant, as set forth more fully at

paragraph 25 *infra*, make clear that **ANTOINE JONES** is the user of this phone.  For example,

though there were few substantive text-messages sent from this telephone, several pertained to

advertisements of special events nights at his nightclub **LEVELS**, with which his wife has no

affiliation.

## D.  OBJECTIVES

9.  I have participated in the investigation of the offenses set forth in paragraph seven of

this affidavit.  As a result of my participation in this investigation, and through interviews with

other law enforcement agents and analyses of reports submitted by other special agents of the FBI

and officers of the MPD, I am familiar with all aspects of this investigation.  On the basis of this

familiarity, and on the basis of other information which I have reviewed and determined to be

reliable, I allege the facts to show that:

(a) there is probable cause to believe that the **Target Subjects** and others as yet unidentified are committing, and will continue to commit, the offenses described in paragraph 7 above;

(b) there is probable cause to believe that particular wire communications of the **Target Subjects** and others known and unknown concerning the above offenses will be obtained through the interception of wire communications to and from the target cellular telephone assigned number (202) 538-3946. In particular, these communications are expected to concern the specifics of the above offenses, including: (i) the nature and extent of the narcotics trafficking and other illegal activities of the individuals identified herein during the commission of the aforementioned offenses; (ii) the methods of operation and procedures of the individuals identified herein during the commission of the aforementioned offenses, including but not limited to the means and manner by which individuals are obtaining and redistributing large quantities of cocaine in various locations in the United States; (iii) the identities and roles of participants in the illegal activities, including accomplices, aiders and abettors, co-conspirators and other participants in their illegal activities; (iv) the source of the controlled substances, primarily cocaine; (v) the manner in which these illegal activities are being conducted, including the methods of distribution and possession of said controlled substances and transfer of the contraband and money involved in those activities; (vi) other locations utilized in furtherance of these illegal activities; (vii) the methods of operation of laundering proceeds of illegal drug sales; (viii) the existence and location of records; (ix) the location and source of the resources used to finance their illegal activities; (x) the location and disposition of the proceeds from those

activities; and (xi) the locations and items used in furtherance of those activities. In addition, there is probable cause to believe these wire communications will constitute admissible evidence of the above-described offenses.

10. The affiant believes that the wire communications concerning the above-described offenses will be obtained through the interception of communications to and from the **target telephone**; that such communications will be admissible evidence of the offenses; and that there is a reasonable likelihood that such evidence will enable law enforcement to interdict a shipment of cocaine or other illegal drugs and to ascertain the identities of, and prove beyond a reasonable doubt the guilt of, the participants in this illegal conspiracy.

### E. PERSONS LIKELY TO BE INTERCEPTED

11. The following persons are expected to be intercepted using the above-described telephone number in the commission of the alleged offenses:

(a) ANTOINE JONES, a/k/a ANTONIO JONES, a/k/a/ "TOINE" is a black male, born on February 25, 1960. He is described as 6'2" tall and approximately 220 pounds, with a Social Security Number of 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. JONES resides at 10870 Moore Street, Waldorf, Maryland, with a second address of 12221 Brandywine Road, Brandywine, Maryland. A search of FBI criminal history records for JONES (FBI# 901461KA2) revealed the following: 1994, District of Columbia, Conspiracy to Distribute 50 Grams or More of Cocaine Base, Possession with Intent to Distribute 50 Grams or More of Cocaine Base, and Possession with Intent to Distribute Cocaine, guilty, sentenced to ten years' imprisonment, placed on supervised release until April 25, 2007; 1989, District of Columbia, Carrying a Pistol Without a License and Disorderly Conduct, dismissed; 1991, Arlington, Virginia, Selling Cocaine, Guilty; 1993, District

of Columbia, Possession of an Unregistered Firearm and Possession with Intent to Distribute

Cocaine, dismissed.

(b) **LAWRENCE MAYNARD** is a black male, born on August 21, 1961.  He is

described as approximately 6'2" tall and 240 pounds, with a Social Security Number of 579-92-

7661.  **MAYNARD** resides at 7711 Greanleaf Road, Hyattsville, Maryland.  A search of FBI

criminal history records for **MAYNARD** (FBI #512598TA1) revealed the following:  1993,

District of Columbia, Distribution of Cocaine, found not guilty.

(c) **NICHOLAS JONES, a/k/a "TOBY"** is a black male, born on July 3, 1964.  He is

described as approximately 6'0" tall and 205 pounds, with a Social Security Number of 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.

**JONES** resides at 563 23rd Place, N.E., Washington, D.C.  A search of FBI criminal history records

for **JONES** (FBI#899882DA1) revealed the following:  1985, District of Columbia, Carrying a

Pistol without a License, Possession with Intent to Distribute Cocaine, Receiving Stolen Property,

dismissed; 1985, District of Columbia, Possession with Intent to Distribute Cocaine, pled guilty to

Possession of Cocaine, sentenced to one year probation; 1987, Hyattsville, Maryland, Distribution

of Controlled Dangerous Substance Cocaine, dismissed; 1987, Baltimore, Maryland, Possession with

Intent to Distribute Cocaine, guilty, sentenced to five years' imprisonment, with all but one year

suspended; 1991, District of Columbia, Distribution of Heroin, guilty, sentenced to 7-21 years'

imprisonment; 2003, District of Columbia, Simple Assault, dismissed.

(d) **ANTHONY LAMONT KOONCE, a/k/a "TONY, " a/k/a LAMONT,** is described

as a black male, born March 27, 1972.  He is approximately 5'8" tall and 165 pounds, with a Social

Security Number of 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.  **KOONCE** resides at 1459 Ridge Place, S.E. Washington, D.C.,

with a second address of 2006 38th Street, S.E. #202, Washington, D.C., but is presently a resident

of a District of Columbia halfway house, as he awaits trial on narcotics trafficking charges in United States District Court for the District of Columbia. A search of FBI criminal history records for **KOONCE** (FBI# 331562MA3) revealed the following criminal history: 1990, Washington, D.C., Controlled Substances Act Violation, Cocaine, dismissed; 1991, District of Columbia, Fugitive from Justice, dismissed; 1991, District of Columbia, Carrying a Pistol without a License, dismissed; 1991, District of Columbia, Possession with Intent to Distribute Cocaine, pled guilty to Attempted Possession with Intent to Distribute Cocaine, sentenced to two years' probation, revoked in 1993, sentenced to 15-45 months' incarceration; 1993, District of Columbia, Possession of PCP, guilty, sentenced to 60 days' incarceration; 1995, District of Columbia, Escape from Institution, guilty, sentenced to 4-12 months' incarceration; 2002, District of Columbia, Assault with a Dangerous Weapon, Bat, dismissed; 2002, District of Columbia, Simple Assault, dismissed; 2003, District of Columbia, Simple Assault, dismissed; 2005, District of Columbia, Simple Assault, dismissed; 2005, District of Columbia, Possession with Intent to Distribute Five Grams or More of Cocaine Base, Possession with Intent to Distribute Heroin, Possession of Marijuana, currently pending in the United States District Court for the District of Columbia.

(e) **DERRICK GORDON** is a black male born on April 10, 1977. He is described as approximately 5'8" tall and 150 pounds, with a Social Security Number of 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. **GORDON** resides at 4748 Benning Road, S.E., Apartment 202, Washington, D.C. A search of FBI criminal history records for **GORDON** (FBI# 528127EB5) revealed the following criminal history: 1987, District of Columbia, Possession with Intent to Distribute Marijuana, Possession of an Unregistered Firearm, Unlawful Possession of Ammunition, dismissed; 1997, District of Columbia, Possession of Marijuana, dismissed; 1997, District of Columbia, Possession with Intent to Distribute Marijuana,

dismissed; 1997, District of Columbia, Possession of Marijuana, dismissed; 1999, District of Columbia, Unauthorized Use of a Motor Vehicle, Driver, dismissed.

(f) **BRADFORD WADDELL** is a black male born on March 8, 1964.  He is described as approximately 5'9" tall and 195 pounds, with a Social Security Number of 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. **WADDELL** is believed to reside at 3920 Brooklyn Drive, Baltimore, Maryland.  A search of FBI criminal history records for **WADDELL** (FBI# 549643CA1) revealed the following criminal history: 1984, District of Columbia, Unlawful Possession of Ammunition, Possession of PCP, dismissed; 1985, District of Columbia, Possession with Intent to Distribute PCP, pleaded guilty to Possession of PCP, sentenced to three years' probation; 1998, Anne Arundel County, Maryland, Second Degree Assault, Resisting Arrest, plead guilty to Disorderly Conduct in Public, sentenced to 60 days' incarceration, suspended, with nine months' probation; 1995, Prince Georges County, Maryland, 4th Degree Burglary, dismissed; 1995, Prince Georges County, Maryland, Disorderly Conduct and Resisting Arrest, dismissed; 1985, Charles County, Maryland, Possession of Controlled Dangerous Substance, PCP, with Intent to Distribute, Possession CDS Marijuana, with Intent to Distribute, Possession CDS Cocaine, with Intent to Distribute, pled guilty to Possession CDS PCP with Intent to Distribute, and sentenced to three years' incarceration.

(g) **ANNETTE BIGESBY** is a black female born on February 11, 1962.  She is described as approximately 5'4" tall and 155 pounds, with a Social Security Number of 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. **BIGESBY** resides at 11018 Spring Lake Drive, Mitchellville, Maryland.  A search of FBI criminal history records for **BIGESBY** (FBI#895031V9) revealed the following: 1982, District of Columbia, Robbery, dismissed; 1992, District of Columbia, Possession with Intent to Distribute Marijuana and Possession with Intent to Distribute Heroin, dismissed; 1983, District of Columbia, Robbery (Two

10

counts), pled guilty to Attempted Robbery, sentenced to two-six years' incarceration; 1985, District of Columbia, Petit Larceny, guilty, sentenced to one year of incarceration, suspended, four years' probation, probation revoked, 1987; 1986, District of Columbia, Armed Robbery, dismissed; 1987, District of Columbia, Attempted Distribution of Marijuana, guilty, sentenced to one year of incarceration, suspended, 12 months probation; 1987, District of Columbia, Bail Reform Act violation, guilty, 12 months' probation; 1987, District of Columbia, Shoplifting, guilty, sentenced to 20 days' incarceration; 1988, District of Columbia, Attempted Possession of Cocaine, guilty, sentenced to 120 days' incarceration, suspended, two years' probation, probation revoked 1989; 1990, District of Columbia, Distribution of Cocaine, Guilty, sentenced to three-nine years' incarceration, suspended, two years' probation; 1990, District of Columbia, Distribution of Cocaine, dismissed; 1997, District of Columbia, Simple Assault, dismissed; 2004, District of Columbia, Possession with Intent to Distribute Heroin, dismissed; 1995, Prince Georges County, Maryland, Battery (Deadly Weapon), dismissed; 1986, Prince Georges County, Maryland, Theft (misdemeanor), guilty; sentence not recorded; 1987, Maryland, Shoplifting, guilty, sentenced to one month of incarceration; 1985, Alexandria, Virginia, Concealment (misdemeanor), guilty, sentence not recorded; 1986, Arlington, Virginia, Shoplifting, guilty, sentenced to one week of incarceration; 1999, Ohio, Conveyance of Weapons and Attempted Drug Abuse, guilty, sentenced to 180 days' incarceration, suspended all but 30 days, with one year of probation.

(h) **DONALD ADRIAN HUNTER a/k/a TERRY SAMUEL,** is a black male born on August 9, 1964. He is described as approximately 5'11' tall, weighing approximately 165 pounds with a Social Security Number 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. **HUNTER** is believed to reside at 3202 Curtis Drive, Apartment # 708, Temple Hills, Maryland. A search of FBI criminal history records for **HUNTER**

11

(FBI# 347990CA2) revealed the following criminal history: 1984, District of Columbia, Taking Property Without Right, Second Degree Theft, dismissed; 1987, District of Columbia, Attempted Distribution of Cocaine, sentenced to 20 months to five years of incarceration, execution of sentence suspended; 1987, District of Columbia, Possession of Cocaine, sentenced to 14 days' incarceration, 1987, District of Columbia, Simple Assault, found not guilty; 1990, District of Columbia, United States District Court, pled guilty to Conspiracy to Possess with Intent to Distribute Cocaine, sentenced to 121 months' incarceration, eight years' supervised release; and Assault with a Deadly Weapon, sentenced to 120 months' incarcerations and eight years' supervised release; supervised release revoked 2000, sentenced to 18 months' incarceration; 2000, District of Columbia, Robbery, Possession of a Firearm During a Crime of Violence, dismissed, 2001; Prince George's County, Possession With Intent to Distribute a Controlled Substance, dismissed; 2002, District of Columbia, Disorderly Conduct, dismissed, Reckless Driving, sentenced to three months' incarceration, Violating a Drug Free Zone, dismissed; 2005, District of Columbia Superior Court, Possession with Intent to Distribute Heroin, currently pending.

(i) **ADRIAN JACKSON** is a black male, born July 11, 1978. He is described as 5'8" tall and 185 pounds, with a Social Security Number of 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. **JACKSON** is believed to reside at 2627 Bowen Road, S.E., Apartment 102, Washington, D.C. A search of FBI criminal history records for **JACKSON** (FBI# 941681FB3) revealed that he has convictions for narcotics and weapons offenses, his most recent conviction being for Carrying a Handgun in Maryland in 2004; in addition, he has a pending case for Carrying a Pistol without a License in the District of Columbia, for which he was indicted in December, 2004.

(j) **DIANE BUSHROD, a/k/a, DIANE SMITH** is a black female, believed to be born on February 25, 1960, with a second listed date of birth of February 25, 1962. She is described as 5'9" and tall 250 pounds, with a Social Security Number of 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. **BUSHROD** is believed to reside at 3430 21st Street, S.E., Washington, D.C., but the address listed on her driver's license is 3103 Sherman Avenue, N.W., Washington, D.C. A search of FBI criminal history records for **BUSHROD** (FBI# 379746CA3) revealed that she has arrests for narcotics violations, and that her most recent conviction is for Attempted Distribution of Marijuana in 1988.

(k) **TERRENCE DIXON a/k/a NIMROD BABYLON**, is a black male born on January 16, 1979. He is described as 5'8" tall and 120 pounds, and uses Social Security Numbers 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 and 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. **DIXON** is believed to reside at 1220 North Scott Street, apartment 202, Arlington, Virginia. A search of FBI criminal history records for **DIXON** (FBI # 872752DB8) revealed that he has arrests for sexual assault, kidnaping and weapons offenses. In January 1999, he was convicted in the District of Columbia of Possession with Intent to Distribute Cocaine While Armed, Carrying a Pistol Without a License, and Unlawful Possession of Ammunition for which he was sentenced to terms of incarceration of three to nine years, 20 to 60 months and one year respectively.

(l) **KIRK R. CARTER** is a black male born on April 9, 1963. He is described as 5'8" tall and 160 pounds, and uses Social Security Number 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. **CARTER** is believed to reside at 2504 Pomeroy Road, S.E., Apartment 402, Washington, D.C. A search of FBI criminal history records (FBI# 362520DA9) revealed that **CARTER** has a 1990 conviction in United States District Court for the District of Columbia for Conspiracy to Distribute Cocaine, for which he was sentenced to a term of incarceration of 135 months. He also has two other federal court narcotics trafficking

13

cases, which appear to have been consolidated with the 1990 Conspiracy case. In addition, he has a 2004, Possession of Marijuana case, for which he was given Diversion, in lieu of a criminal conviction.

(m) **TWANDA CAMPBELL** is a female born on January 27, 1967, with a Social Security Number of 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. She is believed to reside at 5412 D Street, S.E., Washington, D.C., although the cellular telephone subscribed to in her name lists an address of 3920 Brooklyn Avenue, Baltimore, Maryland. Investigation revealed no additional information regarding **CAMPBELL**.

(n) **DAMIEN LOMERT BROUSSARD**, is a black male born on February 15, 1975. He is described as 6 feet tall and 145 pounds, with a Social Security Number of 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, and additional Social Security Numbers of 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, and 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. **BROUSSARD**'s address is unknown at this time, and his last-known mailing address is P.O. Box 16927, Lake Charles, Louisiana.[1] A search of FBI criminal history records (FBI# 485536RA9) revealed that **BROUSSARD** has had at least seven arrests for Cocaine and Marijuana Distribution, and related offenses, in Lake Charles, Louisiana, dating back to 1992, with at least one conviction for Felony Possession of Cocaine, for which he is on probation until 2008.

(o) **TYMIRA HUNTER** is a black female, born on February 19, 1973. She is described as 5'3" tall and 137 pounds, with a Social Security Number of 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.[2] **HUNTER** is believed to reside at 1238 D Street, N.E., Washington, D.C. A search of FBI criminal history records (FBI#

---

[1]    **BROUSSARD** has a relative named **QUENTESA BROUSSARD**, who resides at 432 Longfellow Street, N.W., Washington, D.C. As set forth more fully *infra*, investigators believe that **DAMIEN BROUSSARD** is using a cellular telephone in the name of **QUENTESA BROUSSARD**, to engage in narcotics-trafficking activity with **ANTOINE JONES**.

[2]    At this time, investigators know of no relationship between **TYMIRA HUNTER** and **DONALD HUNTER, a/k/a TERRY SAMUEL**.

821196RA8) revealed that **HUNTER** has arrests for Unauthorized Use of a Motor Vehicle and Theft II, and a conviction in 1997 for Assault with a Dangerous Weapon, Knife, in the District of Columbia, and a pending case in Hyattsville, Maryland, charging her with Seconds Degree Assault, Disorderly Conduct, and related charges.

(p) **WALLACE WARD** is a black male, born December 15, 1960. He is described as 6'2" tall and 335 pounds, with a Social Security Number of 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. **WARD** is believed to reside at 4734 Rollingdale Way, Capitol Heights, Maryland. A search of FBI criminal history records (FBI# 286555WA8) revealed that **WARD** was convicted in 1995 in federal court in Maryland of Conspiracy to Commit Food Stamp Fraud.

(q) **FNU, LNU, a/k/a/ KARISA JONES** is believed to be a fictitious person, as investigators could find no information of any kind regarding this individual.

(r) **NITA WORLEY** is believed to be **GENNELL ANITA WORLEY**, born on August 22, 1972. While no current address information is available for **WORLEY**, a search of F.B.I. criminal history records (FBI# 455656HB8), revealed that **WORLEY** has a conviction for Felony Larceny in Arlington, Virginia.

## F.  PRIOR APPLICATIONS

12. On July 6, 2005, July 7, 2005, July 21, 2005, August 1, 2005,  August 4, 2005, and August 26, 2005, I caused the records of the FBI, and the DEA to be searched, and on the basis of those searches, I have learned the following: On June 16, 1997, the Honorable Paul L. Friedman, United States District Judge of the United States District Court for the District of Columbia, issued an order in Miscellaneous Case Number 97-166, authorizing the interception of wire communications to and from a telephone used by **ANNETTE BIGESBY**. Interceptions began on

that date and were terminated ten days later. The authorization for interception was requested by the FBI in connection with an investigation being conducted into cocaine trafficking, by Roderick Samuel Johnson, a/k/a "Pepsi," and his associates in the area of the Clifton Terrace apartments in Northwest Washington, D.C. In the course of the investigation, Roderick Samuel Johnson, a/k/a "Pepsi," and others were prosecuted for drug trafficking offenses. **BIGESBY** was not prosecuted in that case. With the exception of **BIGESBY**, none of the targets or subjects of that investigation are named as targets or subjects in this affidavit. Except for the fact that both had telephone contact with **BIGESBY** at various times over an approximate seven year period, your affiant is not aware of any connection between **ANTOINE JONES, LAWRENCE MAYNARD,** and other targets or subjects of this investigation, and Roderick Samuel Johnson, a/k/a "Pepsi," and the other subjects of the 1997 FBI investigation. With the exception of the above-described wire interceptions on **BIGESBY**'s telephone in 1997, I represent that no previous applications have been made to any judge of competent jurisdiction for authorization to intercept, or for approval of interception of wire, oral, or electronic communications involving the same persons or facility specified herein.

### G. SUMMARY OF INVESTIGATION

13. In October, 2004, the FBI obtained information that a large narcotics trafficking organization was operating in the greater Metropolitan Washington, D.C., area and elsewhere.[3] This organization, which is headed by **ANTOINE JONES**, is responsible for the distribution of cocaine.

---

[3]     This summary is intended to give the reader an overview of the investigation. The details of the investigation to support the accompanying application for the order authorizing the interceptions requested are more fully set forth in the section of this affidavit entitled "Details of Investigation."

14. Based on information obtained from confidential sources and corroborated by physical surveillance, analysis of telephone records and pen registers, and other investigative techniques, the FBI has learned that **ANTOINE JONES** is the main supplier of large quantities of cocaine, including kilogram quantities, for the drug trafficking organization. Investigation into **ANTOINE JONES's** background revealed that he has an extensive history of trafficking in narcotics, particularly cocaine. **ANTOINE JONES** was arrested in 1993 and charged with Possession with Intent to Distribute 50 Grams or More of Cocaine Base, and Using and Carrying a Firearm During a Drug Trafficking Offense, in connection with a cocaine distribution scheme that moved numerous kilograms of cocaine through the Washington, D.C. area. In that case, **ANTOINE JONES** was released on personal recognizance pending trial. After having been indicted, and while still on release, **ANTOINE JONES** was arrested in possession of over 600 grams of cocaine, charges to which he eventually pled guilty. **ANTOINE JONES** now maintains a discreet operation, and limits his contacts to individuals known to him personally, or introduced to him by trusted, well known associates. When he does engage in drug transactions, he does so almost exclusively with the assistance of his right-hand associate, **LAWRENCE MAYNARD,** one of the few people with whom he will deal directly.

15. **ANTOINE JONES** is the sole proprietor of a nightclub named "**LEVELS,**" which is located at 1960 Montana Avenue, N.E., Washington, D.C. Investigators believe that **ANTOINE JONES** uses his business as a location where he can conduct his drug trafficking activities, as well as launder drug trafficking proceeds. **MAYNARD** is listed as the "A.B.C. manager" of the nightclub in the records on file with the District of Columbia Alcoholic Beverage Regulatory Agency (ABRA).

17

16. According to information provided by confidential sources, and confirmed through various law enforcement means, **MAYNARD** undertakes many tasks on behalf of **ANTOINE JONES's** narcotics trafficking organization, including but not limited to being an intermediary and a point of contact between **ANTOINE JONES** and his drug suppliers and customers. On what investigators believe is a monthly basis, **MAYNARD** drives a vehicle that is usually supplied by **ANTOINE JONES** to unknown locations outside of the District of Columbia where he meets with an unknown supplier(s), exchanges large quantities of U.S. currency for kilogram quantities cocaine, and then transports the cocaine back to the greater Washington D.C. area for redistribution.

17. As set forth in more detail below, there is probable cause to believe that **ANTOINE JONES** has used, and will continue to use, the **target telephone** to facilitate and conduct his illegal drug business, to include, *inter alia*: (a) arranging for receipt of large, multiple-kilogram quantities of cocaine from suppliers; (b) arranging for the re-distribution to customers of smaller quantities of cocaine up to and including several kilogram quantities; (c) contacting other members of the narcotics trafficking organization; (d) facilitating the interstate transportation of illegal narcotics and money; and (e) monitoring law enforcement activities.

## H. DETAILS OF INVESTIGATION

18. During the course of this investigation, three confidential sources, who are cooperating with law enforcement, have provided details regarding **ANTOINE JONES'** large-scale narcotics trafficking organization. The information provided by these confidential sources has been corroborated by independent investigation, including but not limited to surveillance, search warrants, debriefings of additional confidential sources and witnesses, a review of available subscriber information and pen-register data, and a review of stored text-messages on the cellular telephones

18

of **MAYNARD** and **ANTOINE JONES**, obtained via search warrant.

<u>Confidential Source Number One</u>

19.   Confidential Source Number One, hereinafter referred to as CS-1, was arrested on narcotics-related offenses and entered into a plea agreement which requires him to cooperate with the government in exchange for the possibility of a reduced sentence.   CS-1 has provided reliable information concerning **ANTOINE JONES's** organization and other significant narcotics traffickers in the District of Columbia area.   CS-1's information has been corroborated by other sources of information, such as pen register data and physical surveillance, other evidence gathered during this investigation, and other investigations conducted by law enforcement.   CS-1 has never been known to provide false or inaccurate information.   Moreover, CS-1 has provided information in other investigations which has been verified by law enforcement as being accurate.

20. CS-1 has known **ANTOINE JONES, a/k/a "TOINE,"** since sometime in the summer of 2003. CS-1 met **LAWRENCE MAYNARD,** through **ANTOINE JONES**, sometime thereafter. CS-1 has identified photographs of **ANTOINE JONES** and **MAYNARD**.   CS-1 met **ANTOINE JONES** in **ANNETTE BIGESBY's** shop, DE ANJA's HAIR SALON, 1116 H Street, N.E., Washington. CS-1, who is a close associate of **BIGESBY,** is familiar with her narcotics trafficking activity and knows that she often used the hair salon as a location for narcotics distribution.   In the summer and fall of 2003, CS-1 would often see **ANTOINE JONES** leaving **BIGESBY's** shop.

21.   Based on its contacts with **BIGESBY**, CS-1 knows that for a time in approximately 2004, **BIGESBY** was selling heroin out of a house in the District of Columbia.   CS-1 said that in addition, **BIGESBY** used an apartment on Kenilworth Avenue, N.E., Washington, D.C. as a stash location as well as to cook and bag up cocaine which CS-1 believed she purchased from **ANTOINE**

JONES. CS-1 said that **BIGESBY** made threats to disrupt his drug business to **ANTOINE JONES** in the fall of 2004, over a drug-related business dispute. CS-1 further states, based on its contacts with **BIGESBY**, that **BIGESBY** is continuing to facilitate drug transactions by referring prospective drug purchasers to drug suppliers.

22.   In 2002, before CS-1 met **ANTOINE JONES**, CS-1 always obtained wholesale quantities of cocaine with other individuals, including **DONALD ADRIAN HUNTER, a/k/a TERRY SAMUEL,** who, CS-1 learned, in turn purchased cocaine directly from **ANTOINE JONES**. A short time after personally meeting **ANTOINE JONES** at **BIGESBY's** hair salon in the summer of 2003, CS-1 began buying multiple kilogram quantities of cocaine directly from **ANTOINE JONES**. CS-1 estimated having purchased in excess of fifty (50) kilograms of cocaine directly from **ANTOINE JONES** over the course of their drug business relationship which extended from the summer of 2003 until the fall of 2004.

23.   CS-1 reported that **HUNTER** has continued his drug-trafficking relationship with **ANTOINE JONES** since that time, up to and including the present-day. In a conversation during the second week of August, 2005, **HUNTER** reported to CS-1 that within the past week, he had purchased "half a brick" (half a kilogram) of cocaine from **ANTOINE JONES** for $11,500.00. **HUNTER** reported that he had intended to purchase a full kilogram from **ANTOINE JONES**, but he could not get enough money together to do so. According to **HUNTER**, "**TOINE [ANTOINE JONES]** is back all the way live." **HUNTER** encouraged CS-1 to "get back in the game" with narcotics from **ANTOINE JONES**, going so far as to offer to serve as the middle-man between CS-

1 and **ANTOINE JONES**.[4]

24.  CS-1's report of this cocaine transaction between **HUNTER** and **ANTOINE JONES** is supported by a large number of telephone calls between **HUNTER** and **ANTOINE JONES** in the days leading up to, and at the time of, the transaction, which investigators believe took place some time during the weekend of August 5-7, 2005.[5]  Analysis of recent pen-register data reveals the following pattern of telephone contact between the **target telephone, (202) 538-3946**, which is believed to be used by **ANTOINE JONES**, and (202) 380-2139, the telephone listed to **HUNTER** at 3202 Curtis Drive, Temple Hills, Maryland: between June 23, 2005, and August 24, 2005, there

---

[4]  Your affiant notes that it would be impossible for CS-1 to take **HUNTER** up on his offer to facilitate a drug transaction between CS-1 and **ANTOINE JONES** because CS-1 will not be able to redistribute the narcotics, as **HUNTER** would expect.  Because **HUNTER** and CS-1 know many of the same people, including a large group of shared customers, there is no way for CS-1 to safely make a wholesale purchase from **HUNTER** and **ANTOINE JONES** without these mutual customers hearing that he was "back in the game."  Indeed, in recent weeks, several of CS-1's former customers have approached CS-1, seeking to purchase narcotics, stating that "word on the street" is that the drug case against him was dropped back in July 2005.  CS-1 has rebuffed these former customers, stating that it is taking its time before selling cocaine again, in large part because it is unsure who set it up in that case.  (The case against CS-1 stemmed from a series of videotaped purchases from CS-1 to a confidential source).  It is also unlikely that **ANTOINE JONES** would sell cocaine to CS-1 in any event, due to **ANTOINE JONES's** suspicions that CS-1 may be cooperating with authorities.  In March, 2005, CS-1 made in-person efforts to reestablish contact with **ANTOINE JONES**, in the hopes of making a controlled purchase of narcotics from him; however, **ANTOINE JONES** rebuffed CS-1, stating that "no one has been doing anything since [CS-1] got locked up," that his wife was "picking up the slack" with her real estate business, and that "everyone still has their guards up."  This conversation, which by its thinly-veiled references to past illicit activity, further confirms CS-1's claims of a narcotics-trafficking relationship with **ANTOINE JONES**, was recorded on a body wire.

[5]  In June 2005, your affiant obtained a pen register in U.S. District Court for the District of Columbia, ordered by Magistrate Judge Facciola, for telephone number **(202) 538-3946, the target telephone,** a cellular telephone subscribed to by DENISE JONES (wife of **ANTOINE JONES**), 12221 Brandywine Road, Brandywine, Maryland.

were 98 calls between the **target telephone** and **HUNTER** (date last dialed: August 24, 2005).

**HUNTER** and **ANTOINE JONES** spoke nearly every day in the month of July, 2005. In addition, on August 4, 2005, and again on August 6, 2005, there was a cluster of telephone activity between these two phones - precisely the time-frame in which investigators believe **HUNTER** purchased the half-kilogram of cocaine from **ANTOINE JONES**. Specifically, on August 4, 2005, **HUNTER** called **ANTOINE JONES** at 6:34 pm, and again at 6:35 pm. **ANTOINE JONES** called **HUNTER** back at 7:30 pm, and again at 10:12 pm. Then, on August 6, 2005, at 12:23 am, **HUNTER** called **ANTOINE JONES**, a call which lasted 3 seconds. At 12:24 am, and again at 12:27 am, **ANTOINE JONES** called **HUNTER** back, and the pair spoke for 43 seconds and one minute 48 seconds, respectively. According to the cellular-site tracker, **ANTOINE JONES** was in the cellular site that covers his night club **LEVELS** – a location from which, according to both CS-1 and CS-2, he frequently distributes cocaine – at the time that they had these conversations. Based on the fact that this flurry of calls between **HUNTER** and **ANTOINE JONES** is contemporaneous with **HUNTER**'s report of his purchase of half of a kilogram of cocaine from **ANTOINE JONES**, your affiant believes that these calls related specifically to this wholesale narcotics sale from **ANTOINE JONES** to **HUNTER**. In addition, after these August 6, 2005 calls, there was no telephone contact between these two telephone numbers until August 16, 2005, at which point there was a total of 24 calls between **ANTOINE JONES** and **HUNTER** from August 16 - August 24, 2005. Based on **HUNTER's** expressed desire to obtain more cocaine from **ANTOINE JONES**, in addition to the half-kilogram he purchased in early August, your affiant believes that this additional high volume of telephone calls between the pair is related to **HUNTER's** purchase of more cocaine from **ANTOINE JONES**, with proceeds from the resale of his initial half-kilogram purchase. As set forth

previously at paragraph 11(h), **DONALD ADRIAN HUNTER** has numerous narcotics-related arrests, and several convictions, including a federal court narcotics conviction, which resulted in incarceration, and also has a pending narcotics distribution case in the Superior Court of the District of Columbia.

25. This belief that **ANTOINE JONES** had a large quantity of cocaine available for sale in early August, 2005, is confirmed by suspicious use by both **ANTOINE JONES** and **MAYNARD** of the text-messaging function of their cellular telephones. On August 10, 2005, your affiant obtained a search warrant for the content of the electronic communications -- i.e., text messages -- which Sprint Spectrum LP (pertaining to **MAYNARD's** cellular telephone, (301) 613-6293), and Cingular Wireless (pertaining to the **target telephone, (202) 538-3946, ANTOINE JONES's** phone) had in electronic storage. Of the relatively small number of text-messages to and from the **target telephone**, during the timeframe from April 18, 2005, through August 11, 2005 (the period for which Cingular Wireless had messages in electronic storage), several contained suspicious content. First, there were numerous messages which simply contained a phone number, which investigators believe to be the equivalent of a page -- i.e., a message asking **ANTOINE JONES** to call that number.

(b) 19 were to the two telephone numbers listed to **DIANE BUSHROD**, who, as set forth more fully in paragraph 11(j), has numerous narcotics arrests; (c) there are several other page messages to telephone numbers whose subscribers have known narcotics histories; and finally (d)



26. In addition, while there was not a large number of text-messages with substantive content, of those, several were suspicious. First, there were four messages from (301) 768-8466, a telephone number listed to QUENTESA BROUSSARD, and believed to be used by her relative, **DAMIEN BROUSSARD,** who as noted in paragraph 11(n), has numerous narcotics-related arrests, and at least one conviction. On May 29, 2005, at 5:21 a.m., the telephone believed to be used by **DAMIEN BROUSSARD** sent a message to **ANTOINE JONES** saying: "Need ones." Then, on June 4, 2005, at approximately 5:36 a.m., the phone believed to be used by **DAMIEN BROUSSARD** sent a message to **ANTOINE JONES**, that appeared to be forwarded from another number, saying: "Need ones bad." Further, on June 27, 2005, at approximately 4:46 a.m., **DAMIEN BROUSSARD** sent a message stating: "Need 2 talk 2 u tonight please. R u coming in?" Finally, on July 1, 2005, at approximately 7:20 p.m., **DAMIEN BROUSSARD** sent a message stating: "Have your package, will c u 2nite at work if that's okay." During the same time frame as these text-messages, **ANTOINE JONES** called **DAMIEN BROUSSARD's** number on two occasions (date of last contact: July 1, 2005). Investigators believe that these messages are consistent with the encryption frequently used by narcotics traffickers in an effort to elude law enforcement, and are in fact related to **DAMIEN BROUSSARD's** repeated efforts to purchase kilograms of cocaine ("ones") from **ANTOINE JONES** in late June/early July, 2005. There is frequent activity on

MAYNARD's pen register with this number as well.

27.  In addition, there was a suspicious series of text-messages to **ANTOINE JONES** from (301) 379-4141, which is listed to **WALLACE WARD**, 4734 Rollingdale Way, Capitol Heights, Maryland.  First, on June 12, 2005, **WARD** sent the **target telephone** a test-message stating: "You should get at me as soon as u get a chance you will like me i promise check me out."  This message is followed on June 13, 2005, by two text-messages from **WARD** to **ANTOINE JONES**, one minute apart, stating: "Just between me and u get at me asap," and "You should get at me as soon as you get a chance you wou."  A review of the pen register data pertaining to the target telephone revealed that **ANTOINE JONES** called **WALLACE WARD** on at least four occasions during the pertinent pen register period (date last dialed: August 22, 2005).  As set forth below, **WALLACE WARD** is the recipient of suspicious text-messages from **MAYNARD** as well.  Investigators similarly believe that these are encoded messages from **WARD** to **ANTOINE JONES**, intended to alert **ANTOINE JONES** that **WARD** wished to purchase narcotics.

28.  With respect to **MAYNARD's** text-messaging data, of the approximately 180 text-messages to and from (301) 613-6293, between the dates August 4, 2005, and August 10, 2005,[7] several contained similarly suspicious content, in particular, two text-messages on August 4, 2005, from **MAYNARD** to (301) 379-4141, the phone listed to **WARD**, stating: "My man is back up and working with a monster."  In addition, **MAYNARD** sent a text-message to (301) 536-0913, a phone

---

[7]    Sprint Spectrum LP advised your affiant that, due to problems with their computer system, they were only able to supply text-messages for these dates.

number listed to **TYMIRA HUNTER**,[8] 5623 30th Avenue, Hyattsville, Maryland, on August 5, 2005, with similar content: "My man is working with a big monster – back up working with a monster." **MAYNARD** sent this same message to another telephone number, (301) 576-0913, registered to **TYMIRA HUNTER**, also on August 5, 2005: "What are you doing? - - - Back up working with a monster :-)." Finally, over the course of six minutes on August 6, 2005, **MAYNARD** sent a series of five text-messages to different telephone numbers, all with identical content: "Good Morning!!!" These messages are consistent with the report of CS-1, who indicated that **ANTOINE JONES** and **MAYNARD** frequently used codes – such as telling CS-1 that they wanted to meet it "in the morning for breakfast" – to indicate that the most recent shipment of cocaine had arrived, and was available for pickup. Given the close timing of these messages, on August 4-6, 2005, and their coincidence with the time frame in which investigators believe **DONALD HUNTER** purchased half a kilogram of cocaine from **ANTOINE JONES**, your affiant believes that these messages by **MAYNARD** are similarly intended to indicate to customers that **ANTOINE JONES** had received his latest shipment of cocaine, which was available for pickup.

29. Further, **MAYNARD's** telephone received two suspicious messages from (202) 528-3405, which is registered to **KARISSA JONES**, 11010 Mt. Lubenita Way, Upper Marlboro, Maryland, in the early morning hours of August 6, 2005, seemingly placing an "order": "2 cokes & malibu, pls. Ka$h Money," followed shortly thereafter by "Need a can opener! Ka$h Money." Finally, in similar fashion, **MAYNARD's** telephone received a message from a Skytel.com pager, with the name **NITA WORLEY** in the message line, at approximately 10:15 p.m., on August 5,

---

[8]       At this point in the investigation, investigators know of no relation between **TYMIRA HUNTER** and **DONALD HUNTER, a/k/a TERRY SAMUEL.**

2005, stating: "I need ice 4my beer." Investigators believe that these are similarly encoded narcotics-trafficking messages, by which the sender is indicating a desire to purchase a wholesale quantity of cocaine from **ANTOINE JONES** through his right-hand associate **MAYNARD**.

30. In addition, of the 94 calls between **ANTOINE JONES**, using the **target telephone**, and **MAYNARD**, from August 1-23, 2005, 43 took place within the first week of August, which is the week in which (a) **MAYNARD** sent and received this series of highly-suspicious, encoded text-messages, (b) **HUNTER** purchased half of a kilogram of cocaine from **ANTOINE JONES**, and (c)

Investigators believe that many of these conversations between **MAYNARD** and **ANTOINE JONES** during this period were related to the mechanics of the re-sale of the most recent multi-kilogram shipment of cocaine.

31. Investigators' belief that **ANTOINE JONES** and **MAYNARD** are selling wholesale quantities of cocaine to numerous customers in the greater Washington, D.C., area is confirmed by CS-1's report that he knew several individuals throughout the greater Washington, D.C. area who also were buying cocaine from **ANTOINE JONES** during the period during which CS-1 purchased cocaine from **ANTOINE JONES** because, as CS-1 described, **ANTOINE JONES'** prices were good; he usually charged CS-1 $20,000.00 per kilogram. On numerous occasions during 2004, CS-1 saw a number of persons known to it to be wholesale narcotics distributors at special events nights at **ANTOINE JONES'** club **LEVELS**, located at 1960 Montana Avenue, N.E., Washington, D.C.

32. In terms of the specifics of how **ANTOINE JONES** transacted business, according to CS-1, **ANTOINE JONES** often "fronted," i.e., sold on consignment, multiple kilograms of cocaine to CS-1. At one point during their drug relationship, CS-1 owed **ANTOINE JONES** over $500,000.00 for cocaine, which CS-1 paid back in installments. CS-1 said it was not uncommon for it to owe **ANTOINE JONES** large sums of money for consigned cocaine.

33. CS-1 reported that, based on its conversations with **ANTOINE JONES** and **MAYNARD, ANTOINE JONES** and **MAYNARD** traveled out of the Metropolitan Washington, D.C., area near the end of each month to obtain multiple-kilogram quantities for cocaine for redistribution. While CS-1 does not know precisely where **ANTOINE JONES** and **MAYNARD** traveled to pick up the narcotics, it recalled hearing **ANTOINE JONES** state that they were "goin' down the road" and refer to "Carolina." Further, CS-1 noted that **MAYNARD** and **ANTOINE JONES** always returned from their trip to obtain narcotics within 24 hours of departing, and often called CS-1 during the trips from **MAYNARD**'s cellular phone, (301) 613-6293, or a pre-paid disposable cellular phone, which CS-1 referred to as a "throw away phone". In the background of such telephone calls, the most recent of which took place in fall 2004, CS-1, who is familiar with money counting machines, occasionally heard the distinctive sound of a money-counting machine. CS-1 additionally reported that, while it was not aware of the specific identity of **ANTOINE JONES'** narcotics supplier, it recalled **ANTOINE JONES** or **MAYNARD** mention narcotics coming from "the Mexicans" and "Texas."

34. CS-1 reported further that **ANTOINE JONES** stated that **MAYNARD** always drove the vehicle for these trips to obtain narcotics because **ANTOINE JONES** is on Supervised Release for his previous narcotics convictions. According to CS-1, **MAYNARD** received $250.00 for every

28

half-kilogram and $500.00 per kilogram of cocaine that he transported. Based on surveillance throughout this investigation and continuing up until the present, and other investigation, it appears that **ANTOINE JONES** no longer accompanies **MAYNARD** on every trip.

35. CS-1's information is corroborated by a traffic stop of **MAYNARD** on April 5, 2005. As set forth more fully *infra* at paragraphs 64-71, on that date, the Highway Interdiction Unit of the Durham, North Carolina Police Department conducted a traffic stop of a 1997 Honda Odyssey mini-van bearing Maryland tags 273M195, operated by **MAYNARD** and also occupied by **DERRICK GORDON** in the vehicle front passenger seat. Their investigation revealed that this car was registered to **ANTOINE JONES**, with a date of birth of February 25, 1960, and to one of his residences, 12221 Brandywine Road, Brandywine, Maryland. In the course of further investigation, the interdiction unit canine alerted on the right rear passenger area of the mini-van. A search of the mini-van revealed a hidden compartment in the van, which contained six white plastic Target shopping bags, containing a total of $67,115.00 in U.S. currency, in various denominations, held together by rubber bands. In addition, both **MAYNARD** and **GORDON** had in their possession well in excess of $1,000.00, which totaled just under $5,000.00. When interviewed by the Interdiction Unit, **MAYNARD** and **GORDON** both denied any knowledge of the secret compartment and the money contained therein. The Honda Odyssey was impounded, the $67,115.00, was seized as evidence, **MAYNARD** and **GORDON** received a warning ticket, and then were released without additional charges.

36. During the course of its drug trafficking relationship with **ANTOINE JONES** in 2003 and 2004, CS-1 met **ANTOINE JONES** at various locations throughout the Washington, D.C. Metropolitan area to conduct transfers of both money and drugs. CS-1 reported that, in order to

designate meeting locations for the transfer of money and narcotics, CS-1 and **ANTOINE JONES** frequently used special codes. For example, CS-1 knew that any reference to "supplies" meant that **ANTOINE JONES** wanted to meet at the Home Depot in Landover, Maryland. When **ANTOINE JONES** said to meet at "the gym," CS-1 knew to go to the work out complex near FedEx Field, also in Landover; references to "the club" meant that **ANTOINE JONES** wanted to meet at **LEVELS**. Indeed, whenever **ANTOINE JONES** told CS-1 to meet him at the club, CS-1 knew that **ANTOINE JONES** had drugs on-hand. Similarly, as noted *supra*, while still out of the area picking up the wholesale quantities of narcotics, **ANTOINE JONES** often would call CS-1 from a prepaid disposable phone and tell CS-1 that he wanted to "meet in the morning for breakfast." CS-1 noted that the parties never actually ate breakfast, but rather, this was a code indicating that **ANTOINE JONES** would have narcotics available for purchase the following morning.

37. CS-1 further reported that on occasion, CS-1 contacted **MAYNARD** on his cellular telephone, (301) 613-6293, because **ANTOINE JONES** often discarded his prepaid cellular phones to avoid detection by law enforcement. CS-1 noted that **MAYNARD**'s cellular phone number, (301) 613-6293, has remained the same since CS-1 began its dealings with **ANTOINE JONES** and **MAYNARD** in 2003, up to an including its last telephone contact with **ANTOINE JONES** and **MAYNARD** in the fall, 2004. CS-1 does not know **ANTOINE JONES**' current cellular telephone number. Investigation has revealed that (301) 613-6293, remains the cellular telephone number **MAYNARD** uses to the present day. On still other occasions, CS-1 would contact **ANTOINE JONES** on the landline telephone at **LEVELS**, (202) 269-0100, to arrange a time and place for the drug transaction.

38. Typically, prior to receiving the drugs from **ANTOINE JONES**, CS-1 would take the "drug payment money," in varying amounts, ranging from $10,000 to in excess of $100,000, to **ANTOINE JONES** at his club, **LEVELS**, located at 1960 Montana Avenue, N. E., where it would give the money directly to **ANTOINE JONES**.   CS-1 would then arrange for pickup of the narcotics, as described herein. At other times, **ANTOINE JONES** would front the cocaine to CS-1, for later payment. On a few occasions, CS-1 gave money to **ANTOINE JONES** at the same time that it received cocaine.

39. On one occasion, CS-1 met **ANTOINE JONES** at "DENO's," a nightclub located in the 2300 block of Bladensburg Road, N.E., Washington, D.C., and obtained cocaine directly from **ANTOINE JONES**. CS-1 reported that it and **ANTOINE JONES** also met at various locations in Maryland, as set forth in paragraph 36 above, and obtained cocaine from **ANTOINE JONES** there.

40. CS-1 reports that **ANTOINE JONES** drove several different vehicles when making deliveries of cocaine to CS-1, including a white van, and a gold or champagne-colored Jeep Cherokee. Surveillance of **LEVELS**, over a several-month span in 2004 and 2005, revealed that a white Plymouth van, with Maryland registration 097M893, was parked outside the club on several occasions.

41. From time to time, CS-1 also went to **ANTOINE JONES's** club **LEVELS** to pick up the cocaine it had ordered.  CS-1 would sometimes drop a bag, such as a department store bag, a grocery store bag or a dark colored backpack containing money at a designated location within the club. **ANTOINE JONES** would then direct CS-1 to his truck, described as a gold or champagne-colored Jeep Cherokee, that was parked outside the night club. **ANTOINE JONES** would unlock

the truck for CS-1 using the automatic key remote and CS-1 would retrieve the designated number of kilograms of cocaine from the cocaine stored in the vehicle.

42. Surveillance conducted by law enforcement at **LEVELS**, over a several-month span in 2005, revealed that a champagne-colored Jeep Grand Cherokee, Maryland tag number M667480, registered in the name of DENIECE JONES, 12221 Brandywine Road, Brandywine, Maryland, was parked at the club over 36 times. DENIECE JONES is the wife of **ANTOINE JONES**.

43. According to CS-1, **ANTOINE JONES** often had bags, such as duffel bags and over the shoulder bags, full of kilograms of cocaine when CS-1 went to pick up the drugs that it had ordered. CS-1 described the kilograms as packages of powder, sealed in black wrapping material. CS-1 said that each package of cocaine had an "emblem" on it. CS-1 described some of the emblems as 4's, stars, jokers, butterflies or funny faces.

44. Sometime in spring, 2005, CS-1 saw **MAYNARD** upstairs at **LEVELS**, carrying a dark-colored backpack. CS-1 became suspicious because this bag looked similar to the types of bags **ANTOINE JONES** and **MAYNARD** used when transporting their narcotics.

45. On May 20, 2005, CS-1 positively identified from Metropolitan Police Department and Department of Motor Vehicles photographs several persons, including: **NICHOLAS JONES, a/k/a, TOBY, ANTOINE JONES, LAWRENCE MAYNARD,** and his wife JOYCE MAYNARD, **DERRICK GORDON**, and **BRADFORD WADDELL**.

32

<u>Confidential Source Number Two</u>

46. Confidential Source Number Two (CS-2) intends to plead guilty to narcotics trafficking charges in the United States District Court for the District of Columbia and has provided information to the FBI concerning narcotics trafficking in the Washington, D.C. area. CS-2 has provided reliable information concerning **ANTOINE JONES'** organization and other significant narcotics traffickers in the District of Columbia area. CS-2's information has been corroborated by other sources of information, other evidence gathered during this investigation, and other investigations conducted by law enforcement. CS-2 has never been known to provide false information.[9]

47. In 2003 and 2004, CS-2 bought kilogram quantities of powder cocaine approximately ten times from **ANTOINE JONES.** CS-2 was arrested in 2004 with a large wholesale quantity of cocaine that CS-2 had recently purchased from **ANTOINE JONES.**

48. CS-2 met **ANTOINE JONES** sometime around November, 2003, through a person with whom CS-2 dealt on a regular basis. This person told CS-2 that it had a long-term drug business relationship with **ANTOINE JONES.** For several months in late 2003 and early 2004, CS-2 purchased cocaine from **ANTOINE JONES** through this middleman in quantities ranging from an eighth of a kilogram to a kilogram. CS-2 was present and observed the transactions in which the middleman purchased cocaine from **ANTOINE JONES** on behalf of CS-2. In late 2003 or early 2004, CS-2 and **ANTOINE JONES** began to transact business in person, without the aid of a middleman, in larger, multiple-kilogram quantities.

---

[9] There is no known business or personal relationship between CS-1 and CS-2. Moreover, to the best of your affiant's knowledge, they do not know each other, or know of each other.

33

49. According to CS-2, **ANTOINE JONES** sells high quality cocaine at a reasonable price. **ANTOINE JONES** initially charged CS-2 $23,000.00 per kilogram of cocaine; but, he eventually lowered the price to $21,000.00 per kilogram.

50. CS-2 reported that **ANTOINE JONES** distributes large quantities of cocaine. For example, in the early days of CS-2's business relationship with **ANTOINE JONES**, CS-2 combined money with several other people and bought three (3) kilograms of cocaine from **ANTOINE JONES**. CS-2 said that, initially, they paid **ANTOINE JONES** all of the money at the time they purchased kilograms of cocaine from **ANTOINE JONES**. However, CS-2 said that eventually **ANTOINE JONES** would provide CS-2 and its associates with kilograms on consignment and they would pay him for the remaining kilograms of cocaine when they were sold to other distributors. On another occasion, CS-2 ordered five (5) kilograms of cocaine and, in exchange for approximately $120,000.00, was fronted an additional five (5) kilograms.

51. CS-2 heard from the middleman described in paragraph 44, and other sources, that **ANTOINE JONES** purchased a warehouse on a corner off Bladensburg Road, near the Fifth Police District, which **ANTOINE JONES** began operating as a nightclub. These sources told CS-2 that **ANTOINE JONES** invested a lot of money in the club. Although invited, CS-2 never went inside of the club. However, CS-2 has spoken with other drug dealers with whom it associated who told it that they purchased cocaine from **ANTOINE JONES** inside the club, including multiple-kilogram quantities of cocaine. Investigation has determined that in May 2004, **ANTOINE JONES** leased the night club **LEVELS,** located at 1960 Montana Avenue, N.E., Washington, D.C., for the period May 2004, until May 2014.

52. CS-2 said that the beginning of each month is the best time to purchase cocaine from **ANTOINE JONES** because CS-2 believes this is when **ANTOINE JONES** receives his supply of cocaine. According to CS-2, during the period when he was buying cocaine from **ANTOINE JONES** the kilograms of cocaine were wrapped in multiple layers of saran wrap and there were generally two (2) wrapped together. Once taken apart, CS-2 said the kilograms were individually wrapped in what CS-2 described as some kind of wax material. CS-2 reported that the individual kilograms were then stamped with distinctive marks such as crosses or two cars.

53. When CS-2 arranged to purchase cocaine from **ANTOINE JONES**, it would meet **ANTOINE JONES** in various locations in the Washington, D.C. metropolitan area. On these occasions, CS-2 observed **ANTOINE JONES** driving a white Dodge Caravan and a Champagne colored Jeep.

54. As noted above, surveillance conducted by law enforcement at **LEVELS**, between 2004 and 2005, revealed that a champagne-colored Jeep Grand Cherokee, bearing Maryland tag number M667480, registered in the name of the wife of **ANTOINE JONES**, DENIECE JONES, 12221 Brandywine Road, Brandywine, Maryland, was parked at the club in excess of 36 times.

55. Like CS-1, CS-2 also stated that **ANTOINE JONES** transported the cocaine in shopping bags or backpacks which **ANTOINE JONES** had stored in the back of his vehicle. Whenever CS-2 met **ANTOINE JONES, ANTOINE JONES** was always by himself and wore sunglasses and a hat. CS-2 would make payments in the same way, transporting the cash payment in a shopping bag or backpack.

<u>Confidential Source Number Three</u>

56.  In 2002, Confidential Source Number Three, hereinafter referred as CS-3, pled guilty

to narcotics trafficking charges in the United States District Court for the District of Columbia, was

released into the community, and began providing to the FBI information concerning narcotics and

firearms traffickers in the Washington, D.C., area.  CS-3's information has been corroborated by

other sources of information, other evidence gathered during this investigation, and other

investigations conducted by the FBI.  CS-3 has never been known to provide false information.[10]

57.  According to CS-3, **ANTHONY KOONCE** is buying five (5) to ten (10) kilograms of

cocaine at a time from a person who owns the club **LEVELS**, which is located near the Fifth Police

District in the District of Columbia.  Your affiant notes that the Fifth Police District Headquarters

is located at 1805 Bladensburg Road, N.E., and is directly across the street from **LEVELS.**

According to CS-3,  **KOONCE** pays $18,000.00 or $19,000.00 for each kilogram of cocaine from

this supplier.   CS-3 has learned this information regarding **KOONCE's** cocaine supplier through

conversations both with **KOONCE** himself and with a mutual friend of CS-3 and **KOONCE,**

another drug trafficker who has purchased cocaine directly from **KOONCE** in early 2005.



---

[10]  Similarly, CS-3 has no known business or personal relationship with CS-1 or CS-2, but
rather is an independent source.



60. CS-3 heard from various sources, including **KOONCE** himself, that **KOONCE** was arrested on March 23, 2005.

61. The investigation has revealed that **KOONCE** in fact was arrested on March 23, 2005, in the 400 block of W Street, N.W., Washington, D.C., in possession of approximately 18 grams of crack cocaine, 11 grams of heroin, and a small quantity of marijuana. He was charged in the Superior Court of the District of Columbia with Possession with Intent to Distribute Cocaine, Possession with Intent to Distribute Heroin, and Possession of Marijuana, and was remanded to a halfway house pending trial. Further investigation revealed that a subsequent indictment for these offenses was brought against **KOONCE** in United States District Court for the District of Columbia in June 2005, and the parallel Superior Court charges were dismissed.

62. CS-1 reported that in early 2005, **ANNETTE BIGESBY** told it that **"LAMONT"** **(ANTHONY LAMONT KOONCE)** asked her if she would "vouch" for his employment at her shop, DE ANJA'S HAIR SALON, 1116 H Street, N.E., Washington, D.C., in order that he be released from the half-way house to go to work. Investigation has revealed that **KOONCE** does not in fact work at DE ANJA's HAIR SALON; instead, he is using his false employment as a way to get

37

out of the half-way house, in order to continue his cocaine-trafficking business.

63. A review of the records pertaining to **ANTOINE JONES's** parole indicate that, in a letter dated April 26, 2002, **ANTOINE JONES** similarly reported to the Parole Commission that he was employed at DEANJA's HAIR SALON, 1116 H Street, N.E., Washington, D.C., as a maintenance worker. He reported making $6.75 per hour and that his supervisor was **ANNETTE BIGESBY.**

<u>Durham, North Carolina Interdiction Team Traffic Stop</u>

64. On Tuesday, April 5, 2005, at approximately 2:25 p.m., officers from the Highway Interdiction Unit of the Durham Police Department, Special Operations Division conducted a traffic stop on a 1997 Honda Odyssey mini-van bearing Maryland registration 273M195, because it was exceeding the speed limit. A database check revealed that the vehicle is registered to **ANTOINE JONES**, DOB 02/25/1960 of 12221 Brandywine Road, Brandywine, Maryland 20613.

65. The driver was identified as **LAWRENCE MAYNARD,** who told the officer that he and his passenger were traveling to an unidentified town in South Carolina from the Washington, D.C./Maryland area to pick up a disc jockey for an upcoming event at his club back in Washington.

66. Officers then spoke with the passenger, who provided identification in the name of **DERRICK C. GORDON. GORDON** told law enforcement officers that he and **MAYNARD** were traveling from the Washington, D.C. area in route to Atlanta, Georgia, to visit family and hang out with some girls they had met on a previous visit.

67. Officers issued a warning ticket to **MAYNARD** for the speeding infraction and then, based upon the inconsistent stories and suspicious actions of the minivan's occupants, called for a canine officer to arrive at the scene. In the meantime, officers asked **MAYNARD** if he was transporting any large sums of U.S. currency and/or narcotics or illegal weapons. When **MAYNARD** denied this, the officers asked him for permission to search his person and the van for weapons and contraband. **MAYNARD** agreed to the requested searches. A search of **MAYNARD** revealed a large sum of U.S. currency, in excess of $1,000.00. A subsequent consensual search of **GORDON** revealed a similarly large quantity of U.S. currency which, when taken together with **MAYNARD's** money, totaled close to $5,000.00.

68. Shortly thereafter, a canine arrived on the scene, and conducted a free air sniff of the minivan. After the canine alerted on the right rear passenger side of the minivan, the officers located a hidden compartment in the van. Inside the hidden compartment they found six (6) Target store bags containing $67,115.00, in multiple denominations of U.S. currency, bound together by rubber bands. Both **MAYNARD** and **GORDON** denied knowledge of the money and the secret compartment.

69. As set forth more fully at paragraph 81 *infra*, in January, 2005, your affiant obtained a pen register in U.S. District Court for the District of Columbia, signed by Magistrate Judge John Facciola, for (301) 613-6293, the cellular telephone registered in the name of **LAWRENCE MAYNARD**, 1960 Montana Avenue, N.E., Washington, D.C. 20002, the address of **LEVELS**. A review of pen register data pertaining to (301) 613-6293, from the day of the stop, April 5, 2005, revealed an unusual pattern of activity. Between the hours of 7:02 a.m. and 9:54 a.m., there were a total of 25 activations to and from **MAYNARD's** phone. Of those communications,

ten were text-messages between **MAYNARD's** phone and unknown numbers.[11]  Thereafter,

there was not another text-message until 11:52 p.m., though there are 39 wire communications.

Among the first outgoing calls that **MAYNARD** made from (301) 613-6293, after he was

released from the police station, was to **ADRIAN JACKSON**, who, as set forth more fully at

paragraph 11 *supra*, has convictions for narcotics and weapons offenses, as recently as 2004, and

whose vehicles have been spotted outside of **LEVELS** in excess of 25 times during the

surveillance period.  These calls are followed by five hours of all incoming calls.  Many of these

telephone activations to and from **MAYNARD's** phone on that day involved numbers with

unknown subscribers, a characteristic of pre-paid cellular phones, which narcotics traffickers,

including **ANTOINE JONES**, are known to use.  Then, on April 6, 2005, there are two more

incoming calls from **ADRIAN JACKSON** to **MAYNARD's** telephone.  Based on the above,

investigators believe that these telephone calls made by **MAYNARD** are related to **ANTOINE**

**JONES's** drug trafficking business, in particular to the money that was seized from the hidden

compartment in **ANTOINE JONES's** minivan which **MAYNARD** was driving.

    70. Further, surveillance of **LEVELS** revealed that the following morning, April 6, 2005,

**MAYNARD** arrived back at the club, in a white truck registered to **ANTOINE JONES**.

    71. Finally with respect to the April 5, 2005, traffic stop, **MAYNARD's** cellular

telephone received a call that day at approximately 2:17 p.m. from (713) 418-9851.  This is a

Boost Mobile cellular telephone with a Texas area code, listed in the name of HENRY GARCIA,

---

[11]    On pen-register records, the phone number associated with the text message remains blank, the duration of the activation is listed as "00:00:00," and there is no data in the raw data line.

and registered to P.O. Box 55026, Irvine, California.[12] ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████    In addition to this call from GARCIA to **MAYNARD** on April 5, 2005, pen register

data shows three more calls from GARCIA to **MAYNARD**, two on March 25, 2005, and one on

March 30, 2005.  Finally, pen register data pertaining to **(202) 538-3946**, the **target telephone**

believed to be in use by **ANTOINE JONES**, reflects a telephone call from **ANTOINE JONES**

to GARCIA on June 25, 2005.  Based on (a) the number of narcotics-trafficking investigations

into the P.O. Box used by GARCIA, (b) the implication of Mexico and Texas in those

investigations, (c) information from CS-1 that **ANTOINE JONES'S** source of cocaine is

"Texas" and "the Mexicans," and (d) the traffic stop of **MAYNARD** which revealed $67,100 in a

hidden compartment in **ANTOINE JONES'S** car, your affiant believes that these telephone

contacts between **MAYNARD, ANTOINE JONES**, and GARCIA relate to illegal narcotics-

trafficking activities.

---

[12]    Investigation has revealed no information regarding "HENRY GARCIA."  In light of the fact that the user of this telephone has registered it to the aforementioned post office box, and has provided no additional personal information, coupled with the fact that narcotics traffickers often utilize fictitious names when purchasing and subscribing to cellular phones which they intend to use in their illicit business, investigators believe that no such HENRY GARCIA exists.  Therefore, he is not listed among the **target subjects** of this investigation.

<u>Physical Surveillance</u>

72. Law enforcement conducted physical surveillance of **ANTOINE JONES'** night club **LEVELS** between the fall of 2004 and August 18, 2005 ("the surveillance period"). In the course of that period, various law enforcement personnel conducted both on-scene personal surveillance and video surveillance of the club, both during business hours and during off-hours. In addition, investigators reviewed documents pertaining to **LEVELS** on file with the District of Columbia Alcoholic Beverages Regulatory Agency (ABRA), including the club's liquor license, and learned that the hours of operation for food and alcohol are: 11:00 a.m. through 2:00 a.m., Sunday through Thursday, and until 3:00 a.m. Friday and Saturday. For entertainment, hours of operation are 9:00 p.m. through 2:00 a.m., Sunday through Thursday, and until 3:00 a.m. on Friday and Saturday.

73. On numerous occasions during the surveillance period, investigators observed both **LAWRENCE MAYNARD** and **ANTOINE JONES** use keys to lock and unlock the outer door to **LEVELS**.

74. During this time period, investigators observed a number of known and unknown vehicles coming and going from the **LEVELS** nightclub, at 1960 Montana Avenue, N.E., during daytime hours when the club is not open for business. In addition, investigators have observed substantial foot traffic into and out of **LEVELS**, during daytime hours. This observed foot traffic consists of both men and women, and occasionally small children, entering and exiting the

---

[13]    The observations noted herein do not include all vehicle and foot traffic at **LEVELS** during the whole of the surveillance period. It was not practicable to review in real-time in excess of six months of surveillance. Instead, the investigators reviewed videotapes and personal notes, the results of which are described in this section of the affidavit.

establishment, often carrying over-the-shoulder bags, shopping bags, diaper bags, and backpacks.

75. Surveillance conducted by law enforcement during the surveillance period showed **NICHOLAS JONES, a/k/a TOBY,** going into and coming out of **LEVELS** on several occasions, during hours when the business is purportedly closed. Similarly, surveillance revealed that a white Ford Bronco, with District of Columbia tags BR3315, registered to **NICHOLAS JONES,** at 563 23rd Place, N.E., Washington, D.C., was parked outside of **LEVELS** on at least 12 occasions during the same surveillance period. According to information on file with the District of Columbia Alcoholic Beverages Regulatory Agency (ABRA), **NICHOLAS JONES** has no known business relationship with **LEVELS.** CS-1 has known **TOBY** to sell both heroin and cocaine for the past several years.

76. Surveillance conducted by law enforcement during the surveillance period at **ANTOINE JONES's** nightclub **LEVELS,** revealed the presence of the champagne-colored Jeep Cherokee, Maryland registration M667480, registered to DENEICE JONES, wife of **ANTOINE JONES,** at this location in excess of 35 times.

77. Surveillance conducted by law enforcement at **ANTOINE JONES's** nightclub **LEVELS** during the surveillance period revealed the presence of the 1997 Honda Odyssey mini-van bearing Maryland registration 273M195, registered to **ANTOINE JONES,** at this location four times, all in the month of March, 2005, a month prior to the interdiction stop of that vehicle in North Carolina on April 5, 2005. Additionally, on at least one occasion, both the Honda Odyssey and the champagne colored Jeep were observed at **LEVELS** at the same time during the surveillance period.

78. Surveillance conducted by law enforcement at **ANTOINE JONES's** nightclub **LEVELS** during the surveillance period revealed the presence of the white Ford Bronco truck, bearing D.C. registration BR3315, registered to **NICHOLAS JONES**, at this location in excess of 12 times.

79. Surveillance conducted by law enforcement at **ANTOINE JONES's** nightclub **LEVELS** during the surveillance period revealed the presence of a 1999 Lexus GS3, bearing District of Columbia registration BR4362, registered to CARMENCITA D. STRANGE (wife of **NICHOLAS JONES**), at this location in excess of three times. On numerous occasions, both the Bronco and the Lexus were observed in front of 563 23rd Place, N.E., Washington, D.C., the residence of **JONES** and Strange.

80. Surveillance conducted by law enforcement at **ANTOINE JONES's** nightclub **LEVELS** during the surveillance period revealed the presence of a 2000 white Dodge Neon, bearing Maryland registration MSV785, registered to CAROLYNETTE WADDELL, a relative of **BRADFORD WADDELL**, at this location in excess of eight times. An examination of the Bureau of Prison records for **ANTOINE JONES** pertaining to his incarceration for the 1994 narcotics trafficking conviction revealed that CAROLYNETTE WADDELL was listed on both **ANTOINE JONES's** approved visitation list as well as his telephone list.

<u>Pen Register and Call Data</u>

81. In January of 2005, your affiant obtained a pen register in U.S. District Court signed by Magistrate Judge Facciola for a Sprint PCS cellular telephone with number (301) 613-6293. This cellular account is listed in the name of **LAWRENCE MAYNARD**, 1960 Montana Avenue, Washington, D.C. 20002, the address of **LEVELS**.

44

82. An analysis of the air-time records for this cellular account for the period from January 20, 2005, until August 18, 2005 ("the pertinent time period"), identified a total of 20,056, activations.[14] Your affiant notes that this is an inordinately high number of activations for a cellular telephone in that time period. Based on the affiant's experience and training, even after accounting for calls to friends and family, the volume of calls is consistent with the use of a cellular telephone to facilitate narcotics trafficking.[15] Pursuant to administrative subpoenas to various telephone companies, including Sprint Spectrum LP, Cingular Wireless, Verizon, and Phone Tech, investigators obtained subscriber information for the most frequently-called numbers. Many of the most frequently-called numbers are associated with individuals who have narcotics trafficking convictions.

83. Telephone number (202) 269-0100 is listed to **LEVELS** nightclub at 1960 Montana Avenue, Northeast, Washington, D.C. Records reflect a total of 237 activations between this number and (301) 613-6293, **MAYNARD's** phone, during the pertinent time period (Date last dialed: August 17, 2005).

84. In addition, in June 2005, your affiant obtained a second pen register in U.S. District Court, ordered by Magistrate Judge Facciola, for telephone number **(202) 538-3946, the target telephone,** a cellular telephone subscribed to by DENEICE JONES (wife of **ANTOINE**

---

[14] This section of the affidavit pertaining to **MAYNARD's** telephone refers to "activations" to encompass all interceptions from that telephone, to include telephone calls and text-messages.

[15] Telephone numbers (301) 773-4065 and (301) 773-0709 are listed to JOYCE MAYNARD, who is the wife of **LAWRENCE MAYNARD**, at 7711 Greanleaf Road, Hyattsville, Maryland. Records reflect a total of 1125 activations between (301) 613-6293, and these numbers during the pertinent time period. ((301) 773-4065, Date last dialed: August 18, 2005; (301) 773-0709, Date last dialed: July 30, 2005)

JONES), 12221 Brandywine Road, Brandywine, Maryland.  A review of the pen-register records

pertaining to (202) 538-3946, which is believed to be used by **ANTOINE JONES**, in the period

from June 23, 2005 until August 18, 2005 ("the pertinent time period"), identified a total of

7,452 activations.[16]  The records for the **target telephone** also demonstrated a similar pattern of

contacts with telephones associated with individuals who have narcotics trafficking convictions.

For example, beginning in late July, 2005, there are numerous calls between **ANTOINE JONES**

and (202) 437-0047, a cellular telephone listed to **KIRK R. CARTER**.  As set forth more fully

in paragraph 11(l), **CARTER** has a conviction for Conspiracy to Distribute Cocaine from United

States District Court for the District of Columbia, for which he served over 10 years

incarceration.  An

analysis of pen register data pertaining to his phone, obtained pursuant to the Washington Field

Office investigation, reveals that **CARTER** and **ANTOINE JONES** have at least one

commonly-called number, though no information is available regarding that telephone at this

time.

---

[16]     A review of the pen register data revealed that the vast majority of the activations on the target telephone were wire communications, not electronic communications, i.e., text-messages.  Unless otherwise specified, the communications set forth below pertaining to the **target telephone**, believed to be used by **ANTOINE JONES**, were wire communications.

46

85. Further, as set forth more fully below, several of the telephone numbers called by **MAYNARD** were also called by telephones associated with **ANTOINE JONES** during the relevant pen register periods. The following is a synopsis of the call data for some of the telephone numbers in contact with both **(202) 538-3946**, the **target telephone**, and **MAYNARD's** cellular phone, (301) 613-6293, and the last date of pen register activity for each:

86. Records reflect a total of 2026 calls between the **target telephone, (202) 538-3946,** the number of the cellular telephone believed to be used by **ANTOINE JONES,** and (301) 613-6293, **MAYNARD's** cellular phone (Date last dialed: August 18, 2005).

87. Telephone number (202) 436-0020 is listed to JOZEF W. HAWKINS and the Service User is **ADRIAN JACKSON**. Records reflect a total of 200 calls between the **target telephone** and this number during the pertinent time period (Date last dialed: August 17, 2005). Further, shortly after being stopped by the Highway Interdiction Unit of the Durham Police Department, Special Operations Division on April 5, 2005, **LAWRENCE MAYNARD** made a telephone call from (301) 613-6293, to this number. As previously set forth in paragraph 11, **ADRIAN JACKSON** has convictions for narcotics and weapons offenses. **JACKSON** has two vehicles registered in his name which have been observed at **LEVELS**, 1960 Montana Avenue, N.E., Washington, D.C. during the surveillance period: a Chrysler 300M, which has been observed at the aforementioned location in excess of 16 times, and a 1995 Chevy van, which has been observed there in excess of two times. Records further revealed 636 activations between (301) 613-6293, **MAYNARD's** cellular telephone, and (202) 436-0020, the telephone believed to be used by JACKSON, between January 27, 2005, and August 17, 2005.

47

88. Further comparison of pen register data from the **target telephone** to pen register data from **MAYNARD's** cellular telephone, (301) 613-6293, between June 23, 2005, and August 18, 2005, shows at least six commonly-called telephone numbers, in addition to that of **ADRIAN JACKSON**, as set forth above. The following is a synopsis of the call data for each of the pertinent numbers and the last date of pen register activity for each:

(a)    Telephone number (202) 380-2139 is listed to **DONALD HUNTER** at 3202 Curtis Drive, Apartment 708, Temple Hills, Maryland. Investigators conducted various database checks which indicate that **DONALD ADRIAN HUNTER**, as previously set forth in paragraph 11(h), has numerous narcotics-related arrests and several convictions, including a federal court narcotics conviction, which resulted in a sentence of incarceration. Records show a total of 80 calls between the target telephone, (202) 538-3946, believed to be in use by **ANTOINE JONES** and this number (date last dialed: August 17, 2005), and a total of 22 activations between **MAYNARD's** cellular phone, (301) 613-6293, and this number (Date last dialed: August 17, 2005), during the relevant pen register periods. As set forth more fully in paragraph 23, CS-1 reported that in early August, 2005, **HUNTER** told it that he had just purchased half a kilogram of cocaine from **ANTOINE JONES**, and encouraged CS-1 to make a similar purchase. Based on this purchase, and other information from CS-1 relating to **HUNTER's** long-standing narcotics-trafficking relationship with **ANTOINE JONES**, dating back at least two years, investigators believe that these calls between **HUNTER** and **ANTOINE JONES** are related to their illicit drug-trafficking activity.

(b)    Telephone numbers (202) 256-1072 and (202) 256-1468 are listed to **DIANE BUSHROD** at 3430 21ˢᵗ Street, S.E., Washington, D.C.  **BUSHROD** also has a driver's license listing an address of 3103 Sherman Avenue, N.W., Apartment 1, Washington, D.C.  Investigators

48

conducted various database checks which revealed that **DIANE BUSHROD, a/k/a DIANE SMITH**, DOB 2/25/1962 and 2/25/1960, FBI#: 379746CA3, has a criminal history that includes a narcotics violation, as set forth more fully in paragraph 11. The investigation has revealed that **BUSHROD** works at the Arboretum Recreation Center, which is located near the **LEVELS** nightclub. Records show 51 activations between the **target telephone** and (202) 256-1072 (date last dialed: August 8, 2005 ), and 42 activations between **MAYNARD's** telephone and that number (date last dialed: August 8, 2005), during the relevant pen register periods. Similarly, records show 96 calls between the **target telephone** and (202) 256-1468 (date last dialed: August 9, 2005), and 5 activations between **MAYNARD's** cellular telephone and that number (date last dialed: August 9, 2005), during the relevant pen register periods.

89. Further analysis of recent pen register data pertaining to the **target telephone (202) 538-3946**, and **MAYNARD's** cellular telephone, (301) 613-6293, reveals an unusual pattern of activity, which is consistent with the reports of CS-1 and CS-2 that **ANTOINE JONES** and **MAYNARD** obtain shipments of cocaine towards the end of the month into the beginning of the following month, and consistent with CS-1's report that the source of supply of **ANTOINE JONES'** cocaine is "Texas" and "the Mexicans." For example, at approximately 10:30 a.m. on July 25, 2005, **ANTOINE JONES** received a call from (876) 539-2380, a phone number listed in Jamaica. Two hours later, **ANTOINE JONES** received a call from (210) 528-1460, a phone number listed in McAllen, Texas, a town which borders Mexico, and which is known to be a point of entry for narcotics into the United States. At 12:49 p.m., **ANTOINE JONES** called the number in McAllen, Texas. Thereafter, in the 23 minutes between 1:37 p.m. and 2:00 p.m., there are a total of 24 calls between **ANTOINE JONES** and (301) 613-6293, **MAYNARD's** telephone. At 2:03 p.m., the

target telephone, believed to be in use by **ANTOINE JONES** called the number in Jamaica again, and then called **MAYNARD** six times between 2:58 p.m. and 3:22 p.m. These calls were followed closely by a call to **ANTOINE JONES** from (215) 917-4008, which is listed in the name of JIMMY KING, at 6813 Oakland Street, Philadelphia, PA, but believed to be used by **TERRENCE DIXON**, a/k/a, **NIMROD BABYLON**.

90. Finally, analysis of pen register data pertaining to both **(202) 538-3946**, the **target telephone** and (301) 613-6293, **MAYNARD's** cellular telephone, reveals recent contact between both of these telephones and (998) 885-3310. Specifically, on July 26, 2005, **(202) 538-3946**, the **target telephone**, received a call from that number at 2:06:45 p.m., with a duration of zero seconds. At 2:07:05 p.m., the **target telephone** received another call from that number, with a duration of nine seconds. Approximately five seconds later, on (301) 613-6293, **MAYNARD** received a phone call lasting seven minutes and 29 seconds from the same number, (998) 885-3310. The subscriber information pertaining to this telephone is unknown, but analysts have confirmed that the (998) prefix is the international calling code for the country of Uzbekistan. Given that these contacts between the **target telephone,** believed to be used by **ANTOINE JONES,** (301) 613-6293, **MAYNARD's** phone, and Uzbekistan took place within the same time frame as the contacts between the above-described telephones and the telephone in McAllen, Texas, a common point of entry of cocaine into the United States, investigators believe that these contacts with Uzbekistan pertain to the illegal activities of **ANTOINE JONES** and **MAYNARD.** Additionally, your affiant

knows that, among other countries in that region, Uzbekistan is a major exporter of poppy, from which opium and heroin are derived.

91. Your affiant notes that this pattern of suspicious telephone activity with telephone numbers associated with known drug-traffickers and known drug-trafficking areas, e.g., McAllen, Texas, further corroborates investigators' belief that the pattern of telephone activity in late July/early August 2005 on the **target telephone** pertained to the acquisition and eventual re-sale of a large wholesale quantity of cocaine, a belief corroborated by **DONALD HUNTER's** report to CS-1 that he had purchased a half of a kilogram of cocaine from **ANTOINE JONES** in the first week of August, 2005, and the suspicious text-messaging and pen-register activity surrounding that sale, as set forth more fully at paragraphs 23-30, *supra*..

## I. OTHER INVESTIGATIVE TECHNIQUES

92. Based upon my training and experience investigating narcotics trafficking organizations, and based on my knowledge of the facts of this investigation as set forth herein, it is my belief that the interception of wire communications is the only available investigative technique which has a reasonable likelihood of revealing and of securing admissible evidence needed to establish the full scope and nature of the offenses of the **Target Subjects**, and others as yet unknown or unidentified, which are under investigation.

93. Normal investigative procedures have been tried and have failed, appear reasonably unlikely to succeed if tried or continued, or are too dangerous to employ in this investigation to date, including surveillance procedures, use of cooperating witnesses or undercover officers to make controlled purchases, review of calling data, the use of pen registers, interviews, public records and information received from confidential sources, as described further *infra*. While this information

has been probative in proving that an ongoing illegal narcotics business is operating, it has not yielded sufficient evidence or ascertained the identities of, and proven beyond a reasonable doubt the guilt of, all those participants in this illegal conspiracy. This includes suppliers of the illegal drugs, the members of the conspiracy involved in the operation, particularly those co-conspirators assisting **ANTOINE JONES** in the redistribution of large quantities of cocaine and the distribution of proceeds from these illegal activities.

(a) Physical surveillance: Physical surveillance, though invaluable in identifying some activities of the **Target Subjects**, such as meetings and daily patterns, has not always been a viable investigative tool in this investigation. Much of the criminal activity outlined above has occurred inside buildings or vehicles. Physical surveillance has yielded little valuable information to further the investigation, other than confirming that some of the identified members of the conspiracy associate with one another. Surveillance has demonstrated, for example, that people are entering and exiting **LEVELS** with backpacks and similar bags, which is consistent with how CS-1 and CS-2 report that narcotics and money are moved into and out of the club. However, the contents of those bags – the ultimate inquiry of this investigation – are revealed only behind closed doors. Indeed, **ANTOINE JONES, MAYNARD**, and other members of the conspiracy have made it more difficult than in some other cases to surveil their activities. They frequently post individuals outside the door to **LEVELS**, and in addition, when the club is not in operation, the outer door is locked, so that in order to gain entry to the club, the entrant must either have a key, or knock, and be permitted inside. In addition, the location of **LEVELS** itself – on a busy street connecting two major thoroughfares – makes surveillance more difficult than other circumstances. FBI efforts to observe **JONES, MAYNARD** and other members of the conspiracy have been further frustrated by the fact that the

FBI has limited advance information concerning planned meetings and therefore is typically unable to arrange and conduct physical surveillance. Thus, although physical surveillance has provided some helpful information, physical surveillance, if not used in conjunction with other techniques, including electronic surveillance, is of limited value. Physical surveillance of the alleged conspirators will not establish conclusively the elements of the violations and has not and most likely will not establish conclusively the identities of various conspirators. Indeed, prolonged or regular surveillance of the movements of the suspects would most likely be noticed, causing them to become more cautious in their illegal activities, to flee to avoid further investigation and prosecution, to cause a real threat to confidential informants or to otherwise compromise the investigation. Physical surveillance is also unlikely to establish conclusively the roles of the named conspirators, to identify additional conspirators, or otherwise to provide admissible evidence in regard to this investigation.

(b) <u>Undercover Operations</u>: Investigation has revealed that **ANTOINE JONES** is very secretive and protective of his narcotics trafficking enterprise. **ANTOINE JONES** is believed to deal only with known associates, most of whom he has associated with over the course of numerous years. For this reason, it is highly unlikely that **ANTOINE JONES** would be willing to interact with an undercover officer. Indeed, the FBI knows of no source who is in a position to be able to purchase narcotics from **ANTOINE JONES** or to make an introduction of an undercover officer for that purpose. As noted earlier, CS-1 contacted **ANTOINE JONES** and attempted to reinitiate their drug dealing relationship. **ANTOINE JONES** rebuffed CS-1 and declined to discuss drug related matters with it. In addition, CS-1 will be unable to sell the cocaine from **ANTOINE JONES** as **ANTOINE JONES, HUNTER,** and others would expect. In addition, CS-2 and CS-3 are unavailable to law enforcement. Further, even if the FBI could make controlled purchases using an

undercover officer, I do not believe, based on my experience investigating large-scale narcotics traffickers and the specific information gathered during this investigation, that such an operation in this case would lead to sufficient evidence as to: (i) the manner in which **ANTOINE JONES** redistributes large quantities of illegal drugs in the greater Metropolitan Washington, D.C. area; (ii) the identity of all of the other members of the organization assisting **ANTOINE JONES**, and the other subjects listed above in obtaining and redistributing large quantities of illegal drugs; and (iii) the manner in which **ANTOINE JONES, MAYNARD** and the other subjects dispose of the proceeds of their operation. Even if an undercover officer were able to gain the trust of **ANTOINE JONES and MAYNARD**, the investigators would not be able to obtain adequate information concerning the relationship among **ANTOINE JONES, MAYNARD** and other co-conspirators, or the full scope of the illegal drug operation, including the extent of their dealings with each other, the identification of other persons who may be involved in the operation, as well as the disposal of proceeds from the illegal drug business. Based on my experience and given the secretive nature of the illegal drug business, an undercover investigation, even if possible, which it is not in this case, would yield no significant new evidence of the full scope of the illegal drug business. As detailed above, **ANTOINE JONES's** local redistribution operation is extremely close-knit, involving close associates, and is very carefully managed and operated so as to minimize his contacts with other co-conspirators and appears to rely extensively on the use of communications devices and co-conspirators to arrange and facilitate the transportation and distribution of large quantities of cocaine and monies.

54

(c) <u>Pen Registers and Airtime Records</u>: The use of pen registers and airtime records have been valuable in providing investigative leads and intelligence, but are limited in their use. The affiant knows from personal experience that pen registers provide only limited evidence of narcotics dealing between individuals. Pen registers in and of themselves are useful mainly in establishing relationships and patterns of operations and provide little direct evidence of the significance of the telephone calls. For example, the pen register data for the **target cellular telephone number (202) 538-3946,** confirms that drug associates are communicating with each other. Cellular telephone airtime records have also provided information regarding associates and possible customers of the **Target Subjects,** but this information has not been provided in real time to provide law enforcement with the opportunity to identify the participants in these telephone calls an the nature of the telephone calls. Moreover, cellular telephones used by the **Target Subjects** and other co-conspirators often are subscribed to in other names. Thus, without access to the content of the conversations, law enforcement agents cannot know definitively whether calls to the **target cellular telephone** involve drug customers or other conspirators. To have real-time information regarding when customers are contacting the **Target Subjects,** information that can be provided by a wire interception, would allow agents to know the significance of what is observed during surveillance and would allow agents to identify customers and the location where drugs, money, and/or weapons are stored. The information gained from the wire interceptions described in this affidavit is also expected to allow law enforcement agents to pursue fruitfully other, more traditional investigative techniques against the immediate targets of the investigation, as well as others.

(d) <u>Confidential Sources</u>: As indicated earlier, a large portion of the information herein was obtained from confidential sources. Although valuable evidence has been collected through the use of confidential sources, such information is almost entirely historical in nature. Further, these sources are not privy to the identities and conversations of all other co-conspirators comprising the distribution network of this organization. While both CS-1 and CS-2 have extensive and detailed personal dealings with, and information regarding, **ANTOINE JONES** and his organization, neither know all of the members of the organization. Additionally, neither CS-1 nor CS-2 have full and complete knowledge as to all of the sources of supply, the full scope of the organization, the complete manner in which it operates, or how members of the organization launder proceeds of its illegal drug sales. And perhaps most importantly, because of their arrests, and suspicions about their possible cooperation with law enforcement, neither CS-1 nor CS-2 are in a position to make a controlled narcotics purchase from either **ANTOINE JONES** or any of his associates.[17]  As noted, CS-1 is unable to make a controlled purchase of drugs from **ANTOINE JONES** even through an intermediary, **DONALD HUNTER**, because **HUNTER** would expect CS-1 to distribute the drugs to their mutual customers. Indeed, the investigation has not produced anyone who is in a position to do so. Though arrests and indictments have been made of individuals who are believed to be customers of **ANTOINE JONES** and his organization, and of at least one member of the organization itself, **ANTHONY KOONCE**, none of these individuals, with the exceptions of the Confidential Sources described in this Affidavit, is willing to debrief or cooperate with the

---

[17]     It should be noted that CS-3 is merely a friend of **ANTHONY KOONCE**, and thus knows very little regarding the inner workings of **ANTOINE JONES'** narcotics trafficking conspiracy. It similarly is not in a position to make controlled purchases from any member of that organization, not even **KOONCE**.

government, making controlled purchases impossible.

(e) <u>Search Warrants</u>:  The use of additional search warrants and interviews is premature. Investigators have obtained search warrants for text-messaging data held in electronic storage by Sprint Spectrum LP and Cingular Wireless.  While this information has proven to be helpful in corroborating the reports of CS-1 and CS-2, and in establishing that **ANTOINE JONES's** drug-trafficking continues, it does not provide an independent proof of drug-trafficking, nor does it establish the identities of all the conspirators involved.  Further, investigators have obtained search warrants and searched various locations of lower level drug dealers.  Information gained by the search warrants has not furthered the investigation against the **Target Subjects**.  Moreover, at this juncture, even if probable cause to search additional premises could be established, these techniques would alert the subjects to the existence of the investigation and would prevent the identification of other co-conspirators and/or the seizure of contraband.  **ANTOINE JONES, MAYNARD** and other members of the organization are conducting a highly secretive illegal operation.  Because of the close-knit nature of the organization, the execution of search warrants may cause them and other conspirators to become even more secretive and frustrate law enforcement efforts to obtain evidence of the ongoing criminal operation.  In addition, use of search warrants would not be likely to reveal the total scope of the illegal operation and the identities of the co-conspirators.  From your affiant's experience in this and other investigations, it is doubtful that search warrants, if obtained and executed, would result in obtaining records and physical evidence sufficient to show the complete extent and nature of this illegal conspiracy, particularly the source(s) of supply, the identity and roles of all co-conspirators, and the manner in which members of the conspiracy dispose of proceeds from the illegal drug business.  Further, in the absence of the interception of wire communications, it

would be difficult to determine future illegal drug distributions and/or the locations of stored illegal drugs by conspirators for purposes of sale and distribution, so as to permit the effective execution of search warrants for such illegal drugs. Finally, your affiant does not know the locations where illegal drugs are distributed and stored by **ANTOINE JONES** and the **Target Subjects** in the greater Metropolitan Washington, District of Columbia area.

(f) <u>Grand Jury and Interviews</u>:  Calling witnesses before the Grand Jury or otherwise interviewing them would not likely result in the gathering of sufficient evidence to uncover the full scope, nature, or identities of all the participants in this criminal conspiracy. Only the individuals intimately involved in the criminal activity at the highest levels have the requisite knowledge regarding the full scope and nature of the operation, and those who might be the most culpable persons. As noted above, the FBI has obtained information from numerous confidential sources concerning **ANTOINE JONES,** the **Target Subjects** and their associates' illegal drug activities. Some of this information is historical and does not further the FBI's current objective of obtaining current information about their illegal operations. Other witnesses besides the confidential sources, even if immunized, are reluctant to incriminate themselves and their close working associates. Indeed, as noted in paragraph 60-64, *supra*, both **MAYNARD** and **GORDON** have already lied to law enforcement regarding the April 5, 2005, traffic stop, which revealed $67,115.00, secreted in a hidden compartment in **ANTOINE JONES'** minivan. And further, at least one member of **ANTOINE JONES'** enterprise, **ANTHONY KOONCE**, has been indicted on federal narcotics-trafficking charges, and has refused to debrief with the government. Even if the government were able to convince these individuals to debrief truthfully, to obtain their testimony would require immunization and non-prosecution of those who are the principals of the operation. Even if

obtained, that testimony could not be adequately corroborated and could be tailored to mislead the Grand Jury or interviewing agent and be used to falsely exculpate the witness. Further, it is unlikely that interviewing any of the participants outside of the Grand Jury would be successful for the same reasons that a Grand Jury investigation is unlikely to further the investigation. Moreover, a Grand Jury investigation, immunity grants, or, similarly, the use of interviews would disclose the facts of this ongoing investigation, and the substantial scope and magnitude of the investigation. Although this could lead to certain lower level participants' providing information under grants of immunity, this information would not disclose the full scope and nature of the criminal conspiracy or likely identify unknown participants or co-conspirators. Further, should the focus of the investigation and the magnitude of the potential penalties involved be disclosed to the principals, it is likely that they would then (1) become more secretive and (2) attempt to further disguise or hide the criminal activities previously described herein. In addition, it is likely that some or all of the principals would flee the area.

(g) <u>Other Investigations</u>: Although, as noted *supra*, there are several law enforcement investigations relating to some of the **Target Subjects,** ███████████████████ ███████████████████, none of these investigations has revealed any information regarding **ANTOINE JONES**, or any of the other **Target Subjects**. None of the sources in any of those investigations has provided information regarding the **Target Subjects**, nor has there been any demonstrable overlap between any of those investigations and the investigation which underpins this Affidavit, aside from occasional overlapping pen-register data. This data, while useful in demonstrating that suspected narcotics-traffickers are communicating with each other, provides little direct evidence of the significance of

59

the telephone calls.

94. In summary, normal investigative techniques have not produced significant admissible2 evidence as to identify all of the participants nor the full scope and nature of this criminal conspiracy, and are not likely to do so if employed in the future.

95. Based upon the experience and training of your affiant, as well as the experience of other FBI agents and other law enforcement officers consulted, and based upon all the facts set forth herein, your affiant believes that interception of wire communications is the only reasonable method of developing evidence of the full scope of the suspected violations being committed by the target subjects and others as yet unknown or not yet fully identified. This is because normal investigative procedures have been tried and have failed, appear reasonably unlikely to succeed if continued, or are too dangerous to employ further in this investigation. Normal investigative procedures which have been employed or been considered in this investigation to date have included: surveillance procedures; installation of and analysis of data from pen registers; debriefings of cooperating witnesses; analysis of telephone toll records; interdiction traffic stops; execution of search warrants; review of public records and information; and use of a Grand Jury to call witnesses and gather evidence.

## J.  PERIOD OF TIME FOR INTERCEPTION

96. Your affiant believes, based upon experience and the experience of other agents working on this investigation, and based upon the facts set forth herein, demonstrating a consistent course of criminal conduct over a substantial time period, that after the described communications have first been intercepted, additional communications of the same type will occur. The interception of more than one such communication will be necessary to determine the identities of the co-conspirators and

to establish and understand the full extent and nature of their participation in the conspiracy and the method of its operation. For these reasons, authorization to intercept wire communications should not be terminated upon the interception of the first described communication but should continue, until the object of the investigation is attained.

97. The requested order is sought for a period of time until the interception fully reveals the manner in which the above named individuals and their confederates participate in the above described offenses, or for a period of thirty days, whichever is earlier. Pursuant to 18 U.S.C. § 2518(5), it is further requested that the time set forth in the order run from the day on which the investigative agents first begin to conduct the interception pursuant to the court's order, or ten days from the date the order is entered, whichever is earlier.

## K MONITORING AND MINIMIZATION

98. All monitoring of wire and electronic communications will be minimized in accordance with the minimization requirements of Chapter 119 of Title 18, United States Code, and all interceptions conducted pursuant to this Court's Order will be terminated upon attainment of the authorized objectives or, in any event, at the end of thirty (30) days from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception under this Court's Order or ten (10) days after the Order is entered, whichever is earlier.

99. Monitoring of an intercepted conversation will be immediately terminated when it is determined that the conversation's subject matter is unrelated to communications subject to interception under Chapter 119, Title 18, United States Code. Wire interception will be suspended immediately when it is determined, through voice identification, physical surveillance or otherwise, that the named interceptees or any of their confederates, when identified, are not participants in the

61

conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. Reasonable spot monitoring will be utilized to ensure that minimized calls have not become criminal in nature. Monitoring will be conducted by FBI Special Agents and/or trained FBI employees, under the supervision of investigative or law enforcement officers authorized to conduct the interception. Your affiant, as well as other agents and investigators participating in this interception of wire communications, will operate all equipment necessary to monitor all calls and the FBI will maintain custody of the logs of conversations monitored.

100. In the event that intercepted communications are in a code or foreign language and an expert translator in that code or foreign language is not reasonably available during the interception period, minimization will be accomplished as soon as practicable after such interception in accordance with 18 U.S.C. § 2518(5). Accordingly, in the event the translator is not a federal agent, the translator, whether a language-trained support employee or someone under contract with the government, will be under the direct supervision of a federal agent. If, however, such a translator is not reasonably available on the spot, the following after-the-fact minimization procedures have been established pursuant to 18 U.S.C. § 2518(5): (a) all such foreign language conversations will be intercepted and recorded in their entirety; and (b) as soon as practicable after such interception, these conversations will be reviewed and minimized by a translator under the guidance of a federal agent, after which an English translation of the pertinent criminal conversations will be furnished to the supervising federal agent.

L. TECHNICAL ASSISTANCE

101. Your affiant requests, pursuant to the provisions of 18 U.S.C. § 2518(4), the Court order the communications service provider, in this case Cingular Wireless, P.O. Box 24679, West Palm Beach, Florida, 33416-4679, to furnish the applicant forthwith all information, facilities and technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with such services as that provider is according to the person whose communications are to be intercepted. Reasonable expenses incurred through the furnishing of facilities or assistance will be processed for payment by the FBI, United States Department of Justice.

M. CONCLUSION

102. Based on all of the above your affiant submits that there is probable cause to believe that the above-described violations have occurred, are currently occurring, and will continue to occur; that the **Target Subjects**, and others unknown or as yet unidentified have used, are using and will continue to use the **target telephone** in furtherance of illicit narcotics activities, and that normal investigative techniques have failed to produce evidence necessary to sustain a prosecution of the aforesaid offenses and reasonably appear unlikely to succeed.

STEPHANIE E. YANTA
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me
this 2nd day of _____ 2005 in
the District of Columbia.

UNITED STATES DISTRICT JUDGE

63