9/30/05 Title III Affidavit unredacted pages - 13, 25

**FILED**

SEP 3 0 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE APPLICATION OF  )  Misc. No. 05-MS-346 (PLF)
THE UNITED STATES OF AMERICA FOR AN  )
ORDER AUTHORIZING THE INTERCEPTION  )
OF WIRE COMMUNICATIONS TO AND FROM  )
MOBILE CELLULAR TELEPHONE NUMBER  )  FILED UNDER SEAL
(202) 746-0470, ESN 010330005007579  )

## AFFIDAVIT

I, Stephanie E. Yanta, Special Agent with the Federal Bureau of Investigation (FBI),

Washington Field Office, Washington, D.C., (hereinafter affiant) being duly sworn, depose and

state as follows:

### A. INTRODUCTION

1. I am "an investigative or law enforcement officer" of the United States within the

meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States

who is empowered by law to conduct investigations of and to make arrests for offenses

enumerated in Section 2516 of Title 18, United States Code.

2. I have been a Special Agent with the FBI since March 1998. I am currently assigned

to the Safe Streets Task Force, which is tasked with the investigation of violent narcotics

traffickers in the District of Columbia and elsewhere. I have previously participated in

investigations that led to the arrest and conviction of narcotics dealers. Since 1998, I have

received training and developed experience in interviewing and interrogation techniques, arrest

procedures, search and seizure, narcotics, white collar crimes, search warrant applications, and

various other crimes. In the course of my training and experience, I have become familiar with

the methods and techniques associated with the distribution of narcotics, the laundering of drug

proceeds, and the organization of drug conspiracies. In the course of conducting these

investigations, your affiant has been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; conducting short-term and long-term undercover operations, including reverse undercover drug operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; conducting court-authorized electronic surveillance; and preparing and executing search warrants which have led to substantial seizures of narcotics, firearms and other contraband.

3. Through instruction and participation in investigations, your affiant has become familiar with the manner in which narcotics traffickers conduct their illegal business and the methods, language, and terms that are used to disguise conversations about their narcotics activities. From experience and training, your affiant has learned, among other things, that:(a) drug traffickers virtually never expressly refer to cocaine or other illegal drugs by name; instead to conceal the true nature of their illegal activities and to thwart detection by law enforcement, they refer to the drugs and drug quantities using seemingly innocent terms; (b) narcotics traffickers frequently use electronic paging devices, commonly referred to as pagers or beepers, cellular telephones, digital telephones, and other communications devices to further their illegal activities by, among other things, remaining in constant or ready communication with one another without restricting either party to a particular telephone or location at which they might be the subject of physical surveillance by law enforcement authorities; and (c) narcotics traffickers frequently transmit pre-arranged numerical codes to pagers or telephones to identify themselves or to otherwise communicate information, such as price or quantity of drugs, to the person in possession of the pager.

2

4.  Throughout this investigation, your affiant has worked with other Special Agents (SAs) of the FBI, and members of the Washington, D.C. Metropolitan Police Department (MPD) assigned to the Safe Streets Task Force. This affidavit is based on my personal knowledge derived from my participation in this investigation, as well as speaking with other law enforcement officers assigned to this investigation, and includes, but is not limited to, the following information: (a) oral and written law enforcement reports regarding this and other related investigations; (b) physical surveillance; (c) review of dialed number recorder data (pen register records) and telephone toll records; (d) review of vehicle registration records and licenses; (e) review of criminal history records; and (f) review of wire interceptions pertaining to the **target telephone** authorized by this Court on September 2, 2005, and (g) debriefings of confidential informants.

5.  Since this affidavit is being submitted for the limited purpose of seeking authorization for the continued interception of wire communications, your affiant has not set forth each and every fact learned during the course of this investigation.

## B.  TARGETS AND OFFENSES

6.  This affidavit is submitted in support of an application for the authority to continue the interception of wire communications, including direct-connect, and background conversations intercepted while the telephone is off the hook, of the targeted interceptees and others, including persons, as yet unknown or not yet fully identified, to and from the **target telephone**, when the telephone is in use by: ANTOINE JONES, a/k/a "TOINE"; LAWRENCE MAYNARD; DONALD ADRIAN HUNTER, a/k/a TERRY SAMUEL; DIANE BUSHROD, a/k/a DIANE SMITH; ADRIAN JACKSON; KIRK R. CARTER; MICHAEL HUGGINS;

3

KEVIN LAMONT HOLLAND; FNU, LNU, a/k/a DEMETRIUS JOHNSON; JOHN

ADAMS; PAULINE SPENCE, KEVIN WESLEY MORRIS, and others not yet fully

identified (hereinafter referred to as the "**Target Subjects**") to and from mobile cellular

telephone number (202) 746-0470, which is subscribed to DENISE JONES, a/k/a, DENICE

JONES, a/k/a DENIECE JONES, and used by her husband, **ANTOINE JONES**, which this

Court authorized for an initial 30-day period on September 2, 2005.

 7. There is probable cause to believe that these communications will concern violations

of the Controlled Substances Act, Title 21, United States Code, Section 801, <u>et seq.</u>; including:

(a) the possession with intent to distribute and distribution of controlled substances, in violation

of Title 21 United States Code (USC) § 841(a)(1); (b) conspiracy to commit such offenses, in

violation of 21 U.S.C. § 846; (c) the use or carrying of firearms during the course of the above

offenses involving controlled substances, in violation of 18 U.S.C. § 924(c); (d) the use of

communications facilities to facilitate the commission of the above offenses involving controlled

substances, in violation of 21 USC § 843(b); and (e) the laundering of proceeds of specified

unlawful activity, such as the distribution of controlled substances, in violation of 18 U.S.C. §§

1956 and 1957.

### C. <u>Target Telephone</u>

 8. Based on the affiant's investigation and for the reasons which are set forth herein,

there is probable cause to believe that the **Target Subjects** and others as yet unidentified, have

used, are using, and will continue to use the telephone which is presently assigned cellular

telephone number (202) 746-0470,[1] ("the target telephone") in connection with the above

offenses. Additionally, there is probable cause to believe that evidence of such criminal

communications will be obtained through continued interceptions of wire communications made

to and from the **target telephone**. Telephone number (202) 746-0470, is a mobile cellular

telephone with service provided by Cingular Wireless, P.O. Box 24679, West Palm Beach, FL,

33416-4679, and is subscribed to in the name of DENISE JONES, a/k/a DENIECE JONES, a/k/a

DENICE JONES (wife of **ANTOINE JONES**), 12221 Brandywine Road, Brandywine,

Maryland, and is assigned the **Electronic Serial Number 010330005007579**. While the target

telephone is not subscribed to in the name of **ANTOINE JONES**, but rather in the name of his

wife, investigation, including wire interceptions over the course of the previous 30 days, has

confirmed that he is the sole user of that facility.

### D. SUBJECTS OF THE INVESTIGATION

9. The subjects of this investigation and their criminal histories are set forth at pages 7

through 15 of the September 2, 2005, affidavit, which is incorporated herein by reference. Your

affiant has further identified the following as persons **JONES** regularly associates with in his

criminal ventures, who are to be added as targeted interceptees: **MICHAEL HUGGINS; FNU,**

**LNU, a/k/a DEMETRIUS JOHNSON; JOHN ADAMS; KEVIN LAMONT HOLLAND,**

**PAULINE SPENCE, and KEVIN WESLEY MORRIS**. The records for **HUGGINS,**

**JOHNSON, ADAMS, HOLLAND, SPENCE, and MORRIS**, who are newly identified targets,

---

[1]     Your affiant's initial affidavit, and this Court's initial order, both dated September
2, 2005, indicate that the **target telephone** was assigned the telephone number (202) 538-3946.
However, on September 10, 2005, JONES changed his cellular telephone number to **(202) 746-
0470**. I note that the ESN remains the same.

5

are listed below:

(a) **MICHAEL HUGGINS** is a is a black male, born April 27, 1964. He is described as 5'11" tall and 171 pounds, with a Social Security Number of 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. HUGGINS is believed to reside at 229 Douglas Street, N.W., Washington, D.C. A search of FBI criminal history records for **HUGGINS** (FBI# 200725JA2) revealed that he has convictions for narcotics and weapons offenses, his most recent conviction being for Providing Contraband (Heroin) to an Inmate, in 1995.

(b) **FNU, LNU, a/k/a DEMETRIUS JOHNSON** is a male about whom little information in known. According to toll records, he uses cellular telephone number (301) 751-7614, with a listed address of 12110 Deka Road, Clinton, Maryland.

(c) **JOHN ADAMS** is a black male, born July 15, 1965. He is described as 5'9" tall and 190 pounds, with a Social Security Number of 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. **ADAMS** is believed to reside at 5703 Gloria Drive, Temple Hills, Maryland, but has additional reported addresses of 367 Ridge Road, S.E., Washington, D.C., 1822 Savannah Street, S.E., Apartment 10, Washington, D.C., and 4241 Duke Street, Apartment A5, Alexandria, VA. A search of FBI criminal history records for **ADAMS** (FBI# 952661CA4) revealed that he has convictions for narcotics, weapons, and property offenses, including a 1993 conviction in the District of Columbia for Carrying a Pistol without a License.

(d) **KEVIN LAMONT HOLLAND** is a black male born on June 9, 1976. He is described as 5'11" tall and 175 pounds, with a Social Security Number of 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. HOLLAND is believed to reside at 1339 South Carolina Avenue, S.E., Washington, D.C. A search of FBI criminal history records (FBI# 179452CB8) revealed that he has a1996 conviction

6

in United States District Court in Virginia for Conspiracy to Distribute 50 Grams or More of

Cocaine Base, for which he was sentenced to 120 months' incarceration in October, 1997.

(e) **PAULINE SPENCE** is a black female born September 11, 1958. She is described as

5'4" tall and 189 pounds and uses Social Security Number 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. **SPENCE** is believed to

reside at 1523 Benning Road, N.E., Apartment 23, Washington, D.C., but has a second address

of 806 Moray Avenue, in Prince Georges County, Maryland. A search of FBI criminal history

records (FBI#: 760576KA1) revealed that she has a conviction in the United States District Court

for the District of Columbia for Distribution of Cocaine, in 1989, along with numerous arrests in

Georgia for property offenses.

(f) **KEVIN WESLEY MORRIS** is a black male born April 30, 1973. He uses Social

Security Number 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, and is believed to reside at 1258 Barnaby Terrace, S.E.,

Washington, D.C. A search of F.B.I. criminal history records for **MORRIS** (FBI# 368644NA1)

revealed that he has numerous narcotics convictions, including for Possession with Intent to

Distribute Heroin in 1999, Possession of Marijuana in 2000, Distribution of Cocaine in 2002,

and Distribution of Marijuana in 2003, all in the District of Columbia. In addition, he has at least

two property convictions in Prince Georges County, Maryland, in the early 1990s.

### E. PRIOR APPLICATIONS

10. On July 6, 2005, July 7, 2005, July 21, 2005, August 1, 2005, August 4, 2005, and

August 26, 2005, and September 23, 2005, I caused the records of the FBI, DEA, and ICE

(Immigration and Customs Enforcement) to be searched, and on the basis of those searches, I

have learned the following: On September 2, 2005, this Court authorized the interception of wire

communications to and from the **target telephone**, at that time (202) 538-3946, subscribed to in

7

the name of DENISE JONES, and used by ANTOINE JONES.  Interceptions of wire

communications to and from that number commenced on September 2, 2005, at approximately

3:48 p.m.  As of September 28, 2005, the following targets have been intercepted on that wire:

ANTOINE JONES, LAWRENCE MAYNARD, DONALD ADRIAN HUNTER, a/k/a

TERRY SAMUEL, DIANE BUSHROD, a/k/a DIANE SMITH, ADRIAN JACKSON,

KIRK R. CARTER, MICHAEL HUGGINS, DEMETRIUS JOHNSON, JOHN ADAMS,

KEVIN LAMONT HOLLAND, PAULINE SPENCE, and KEVIN WESLEY MORRIS.



8



As of

September 28, 2005, all other searches of indices and databases for the FBI and DEA have

revealed no additional applications to any judge of competent jurisdiction for the authorization to

intercept or for the approval of the interception of wire, oral and electronic communications

involving any of the same persons, facilities, or places specified herein.

## F.  BACKGROUND OF INVESTIGATION

11.  The affidavit, dated September 2, 2005, submitted in support of an application for an

order authorizing the interception of wire and oral communications to and from the **target**

**telephone**, is incorporated herein by reference, and is available for review upon request.  In that

affidavit, your affiant described in detail the information which had been developed during the

investigation of **ANTOINE JONES**, including his management of drug trafficking and other

related crimes.  Information presented in the aforementioned affidavit originated from a number

of sources, including cooperating individuals, physical surveillance, analysis of telephone toll

records, data from Court-ordered pen registers, and search warrants.

12.  In summary, the affidavit referred to in the previous paragraph identified JONES as

an upper-level distributor of cocaine with connections to other importers/distributors of cocaine

in the Washington, D.C. area.  JONES and **LAWRENCE MAYNARD** were shown to

personally, and by enlisting others, traffic cocaine in the Washington, D.C., area.  That affidavit

also demonstrated that these targets were assisted in their criminal enterprise by, among others,

**DONALD ADRIAN HUNTER**, a/k/a **TERRY SAMUEL**; **DIANE BUSHROD**, a/k/a

**DIANE SMITH**; **ADRIAN JACKSON**; **KEVIN LAMONT HOLLAND**, and **KIRK R.**

CARTER, and others known and unknown. In that affidavit, your affiant wrote that confidential

source information, confirmed by, among other things, pen-register data and an interdiction stop,

disclosed that JONES runs a large-scale cocaine-trafficking operation, utilizing his nightclub,

LEVELS, located at 1960 Montana Avenue, N.E., Washington, D.C., as his base of operations.

MAYNARD serves as both JONES's nightclub manager and an associate in his cocaine-

trafficking enterprise.

13. On September 2, 2005, the Honorable Paul L. Friedman, United States District Judge

for the District of Columbia, authorized the interception of wire communications to and from

JONES's telephone, which is a Cingular Wireless cellular telephone subscribed to by DENISE

JONES, but used by ANTOINE JONES. Interception of wire communications to and from the

target telephone was initiated by the FBI on September 2, 2005, at approximately 3:48 p.m., and

remains ongoing.

14. Your affiant has confirmed that JONES, MAYNARD, HUNTER, BUSHROD,

CARTER, HOLLAND, and JACKSON were intercepted during the monitoring of JONES's

telephone. In addition, your affiant has learned that JONES communicates with other newly-

identified targets, MICHAEL HUGGINS; DEMETRIUS JOHNSON; JOHN ADAMS,

KEVIN LAMONT HOLLAND, PAULINE SPENCE, and other individuals not yet identified,

who are engaged in narcotics trafficking and other offenses. Specifically, these calls confirmed

the suspected role of ANTOINE JONES as a significant supplier of cocaine in the greater

Washington, D.C., area.

15.    Monitoring of the **target telephone** has confirmed that **JONES** and other members of his drug-trafficking organization frequently use that phone to conduct, facilitate, and direct various illicit activities of this drug trafficking organization.

## G. INTERCEPTION OF JONES'S PHONE AND FOLLOW-UP INVESTIGATION

16.  The following is a summary of the Court-authorized interceptions of **JONES's** conversations on the **target telephone** with other targets of this investigation, including some examples of specific calls.  Also, below are some examples of how investigators used the information to further the investigation.

17.  As an initial matter, the content and timing of many of **JONES's** calls demonstrates a clear pattern of suspicious contacts with several individuals, involving the timing and location of meetings, but without any other substantive content.  For example, on Day 2 of the interception period, September 3, 2005, beginning at approximately 9:00 a.m., **JONES** made a series of telephone calls to several individuals, all within a few minutes of each other, and left a message for each, asking that person to call him back.  Over the course of the ensuing few hours, **JONES** spoke in person to each of these individuals, inquiring about where that person was, and indicating that he would be leaving his house shortly and would stop by.  Based on the similarity of the telephone contacts between **JONES** and numerous individuals, and their content, all referring to locations and times to get together, investigators believe that, throughout the course of the interception period, on nearly a daily basis, **JONES** met with various individuals, both at his nightclub, LEVELS, and other large public facilities (e.g., Sam's Carwash), and exchanged narcotics for money.

18. For example, on that date at 9:14 a.m., JONES called MICHAEL HUGGINS at (301) 702-1124, believed to be the home telephone number for HUGGINS, and spoke to an unidentified male, who told him that "Mike" wasn't there. At 9:15 a.m., JONES called (240) 475-2981, the cellular telephone listed in the name of MICHAEL HUGGINS, and left a message asking "Mike" to call him. Then, at 1:51 p.m., JONES called HUGGINS again at (240) 475-2981, and stated that he was "outside." HUGGINS stated that he would be down in a couple of minutes. Investigators believe that within a few minutes of this call, JONES and HUGGINS engaged in a narcotics transaction.

19. JONES repeated this pattern throughout the course of the interception period. For example, on Day 5, September 6, 2005, at 10:45 a.m., JONES received a call from (202) 355-2621, a phone known to be in use by DONALD HUNTER. HUNTER told JONES to call him when JONES got into town. JONES asked HUNTER whether he would be ready, to which HUNTER responded: "yeah." Then, at 11:10 a.m., HUNTER again called JONES, at which time JONES told HUNTER that he would call HUNTER back in three minutes. At 11:30 a.m., JONES called HUNTER and asked: "where you at, slim?" HUNTER responded that he was at 8th and H. JONES told HUNTER to come up to "where your girl work at," and added a reference to what sounded like "the Circuit," to which HUNTER responded: "OK, I'm on my way."[2] JONES called HUNTER again at 12:21 p.m., and stated: "I want to wash my car, go wash my car." HUNTER asks whether he should go to the car wash, and JONES replied: "yeah." Investigators believe that this was a thinly veiled attempt by JONES to communicate to

---

[2]    Agents believe that HUNTER has a romantic relationship with a woman who works at Circuit City on Branch Avenue in Temple Hills, Maryland.

HUNTER that they should meet at Sam's Carwash to conduct a narcotics transaction. Sam's

Carwash is within the same block as the Circuit City on Branch Avenue, an area to which

JONES referred numerous customers over the course of the interception period, in order to

engage in cocaine transactions, and a location in which Confidential Source 1 frequently met

with JONES to engage in cocaine transactions in 2004, as noted in your affiant's initial affidavit.

20. Further, as Confidential Source 1 indicated was JONES's practice, JONES

uniformly speaks in code throughout the interception period, with only the very occasional slip-

up. For example, he and his drug-trafficking colleagues speak frequently of the need for

"tickets," which investigators believe to be a reference to wholesale quantities of cocaine,

perhaps kilograms. They speak, too, of "VIP tickets" (larger quantities) and occasionally of

"little tickets." For example, on September 7, 2005, Day 6 of the interception period, throughout

the course of the day, JONES had discussions with several people, including MAYNARD,

about the sale of "tickets." At 10:24 a.m., JONES called (240) 463-3129, a telephone registered

in the name of Simona Adama, but which is believed to be in use by JOHN ADAMS, and asked

whether he was "in the house." ADAMS told JONES that he would be there in 15 minutes.

JONES told ADAMS to catch up with MAYNARD for that "ticket" and that MAYNARD

"knows what to do with it." JONES also told ADAMS to call him once he got in the house, to

which ADAMS replied: "10/4."

21. JONES then called MAYNARD at 10:25 a.m., and informed MAYNARD that

"John" would be calling him in 15 minutes, and that he has the ticket for "Pauline." Agents note

that throughout the course of the previous several days, there were telephone calls between

JONES and PAULINE SPENCE that were suspicious in nature, regarding "tickets" and

13

"flyers." **SPENCE** has no known relationship to **JONES** or his club, **LEVELS**.

22. One minute later, at 10:26 a.m., **JONES** called **SPENCE** and told her that **MAYNARD** was going to call her, and that he will have another ticket and will "take care of that," and that when he gets back from his trip to Baltimore, he would have another "VIP ticket."

23. At 2:22 p.m., **JONES** received a call from an unknown female, who asked whether he remembered what she told him. **JONES** said "yeah, you need two more tickets." The conversation then turned to VIP tickets, and the fact that she has two tickets and does not need VIP tickets. **JONES** did not seem to understand what the female caller is saying, prompting her to say "do you understand me?" They then discussed the fact that she will need "front row" tickets soon, and **JONES** told her to call him and he will "take care of that" for her. Agents believe that this conversation deals with varying quantities of cocaine, and that "front row" tickets refers to the caller's desire for **JONES** to "front" cocaine to her, i.e., provide it to her on consignment.

24. In addition, there were coded telephone calls on that date which appeared to refer to guns and money. For example, at approximately 10:06 a.m., **JONES** got a call from an unknown male at (202) 465-1651. After some conversation about the possible sale of a soda machine, the unknown male paused and then said, haltingly, that while **JONES** "probably doesn't need one," he would "holler at [**JONES**] later about that, um, that heater." When **JONES** asked what the male was talking about, the unknown male doesn't respond, at which point **JONES** asks: "what kind of heater?" And the unknown male says: "you know, the desert." They agree to talk more about this later. Investigators believe that **JONES** and the unknown male are discussing the possible purchase of a Desert Eagle gun, in part because guns are frequently referred to as "heat"

14

on the street.

25.  Further, at 10:33 a.m., JONES received a call from an unknown male at (202) 286-

3057.  JONES told the caller that he was in his house, but was about to go to Baltimore to look

at houses.  JONES asked the unknown male whether he had "done that math homework."  The

unknown male, who sounded exasperated, stated: "there's no way in the world . . . I don't want

to argue over it, there's nothing I can do about it, but I'm telling you, it's ridiculous . . . ."

JONES told him that he wished he could take the unknown male "there to see," and then asked

"what was it, $3? $2?"  The unknown male replies that it was "way way more than that."

JONES then slipped and asked whether it was "more than 3,000, I mean $3."  The unknown

male tells JONES that it is more than 5, "that's why I'm saying something's gotta be wrong."

They agree to discuss the matter further after JONES returns from his house-hunting trip to

Baltimore.  Investigators believe that this conversation refers to a shortage of cash with respect to

a narcotics deal.  As noted, at one point, JONES slips and refers to "3,000" but then recovers,

saying "I mean, $3."  In addition, a money counting machine can be heard in the background.

26.  JONES, having returned from Baltimore, called that unknown male again at (202)

286-3057, at 2:14 p.m.  JONES asked the unknown male whether he was in the house, and when

he responded that he was, JONES stated that he was coming over because he needed to talk to

him.  A few minutes later, JONES received an incoming call from ADRIAN JACKSON, whom

he had referred to as his "partner" in other intercepted conversations, and told JACKSON that he

was going over to his man's house around the corner.  Investigators believe that JONES was

going to meet with this unknown individual to discuss the financial problem discussed in the call

earlier that day, and that JONES was informing JACKSON of his efforts to clear up the

15

problem.

27.    Throughout the remainder of the interception period, JONES and his colleagues continue to make reference to "tickets," in various forms, in a manner which investigators believe connotes wholesale quantities of cocaine.  For example, on Day 11 of the interception period, September 12, 2005, JONES urgently requested "two tickets" from ADAMS, who is believed to be the owner of at least one of JONES's stash houses, located just off of Branch Avenue, in Landover, Maryland – a location where JONES conducts much of his cocaine distribution – promising to get two tickets back to ADAMS the following day.

28.    Further, on Day 19 of the interception period, September 20, 2005, JONES had a conversation with ADAMS beginning at 1:08 p.m., in which ADAMS told JONES that he would "have the ticket money" around 6:00 p.m.  JONES then told ADAMS that he still needed to "come through for Youngin" (a reference to DEMETRIUS JOHNSON), to which ADAMS responded that JONES might as well wait until later, when he has the "ticket money."  Within 30 seconds of hanging up with ADAMS, JONES received an incoming call from JOHNSON, who discussed money with JONES, specifically that he is "26 in the hole."  After further discussion of numbers, JONES told JOHNSON that he has "it" and "won't do nothin' with it" until he hears from JOHNSON, after JOHNSON speaks with someone else and "gets it straight."  JONES also told JOHNSON during the course of the conversation that he has to get his car fixed first, but assured JOHNSON "I got you."  JOHNSON answered an incoming call from call waiting, and after approximately 40 seconds, returned to JONES who asked: "you're talkin' VIP, right?"  After JOHNSON assented, JONES told him to "call him back and tell him a couple of hours, right?"

16

29.    Based on these calls between **JOHNSON** and **JONES**, investigators believe that **JOHNSON** was brokering a cocaine deal between **JONES** and another individual, to whom they refer as "little dude." This pattern of telephone communications mirrors a pattern of conversations between **JONES** and **JOHNSON** on September 3, 2005, Day 2 of the interception period. On that date, **JOHNSON** called **JONES** at 9:47 a.m. **JONES** asked **JOHNSON** whether he wanted the "same old same old, or something different?" **JOHNSON** replied that he would "call the dude back right now and see where's he's at and go from there." Two minutes later, **JOHNSON** called **JONES** again and stated that "he didn't answer his phone, but nine out of 10 times he's waiting for me." **JONES** told **JOHNSON** to call him, that he is "out and about." **JOHNSON** then called **JONES** at 5:10 p.m., and told **JONES** that he is going to "shoot up there" to the Club, and called again at 5:51 p.m., telling **JONES** that he is 10 minutes away. Finally, at 6:02 p.m., **JOHNSON** called **JONES** at told **JONES** that he was downstairs. Investigators believe that within a few minutes of this call, **JONES** and **JOHNSON** conducted a narcotics transaction, which **JOHNSON** was likely brokering for another individual.

30.    Intercepted calls with similar content also confirmed investigators' suspicions, articulated in your affiant's initial affidavit, that **JONES** is supplying cocaine to **KIRK CARTER**, who has at least one conviction for narcotics trafficking. For example, on September 9, 2005, Day 8 of the interception period, at 8:21 a.m., **JONES** called **CARTER** and asked if they got the last tickets from him. **CARTER** replied "no, um, but you want me . . You, um, going over there at halftime?" **JONES** replied: "Nah, slim, I can do halftime with you, you ready for halftime?" **CARTER** said: "I'll be over there and um make that delivery time . . . I'll bring you your order over there." **JONES** said that he would be over to where **CARTER** is in approximately 20 minutes.

17

CARTER agreed to wait for JONES. Investigators believe that CARTER was making a delivery of money to JONES, which CARTER owed for fronted narcotics. Similarly, the next day, JONES called CARTER at 5:51 p.m., and gave CARTER his new telephone number. CARTER told JONES that he wanted to see him. JONES was on Branch Avenue, and agreed to meet CARTER at the carwash. CARTER called JONES again at 6:22 p.m., and informed him that he was at the carwash. JONES stated that he was about five minutes away. At 6:27 p.m., JONES called CARTER and asked "where you at?" CARTER stated that he was at the McDonald's. Investigators believe that shortly after this call, JONES and CARTER met at Sam's Carwash on Branch Avenue and conducted a narcotics transaction. Finally, after a similar pattern of telephone contacts on September 15, 2005, between JONES and CARTER, the pair agreed to meet again at the carwash on Branch Avenue. A surveillance team responded to that location in advance of JONES and CARTER, and took photographs of their brief meeting at the carwash, and again a few moments later in the Circuit City parking lot, a few blocks down Branch Avenue.[3]

31. Law enforcement surveillance further confirmed that KEVIN LAMONT HOLLAND, who uses cellular telephone number (202) 277-8552, and who himself has a conviction for Distribution of 50 Grams or More of Cocaine Base, is a significant customer of JONES's. On very nearly a daily basis throughout the course of the interception period, HOLLAND and JONES would make arrangements to meet in various locations, usually along Branch Avenue, and, investigators believe, exchange money and cocaine. For example, within hours of the initiation of wire

---

[3]    Given the angle from which they were able to take photographs, it was impossible to capture what JONES and CARTER were doing with their hands. However, investigators believe that at the Circuit City meeting, they observed CARTER toss a plastic bag into JONES's champagne-colored Jeep Grand Cherokee.

interceptions on September 2, 2005, the following pattern of telephone contacts between **JONES** and **HOLLAND** occurred: at 5:14 p.m., **JONES** called (202) 277-8552, and said "hello" several times, and then hung up. At 5:15 p.m., **JONES** called **HOLLAND** again and got his voicemail, hanging up without leaving a message. Also at 5:15 p.m., **JONES** received an incoming call from **HOLLAND**, but **JONES** did not answer and no message is left. At 5:17 p.m., **JONES** received another call from **HOLLAND**, which similarly goes unanswered. Finally, at 5:19 p.m., **HOLLAND** got through on **JONES**'s phone. **JONES** asked **HOLLAND** to meet him at the Club, to which **HOLLAND** replied "Yep." Following up on this previous telephone activity, **JONES** called **HOLLAND** at 5:51 p.m., and told **HOLLAND** that he was leaving the Club in a few minutes, and then inquired as to **HOLLAND**'s whereabouts. **JONES** told **HOLLAND** that he will head out Branch Avenue, and will meet him near the carwash, and **HOLLAND** agreed. One minute later, **HOLLAND** called **JONES** and told him that he would be at Circuit City, because he needed some movies. Then, at 6:31 p.m., **JONES** received a call from **HOLLAND**, who stated that he was going to grab some "flyers" at an unintelligible location. **JONES** responded that he would pull around. Investigators believe that **JONES** and **HOLLAND** met within a few minutes of this call to conduct a narcotics transaction.

32. After monitoring these conversations for approximately two weeks, investigators were able to capture in still photographs **JONES** and **HOLLAND** in the course of what investigators believe to be a cocaine transaction. Specifically, after a similar pattern of telephone calls, in which **JONES** and **HOLLAND** agree to meet at Oxon Hill Plaza, in Oxon Hill, Maryland, a team of investigators responded to that area and set up covert surveillance. Within a few minutes of their arrival, **JONES** appeared, driving his champagne-colored Jeep, and **HOLLAND** appeared, driving

a silver Mercedes sedan, which is registered in his name. In the course of this brief meeting, investigators observed and photographed **HOLLAND** tossing a white plastic shopping bag into **JONES's** Jeep and then quickly departing. Within a few hours of this delivery, **JONES** and **HOLLAND** again agreed to meet. Investigators believe that within a few minutes of that conversation, **JONES** delivered cocaine to **HOLLAND**.

33. Further, in the course of the investigation leading up to the initial affidavit in support of the wire tap, pen register data revealed that towards the end of every month, **JONES** spoke with an individual on a cellular telephone number with a (713) area code, which was subscribed to in the name of Juan Lopez,[4] in McAllen, Texas, a major point of entry of narcotics into the United States. True to form, on September 20, 2005, **JONES** received two telephone calls from (713) 386-9548,[5] at 10:45 a.m., and again at 10:47 a.m. (the first call was apparently cut dropped mid-conversation), totaling 3 minutes and 46 seconds. This is the first time that **JONES** has spoken with UM-1 during the course of the interception period. During the call, UM-1 told **JONES** that he had been trying to find "some new music", but that it is getting a little rough on his side. He assures **JONES**, however, that he has some "good people" who make some "good music," and that he is just waiting for them. UM-1 then asks **JONES** whether he likes the music that UM-1 sent, to which **JONES** replies that "they love the sound, they love the entertainers, they love it." **JONES** asks UM-1

---

[4]      Investigators believe that "Juan Lopez" is a fictitious name. However, your affiant will refer to the user of this telephone as "UM-1" for ease of reference.

[5]      While this is a different number than showed up on the pen register on **JONES's** phone in previous months, UM-1 actually tells **JONES** in the course of this conversation that this is his new number, to which **JONES** replies that he will "lock it in." Further, both (713) telephone numbers come back to "Juan Lopez."

whether they will take "a couple weeks," to which UM-1 responds that he still has a little bit of music there. JONES mentions that "they like the whole studio, they like how they can practice back-to-back," and that everyone is happy on this side "as far as the band." UM-1 states that it will take "a couple weeks, right," and JONES states "they just go ahead and be ready." UM-1 replies that he just needs time to "put the music straight and everything together and that will work." Later in the conversation, UM-1 tells JONES that he was just trying to see if everything was cool and to inform JONES that everything looks good on his end, to which JONES responds that they just need it in a week or two, so it's cool. Also, twice in the conversation, JONES tells UM-1 that he is going to the "Studio" later that day. Investigators believe that in this conversation, JONES and UM-1 are discussing the quality of the most recent multiple-kilogram shipment of cocaine ("how do they like the music?" and "they love the music") and also discussing the timing of a forthcoming shipment ("everything looks good on this end" and "a week or two is cool").

34. Then, on Monday, September 26, 2005, at approximately 6:30 p.m., JONES called UM-1 at (713) 386-9548, and reported to UM-1 that he has been working around the clock to get things together so that the "studio" be ready. UM-1 replies "great" and says that a "friend" is going to get everything together by Wednesday (believed to be September 28, 2005), and that they are going to pick up the "discs" of which they have nine remaining, and requests that JONES "give [him] a hand." At that point, JONES cuts him off, saying "we got you, we got you – we can't do it no quicker but we're trying," stating that they have "been going 24 hours a day" with "100 things going," but that they should be ready by Wednesday. Both men express a hope that, after Wednesday, everything will be in place so that they can "take a few days off." Investigators believe that in this conversation, JONES and UM-1, who supplies cocaine to him, are discussing the timing

of the next big shipment of cocaine, and **JONES**'s ability to collect money in advance from his customers to pay for this shipment. In the hour after this call, **JONES** attempted to contact or contacted **ADAMS, HOLLAND, JOHNSON,** and **CARTER**.

35. Further, with respect to **JONES**'s supply chain, **JONES** has been making suspicious telephone calls with great frequency in recent days with telephone number (678) 330-7712, a Nextel cellular telephone, subscribed to in the name of John Yi, at an Atlanta, Georgia address.[6] Within the past week, we have obtained a pen register order for this telephone, complete with tracker and cell site information, which has revealed that the user of this telephone has made the majority of the phone calls to **JONES** while in the Oxon Hill, Maryland area. In these calls, all of which are initiated by **JONES**, **JONES** states simply "what's up" or "yeah" or "OK," to which UM-2 responds in kind. In a few of these calls, **JONES** says "20 minutes," or "5 minutes," or similar. On those occasions, the cellular site tracker on **JONES**'s telephone has revealed that he is in the same cellular site in Maryland. Investigators believe that through these calls, **JONES** is signaling to UM-2 a time to meet at a pre-ordained location, or perhaps a quantity of cocaine he plans to purchase (e.g., "5 minutes" may mean that **JONES** is seeking five kilograms of cocaine). Investigators further believe that UM-2 may be the "friend" who is going to "hook everything up," to whom UM-1 referred in the September 26, 2005, telephone call with **JONES**.

36. Finally, toll records pertaining to (678) 330-7712, have revealed that UM-2 utilizes the "direct connect" function on his telephone – which allows him to speak with another Nextel subscriber, if he specially identifies that number with Nextel, with the touch of one button. Of the

---

[6]    Investigators similarly believe that this is a fictitious name, and for ease of reference, will refer to the user of this telephone as "UM-2.".

few telephone numbers he has specifically identified, two of them are these (713) numbers subscribed to by Juan Lopez, UM-1. Thus, investigators believe that UM-1 and UM-2 are close associates of each other, and are likely members of the supply-chain leading to **JONES.**

## H.  NEED FOR THE INTERCEPTION

37.  Continued interception of the target telephone is necessary to fully achieve the goals of this investigation.  While some investigative goals have been partially satisfied, no goal has been completely satisfied, including determination of: (a) the nature, extent and methods of operation of the narcotics trafficking activities in which the interceptees and others as yet unknown are engaged; (b) the identities, roles, and telephone numbers of all of the co-conspirators, accomplices, aiders and abettors and other participants in such illegal activity; (c) the source, distribution, transfer and location of the narcotics and money involved in those activities; (d) the existence and location of payphones, apartments, residences, businesses and other premises used in the furtherance of the illegal activity; (e)  the existence and location of records of the illegal activity; (f) the existence, location and source of the resources used to finance the illegal activity; (g) the identification and location of the resources and assets being accumulated by known subjects of this investigation and others as a result of their illegal activities; (h) the existence, location and disposition of proceeds from the activity; (i) the existence and location of any other item or means used in furtherance of those activities; (j) the dates, times, and details for the continued commission of the above-mentioned offenses; and (k) other evidence necessary for successful prosecution and conviction of the above-described criminal activity.  Therefore, in that conventional investigative techniques have allowed for only limited achievement of the goals as described herein, it is your affiant's belief that the continued

23

interception of wire communications is the only available technique that has a reasonable likelihood of securing the evidence necessary to prove beyond a reasonable doubt that the **Target Subjects,** and others as yet unknown or identified, are engaged in the above-described offenses.

## I.   RESULTS OF TRADITIONAL INVESTIGATIVE TECHNIQUES

38.   Your affiant states that the following investigative techniques usually employed in the investigation of this type of criminal case, have been tried and have failed, reasonably appear unlikely to succeed if they are tried, or are too dangerous to employ.  The following paragraphs summarize the techniques employed during the course of this investigation, and explain why other investigative techniques were not attempted:

(a) <u>Physical Surveillance</u>:  Although there has been limited success at surveillance of **JONES, CARTER,** and **HOLLAND** during this investigation, including the period of interception of the **target telephone,** this investigative technique is not expected to be fruitful on its own.  Agents have been successful in photographing two meetings between **JONES** and these associates, and have obtained limited footage by pole camera of individuals coming to and leaving from **LEVELS.**  However, without advanced notice of meetings between **JONES** and his associates, obtained from real-time wire interceptions, it is nearly impossible to get into a position to photograph **JONES** and his co-conspirators in advance of their meetings.  There is also a danger of encountering suspected targets during surveillance or other covert operations.  Because this investigation is still in the rather early stages, if **JONES** were to suspect that he were under investigation, there is a great likelihood that he would attempt to shut down his operation, and at the very least would drop his cellular telephone, especially in light of the fact that he is known to run a very secretive operation, and is more cautious than the typical narcotics-

24

distributor.  Therefore, while agents will continue to attempt physical surveillance when they are

certain that such surveillance will not be detected, but it is unlikely that the goals of the

investigation will be met without continued interception of the **target telephone**.

(b) <u>Source Information and Undercovers</u>:  During this investigation, some information

has been obtained through the actions of cooperating individuals but, at present, there are still no

cooperating individuals (CI) or undercover police officers (UCO) who are capable of safely

purchasing narcotics or providing current, detailed information concerning the drug-trafficking

activities of **JONES** and his associates including: (i)  the means by which their drugs are

obtained; (ii)  the manner and timetable of cocaine, heroin and PCP shipments; (iii)  the locations

where illegally obtained assets and drugs are hidden; or (iv)  the manner in which the co-

conspirators conceal their activities and insulate themselves from law enforcement scrutiny.

Further, **JONES** is still less susceptible to infiltration by police informants or undercover officers

because, given his position as a wholesale drug supplier, he only needs to deal with relatively few

people, which differs from the street level retail dealers and suppliers who deal with many more

people, and who are more susceptible of selling to under cover officers and CIs.  Although

Confidential Source One might be able to purchase cocaine from **JONES** and/or **HUNTER**, as

noted in the initial affidavit, CS-1 would not be able to re-distribute the purchased cocaine as

**JONES** and **HUNTER** would expect him to.  Furthermore, the danger associated with an

undercover operation using this cooperating witness is great, both because he is expected to

testify at trial, and because **HUNTER** knows him well, including where he lives, where his

children go to school, where his wife works, and the like.  Finally, although attempts have been

made, investigators have not developed any new confidential sources in this investigation over

25

the course of the past 30 days.

(c) <u>Buy/Bust Technique</u>: Agents are presently contemplating an attempt to introduce a CI to **KIRK CARTER**, in the hopes of arranging a controlled purchase of cocaine. However, at this time, it is not clear whether that attempt will be successful; further even if successful, such a purchase would not provide additional information regarding the identity of **JONES's** source of supply, the identities of all of his associates, the locations of stash houses, or the location of his assets.

(d) <u>Search Warrants</u>: Thus far, wire interceptions have lead investigators to various locations in the Metropolitan Washington, D.C. area, which appear to be stash houses and residences for some of the **target subjects**. Investigators hope to further this investigation by executing search warrants at some or all of these locations, but before doing so, need to develop more information regarding the specifics of the stash locations, and the various residences of each of the **target subjects**. Further, at this stage of the investigation, without additional information, the execution of search warrants in this matter could not reasonably be expected to produce incriminating evidence of the full scope of the co-conspirators' narcotics activities, nor would this technique be likely to identify other co-conspirators, as it is unlikely all principals of this organization would be at any one location when a search warrant was executed. It is believed that search warrants, executed at this time, would be more likely to compromise the investigation by alerting the principals of the investigation and, thereby, allow suppliers and other unidentified members of the conspiracy to further insulate themselves from successful detection and to otherwise frustrate the purpose of this investigation.

26

00002
00002

(e) <u>Use of the Grand Jury</u>: Use of a Federal Grand Jury would still be of limited value at this time in achieving the above-stated investigative goals for the following reasons: (i)  subjects of the investigation, should they be called to testify, would most likely invoke their Fifth Amendment privileges.  Furthermore, subpoenas directed to the subjects would alert them to the ongoing federal investigation, thus presenting them an opportunity to destroy, alter or move evidence; (ii)  it would be unwise to seek Grand Jury immunity for any of the subjects named herein as it might foreclose prosecution of the most culpable person; (iii)  Grand Jury testimony by a cooperating individual or undercover police officer at this time would lead only to a limited prosecution, possibly allowing key members of this organization to go unidentified and unprosecuted.  Further, such testimony at this stage of the investigation would fail to identify the methods of operation of this organization, as well as the location of any assets which co-conspirators may have accumulated as a result of their unlawful activities; and (iv)  it would be difficult to effectively question witnesses without having additional detailed information about this organization;

(f) <u>Interviews</u>: The subjects of this investigation do not often reveal information to persons who are not part of their criminal conspiracy.  As a result, interviews would not likely be productive in that only the subjects of this investigation have the information needed by law enforcement authorities.  Furthermore, attempts to interview targets of this investigation would only result in their being alerted to the existence of a Federal investigation.  Finally, we have made repeated efforts to debrief defendants who are thought to be associated with members of JONES's organization, but continue to be rebuffed across the board.

(g) <u>Pen Registers and Toll Record Analyses</u>: The pen register information used in this investigation has verified frequent telephone communication between the **target telephone** and other telephones. Pen registers, however, do not record the identity of the parties to the conversations, cannot identify the nature or substance of the conversations and cannot differentiate between legitimate calls and calls for criminal purposes. Pen registers cannot identify the source or sources of the controlled substances, nor can they, in themselves, establish proof of the conspiracy. Telephone toll information, which identifies the existence and length of telephone calls placed from the target telephone to telephones located outside of the local service zone, has the same limitations as pen registers, and is generally available only on a monthly basis.

(h) <u>Electronic Surveillance</u>: While, as set forth more fully *supra*, the wire interceptions in the initial 30-day period have proven to be a fruitful source of information regarding **JONES's** cocaine-trafficking operation, they have not provided all of the information necessary to understand, *inter alia*, the identities and locations of all of his customers, the identity and locations of the members of his supply-chain, the locations of all of the stash houses, the quantity of cocaine that he is trafficking in, and all of the various methods by which he distributes cocaine, and collects money therefor. ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████

## J. <u>MINIMIZATION</u>

40.  All interceptions will be minimized in accordance with the minimization requirements of Chapter 119 of Title 18, United States Code, and all interceptions conducted pursuant to this Court's Order will terminate upon attainment of the authorized objectives or, in any event, at the end of thirty (30) days from the date the Order is signed.  Monitoring of conversations will terminate immediately when it is determined that the conversation or activity is unrelated to communications subject to interception under Chapter 119 of Title 18, United States Code.  Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard, that the conversation or conduct is criminal in nature.  Reasonable spot monitoring will be utilized to ensure that minimized calls, and oral communications have not become criminal in nature.

41.  Monitoring will be conducted by Special Agents of the FBI, Metropolitan Police Department officers, and/or other persons acting under the supervision of the FBI and under the supervision of investigative or law enforcement officers authorized to conduct the interceptions. Your affiant, as well as other agents and investigators participating in the interceptions of wire communications, will operate all equipment necessary to monitor all interceptions, and the FBI will maintain custody of the logs of all interceptions monitored.

## K. LENGTH OF INTERCEPTION

42.  The Application for which this Affidavit is submitted in support thereof seeks authorization to intercept wire communications for a thirty (30) day period concerning offenses listed in paragraph 3, above.  Because of the continuing nature of the above-described offenses, and in order to determine the full scope of the organization under investigation and to achieve the goals of the investigation as specified herein, it is requested that the interception of wire communications not cease when the type of communications described above are first intercepted, but continue until the objectives of this investigation are accomplished, not to exceed a period of thirty (30) days, commencing from the date of the Court's Order.

## L. EXPENSES

43.  Any reasonable expenses necessarily incurred pursuant to a Court Order under Section 2518 (4)(e) of Title 18, United States Code, relating to the technical assistance rendered to the Government by a communications service provider or other persons, will be processed by the FBI for payment by the United States Government, unless the Court should direct otherwise.

## M. CONCLUSION

44.    Wherefore, based upon the facts and circumstances related above and my experience as a Special Agent of the FBI, I believe that probable cause exists to permit the issuance of an Order to Intercept Wire Communications, and that Order should not terminate on the first interception that reveals the manner in which the **target subjects**, and others as yet unknown conduct their illegal activities, but should continue until such interceptions lead to the satisfaction of the specified goals of this investigation, or for the total period of thirty (30) days, whichever is earlier.  It is requested that this thirty (30) day period run from the date of the

30

Court's Order.

I swear and subscribe to the information contained in the Affidavit:

STEPHANIE E. YANTA
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me
this 30th day of September 2005 in
the District of Columbia.

UNITED STATES DISTRICT JUDGE

31