# Maryland Search Warrants

## AFFIDAVIT

I, Stephanie E. Yanta, Special Agent with the Federal Bureau of Investigation (FBI),

Washington Field Office, Washington, D.C., (hereinafter affiant) being duly sworn, depose and state as

follows:

## A. INTRODUCTION

I am "an investigative or law enforcement officer" of the United States within the meaning of

Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is

empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section

2516 of Title 18, United States Code.

I have been a Special Agent with the FBI since March 1998. I am currently assigned to the

Safe Streets Task Force, which is tasked with the investigation of violent narcotics traffickers in the

District of Columbia and elsewhere. I have previously participated in investigations that led to the arrest

and conviction of narcotics dealers. Since 1998, I have received training and developed experience in

interviewing and interrogation techniques, arrest procedures, search and seizure, narcotics, white collar

crimes, search warrant applications, and various other crimes. In the course of my training and

experience, I have become familiar with the methods and techniques associated with the distribution of

narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. In the course of

conducting these investigations, your affiant has been involved in the use of the following investigative

techniques: interviewing informants and cooperating witnesses; conducting physical surveillance;

conducting short-term and long-term undercover operations, including reverse undercover drug

operations; consensual monitoring and recording of both telephonic and non-telephonic

communications; analyzing telephone pen register and caller identification system data; conducting

court-authorized electronic surveillance; and preparing and executing search warrants which have led to

substantial seizures of narcotics, firearms and other contraband.

Through instruction and participation in investigations, your affiant has become familiar with the

manner in which narcotics traffickers conduct their illegal business and the methods, language, and

terms that are used to disguise conversations about their narcotics activities. From experience and

training, your affiant has learned, among other things, that:(a) drug traffickers virtually never expressly

refer to cocaine or other illegal drugs by name; instead to conceal the true nature of their illegal activities

and to thwart detection by law enforcement, they refer to the drugs and drug quantities using seemingly

innocent terms; (b) narcotics traffickers frequently use electronic paging devices, commonly referred to

as pagers or beepers, cellular telephones, digital telephones, and other communications devices to

further their illegal activities by, among other things, remaining in constant or ready communication with

one another without restricting either party to a particular telephone or location at which they might be

the subject of physical surveillance by law enforcement authorities; and (c) narcotics traffickers

frequently transmit pre-arranged numerical codes to pagers or telephones to identify themselves or to

otherwise communicate information, such as price or quantity of drugs, to the person in possession of

the pager.

Throughout this investigation, your affiant has worked with other Special Agents (SAs) of the

FBI, and members of the Washington, D.C. Metropolitan Police Department (MPD) assigned to the

Safe Streets Task Force. This affidavit is based on my personal knowledge derived from my

participation in this investigation, as well as speaking with other law enforcement officers assigned to

2

this investigation, and includes, but is not limited to, the following information: (a) oral and written law enforcement reports regarding this and other related investigations; (b) physical surveillance; (c) review of dialed number recorder data (pen register records) and telephone toll records; (d) review of vehicle registration records and licenses; (e) review of criminal history records; and (f) review of wire interceptions pertaining to the target telephone authorized by United States District Court Judge Paul L. Friedman on September 2, 2005, and extended on September 30, 2005, and (g) debriefings of confidential informants.

Based upon my training and experience, as well as the corporate knowledge and experience of other agents and police officers in my office, I am aware that it is generally a common practice for drug traffickers to store their drug inventory and drug-related paraphernalia (including scales and ziploc bags and other packaging materials used in the distribution of cocaine) in their residences and the residences of co-conspirators. Further, based on the information developed in this investigation it is my opinion that the "target subjects" are using the above-described premises to store the cocaine they are selling. Further, it is generally a common practice for drug traffickers to maintain in their residences and the residences of co-conspirators records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's supplier and the trafficker's dealer(s). Additionally, drug traffickers must maintain telephone

3

and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.

It is also a generally common practice for traffickers to conceal at their residences large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances. In this connection, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

Typically, drug traffickers possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs.

## LOCATIONS TO BE SEARCHED

The descriptions of the following addresses were obtained through physical surveillance by your affiant and/or other law enforcement officers.

### (1)  10870 Moore Street, Waldorf, Maryland

Is described as a brick single family house with the numbers "10870" on the mailbox post to the right of the driveway.

### (2)  12221 Brandywine Road, Brandywine, Maryland

Is described as a single family house, brick with yellow siding, with the numbers "12221" above the front door.

### (3)  7921 Allendale Drive, Landover, Maryland

4

Is described as a white duplex house with the numbers "7921" in black to the right of the front door.

### (4) 5119 Barto Avenue, Suitland, Maryland 20746

Is described as a brick single family house with a wooden fenced-in yard. The numbers "5119" are on the fence post to the right of the driveway.

### (5) 10441 Crescent Park Way, Waldorf, Maryland

Is described as a brick single family house with the numbers "10441" in black on a white placard to the left of the front door.

### (6) 5703 Gloria Drive, Suitland, Maryland

Is described as a brick single family house with the numbers "5703" on the left of two columns, which is to the left of the front door.

### (7) 9156 Piscataway Road, Clinton, Maryland 20735

Is described as a brick with white siding single family home with white columns. The numbers "9156" are displayed on a brick column to the left of the driveway and at the driveway entrance.

### (8) 9508 Potomac Drive, Fort Washington, Maryland

Is described as a single family house with yellow siding and the numbers "9508" on the mailbox to the left of the driveway.

## TARGETS OF THE INVESTIGATION

As described below, an extensive investigation has developed probable cause to believe that the following individuals and others are involved in an ongoing drug conspiracy: **ANTOINE JONES, a/k/a "TOINE"; DENISE JONES, a/k/a DENIECE JONES, a/k/a DENICE JONES** (wife of

5

ANTOINE JONES); LAWRENCE MAYNARD; ADRIAN JACKSON; MICHAEL ANDRE

HUGGINS; ANJA HUGGINS (wife of MICHAEL HUGGINS);  KEVIN LAMONT

HOLLAND; DEMETRIUS CORTEZ JOHNSON; JOHN ADAMS; SIMONA ADAMS (wife

of JOHN ADAMS); PAULINE SPENCE and GREGORY HAWKINS.

The criminal histories of some of the target subjects of this investigation are as follows:

ANTOINE JONES, a/k/a ANTONIO JONES, a/k/a/ "TOINE" is a black male, born on

February 25, 1960.  He is described as 6'2" tall and approximately 220 pounds, with a Social Security

Number of 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.  A search of FBI criminal history records for JONES (FBI# 901461KA2)

revealed the following: 1994, District of Columbia, Conspiracy to Distribute 50 Grams or More of

Cocaine Base, Possession with Intent to Distribute 50 Grams or More of Cocaine Base, and

Possession with Intent to Distribute Cocaine, guilty, sentenced to ten years' imprisonment, placed on

supervised release until April 25, 2007; 1989, District of Columbia, Carrying a Pistol Without a

License and Disorderly Conduct, dismissed; 1991, Arlington, Virginia, Selling Cocaine, Guilty; 1993,

District of Columbia, Possession of an Unregistered Firearm and Possession with Intent to Distribute

Cocaine, dismissed.

DENISE JONES, a/k/a DENIECE JONES, a/k/a DENICE JONES (wife of

ANTOINE JONES) is a black female, born on March 17, 1963.  She is described as approximately

5'5" tall and 190 pounds.  A search of FBI criminal history records for DENIECE JONES  revealed

no known criminal history.

LAWRENCE MAYNARD is a black male, born on August 21, 1961.  He is described as

approximately 6'2" tall and 240 pounds, with a Social Security Number of 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.  A search of

FBI criminal history records for **MAYNARD** (FBI #512598TA1) revealed the following: 1993, District of Columbia, Distribution of Cocaine, found not guilty.

**ADRIAN JACKSON** is a black male, born July 11, 1978. He is described as 5'8" tall and 185 pounds, with a Social Security Number of 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. A search of criminal history record for **JACKSON** (FBI# 941681FB3) revealed that he has convictions for narcotics and weapons offenses, his most recent conviction being for Carrying a Handgun in Maryland in 2004; in addition, he has a pending case for Carrying a Pistol without a License in the District of Columbia, for which he was indicted in December, 2004.

**MICHAEL ANDRE HUGGINS** is a black male, born April 27, 1964. He is described as 5'11" tall and 171 pounds, with a Social Security Number of 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. A search of FBI criminal history records for **HUGGINS** (FBI# 200725JA2) revealed that he has convictions for narcotics and weapons offenses, his most recent conviction being for Providing Contraband (Heroin) to an Inmate, in 1995.

**ANJA HUGGINS** is a black female, born October 8, 1965. She is described 5'4" tall and 135 pounds, with a Social Security Number of 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. A search of FBI criminal history records for **ANJA HUGGINS** revealed no known criminal history.

**KEVIN LAMONT HOLLAND** is a black male born on June 9, 1976. He is described as 5'11" tall and 175 pounds, with a Social Security Number of 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. A search of FBI criminal history records (FBI# 179452CB8) revealed that he has a1996 conviction in United States District Court in Virginia for Conspiracy to Distribute 50 Grams or More of Cocaine Base, for which he was sentenced to 120 months' incarceration in October, 1997.

7

**DEMETRIUS CORTEZ JOHNSON** is a black male born on August 1, 1967. He is described as 6'3" tall and 180 pounds, with Social Security Numbers 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 and 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. According to toll records, he uses cellular telephone number (301) 751-7614, with a listed address of 12110 Deka Road, Clinton, Maryland. A search of FBI criminal history records (FBI# 400182HA0) revealed that he has a 1987 conviction in Superior Court for the District of Columbia for UCSA Cocaine and an arrest in 02/1994 in Prince George's County, Maryland for Battery.

**JOHN ADAMS** is a black male, born July 15, 1965. He is described as 5'9" tall and 190 pounds, with a Social Security Number of 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. A search of FBI criminal history records for **ADAMS** (FBI# 952661CA4) revealed that he has convictions for narcotics, weapons, and property offenses, including a 1993 conviction in the District of Columbia for Carrying a Pistol without a License.

**SIMONA ADAMS** is a black female born February 13, 1973. She is described as 5'3" tall and 150 pounds with a Social Security Number of 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. A search of FBI criminal history records for **SIMONA ADAMS** (FBI# 232866TB7) revealed a July 2001 arrest for Misdemeanor Disorderly in Alexandria, Virginia.

**PAULINE SPENCE** is a black female born September 11, 1958. She is described as 5'4" tall and 189 pounds and uses Social Security Number 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. **SPENCE** is believed to reside at 1523 Benning Road, N.E., Apartment 2, Washington, D.C., but has a second address of 806 Moray Avenue, in Prince Georges County, Maryland. A search of FBI criminal history records (FBI#: 760576KA1) revealed that she has a conviction in the United States District Court for the District of Columbia for Distribution of Cocaine, in 1989, along with numerous arrests in Georgia for property offenses.

8

GREGORY HAWKINS is a black male born November 17, 1945.  He is described as 5'5" tall and 142 pounds with a Social Security Number 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.  A search of FBI criminal history records for 221410P4 revealed that HAWKINS' criminal history was expunged in 1977.

## PROBABLE CAUSE GENERALLY

### A.  Prior to First Interception

1.  In October, 2004, the FBI obtained information that a large narcotics trafficking organization was operating in the greater Metropolitan Washington, D.C., area and elsewhere.

2.  Based on information obtained from confidential sources and corroborated by physical surveillance, analysis of telephone records and pen registers, and other investigative techniques, the FBI learned that ANTOINE JONES is a major supplier of large quantities of cocaine, including kilogram quantities, for the organization.

3.  ANTOINE JONES is the sole proprietor of a nightclub named "LEVELS," which is located at 1960 Montana Avenue, N.E., Washington, D.C.  Investigators believe that ANTOINE JONES uses his business as a location where he can conduct his drug trafficking activities, as well as launder drug trafficking proceeds.  LAWRENCE MAYNARD, one of JONES's drug associates, is listed as the "A.B.C. manager" of the nightclub in the records on file with the District of Columbia Alcoholic Beverage Regulatory Agency (ABRA).

4.  During the course of this investigation, a number of confidential sources, who are cooperating with law enforcement, provided details regarding ANTOINE JONES' large-scale narcotics trafficking organization.  The information provided by these confidential sources has been corroborated by independent investigation, including but not limited to surveillance, search warrants,

9

debriefings of additional confidential sources and witnesses, a review of available subscriber information and pen-register data, and a review of stored text-messages on the cellular telephones of **MAYNARD** and **ANTOINE JONES**, obtained via search warrant.  Information from two of those sources is highlighted forthwith.

Confidential Source Number One

5.  Confidential Source Number One, hereinafter referred to as CS-1, has known **ANTOINE JONES, a/k/a "TOINE,"**  since sometime in the summer of 2003.  CS-1 met **LAWRENCE MAYNARD,** through **ANTOINE JONES**, sometime thereafter.  CS-1 has identified photographs of **ANTOINE JONES and MAYNARD.**

6.  In the summer of 2003, CS-1 began buying multiple kilogram quantities of cocaine directly from **ANTOINE JONES**.  CS-1 estimated having purchased in excess of fifty (50) kilograms of cocaine directly from **ANTOINE JONES** over the course of their drug business relationship which extended from the summer of 2003 until the fall of 2004.

7.  Investigators' belief that **ANTOINE JONES** and **MAYNARD** are selling wholesale quantities of cocaine to numerous customers in the greater Washington, D.C., area is confirmed by CS-1's report that he knew several individuals throughout the greater Washington, D.C. area who also were buying cocaine from **ANTOINE JONES** during the period during which CS-1 purchased cocaine from **ANTOINE JONES** because, as CS-1 described, **ANTOINE JONES'** prices were good; he usually charged  CS-1 $20,000.00 per kilogram.  On numerous occasions during 2004, CS-1 saw a number of persons known to it to be wholesale narcotics distributors at special events nights at **ANTOINE JONES'** club **LEVELS**, located at 1960 Montana Avenue, N.E., Washington, D.C.

10

8. CS-1 reported that, based on its conversations with **ANTOINE JONES** and

**MAYNARD, ANTOINE JONES** and **MAYNARD** traveled out of the Metropolitan Washington,

D.C., area near the end of each month to obtain multiple-kilogram quantities for cocaine for

redistribution.  While CS-1 does not know precisely where **ANTOINE JONES** and **MAYNARD**

traveled to pick up the narcotics, it recalled hearing **ANTOINE JONES** state that they were "goin'

down the road" and refer to "Carolina."  Further, CS-1 noted that **MAYNARD** and **ANTOINE**

**JONES** always returned from their trip to obtain narcotics within 24 hours of departing, and often

called CS-1 during the trips from **MAYNARD**'s cellular phone, (301) 613-6293, or a pre-paid

disposable cellular phone, which CS-1 referred to as a "throw away phone".  In the background of

such telephone calls, the most recent of which took place in fall 2004, CS-1, who is familiar with

money counting machines, occasionally heard the distinctive sound of a money-counting machine.  CS-

1 additionally reported that, while it was not aware of the specific identity of **ANTOINE JONES'**

narcotics supplier, it recalled **ANTOINE JONES** or **MAYNARD** mention narcotics coming from

"the Mexicans" and "Texas."

9. CS-1's information is corroborated by a traffic stop of **MAYNARD** on April 5, 2005.  The

Highway Interdiction Unit of the Durham, North Carolina Police Department conducted a traffic stop

of a 1997 Honda Odyssey mini-van bearing Maryland tags 273M195, operated by **MAYNARD** and

also occupied by **DERRICK GORDON** in the vehicle front passenger seat.  Their investigation

revealed that this car was registered to **ANTOINE JONES**, with a date of birth of February 25,

1960, and to one of his residences, 12221 Brandywine Road, Brandywine, Maryland.  In the course of

further investigation, the interdiction unit canine alerted on the right rear passenger area of the mini-van.

11

A search of the mini-van revealed a hidden compartment in the van, which contained six white plastic Target shopping bags, containing a total of $67,115.00 in U.S. currency, in various denominations, held together by rubber bands. When interviewed by the Interdiction Unit, **MAYNARD** and **GORDON** both denied any knowledge of the secret compartment and the money contained therein. The Honda Odyssey was impounded, the $67,115.00, was seized as evidence, **MAYNARD** and **GORDON** received a warning ticket, and then were released without additional charges.

10. During the course of its drug trafficking relationship with **ANTOINE JONES** in 2003 and 2004, CS-1 met **ANTOINE JONES** at various locations throughout the Washington, D.C. Metropolitan area to conduct transfers of both money and drugs. CS-1 reported that, in order to designate meeting locations for the transfer of money and narcotics, CS-1 and **ANTOINE JONES** frequently used special codes. For example, CS-1 knew that any reference to "supplies" meant that **ANTOINE JONES** wanted to meet at the Home Depot in Landover, Maryland. When **ANTOINE JONES** said to meet at "the gym," CS-1 knew to go to the work out complex near FedEx Field, also in Landover; references to "the club" meant that **ANTOINE JONES** wanted to meet at **LEVELS**. Indeed, whenever **ANTOINE JONES** told CS-1 to meet him at the club, CS-1 knew that **ANTOINE JONES** had drugs on-hand. Similarly, as noted *supra*, while still out of the area picking up the wholesale quantities of narcotics, **ANTOINE JONES** often would call CS-1 from a prepaid disposable phone and tell CS-1 that he wanted to "meet in the morning for breakfast." CS-1 noted that the parties never actually ate breakfast, but rather, this was a code indicating that **ANTOINE JONES** would have narcotics available for purchase the following morning.

11. CS-1 reports that **ANTOINE JONES** drove several different vehicles when making

12

deliveries of cocaine to CS-1, including a white van, and a gold or champagne-colored Jeep Cherokee.

Surveillance of **LEVELS**, over a several-month span in 2004 and 2005, revealed that a white

Plymouth van, with Maryland registration 097M893, was parked outside the club on several occasions.

12.  From time to time, CS-1 also went to **ANTOINE JONES's** club **LEVELS** to pick up

the cocaine it had ordered.  CS-1 would sometimes drop a bag, such as a department store bag, a

grocery store bag or a dark colored backpack containing money at a designated location within the

club.  **ANTOINE JONES** would then direct CS-1 to his truck, described as a gold or champagne-

colored Jeep Cherokee, that was parked outside the night club.  **ANTOINE JONES** would unlock

the truck for CS-1 using the automatic key remote and CS-1 would retrieve the designated number of

kilograms of cocaine from the cocaine stored in the vehicle.

<u>Confidential Source Number Two</u>

13.  In 2003 and 2004, Confidential Source Number Two (herein referred to as "CS-2"),  CS-

2 bought kilogram quantities of powder cocaine approximately ten times from **ANTOINE JONES.**

CS-2 was arrested in 2004 with a large wholesale quantity of cocaine that  CS-2  had recently

purchased from **ANTOINE JONES.**

14.  CS-2 met **ANTOINE JONES** sometime around November, 2003, through a person with

whom CS-2 dealt on a regular basis.  This person told CS-2 that it had a long-term drug business

relationship with **ANTOINE JONES.**  For several months in late 2003 and early 2004, CS-2

purchased cocaine from **ANTOINE JONES** through this middleman in quantities ranging from an

eighth of a kilogram  to a kilogram. CS-2 was present and observed the transactions in which the

middleman purchased cocaine from **ANTOINE JONES** on behalf of CS-2.  In late 2003 or early

13

2004, CS-2 and **ANTOINE JONES** began to transact business in person, without the aid of a

middleman, in larger, multiple-kilogram quantities.

15. According to CS-2, **ANTOINE JONES** sells high quality cocaine at a reasonable price.

**ANTOINE JONES** initially charged CS-2 $23,000.00 per kilogram of cocaine; but, he eventually

lowered the price to $21,000.00 per kilogram.

16. CS-2 heard that **ANTOINE JONES** purchased a warehouse on a corner off

Bladensburg Road, near the Fifth Police District, which **ANTOINE JONES** began operating as a

nightclub. These sources told CS-2 that **ANTOINE JONES** invested a lot of money in the club.

Although invited, CS-2 never went inside of the club. However, CS-2 has spoken with other drug

dealers with whom it associated who told it that they purchased cocaine from **ANTOINE JONES**

inside the club, including multiple-kilogram quantities of cocaine. Investigation has determined that in

May 2004, **ANTOINE JONES** leased the night club **LEVELS,** located at 1960 Montana Avenue,

N.E., Washington, D.C., for the period May 2004, until May 2014.

17. CS-2 said that the beginning of each month is the best time to purchase cocaine from

**ANTOINE JONES** because CS-2 believes this is when **ANTOINE JONES** receives his supply of

cocaine. According to CS-2, during the period when he was buying cocaine from **ANTOINE**

**JONES** the kilograms of cocaine were wrapped in multiple layers of saran wrap and there were

generally two (2) wrapped together. Once taken apart, CS-2 said the kilograms were individually

wrapped in what CS-2 described as some kind of wax material. CS-2 reported that the individual

kilograms were then stamped with distinctive marks such as crosses or two cars.

18. When CS-2 arranged to purchase cocaine from **ANTOINE JONES**, it would meet

14

ANTOINE JONES in various locations in the Washington, D.C. metropolitan area. On these occasions, CS-2 observed ANTOINE JONES driving a white Dodge Caravan and a Champagne colored Jeep.

19. Like CS-1, CS-2 also stated that ANTOINE JONES transported the cocaine in shopping bags or backpacks which ANTOINE JONES had stored in the back of his vehicle. Whenever CS-2 met ANTOINE JONES, ANTOINE JONES was always by himself and wore sunglasses and a hat. CS-2 would make payments in the same way, transporting the cash payment in a shopping bag or backpack

### B. First Interception Period -- September 3 - September 30, 2005

20. The following is a summary of the Court-authorized interceptions of JONES' conversations on the target telephone with other targets of this investigation, including some examples of specific calls.

21. As an initial matter, the content and timing of many of JONES' calls demonstrates a clear pattern of suspicious contacts with several individuals, involving the timing and location of meetings, but without any other substantive content. For example, on Day 2 of the interception period, September 3, 2005, beginning at approximately 9:00 a.m., JONES made a series of telephone calls to several individuals, all within a few minutes of each other, and left a message for each, asking that person to call him back. Over the course of the ensuing few hours, JONES spoke in person to each of these individuals, inquiring about where that person was, and indicating that he would be leaving his house shortly and would stop by. Based on the similarity of the telephone contacts between JONES and numerous individuals, and their content, all referring to locations and times to get together, almost

15

always on or near Branch Avenue, which is where CS-1 frequently met with **JONES** to engage in narcotics transactions, investigators believe that, throughout the course of the interception period, on nearly a daily basis, **JONES** met with various individuals, both at his nightclub, **LEVELS**, and other large public facilities (e.g., Sam's Carwash), and exchanged narcotics for money.

22. For example, on that date at 9:14 a.m., **JONES** called **MICHAEL HUGGINS** at (301) 702-1124, believed to be the home telephone number for **HUGGINS**, and spoke to an unidentified male, who told him that "Mike" wasn't there. At 9:15 a.m., **JONES** called (240) 475-2981, the cellular telephone listed in the name of **MICHAEL HUGGINS**, and left a message asking "Mike" to call him. Then, at 1:51 p.m., **JONES** called **HUGGINS** again at (240) 475-2981, and stated that he was "outside." **HUGGINS** stated that he would be down in a couple of minutes. Investigators believe that within a few minutes of this call, **JONES** and **HUGGINS** engaged in a narcotics transaction.

23. **JONES** repeated this pattern throughout the course of the interception period. For example, on Day 5, September 6, 2005, at 10:45 a.m., **JONES** received a call from (202) 355-2621, a phone known to be in use by **DONALD HUNTER**. **HUNTER** told **JONES** to call him when **JONES** got into town. **JONES** asked **HUNTER** whether he would be ready, to which **HUNTER** responded: "yeah." Then, at 11:10 a.m., **HUNTER** again called **JONES,** at which time **JONES** told **HUNTER** that he would call **HUNTER** back in three minutes. At 11:30 a.m., **JONES** called **HUNTER** and asked: "where you at, slim?" **HUNTER** responded that he was at 8th and H. **JONES** told **HUNTER** to come up to "where your girl work at,"and added a reference to what sounded like

"the Circuit," to which **HUNTER** responded: "OK, I'm on my way."[1] **JONES** called **HUNTER** again at 12:21 p.m., and stated: "I want to wash my car, go wash my car." **HUNTER** asks whether he should go to the car wash, and **JONES** replied: "yeah." Investigators believe that this was a thinly veiled attempt by **JONES** to communicate to **HUNTER** that they should meet at Sam's Carwash to conduct a narcotics transaction. Sam's Carwash is within the same block as the Circuit City on Branch Avenue, an area to which **JONES** referred numerous customers over the course of the interception period, in order to engage in cocaine transactions, and a location in which Confidential Source 1 frequently met with **JONES** to engage in cocaine transactions in 2004. **HUNTER**'s role as a customer of **JONES** was confirmed upon his arrest on October 14, 2005, in possession of cocaine, having just met **JONES** at **LEVELS**. On that date, **HUNTER** called **JONES** and arranged to meet him at the Club. Within the hour, **HUNTER**'s Jeep was observed at the Club, and then followed as he drove out of the area. Investigators stopped the car pursuant to an unrelated warrant, and recovered a firearm and cocaine from the car. Investigators believe that **HUNTER** intended to return to **LEVELS** later that day to receive another quantity of cocaine. This belief is confirmed by phone calls from **JONES** to **HUNTER** over the ensuing days, saying "where you at, slim?" and several other attempted calls from **JONES** to **HUNTER**, where no message was left.

24. Further, as Confidential Source 1 indicated was **JONES'** practice, **JONES** uniformly speaks in code throughout the interception period, with only the very occasional slip-up. For example, he and his drug-trafficking colleagues speak frequently of the need for "tickets," which investigators

---

[1]     Agents believe that **HUNTER** has a romantic relationship with a woman who works at Circuit City on Branch Avenue in Temple Hills, Maryland.

believe to be a reference to wholesale quantities of cocaine, perhaps kilograms. They speak, too, of "VIP tickets" (larger quantities) and occasionally of "little tickets." For example, on September 7, 2005, Day 6 of the interception period, throughout the course of the day, **JONES** had discussions with several people, including **MAYNARD**, about the sale of "tickets." At 10:24 a.m., **JONES** called (240) 463-3129, a telephone registered in the name of Simona Adama, but which is believed to be in use by **JOHN ADAMS**, and asked whether he was "in the house." **ADAMS** told **JONES** that he would be there in 15 minutes. **JONES** told **ADAMS** to catch up with **MAYNARD** for that "ticket" and that **MAYNARD** "knows what to do with it." **JONES** also told **ADAMS** to call him once he got in the house, to which **ADAMS** replied: "10/4."

25. **JONES** then called **MAYNARD** at 10:25 a.m., and informed **MAYNARD** that "John" would be calling him in 15 minutes, and that he has the ticket for "Pauline." Agents note that throughout the course of the previous several days, there were telephone calls between **JONES** and **PAULINE SPENCE** that were suspicious in nature, regarding "tickets" and "flyers." **SPENCE** has no known relationship to **JONES** or his club, **LEVELS**.

26. One minute later, at 10:26 a.m., **JONES** called **SPENCE** and told her that **MAYNARD** was going to call her, and that he will have another ticket and will "take care of that," and that when he gets back from his trip to Baltimore, he would have another "VIP ticket."

27. At 2:22 p.m., **JONES** received a call from an unknown female, who asked whether he remembered what she told him. **JONES** said "yeah, you need two more tickets." The conversation then turned to VIP tickets, and the fact that she has two tickets and does not need VIP tickets. **JONES** did not seem to understand what the female caller is saying, prompting her to say "do you

18

understand me?" They then discussed the fact that she will need "front row" tickets soon, and **JONES** told her to call him and he will "take care of that" for her. Agents believe that this conversation deals with varying quantities of cocaine, and that "front row" tickets refers to the caller's desire for **JONES** to "front" cocaine to her, i.e., provide it to her on consignment.

28. This belief that **JONES** is referencing wholesale quantities of cocaine for delivery when he speaks of "tickets" is confirmed by frequent surveillance of **JONES** within the past month. On numerous occasions in this time-frame, **JONES** is heard on the wire discussing "tickets" with **MIKE HUGGINS, ADRIAN JACKSON, JOHN ADAMS, DEMETRIUS JOHNSON,** and others in fashion similar to the above. Shortly after many of these conversations, surveillance has revealed **JONES** meeting with these individuals for a very brief period of time – which investigators believe to be a drop-off of cocaine. Further, wire activity demonstrates that, at times, **JONES**'s cocaine supply is low. In one such conversation, for instance, **JONES** and **ADAMS** discuss **JONES**'s need to get a number of tickets back from **ADAMS** so that **JONES** can give them to **DEMETRIUS JOHNSON,** who needs to give them to someone else. In this conversation, **JONES** assures **ADAMS** that he will replace the tickets the following day. Similarly, on several occasions throughout the interception period, **JONES** has a conversation with one of the Hispanic males believed to be his cocaine suppliers, in which he arranges to meet that person. Shortly after these calls to arrange a meeting, **JONES** is surveilled at 9508 Potomac Drive in Ft. Washington, Maryland, which is believed to be a stash location. Within a few minutes of when **JONES** is surveilled leaving the Potomac Drive house, he is on his phone calling **ADAMS, HUGGINS, JACKSON, JOHNSON,** and others asking them how many "tickets" they need.

29. In addition, there were coded telephone calls on that date which appeared to refer to guns and money. For example, at approximately 10:06 a.m., **JONES** got a call from an unknown male at (202) 465-1651. After some conversation about the possible sale of a soda machine, the unknown male paused and then said, haltingly, that while **JONES** "probably doesn't need one," he would "holler at [**JONES**] later about that, um, that heater." When **JONES** asked what the male was talking about, the unknown male doesn't respond, at which point **JONES** asks: "what kind of heater?" And the unknown male says: "you know, the desert." They agree to talk more about this later. Investigators believe that **JONES** and the unknown male are discussing the possible purchase of a Desert Eagle gun, in part because guns are frequently referred to as "heat" on the street.

30. Also, **JONES** and his associates use codes to refer to money. For example, on September 7, 2005, **JONES** received a call from **GREGORY HAWKINS**, whom he has referred to as his "partner" at (202) 286-3057. **JONES** told **HAWKINS** that he was in his house, but was about to go to Baltimore to look at houses. **JONES** asked **HAWKINS** whether he had "done that math homework." **HAWKINS,** who sounded exasperated, stated: "there's no way in the world . . . I don't want to argue over it, there's nothing I can do about it, but I'm telling you, it's ridiculous . . . ." **JONES** told him that he wished he could take **HAWKINS** "there to see," and then asked "what was it, $3? $2?" **HAWKINS** replies that it was "way way more than that." **JONES** then slipped and asked whether it was "more than 3,000, I mean $3." **HAWKINS** tells **JONES** that it is more than 5, "that's why I'm saying something's gotta be wrong." They agree to discuss the matter further after **JONES** returns from his house-hunting trip to Baltimore. Investigators believe that this conversation refers to a shortage of cash with respect to a narcotics deal. As noted, at one point, **JONES** slips and

20

refers to "3,000" but then recovers, saying "I mean, $3." In addition, a money counting machine can be heard in the background.

31. **JONES**, having returned from Baltimore, called **HAWKINS** again at (202) 286-3057, at 2:14 p.m. on September 7, 2005 **JONES** asked **HAWKINS** whether he was in the house, and when he responded that he was, **JONES** stated that he was coming over because he needed to talk to him. A few minutes later, **JONES** received an incoming call from **ADRIAN JACKSON**, whom he had referred to as his "partner" in other intercepted conversations, and told **JACKSON** that he was going over to his man's house around the corner. Investigators believe that **JONES** was going to meet with this unknown individual to discuss the financial problem discussed in the call earlier that day, and that **JONES** was informing **JACKSON** of his efforts to clear up the problem, particularly because these calls do not appear to relate in any way to club business.

32. Throughout the remainder of the interception period, **JONES** and his colleagues continue to make reference to "tickets," in various forms, in a manner which investigators believe connotes wholesale quantities of cocaine. For example, on Day 11 of the interception period, September 12, 2005, **JONES** urgently requested "two tickets" from **ADAMS**, who is believed to be the owner of at least one of **JONES'** stash houses, located just off of Branch Avenue, in Landover, Maryland – a location where **JONES** conducts much of his cocaine distribution – promising to get two tickets back to **ADAMS** the following day.

33. Further, on Day 19 of the interception period, September 20, 2005, **JONES** had a conversation with **ADAMS** beginning at 1:08 p.m., in which **ADAMS** told **JONES** that he would "have the ticket money" around 6:00 p.m. **JONES** then told **ADAMS** that he still needed to "come through for

Youngin" (an apparent reference to **DEMETRIUS JOHNSON**), to which **ADAMS** responded that

**JONES** might as well wait until later, when he has the "ticket money." Within 30 seconds of hanging up

with **ADAMS**, **JONES** received an incoming call from **JOHNSON**, who discussed money with **JONES**,

specifically that he is "26 in the hole." After further discussion of numbers, **JONES** told **JOHNSON** that

he has "it" and "won't do nothin' with it" until he hears from **JOHNSON**, after **JOHNSON** speaks with

someone else and "gets it straight." **JONES** also told **JOHNSON** during the course of the conversation

that he has to get his car fixed first, but assured **JOHNSON** "I got you." **JOHNSON** answered an

incoming call from call waiting, and after approximately 40 seconds, returned to **JONES** who asked,

"you're talkin' VIP, right?" After **JOHNSON** assented, **JONES** told him to "call him back and tell him

a couple of hours, right?"

34.    Based on these calls between **JOHNSON** and **JONES**, investigators believe that

**JOHNSON** was brokering a cocaine deal between **JONES** and another individual, to whom they refer

as "little dude." This pattern of telephone communications mirrors a pattern of conversations between

**JONES** and **JOHNSON** on September 3, 2005, Day 2 of the interception period.  On that date,

**JOHNSON** called **JONES** at 9:47 a.m.  **JONES** asked **JOHNSON** whether he wanted the "same old

same old, or something different?"  **JOHNSON** replied that he would "call the dude back right now and

see where's he's at and go from there."  Two minutes later, **JOHNSON** called **JONES** again and stated

that "he didn't answer his phone, but nine out of 10 times he's waiting for me."  **JONES** told **JOHNSON**

to call him, that he is "out and about."  **JOHNSON** then called **JONES** at 5:10 p.m., and told **JONES**

that he is going to "shoot up there" to the Club, and called again at 5:51 p.m., telling **JONES** that he is 10

minutes away.  Finally, at 6:02 p.m., **JOHNSON** called **JONES** and told **JONES** that he was downstairs.

Investigators believe that within a few minutes of this call, **JONES** and **JOHNSON** conducted a narcotics transaction, which **JOHNSON** was likely brokering for another individual.

35. Intercepted calls with similar content also confirmed investigators' suspicions, articulated in your affiant's initial affidavit, that **JONES** is supplying cocaine to **KIRK CARTER,** who has at least one conviction for narcotics trafficking. For example, on September 9, 2005, Day 8 of the interception period, at 8:21 a.m., **JONES** called **CARTER** and asked if they got the last tickets from him. **CARTER** replied "no, um, but you want me . . You, um, going over there at halftime?" **JONES** replied: "Nah, slim, I can do halftime with you, you ready for halftime?" **CARTER** said: "I'll be over there and um make that delivery time . . . I'll bring you your order over there." **JONES** said that he would be over to where **CARTER** is in approximately 20 minutes. **CARTER** agreed to wait for **JONES**. Investigators believe that **CARTER** was making a delivery of money to **JONES**, which **CARTER** owed for fronted narcotics. Similarly, the next day, **JONES** called **CARTER** at 5:51 p.m., and gave **CARTER** his new telephone number. **CARTER** told **JONES** that he wanted to see him. **JONES** was on Branch Avenue, and agreed to meet **CARTER** at the carwash. **CARTER** called **JONES** again at 6:22 p.m., and informed him that he was at the carwash. **JONES** stated that he was about five minutes away. At 6:27 p.m., **JONES** called **CARTER** and asked "where you at?" **CARTER** stated that he was at the McDonald's. Investigators believe that shortly after this call, **JONES** and **CARTER** met at Sam's Carwash on Branch Avenue and conducted a narcotics transaction. Finally, after a similar pattern of telephone contacts on September 15, 2005, between **JONES** and **CARTER**, the pair agreed to meet again at the carwash on Branch Avenue. A surveillance team responded to that location in advance of **JONES** and **CARTER**, and took photographs of their brief meeting at the carwash, and again a few moments later in the Circuit City parking

23

lot, a few blocks down Branch Avenue.[2]

36. Law enforcement surveillance further confirmed that **KEVIN LAMONT HOLLAND**, who uses cellular telephone number (202) 277-8552, and who himself has a conviction for Distribution of 50 Grams or More of Cocaine Base, is a significant customer of **JONES'**.  On very nearly a daily basis throughout the course of the interception period, **HOLLAND** and **JONES** would make arrangements to meet in various locations, usually along Branch Avenue, and, investigators believe, exchange money and cocaine.  For example, within hours of the initiation of wire interceptions on September 2, 2005, the following pattern of telephone contacts between **JONES** and **HOLLAND** occurred: at 5:14 p.m., **JONES** called (202) 277-8552, and said "hello" several times, and then hung up.  At 5:15 p.m., **JONES** called **HOLLAND** again and got his voice mail, hanging up without leaving a message.  Also at 5:15 p.m., **JONES** received an incoming call from **HOLLAND**, but **JONES** did not answer and no message is left. At 5:17 p.m., **JONES** received another call from **HOLLAND**, which similarly goes unanswered.  Finally, at 5:19 p.m., **HOLLAND** got through on **JONES'** phone.  **JONES** asked **HOLLAND** to meet him at the Club, to which **HOLLAND** replied "Yep."  Following up on this previous telephone activity, **JONES** called **HOLLAND** at 5:51 p.m., and told **HOLLAND** that he was leaving the Club in a few minutes, and then inquired as to **HOLLAND's** whereabouts.  **JONES** told **HOLLAND** that he will head out Branch Avenue, and will meet him near the carwash, and **HOLLAND** agreed.  One minute later, **HOLLAND** called **JONES** and told him that he would be at Circuit City, because he needed some movies.  Then, at

---

[2]    Given the angle from which they were able to take photographs, it was impossible to capture what **JONES** and **CARTER** were doing with their hands.  However, investigators believe that at the Circuit City meeting, they observed **CARTER** toss a plastic bag into **JONES's** champagne-colored Jeep Grand Cherokee.

6:31 p.m., **JONES** received a call from **HOLLAND**, who stated that he was going to grab some "flyers" at an unintelligible location. **JONES** responded that he would pull around. Investigators believe that **JONES** and **HOLLAND** met within a few minutes of this call to conduct a narcotics transaction.

37. After monitoring these conversations for approximately two weeks, investigators were able to capture in still photographs **JONES** and **HOLLAND** in the course of what investigators believe to be a cocaine transaction. Specifically, after a similar pattern of telephone calls, in which **JONES** and **HOLLAND** agree to meet at Oxon Hill Plaza, in Oxon Hill, Maryland, a team of investigators responded to that area and set up covert surveillance. Within a few minutes of their arrival, **JONES** appeared, driving his champagne-colored Jeep, and **HOLLAND** appeared, driving a silver Mercedes sedan, which is registered in his name. In the course of this brief meeting, investigators observed and photographed **HOLLAND** tossing a white plastic shopping bag into **JONES'** Jeep and then quickly departing. Within a few hours of this delivery, **JONES** and **HOLLAND** again agreed to meet. Investigators believe that within a few minutes of that conversation, **JONES** delivered cocaine to **HOLLAND**.

38. Further, in the course of the investigation leading up to the initial affidavit in support of the wire tap, pen register data revealed that towards the end of every month, **JONES** spoke with an individual on a cellular telephone number with a (713) area code, which was subscribed to in the name of Juan Lopez,[3] in McAllen, Texas, a major point of entry of narcotics into the United States. On September 20, 2005, **JONES** received two telephone calls from (713) 386-9548,[4] at 10:45 a.m., and again at 10:47 a.m. (the

---

[3]     Investigators believe that "Juan Lopez" is a fictitious name. However, your affiant will refer to the user of this telephone as "UM-1" for ease of reference.

[4]     While this is a different number than showed up on the pen register on **JONES'** phone in previous months, UM-1 actually tells **JONES** in the course of this conversation that this is his new

first call was apparently cut dropped mid-conversation), totaling 3 minutes and 46 seconds. This is the first time that **JONES** has spoken with UM-1 during the course of the interception period. During the call, UM-1 told **JONES** that he had been trying to find "some new music", but that it is getting a little rough on his side. He assures **JONES**, however, that he has some "good people" who make some "good music," and that he is just waiting for them. UM-1 then asks **JONES** whether he likes the music that UM-1 sent, to which **JONES** replies that "they love the sound, they love the entertainers, they love it." **JONES** asks UM-1 whether they will take "a couple weeks," to which UM-1 responds that he still has a little bit of music there. **JONES** mentions that "they like the whole studio, they like how they can practice back-to-back," and that everyone is happy on this side "as far as the band." UM-1 states that it will take "a couple weeks, right," and **JONES** states "they just go ahead and be ready." UM-1 replies that he just needs time to "put the music straight and everything together and that will work." Later in the conversation, UM-1 tells **JONES** that he was just trying to see if everything was cool and to inform **JONES** that everything looks good on his end, to which **JONES** responds that they just need it in a week or two, so it's cool. Also, twice in the conversation, **JONES** tells UM-1 that he is going to the "Studio" later that day. Investigators believe that in this conversation, **JONES** and UM-1 are discussing the quality of the most recent multiple-kilogram shipment of cocaine ("how do they like the music?" and "they love the music") and also discussing the timing of a forthcoming shipment ("everything looks good on this end" and "a week or two is cool").

39. Then, on Monday, September 26, 2005, at approximately 6:30 p.m., **JONES** called UM-1 at (713) 386-9548, and reported to UM-1 that he has been working around the clock to get things

---

number, to which **JONES** replies that he will "lock it in." Further, both (713) telephone numbers come back to "Juan Lopez."

together so that the "studio" be ready. UM-1 replies "great" and says that a "friend" is going to get everything together by Wednesday (believed to be September 28, 2005), and that they are going to pick up the "discs" of which they have nine remaining, and requests that **JONES** "give [him] a hand." At that point, **JONES** cuts him off, saying "we got you, we got you – we can't do it no quicker but we're trying," stating that they have "been going 24 hours a day" with "100 things going," but that they should be ready by Wednesday. Both men express a hope that, after Wednesday, everything will be in place so that they can "take a few days off." Investigators believe that in this conversation, **JONES** and UM-1, who supplies cocaine to him, are discussing the timing of the next big shipment of cocaine, and **JONES'** ability to collect money in advance from his customers to pay for this shipment. In the hour after this call, **JONES** attempted to contact or contacted **ADAMS, HOLLAND, JOHNSON,** and **CARTER**.

40. Further, with respect to **JONES'** supply chain, **JONES** has been making suspicious telephone calls with great frequency in recent days with telephone number (678) 330-7712, a Nextel cellular telephone, subscribed to in the name of John Yi, at an Atlanta, Georgia address.[5] In these calls, all of which are initiated by **JONES, JONES** states simply "what's up" or "yeah" or "OK," to which UM-2 responds in kind. In a few of these calls, **JONES** says "20 minutes," or "5 minutes," or similar. Investigators believe that through these calls, **JONES** is signaling to UM-2 a time to meet at a pre-ordained location, or perhaps a quantity of cocaine he plans to purchase (e.g., "5 minutes" may mean that **JONES** is seeking five kilograms of cocaine). Investigators further believe that UM-2 may be the "friend" who is going to "hook everything up," to whom UM-1 referred in the September 26, 2005, telephone call with

---

[5]     Investigators similarly believe that this is a fictitious name, and for ease of reference, will refer to the user of this telephone as "UM-2.".

**JONES.** Further, after some of these calls, physical surveillance of **JONES** revealed that **JONES** was at the suspected stash location on Potomac Drive in Ft. Washington, Maryland.

41. Finally, toll records pertaining to (678) 330-7712, have revealed that UM-2 utilizes the "direct connect" function on his telephone – which allows him to speak with another Nextel subscriber, if he specially identifies that number with Nextel, with the touch of one button. Of the few telephone numbers he has specifically identified, two of them are these (713) numbers subscribed to by Juan Lopez, UM-1. Thus, investigators believe that UM-1 and UM-2 are close associates of each other, and are likely members of the supply-chain leading to **JONES.**

### C. Extension Period -- September 30 - present

42. During the period since September 30, 2005, **JONES** continues his use of the code "tickets," which investigators believe to be a reference to wholesale quantities of cocaine, perhaps kilograms. Throughout the course of the current interception, **JONES**'s drug-trafficking colleagues speak frequently of their need for various numbers of "tickets," They continue to speak, too, of "VIP tickets" (larger quantities) and occasionally of "little tickets." For example, on October 3, 2005, **JONES** and **JOHN ADAMS** discuss someone who needs four tickets. **ADAMS** says he has three tickets and needs one more. **JONES** says he thought **ADAMS** had four tickets. However, **JONES** then recalls that "peanut" got one of those tickets. **JONES** says he will be at **ADAMS**'s house in about two minutes. The following day, at 9:54 a.m., **JONES** called **ADAMS**, and asked whether that dude came and got "those three tickets." **ADAMS** replied that he hadn't but that he was coming that day. **JONES** told **ADAMS** to call him as soon as that dude comes, because **JONES** had to pay the lease on the club, which had been in arrears, that day. Later that day, at 4:58 p.m., **JONES** called **ADAMS**, who informed **JONES** that

he was "waiting on him right now." **JONES** planned to come see **ADAMS** later. Then, at 5:58 p.m.,

**ADAMS** called **JONES** and told him that he sold those tickets and that he would be home in the next 20

minutes. **JONES** said that he would catch **ADAMS** in the morning. Investigators believe that in this series

of conversations, **JONES** and **ADAMS** are discussing the sale by **ADAMS** of four kilograms of cocaine,

and the arrangement for subsequent payment to **JONES** therefor.

43. Wire interceptions further reveal the role of Texas suppliers in **JONES'** organization. For

example, on Monday, October 10, 2005, **JONES** spoke with an unknown Hispanic sounding male (UM-

1) on (713) 386-9548, who indicated that it should be another 7-8 days before things are ready."

Throughout the course of this period, **JONES** also has had more frequent contact with another Hispanic

sounding male (UM-3)[6] at (909) 975-0957, which is a Nextel cellular telephone registered in the name of

Mike Wills in Irvine, California, and believed to be a fictitious name, in which the pair seem to meet on

numerous occasions at a location which investigators believe to be a stash house in Ft. Washington,

Maryland. For example, on October 4, 2005, at 10:56 a.m., **JONES** called (909) 975-0957, and asked

UM-3 what time he could get to "the spot." The unknown male replied "15 or 20 minutes?" **JONES** said

"OK" and hung up the phone. Then, at 11:19 a.m., UM-3 called **JONES** from (909) 975-0957, and

stated that he was "already there." **JONES** replied that he would be there in 10 minutes. Based on the

first call, a team of investigators quickly set up surveillance on a road near the suspected stash house in Ft.

Washington, Maryland. Sure enough, a short time after the second call, **JONES** drove into the

---

[6]     For clarity, we are using the designation "UM-3" in this affidavit to refer to the user of
(909) 975-0957, because UM-2 has referred in the September 30, 2005, extension affidavit to another
Hispanic sounding male, also believed to be a member of **JONES'** Texas-based supply chain.

neighborhood in his Jeep Cherokee, and was observed and photographed driving out of the neighborhood a few moments later, in the company of a Hispanic male.

44. Similarly, on October 13, 2005, at 5:25 p.m., **JONES** called the (909) number. UM-3 who answered said that he would only be around until 8:00 p.m., and then he was going to meet the girls. **JONES** said he would swing by, either before then or the following morning. **JONES** also referenced "20 of the VIP tickets." **JONES** followed up on this call at 7:13 p.m, when he called the (909) number again and stated that he was 5-10 minutes away. Approximately 30 minutes later, in rapid succession over the course of 8 minutes, **JONES** called **KEVIN HOLLAND, DEMETRIUS JOHNSON, MIKE HUGGINS,** and **JOHN ADAMS**, each call lasting between 41 seconds and 1 minute and 35 seconds. For unknown reasons, the wire tap equipment transmitted no audio with respect to these calls (or several non-pertinent calls thereafter). Investigators nonetheless note the significance of this flurry of calls by **JONES** to his usual purchasers, in the immediate aftermath of his meeting with the user of (909) 975-9057, a likely cocaine supplier, as **JONES** notifying his customers that another shipment was coming through.

45. It further became apparent from the interceptions that there were times within the month that **JONES** became low on cocaine, and was awaiting a large shipment from these Texas suppliers. For example, on Friday, September 30, 2005, **JONES** and **JOHN ADAMS** discussed whether **ADAMS** could sell someone five VIP tickets. **JONES** told **ADAMS** that at the moment it couldn't be done because there would not be enough for everyone else. Investigators believe that **JONES** is referring to the fact that his drug supply is low and if they make a larger sale now they will not be able to supply anything to their other customers.

46. This belief is confirmed by a call on Monday, October 3, 2005, between **JONES** and

**DEMETRIUS JOHNSON**, in which **JONES** tells **JOHNSON** that he was trying to save a couple of tickets for **JOHNSON**, and that **JOHNSON** should holler at him when he was ready. And further confirmed by a call that **JONES** received at 4:25 p.m., on Tuesday, October 4, 2005, from UM-3 at (909) 975-0957, who stated that "um, Saturday, we are going to have that party after all," to which **JONES** replied "OK." And finally by a conversation on Wednesday, October 5, 2005, which confirmed investigators' suspicions that **JONES** was hoping to receive a shipment of cocaine from his suppliers over the coming weekend. At 11:44 a.m. that day, **SPENCE** called **JONES** and asked whether something was going to happen soon. **JONES** told **SPENCE** that he didn't want to talk about it over the telephone, but that it would be soon.

47. It is further apparent from wire interceptions that **JONES** anticipated another shipment of cocaine on October 13, 2005. For example, on October 12, 2005, at 12:36 p.m., **JONES** received a call from UM-3 at (909) 975-0957, who stated: "hey, the girls are coming tomorrow night." To which **JONES** responded in an animated voice: "gotcha, gotcha, gotcha." Then, in his next call, at 12:44 p.m., **JONES** called **JOHN ADAMS**, and told **ADAMS** to tell his brother-in-law "sometime tomorrow." Clearly confused, **ADAMS** said "huh?" **JONES** said "brother-in-law. Youngin didn't tell you about brother-in-law?" **JONES** repeated "tomorrow" several times throughout the conversation. Finally **ADAMS** seemed to understand, saying "Tomorrow? Oh, okay, you must mean my cousin." **JONES** told **ADAMS** that he needed to "see you all" today so that he could be ready with his video tomorrow. (Investigators believe that in this conversation, **JONES** is telling **ADAMS** that he needs to collect money from his customers to be ready for the cocaine shipment the following day). Then, at 12:47 p.m., **JONES** received a call from an unknown subscriber using cellular telephone number (202) 286-3057, who told

31

JONES that he just wanted JONES to know that he was back. JONES and the caller discuss their whereabouts, and then at the end of the brief conversation, JONES said to the caller: "I was talking to your uncle, they they, he said he's gonna come talk to you tomorrow." Next, at 1:40 p.m., JONES received a call from MIKE HUGGINS. JONES told HUGGINS that he spoke with "Playboy" and then stated "tomorrow sometime, man." HUGGINS replied that he was waiting on JONES. Later, at 3:05 p.m., JONES called ADRIAN JACKSON and said: "Um, tomorrow." After there was a pause, JONES asked: "you know what talking about? Your uncle." JACKSON replied: "alright." JONES stated: "tomorrow." Further, at 7:40 p.m., JONES called (202) 286-3057, which is registered in the name of Kim's Wireless, at 1801 Pennsylvania Avenue, and believed to be in use by JONES's "partner" GREGORY HAWKINS, and told the unknown male that "Youngin said he will probably see us tomorrow evening." The male replied "alright," and the pair hung up. Finally, at 9:18 p.m., JONES received an incoming call from an unknown male using telephone number (202) 276-5208. This male wanted to borrow $7,000 from JONES to pay two of the bands who perform and at LEVELS. JONES told the male that he didn't have that kind of money on him now, but noted that the man's uncle was supposed to be in town the following day. In sum, investigators believe that this pattern of thinly-veiled calls relates to the initial call from UM-3 at (909) 975-0957, indicating that something would be coming into town the following day, presumably a large quantity of cocaine. Throughout the day, JONES communicated with several of his customers, referring to this call with their "uncle" or other relative - the user of the (909) phone - and indicating that he would be in town the following day. There is no known familial relationship between the Hispanic male user of this telephone and any of JONES's associates.

48. While it is not precisely clear when that shipment arrived, within 2 days of the calls speaking

of the meeting with the uncle tomorrow, as of Saturday, October 15, 2005, **JONES** was flush with cocaine

again. At 10:10 a.m. that day, **JONES** called **JOHNSON** and asked whether **JOHNSON** wanted him

to come through and catch him. **JOHNSON** replied that he was still waiting on two dudes, and would call

**JONES** as soon has he had caught up with them. Shortly thereafter, **JONES** called **HUGGINS** and told

him he was about to "make a run" and asked what was up with **HUGGINS**. The pair agreed to meet at

the Lowe's home improvement store in Clinton, Maryland. A subsequent call, at 11:45 a.m., revealed that

**JONES** and **HUGGINS** met up at the Lowe's. Over the course of the next several hours, **JONES** called

**GREGORY HAWKINS, KIRK CARTER, FNU, LNU, a/k/a JAUON JENKINS, JOHN**

**ADAMS, DEMETRIUS JOHNSON, and ADRIAN JACKSON** arranging similar meetings.

Investigators believe that **JONES** delivered cocaine to each of these individuals throughout the day.

49. Further confirmation of **JONES's** drug trafficking activity comes from an arrest on October

14, 2005, of **DONALD HUNTER**, shortly after he arranged to meet with **JONES** at **LEVELS**. That

morning, **HUNTER** called **JONES** and said that he was going to stop by the club. Investigators set up

surveillance, and observed his Jeep parked outside the club in the late morning. Once **HUNTER** emerged

from **LEVELS**, investigators followed him for some distance, and then conducted a traffic stop of his car,

based on an arrest warrant which was outstanding on **HUNTER** in an unrelated matter. Recovered from

**HUNTER** was approximately 50 grams of cocaine powder and a handgun. ██████████

████████████████████████████████████████████

████████████████████ This assertion is supported by numerous telephone calls by

**JONES** to **HUNTER's** telephone over the course of the next several days.

50. Finally, wire interceptions over the past few days make clear that **JONES** and his associates

are continuing their pattern of drug trafficking activity, as set forth above. For example, on October 17, 2005, at 4:51 p.m., **JONES** called **CARTER** and asked whether he wanted some tickets. **CARTER** replied that he would come see **JONES** the following day. **JONES** mentioned that the tickets were $10.50, and **CARTER** said that he didn't know that. They agree to discuss the price difference in person, not over the phone. Further, **JONES** received a telephone call from UM-3, from (909) 975-9057, who said that he just wanted to let **JONES** know that "I took off where I live, and I will be out for a day or two." To which **JONES** replied: "Ah, man." UM-3 said that he would call **JONES** as soon as he got back. True to his word, mid-day on October 19, 2005, UM-3 called **JONES** again, and indicated that he would be back in the area at approximately 5:00 p.m. Also, late-morning this same day, **JONES** received a call from UM-1, another Hispanic male whom investigators believe to be associated with UM-3 in **JONES'** supply chain, indicating that something would be happening on Friday (October 21, 2005). Investigators believe that these telephone calls from **JONES'** suppliers are tipping **JONES** off to the timing of the arrival of a large shipment of cocaine.

### F. PROBABLE CAUSE FOR INDIVIDUAL LOCATIONS

**(1)  10870 Moore Street, Waldorf, Maryland**

**(2)  12221 Brandywine Road, Brandywine, Maryland**

      51. These address are the residences for Antoine and Deniece **JONES**. The Brandywine Road address is used as the primary mailing address and the address where Deniece **JONES** has her cellular telephone, "the target phone," registered. Four vehicles, a Jeep Cherokee (registered in the name of Deniece **JONES**), a Toyota Sequoia (registered in the name of Deniece and **ANTOINE JONES**), a Cadillac (registered in the name of **ANTOINE JONES**), and a box truck (also registered in the name of

34

ANTOINE JONES), are all registered to this address. Surveillance conducted throughout the course of this investigation has shown that the Jeep, Cadillac and Sequoia have all been observed parked at the Moore Street address. Surveillance frequently showed **ANTOINE JONES** driving the Jeep. Finally, Antoine **JONES** has a hard line registered to "A. **JONES**" at the Moore Street address.

**(3) 7921 Allendale Drive, Landover, Maryland**

52. This address is the where Adrian **JACKSON** is currently residing. **JACKSON** has been overheard telling **JONES** that he is staying at his "Ma's." Based on telephone calls between **JONES** and **JACKSON** in which they arrange to meet, and surveillance of **JONES** thereafter, Investigators know that **JONES** traveled to the above described address to meet with **JACKSON**, based on directions **JACKSON** gave to **JONES**. Also, **JACKSON** is heard in calls to tell **JONES** that he needs to go to this residence to change his clothes. Further, on October 16, 2005 at approximately 09:40 a.m., and October 18, 2005 at approximately 08:24 a.m., physical surveillance of this location revealed a silver Chrysler 300M bearing D.C. tag CA1898. This vehicle is registered to **ADRIAN JACKSON** and is known to be the primary vehicle driven by **JACKSON**. Finally, on October 20, 2005, **JACKSON** is intercepted on the wire telling **JONES** that he is about to "lay down." Shortly thereafter, physical surveillance of this location revealed the Chrysler parked outside that location.

53. **JONES** considers **ADRIAN JACKSON** to be his "partner" not only at his night club, Levels, but also a partner in his narcotics trafficking. **JACKSON**'s name is on the **LEVLES** business card. Further, as set forth in paragraph 47-48 above, **JACKSON** was one of the individuals **JONES** called and discussed his "uncle coming tomorrow." **JONES** and his wife are currently helping **JACKSON** purchase a house. To this end, they have given **JACKSON** money for a down payment.

35

54. The following is a sampling of conversations illustrating the above: On Wednesday, October 12, 2005 at 3:05 p.m., after **JONES** received a call from his Hispanic supplier who told him that "the girls are coming tomorrow night," he telephones **JACKSON**. **JONES** tells **JACKSON**, "Tomorrow." There is a pause after which **JONES** asks **JACKSON** if he knows what **JONES** is talking about? "Your uncle." **JACKSON** says "alright." **JONES** reiterates, "tomorrow." Given that **JONES** made several other phone calls within a short time of this call to other of his standard customers, alerting them to the arrival of their "uncle" or "cousin," investigators believe that this reference to "your uncle" refers to **JONES's** Hispanic cocaine supplier. In addition, in this same telephone conversation, **JONES** and **JACKSON** discuss plans for **JACKSON** to meet with **JONES's** wife, who has a real estate license, to continue house-hunting.

## (4) 5119 Barto Avenue, Suitland, Maryland 20746

55. This is the residence of Michael, a/k/a "**MIKE**," and Anja **HUGGINS**. The listed owner of this residence is Anja **HUGGINS**, wife of **MICHAEL HUGGINS**. **MICHAEL HUGGINS** is known to be a close associate of **JONES**. **JONES** frequently supplies **HUGGINS** with multiple kilogram quantities of cocaine. On a number of occasions, **JONES** has telephoned the hard line listed to this address in the name of Anja **HUGGINS**, and has spoken with both Anja and **MICHAEL HUGGINS**. The following is a sampling of conversations highlighting **HUGGINS'** narcotics trafficking activities: On the first day of the interception period, Friday, September 2, 2005 at 7:27 p.m., **JONES** received an incoming call from (301) 702-1124, which is listed to "Anja **HUGGINS**." **JONES** asked **MIKE HUGGINS** if he was at the house and whether he was "ready." **HUGGINS** told **JONES** that he needed "a little somethin' somethin'." **JONES** told **HUGGINS** that he was waiting for **ADRIAN JACKSON**, and that he'll be around in a couple of minutes and to meet him outside. At 7:36 p.m., **JONES** called

HUGGINS (to whom he refers as "Mike"), and told him that he [JONES] was outside. It is your affiant's

belief that JONES and HUGGINS met within a few minutes of this call to conduct a narcotics transaction.

There are a number of conversations similar to this during/after which Investigators believe narcotics

transactions were consummated, after some of which JONES is surveilled at this house.

56. On Wednesday, October 5, 2005, after several attempts to reach MICHAEL HUGGINS,

JONES finally got through at 11:07 a.m. and told HUGGINS that he had "that picture and stuff" for him

and that he would walk up. Investigators believe that JONES met HUGGINS at the above mentioned

address and conducted a narcotics transaction. A few minutes later, HUGGINS called JONES. JONES

asked HUGGINS how many tickets he had left. HUGGINS said that he had two, but only has half now.

JONES told HUGGINS to call him once he was finished working. JONES called HUGGINS back a

minute later to confirm that HUGGINS had sold one and a half "tickets." Your affiant believes the use of

the word "tickets" actually refers to a large quantity of cocaine presumably a kilogram. Finally, HUGGINS

is another of the individuals whom JONES called to discuss and "uncle" coming "tomorrow" (see

paragraphs 47-48).

## (5) 10441 Crescent Park Way, Waldorf, Maryland

57. This location is the residence of DEMETRIUS JOHNSON. On October 19, 2005, at

approximately 07:49 a.m, physical surveillance of this location revealed a 2002 Chevy 4-door pick-up

truck bearing Maryland tag: 364M100. This vehicle is registered to Demetrius Cortez Johnson at 10441

Crescent Park Way, Waldorf, Maryland. Further, on the first day of the interception period, September

2, 2005, surveillance revealed JOHNSON driving this truck to a meeting with JONES. Finally, an open

source database indicates that 10441 Crescent Park Way is his current address, as of October 2004.

58.  JOHNSON is a regular narcotics customer of JONES's.  JOHNSON is believed to regularly purchase kilogram quantities of cocaine from JONES.  Notably, JONES, and several of his associates, often refer to JOHNSON as "youngin'."  The following is a sampling of conversations between JOHNSON and JONES demonstrating their drug relationship:  On Monday, September 5, 2005, at 1:21 p.m., JONES called JOHNSON, who stated that he was about to leave the parking lot.  With a note of frustration in his voice, JONES told JOHNSON, "Hold up, slim. I need to see you."  JOHNSON said that he would wait for JONES who was around the corner and would "be right there."  Investigators believe that within a few minutes of this call, JONES and JOHNSON completed a narcotics transaction. Also, on Monday, September 12, 2005 at 10:37 p.m., JONES called JOHNSON and asked if JOHNSON still needed "those two little tickets."  JOHNSON responded "Yes, if it's possible."  JONES told JOHNSON that he could probably get JOHNSON those tickets tonight if he wants.  JONES also told JOHNSON that he could probably use the "homework" that JOHNSON was looking over.  He ended by telling JOHNSON that he has to "see if [his] man is up."  Your affiant believes that, again, "tickets" is a reference to kilogram quantities of cocaine and "homework" refers to some sort of accounting/money for previous drug sales.  Investigators believe that the reference to "his man" is JOHN ADAMS, whose house is located just off of Branch Avenue, and is believed to be one of JONES's stash houses.  Later this same day, at 10:43 p.m., JONES called JOHNSON back and left a message asking JOHNSON to call him back.  (While the wire transmissions indicate only a series if attempted phone calls between JONES and JOHNSON after this message, Investigators believe that at some point later in the evening, JONES delivered the "two tickets," believed to be kilograms of cocaine, to JOHNSON.  In support of this conclusion, the following day, JONES called JOHNSON at 5:17 p.m., and asked whether

JOHNSON still had "those two tickets" he gave him. JOHNSON replied that he did, but noted that he

was "getting ready to get rid of them in a minute." JOHNSON noted that he would need "that VIP" but

that he would instead get "this one to" JONES. It is thought that a "VIP" or "VIP ticket" refers to more

than one kilogram, possibly two kilograms wrapped together.

**(6) 5703 Gloria Drive, Suitland, Maryland**

59. This is the residence of JOHN and SIMONA ADAMS. JOHN ADAMS and JONES

often talk on a hard line telephone registered in the name of Simona ADAMS at the above address.

JOHN ADAMS is a close associate of ANTOINE JONES. Your affiant believes that JONES uses

the ADAMS' residence as a stash house for his narcotics. There are countless telephone calls between

JONES and ADAMS during which the two discuss whether or not ADAMS is home which is generally

followed by JONES stopping by this residence. Additionally, based on wire interceptions, in which

JONES and ADAMS discuss the fact that ADAMS is "in the house" and then discuss whether "the dudes

have stopped by to get their tickets" or similar language, it is believed that JONES often delegates narcotics

distribution duties to ADAMS. Surveillance on a number of occasions also has revealed JONES going

to and coming from ADAMS' house to conduct/facilitate narcotics transactions. The following is a

sampling of conversations demonstrating ADAMS' role: On Wednesday, September 7, 2005 at 10:24

a.m., JONES called ADAMS, and asked whether he was "in the house." ADAMS told JONES that

he would be there in 15 minutes. JONES told ADAMS to catch up with MAYNARD for that "ticket"

and that MAYNARD "knows what to do with it." JONES also told ADAMS to call him once he got

in the house. To which ADAMS replied: "10/4." Again, it is believed that the reference to "ticket" refers

to cocaine.

39

60. On Thursday, September 8, 2005 at 9:53 a.m., **JONES** called **ADRIAN JACKSON** and left a message on **JACKSON's** voice mail, stating that he "left [**JACKSON's**] bag over at **JOHN's**." **JONES** reiterates that he left **JACKSON's** bag at **JOHN's**. On the same day at 10:54 a.m., **JONES** spoke with "**JOHN,** " telling him to tell **JACKSON** that he left that bag at **JOHN's** house for him, but that only one bag is his. In another instance, **JONES** speaks with an unknown female, believed to be **SIMONA ADAMS** and seems to be encouraging her to get back into the cocaine-trafficking business.

61. On Monday, September 12, 2005 at 10:42 p.m., **JONES** called **JOHN ADAMS** stating that he needed a favor. **JONES** needs two tickets, and will give them back tomorrow. **JONES** asks **ADAMS** whether he is "at the house." **ADAMS** replied that he was, and **JONES** told him he would be there in a minute. The next day at 4:50 p.m., **ADAMS** called **JONES** and told **JONES** that he needed those two tickets that he gave to **JONES** last night back as soon as possible. **JONES** stated that he was at the club and that he would "make a call." **ADAMS** said "OK." One minute later, **ADAMS** calls **JONES** again, and told **JONES** that he was trying to find another "four of them tickets." **ADAMS** asked **JONES** "what's up with youngin'" (a reference to **DEMETRIUS JOHNSON**), and **JONES** replied that he thought that "youngin" had already sold a couple of his tickets. The pair continue to discuss how many tickets various people have and need.

62. On Sunday, September 18, 2005, **JONES** and **ADAMS** discuss "cutting the cake." This is believed to be a reference to re-packaging drugs. Finally, on October 15, 2005, **ADAMS** calls **JONES** and tells **JONES** that he is sitting there waiting. **JONES** asks if the party was cool with [unintelligible]. **ADAMS** says, yeah, the party must have been cool. He talked with him this morning and the flyers must be good. He liked the format and the way they were designed.... **ADAMS** tells **JONES** he has the day

40

off and is waiting for some things to happen. **JONES** tells **ADAMS**, if Youngin' and them call, tell them he's at the movies. Finally, **ADAMS** is another of the individuals with whom **JONES** discussed "tomorrow" – this time trying out "brother in law" and "cousin." (See paragraphs 47-48).

**(7) 9156 Piscataway Road, Clinton, Maryland 20735**

63. This is the primary address for **GREGORY HAWKINS**, who is the listed owner. **HAWKINS** is a known associate and business partner of **JONES'**. Additional investigation conducted by your affiant and other law enforcement officers revealed that, on his Official Passport, **HAWKINS** listed his address as 9156 Piscataway Road, Clinton, Maryland. Further, **HAWKINS** owns a car, listed in his name, and registered to that address.

64. Investigators believe that **HAWKINS** assists **JONES** with the financial aspects of his narcotics trafficking business, i.e., he handles the money, which, Investigators believe is often referred to as "homework." Following is a summary of conversations intercepted between **JONES** and **HAWKINS**: On Wednesday, September 7, 2005 at 10:33 a.m., **JONES** received a call from **HAWKINS**. **JONES** told **HAWKINS** that he was in his house, but was about to go to Baltimore to look at houses. **JONES** asked **HAWKINS** whether he had "done that math homework." **HAWKINS**, who sounds exasperated, states: "There's no way in the world . . . I don't want to argue over it, there's nothing I can do about it, but I'm telling you, it's ridiculous . . . ." **JONES** tells him that he wishes he could take **HAWKINS** there to see, and then asks "what was it, $3? $2?" **HAWKINS** replies that it was "way way more than that." JONES then slips and asks whether it was "more that 3,000, I mean $3." **HAWKINS** tells **JONES** that it is more than 5, "that's why I'm saying something's gotta be wrong." They agree to discuss the matter further after **JONES** returns from his house-hunting trip to Baltimore. Investigators believe that this

41

conversation refers to a shortage of cash with respect to a narcotics deal(s).  As noted, at one point, **JONES** slips and refers to "3,000" but then recovers, saying "I mean, $3." In addition, what is believed to be a money counting machine can be heard in the background.     Further, **HAWKINS** is another of the individuals **JONES** called and referred to an uncle coming tomorrow (see paragraphs 47-48).

65.  On Wednesday, October 12, 2005 at 7:40 p.m., **JONES** called his "partner," **GREGORY HAWKINS**, and said that "Youngin' said he will probably see us tomorrow evening." HAWKINS replied "Alright."

66.  On October 20, 2005 at 12:14 p.m., **JONES** called **HAWKINS** who told **JONES** he was out around town trying to deal with these.... **HAWKINS** tells **JONES** that one of our little young ones got killed, Marcelle. He was a terrorist, though, **HAWKINS** says. I know Marcelle, **JONES** says, Atlanta? **HAWKINS** says yeah, Atlantic Street. That (unintelligible) is his uncle. Young one was out here on a nut. He was robbin' niggers, beating niggers up in his neighborhood. He was one of the young ones got dumped on Suitland Parkway. I talked to these dudes from around this area....call is disconnected. Investigators believe that **JONES** and **HAWKINS** are discussing the murder the previous weekend of a juvenile named Marcelle, whose body was found along the Suitland Parkway.

**(8)  9508 Potomac Drive, Fort Washington, Maryland**

67.  This location is believed to be the stash/meeting location for **JONES's** Hispanic drug suppliers. The property is owned by Delia ALVAREZ, who, in addition to this property, owns a number of other properties, primarily along the east coast. On a number of occasions, surveillance has revealed **JONES** at this location.

68. Further, with respect to **JONES'** supply chain, over the course of the interception period, **JONES** had numerous suspicious telephone conversations with telephone number (678) 330-7712, a Nextel cellular telephone, subscribed to in the name of John Yi, at an Atlanta, Georgia address.[7] In these calls, all of which are initiated by **JONES**, **JONES** states simply "what's up" or "yeah" or "OK," to which UM-2 responds in kind. In a few of these calls, **JONES** says "20 minutes," or "5 minutes," or similar. After many of these occasions, surveillance revealed that within the appointed time-frame, **JONES** was at the 9508 Potomac Drive address.

69. Further, toll records pertaining to (678) 330-7712, have revealed that UM-2 utilizes the "direct connect" function on his telephone – which allows him to speak with another Nextel subscriber, if he specially identifies that number with Nextel, with the touch of one button. Of the few telephone numbers specifically identified, two of them are these (713) numbers subscribed to by Juan Lopez, UM-1. The other number "direct connected" by (678) is (909) - UM-3, the same number in touch with **JONES**. Thus, investigators believe that UM-1 and UM-2 are close associates of each other, and are likely members of the supply-chain leading to **JONES**.

70. Wire interceptions further reveal the role of Texas suppliers in **JONES'** organization. For example, on Monday, October 10, 2005, **JONES** spoke with UM-1 on (713) 386-9548, who indicated that it should be another 7-8 days before things are ready. In recent weeks, **JONES** also has had more frequent contact with another Hispanic sounding male (UM-3)[8] at (909) 975-0957, which is a Nextel

---

[7]     Investigators similarly believe that this is a fictitious name, and for ease of reference, will refer to the user of this telephone as "UM-2.".

[8]     Again, investigators believe that this is a fictitious name. For clarity, we are using the designation "UM-3" in this affidavit to refer to the user of (909) 975-0957.

cellular telephone registered in the name of Mike Wills in Irvine, California, and believed to be a fictitious name, in which the pair meet on numerous occasions at the 9508 Potomac Drive house. For example, on October 4, 2005, at 10:56 a.m., **JONES** called (909) 975-0957, and asked UM-3 what time he could get to "the spot." The unknown male replied "15 or 20 minutes?" **JONES** said "OK" and hung up the phone. Then, at 11:19 a.m., UM-3 called **JONES** from (909) 975-0957, and stated that he was "already there." **JONES** replied that he would be there in 10 minutes. Based on the first call, a team of investigators quickly set up surveillance on a road near 9508 Potomac Drive. A short time after the second call, **JONES** drove into the neighborhood in his Jeep Cherokee, and was observed and photographed driving out of the neighborhood a few moments later, in the company of a Hispanic male.

71. Similarly, on October 13, 2005, at 5:25 p.m., **JONES** called the (909) number. UM-3 who answered said that he would only be around until 8:00 p.m., and then he was going to meet the girls. **JONES** said he would swing by, either before then or the following morning. **JONES** also referenced "20 of the VIP tickets." **JONES** followed up on this call at 7:13 p.m, when he called the (909) number again and stated that he was 5-10 minutes away. Surveillance revealed that within approximately 10 minutes, **JONES** went to the 9508 Potomac Drive house. Then, approximately 30 minutes later, in rapid succession over the course of 8 minutes, **JONES** called **KEVIN HOLLAND**, **DEMETRIUS JOHNSON**, **MIKE HUGGINS**, and **JOHN ADAMS**, each call lasting between 41 seconds and 1 minute and 35 seconds. For unknown reasons, the wire tap equipment transmitted no audio with respect to these calls (or several non-pertinent calls thereafter). Investigators nonetheless note the significance of

this flurry of calls by **JONES** to his usual customers, in the immediate aftermath of his meeting with the user of (909) 975-9057, a likely cocaine supplier, as **JONES** notifying his customers that another shipment was coming through.

## OFFENSES

Violations of the Controlled Substances Act, Title 21, United States Code, Section 801, et seq., including: (a) the possession with intent to distribute and distribution of controlled substances, in violation of Title 21 United States Code (USC) § 841(a)(1); (b) conspiracy to commit such offenses, in violation of 21 U.S.C. § 846; (c) the use or carrying of firearms during the course of the above offenses involving controlled substances, in violation of 18 U.S.C. § 924(c); (d) the use of communications facilities to facilitate the commission of the above offenses involving controlled substances, in violation of 21 USC § 843(b); and (e) the laundering of proceeds of specified unlawful activity, such as the distribution of controlled substances, in violation of 18 U.S.C. §§ 1956 and 1957.

## CONCLUSION

Wherefore, based upon the facts and circumstances related above and my experience as a Special Agent of the FBI, I believe that there is probable cause to believe that the following articles are present at the subject premises:

1) Controlled substances, to wit: Cocaine in violation of Title 21 United States Code

2) Paraphernalia for packaging, processing, weighing, and distributing controlled substances, for example: scales, razor blades, plastic bags, and heat-sealing devices;

3) Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances;

4) Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

5) Cash, currency, and records relating to controlled substances income and expenditures of money and wealth, to-wit: money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as precious metals and gems such as gold, silver, diamonds, etc.;

6) Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the premises that is the subject of this warrant, including but not limited to canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, cell phones (and the numbers contained therein) diaries, utility and telephone bills, statements, identification documents, and keys; and

7) Firearms and other dangerous weapons.

Based on this affidavit, your affiant requests authorization to seize items listed on Attachment A.

_____

STEPHANIE E. YANTA
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me  this _____ day of October 2005.

_____

CHARLES B. DAY
UNITED STATES MAGISTRATE JUDGE

46

# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

In the Matter of the Search of
(Name, address or brief description of person or property to be searched)

**SEARCH WARRANT**

10441 Crescent Park Way
Waldorf, Maryland

CASE NUMBER: 05-4495 CBD

TO: <u>Special Agent Stephanie Yanta</u> and any Authorized Officer of the United States

Affidavit(s) having been made before me by <u>Special Agent Stephanie Yanta</u> who has reason to believe that
☐ on the person or ☒ on the premises known as (name, description and or location)

A brick single family house with the numbers "10441" in black on a white placard to the left of the front door.

in the District of Maryland, there is now concealed a certain person or property, namely (describe the person or property)

See Attachment A

I am satisfied that the affidavits(s) and any recorded testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before *October 31, 2005*
Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making the search (in the daytime - 6:00 A.M. to 10:00 P.M.) ~~(at any time in the day or night as I find reasonable cause has been established)~~ and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to the Honorable Charles B. Day, U.S. Magistrate Judge, as required by law.

*October 22, 2005* at Greenbelt, Maryland
Date and Time Issued
*5:50 pm*

Charles B. Day
United States Magistrate Judge
Signature of Judicial Officer

| RETURN | | CASE NUMBER: |
|---|---|---|
| DATE WARRANT RECEIVED<br>10/22/05 | DATE AND TIME WARRANT EXECUTED<br>10/24/05 | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH<br>DEMETRIUS JOHNSON |

INVENTORY MADE IN THE PRESENCE OF

SA TURNER, SA VASAKAS

INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT

SEE ATTACHED FD-597

## CERTIFICATION

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

Subscribed, sworn to, and returned before me this date.

_____    11/8/05
U.S Judge or Magistrate                Date

FD-597 (Rev 8-11-94)

## UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION
Receipt for Property Received/Returned/Released/Seized

File # _2810-WF-213679_

On (date) _10/24/05_

item(s) listed below were:
- ☐ Received From
- ☐ Returned To
- ☐ Released To
- ☒ Seized

(Name) _Demetrius Johnson_

(Street Address) _10441 Crescent Park Way_

(City) _Waldorf MD_

Description of Item(s):

① Documents located in garage and 1 photo (Turner)

② 2 sets of tickets/passes located in trunk of BMW in garage by SA Turner

③ Documents, photos, keys, etc. seized from kitchen closet (Room D) by SA Turner

④ three blank checks numbered 1007, 1008, 1009 found in room F by SA Maruschak

⑤ white powder substance and white rock substance in plastic bags located by SA Uesaka in black fanny pack Room J dresser.

⑥ Approx $12,000 seized from Room J by SA Uesaka U.S. Currency

⑦ Verizon cell phone seized from nightstand near window in Room J (Uesaka)

⑧ One blackberry cell phone found on night stand near door Room J (Gomez)

⑨ Jewelry located by SA Uesaka in Room J

⑩ Suspected marijuana found in glass case on night stand

Received By: _____ (Signature)

Received From: _____ (Signature)

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property Received/Returned/Released/Seized

File # 28ID-WF-213679

On (date) 10/24/05

item(s) listed below were:
- [ ] Received From
- [ ] Returned To
- [ ] Released To
- [x] Seized

(Name) Demetrius Johnson

(Street Address) 10441 Crescent Park Way

(City) Waldorf MD

Description of Item(s):

Continue... near closet door room J   (SA Wright)

(11) Pager found in pants pocket located on chair in Room J (Uraaka)

(12) Misc financial documents and prepaid proof of purchase located closet Room J by Krest

(13) Digital scale in top left dresser drawer of Room J (Uraaka)

(14) Black Nike bag with numerous bags of white powder. Bag located on floor next to night stand next to window in Room J (Uraaka)

(15) Box of ziplock baggies found near nightstand next to window in Room J (Gomez)

(16) 2 checks located in kitchen in Room D by Gomez

Nothing ELSE

Received By: _____ (Signature)

Received From: _____ (Signature)

# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

In the Matter of the Search of
(Name, address or brief description of person or property to be searched)

10870 Moore Street
Waldorf, MD

### SEARCH WARRANT

CASE NUMBER: 05-4491 CBD

TO: Special Agent Stephanie Yanta and any Authorized Officer of the United States

Affidavit(s) having been made before me by Special Agent Stephanie Yanta who has reason to believe that ☐ on the person or ☒ on the premises known as (name, description and or location)

A brick single family house with the numbers "10870" on the mailbox post to the right of the driveway

in the District of Maryland, there is now concealed a certain person or property, namely (describe the person or property)

See Attachment A

I am satisfied that the affidavits(s) and any recorded testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before _____
                                                                            Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making the search (in the daytime - 6:00 A.M. to 10:00 P.M.) (at any time in the day or night as I find reasonable cause has been established) and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to the Honorable Charles B. Day, U.S. Magistrate Judge, as required by law.

_____ at Greenbelt, Maryland
Date and Time Issued

_____
Charles B. Day
United States Magistrate Judge
Signature of Judicial Officer

| RETURN | | | CASE NUMBER: |
|---|---|---|---|
| DATE WARRANT RECEIVED<br>10/22/05 | DATE AND TIME WARRANT EXECUTED<br>10/24/05 6:15 AM | | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH<br>DeNiece Jones |

INVENTORY MADE IN THE PRESENCE OF

NAUGLE, STEPHEN R.

INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT

See attached 597's (Receipt of Property Seized)

## CERTIFICATION

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

*Manta*

Subscribed, sworn to, and returned before me this date.

_Paul R. Day_     11/8/05

U.S Judge or Magistrate     Date

FD-597 (Rev 8-11-94)

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property Received/Returned/Released/Seized

e # 281D-WF-213679

On (date) 10/24/2005

item(s) listed below were:
- ☐ Received From
- ☐ Returned To
- ☐ Released To
- ☒ Seized

(Name) Antoine Jones, aka "Toine"

(Street Address) 10870 Moore Street

(City) Waldorf, Maryland

Description of Item(s): #1: Bank of America, Visa Statement; Verison Statement; Property Information 2221 Brandy Wine Rd, Brandy Wine, MD, 20613.

#2: Unmarked 3½ computer disk, blue

#3: Real Estate Documents.

#4: Pictures from Club.

5: Bank documents from Club Levels

#6: Box of documents from Prison addressed to A. Johnson Jones Sr.

#7: Financial Documents in cardboard box

#8: Financial Documents in Blue plastic bin

#9: Financial Real Estate Documents in Grey Plastic Bin

#10: 23 (twenty three) 3½ inch computer disks.

#11: Real Estate printouts and contracts.

#12: Financial documents, credit card statements, bank statements, mortgage statements, cell phone statements.

#13: Financial documents.

#14: Financial documents, from upstairs bedroom

#15: 2 (two) cellular telephones

#16: Misc. documents from room H, large bureau.

"17: Financial documents from room H large bureau.

#18: 2 (two) large rings of keys

Received By: _____ (Signature)    Received From: _____ (Signature)

FD-597 (Rev 8-11-94)

## UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property Received/Returned/Released/Seized

ile # 2810 - WF - 213679

On (date) 10/24/2005

item(s) listed below were:
- [ ] Received From
- [ ] Returned To
- [ ] Released To
- [x] Seized

(Name) Antoine Jones, aka "Toine"

(Street Address) 10870 Moore Street

(City) Waldorf, Maryland

Description of Item(s):

#19: Real Estate and Finacial Documents.

#20: Lowe's Receipts.

#21: 2 (two) Bank of America receipts, 1- American Express business receipt, 1 (one) FTN Consultant Bank Allt.

#22: Personal Papers in the name of A. Jones and Deniece Jones.

#23: Receipts and Wachovia Bank Statement

#24: 1 (one) 3½ inch computer disk with "A. Jones Da 5th Quarter "sign unit.

#25: "Offer to Purchase" sheet of paper, ATM receipts.

#28: Black bag with documents, located in Jeep Cherokee.

#29: Bags and rubber bands to package money, located in rear of Jeep Cherokee.

Received By: _Signature_ (Signature)    Received From: _Deniece Jones_ (Signature)

FD-597 (Rev 8-11-94)

## UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION
#### Receipt for Property Received/Returned/Released/Seized

File # _281D-WF-213679_

On (date) _10/24/2005_

item(s) listed below were:
- [ ] Received From
- [ ] Returned To
- [ ] Released To
- [X] Seized

(Name) _Antoine Jones, aka "Toine"_

(Street Address) _10870 Moore Street_

(City) _Waldorf, Maryland_

Description of Item(s):

#26: Cash in amount of $69,191.⁰⁰ (sixty nine thousand dollars and 00/100), located in bag in rear of Jeep Cherokee.

#27: Cash in amount of $452.⁰⁰ (four hundred fifty two dollars and 00/100; 43 x $10; 4 x $5; 2 x $1), located in the pocket of subject's pants.

Received By: _[Signature]_
(Signature)

Received From: _[Signature]_
(Signature)

FD-597 (Rev 8-11-94)

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property Received/Returned/Released/Seized

.le # _281D-WF-213679_

On (date) ___10/24/2005___

item(s) listed below were:
- ☐ Received From
- ☐ Returned To
- ☐ Released To
- ☒ Seized

(Name) _Antoine Jones, aka 'Toine'_

(Street Address) _10870 Moore Street_

(City) _Waldorf, Maryland_

Description of Item(s):

_#30: 2001 Cream Colored Jeep Grand Cherokee,_
_VIN: 1J4GW48S71C683464; Maryland License_
_tag # M667480_

SK

Received By: _[Signature]_ (Signature)   Received From: _[Signature]_ (Signature)

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property Received/Returned/Released/Seized

File # _281-D-WF-213679_

On (date) _10/24/2005_

item(s) listed below were:
- ☐ Received From
- ☐ Returned To
- ☐ Released To
- ☒ Seized

(Name) _Antoine Jones, aka "Toine"_

(Street Address) _10870 Moore Street_

(City) _Waldorf, Maryland_

Description of Item(s):

#31: 2002 Silver Colored Toyota Sequoia SR5
VIN: 5TDBT44A43S144078, Maryland license
plate # M895532.

Received By: _(Signature)_     Received From: _(Signature)_

# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

In the Matter of the Search of
(Name, address or brief description of person or property to be searched)

12221 Brandywine Road
Brandywine, Maryland

**SEARCH WARRANT**

CASE NUMBER: 05-4492(BD)

TO: <u>Special Agent Stephanie Yanta</u> and any Authorized Officer of the United States

Affidavit(s) having been made before me by <u>Special Agent Stephanie Yanta</u> who has reason to believe that ☐ on the person or ☒ on the premises known as (name, description and or location)

A single family house, brick with yellow siding, with the numbers "12221" above the front door.

in the District of Maryland, there is now concealed a certain person or property, namely (describe the person or property)

See Attachment A

I am satisfied that the affidavits(s) and any recorded testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

**YOU ARE HEREBY COMMANDED** to search on or before _October 31, 2005_
                                                                    Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making the search (in the daytime - 6:00 A.M. to 10:00 P.M.) ~~(at any time in the day or night as I find reasonable cause~~ ~~has been established)~~ and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to the Honorable Charles B. Day, U.S. Magistrate Judge, as required by law.

_October 22, 2005_ at Greenbelt, Maryland
Date and Time Issued
_5:40 pm_

_Charles R. Day_
Charles B. Day
United States Magistrate Judge
Signature of Judicial Officer

| RETURN | | CASE NUMBER: |
|---|---|---|
| DATE WARRANT RECEIVED<br>10/22/05 | DATE AND TIME WARRANT EXECUTED<br>10/24/05    6:07 AM | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH<br>*PAULETTE BIZZELLE* |
| INVENTORY MADE IN THE PRESENCE OF<br>*PAULETTE BIZZELLE* | | |

INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT

*- SEE ATTACHED -*

### CERTIFICATION

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

*S. Manda*

Subscribed, sworn to, and returned before me this date.

_____          11/8/05
U.S Judge or Magistrate                                    Date

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property Received/Returned/Released/Seized

File # _281D-WF-213679_

On (date) _10/24/05_

item(s) listed below were:
- ☐ Received From
- ☐ Returned To
- ☐ Released To
- ☒ Seized

(Name) _PAULETTE BIZZELLE_

(Street Address) _12221 BRANDYWINE ROAD_

(City) _BRANDYWINE, MARYLAND_

Description of Item(s): ① PELLET GUN WITH PELLETS ROOM F
② SMALL QUANTITY OF MARIJUANA - ROOM F
③ MISC PHOTOS - ROOM C
④ 1 PHOTO, EMASCOPO - NAME ANTOINE JONES, COMP DESK

_NOTHING BELOW_

Received By: _____ Received From: ✓ _Paulette M. Bizzelle_
(Signature)                              (Signature)

# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

In the Matter of the Search of
(Name, address or brief description of person or property to be searched)

**SEARCH WARRANT**

7921 Allendale Drive
Landover, Maryland

CASE NUMBER: O5-4445 CBD

TO: <u>Special Agent Stephanie Yanta</u> and any Authorized Officer of the United States

Affidavit(s) having been made before me by <u>Special Agent Stephanie Yanta</u> who has reason to believe that ☐ on the person or ☒ on the premises known as (name, description and or location)

A white duplex house with the numbers "7921" in black to the right of the front door.

in the District of Maryland, there is now concealed a certain person or property, namely (describe the person or property)

See Attachment A

I am satisfied that the affidavits(s) and any recorded testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before *October 31, 2005*

Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making the search (in the daytime - 6:00 A.M. to 10:00 P.M.) ~~(at any time in the day or night as I find reasonable cause has been established)~~ and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to the Honorable Charles B. Day, U.S. Magistrate Judge, as required by law.

*October 22, 2005* at Greenbelt, Maryland

Date and Time Issued

*5:58 pm*

Charles B. Day
United States Magistrate Judge
Signature of Judicial Officer

| RETURN | | | CASE NUMBER: |
|---|---|---|---|
| DATE WARRANT RECEIVED<br>10/22/2005 | DATE AND TIME WARRANT EXECUTED<br>10/24/2005  6:22 am | | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH<br>*Adrian Jackson* |

INVENTORY MADE IN THE PRESENCE OF    *ADRIAN JACKSON*

INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT

*See attached FD-597*
*by 10/24/2005*

## CERTIFICATION

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____    _____
U.S Judge or Magistrate                   Date

FD-597 (Rev 8-11-94)

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**
Receipt for Property Received/Returned/Released/Seized

File # 281D-WF-213679

On (date) 10/24/2005

item(s) listed below were:
☐ Received From
☐ Returned To
☐ Released To
☒ Seized

(Name) ADRIAN JACKSON

(Street Address) 7921 Allendale Drive

(City) Landover MD

Description of Item(s): 1) United States Passport found in Room I (Shed) in the name of Angila TAYLOR; located by SA N. Vorndran (FBI-BALTIMORE);

#2 (1) Cingular phone w/charger + (1) Nextel phone found in windowsill Room E (MBR) by Det. Larry Porter. Safe Streets Task Force;

#3 (9) cell phones + marriage certificate found in Rm F (bedroom), in Timberland shoe box, found by DUSM WAYNE WARREN;

4 Assorted photographs found in Room F (bedroom) in plastic bag by DUSM Wayne Warren;

#5 $2,743.00 in USC found in sweat pants pocket - Room E MBR - found by Det. Porter;

#6 photograph, miscellaneous documents, pay checks from Club Levels, found in Room E, top of dresser by SA M. Counts;

#7 "MY WEIGH" scale found in Room E, top drawer of nightstand Room E, MBR, by DUSM Warren.

#8 STEYR M-40 Semi Automatic handgun w/5 rounds in the magazine, black in color; serial # 009920 found on top shelf of closet, Room E, MBR by Det. Porter;

#9 small plastic zip lock bag containing off white rock like substance - located in top drawer of nightstand - Master BR - Room E by DUSM Wayne Warren.

Received By: _____ (Signature)

Received From: Mary A Counts FBI, SA (Signature)

FD-597 (Rev 8-11-94)

### UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property Received/Returned/Released/Seized

ile # _281D-WF-213679_

On (date) _10/24/2005_

item(s) listed below were:
- ☐ Received From
- ☐ Returned To
- ☐ Released To
- ☑ Seized

(Name) _ADRIAN JACKSON_

(Street Address) _7921 Allandale Drive_

(City) _Landover, Maryland_

Description of Item(s): #10 Miscellaneous financial documents found in garbage - front yard of 7921 Allandale Road, Landover Md found by SA Vondras (FBI Baltimore)

#11 - Black "GUESS" pouch with light colored rock type substance inside - Room E - nightstand

12 Miscellaneous papers, documents photographs and cellular phone found in bottom drawer of Nightstand - Room E MBR by Walter Warren DUSM

#13 (3) Travelers Express Money Gram receipts; one Wachovia statement and one Sprint bill found on dryer in Room A - Kitchen

Nothing follows     mg     10-24-2005

Received By: _____ (Signature)     Received From: _Mary J Counts SA FBI_ (Signature)

# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

In the Matter of the Search of
(Name, address or brief description of person or property to be searched)

**SEARCH WARRANT**

5119 Barto Ave
Suitland, Maryland

CASE NUMBER:  05-4494 CB1)

TO:  Special Agent Stephanie Yanta and any Authorized Officer of the United States

Affidavit(s) having been made before me by Special Agent Stephanie Yanta who has reason to believe that ☐ on the person or ☒ on the premises known as (name, description and or location)

A brick single family house with a wooden fenced-in yard.  The numbers "5119" are on the fence post to the right of the driveway.

in the District of Maryland, there is now concealed a certain person or property, namely (describe the person or property)

See Attachment A

I am satisfied that the affidavits(s) and any recorded testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

**YOU ARE HEREBY COMMANDED** to search on or before _October 31 2005_

Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making the search (in the daytime - 6:00 A.M. to 10:00 P.M.) ~~at any time in the day or night as I find reasonable cause has been established~~ and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to the Honorable Charles B. Day, U.S. Magistrate Judge, as required by law.

_October 22, 2005_  at Greenbelt, Maryland
Date and Time Issued  5:50 AM

Charles B. Day
United States Magistrate Judge
Signature of Judicial Officer

| RETURN | CASE NUMBER: |
|---|---|

DATE WARRANT RECEIVED
*10/22/05*

DATE AND TIME WARRANT EXECUTED
*10/24/05    6:14 am*

COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH
*Deonte Wilson (Juvenile, 15)*

INVENTORY MADE IN THE PRESENCE OF
*SA Lockhart, SA Ashby, SA Cimakosky, SA Hund*

INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT

*— see FD-597 (Two pages)*

## CERTIFICATION

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

Subscribed, sworn to, and returned before me this date.

_____    *10/8/05*
U.S Judge or Magistrate                              Date

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**
Receipt for Property Received/Returned/Released/Seized

*Time of Entry: 6⁴⁵am*

` # 2810-WF-213679

On (date) ___10/24/05___

item(s) listed below were:
☐ Received From
☐ Returned To
☐ Released To
☑ Seized

(Name) _Deonte Wilson (Juvenile, 15 yrs)_

(Street Address) _5119 Barto Avenue_

(City) _Suitland, MD_

Description of Item(s):

1) Photos (Room E - SA Lockhart)
2) Bank Documents, Phone Bill (Room G - SA James)
3) Adidas Shoe Box (Room A - SA Love)
4) White Digital Scale (Room A - SA Love)
5) Black Plastic Bag with White Powder - [FTP Cocaine by Lockhart] (Room A - SA Love)
6) Packard Bell Hard Drive (Room L - SA Hund)
7) Computer Hard Drive (Room K - SA Hund)
8) $5,750.⁰⁰ in U.S. Currency (Room A - SA Farrell)
9) Tax/Financial Documents (Room A - SA D
10) White Powder in Ziplock Bag (Room A - SA Machafka)
11) Electronic Scale & Razor (Room A - SA Machafka)
12) Photos, Financial Paperwork, Cell Phones (2) Ziplock Bags (Room A - Inv. Waid)
13) Photos, Financial Paperwork (Room A - Inv. Waid)
14) Safety Deposit Key (Room A - Inv. Waid)
15) Tax Paperwork, Photo, Letter (Room F - SA Ashby)
16) Identification Cards name Michael Huggins (Room A - SA Farrell)
17) $5000.⁰⁰ in U.S. Currency (Room A - SA Farrell)
18) Financial Documents (Room A - SA Cmatasky)
19) Bank Statements/Tax Bill/Phone Bill (Room A - SA Love)

(cont)

Received By: _SA _____   Received From: _Deonte Wilson_
            (Signature)                          (Signature)

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property Received/Returned/Released/Seized

File # _281 D - WF - 213679_

On (date) _10/24/05_

item(s) listed below were:
- ☐ Received From
- ☐ Returned To
- ☐ Released To
- ☑ Seized

(Name) _Deonte Wilson (Juvenile, 15 yoa)_

(Street Address) _5119 Barto Avenue_

(City) _Suitland, MD_

Description of Item(s): _20) Cordless AT&T Phone & Charger (Room F- SA Ashby)_
_21) Copy of Check (Room A - SA Werner)_
_22) Vehicle Registration Documents (Room A - SA Werner)_
_23) W-2 Tax Form (Room A - SA Werner)_
_24) Address Book (Room A- SA Werner)_
_25) Title 1999 GMC / HUD Settlement Statement (Room A- SA Cimakosky)_
_26) Assorted Photos / Two Photo Albums (Room A- SA Farrell)_
_27) White 740; BMW, MD Registration 5AZ- ▓▓▓▓ Per K53_
_VIN # WBAGD432XRDE66855_

Received By: _SA Robert Chalet_
(Signature)

Received From: _Keona Wilson_
(Signature)

# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

In the Matter of the Search of
(Name, address or brief description of person or property to be searched)

**SEARCH WARRANT**

5703 Gloria Drive
Suitland, Maryland

CASE NUMBER: 05-4496 CB

TO:  Special Agent Stephanie Yanta and any Authorized Officer of the United States

Affidavit(s) having been made before me by Special Agent Stephanie Yanta who has reason to believe that ☐ on the person or ☒ on the premises known as (name, description and or location)

A brick single family house with the numbers "5703" on the left of two columns, which is to the front door.

in the District of Maryland, there is now concealed a certain person or property, namely (describe the person or property)

See Attachment A

I am satisfied that the affidavits(s) and any recorded testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

**YOU ARE HEREBY COMMANDED** to search on or before _October 31 2005_
Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making the search (in the daytime - 6:00 A.M. to 10:00 P.M.) (at any time in the day or night as I find reasonable cause has been established) and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to the Honorable Charles B. Day, U.S. Magistrate Judge, as required by law.

_October 22, 2005_ at Greenbelt, Maryland
Date and Time Issued
5:55 PM

Charles B. Day
United States Magistrate Judge
Signature of Judicial Officer

| RETURN | | | CASE NUMBER: |
|---|---|---|---|
| DATE WARRANT RECEIVED 10/23/05 | DATE AND TIME WARRANT EXECUTED 10/24/05   0600 hrs | | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH John Adams   Simona Adams |

INVENTORY MADE IN THE PRESENCE OF
Det Steven Kirschner  /SA Jeff Johanns /SA Andrew Gardiner, Jr.

INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT

SEE FD-597
For Inventory List

## CERTIFICATION

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

Subscribed, sworn to, and returned before me this date.

_____        10/8/05
U.S Judge or Magistrate                      Date

FD-597 (Rev 8-11-94)

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**
Receipt for Property Received/Returned/Released/Seized

File # 281D-WF-213679

On (date) 10/24/2005

item(s) listed below were:
☐ Received From
☐ Returned To
☐ Released To
☒ Seized

(Name) JOHN ADAMS

(Street Address) 5703 Gloria Dr., Suitland, Md.

(City) Suitland, MD

Description of Item(s):

#1 - (2) Letters in name of John Adams, (1) letter in name of Simons from Room P Closet third shelf

#2 - (2) photo, Funeral Notice, Document to John Adams Document from Levels & Notice in name of Francetta Monique Pittman from Room I

#3 - Sandwich bag containing white chunky Powder from Room M

#4 - Folding Knife and Razor Blades from Room - M

#5 - Blue Plastic Shopping Bag, white Plastic Shopping Bag Containing (2) ziplock plastic Bag containing white chunky Powder from Room M

#6 - (4) Photos from Room - F

#7 - Various Financial Account Statements from Room - F

#8 - Red and White coat from Closet - J

#9 - $9600.00 from Room - M closet

#10 - L.G. Cell Phone and (2) Video Tapes from Room M

#11 - Check Book, Title to Vehicle and Various Documents from Room M

#12 - $160.00 from Purse in room - M

#13 - A Salter Chrome Elite Digital Scale from Room I

#14 - (2) cell phones from room M

#15 - (2) Gift receipts, (1) 8mm Video Tape, (1) cell phone

#16 - pictures, Mail, Steno pad from Room - M

Received By: _____
(Signature)

Received From: John Adams
(Signature)

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**
Receipt for Property Received/Returned/Released/Seized

File # 281D-WF-213679

On (date) 10/24/05

item(s) listed below were:
☐ Received From
☐ Returned To
☐ Released To
☒ Seized

(Name) John Adams

(Street Address) 5703 Gloria Dr

(City) Suitland, MD

Description of Item(s):

#17 - One Samsung Flat screen television ser# 39FY3CFY400309V Room M

#18 - One Averatec Computer ser# NSOICE050802449 Room M

#19 - Sony Handycam 8mm Camcorder DCRTRV27 Room M

#20 - I-tec .45 cal semi Auto pistol ser#001814 From Room C closet

#21 - (1) Magazine with (6) 45 cal rounds From Item #20

#22 - S&W .357 cal revolver ser# BRJ8476 From Room D Safe

#23 - (6) rounds of .357 Ammo From Item #22

#24 - (1) Box of Remington .357 ammo, (1) Box of UMC .45 cal Ammo, (1) Box of Olin 25mm Ammo, one Bag of Loose rounds From Room D safe

#25 - Dell Desk top Computer CPU ser# 33GTP51 Room E

#26 - Photos, Bank records, Sprint cell phone, (5) CD's Room D

#27 - Documents pertaining to Banking, telephones & phone numbers Room F

Received By: _____
(Signature)

Received From: _____
(Signature)

# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

In the Matter of the Search of
(Name, address or brief description of person or property to be searched)

**SEARCH WARRANT**

9156 Piscataway Road
Clinton, Maryland

CASE NUMBER: O5- 4497 CBD

TO: <u>Special Agent Stephanie Yanta</u> and any Authorized Officer of the United States

Affidavit(s) having been made before me by <u>Special Agent Stephanie Yanta</u> who has reason to believe that ☐ on the person or ☒ on the premises known as (name, description and or location)

A brick with white siding single family home with white columns and the numbers 9156 are displayed on a brick column to the left of the driveway at the drive way entrance

in the District of Maryland, there is now concealed a certain person or property, namely (describe the person or property)

See Attachment A

I am satisfied that the affidavits(s) and any recorded testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

**YOU ARE HEREBY COMMANDED** to search on or before _October 31, 2005_
Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making the search (in the daytime - 6:00 A.M. to 10:00 P.M.) ~~(at any time in the day or night as I find reasonable cause has been established)~~ and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to the Honorable Charles B. Day, U.S. Magistrate Judge, as required by law.

_October 22, 2005_ at Greenbelt, Maryland
Date and Time Issued
_5:45 pm_

_Charl B. Day_
Charles B. Day
United States Magistrate Judge
Signature of Judicial Officer

| RETURN | | CASE NUMBER: |
|---|---|---|
| DATE WARRANT RECEIVED  10/24/05 | DATE AND TIME WARRANT EXECUTED  10/24/05   6:03 AM | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH  GREGORY HAWKINS |

INVENTORY MADE IN THE PRESENCE OF
GREGORY HAWKINS / Kietina Latimore

INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT

SEE Attached FD-597

## CERTIFICATION

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

*Martin*

Subscribed, sworn to, and returned before me this date.

_____          a/8/9
U.S Judge or Magistrate                    Date

FD-597 (Rev 8-11-94)

## UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property Received/Returned/Released/Seized

File # ~~281D-WF-213679~~

On (date) _____ 10-24-05 _____

item(s) listed below were:
- ☐ Received From
- ☐ Returned To
- ☐ Released To
- ☒ Seized

(Name) _____ Gregory Hawkins _____
(Street Address) _____ 9156 Piscataway Rd _____
(City) _____ Clinton, MD _____

Description of Item(s): _____

1. Phone Bills, credit card statements — Room A (Tullbanc)
2. Bankruptcy records — Room D (Genter)
3. Photos, Bills — Room E
4. Notepad, phone # — Room K
5. Cordless uniden phone — Room K
6. AT+T wireless phone — Room K
7. Bank statement, car receipts — Room K
8. Box top w/ phone # — Room K
9. Bills, disclosure statements — Room N
10. Check restitution, Bills — Room O
11. Treasury cheks — Room O

Received By: _(Signature)_   Received From: _(Signature)_

# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

In the Matter of the Search of
(Name, address or brief description of person or property to be searched)

9508 Potomac Drive,
Fort Washington, Maryland

**SEARCH WARRANT**

CASE NUMBER: 05-4498 CBD

TO: <u>Special Agent Stephanie Yanta</u> and any Authorized Officer of the United States

Affidavit(s) having been made before me by <u>Special Agent Stephanie Yanta</u> who has reason to believe that
☐ on the person or ☒ on the premises known as (name, description and or location)

A single family house with yellow siding and the numbers "9508" on the mailbox to the left of the driveway

in the District of Maryland, there is now concealed a certain person or property, namely (describe the person or property)

See Attachment A

I am satisfied that the affidavits(s) and any recorded testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before _October 31, 2005_
                                                                         Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making the search (in the daytime - 6:00 A.M. to 10:00 P.M.)(at any time in the day or night as I find reasonable cause has been established) and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to the Honorable Charles B. Day, U.S. Magistrate Judge, as required by law.

_October 22, 2005_ at Greenbelt, Maryland
Date and Time Issued
_5:55 pm_

Charles B. Day
United States Magistrate Judge
Signature of Judicial Officer

| RETURN | | | CASE NUMBER: |
|---|---|---|---|
| DATE WARRANT RECEIVED 10/22/05 | DATE AND TIME WARRANT EXECUTED 10/24/05    0600 | | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH AT RESIDENCE |

INVENTORY MADE IN THE PRESENCE OF

DET· WEBB, DET· Giannhoulias, St Gibson

INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT

SEE ATTACHED FD-597

### CERTIFICATION

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____      _____
U.S Judge or Magistrate                          Date

UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF INVESTIGATION
Receipt for Property Received/Returned/Released/Seized

e # 281D-WF-213679

On (date) 24 OCT 2005

item(s) listed below were:
☐ Received From
☐ Returned To
☐ Released To
☒ Seized

(Name) _____

(Street Address) 9508 POTOMAC DRIVE

(City) FORT WASHINGTON MD

Description of Item(s)
1) 2 CELL PHONES W/CHARGERS LOCATED IN ROOM H BY SA CARRILLO & SA VOONDRAN

2) 1 MACHETE LOCATED IN RM E (CLOSET) BY SA GIBSON

3) NOTEBOOK LOCATED BY SA VOONDRAN CLOSET ROOM H

4) 2 CELL PHONES LOCATED IN RM G BY SA GARCIA

5) 1 CELL PHONE & ONE CALL CARD (NEXTEL) LOCATED IN RM B BY SA GARCIA

6) NOTEBOOK LOCATED IN RM C BY SA GARCIA

7) OPERATION MANUEL FOR MONEY COUNTER & TALLY SHEET BY J. HILL IN RM E

8) PHONE CARD LOCATED IN ROOM C BY SA GARCIA

9) WALLET (RICARDO GONZALEZ) LOCATED IN RM B BY J. HILL

10) WALLET (ROEL BERMEA) LOCATED IN RM B BY J. HILL

11) 3 CELL PHONES, 1 KNIFE & BUSINESS CARDS LOCATED ON ROLANDO CARRILLO

12) FOOD SAVER BAGS & HEAT SEALER LOCATED IN RM A BY SA BELTRAN

13) FOOD SAVER HEAT SEALER LOCATED IN RM A BY SA BELTRAN

14) ROYAL SOVEREIGN MONEY COUNTER LOCATED E BY SA GIBSON

15) EARTH SHOE BOX CONTAINING PACKAGE SUPPLIES LOCATED IN E BY J. HILL

16) GOLD NECKLACE & BLACK BRACLET LOCATED IN RM B BY J. HILL

17) ASSORTED PAPER WORK & LEASE AGREEMENT LOCATED IN RM A BY SA BELTR

9) ASSORTED RECEIPTS, PEPCO BILLS, PHONE CARDS LOCATED IN RM A BY DET.
Giannakod

Received By: _____        Received From: _____
              (Signature)                                      (Signature)

UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF INVESTIGATION
Receipt for Property Received/Returned/Released/Seized

File # 2810-WF-213679

On (date) 24 OCT 2005

item(s) listed below were:
☐ Received From
☐ Returned To
☐ Released To
☒ Seized

(Name) _____

(Street Address) 9508 POTOMAC DRIVE

(City) FORT WASHINGTON MD

Description of Item(s): 19) TIMBERLAND BOX CONTAINED $94,510.00 IN U.S.
CURRENCY FOUND IN ATTIC BY SA GARCIA

20) $624.01 IN U.S. CURRENCY FOUND ON ROLANDO CARILLO
BY J. HILL

21) $1050.00 IN U.S. CURRENCY FOUND ON ROEL BERMEA JR BY J. HILL

22) $69.00 IN U.S. CURRENCY FOUND ON RICARDO GONZALEZ BY J. HILL
$100.00 IN MEXICAN CURRENCY

23) $94,510.00 IN U.S. CURRENCY FROM TIMBERLAND BOX LOCATED
BY SA GARCIA

24) BLUE GYM BAG (EMPTY) LOCATED IN RM L BY SA UMBEL

25) BLACK GYM BAG (EMPTY) LOCATED IN RM H BY SA UMBEL

26) BLUE GYM BAG (EMPTY) LOCATED IN RM H BY SA UMBEL

27) BLUE/BROWN GYM BAG (EMPTY) LOCATED IN RM G BY SA GARCIA

28) BLUE GYM BAG (EMPTY) LOCATED IN RM G BY SA GARCIA

29) BLACK GYM BAG (EMPTY) LOCATED IN RM H BY SA UMBEL

30) THREE HEAT SEALED BAGS CONTAINING A WHITE POWDER
SUBSTANCE LOCATED IN ATTIC BY SA GARCIA

31) LARGE BLACK BAG CONTAINING HEAT SEALED U.S. CURRENCY
LOCATED IN ATTIC BY SA GARCIA

Received By: _____     Received From: _____
                (Signature)                                (Signature)

## UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION
Receipt for Property Received/Returned/Released/Seized

File # _281D-WF-213679_

On (date) _24 OCT 2005_

item(s) listed below were:
- ☐ Received From
- ☐ Returned To
- ☐ Released To
- ☑ Seized

(Name) _____

(Street Address) _9508 POTOMAC DRIVE_

(City) _FORT WASHINGTON MARYLAND_

Description of Item(s):

**32)** BLUE, BLACK & GRAY BAG CONTAINING 25 BLACK BRICKS IN HEAT SEAL BAGS LOCATED IN ATTIC BY SA GARCIA ✱

**33)** BLUE, BLACK & GRAY BAG CONTAINING 30 BLACK BRICKS IN HEAT SEAL BAGS LOCATED IN ATTIC BY SA GARCIA ✱

**34)** RED BAG CONTAINING 25 BLACK BRICKS IN HEAT SEAL BAGS LOCATED IN ATTIC BY SA GARCIA ✱

**35)** BLACK BAG CONTAINING 17 BLUE BRICKS LOCATED IN ATTIC BY SA GARCIA ✱

**36)** 1 ROLL OF 35mm FILM LOCATED IN RM C BY DET GIANNAKOULIAS ✱

Received By: _____
(Signature)

Received From: _____
(Signature)