# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

UNITED STATES OF AMERICA,                )
                                         )
                                         )
                                         )
              v.                         )        **Criminal No. 05-0386 (ESH)**
                                         )
ANTOINE JONES, *et al.*,                 )
                                         )
                   Defendant.            )
_____         )

## MEMORANDUM OPINION

Before the Court are a series of motions, filed by Defendant Jones, to suppress evidence

found in vehicles and at Levels nightclub, evidence obtained from a mobile tracking device, from

the seizure of electronic communications, and from the interception of wire communications.

Defendant also seeks discovery regarding co-conspirator statements, a preliminary determination

of the conspiracy and a pretrial ruling on the admissibility of co-conspirator statements.[1]

## BACKGROUND

Defendants Antoine Jones, Adrian Jackson, Michael Huggins, Kevin Holland and Kirk

Carter are charged in a 34-count Superseding Indictment (the "Indictment"). All defendants are

charged with Conspiracy to Distribute and Possess with Intent to Distribute 5 Kilograms or more

of Cocaine and 50 Grams or More of Cocaine Base, in violation of 21 U.S.C. § 846 (Count One),

and with various individual counts of Use of a Communication Facility to Facilitate a Drug

Trafficking Offense, in violation of 21 U.S.C. § 843(b) (Counts Five through Thirty-Four). In

---

[1] Also pending before the Court is the government's Rule 404(b) motion and Defendant Jones' motions for a bill of particulars and for disclosure of confidential informants. The Court will address these motions at the hearing on Monday, August 14, 2006.

addition, Jones is charged with two counts of Unlawful Possession with Intent to Distribute Cocaine or Cocaine Base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(iii) (Count Two), and 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (Count Three), and Jackson is charged with Using, Carrying, Brandishing, and Possessing a Firearm During a Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (Count Four).

As alleged in the Indictment, from at least sometime in 2003 through October 24, 2004, defendants and their co-conspirators acquired, repackaged, stored, processed, sold, and redistributed large quantities of cocaine and cocaine base, in the District of Columbia, the States of Maryland and Texas, the Republic of Mexico and elsewhere.  It is further alleged that Jones was the primary supplier of cocaine and cocaine base to members of the organization in the District of Columbia and in the State of Maryland.

As part of their investigation into the alleged conspiracy, law enforcement agents utilized a number of investigative techniques, including surveillance, informants, installation of an electronic tracking device on Jones' vehicle, search warrants issued to electronic communication service providers for text messages to or from cellular telephones used by Jones and an alleged co-conspirator, and a Title III wire intercept.  The covert portion of the investigation ended on October 24, 2005, with searches pursuant to warrants and arrests.  At that time, drugs, drug paraphernalia, firearms, and significant quantities of cash were seized from the homes of a number of the defendants, as well as from an alleged "stash house" in Fort Washington, Maryland where 97 kilograms of cocaine, 3 kilograms of crack cocaine, and in excess of $800,000 was found.  (Government's Omnibus Response to Defendant's Legal Motions ["Gov't's Omnibus Opp'n"] at 5.)  The evidence the government intends to introduce at trial

includes, *inter alia,* items seized on October 24, 2005, a number of conversations intercepted pursuant to Title III wiretap orders, and the testimony of individuals who were allegedly part of Jones' drug organization.[2]  (*See id.*)

**I.    Motion to Suppress Evidence Obtained From Interception of Wire Communications and Seizure of Electronic Communications**

Jones first moves to suppress evidence obtained from the interception of wire communications (telephone conversations) to or from his cellular telephone and the seizure of electronic communications (text messages) to or from both his cellular telephone and the cellular telephone of an alleged co-conspirator Lawrence Maynard.  (*See* Defendant's Motion to Suppress Evidence Obtained From Interception of Wire Communications and Seizure of Electronic Communications ["Def.'s Mot. to Suppress Evid."].)  The text messages were held in storage by two electronic communication service providers at the time of their acquisition by the government.  In support of his motion, Jones argues that (1) the affidavits submitted by FBI Special Agent Stephanie Yanta in support of the text message search warrants and the wire intercept violated both the probable cause and necessity requirements of Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (the "Wiretap Act"), 18 U.S.C. § 2510 *et seq.*; (2) Special Agent Yanta intentionally misled the authorizing court and demonstrated a reckless disregard for the truth in setting forth the factual allegations in her supporting affidavits; and (3) the government impermissibly failed to minimize the intercepted wire communications.  In connection with his claim that the affidavits contained deliberate, material misstatements, Jones

---

[2] On June 5, 2006, the government filed a 21-page itemization of evidence, divided into nine categories, that it intends to rely on at trial.

also seeks a hearing under *Franks v. Delaware*, 438 U.S. 154 (1977).[3]  For the reasons explained

herein, all of Jones' arguments are without merit.

      A.      The Text Message Affidavits

      On August 10, 2005, and again on August 18, 2005, Magistrate Judge Alan Kay issued

search warrants to two electronic communication service providers for stored text messages that

had been transmitted over cellular telephones used by Jones and Maynard.  In support of the

search warrants, the government submitted affidavits sworn to by Special Agent Yanta (the

"August 10th Affidavit" and the "August 18th Affidavit").  In response to the search warrants,

the companies provided a significant number of text messages to the government, which, in turn,

referenced several of the messages in the affidavit in support of the first wiretap.  (*See* Gov't's

Omnibus Opp'n at 7.)

      1.      <u>Governing Law</u>

      Jones' argument that the affidavits submitted in support of the text message search

warrants violated certain requirements of the Wiretap Act fails as a matter of law because the

Wiretap Act does not apply to the government's acquisition of text messages held in storage at

electronic communication service providers.  First, as amended by Title I of the Electronic

Communications Privacy Act of 1986, Pub. L. No. 99-508, Title I, 100 Stat. 1848 (Oct. 21,

1986), the Wiretap Act applies only to the "interception" of wire, oral or electronic

communications.  An  "intercept" is defined in the Wiretap Act as "the aural or other acquisition

of the contents of any wire, electronic, or oral communication *though the use of any electronic,*

---

[3] Jones also requests a *Franks* hearing in connection with his motions to suppress tangible evidence obtained from his Jeep Cherokee, evidence obtained from a mobile tracking device, and evidence seized at the Levels nightclub.  These claims are addressed herein *infra*.

*mechanical or other device.*" *Id.* § 2510(4) (emphasis added).  The text messages here were supplied to the government by electronic communication providers in response to search warrants issued to companies.  The messages, therefore, were not acquired by the government "through the use of any electronic, mechanical or other device."  As a result, the government's acquisition of the text messages did not involve an "intercept" within the meaning of the Wiretap Act.

Moreover, while Jones accurately asserts that text messages constitute "electronic communications" within the meaning of the Wiretap Act (*see* Def.'s Mot. to Suppress Evid. at 5), this assertion gets him nowhere.  Courts consistently have held that the Wiretap Act governs only the acquisition of the contents of electronic communications that occur contemporaneous with their transmission, and not -- as is the case here -- the subsequent acquisition of such communications while they are held in electronic storage by third parties.  *See*, *e.g.*, *United States v. Steiger*, 318 F.3d 1039, 1048-49 (11th Cir. 2003) (holding that "a contemporaneous interception – *i.e.*, an acquisition during 'flight' – is required to implicate the Wiretap Act with respect to electronic communications"); *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868 (holding that "for [an electronic communication] to be 'intercepted' in violation of the Wiretap Act, it must be acquired during transmission, not while it is in electronic storage"); *Steve Jackson Games, Inc. v. U.S. Secret Serv.*, 36 F.3d 457, 462 (5th Cir. 1994) (analyzing statutory text and legislative history and concluding that "Congress did not intend for 'intercept' to apply to 'electronic communications' when those communications are in 'electronic storage'"); *see also* *See* Clifford S. Fishman & Anne T. McKenna, *Wiretapping and Eavesdropping* § 2:5 (West, 2d ed. 1995) ("An interception [of an electronic communication] occurs . . . only if the contents are

acquired as the communication takes place, not if they are acquired while the communications

are in storage.").

Instead, the relevant statutory provision governing searches and seizures of stored

electronic communications, such as the text messages at issue here, appears in Title II of the

Electronic Communications Privacy Act of 1986 (the "Stored Communications Act"), 18 U.S.C.

§ 2701 *et seq.  See* Fishman & McKenna, *supra*, § 26:1 (the Stored Communications Act "spells

out the circumstances in which the government may obtain access" to the contents of stored wire

or electronic communications.)   In pertinent part, it provides that:

> A governmental entity may require the disclosure by a provider of
> electronic communication service of the contents of a wire or
> electronic communication, that is in electronic storage in an
> electronic communications system for one hundred and eighty days
> or less, only pursuant to a warrant issued using the procedures
> described in the Federal Rules of Criminal Procedure by a court
> with jurisdiction over the offense under investigation . . . .

*Id.* § 2703(a).[4]  And as courts have recognized, the procedures the government must follow to

access the contents of stored electronic communications "are considerably less burdensome and

less restrictive than those required to obtain a wiretap order under the Wiretap Act."  *Konop*, 302

F.3d at 879.  For example, unlike the Wiretap Act, the Stored Communications Act contains no

express requirement that the government demonstrate necessity.  In light of the substantial

---

[4] As used in the Stored Communications Act, which expressly adopts the definitions
provided in § 2510 of the Wiretap Act, 18 U.S.C. 2711(1), the term "electronic storage" means
"any temporary, intermediate storage of a wire or electronic communication incidental to the
electronic transmission thereof" and "any storage of such communication by an electronic
communication service for purposes of backup protection of such communication."  *Id.*
§ 2510(17).  "Electronic communication service," in turn, is defined as "any service which
provides to users thereof the ability to send or receive wire or electronic communications."  *Id.*
§ 2510(15).

differences between the statutory procedures and requirements between the Wiretap Act and the

Stored Communications Act, courts consistently have concluded that "Congress could not have

intended" to require the government "to comply with the more burdensome, more restrictive

procedures of the Wiretap Act to do exactly what Congress apparently authorized it to do under

the less burdensome procedures of the [Stored Communications Act]." *Konop*, 302 at 879; *see

also Steve Jackson Games, Inc.*, 36 F.3d at 463 ("to satisfy the more stringent requirements for an

intercept in order to gain access to the contents of stored electronic communications").

2.    Probable Cause

Jones' argument that the text message affidavits lacked probable cause also misses the

mark.  The task of an issuing magistrate, when assessing probable cause for search warrants

> is simply to make a practical, commonsense decision whether,
> given all the circumstances set forth in the affidavit before him,
> including the "veracity" and "basis of knowledge" of persons
> supplying hearsay information, there is a fair probability that
> contraband or evidence of a crime will be found in a particular
> place.

*Illinois v. Gates*, 462 U.S. 213, 238 (1983).  And the duty of a reviewing court, in turn, "is simply

to ensure that the [issuing court] had a 'substantial basis for . . . conclud[ing]' that probable cause

existed."  *Id.* at 238-39 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). The issuing

court's determination that probable cause exists "should be paid great deference by reviewing

courts."  *Gates*, 462 U.S. at 236 (internal quotation marks omitted).  Moreover, in reviewing a

warrant application, courts must treat the affidavit "in a commonsense and realistic fashion.

They are normally drafted by nonlawyers in the midst and haste of a criminal investigation.

Technical requirements of elaborate specificity once exacted under common law pleading have

no proper place in this area." *United States v. Ventresca*, 380 U.S. 102, 108 (1965).

Applying these standards, the Court easily concludes that the information contained in Special Agent Yanta's supporting affidavits was sufficient to establish probable cause for the text message warrants. The 29-page August 10th Affidavit, which served as the foundation upon which subsequent affidavits submitted in support of wiretap and search warrant applications were based, references information provided by three confidential sources who had first-hand knowledge of Jones' illicit activity.[5] For example, the affidavit states that Confidential Source Number One ("CS-1") reported having made multi-kilogram purchases of cocaine directly from Jones in the recent past, including at Jones' Levels nightclub. (Def.'s Mot. to Suppress Evid. Ex. 1 at 9, 13.) CS-1 also provided specific pricing, packaging, distribution, and operating information, and detailed vehicles, individuals, and locations that Jones used for transporting and distributing the narcotics. (*Id*. at 12-14.) CS-2 also described having purchased kilogram quantities of cocaine from Jones (*id.* at 14), and independently confirmed details provided to investigators by CS-1 concerning pricing, packaging, vehicles used to transport the drugs, and procedures used to distribute drugs. (*Id.* at 13-16.) The August 10th Affidavit further indicates that CS-3 was in communication with, and made privy to the activities of, a suspected cocaine customer of Jones. (*Id.* at 17.)

In addition to the testimony of each of the confidential informants, the August 10th

---

[5] The affidavit establishes the informants' credibility for providing accurate information. (Def.'s Mot. to Suppress Evid. Ex. 1 at 9, 14, 17.) *See United States v. Bruner*, 657 F.2d 1278, 1297 (D.C. Cir. 1981) (issuing court may rely on recital that informant previously provided reliable information without requiring further factual elaboration). Furthermore, none of the three informants had any business or personal relationships with each other and likely did not even know of each other. (*See* Def.'s Mot. to Suppress Evid. Ex. 1 at 14, 17.)

Affidavit also describes at length the results of surveillance, searches, debriefings, review of electronic data, and other investigative techniques. For instance, the affidavit states that alleged co-conspirator Maynard, the manager of the Levels nightclub, was stopped for speeding in North Carolina, while driving a minivan registered to Jones. (Def.'s Mot. to Suppress Evid. Ex. 1 at 11, 18-20.) After an interdiction canine alerted on the right rear area of the minivan, officers searched the vehicle and recovered from a hidden compartment $67,115.00 in U.S. currency, bundled together and contained in plastic bags. (*Id.* at 19.) The affidavit further provides the basis for investigators' belief that Jones and Maynard were using text messaging in an attempt to conceal their alleged narcotics trafficking activities. First, analysis of pen register data indicated that several weeks prior to August 10, 2005, the target cellular telephones showed an increase in text messaging from 50% of all activations to 90%. (*Id.* at 26-27.) And second, the technology to capture the contents of text messages had "only become available to law enforcement within recent weeks." (*Id.* at 27.)

In summary, the Court finds that the affidavit clearly establishes probable cause to believe that Jones operated a conspiracy to distribute narcotics, and that Jones and Maynard were using text messages on their phones to further that conspiracy. Because the August 18th Affidavit contained all of the foregoing information,[6] the Court likewise finds that it is sufficient.

---

[6] In addition to the information provided in the August 10th Affidavit, the August 18th Affidavit also states that some of the 180 text messages, submitted to investigators pursuant to the August 10th search warrant issued by Magistrate Judge Kay, were suspicious. (Def.'s Mot. to Suppress Evid. Ex. 2 at 28.) According to the August 18th Affidavit, in light of the context provided by the confidential informants and the increased activity observed by surveillance at the Levels nightclub, investigators believed that certain of the text messages referred to narcotics activity. (*See id.*). Because the Court concludes that other information contained in the affidavit is sufficient to establish probable cause to believe that Jones operated a conspiracy to distribute narcotics, and that Jones and Maynard were using text messages on their phones to further that

3.     Request for a *Franks* Hearing

Although there is a "presumption of validity" with respect to affidavits in support of search warrants, *Franks*, 438 U.S. at 171, a court is required to hold an evidentiary hearing "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." *Id.* at 155-56; *see also United States v. Dale*, 991 F.2d 819, 843 (D.C. Cir. 1993); *United States v. Sobamowo*, 892 F.2d 90, 94 (D.C. Cir. 1989); *United States v. Richardson*, 861 F.2d 291, 293-94 (D.C. Cir. 1988). The rule set forth in *Franks*, however, "has a limited scope, both in regard to when exclusion of the seized evidence is mandated, and when a hearing on allegations of misstatements must be accorded." *Id.* at 167. As the D.C. Circuit has instructed, "a defendant is entitled to an evidentiary hearing *only* if his attack on the accuracy of the affidavit is 'more than conclusory' and is accompanied by 'allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.'" *United States v. Gaston*, 357 F.3d 77, 80 (D.C. Cir. 2004) (quoting *Franks*, 438 U.S. at 171) (emphasis added). Furthermore, even if the defendant makes the requisite preliminary showing, a hearing is not required unless the alleged misstatement was material to the finding of probable cause. *See Richardson*, 861 F.2d at 294.

In requesting a *Franks* hearing in connection with the August 10th and the August 18th Affidavits, Jones argues that Special Agent Yanta "omitted certain unhelpful facts while touting

conspiracy, the Court need not address the reasonableness of the investigators' belief regarding the text messages.

other facts for the sole purpose misleading" the issuing court.  (Def.'s Mot. to Suppress Evid. at

3.)  More specifically, he contends that Special Agent Yanta omitted pertinent details concerning

(1) the context of the Levels nightclub; (2) the legitimate relationships between Jones and his

associates; (3) phone activation figures; and (4) the context of several text messages.  (*Id.* at 8-

15.)  Jones arguments are both factually incorrect and legally without merit.

      First, his contentions that Special Agent Yanta omitted details regarding the context of his

"legitimate" business activities and associations are false.  To the contrary, based on information

provided by confidential sources and obtained through surveillance, the affidavits set forth the

fact that Jones was using his "legitimate" nightclub business for the purposes of conducting drug

tracfficking activities and laundering proceeds, and that Jones employed Maynard both as his

nightclub manager and as an assistant in his narcotics business.  (*See*, *e.g.*, Def.'s Mot. to

Suppress Evid. Ex. 1 at 7.)  Moreover, this latter disclosure regarding Maynard's dual roles belies

Jones' assertion that the affidavit omitted information tending to indicate that the number of

activations between Maynard's and Jones' cellular telephones is related to their operation of a

nightclub and not the facilitation of narcotics trafficking.

      Furthermore, even if Jones could prove that the affidavits contain material false

statements, which he cannot, he has offered no proof that Special Agent Yanta made such

misstatements or omissions with the requisite scienter -- namely, that she intentionally tried to

deceive the issuing court or manifested a reckless disregard for the truth.  And perhaps most

significantly, the alleged omissions were immaterial to the magistrate judge's probable cause

determination.  That is to say, even without the contested portions (or rather, even with the

additional details that Jones argues should have been included), the affidavit more than

establishes probable cause.[7]  The fact that legitimate nightclub activities may have taken place at

Levels; that Jones may have had personal or legitimate business relationships with some or all of

his associates referenced in the affidavit; or that the contested text messages were sexual in

nature rather than indicative of illegal activity simply does not undermine the wealth of facts in

the affidavit establishing probable cause to believe that Jones was operating a large-scale cocaine

business.

Accordingly, because Jones has offered little more than conclusory assertions, some of

which are factually incorrect, that Special Agent Yanta omitted information that is material to a

court's probable cause determination, he is *not* entitled to a *Franks* hearing.[8]

B.    The Wire Tap Affidavits

On September 2, 2005, the government applied, pursuant to 18 U.S.C. § 2518, for an

Order from the Honorable Paul L. Friedman, authorizing the interception of communications

occurring to and from the cellular telephone used by Jones.  In support of the application, the

government again submitted an affidavit sworn to by Special Agent Yanta (the "September 2nd

Affidavit").  That same day, Judge Friedman issued an Order authorizing electronic surveillance

_____

[7] In this regard, with respect to Jones' assertion that Special Agent Yanta, in her August 18th Affidavit, misleadingly referenced portions of text messages out of context, the Court already has concluded that the referenced text messages are immaterial to a finding of probable cause.  *See supra* note 8.

[8] Having concluded that the affidavits in support of the text message search warrants satisfied the standard for probable cause and that a *Franks* hearing is not warranted, the Court need not address the government's arguments that (1) the Stored Communications Act does not create a statutory suppression remedy (Gov't's Omnibus Mot. at 10); (2) the Wiretap Act, while providing such a remedy for improperly intercepted oral and wire communications, does not provide such a remedy for electronic communications (*id.* at 9 n.3); and (3) regardless, Jones has no protected Fourth Amendment interest in text messages in the hands of third parties.  (*Id.* at 10-11.)

-12-

for a period of thirty days, and on September 30, 2005, at the government's request, supported by

yet another affidavit by Special Agent Yanta (the "September 30th Affidavit"), Judge Friedman

authorized an extension of the interception period for an additional thirty days.  On October 24,

2005, the government terminated the intercept.

As noted, Jones claims that the affidavits submitted in support of the government's

wiretap application violated both the probable cause and necessity requirements of the Wiretap

Act; that the affidavits contained deliberate, material misstatements; and that the government

impermissibly failed to minimize the intercepted wire communications.[9]

1.      The Wiretap Act

Jones certainly is correct that the government's interception of his telephone calls is

governed by the Wiretap Act.  It requires that an application for the interception of certain oral,

wire or electronic communications shall be in writing, under oath, and shall contain certain

information including "a full and complete statement of the facts and circumstances relied upon

by the applicant[ ] to justify his belief that an order should be issued."  *Id.* § 2518(1).  On the

basis of the facts submitted by the applicant, a district court may authorize a wiretap upon finding

that (1) probable cause exists to believe that an individual has committed or is about to commit

one of certain enumerated offenses; (2) probable cause exists to believe that "particular

communications concerning that offense will be obtained" through an interception; (3) "normal

investigative procedures have been tried and have failed or reasonably appear to be unlikely to

succeed if tried"; and (4) probable cause exists to believe that the communication facility sought

---

[9] Although Jones purportedly challenges both affidavits submitted in support of the
government's wiretap application, he only addresses the September 2nd Affidavit in his
argument.

to be wiretapped "[is] being used, or [is] about to be used, in connection with the commission of [the] offense." *Id.* § 2518(3)(a)-(d); *see also United States v. Donovan*, 429 U.S. 413, 435 (1977). The determination that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous," 18 U.S.C. § 2518(3)(c), is referred to as the "necessity requirement," which is the "keystone of congressional regulation of electronic eavesdropping." *United States v. Williams,* 580 F.2d 578, 587-88 (D.C. Cir.1978).

The statute also requires that "[e]very [wiretap] order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable [and] shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception . . . ." 18 U.S.C. § 2518(5). This is referred to as the "minimization requirement." Although "[t]he statute does not forbid the interception of all nonrelevant conversations," the government must make reasonable efforts to "minimize" the interception of such conversations. *Scott v. United States,* 436 U.S. 128, 139-40 (1978). The statute also provides that an order authorizing an interception cannot extend "for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than thirty days." 18 U.S.C. § 2518(5). Furthermore, the statute provides that "no part of the contents of [intercepted] communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding . . . if the disclosure of that information would be in violation of this chapter." *Id.* § 2515. Any "aggrieved person" may move to suppress the introduction of wiretap evidence or its fruits if "the communication was unlawfully intercepted," the "order of authorization or approval under which it was intercepted is insufficient on its face,"

or if "the interception was not made in conformity with the order of authorization or approval."

*Id.* § 2518(10)(a)(i)-(iii); *see also Donovan*, 429 U.S. at 433-34.

### 2. Probable Cause

Having found that the August 10th Affidavit submitted in support of the first text message search warrant establishes probable cause to believe that Jones operated a conspiracy to distribute narcotics, it follows that the September 2nd Affidavit is sufficient because, as even Jones concedes, the September 2nd Affidavit relies in significant part on the information contained in the August 10th Affidavit. (*See* Def.'s Mot. to Suppress Evid. at 11-15.) Furthermore, the September 2nd Affidavit also states that surveillance of Jones and the Levels nightclub revealed that a number of the individuals whom the confidential informants linked to narcotics activity were in frequent contact with Jones. (Def.'s Mot. to Suppress Evid. Ex. 3 ¶¶ 75, 79, 80.) Pen register data included in the affidavit, in turn, verified that the target cellular telephone was in contact with phones used by these individuals as well as a number of other persons with drug convictions or histories of drug activity. (*Id.* ¶¶ 84-91.) The Court accordingly finds that the affidavit satisfies the applicable probable cause requirements.

### 3. Necessity

Jones contends that the government violated the Wiretap Act's necessity requirement because it failed to conduct all other methods of investigation before resorting to wire intercepts. Specifically, he alleges that, based upon the information contained in Special Agent Yanta's affidavits, the government never attempted (1) to perform surveillance at the Levels nightclub, (2) to perform surveillance at Jones' home or at the homes or employment sites of his alleged co-conspirators, or (3) to make undercover drug purchases. (*See* Def.'s Mot. to Suppress Evid. at

-15-

11, 15, 21-24.)

Congress created the necessity requirement to ensure that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn,* 415 U.S. 143, 153 n.12 (1974). Thus, a court should "give close scrutiny" to a contested wiretap application and "reject generalized and conclusory statements that other investigative procedures would prove unsuccessful." *Williams*, 580 F.2d at 588. Because, however, the "statutory command was not designed to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, the government will meet its burden of demonstrating necessity if it shows that other techniques are impractical under the circumstances and that it would be unreasonable to require pursuit of those avenues of investigation." *United States v. Carter*, 449 F.3d 1287, 1293 (D.C. Cir. 2006) (internal quotation marks and citation omitted). Moreover, while this requirement compels the government to demonstrate that it has made a good faith effort to utilize a range of conventional law enforcement techniques before it resorts to the more intrusive means of electronic eavesdropping, the statute does not require the literal exhaustion of all other possible investigative approaches. *See United States v. Lopez*, 300 F.3d 46, 52-53 (1st Cir. 2002) ([T]he necessity requirement is not tantamount to an exhaustion requirement."); *United States v. Thompson*, 210 F.3d 855, 858-59 (8th Cir. 2000). Instead, in a case involving a wide-ranging conspiracy, the government must simply provide an adequate basis for the court to make a practical, common-sense determination that other methods would likely prove inadequate to reveal the operation's "full nature and scope." *United States v. Brown*, 823 F.2d 591, 598 (D.C. Cir. 1987); *see also United States v. Nelson-Rodriguez*, 319 F.3d 12, 33 (2003). This

-16-

determination is reviewed only for abuse of discretion.  *See United States v. Sobamowo*, 892 F.2d

90, 93 (D.C. Cir. 1989).

In this case, the September 2nd Affidavit amply satisfies the necessity requirement.[10]  The

affidavit details the normal investigative procedures that already had been tried, including the use

of physical and video surveillance, confidential informants, pen registers, interviews, public

records, and search warrants, and noted that while these techniques had been probative "in

proving that an ongoing illegal narcotics business is operating," they had not "yielded sufficient

evidence or ascertained the identities of, and proven beyond a reasonable doubt, the guilt of all

those participants in this illegal conspiracy."  (Def.'s Mot. to Suppress Evid. Ex. 3 ¶ 93.)  Further

information is then provided as to the specific failings of each of these and other approaches and

the role that wiretap evidence would likely provide in filling these gaps.[11]  "Having engaged in an

---

[10] Nor has Jones demonstrated that there are any material misstatements or omissions in the September 2nd Affidavit.

[11] For example, physical surveillance had yielded little valuable information to further the investigation, other than confirming that some of the identified members of the alleged conspiracy associated with one another.  Efforts to observe the members of the alleged conspiracy had been frustrated by the FBI's limited ability to obtain advanced information concerning planned activities.  (Def.'s Mot. to Suppress Evid. Ex. 3 ¶ 93(a).)  Undercover operations also had their limitations; Jones was believed to deal only with known associates, and the FBI knew of no known source who was in a position to purchase narcotics from Jones or to introduce an undercover officer for that purpose.  These circumstances limited the ability of investigators to amass sufficient evidence as to the manner in which Jones allegedly redistributed large quantities of narcotics in the Washington, D.C. area, the identities of all other members of the alleged conspiracy, or the manner in which Jones and others disposed of the proceeds of the operation.  (*Id.* ¶ 93(b).)  The confidential sources who has provided much of the probable cause for the affidavit had information that was principally "historical in nature," and although a number of individuals who were believed to be customers of Jones had been arrested, none was willing to cooperate with the government.  (*Id.* ¶ 93(d).)  Similar representations have led courts to find the use of wiretaps necessary under § 2518(1)(c).  *See, e.g.*, *United States v. Williams*, 124 F.3d 411, 418 (3d Cir. 1997) (necessity requirement satisfied where use of informants was thought too dangerous and conspirators regularly used evasive techniques to avoid other kinds of

adequate range of investigative endeavors, the government properly sought wiretap permission

and was not required to enumerate every technique or opportunity missed or overlooked."

*Sobamowo*, 892 F.2d at 93.

Indeed, the September 2nd Affidavit indicates that the government sought the wiretap in

order to uncover the full extent of the alleged conspiracy, including how Jones laundered the

proceeds of his criminal enterprise.  From the government's perspective, wiretaps represented

"the only reasonable method of developing evidence of the full scope of the suspected violations

being committed by the target subjects and others as yet unknown or not yet fully identified"

(Def.'s Mot. to Suppress Evid. Ex. 3 ¶ 95.)  The use of wiretaps for such purposes in comparable

investigations has been repeatedly upheld.  *See, e.g.*, *Lopez*, 300 F.3d at 53-54 (identities of some

conspirators); *United States v. Diaz*, 176 F.3d 52, 111 (2d Cir. 1999) (sources of drug supply and

location of drug proceeds); *United States v. Cooper*, 868 F.2d 1505, 1510 (6th Cir. 1989)

(customers and agents of drug ring).  Thus, even where the government has other evidence

linking a defendant to a crime, § 2518 does not prevent it from obtaining wiretaps in order to

"ascertain the extent and structure of the conspiracy."  *United States v. Plescia*, 48 F.3d 1452,

1463 (7th Cir. 1995); *see also United States v. McGuire*, 307 F.3d 1192, 1198-99 (9th Cir. 2002)

("The government's possession of evidence sufficient to indict some conspirators does not bar it

from seeking evidence against others. . . . [T]here was a powerful government interest in

---

law enforcement infiltration); *United States v. Carrazana*, 921 F.2d 1557, 1564-65 (11th Cir.
1991) (necessity existed where drug ring used counter-surveillance to frustrate investigation);
*United States v. Macklin*, 902 F.2d 1320, 1327 (8th Cir. 1990) (necessity found where affidavit
disclosed that normal methods, including physical surveillance, pen registers, and confidential
information had been tried and failed to "disclose the scope of the conspiracy and all the persons
involved," and other tactics, including grand jury investigation and undercover operations had
been rejected as too dangerous).

identifying all conspirators and the full scope of the conspiracy."). The necessity requirement is not meant to work as an impediment to making a good case better, or a strong case airtight.

Moreover, as detailed above, the government's affidavits regarding the necessity for wiretaps were not based merely on conclusory statements about the difficulties of investigating large-scale narcotics distribution conspiracies in general, but instead provided specific information about the *Jones operation* that limited the effectiveness of conventional investigative methods, and made the request for wiretaps not merely useful but indispensable. *See United States v. Johnson*, 696 F.2d 115, 123-24 (D.C. Cir. 1982) (rejecting defendant's challenge to wiretap orders where the government's supporting affidavit "revealed that the wiretap was sought only after more than six months of extensive investigation, discussed a number of techniques that had been tried or considered, and amply demonstrated the need for electronic surveillance *in this particular investigation*"). Therefore, in light of the considerable documentation presented by the government concerning the progress of its investigation and the difficulties of gathering the evidence needed to present a complete picture of the extensive criminal activity that was being uncovered, the Court concludes that Judge Friedman did not abuse his discretion in initially authorizing the wiretap on September 2, 2005, and in authorizing an extension of the wiretap on September 30, 2005.

4.    Minimization

While Jones also challenges the degree to which intercepted conversations were appropriately minimized (Def.'s Mot. to Suppress Evid. at 25-26), he points to no specific conversations that he claims should have been minimized. Instead, he baldly asserts that the government should have minimized all conversations between the targets "pertaining to their

joint business ventures as well as social or other matters unrelated to a drug distribution

conspiracy." (*Id.* at 25.)  Allegations of this type are insufficient, as recently affirmed by the

D.C. Circuit in *Carter*.  The defendant in *Carter* challenged a wire intercept by presenting

evidence that only 27% of the non-pertinent calls in the intercept had been minimized.  He also

alleged that non-pertinent calls had been monitored, particularly conversations concerning golf,

but pointed to no specific conversations.  On that record the district court rejected the contention

without any evidentiary hearing.  The D.C. Circuit agreed because:

> What the wiretapping statute forbids is failure by the government to
> make reasonable efforts to minimize interceptions of non-pertinent
> communications; consequently, a defendant must identify particular
> conversations so that the government can explain their non-
> minimization.  Having failed to identify 'specific conversations that
> should not have been intercepted, or even . . . a pattern of such
> conversations,' . . . *the issue of reasonable minimization was simply
> not in play*."

*Carter*, 449 F. 3d at 1295 (internal citation omitted) (emphasis added).  Here too, because Jones

has failed to identify even a single conversation that should have been minimized, he has not

properly raised the issue of reasonable minimization.

## II.     Motion to Adopt and Conform to Co-defendant's Motions

Because the deadline for filing has expired and none of Jones' co-defendants has filed a

substantive motion, this motion by Jones is denied as moot.

## III.    Motion for a Preliminary Determination of Conspiracy and Pretrial Ruling on the Admissibility of Co-conspirators' Statements

Jones also has moved for a pretrial hearing on the admissibility of co-conspirator

statements.  The admission of co-conspirator statements is governed by Fed. R. Evid.

801(d)(2)(E), which requires proof of the following: (1) a conspiracy, (2) between the declarant

and the co-defendant, and (3) statements made in furtherance of the conspiracy. Here, the government persuasively argues that no pretrial hearing is necessary and that the Court instead should admit the statements during trial subject to the contingent relevancy rule of Fed. R. Evid. 104(b).

It is accepted in this jurisdiction that district courts have discretion to admit co-conspirator statements conditionally, "subject to connection" at the close of the government's case to the three requirements of Rule 801(d)(2)(E) (co-conspirators making statements in furtherance of the conspiracy). *See United States v. Jackson*, 627 F.2d 1198, 1218 (D.C. Cir. 1980) (holding that a district court has "no obligation" to conduct a "mini-trial" before trial to determine the existence of the conspiracy and noting that a district court is "vested with considerable discretion to admit particular items of evidence 'subject to connection'"); *United States v. Gantt*, 617 F.2d 831, 845 (D.C. Cir. 1980) ("As a practical matter, to avoid what otherwise would become a separate trial on the issue of admissibility, the court may admit declarations of co-conspirators 'subject to connection.'").[12]

Here, given that the indictment includes a total of 94 overt acts in furtherance of the alleged narcotics conspiracy and considering the large number of witnesses expected to testify, the Court finds that such a preliminary hearing would be immensely time-consuming and would unnecessarily delay the trial. Therefore, in accordance with the governing practice in this

---

[12] This approach has been used in recent cases similar in scope and nature to this one. *See, e.g.*, *United States v. Edelin*, 128 F. Supp. 2d 23, 45-46 (D.D.C. 2001) (finding it unnecessary to conduct an advance determination of conspiracy, which would amount to a time-consuming "mini-trail prior to trial in this case" and place an unreasonable burden on the government); *United States v. Cooper*, 91 F. Supp. 2d 60, 78 (D.D.C. 2000) (noting, in a RICO conspiracy case, that it is common practice in the D.C. Circuit to admit declarations of co-conspirators subject to connection).

jurisdiction, the Court denies defendant's motion and will allow the admission of co-conspirator statements at trial subject to proof of connection. Of course, if the requisite connection is not demonstrated at trial, the Court will strike the testimony and provide a cautionary instruction to the jury.

**IV.    Motion For an Order Directing the Government to Specify All Evidence Which May Be Subject to Suppression**

Because the Court already has ordered the government to specify all the evidence it intends to introduce at trial, and the government has complied,[13] this motion is denied as moot.

**V.    Motion For Discovery of Co-Defendant And Co-Conspirator Statements**

Jones seeks an order directing the government to provide discovery of "any statements made by co-defendants or alleged co-conspirators that the government intends to offer against him pursuant to Fed. R. Crim. P. 801(d)(2)(E)." (Def.s' Omnibus Mot. at 13.) To the extent that such statements are those of testifying witnesses, they are covered by the Jencks Act and must be produced by the government in accordance therewith. To the extent that Jones seeks discovery of statements made by co-defendants or co-conspirators whom the government does not intend to call at trial, his motion must be denied. The D.C. Circuit has ruled on this precise question, finding itself "without authority to order such discovery" because "[n]othing in the Federal Rules of Evidence or in the Jencks Act requires such disclosure." *United States v. Tarantino*, 846 F.2d 1384, 1418 (D.C. Cir. 1988). The court, therefore "decline[d] to extend the defendant's right to

---

[13] The government has acknowledged that the 21-page itemization of evidence that it intends to rely on at trial, filed on June 5, 2006, is overinclusive. Accordingly, the government has represented that, "[a]s the case pares down," it will alert counsel for the defendants to those items of evidence that it no longer anticipates relying on at trial. (Gov't Omnibus Opp'n at 42.) It is noted that by Order dated June 27, 2006, the government must file a list of all exhibits it intends to use at trial.

discovery beyond that required by statute or the Constitution." *Id.* This approach concords with the majority of other circuits. *See, e.g., United States v. Orr*, 825 F.2d 1537 (11th Cir. 1987); *United States v. Roberts*, 811 F.2d 257 (4th Cir. 1987) (*en banc*); *United States v. Percevault*, 490 F.2d 126 (2d Cir. 1974.) Thus, to the extent that co-defendant or co-conspirator statements are not otherwise discoverable, defendant's motion is denied.

**VI.    Motion to Suppress Tangible Evidence Seized From Jones' Waldorf, Maryland Home[14]**

On October 22, 2005, law enforcement agents obtained a search warrant for several locations, including Jones' home at 10870 Moore Street in Waldorf, Maryland. The warrant application was supported by a 47-page affidavit sworn to by Special Agent Yanta. (Def.'s Omnibus Mot., Ex. 2.) During the course of the search of the Moore Street residence on October 24, 2005, agents located a Jeep Cherokee parked inside the garage attached to the house. Jones was provided with and signed a consent form authorizing the agents to search the vehicle. (*Id.*, Ex. 3.)

Jones asserts three claims in support of his motion to suppress the evidence seized from the Moore Street address. First, he argues that the search warrant for the home was invalid because it was tainted by evidence obtained through illegal wiretapping and because it was based on false affidavit. (*Id.* at 14.) As already decided, there was no violation of law in connection with the government's interception of telephone conversations from Jones' cellular telephone. Nor was Special Agent Yanta's affidavit faulty, for it exhaustively details why investigators

---

[14] Though Jones styled this motion as one to "Suppress Tangible Evidence Obtained From Jeep Cherokee" in his Omnibus Motion, he actually seeks suppression of "all evidence obtained as a result of the search of 10870 Moore Street, Waldorf, Maryland." (Def.'s Omnibus Mot. at 16.)

believed they had uncovered a massive international cocaine smuggling and distribution

conspiracy with Antoine Jones as the conspiracy's ringleader in the Washington, D.C. area.  The

affidavit supplies the agent's basis of knowledge for the information contained therein, which

includes confidential source information, police surveillance, and interceptions of wireless

communications between Jones and his alleged co-conspirators.  (Def.'s Omnibus Mot. Ex. 2.)

Specifically with respect to the Moore Street location, the affidavit notes that "a Jeep Cherokee

(registered in the name of Deniece Jones)" had "been observed parked at the Moore Street

Address)," and that "[s]urveillance frequently showed Antoine Jones driving the Jeep."  (*Id*. at

34-35.)

    The Court therefore concludes that the affidavit clearly establishes probable cause to

search Jones' Moore Street residence, and moreover, for the reasons previously explained, Jones

is not entitled *Franks* hearing to determine the validity of the warrant because he has alleged no

facts to support his claim that the affidavit contained "intentional misstatements and a reckless

disregard for the truth."  (*Id*. at 14.)

    Jones next argues that the investigating officers violated Fed. R. Crim. P. 41(f) by failing

to "present either Jones, his wife or son a copy of the warrant with attachment to inform them of

the scope of the warrant, nor did they leave a copy on the premises."  (Def.'s Omnibus Mot. at

16.)  Under Rule 41(f), the "officer executing the warrant must . . . give a copy of the warrant and

a receipt for the property taken to the person from whom, or from whose premises, the property

was taken, or . . . leave a copy of the warrant and receipt at the place where the officer took the

property."  Fed. R. Crim. P. 41(f)(3).  In support, Jones cites *United States v. Gantt*, 194 F.3d 987

(9th Cir. 1999), for the proposition that all evidence seized during a search conducted in violation

-24-

of Rule 41(f) should be suppressed. The D.C. Circuit has not resolved the question of whether a

violation of Rule 41 merits the suppression of the disputed evidence. *See United States v. Weaks*,

388 F.3d 913, 915 (D.C. Cir. 2004) (referring to question as "undecided"). The Ninth Circuit in

*Gantt* held, however, that "[v]iolations of [Rule 41(f)] do not usually demand suppression." 194

F.3d at 1005. Rather, "only if there was a deliberate disregard of the rule or if the defendant was

prejudiced," is suppression necessary. *Id*. (internal quotation marks omitted). Jones' claim is

belied, however, by the unrebutted fact that the returned copy of the warrant notes that a "copy of

warrant and receipt for items" was left with Deniece Jones, defendant's wife. (Def.'s Omnibus

Mot. Ex. 2 at 53.) Deniece Jones' signature is affixed to each page of a five-page receipt for

goods taken during the search. (*Id*. at 54-58.) Therefore, at the very least, Jones was provided

with a copy of the warrant and a receipt at the conclusion of the search.[15]

Third, Jones asserts that the search of the Jeep Cherokee parked in the attached garage at

the Moore Street residence was illegal because he signed the consent form authorizing the search

---

[15] Neither the government nor defendants allege or present any evidence to demonstrate whether the warrant was served at the outset of the search. As the Supreme Court has noted, "neither the Fourth Amendment nor Rule 41 of the Federal Rules of Criminal Procedure requires the executing officer to serve the warrant on the owner before commencing the search." *Groh v. Ramirez*, 540 U.S. 551, 563 n.5 (2004). The Court declined, however, to express an opinion on "[w]hether it would be unreasonable to refuse a request to furnish the warrant at the outset of the search when . . . an occupant of the premises is present and poses no threat to the officers' safe and effective performance of their mission." *Id*. Therefore, in the absence of any allegation that Jones requested that officers provide him a copy of the warrant at the outset of the search, the Court has no reason to suspect that the officers actions were "unreasonable" within the meaning of the Fourth Amendment or that there was any prejudice to defendant even if he did not receive the warrant until after the search was completed. "Prejudice in this context means the search would otherwise not have occurred or would have been less intrusive absent the error." *United States v. Negrete-Gonzales*, 966 F.2d 1277, 1283 (9th Cir. 1992). Here, the Court has already upheld the validity of the warrant. There is no likelihood that the scope of the search would have been altered by defendant's receipt of the warrant at the beginning of the search.

involuntarily.  Jones alleges that he "felt [he had] no choice but to sign the paper" because he was "guarded by several heavily armed agents after having been rudely awakened."  (Def.'s Omnibus Mot. at 15.)  Jones' argument fails, however, because the officers did not need to rely on his consent to search the Jeep; the search of the vehicle was authorized by the original search warrant.  Courts have consistently held that a search of "the premises" of a home includes vehicles located within its curtilage.  *See*, *e.g.*, *United States v. Duque*, 62 F.3d 1146, 1151 (9th Cir. 1995); *United States v. Singer*, 970 F.2d 1414, 1418 (5th Cir. 1992); *United States v. Gottschalk*, 915 F.2d 1459, 1461 (10th Cir. 1990); *United States v. Percival*, 756 F.2d 600, 612 (7th Cir. 1985).  Moreover, the affidavit in support of the warrant application specifically noted the Jeep Cherokee as having "been observed parked at the Moore Street Address," and that "[s]urveillance frequently showed Antoine Jones driving the Jeep."  (Def.'s Omnibus Mot. Ex. 2 at 34-35.)  Therefore, the warrant authorizing a search of the premises of 10870 Moore Street also authorized the search of the Jeep Cherokee parked in the garage attached to the house, rendering the consent form superfluous.[16]

## VII.    Motion to Suppress Evidence Obtained From Mobile Tracking Device

Jones also has moved to suppress the data obtained from an electronic tracking device -- a Global Positioning System ("GPS") -- which law enforcement agents placed on his Jeep Cherokee pursuant to an Order issued by the Honorable Paul L. Friedman on September 16,

---

[16] Nor does Jones' argument, based on *Coolidge v. New Hampshire*, 403 U.S. 443 (1971), that agents should not have been able to seize the car without having a warrant specific to the vehicle, have any validity.  *Coolidge* involved a warrantless search incident to arrest at the suspect's home.  *Id*. at 457.  This case, by contrast, involves a search of a residence pursuant to a valid warrant that, by law, authorized the search of vehicles within the curtilage of the home. *Coolidge* is therefore inapposite.

2005.  In support of the motion, Jones advances two arguments.  First, he contends that Special

Agent Yanta's affidavit in support of the application for GPS authorization lacked probable

cause to believe that his vehicle "was in any manner being used for criminal activity."  (Def.'s

Omnibus Mot. at 18.)  Second, Jones asserts that the government placed the GPS device on his

vehicle both after the Order authorizing its placement had expired and while the vehicle was

located outside of the issuing court's jurisdiction.  (*See* Defendant Jones' Supplemental Omnibus

Pre-Trial Motion at 3-6.)  In response, while conceding the "technical" violations of the

September 10, 2005 Order (Gov't's Omnibus Opp'n at 52 n.12), the government contends that

the placement of the GPS device was proper -- "even in the complete absence of a court order" --

because Jones lacked a reasonable expectation of privacy in the whereabouts of his vehicle.  (*Id.*

at 51.)

      The government is correct, but only to a point.  As a number of courts have held, the

government is not required to obtain a court order or search warrant to install a GPS or similar

tracking device on a vehicle.  *See United States v. McIver*, 186 F.3d 1119, 1127 (9th Cir. 1999)

(placement of tracking device is neither search nor seizure under the Fourth Amendment); *United

States v. Moran*, 349 F. Supp. 2d 425, 467 (N.D.N.Y. 2005) (no Fourth Amendment violation

through installation of GPS device without a warrant because "law enforcement personnel could

have conducted a visual surveillance of the vehicle as it traveled on the public highways").

These courts have relied upon the Supreme Court's statement in *United States v. Knotts*, 460

U.S. 276 (1983), a case involving a "beeper" device installed in a container that was secreted in a

vehicle, that:

      A person traveling in an automobile on public thoroughfares has no

> reasonable expectation of privacy in his movements from one place
> to another.  When [the suspect] traveled over the public streets he
> voluntarily conveyed to anyone who wanted to look the fact that he
> was traveling over particular roads in a particular direction, the fact
> of whatever stops he made, and the fact of his final destination
> when he exited from public roads onto private property.

*Id.* at 281-82.  The very next year, however, in *United States v. Karo*, 468 U.S. 705 (1984), a case

that also involved a "beeper" device secreted in a vehicle, the Court distinguished between

monitoring in public spaces versus private locations.  In doing so, it held that, while the data in

question that was obtained from the device while on the public roads was admissible,

information that was obtained from the tracker while it was inside the private residence was not,

because the residents had a justifiable interest in privacy in their home.  *Karo*, 468 U.S. at 715.

Accordingly, as the government here essentially concedes (Gov't's Omnibus Opp'n at 55 n.14),

the data obtained from the GPS device when the Jeep Cherokee was parked in the garage

adjoining the Moore Street property must be suppressed.  All other data obtained from the device

is admissible.

**VIII.  Motion to Suppress Tangible Evidence Seized From Green Honda Odyssey Minivan**

Jones also has moved to suppress the approximately $67,115 in cash discovered in a

secret compartment in his 1997 Honda Odyssey minivan during a traffic stop in Durham, North

Carolina.  (Def.'s Omnibus Mot. at 19.)  Though owned by Jones, the vehicle was being driven at

the time by his co-conspirator, Lawrence Maynard.  Maynard was accompanied by Derrick

Gordon.  (*Id.*)  When a Durham police officer stopped the vehicle for speeding, Maynard gave

him his license and a registration card indicating that the owner of the vehicle was Antoine

Jones.  (*Id.*)  The officer, having become suspicious after Maynard and Gordon gave conflicting

-28-

stories regarding the purpose of their trip when questioned separately, asked Maynard for permission to search the minivan.  Maynard consented to the search.  (*Id*.)

Jones claims that it was not reasonable for the officer to believe that Maynard had authority to consent to the search because the officer was on notice that he was not the owner of the vehicle.  (*Id*. at 19-20.)  That is simply not the case.  The officer acted reasonably in searching the vehicle based on Maynard's consent because Jones gave up any reasonable expectation of privacy he had in the contents of the vehicle when he entrusted complete control over it to Maynard.  *See United States v. Powell*, 929 F.2d 1190, 1196 (7th Cir. 1991) (owner of pickup truck lacked legitimate expectation of privacy where vehicle was driven by another more than 1,000 miles away); *see also United States v. Fuller*, 374 F.2d 617, 622 (8th Cir. 2004).  The Supreme Court has held that consent "obtained from a third party who possessed common authority over . . . the . . . effects sought to be inspected" is valid.  *United States v. Matlock*, 415 U.S. 164, 171 (1974).  "Common authority" is defined as "joint access or control for most purposes," such that the owner has "assumed the risk" that another might consent to a search of the shared item.  *Id*. at 171 n.7.   The D.C. Circuit has held that an owner's "Fourth Amendment rights were not violated when the police, with . . . justification . . . made a warrantless search of those portions of the car which the owner had delivered access and control to others."  *United States v. Free*, 437 F.2d 631, 635 (D.C. Cir. 1970).  There is no contention here that Jones' transfer of authority over the vehicle to Maynard was anything but complete and unequivocal.  Rather, the allegation is merely that the officer failed to act reasonably in acting on Maynard's consent.  (Def.'s Omnibus Mot. at 19.)  On the contrary, however, the Court finds that the officer did act reasonably because Jones ceded complete control to Maynard, thereby assuming the risk

-29-

that he might consent to a search of his vehicle, while he was driving it out-of-state in North Carolina.

## IX.    Motion to Suppress Evidence Seized at Levels Nightclub

Jones alleges that the warrant issued for the search of Levels nightclub was invalid because the affidavit on which it was based "presented intentional misstatements and a reckless disregard for the truth" and because it was tainted by evidence obtained through illegal wiretapping.  (Def.'s Omnibus Mot. at 21.)  As noted above, " to mandate an evidentiary hearing" under *Franks*, "the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.  There must be allegations of deliberate falsehood and those allegations must be accompanied by an offer of proof."  438 U.S. at 171. Jones alleges no facts to support his claim that the affidavit contained "intentional misstatements and a reckless disregard for the truth."  (*Id*. at 21.)  The Court therefore upholds the validity of the warrant and the use of the evidence obtained through electronic interceptions in the affidavit.

## CONCLUSION

For the foregoing reasons, defendant's motions are denied with the exception that the government cannot use GPS tracking data obtained when the Jeep Cherokee was parked in the garage adjoining Jones' Moore Street property.  The Court will consider the parties' arguments regarding the government's Rule 404(b) motion and defendant's motions for a bill of particulars and for disclosure of confidential informants at the hearing on Monday, August 14, 2006.

s/
_____
ELLEN SEGAL HUVELLE
United States District Judge

August 10, 2006