**Instruction 1.03**

**PRELIMINARY INSTRUCTION BEFORE TRIAL**

Before we begin the trial, I want to explain some of the legal rules that will be important in this trial. I want to emphasize that these remarks are not meant to be a substitute for the detailed instructions which I will give at the end of the trial just before you start your deliberations. These preliminary instructions are intended to give you a sense of what will be going on in the courtroom and what your responsibilities as jurors will be.

When you took your seats, you probably noticed that each of you had a notebook and pencil waiting for you. It is my practice to allow jurors to take notes during the trial if they want to, and to have their notes with them during the jury's deliberations. I want to emphasize that none of you are required to take notes. Indeed, you should not do so if you think that notetaking will distract your attention from the evidence or the testimony of the witnesses. On the other hand, if you think that taking notes might help you remember the testimony of the witnesses and the other evidence in the case, or might make you pay more attention during the trial, you are free to take notes. You should remember that your notes are only an aid to help your memory. They should not replace your own memory of the evidence. Those jurors who do not take notes should rely on their own memory of the evidence and should not be influenced by another juror's notes.

Whenever there is a recess in the trial, you should leave your notebooks and pencils on your seats. They will be collected by the clerk and given to me to keep. No one, including myself, will ever look at any of your notes. At the end of the trial, when you come back to the courtroom to

2

deliver your verdict, your notes will be destroyed.  Again, neither I nor anyone else will look at any notes you have taken.

~~Generally only the lawyers and the court ask witnesses questions.  Occasionally, however, a juror feels that an important question has not been asked.  I am not encouraging any of you to pose questions to the witnesses in the case.  However, if during the course of the trial you feel an important question has not been asked, you may write out that question on a piece of paper and submit it to the court after the lawyers are finished with their examination of the witness but before the witness leaves the witness stand.  After consulting with the lawyers, I will determine whether the question is a proper one; if it is and if it relates to a matter about which the witness can testify, I will ask the witness the question.~~

~~If I do not ask the question, that means I have decided that it is not legally proper that the question be asked.  If I do not ask the question, the juror posing it should not guess or speculate about what the answer might have been, and may not consider the question or discuss it with other jurors during deliberations.  If I decide the question relates to a legal issue, I may decide to wait until final instructions and answer the question then if it is relevant to your consideration of the case.~~

~~Juror questions may not be posed orally at any time during a trial.  Also, juror questions are meant only to help jurors understand the testimony, to clarify evidence, or to seek information.  Such questions are not meant to discredit or argue with a witness.  As a juror, you must be an impartial judge of the facts, not an advocate for either side in this proceeding.~~

~~Finally, even though you may submit questions to me to ask a witness, you may not discuss the questions with any fellow jurors or anyone else.~~

You have probably noticed that there are eighteen (**) of you sitting in the jury box.  Only

3

twelve (12) of you will retire to deliberate in this matter.  In some courtrooms, jurors in seats **
through ** are automatically the alternates, but that is not how it works in this courtroom.  Instead,
we randomly select the alternates' seats at the beginning of each trial from among all the jury seats
so that any ** seats -- *** or any other combination -- might turn out to be the seats of the alternates.

I will not disclose who the alternate jurors are until the end of my final instructions just
before you begin your deliberations.  Therefore, it is important that all of you think of yourselves as
regular jurors during this trial, and that all of you give this case your fullest and most serious
attention.

At the beginning of the jury selection process, *you were introduced to some of the
participants in this case in person.  You were also given lists of individuals whose names might be
mentioned or who are potential witnesses in the case.*  If, at any time during this trial, you suddenly
realize that you recognize or might know any witness, lawyer, someone referred to in the testimony
or evidence, or anyone else connected with this case in any way, you should tell the court
immediately.  You should not tell any other member of the jury about your discovery.  If you realize
you are acquainted with someone connected with this case while a witness is testifying, you should
raise your hand immediately and ask to speak privately to the Marshal or with me at the bench.

Now let me explain briefly some of the procedures we will follow and some of the rules of
law that will be important in this case.  This is a criminal case which began when the grand jury
returned an Indictment.  Two Assistant United States Attorneys will present the evidence in support
of the charges in the Indictment.

The defendants in this matter, Antoine Jones, also known as Toine, Adrian Jackson, Michael
Huggins, Kevin Holland, and Kirk Carter, have been charged in an Indictment with one count of

conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine and fifty grams or more of cocaine base, also known as crack.  Count One of that Indictment, charging each of the defendants with  conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine and fifty grams or more of cocaine base, also known as crack, reads:

From at least sometime in 2003, the exact date being unknown to the Grand Jury, up to and including October 24, 2005, in the District of Columbia, the State of Maryland, the State of Texas, the State of North Carolina, and elsewhere, the defendants, **ANTOINE JONES, also known as Toine**, **(hereinafter "JONES"), ADRIAN JACKSON (hereinafter "JACKSON"), MICHAEL HUGGINS (hereinafter "HUGGINS"), KEVIN HOLLAND (hereinafter "HOLLAND"),** and **KIRK CARTER (hereinafter "CARTER"),** did knowingly and willfully combine, conspire, confederate and agree together and with Lawrence Maynard (hereinafter "Maynard"), John Adams (hereinafter "Adams"), Demetris Johnson (hereinafter "Johnson"), Roel Bermea, Jr. (hereinafter "Bermea"), Alberto Rolando Carrillo-Montelongo (hereinafter "Montelongo"), Ricardo Sanchez-Gonzalez (hereinafter "Sanchez-Gonzalez"),  and  other persons both known and unknown to the Grand Jury, to unlawfully, knowingly and intentionally distribute and possess with intent to distribute the following:

a) a mixture and substance containing a detectable amount of cocaine, a schedule II narcotic drug controlled substance, and the amount of said mixture and substance was 5 kilograms or more, in violation of Title 21 United States Code, Sections 841(a)(1) and 841(b)(1)(A)(ii);

b) a mixture and substance containing a detectable amount of cocaine base, in the form of "crack," a schedule II narcotic drug controlled substance, and the amount of said substance was 50 grams or more, in violation of Title 21, United State Code, sections 841(a)(1) and 841(b)(1)(A)(iii).

## B.  GOALS OF THE CONSPIRACY

It was the principal goal of the conspiracy that, in order to obtain as much money and other things of value as possible, the defendants, and co-conspirators not indicted herein, both known and unknown to the Grand Jury, acquired, repackaged, stored, processed, sold, and redistributed quantities of cocaine and cocaine base, in the form of crack, in the District of Columbia, the State of Maryland, the State of Texas, the Republic of Mexico, and elsewhere.

## C.    MANNER AND MEANS TO EFFECTUATE THE CONSPIRACY

1.  The members of the conspiracy played various and interchangeable roles based upon the needs of the conspiracy.

6

**JONES** was the primary supplier of cocaine to members of the organization in the District of Columbia and the State of Maryland.

2.    **JACKSON, HUGGINS, HOLLAND, CARTER,** Adams, Johnson, and others known and unknown to the Grand Jury, obtained cocaine from **JONES**. They in turn repackaged it in smaller amounts for redistribution to others.    At other times, they redistributed the cocaine in kilogram form. They on occasion would process the cocaine they obtained from **JONES** into cocaine base in the form of crack cocaine before it was redistributed.

3. **JONES** was supplied with cocaine by various individuals, including persons he identified as "the Mexicans." These individuals, including Bermea, located in the State of Maryland, periodically supplied **JONES** with large quantities of cocaine. At times, these individuals were assisted in their distribution activities by others, including Montelongo and Sanchez-Gonzalez.

4. On some occasions, **JONES,** and/or Maynard, traveled out of the area to pick up cocaine, and to deliver cash payment for the cocaine. On other occasions, individuals traveled to the Washington, D.C., area, to deliver large quantities of cocaine to stash locations where it was given to **JONES**, and to collect money from **JONES** and/or Maynard. In furtherance of this business relationship with their Mexican distributors, **JONES** and Maynard rented houses,

apartments, and other locations in the Washington, D.C., area, where Bermea and others stored their cocaine. The cocaine distributors also stored in these stash locations large amounts of cash that **JONES** delivered to them in payment for cocaine, which they ultimately transported to Mexico. For example, on November 11, 2003, **JONES** rented for a period of six months an apartment located at 9719 Summit Circle, Apartment 3B, Largo, Maryland, for this purpose. And on January 10, 2004, Maynard rented for a period of six months a house located at 8550 Myrtle Avenue, Bowie, Maryland, for the same purpose. On February 27, 2004, a warrant-based search of 8550 Myrtle Avenue revealed several empty duffel bags, heat seal machines, heat seal wrappers, and rubber bands, along with a few air mattresses on the floor, but little additional furniture. On occasion, the suppliers themselves rented houses in the Washington, D.C., area, for the same purpose.

5.    From time to time, Bermea, Montelongo, Sanchez-Gonzalez, and others, visited these stash locations to deliver cocaine and to collect, count, and package the money received from **JONES** in exchange for cocaine. These individuals then transported the money back to Mexico, via the state of Texas. These stash locations also served as temporary residences for Bermea, Montelongo, Sanchez-Gonzalez, and others.

6. The Mexican suppliers often used large trucks to transport large shipments of cocaine, often in excess of 200 kilograms, to the Washington, D.C., area, where they unloaded it into smaller vehicles and transported it to the stash locations for storage for as much as a month at a time.

7. **JONES** also rented warehouse facilities for the same storage purpose. For example, on or about April 30, 2004, a search of **JONES's** warehouse space, located at the Hampton Park Storage Facility, 400 Hampton Park Boulevard, Capitol Heights, Maryland, which he rented from November 17, 2003, until he broke the lease on April 30, 2004, revealed, among other things, several boxes of heat sealing wrappings and air mattresses, similar to the items identified in the search of the Myrtle Avenue house rented by Maynard.

8. **JONES** periodically collected money from some of his co-conspirators, including **JACKSON, HUGGINS, HOLLAND, CARTER,** Adams, Johnson, and others known and unknown to the Grand Jury. **JONES** then visited a storage location, and met with Bermea and others, to deliver quantities of cash, and pick up multiple-kilogram quantities of cocaine for distribution to these co-conspirators. For example, on September 28, 2005, **JONES** met with **HUGGINS** at his residence in Suitland, Maryland, where he remained for approximately 20 minutes. From there, **JONES** drove

directly to the residence of Adams, and remained for approximately 20 minutes. After another similar meeting with an individual unknown to the Grand Jury, at 9:35 p.m., **JONES** drove to a stash location, 9508 Potomac Drive, Ft. Washington, Maryland, where he met with suppliers for approximately 45 minutes.

9. From at least some time in 2003, the exact date being unknown to the Grand Jury, through October 24, 2005, **JONES** supplied a number of unindicted co-conspirators, who are known to the grand jury, with kilogram and half-kilogram quantities of cocaine. **JONES** regularly "fronted," i.e., supplied on consignment, large quantities of cocaine to these co-conspirators, who are known to the Grand Jury. At other times, these co-conspirators paid **JONES** for the cocaine at the time he delivered it to them. These co-conspirators then frequently repackaged the cocaine into smaller quantities, and distributed it either as cocaine hydrochloride or cocaine base, in the form of crack. At times, some of the co-conspirators redistributed the cocaine in kilogram form. The total quantity of cocaine **JONES** provided to these unindicted co-conspirators during this timeframe was in excess of 150 kilograms.

10. The physical transfer of cocaine and cash between **JONES** and these unindicted co-co-conspirators, who are known to the Grand Jury, took place at Levels, a night club in the District of

Columbia owned and operated by **JONES** and managed by Maynard; at the Prince George's County Sports Complex near FedEx Field in Landover, Maryland; at a Home Depot store, in Landover, Maryland; at Sam's Car Wash on Branch Avenue, in Temple Hills, Maryland; and at other locations known and unknown to the Grand Jury. Maynard frequently accompanied **JONES** when he met with various co-conspirators to make deliveries of cocaine and to collect large cash payments.  On several occasions, Maynard also made deliveries of cocaine from **JONES** to the co-conspirators.  When communicating with some of these co-conspirators over the phone, to avoid detection by law enforcement, **JONES** used "code" to avoid reference to drugs, money, or meeting places for the transfer of drugs or payment for the drugs.  The price **JONES** charged per kilogram varied between $20,000, and $23,000, depending on who the co-conspirator was, among other factors.  As part of supplying cocaine to  these co-conspirators, **JONES** informed one co-conspirator sometime in 2004, that **JONES** and Maynard were making periodic trips outside of the Washington, D.C., area to obtain multi-kilogram quantities of cocaine.  In reference to the trips, **JONES** spoke of going to "Carolina" and cocaine coming from the "Mexicans" and "Texas."

11.   In addition to Maynard, **JONES** also employed individuals, both known and unknown to the Grand Jury, to assist in

the day-to-day operations of his cocaine-trafficking business.  For example, Adams broke down larger amounts of cocaine into smaller packages for **JONES,** or Adams, to deliver to other co-conspirators, indicted herein, including **CARTER, HUGGINS**, Maynard, and Johnson.  Adams also collected drug payments for **JONES** from time to time.

12.  During the course of wire interceptions on **JONES's** cellular telephone, which ran from September 2, 2005, through October 24, 2005, the code phrases used by these co-conspirators and **JONES** to reference cocaine and money were often overheard, both in conversations between **JONES** and some of the unindicted co-conspirators, and in conversations between **JONES** and the other individuals he supplied, including **JACKSON, HUGGINS, CARTER, HOLLAND,** Adams, Johnson, and others known and unknown to the Grand Jury.

13.  Also during the wire interception, **JONES** spoke with many of his co-conspirators, including **JACKSON, HUGGINS, CARTER, HOLLAND,** Adams, Johnson, and others known and unknown to the Grand Jury, several times a week to arrange meetings at various locations throughout the Washington, D.C. metropolitan area.  On some occasions, **JONES** delivered wholesale quantities of cocaine to the customers, and on other occasions, the customers

provided **JONES** money therefor.

14.    **JONES** also spoke with Bermea and another co-conspirator, not indicted herein, with some frequency during this timeframe, described in paragraph 12, to set up meetings to drop off cash and to collect multiple-kilogram quantities of cocaine, usually at a house located at 9508 Potomac Drive, Ft. Washington, Maryland. During this time, **JONES** also spoke with another co-conspirator in the Mexican supply-chain, not indicted herein, to discuss the timing of large shipments of cocaine from Mexico into the Washington, D.C. area.

15.    In or about at least September and October, 2005, Bermea, Montelongo, and Sanchez-Gonzalez, and another co-conspirator not indicted herein, used the house located at 9508 Potomac Drive, Ft. Washington, Maryland, as a location in which they stored cocaine for distribution, including one time as much as 100 kilograms of powder and crack cocaine.  They also used this residence for storage of cash payments, including as much as $800,000, which they received in exchange for the cocaine.  They also stored cash packaging  equipment in this residence, including plastic shrink-wrapping materials, a heat-sealing machine, and a money-counting machine.  From time to time during this period, they also resided in the house.

16.    In or about at least October, 2005, defendants **JACKSON, HUGGINS,** Johnson, and Adams, used their residences in the state of Maryland to store cocaine, which they had purchased from **JONES**. **JACKSON, HUGGINS,** Johnson, and Adams also stored large sums of money in their residences, the proceeds of cocaine sales to customers, along with firearms and drug packaging materials, including digital scales, and ziplock bags. **CARTER** used his residence in the District of Columbia to store ammunition and drug packaging materials, including a digital scale and ziplock bags.

17.    From at least 2003, the exact date being unknown to the Grand Jury, up to and including October 24, 2005, **JONES** used his vehicle, a 2001 champagne-colored Jeep Grand Cherokee, MD license # M667480, to store cocaine and cash, which he had secreted in a variety of bags, including plastic shopping bags, duffel bags, and backpacks. **JONES** also used his Grand Cherokee to transport cash to his suppliers, Bermea and others, and to transport cocaine from Bermea and others and deliver it to **JACKSON,   HOLLAND, CARTER, HUGGINS,** Adams, Johnson, and other co-conspirators known and unknown to the grand jury**.**

*The Indictment goes on to set out 94 separate acts, known in the law as overt acts, which the grand jury charges were committed by members of the conspiracy to advance the conspiracy and*

14

*accomplish the goals of the conspiracy. I will discuss those overt acts with you in my final instructions to you at the close of all the evidence in this case.* You should understand clearly that the Indictment that I just read is not evidence. The Indictment is just a formal way of charging a person with a crime in order to bring him to trial. You must not think of the Indictment as any evidence of the guilt of the defendants, or draw any conclusion about the guilt of the defendants just because they have been indicted.

The defendants have been charged with conspiracy to distribute and possess with intent to distribute cocaine and cocaine base or crack. To prove this offense, the government must prove beyond a reasonable doubt each of the elements of that offense. The elements of the charge of conspiracy to distribute and possess with intent to distribute cocaine and cocaine base or crack are

First, that between sometime in 2003 and October 24, 2005, an agreement existed between two or more people, to commit the crime of distribution and possession with intent to distribute cocaine and cocaine base. This does not have to be a formal agreement or plan, in which everyone involved sat down together and worked out the details. On the other hand, merely because people get together and talk about common interests, or do similar things does not necessarily show that an agreement exists to import of heroin and cocaine. It is enough that the government prove beyond a reasonable doubt that there was a common understanding among those who were involved to commit the crime of distribution and possession with intent to distribute cocaine and cocaine base. So, the first thing that must be shown is the existence of an agreement.

Second, the government must prove that the defendant intentionally joined in that agreement. It is not necessary to find he agreed to all the details of the crime, or that he knew the identity of all the other people the government has claimed were participating in the agreement. A person may become a member of a conspiracy even if that person agrees to play only a minor part, as long as that person understands the unlawful nature of the plan and voluntarily and intentionally joins in it. Even if the defendant was not part of the agreement at the very start, he can become a member of a conspiracy later if the government proves that he intentionally joined the agreement. Different people may become part of the conspiracy at different times.

The elements of the offense of distribution of cocaine and cocaine base are:

First, that the defendant distributed a controlled substance. Distribute means to transfer or attempt to transfer to another person;

Second, that the defendant did so knowingly and intentionally. This means consciously, voluntarily and on purpose, not mistakenly, accidentally or inadvertently. The law makes cocaine and cocaine base controlled substances.

The elements of the offense of possession with intent to distribute a controlled substance, in this case, cocaine and cocaine base, are:

First, that the defendant possessed a controlled substance;

Second, that the defendant did so knowingly and intentionally.  This means consciously, voluntarily and on purpose, not mistakenly, accidentally or inadvertently.

Third, that when the defendant possessed the controlled substance he had the specific intent to distribute it.  Distribute means to transfer or attempt to transfer to another person.

Again, the law makes cocaine and cocaine base controlled substances.

Mr. Jones is also charged in Count Two with possession with intent to distribute cocaine base on May 11, 2004, and in Count Three with possession with intent to distribute cocaine on October 14, 2005.  The elements of the offenses charged in Counts Two and Three are the same as those I just read to you.

In Count Four of the Indictment Mr. Jackson is charged with the offense of Using, carrying, brandishing, and possessing a firearm during a drug trafficking offense on October 24, 2005.  The elements of the offense of Using, carrying, brandishing, and possessing a firearm during a drug trafficking offense are:

*First*: That the defendant committed a drug trafficking crime; and

*Second*: That the defendant knowingly used, carried, or brandished a firearm during and in relation to that drug trafficking crime or knowingly possessed a firearm in furtherance of the drug trafficking crime charged in Count One.

To prove the defendant "used" a firearm in relation to a drug trafficking crime, the government must prove that the defendant actively employed the firearm in the

commission of Count One, such as a use that is intended to or brings about a change in the circumstances of the commission of Count One. Use is more than mere possession of a firearm or having it available during the drug trafficking crime.

To prove the defendant "carried" a firearm, the government must prove that the defendant carried the firearm in the ordinary meaning of the word "carry," such as by transporting a firearm on the person or in a vehicle. The defendant's carrying of the firearm cannot be merely coincidental or unrelated to the drug trafficking crime. To prove that a defendant "brandished" a firearm the government must show that the defendant displayed all or part of the firearm to another person in order to intimidate that person.

To prove the defendant possessed a firearm "in furtherance," the government must prove that the defendant possessed a firearm that furthers, advances, or helps forward the drug trafficking crime.

"In relation to" means that the firearm must have some purpose, role, or effect with respect to the drug trafficking crime.

In Counts Five through Thirty-Four of the Indictment each of the defendants is charged in one or more counts with the commission of the crime of use of a communication facility to facilitate a drug trafficking offense. The elements of the offense of illegal use of a communication facility are:

*First*: That the Defendant used a "communication facility," as charged;

*Second*: That the Defendant used the communication facility while in the process of

committing, or to "facilitate" the commission of, the offense charged in Count One

of the indictment; and

*Third*: That the Defendant acted knowingly and willfully. The term "communication

facility" includes all mail, telephone, wire, radio, and computer-based

communication systems.

To "facilitate" the commission of a crime merely means to use a communication

facility in a way which aids or assists the commission of the crime. The Government

does not have to prove, however, that the other crime - - the facilitated offense—was

successfully carried out or completed.


*Now let me explain to you* ~~As I explain~~ how the trial will proceed.  *As I do that*  I will  refer

to the "government" and to the "defendant."  When I mention the "government," I am referring to

the two attorneys who are presenting the evidence in support of the charges contained in the

Indictment.  In this case, it is  Assistant United States Attorney Rachel Carlson Lieber and Assistant

United States Attorney John V. Geise.  When I mention the defendant or the defense, I am referring

either to the defendants, Mr.  Jones, Mr. Jackson, Mr. Huggins, Mr. Holland, or Mr. Carter or to their

attorneys, Mr. Balarezo, Mr. Norris, Mr. Acree, Mr. McDaniel and Mr. Daum.

As the first step in this trial, the government and the defendant will have an opportunity to

make opening statements.  ~~If the government makes an opening statement it must do so at the~~

~~beginning of its case~~. *The government must make an opening statement at the beginning of its case.*

*Each* ~~The~~ defendant may make an opening statement immediately after the government's opening

statement, or *one or more of the defendants* may *determine to* wait until the beginning of the

defendant's case. *A* ~~The~~ defendant does not have to make any opening statement. The opening statements are only intended to help you understand the evidence which will be introduced. The opening statements are not evidence.

After the opening statement or statements, the government will introduce evidence to support the charges in the Indictment. After the government presents its evidence, the defendant may present evidence, but he is not required to do so. The law does not require a defendant to prove his innocence or to produce any evidence.

At the end of all of the evidence, each side will have an opportunity to make a closing argument in support of its case. The lawyers' closing arguments, just like their opening statements, are not evidence in this case. They are only intended to help you understand the evidence.

Finally, at the end of the evidence and after both sides have finished closing arguments, I will tell you in detail about the rules of law that you must follow when you consider what your verdicts shall be. Your verdicts must be unanimous; that is, all twelve jurors must agree on the verdicts.

I want to briefly describe my responsibilities as the judge and your responsibilities as the jury. My responsibility is to conduct this trial in an orderly, fair and efficient manner, to rule on legal questions which come up in the course of the trial, and to instruct you about the law which applies to this case. It is your sworn duty as jurors to accept and apply the law as I state it to you.

Your responsibility as jurors is to determine the facts in the case. You -- and only you -- are the judges of the facts. You alone determine the weight, the effect, and the value of the evidence, as well as the credibility or believability of the witnesses. You must consider and weigh the testimony of all witnesses who appear before you. You alone must decide whether to believe any witness, and to what extent to believe any witness.

And remember, you must pay very careful attention to the testimony of all of the witnesses because you will not have any transcripts or summaries of the testimony available to you during your deliberations. You will have to rely entirely on your memory and your notes if you choose to take any.

During this trial, I may rule on motions and objections by the lawyers, comment to lawyers, question the witnesses, and instruct you on the law. You should not take any of my statements or actions as any indication of my opinion about how you should decide the facts. If you think that somehow I have expressed or even hinted at any opinion as to the facts in this case, you should disregard it. The verdict in this case is your sole and exclusive responsibility.

You may consider only the evidence properly admitted in this case. That evidence includes the sworn testimony of witnesses and exhibits. If the evidence includes anything other than testimony and exhibits, I will instruct you about these other types of evidence when they are admitted during the trial.

During the trial, if the court or a lawyer makes a statement or asks a question that refers to evidence that you remember differently, you should rely on your memory of the evidence during your deliberations.

The lawyers in the case may object when the other side asks a question, makes an argument, or offers evidence which that lawyer believes is not properly admissible. You must not be prejudiced against the lawyer who makes the objection or the party he represents. Indeed, it is the lawyer's responsibility to object to evidence which he or she believes is not properly admissible.

If I sustain an objection to a question asked by a lawyer, you should forget about the question because the question is not evidence. You must not guess or speculate what the answer to the

question would have been.  If a question is asked and answered, and I then rule that the answer should be stricken from the record, you must forget about both the question and the answer that was stricken.  You should follow this same rule if any of the exhibits is stricken.

Every defendant in a criminal case is presumed to be innocent.  This presumption of innocence remains with the defendant throughout the trial unless and until he is proven guilty beyond a reasonable doubt.  The burden is on the government to prove the defendant guilty beyond a reasonable doubt, and that burden of proof never shifts throughout the trial.  The law does not require a defendant to prove his innocence or to produce any evidence.  If you find that the government has proven beyond a reasonable doubt every element of the offense with which the defendant is charged, it is your duty to find him guilty.  On the other hand, if you find that the government has failed to prove any element of the charged offenses beyond a reasonable doubt, you must find the defendant not guilty.

During the course of this trial, you may hear certain tape recorded conversations which were obtained through the use of wire interceptions, commonly referred to as "wire taps." The term "intercept" means to obtain the contents of any wire or oral communication by using an intercepting device. The wire interceptions, or wiretaps, in this case were court-ordered, that is, they were approved by a judge, and the government's use of these interceptions was lawful.

During the course of this trial, you may also hear the phrase "consensual tape recording." This term should not be confused with the phrase "wire interception" or "wiretap." A wire interception or wiretap is a court-ordered interception of communications which does not require the consent of the parties to the conversation. A consensual tape recording, on the other hand, is a recording where one party to the conversation consents to the conversation being tape recorded. It is lawful to conduct

consensual tape recordings, and the other party or parties to the conversation do not have to consent to the taping. Consensual tape recorded conversations may occur over the telephone or face to face.

You must not be influenced by the nature of the charges in arriving at your verdict. Your responsibility is to decide this case solely on the evidence presented in the courtroom. As a result, you must not conduct any independent investigation of your own of the case -- like going to visit the scene.

In addition, you should disregard any statements made about the case by anyone outside the courtroom. You must not talk about the case with the lawyers, the defendant, witnesses, or anyone else connected with the case. If you see someone involved in this case, other than a fellow juror, outside the courtroom, you should not speak with that person about anything. If, at any time during the trial, anyone tries to discuss the case with you or if you hear anyone talking about the case, you should refuse to participate in or listen to the discussion. If you speak with someone involved in the case outside the courtroom while the trial is still going on, we may have to stop the trial, pick a new jury and start all over again. You must also completely disregard any press coverage, including newspaper, television or radio reports which you may read, see or hear. If you are exposed to any news reports inadvertently, you should immediately disregard them and direct your attention elsewhere.

If you have heard any statements about the case, if anyone has tried to discuss the case with you or if you have been exposed to press coverage about the case, you must tell me about it immediately by informing the marshal or the courtroom clerk. You should not tell any of your fellow jurors or anyone else. *It is very important that you not discuss matters of this type with your fellow jurors or with anyone else until I have spoken to you.* You should tell only me, one of the

Deputy Marshals, or the clerk.

You must not discuss this case with anyone until this case is submitted to you for your decision at the end of my final instructions.  Until the case is submitted to you, you must not talk about it with your fellow jurors.  You must not talk about the case to your friends or relatives, or even your spouse or partner, until it is over and you have completed your deliberations.

After I submit the case to you, you may discuss it only when I instruct you to do so, and only in the jury room and only in the presence of all your fellow jurors.  It is important that you keep an open mind and not decide any issue in the case until after I submit the entire case to you with my final instructions.

**Instruction 1.05**

**CAUTIONARY INSTRUCTION**

**PRIOR TO FIRST RECESS**

We are about to take our first break during the trial and it is important that you follow certain instructions whenever the court is in recess.

First, until I submit this case to you at the end of my final instructions, you must not discuss it with anyone -- not with the parties, witnesses, attorneys or anyone else connected with the case. You must not even discuss it with your fellow jurors, friends or family members. To be fair to both the government and the defendant, you should keep an open mind throughout the trial. You should reach your conclusion only during the final deliberations after all the evidence is in and you have heard the attorneys' closing arguments and my instructions to you on the law.

Second, do not permit any other person to discuss the case in your presence. This applies to anyone, including members of your family, friends or relatives, courtroom spectators, witnesses, reporters and parties to this case. If anyone attempts to discuss the case with you, tell them not to talk to you. If anyone attempts to discuss the case with you or you overhear any discussion of the case, you must report that fact to me as soon as you can. However, you should not discuss with any of your fellow jurors the fact that someone tried to discuss the case with you or that you overheard a discussion, nor should you discuss with them any other fact that you feel necessary to bring to the court's attention. If you need to advise me of such matters, please do so through the marshal or clerk.

Finally, although it is a natural human tendency to talk with people with whom you may be

thrown into contact, you must not talk to any of the parties or their attorneys or any witness in this case during the time you serve on this jury. If you encounter anyone connected with the case outside the courtroom, you should avoid having a conversation with them, overhearing their conversation or having any contact with them at all. For example, if you inadvertently find yourself in a courthouse corridor, elevator, the cafeteria or any other location where the case is being discussed by attorneys, parties, witnesses, or anyone else, you should immediately leave the area to avoid hearing such discussions. If you do overhear a discussion about the case, you should report that to me as soon as you can. Finally, if you see an attorney or witness involved in the case and they turn and walk away from you, they are not being rude. They are merely trying to avoid any contact with you as I have instructed them.

**Instruction 1.22**


**A JUROR'S RECOGNITION OF A WITNESS**

**OR OTHER PARTY CONNECTED TO THE CASE**


At the beginning of the jury selection process, you were introduced to some witnesses in person.  Others were identified to you only by name.  If, at any time during this trial, you suddenly realize that you recognize or might know any witness, lawyer, someone referred to in the testimony or evidence, or anyone else connected with this case in any way, you should tell the court immediately.  You should not tell any other member of the jury about your discovery.  If you realize you are acquainted with someone connected with this case while a witness is testifying, you should raise your hand immediately and ask to speak privately to the marshal or with me at the bench.