**Motion to Suppress Tangible Evidence Obtained from Jeep Cherokee**

On October 22, 2005 Magistrate Judge Charles B. Day of the District of Maryland issued a search warrant for Jones' home located at 10870 Moore Street, Waldorf, MD.  The application for a search warrant was supported by an affidavit sworn to by FBI agant Stephanie Yanta (see Exh.2 – Yanta affidavit for search warrant).

    a.  **The search warrant for Jones' home was invalid**:  Agent Yanta's affidavit was substantially similar to the affidavits discussed in Jones' motion to suppress evidence obtained from interception of wire communications and electronic surveillance and also relied on evidence obtained through the electronic surveillance.  Jones incorporates by reference the arguments made in his wire tap suppression motion and submits that the warrant issued was invalid because it resulted from an affidavit that presented intentional misstatements and a reckless disregard for the truth.  See Franks v. Delaware, 438 US154 (1978).  Additionally, the instant search warrant was invalid because it was tainted by illegally obtained evidence (the wire taps, etc., is the fruit from the poisonous tree (see Wong Sun v. United States 371US471 (1963).

    b.  **The search of the Jeep was illegal:**  On October 24, 2005, the FBI agents used a warrantless and expired court order GPS (surveillance aid) to track and monitor the Jeep Cherokee with their belief that Mr. Jones had contraband in the Jeep Cherokee…  Even the Prosecutor stated it in the rebuttal argument, (Document 151 filed 7-24-2006, pg. 51).  The government stated on October 23, 2005, "Jones told many of his suspected customers that he was going to make his round because it's here, and the GPS device confirmed that he did just that".  All of these facts, taken together, demonstrate ample probable cause that Jones was carrying contraband in the Jeep Cherokee on the morning of October 24, 2005.

    Quoting the probable cause conclusion in the vehicle's search warrant affidavit and the houses' search warrant affidavit.  Based on facts the FBI agents believe the following articles are present at the subject premise and in the Jeep Cherokee – controlled substance, cocaine, paraphernalia for packaging, scales, razor blades, plastic bags, heat sealing devices, record keeping books, notes, ledger and other papers relating to distribution of controlled substance, canceled mail, deeds, diaries, utility bills, statements, identification documents, keys, cell phones, telephone bills, telephone numbers.

The FBI agents were expecting to see and seize these items from the Jeep Cherokee and the 10870 Moore Street address.

My argument is once the search started with the warrantless and expired court order GPS (physical surveillance aid) entered the garage.  It was an illegal search, the fruit from the poisonous tree.  In the <u>Honorable Judge Ellen Huvelle</u>'s decision, the agents cannot use the GPS tracking data obtained when the Jeep Cherokee was parked in the garage adjoining Jones' Moore Street property.

Defendant sites <u>US v. Karo</u>, because the residents had a justifiable interest in privacy in their home.  Information that was obtained from the tracking device while it was inside the private residence should therefore be suppressed.  Defendant argues <u>US v. Karo</u>, a search began at the moment Karo brought the car into his house at hence concealed it from the public view.  As a general mater, the private citizen is entitled to assume, and in fact does assume that his possessions are not infected with concealed electronic devices.  The concealment of such items or personal property significantly compromises the owner interest in privacy, by making it impossible to conceal that item's possession and location from the Government, despite the fact that the Fourth Amendment protects the privacy interest in the location of personal property not exposed to public view.  I find little comfort in the courts notion that no invasion of privacy occurred until a listener obtained some significant information.  By use of the device, the expectation of privacy should be measured from the stand point of the citizen whose privacy is at stake, not the Government.  <u>It is compromised, the moment when the invasion occurred.</u>  The agent did not know who was in possession of the property or when, once it entered Karo's house.  Because the beeper enabled the agent to learn the location of the property otherwise concealed from public view, it infringed a privacy interest protected by the Fourth Amendment.

<u>US v. Knotts</u> – was reversed finding for the defendant.  The monitoring of the beeper was prohibited by the Fourth Amendment because its use had violated respondent's reasonable expectation of privacy, and that all information derived after the location of the cabin was a fruit of the illegal beeper monitoring.  When a police agent, track, bugged personal property without first obtaining a warrant, they must do so at the risk that this enhance surveillance intrusive at its best, might push fortuitously and unreasonably into private sphere, prohibit by the Fourth Amendment.  The Fourth Amendment protected against Government invasion of a person's reasonable expectation of privacy, even <u>when the thus invasion are not accomplished by physical intrusion.</u>

It is certainly true that a home owner has reasonable expectation of privacy in the contents of his home, Alderson v. US.

On September 27, 2005, the FBI agent knew they installed a GPS on the Jeep Cherokee violating (18§3117 Code) and the (Judge Friedman 10 days execution order). The agent never applied for a search warrant during this time. Monitoring the GPS and with the physical surveillance from the agents, the agent surveyed and knew that the Jeep Cherokee was "always" parked inside of Moore Street garage.

The agents applied for a search warrant on October 22, 2005, planning to execute the search warrant on October 24, 2005 at the Moore Street house. Allowing the warrantless and expired GPS (surveillance aid) to enter Moore Street garage, starting the search on October 24, 2005 once the garage door was closed to the public view, concealing the believed contraband and the Jeep Cherokee. With this sophisticated GPS tracker, the agents knew Mr. Jones' Jeep and any suspected contraband were stationary, located in the garage of Moore Street house.

US v. Berry – Now on the market re GPS devices even more sophisticated. Such devices can be tracked with aid of computers that display a map showing where the devices are in real time. The computer's memory can store the devices movements, moment by moment for days, weeks, or even years. The improved technology may be viewed as a more sophisticated beeper. In trial, the agents testified of the monitor and movement of the GPS on the Jeep during the time span October 23, 2005 through October 24, 2005 (the morning the agents called the "Big take down"). During trial, the GPS expert summarized a GPS as merely record electronically what the agents could learn if they were willing to devote the personnel necessary to tail a car around the clock.

US v. Berry – The Supreme Court might conclude however that the new technology is so intrusive that the police must obtain a court order before its use. FBI agent testimony and evidence show the GPS (physical surveillance aid) entered Moore Street garage before 6 a.m. on October 24, 2005, whereby starting the search once the garage door was closed. Before the agents entered the house with a search warrant, the search had started with the GPS on the Jeep Cherokee.

    c. <u>Entering the house before 6 a.m.</u> During trial, Agent _____ testified under oath the agents disconnected the GPS device on the Jeep Cherokee in the garage, the morning of October 24, 2005 (the "Big take down"). Agent _____ testimony read off October 24, 2005, **5:21 a.m.** for the last entry of the GPS data. Evidence demonstrates and was put in record the agents did indeed enter the Moore Street house before 6 a.m. early morning October 24, 2005, violating **Rule 41**.

At trial, Mrs. Jones testified under oath, the agents entered the house at the Moore Street address before 6 a.m. Mrs. Jones testified she recalled the agents entered the house at 4:45 a.m.

Jones also noted his son was available to testify that the agents entered the house before 5 a.m. because they entered the house before his alarm clock signaled his daily 5 a.m. wake-up. Jones' son, who attended college in Baltimore, was accustomed to getting up at 5 a.m. and leaving the house at 6 a.m.

Jones' house was also wired by ADT alarm system. The alarm system did sound when the agents entered in the house. Jones' attorney did subpoena the activity report from ADT for the date of October 24, 2005. The ADT report was clearly altered because the report showed only a 6:13 a.m. entrance into the house on October 24, 2005. The report neglected to show the time Mr. Jones entered the house on October 24, 2005 (before 4:45 a.m. and definitely before 5:21 a.m. when the GPS device was removed from the Jeep Cherokee); nor did the report show when Jones' son entered the house on October 24, 2005 shortly after midnight. This is a clear violation of **Rule 41.**

    d. <u>No showing, presenting or leaving of a Search Warrant at the Moore Street house.</u> During the entry and the search, Jones asked numerous times to see a search warrant. None of the agents responded. Throughout the search, one agent (an Asian gentleman) repeatedly asked the other agents if he should take a photograph of the search warrant. (The lead agent – who seemed irritated by the question -- sent him into the garage until the end of the search when he came back into the house and photographed every room of the house and the signed inventory sheet.) Jones was taken away by one of the agents to FBI headquarters in Washington, DC. The other agents continued to search and seize over 40 boxes of personal and private documents and personal property. A search warrant was never presented to

Mrs. Jones or Jones' son.  At the conclusion of the search, Mrs. Jones was given a five page inventory receipt to sign.  There was no Attachment A and no search warrant presented or left at the premises.  **Rule 41 (F)** mandates the officer executing the warrant must give a copy of the warrant and receipt for the property taken to a person from whom, or from whose premises, the property was taken, or … leave a copy of the warrant, Attachment A, and receipt at the place where the officer took the property.

In an e-mail from Ms. Rachel Lieber (prosecutor) to Mr. Eduardo Balarezo (defense attorney for Mr. Jones), Ms. Lieber stated the Jones' had over 40 boxes of inventory, the Jones' save everything.  This has nothing to do with the fact that the agents did not present, leave or obtain a signature on a search warrant.  United States v. Martinez Fuente, US v. Chadwich, Michigan v. Tyler, without a warrant the occupant has "no way of knowing the lawful limits of the inspectors power to search, and no way of knowing, whether the inspector himself is acting under proper authorization (quoting Camara v. Municipal Court).  At no point did the agents present or leave either Mrs. Jones or Jones' son a copy of search warrant or Attachment A, to inform the scope of the warrant, nor did the agents photograph a copy of the warrant in Mrs. Jones' hand, neither was a copy left at the premises.  This failure to provide a copy of the warrant with Attachment A merits suppression of any evidence recorded as results.  See United States v. Gantt 194F.3D987 (9th Cir 1999).  For these reasons, Jones respectfully moves the Honorable court to suppress as evidence at trial.  In this case all evidence obtained as a result of the search of 10870 Moore Street, Waldorf, Maryland is from the fruit of the poisonous tree.

Evidence List

(1) There was no photo of search warrant nor Attachment A; only a photo of inventory sheets and receipt.
(2) Brandywine Road house – There was a photo of child occupant holding the search warrant in his hand.
(3) Potomac Drive – Search Warrant and Attachment A, with inventory sheet was posted on the wall.  A close-up shot and a distance shot.
(4) Residence of Michael Huggins – Search Warrant and Attachment and three inventory sheets on the table with teenage son present in the photo.
(5) Residence of John Adams – Search warrant and Attachment A, and two inventory sheets and receipt page photographed in close-up shot on the sofa.  A second photograph showing

    Mr. Adams and wife in handcuffs from the back along with the completed search warrant in between both persons.

(6) Residence of Demetrius Johnson – On Mr. Johnson's table two photos of the Search Warrant, Attachment A and inventory sheet.

(7) Club Levels – No photograph of Search Warrant, Attachment A or inventory sheet.

Conclusion – Until this present date, Mr. Jones, Mrs. Jones, nor Jones' son have been presented with the Search Warrant or Attachment A for the Moore Street house; only the inventory sheets and receipt which were presented to Mrs. Jones.

Responding to the Government's Rebuttal <u>The defendant's consent was voluntary.</u>  After viewing and reading the motion Mr. Balarezo submitted to the courts, defendant Jones explained the truth of the matter.  Mr. Balarezo (defendant's attorney) communicated to the government, in fact, defendant Jones' position is that he did not sign that consent form at all, but rather the signature is a forgery.  Defendant Jones is willing to call a handwriting expert to resolve this matter.

Jones was handcuffed (in the usual hands behind his back position) while he was upstairs in the Master Bedroom of the Moore Street house.  Jones stated that he was later brought downstairs and sat in a chair where he could view the garage through the open door.  Jones states that the agents said they did not find any drugs but they did find cash money in the Jeep Cherokee.  The other agents responded "that's better than nothing."

Jones challenges the forged consent form, as well as statements made by lead Agent Norma Horne.  Agent Horne testified under oath before the Grand Jury, "he directed agents when they let him know that it was a search, that he had money in his vehicle, and he took them out to the vehicle."  Here we have a lead agent testifying under oath to the Grand Jury on January 26, 2006, Jones took the agents out to the Jeep Cherokee and pointed out the money, never mentioning any signed consent from Mr. Jones.

Jones argues if he was handcuffed behind his back, how could he sign a consent form or go into the garage and point out the money in the Jeep Cherokee while being handcuffed.  Did the

- 6 -

agents remove the cuffs and have him (Mr. Jones) sign the consent and/or did they remove the cuffs again and take him (Mr. Jones) to the garage and ask him to point to the money?

Jones further argues the Grand Jury testimony of Agent Norma Horne is perjury and the signature on the consent form is a forgery.

Quoting from the Government's response, Jones' criminal history makes clear that this wasn't his first encounter with police, rather his extensive criminal history of drug trafficking demonstrates his familiarity with his Constitutional Rights, including the Rights to Consent… Mr. Jones argues "why would I give my Rights up and sign a consent form, or go out to the Jeep Cherokee and point out cash money especially when Jones contends the cash was receipts from Club Levels.

According to Jones, "the only time any law enforcement officer discussed or read me my Rights was Agent Yanta at the FBI Headquarters." Jones states he declined and asked for an Attorney. At that point, Agent Yanta gave Jones a Miranda Rights Card and a one-page inventory sheet to sign.

In conclusion, every affidavit and every Government document stated the vehicle was registered (solely) to Mrs. Jones and belonged to Mrs. Jones. Mrs. Jones purchased the Jeep Cherokee in early 2001 before she married Mr. Jones and in fact, while Mr. Jones was away in prison. The argument here is: "Why didn't the agents ask Mrs. Jones for permission to search the vehicle which was registered in her name and belonged to her?" The agents searched the Toyota Sequoia (registered to both Mr. & Mrs. Jones) and the Cadillac (registered to Mr. Jones) without obtaining a signature on a consent form. Jones contends vehicle searches were conducted by the agents without consent or permission…. For the record, any child with knowledge of graphic arts, can take a graphics art software program and duplicate a signature. The consent form was not signed by Mr. Jones ant the signature is in fact a forgery.