STATEMENT OF FACTS AFFIDAVIT

SUMMATION OF THE TRIAL OF

THE UNITED STATES

Vs

ANTOINE JONES, et al

DOCKET No. CR-05386

WITH CHARGES OF

PROSECUTORIAL MISCONDUCT

EVIDENCE PLANTING

LAW ENFORCEMENT MISCONDUCT

BREAKING & ENTERING

ILLEGAL SEARCH & SEIZURE

TABLE OF CONTENTS

SUMMARY

I        FBI Special Agent Stephanie Yanta, misleading, deceiving, perjury and a total
         Disregard for the truth

II       Detective Norma Horne, misconduct, foul play and planting a gun

III      ICE Agents breaking and entering; Agent Gikas perjury

IV       Invasion of privacy, intrusion, and trespassing on Jeep Cherokee

V        ABRA Executive Director Maria Delaney, operating out of her capacity and
         beyond authority of her ABRA duties

VI       Illegal search – 10870 Moore Street, Waldorf

VII      Prosecutorial Misconduct and Law Enforcement Misconduct

SUMMARY

I.      Special Agent Stephanie Yanta mislead and deceived the judge, the grand jury and the trial jury, displayed a vagrant disregard for the truth and perjured herself in her affidavits, warrant applications, warrants, grand jury testimony and trial testimony.

During the trial, defense attorney, Eduardo Balarezo impeached Agent Yanta on her perjurious testimony, and highlighted her repeated displays of disregard for the truth.

In her closing argument, government prosecutor Ms. Rachel Lieber, admitted that Agent Yanta made mistakes.  Even with this clearly demonstrated law enforcement and prosecutorial misconduct of misleading and deceiving the judge, total disregard for the truth and perjury, the government didn't stop her perjurious testimony nor charge her with perjury or obstruction of justice.  It was proven in the trial there was no investigation on her target.  (Target List summary attached.)

Defense witnesses Ms. Tymira Hunter, Quentessa Broussard, and Karessa Jones provided testimonies which contradicted statements Agent Yanta made under oath.

II.     Detective Norma Horne (DC MPD), misconduct, foul play and planting a gun.

Detective Norma Horne is a dishonest officer.  She planted the gun in Club Levels on October 24, 2005.  Evidence proves that the gun wasn't in Room J, the main office of the club.  Witnesses speak of Norma Horne planting guns to get an arrest and a conviction.  I also add contradicting testimony by the government, photos of October 24, 2005 searches crime scene to compare to Club Levels bogus photos of a black or dark crime scene.  It is customary for agents to photograph evidence exactly as it is found prior to disturbing the scene.  The photograph of the gun which was admitted into evidence at trial was a dark photograph of a gun in a dark nondescript area on a dark or black background.  If you read the trail transcript carefully, the agent says the gun was found in the main office of the club.  If in fact the gun was found inside the office of the club then the photograph

would show the area surrounding the place where the gun was found.  In order to search the office, the agents would have had to turn on the lights inside the office.  Once the lights were turned on, and a weapon spotted, then the weapon would have been photographed exactly where it was found.  Further, the gun would have been photographed inside a lighted room, not the dark space which is depicted in the photograph submitted as evidence at trial.  The testimonies about where and how the gun was found have been conflicting throughout the trial.

III.    ICE Special Agents breaking and entering.

Agent Katerina Gikas perjured herself in her grand jury testimony and during the trial. Misconduct (see page 72, line 23), Agent Gikas admits her ICE team broke into Summit Circle residence without a search warrant.  (She perjured herself and said the agents also broke into Myrtle Ave, Bowie residence on February 28, 2004 and again at the Hampton Park Blvd warehouse sometime late February 2004.  Refer to the leasing agent testimonies:  Hampton Park Blvd, Mr. Schaeffer, page 68 line 23, and Remax leasing agent Mr. Kelly for the Myrtle Ave residence page 24 line 17.

I also enclosed two photos of food saver bags from Myrtle Avenue house.  Also enclosed are numerous of photos of items inside the warehouse, including Valentines Day gift packages.  Agent Gikas perjured herself by testifying that these photographs were taken of these items in the Hampton Park Blvd warehouse on the same day the Mr. Schaeffer and I conducted the final walkthrough (April 30, 2004).  Mr. Schaeffer returned the security deposit after the walkthrough because the warehouse was clean and empty. Therefore, Agent Gikas did commit perjury because these photos were obviously taken before the walkthrough was conducted on April 30, 2004.  The ICE agents did not obtain a search warrant for the warehouse, therefore, Agent Gikas stated they went into the warehouse on April 30, after I had vacated the premises, when in fact, the Valentines Day gift packages and other items in the photos provide proof that the ICE agents went into the warehouse sometime in the month of February, long before I terminated my lease on April 30th.  This is a clear case of perjury, misconduct and foul play.

IV.     Invasion of Privacy, Intrusion and Trespassing on the Jeep Cherokee.

On September 27, 2005, the FBI agents and FBI technician illegally trespassed on the Jeep Cherokee while the Jeep was parked at my wife's place of business on a private lot.

The technicians connected an electronic monitoring device on the Jeep after the expiration of the Court Order.  This is a clear case of contempt of court, and a violation of the court order.  The FBI agents also violated 18§3117, placing the device on the Jeep outside of their jurisdiction.  With these two violations, an expired court order, placing the device on the vehicle while the vehicle was located outside their jurisdiction, the FBI agents and FBI technician broke the law.  The FBI agents and technician further broke the law and violated my Constitutional Rights by entering my house on Moore Street, Waldorf to replace the battery on the GPS device while the Jeep was parked inside my garage.  (Refer to GPS data October 19, 2005).  This data shows the agent put the GPS device on the Jeep while it was parked in the garage on Moore Street.  I also enclosed the GPS court order and Detective Steven Kirschner's trial transcript.

V.     Alcoholic Beverage Regulatory Agency (ABRA) Executive Director, Maria Delaney, misconduct and out of her official capacity of ABRA duties.

Ms. Maria Delaney accompanied the FBI and DC MPD officers in the search of Levels Night Club on October 24, 2005.  Items that were said to have been found in the upstairs office (Room J) of the club include:  hotel receipts and hotel cards.  All of these items were planted there by Ms. Delaney, MPD officers and the FBI agents.  Ms. Delaney also participated with the government in a slanderous and negative pretrial publicity article and news brief (ABC 7 news) on or about March 12, 2007 shortly before the government sought a second indictment with a new grand jury.  This strategic move was calculated and planted to discredit me and to whitewash the March 5, 2007, Washington Post article, "Cash and Cocaine but no Conviction."

The government was responsible for the false and negative information in the Washington Post article "District Jurors Deserve More Credit". This editorial was written by a former assistant US attorney, Timothy J. Heaphy. In his editorial, Mr. Heaphy states a number of lies and erroneous assumptions. As a former assistant US attorney, Mr. Heaphy's actions were misguided, and irresponsible. He was not in the courtroom during the trial and he clearly did not order or review the transcripts from the trial before making his comments. First error: he said "Antoine Jones and four co-defendants" there was Mr. Jones and three co-defendants in trial. Second error: he said the article of March 5th "extensively quoted Mr. Jones's defense attorney, particularly his theory that the Jones case was less serious in the eyes of jurors because it was not alleged that the defendants committed acts of violence." Mr. Jones's attorney, A. Eduardo Balarezo made no such assertion or inference to such in the March 5th article. In fact, my attorney Mr. Balarezo responded to that article and set the facts straight in the Washington Post "The Facts in a Criminal Case." (All of these articles were printed in the Washington Post March 5 through March 16, 2005.)

The government was also responsible for the slandering statements in the March 12, 2007 Washington Times "Man with Drug Conviction Given Liquor License" (with a photo of someone else—not me). The Washington Times "correction" article on March 15, 2007, which printed a photo of me with the caption stating "Man with Drug Conviction Given Liquor License" attempted to clean up the mistake. The article and the ABC-7 news brief insinuated that there was wrong doing in my obtaining a liquor license from the ABRA. I applied for a liquor license and answered the questions on the ABRA application honestly. My question is why would the ABRA Executive Director, Maria Delaney and the government engage in negative press and slander during pretrial, and while a new grand jury was about to be convened in this case.

Further, I have enclosed are documents which clearly show Ms. Delaney was partnering with and assisted the government in the search of Levels Night Club, the removal of the liquor license from the premises without probable cause, and the planting of hotel receipts, hotel cards, and a gun.

VI.     Illegal Search of Moore Street house and the Jeep Cherokee.

FBI Agent Stephen Naugle entered the Moore Street house with an unauthorized key, the agents didn't use a battering ram for force.  The agents used a key to unlock the door and then instantly seized the house.  The agents all entered the house in the dark, came up stairs to the bedrooms and snatched me and my family out of our beds, pointed guns at our heads and made us lay on the floor while they continued to search the house.  They disarmed the ADT alarm so it would not alert the security company.  The use of an unauthorized key and the falsified ADT report need to be investigated by Internal Affairs.

Agent Naugle perjured himself in the trial.  He testified that they entered the house after 6 a.m.  The GPS data on the Jeep Cherokee shows the last entry on the device upon disconnect was at 5:21 a.m.  Enclosed is the data entry sheet of the GPS on October 24, 2005.  My wife testified under oath that the agents entered the house at 4:45 a.m.  Further, my son who was attending college in Baltimore set his alarm clock for 5:00 a.m. and he leaves the house at 6 a.m. each morning.  On the morning of October 24, the agents entered the house before his 5 a.m. alarm clock sounded.  My wife and I have our television alarm set for 6 a.m. and we get up each morning at that time to start our day and see our son off to school and make sure he is properly prepared for his long commute.  (It also serves as a backup incase my son's alarm failed.)  The agents were inside the house, we were handcuffed and they well into their searching when the television alarm came on at 6 a.m.  The agents were startled by the noise.  Both of these alarms sounded while the agents were inside the house.

Enclosed is a copy of the other houses which were searched on that morning to compare to the Moore Street house search.  The other locations have a photograph of the Search Warrant and Attachment A.  The photos were taken with the residents either holding the search warrant or it was photographed inside the location or attached to the wall.  During the search at my residence (Moore Street) one of the agents (an Asian) repeatedly asked the other agents if he should "take a picture of the search warrant now".  There is no

photo of a search warrant or Attachment A at the Moore Street house.   The agents never presented me, my wife or my son with a search warrant or Attachment A.  The search warrant document states that a copy of the search warrant and Attachment A must be signed by the occupants and left at the location.  The agents took over 40 boxes of our personal, private, and business documents and they had my wife sign the inventory sheet for the items they took from the house.  Again, I assert there was no search warrant or Attachment A presented, signed or left at the premise.  Statements and testimony on this matter is enclosed.

The government agents also made perjured statements when they testified that I signed a consent form for the search of the Jeep Cherokee.  From the time the agents entered my house on Moore Street, snatched me out of bed and handcuffed me with my hands behind my back, I remained cuffed until I arrived at FBI headquarters later that day.  Detective Norma Horne testified (see grand jury testimony) that I pointed out bags of money inside the Jeep.  I neither signed a consent form nor did I point to any money inside the Jeep. During the trial Detective Sopota, MPD, testified that he retrieved bags of money from the Jeep.  I assert that the signature on the consent form is a forgery.  Enclosed is the consent form, Detective Norma Horne's perjury statements made to the grand jury, and the bench conference on that matter.

VII.     Prosecutorial Misconduct and Law Enforcement Misconduct.

This section shows numerous accounts of misconduct by the government.  My attorney, Mr. Balarezo requested the August 1, 2005 pen register application and order.  The government has not as of yet turned the information over to the defense attorney. Enclosed is the trial transcript where all of the defense attorneys requested the pen register application.  If the government has the August 1, 2005 pen register application but refuses to turn it over to the defense counsel, this is a violation of the law and an example of prosecutorial misconduct.  If the August 2005 pen register application does not exist, then the agents are in violation of the law again for invading and intruding on my privacy without a court order.  The missing pen register application poses issues of

suppression and the information becomes the fruit of the poisonous tree doctrine and further raises the issue of probable cause.  (See trial transcript page 54, line 18.)

Prosecutors Rachel Lieber and John Geise allowed government witnesses to give fabricated testimonies riddled with perjured statements.  The prosecutors did not attempt to stop these witnesses, but instead they allowed these acts of perjury to continue.  The prosecutors did not attempt to strike the testimonies nor did they charge any of the witnesses (agents, detectives, and citizens) with perjury.

For example, Rachel Lieber allowed the government's witness Anthony Givens to give a false, fabricated testimony.  After Mr. Givens was sworn in and took the stand to testify, he was asked to identify me (Antoine Jones).  Mr. Givens first pointed out Mr. Jackson.  He was instructed to try again and on his second attempt he pointed out Mr. Huggins.  On his third attempt he stated Mr. Jones is seated in "chair one".  "Chair one" was occupied by my attorney, Mr. Balarezo.  Next, Mr. Givens picked me.  Mr. Givens grew up with Mr. Holland.   Therefore, at that point I was the only defendant left other than Mr. Holland.  Instead of stopping and dismissing Mr. Givens at that point, Ms. Rachel Lieber (prosecutor) allowed him to continue with his testimony.  (See page 68, Line 21 Anthony Givens trial testimony.)  Even after my attorney, Mr. Balarezo impeached Mr. Givens testimony because of perjury, Ms. Lieber allowed Mr. Givens to continue with his false statements and perjured testimony at trial.

Another example is Donald Hunter and his perjured testimony.  Mr. Hunter committed perjury in his grand jury testimony and in his trial testimony.  Ms. Lieber did not charge Mr. Hunter with perjury.

The government charged me with two cell phone calls to a foreign country, Uzbekistan, a poppy producing country in the Middle East.  The government even produced a document which listed dates and times for these two calls.  At trial, my attorney produced the cell phone bill from my cell phone carrier which contradicted the document produced by the government.  The cell phone bill listed no such calls.

There was another instance of two tainted cell phone calls. The government charges me with talking on the cell phone with Kevin Morris but when the recorded call was played Kevin Morris is not on the call. The call was between me and a club promoter, K.B. Production. The government agents put Kevin Morris' name and his cell phone number on the call and tried to make the call sound incriminating when the promoter and I were talking about club promotions. The other call is between me and another club promoter, Ronald Moten, co-founder of the Peaceoholics, Inc. Mr. Moten and I were talking about a teen in the Peaceoholics program that had been killed. We were also in the same conversation talking about the young man's uncle, EarthQuake the comedian, and about upcoming club events and promotions. The FBI agents said this call was between me and Gregory Hawkins. Throughout this case, the agents named various persons "Gregory Hawkins." One Gregory Hawkins, a target in Agent Yanta's affidavit is actually an elderly man whose house the FBI and DC MPD detectives entered to search and seize on October 24, 2005 at the same time they conducted the other search and seizures on that morning. (See Gregory Hawkins information in the FBI target list.) The agents made a mistake going into Mr. Gregory Hawkins house. Mr. Hawkins is someone I don't know. Yet another person that I don't know but the government listed as a government witness and confidential source is Mr. Anthony Koonce.

Enclosed is a copy of a letter the government sent to Mr. Derrick Gordon stating his cell phone was being monitored. Derrick Gordon was also on Agent Yanta's FBI target list. Mr. Gordon is my nephew; he was employed at the club. I intended to call Mr. Gordon as a defense witness. Enclosed is the trial transcript showing how the prosecutor and the judge denied me the opportunity to call Mr. Gordon as a witness to testify on my behalf and clear up the erroneous beliefs that the government inserted regarding the North Carolina traffic stop.

Enclosed is a criminal docket on Harold Holden. Harold Holden is a government informant. As a condition of release from DC Jail, Mr. Holden agreed to be a government informant. In her September 2, 2005 wiretap affidavit, Agent Stephanie

Yanta stated under oath that they didn't have an undercover operator.  In court, Judge Huvelle stated "an informer is an informer."  Harold Holden worked at the club.  Mr. Holden was the club security captain; he had keys and access to the club.  He was there on a daily basis, all day and even stayed pass his 10 p.m. home confinement curfew. Harold Holden worked as head security at Club Levels and he also worked as security at Kilis nightclub (another club which I was associated with).  After the FBI and ABRA took the liquor license from Club Levels, the FBI allowed Mr. Holden to continue to go into the building and remove (without my permission or authorization) all of the liquor, furniture, equipment and supplies.  Mr. Holden told numerous people that the FBI would not arrest him because they were working with him.  Mr. Holden and his wife removed the furniture, equipment and supplies without authorization and sold the items to other club owners around the city.  My wife was at the club on January 18, 2006 when Mr. Holden had returned again to attempt to remove more furniture, supplies and equipment. My wife called the police and attempted to file a police report.  (See Misc. Incident Report 1/18/2006, #008-136, Officer Gaglione, badge 834, MDP DC.) The officers would only write an incident report and the MPD 5th District police officers were discourteous and hostile toward my wife.  They refused to charge Mr. Holden with unlawful and unauthorized taking the property from the club.  The officer told my wife that the club property belonged to the FBI, and that my wife and I had no legal right to the items or to be on the premises.  The witnesses to this incident are my son, my brother (Dewayne Jones), and Jauhar Abraham.

I have also enclosed a civil complaint which details the government's fabricated stories and false beliefs.  Ms. Rachel Lieber illegally placed me in "total separation" (SE-1 Unit) a maximum security unit under total separation, locked down 23 hours a day.  Ms. Rachel Lieber had me stripped of due process rights.  (See F.O.I. Request on government prosecutor Rachel Lieber.)  Ms. Lieber spied on my defense, demonstrated vindictive prosecution acts, and was prejudices towards me throughout this case.  The prosecutor and the grand jury investigated this case without being on the grand jury docket. Enclosed is the defendant motion and the government's response – more misconduct.

I also enclosed a copy of the Durham police department notification sheet.  Prosecutor John Geise presented a copy of a certified letter which he said I signed for.  I assert that this is yet another forged signature and I requested the original but it has never been produced.  The certified letter which the government said I sign could not have been signed by me because I was not living at that address (Brandywine) when the letter was sent there.  I had moved away over a year before this letter was sent to the Brandywine Road address.  This is another example of prosecutorial misconduct.

In each instance where the government has produced questionable or forged documents or instances when the government did not follow the law and obtain wiretap warrants, or leave a warrant or Attachment A at the premise, the government has refused to turn over the information to the defense counsel.  This alone is grounds for dismissal and an example of prosecutorial misconduct or law enforcement misconduct.  There are many instances of misconduct in this case.

I have also enclosed minimization information.  Throughout their wiretaps, the government recorded hundreds of my personal, private and business calls without regard to the minimization laws.  This is a violation of USC 2518, and grounds for a civil suit under USC 2520.

Also enclosed is a copy of the Legal Times article "Courts Checking Jurors History".  After a three month trial, the court, the FBI and the prosecutor decided to check members of the jury for criminal histories.  The prosecutor made false charges to members of the jury in an effort to remove certain jurors from the deliberation.  The judge questioned three black jurors and when they got to a white juror, the judge decided to discontinue the process.  The attorneys protested.  Again, the prosecutor was searching for a way to throw this case in the government's direction and make certain they get a conviction.

VIII.   PROSECUTORIAL MISCONDUCT

STATEMENT OF FACTS:

Stephanie Yanta – Grand Jury October 25, 2005

Yanta Materially False Statement #1
Agent Yanta testified, page 4, line 19, the source talked about a number of meeting
places.  Car wash meant Sam's Car Wash on Branch Avenue.  This is a false statement!
Refer to page 30, 31 of the September 2, 2005 wiretap affidavit.  CS-1, (Kevin Ray)
never mentioned a Sam's Car Wash or Branch Avenue.  CS-1 only mentioned "Home
Depot in Landover, Level's, Deno's."

CS-2 (Anthony Givens) pages 33-35, never mentioned a meeting place at all.  He
mentioned that he never went inside the club.  CS-3 was not credible.  He never
mentioned a meeting place.  His statements were all hearsay or false, refer to pages 36-37
in the September 2, 2005 wiretap affidavit.

Yanta Materially False Statement #2
Agent Yanta testified, page 5, two sources made statements that were mirrored.
Specifically, meetings at various locations, spots along Branch Avenue, Home Depot,
cocaine in plastic bags, shoulder bags, duffle bags…  My argument is no sources spoke
of Home Depot, Branch Avenue, and therefore it is highly unlikely for two sources to
have mirrored statements or, as required, to have given the same information.  CS-2
rendered a fabricated story riddled with perjury statements, which leaves CS-1, Kevin
Ray as the only source.  Mr. Ray was proven to be "not credible".

Yanta Materially False Statement #3
Agent Yanta testified, page 6, "We started to see this regular pattern of vehicles there
throughout, you know, all hours of the day and night, especially during daytime hours."
She further stated, "the club is a nightclub so one would presume that the club is open
primarily at night, but we would see cars, you know at this location, I mean, literally you
know 8, 9, 10 o'clock in the morning."  Page 6, lines 2-11.  This testimony by Agent
Yanta demonstrates she knowingly and corruptly endeavored to influence and mislead
the grand jury.  It's a false material declaration!

Agent Yanta is the lead agent, during her investigation and trial testimony, she knew
there was a diner (Mike's) located in the same building on the ground floor (under the
club).  Many Metro Transit employees and law enforcement officers from 5th District
(across the street) were constant customers in the diner which opened at 5:00 a.m.  The
diner has a high volume of foot traffic for breakfast through the lunch hours as is clearly
visible from the FBI pole video surveillance camera.  The pole camera filmed this
activity on a daily basis.  Additionally, Agent Yanta was also aware that the club itself

had a licensed restaurant (Scoopies Café) inside the club.  Scoopies was open for business from 11:00 a.m. until 8:00 p.m.

Yanta Materially False Statement #4
Agent Yanta testified, page 6, lines 17-20.  Agent Yanta, once again, deceived the Grand Jury with materially false statements, misleading and fabrications in her testimony. According to Agent Yanta, the cell phone used by Antoine Jones was in the name of Denise Jones in an attempt, in her estimation to elude law enforcement. Instead, the truth of the matter is that Mrs. Jones had a "family plan" with Cingular Wireless which included a separate telephone and phone number for each member of her family; herself, her husband and their son.

Yanta Materially False Statement #5
Agent Yanta testified, pages 13-15, about Mike Huggins, Kevin Holland, and Adrian Jackson.  This testimony was clearly riddled with materially false, fictitious and fraudulent statements in an endeavor to influence and mislead the grand jury.  During a three month trial, Mr. Huggins, Mr. Holland, and Mr. Jackson proved their innocence. All three gentlemen were acquitted of the conspiracy of which they were charged in the indictment.  All of the materially false, fictitious and fraudulent statements in this testimony provided by Agent Yanta regarding Mr. Huggins, Mr. Holland, and Mr. Jackson were willfully made to prejudice the grand jury against Mr. Jones.

Yanta Materially False Statement #6
Agent Yanta testified, pages 19-21, regarding Donald Hunter – count #3.  Agent Yanta's testimony was false.  In trial, defense attorney (A. Eduardo Balarezo) proved that Mr. Hunter didn't receive any cocaine from Mr. Jones.  Agent Yanta's grand jury testimony again, biased and misleading, laid the foundation of prejudice against Mr. Jones.  After Donald Hunter's testimony, the Government dismissed count #3 from the indictment.

Yanta Materially False Statement #7
Agent Yanta testified, page 26, that there was a meeting between Jones and 909 at some location near Branch Avenue, and Jones was dropping off what we think is the last of money or portion of payment for the shipment, the meeting between Jones and 909 somewhere on Branch Avenue is where we think actually that Antoine Jones received his narcotics.  Agent Yanta is the lead agent, she viewed surveillance tapes, surveillance photos, performed physical surveillance, listened to wiretaps, reviewed pen registers, trap and trace, cell site data, GPS data, etc.  Not once in any of these affidavits or any documents, did it mention 909 and Jones being observed on Branch Avenue or near Branch Avenue.  It never once mentioned Jones giving payment to 909 or receiving narcotics somewhere on or near Branch Avenue.  This is a materially false statement; an act of intentional perjury, and an effort to mislead and deceive the grand jury.

Yanta Materially False Statement #8
Agent Yanta testified, page 31, line 25.  Agent Yanta testified the agents seized 3 kilograms of crack cocaine.  This is a false material declaration.  The field test determined that the amount was actually less than a half a kilogram.

Yanta Materially False Statement #9

Agent Yanta testified, page 35, lines 8-10.  Agent Yanta testified that Antoine Jones was out of town as well and we think he was, you know, dealing with this, you know, shipment of cocaine.  This is a false statement, again, made to mislead the grand jury.  The agents were listening to Jones' phone calls and were aware that he had gone to church with his family on Saturday and Sunday (October 22 & 23, 2005).  Jones was in the company of his wife, mother-in-law, and sister-in-law during this weekend at church.

Yanta Materially False Statement #10

Agent Yanta testified, pages 34-35.  Agent Yanta testified about Mike Huggins and Kevin Holland, two co-defendants (both acquitted of conspiracy at trial).  Agent Yanta's testimony was biased, and she did knowingly endeavor to influence and manipulate the evidence in this case.


Prosecutorial Misconduct
Norma Horne – Grand Jury January 26, 2006

Horne Materially False Statement #1

Agent Horne testified, page 5, line 4.  Agent Horne testified "we" recovered a 9mm Ruger…  Agent Horne's trial testimony contradicted her grand jury testimony.  During the trial, under oath, she testified that she wasn't there when "they" found the gun.  When she walked into the office, the agents had the gun out, taking photos.  Norma Horne also testified under oath at the Grand Jury that the gun was found underneath a black box.  There is no black box in the photos taken during the search of the club.

Horne Materially False Statement #2

Agent Horne testified, page 7, lines 17-19.  The Government asked Norma Horne, "How much crack cocaine was it?"  Agent Horne deceived the Grand Jury into believing the agents seized over 40 grams of crack cocaine.  When asked about the quantity of crack cocaine, Agent Horne perjured herself by responding, "speaking of Mr. Jackson's search, I believe his actual weight was over 40 grams".  In trial she testified under oath that the actual weight was 3.9 grams…

Horne Materially False Statement #3

In the Grand Jury, Norma Horne testified "we" weighed it out, it turned out to be 3 kilos of crack cocaine.  Norma Horne agreed with the Government, 3 kilos of crack cocaine and those were all located in the attic.  Norma Horne's testimony is perjury and a false statement.  Agent Horne couldn't weigh the crack cocaine out, she was at the Club Levels location where no drugs were found.  Norma Horne testified under oath at trial that it was under 500 grams of crack cocaine.  Once again, the Government agents deceived the Grand Jury (page 15, lines 17-24).

Horne Materially False Statement #4

Norma Horne made a statement, (page 18, lines 18-23) "I know one phone call and in the background you can actually hear them kind of cutting something up… This house here believed to be Mr. Adam's house, believed to be the cut house".

I would like to submit this call into evidence, session #4818 202-437-0047, 10/14/2005, 9:35:15 outgoing call to Kirk Carter – Listen to this call.

<u>Horne Materially False Statement #5</u>
Norma Horne testified, page 19, lines 20-21.  Agent Horne testified "we believe he has several houses from Baltimore, PG County.  We think it is <u>six</u>".  Norma Horne is co-lead agent.  According to the testimonies provided by the agents, this investigation was supposed to have been going on since late 2004.  During the wiretap and investigation, investigators only mentioned the Brandywine Road house.  The Brandywine Road house is actually a property rented out to Mr. Jones' mother-in-law and sister-in-law.  Jones and his wife are buying and living in the Moore Street house in Waldorf, Maryland.  Jones and his wife also own a house (an uninhabitable shell) in Baltimore, Maryland which they purchased in August 2005.  It's deceiving and perjury to testify that he has "<u>six</u>" houses.  Agent Horne knowingly and corruptly made these false declarations in an effort to mislead the jury.

<u>Horne Materially False Statement #6</u>
Norma Horne intentionally perjured herself by testifying under oath, "it was told to <u>me</u>" that "he directed agents when they let him know it was a search warrant, that he had money in his vehicle, and took them out to the vehicle, and pointed out some are in the brief case and some are in bags, plastic bags, I believe brown bags…"  Norma Horne is again deceiving the Grand Jury.  During the search of the Moore Street house, the agents implied Mr. Jones signed a "consent to search" form.  (If they had a search warrant, why would they need to ask him to sign a "consent to search" form – here again, proof that the agents entered the Moore Street house without a search warrant.)  Not once, in any statements, any documents, nor during pre-trial is any information on record that Mr. Jones went out to the garage and pointed out anything to the agents.  I challenge Norma Horne's false testimony, by arguing that from the time the agents entered the house and demanded everyone in the house to lie down on the floor, they handcuffed all the occupants.  Never was it stated, written or communicated in any manner that the agents took Mr. Jones to the garage, removed the handcuffs and Mr. Jones pointed out anything in the garage or inside the Jeep itself.  If Agent Horne testified about these events as the lead agent, there should be some report of such events.  The truth of the matter is that the agents entered the Moore Street house without a search warrant (therefore they were not able to obtain a signature on the original warrant from any of the occupants of the house), and the agents dishonestly conspired and created this fictitious statement to cover their "illegal search and entry."  While the agents were in the house conducting the search, one agent in particular (an Asian) repeatedly asked if he should photograph the search warrant.  That photograph was never taken and never presented before or during trial because it does not exist.  Again, the FBI agents knowingly and corruptly chose to enter the home of Mr. Jones without a search warrant; a clear violation of the law.

Prosecutorial Misconduct
Norma Horne – Grand Jury June 27, 2006

<u>Horne Materially False Statement #7</u>
Norma Horne testified, page 4, lines 9-24, on count #2, that Anthony Givens had been arrested May 11, 2004, and Mr. Givens has since indicated that the drugs in his possession at the time of the May 11, 2004 arrest had been supplied to him by Antoine Jones… Mr. Givens made a confession video. Not once did Mr. Givens mention Antoine Jones, nor did he state that he received crack cocaine from Antoine Jones in that confession video. His video taped confession contradicts Norma Horne's testimony.

Prior to delivering his perjured testimony at trial, Mr. Givens was not able to identify Mr. Jones in the courtroom. When asked to point out Mr. Jones for the court, Mr. Givens first pointed to co-defendant Adrian Jackson. On his second attempt he pointed to co-defendant Michael Huggins, (he knew co-defendant Kevin Holland from childhood). After being asked again to point out Antoine Jones, a third time, Mr. Givens stated "chair one". "Chair one" was occupied by defense counsel, Mr. A. Eduardo Balarezo. After that attempt, Mr. Givens finally came to Antoine Jones. Surely, the Government has to agree that Mr. Givens' testimony was fabricated and perjury. Count #2 was dismissed by the Government. Norma Horne's materially false testimony on count #2 as presented to the grand jury was purely prejudiced toward Mr. Jones and tainted the vision of the grand jury. Mr. Jones argues that the Government should have investigated Mr. Givens' statement and reviewed his video taped confession and they would have realized (prior to bringing him into court to testify at the trial) that Mr. Givens' statements regarding Mr. Jones were fabricated thereby rendering his trial testimony perjury.

<u>Horne Materially False Statement #8</u>
Norma Horne testified, regarding count #3, Donald Hunter, October 14, 2005. Norma Horne testified that Donald Hunter indicated that he obtained the 48 grams of cocaine from Antoine Jones. Agent Yanta testified to the 48 grams. Horne testified, "Hunter stated yes, he had obtained it from Mr. Jones, Antoine Jones". After defense counsel Mr. Balarezo's cross examination of Mr. Hunter, defense counsel clearly proved the 48 grams of cocaine couldn't have been purchased from Antoine Jones. In Mr. Donald Hunter's possession, was seized a handgun and heroine which was never mentioned. The Government agreed, thereby admitting to providing materially false information; they dismissed count #3 from the indictment.

<u>Materially False Statement #9</u>
Counts 5-34 of the indictment. Mr. Jones is challenging all calls and counts associated with co-defendants who were acquitted of these counts at trial: Adrian Jackson, Kevin Holland, Michael Huggins, and Kirk Carter.

Prosecutorial Misconduct
Kelli O'Brien – Grand Jury March 14, 2006

17

O'Brien Bias and Misleading Statement #1

Agent O'Brien fully discussed the GPS which was installed on the Jeep Cherokee without a court order.  [The agents violated U.S.C. 18§3117 and the 10-day Execution Order.]  Agent O'Brien mentioned viewing the GPS system, there were the periodic visits to what we viewed as the "stash house" (page 7, lines 22-25, and page 8, lines 1-2).  Mr. Jones challenges this biased testimony and Mr. Jones further argues the GPS was illegally installed on the Jeep Cherokee.  All information is therefore derived from the fruit of the poisonous tree.

One page 5, lines 1-4, Agent O'Brien testified that the GPS installation was pursuant to a court order.  Mr. Jones argues here that the court order had expired prior to the installation of the GPS device on the Jeep Cherokee.  Agent O'Brien deceived the grand jury by not mentioning that the order had expired and the monitoring was therefore without a court order.

O'Brien Materially False and Misleading Statement #2

Agent O'Brien, pages 8-22, discusses coded conversations.  Mr. Jones argues that all discussions of Adrian Jackson, Kevin Holland and Mike Huggins which the Government deemed to be counts and overt acts were determined at trial by the acquittals to be contrary.

Prosecutorial Misconduct
Katerina Gikas– Grand Jury March 14, 2006

Agent Gikas, Grand Jury testimony, pages 4-6, Agent Gikas testified under oath to the grand jury providing materially false, misleading and fictitious statements.  Agent Gikas states that her office got a call from the office in McAllen, Texas, and "they informed us that an individual who was involved with a Mexican cartel, a narcotics cartel was flying into BWI, and he was flying into the area to collect a large amount of narcotics proceeds, from the Maryland area and he was going to carry the narcotics proceeds back to Texas and eventually to Mexico.  They faxed a photo of him.  The description was a Hispanic male about 30 years old, approximately 6 feet tall, 2/230 pounds."  She specifically remembered cream colored boots and belt.  His ostrich skin cream colored belt and boots to aid in their identification of him.  The person on the flight and identified was Francisco Javier Gonzales-Ruden.  He was "observed getting in a silver Impala vehicle."

Gikas Materially False Statement #1

Agent Gikas not only told a fabricated story, she knowingly and corruptly made false material declarations throughout her testimony, and thereby perjured herself under oath before the grand jury.  Refer to the 8550 Myrtle Avenue, Bowie, Maryland search warrant, probable cause section, February 27, 2004.  During that time in the investigation Agent Gikas didn't mention Javier as a suspected target, nor did Agent Gikas mention that her office received a call from the McAllen, Texas office.  She did not give a description of anyone coming to BWI Airport…  Agent Gikas stated under oath that she specifically remembered the ostrich cream colored belts and boots, to aid in their identification.  But yet she didn't mention these important details in the search warrant

probable cause and the ICE Report of Investigation. In both documents, she referred to the targets and (UNKHM1, UNKHM2 and UNKHM3 – Myrtle Avenue house search warrant probable cause section). In her ICE Investigation she referred to the targets as three unknown Hispanic males. Again, no mention by Agent Gikas of Javier being a target nor is there mention of Javier coming through BWI Airport… In her reports and the search warrant, she stated the agents were conducting surveillance in the Arundel Mills Shopping complex in Hanover, Maryland. She stated the same thing in her investigative report.

Refer to Number 4, on her Report of Investigation, the title:  3 Unknown Hispanic/Mexican males… The date 2/27/2004. How can the McAllen Office giver her office any information on Javier, when Agent Gikas didn't know Javier's description or his identification?

Gikas Materially False Statement #2
Agent Gikas testified, page 6, lines 5-9, that she observed a silver Impala vehicle. "There were two other individuals in the vehicle that came and picked him up…"

Agent Gikas never mentioned any vehicle or targets picking up Javier before 2/27/2004 in her Investigation Reports and search warrant probable cause. Agent Gikas willfully and knowingly fabricated her testimony, riddled it with fictitious and fraudulent statements in an effort to manipulate and mislead the jury.

Agent Gikas testified, page 9 lines 17-20. Agent Gikas stated agents who stayed back at the apartment observed Javier coming outside in front of the apartment building and talking on the cell phone. However, in the search warrant, Agent Gikas stated UNKHM1 exit 9719 Summit Circle, talked on a cell phone outside, returned into 9719 Summit Circle.  [In her investigation report it was redacted] no information on Javier on the cell phone outside of the Summit Circle apartments.

Gikas Materially False Statement #3
In the grand jury testimony, Agent Gikas states Javier and one of the young guys got into the Impala and literally hit 95 South at lightning speed. In the search warrant probable cause, she stated UNKHM1 and UNKHM2 departed the area in haste in the silver Impala and did not return to the Summit apartment.

Gikas Materially False Statement #4
In her grand jury testimony, Agent Gikas states "they must have driven nonstop, because Information that we had received from the McAllen office was that they had left the area without accomplishing their objective, which was to collect the money and, they were coming back to get the money."

In the search warrant probable cause, Agent Gikas never mentioned the office of McAllen, Texas. She mentioned investigation and information from a confidential informant SA-441MC referenced, revealed that the three UNKHMs might be returning to the Maryland area.

19

Gikas Materially False Statement #5
Agent Gikas testified she had Javier's cell phone number, and obtained a pen register on it (February 17, 2004).

In the search warrant probable cause, Agent Gikas only mentioned, SA-441MC gave information on cell phone 956-793-0310. She never mentioned this cell number belonging to Javier. All the false material facts here only point to the conclusion that any information Agent Gikas testified to that pertain to Javier before February 28, 2004, is materially false, fabricated and fictitious information thrown in to mislead and manipulate the outcome of the case.

Gikas Materially False Statement #6
Gikas grand jury testimony, pages 20-21. Agent Gikas testified about the execution of the search warrant on Myrtle Avenue, Bowie, Maryland. Agent Gikas testimony is deemed prejudice because it was information from an illegal search.

The courts permitted the delaying of notice of entry of the execution of the warrant for a period of thirty (30) days pursuant to section 213 of the Patriot Act.

In US v Freitas – In denying the Government's motion for reconsideration, the courts reemphasized the lack of any notice provision in the surreptitious entry warrant and held that the lack of notice violates both Rule 41 and the Fourth Amendment.

Agent Gikas never gave notice of a search warrant to Mr. Lawrence Maynard. She had his residential address, and his place of business (the Hampton Blvd warehouse). Agent Gikas knew before she testified the search of the Myrtle Avenue house was invalid since ICE conducted the search without giving notice to Mr. Maynard.

Gikas Materially False Statement #7
Agent Gikas testified the agents entered Hampton Blvd warehouse on April 30, 2004, with permission from the landlord. She stated "He gave them the key…" This is a false material declaration. Mr. Schaffer (the landlord) didn't give the key to the agents. In fact, the ICE agents went into the warehouse, illegally, prior to the April 30, 2004 date. The agents obtained entry without a key by breaking into the warehouse.

Gikas Materially False Statement #8
Agent Gikas made materially false declarations in her testimony. She stated "a brand new house, fairly new cars, he and his wife were driving, just for the basic house, car payments, close to $10,000 a month.

This was deceiving and misleading in an effort to influence and prejudice the court. The Joneses were only responsible for one mortgage payment on the Moore Street house. The Brandywine Road house was being rented out and the "shell" in Baltimore had no outstanding mortgage on it. The only two vehicles which had notes were the 2001 Jeep

and the 2003 Toyota truck.  The one mortgage coupled with the two truck notes were approximately $4,100 a month; less than half the $10,000 estimation of Agent Gikas.

Gikas Materially False Statement #9
Agent Gikas testified "the mortgage note and the car payments was close to $10,000 a month.  Now, Mr. Jones is on <u>probation</u> having got out of <u>prison</u> okay."

This is a prejudice statement, to let the jury know that Mr. Jones is on probation and was inserted to mislead the grand jury.  Mr. Jones had been out of prison and on probation since 2001.  Agent Gikas got away with calling the defendants "bad guys" twice in her testimony.  She endeavored to paint a picture of and leave a negative trail in the minds of the court and the jury.  She did not let the court know that Mr. Jones was the owner and operator of a successful nightclub and was quite capable of paying his bills since he got out of prison.

Gikas Materially False Statement #10
Agent Gikas testified that Mr. Jones had little to no legitimate income.  This is a materially false statement.  On the date these statements were made to the court, (3/14/2006), Agent Gikas being the lead agent, had become aware of the fact that Jones owned Club Levels and had also invested in Kili's nightclub.  Both clubs were operating successfully in the District of Columbia.

PERSONS LIKELY TO BE INTERCEPTED BY THE FBI

TARGET LIST

1. Antoine Jones – Defendant, Owner, Club Levels.

2. Lawrence Maynard – Close friend of Antoine Jones for over twenty years. Met while working at the together at a hotel in Washington, DC in the early 1980s.  Manager, FTN Delivery (trucking and furniture delivery and storage services) and the Operational Manager of Club Levels.

3. Nicholas Jones – long time friend of Antoine Jones.  A promoter for the club and club events and he also worked part-time Assistant Manager, Club Levels.

4. Anthony Lamont Koonce – A person unknown to the defendant (never seen or heard of him until now).  The FBI agents tried to get this man to say he knew me.  The agents went as far as to threaten to transfer his minor charge over from Superior Court to District Court if he didn't say he knew me.  Well, he refused and true to their threat, his case was transferred to District Court. Confidential Source-3 (CS-3) stated in his 302 that someone he believes from Club Levels was giving Anthony Koonce narcotics.  Anthony Koonce could only testify that he does not know me, and he does not know anyone associated with Level Entertainment (Club Levels management).

5. Derrick Gordon – my nephew who was also employed at the club.  He was a passenger in the minivan that was stopped by Durham, NC police.

6. Bradford Waddell – I have known the Waddell family since the mid-1970s.  I am very close to Bradford and his older brothers.  He frequently partied at the club, attended and sold tickets for club events on a regular basis.

7. Annette Bigesby – A friend and business associate who helped me with employment when I was released from prison.  Ms. Bigesby also had parties and sponsored large events at the club.  She was one of the first promoters and sponsors of the club when it first opened.

8. Donald Hunter – A promoter who also sponsored events at the club.  Mr. Hunter agreed to testify for the government after he got arrested for

possession of cocaine, heroin and a gun. He also had numerous other charges pending prior to this particular arrest. Mr. Hunter made the accusation that he got drugs from Antoine Jones. After a lengthy questioning and cross examination, Mr. Hunter's story changed so many times. It was clear that he perjured himself and the government decided it was in their best interest to dismiss that count against Mr. Jones altogether from the indictment.

9.  Adrian Jackson – Partner with Antoine Jones in Levels Entertainment, Inc. Mr. Jackson was also charged in the indictment and went to trial with Antoine Jones, et al. Mr. Jackson was acquitted of all charges.

10. Diane Bushrod – A long time friend for over twenty years. Ms. Bushrod and I grew up in DC and we were both employees of DC Department of Recreation from our teenage years. We both worked our way from summer worker to manager and eventually, area supervisor. Ms. Bushrod organized many of the Recreation Department events. She also promoted many Lesbian-Gay events at Levels nightclub. Ms. Bushrod also promoted events at Kilis nightclub. She and I became associated with Kilis nightclub as a result of our collaboration with the many band producers that we knew throughout the city. In addition, we sponsored and supported many events with MPD, the former Mayor (Anthony Williams) and many charity events.

11. Kirk R. Carter – A friend who I have known for years. He is a promoter who promoted events and sold tickets for events at Levels. Mr. Carter was severed from the first trial. The government alleged that five phone conversations between me and Mr. Carter were drug related. Even without Kirk Carter having any representation at the trial, I was still acquitted of all counts involving phone calls with Mr. Carter. The only remaining issue was John Adams' statements. However, during the trial all of the defense attorneys impeached Mr. Adams therefore rendering his statements and testimony mute.

12. Twanda Campbell - I don't know this woman and have never heard of her before. She is totally unknown to me and not associated with Levels Entertainment.

13.    Damien Lomert Broussard – This is the brother of one of the bartenders (Quentessa Broussard) at Club Levels.  Agent Stephanie Yanta tried to deceive the judge by using Damien Broussard's criminal background information and link it to Quentessa's cell phone.  In trial, Quentessa Broussard testified that her brother Damien was never tied to Club Levels; has never worked there and to her knowledge does not know and has never known Antoine Jones.  Further, Damien Broussard has been in jail in Louisiana since September 2004 and has not been in D.C. since sometime in 1993.

14.    Tymira Hunter – A promoter (Couzins Promotions) who sponsored a party at Levels nightclub.  Ms. Hunter was a female associate of Lawrence Maynard and a frequent patron of Levels nightclub.

15.    Terrence Dixon, aka Nimrod Babylon – This person is unknown to me.  He became a target by calling my cell phone once (a call that lasted 8 seconds).

16.    Wallace Ward – This target died in July 2005.  He was the uncle of Collette Watson a female associate that worked at the club.  Ms. Watson was the owner of the cell phone cited in Agent Yanta's September 2, 2005 affidavit.  Collette Watson regularly sent sexually seductive text messages to Antoine Jones and Lawrence Maynard.  The judge would not allow the defense to discuss Wallace Ward or submit the death certificate into record at trial.

17.    Karissa Jones – A bartender at Levels nightclub.  Karissa Jones regularly sent text messages to Lawrence Maynard regarding club business and bar supplies.

18.    Nita Worley – A bartender at Levels nightclub.  Nita Worley regularly sent text messages to Lawrence Maynard regarding club business and bar supplies.

ENCLOSURES:

    A.  Target List – persons likely to be intercepted

    B.  Text messages, International Time Zone (GMT) document, Payroll & Timesheet (Levels Entertainment) documentation

    C.  September 2, 2005 Wire Tap Affidavit

    D.  Wallace Ward death certificate, bartender testimony

    E.  Grand Opening – flyer of Scoopie's Soul Café (located inside Club Levels)

    F.  Nimrod Babylon, Jamaica, Uzbekistan pen register data and cell phone record

    G.  More targets – Nicholas Jones, aka "Toby", and Derrick Gordon

    H.  Criminal docket for Harold Holden, government informant

DEC 02 2005 16:26 FR VWAU          2023534898 TO ████████          P.01/02



**U.S. Department of Justice**
United States Attorney
District of Columbia

*Judiciary Center*
*555 Fourth St. N.W.*
*Washington, D.C. 20530*

# FAX



| | |
|---|---|
| **To:** DC Jail | **From:** USAO/DC |
| (202)██████ | (202)██████ |
| **Fax:** | **Phone:** |
| **Date:** December 2, 2005 | |
| **Re:** Request for Lockdown: Antoine Jones | |
| **Page(s):** 2 including cover | |

**COMMENTS:**

Please place Antoine Jones immediately in lockdown. If you have any questions,
please call me on the telephone number listed above.

**Thanks**

---

**U.S. ATTORNEY FACSIMILE COMMUNICATION**

*WARNING: Information attached to this cover sheet is U.S. Government Property.
If you are not the intended recipient of this information, disclosure, reproduction,
distribution, or use of this information is prohibited. Please notify the originator
immediately to arrange for proper disposition.*

DEC 02 2005 16:26 FR UWAU                    TO              P.02/02

# Memorandum

**United States Attorney**
**District of Columbia**

| Subject: | Date: |
|---|---|
| Request for Lockdown<br>Antoine Jones<br>DCDC 241912 | December 2, 2005 |

| To: | From: |
|---|---|
| DC Jail | USAO/DC |

AUSA ████████ has indicated in a previous request, dated November 23, 2005, that inmate Antoine Jones, DCDC 241912 should placed immediately in lockdown at the DC Jail. Please ensure that Mr. Jones is lockdown until further notice.

If you have any questions, please call me at (2)████████ or Rachel Lieber at (2)████████

**Thanks**

** TOTAL PAGE.02 **

DEC 22 2005 12:42 FR UWAU ███████████████ TO ██████████ P.02/11

# Memorandum

**United States Attorney**
**District of Columbia**



| Subject | Date: |
|---|---|
| Continuing Problems with Prisoner Antoine Jones, DCDC 241-912 | December 22, 2005 |

| To: | From: |
|---|---|
| Warden, District of Columbia Jail | ████████████   *RC*<br>Assistant United States Attorney |

On November 23, 2005, the United States Attorney's Office made a written request to the D.C. Jail, that the aforementioned prisoner, Antoine Jones (DCDC 241-912) be placed in protective custody, based on growing concerns that Mr. Jones was ████████████████████████ ██████████████████████ in his narcotics conspiracy case being prosecuted in United States District Court for the District of Columbia. Nine days later, on December 2, 2005, it came to my attention, while ██████████████████████████████ that he was continuing to make telephone calls from the Jail, which led me to believe that he remained in population. With the aid of members of ████████████████████████ I learned that Jones did, indeed, remain in population. Thus, we renewed our request to have him transferred to protective custody, to ensure the safety of various individuals, and the integrity of the investigation.

According to Jail records investigators received last Friday, December 16, 2005, and examined this week, while Jones has been transferred to protective custody, he continues to somehow have telephone privileges. This completely undermines the purpose of his being in that placement - ████████████████████████████████████████ ██████████████████████████ Indeed, some of the basis for the government's concern regarding Jones's ███████████████████████████████████████ ████████████████████ ████████████████

I have attached copies of the most recent Department of Corrections call logs, ████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████

DEC 22 2005 12:42 FR UWAU                    TO                    P.03/11

The U.S. Attorney's Office and the F.B.I. are very concerned that Antoine Jones ▉▉▉▉ ▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Please consider this memorandum a formal request for an immediate investigation into this situation, to include an examination of how these clear violations occurred, and more importantly, an immediate correction of the problem.

Please feel free to contact me at (202) ▉▉▉▉▉ (office) or (202) ▉▉▉▉▉▉ (cell), if you have any questions.

2