UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal No. 05-386(1) (ESH) |
| | : | |
| ANTOINE JONES | : | |

### DEFENDANT'S MOTION TO SUPPRESS TANGIBLE EVIDENCE FROM 9719 SUMMIT CIRCLE, APT. 3B, LARGO MD

Defendant Antoine Jones ("Jones"), by and though undersigned counsel, and pursuant to the Fourth Amendment to United States Constitution and applicable case law, hereby respectfully moves to suppress tangible evidence found at an apartment at 9719 Summit Circle, Largo, MD. In support of this Motion, Mr. Jones states as follows:

### FACTS

In February 2004, ICE began an investigation into alleged narcotics trafficking by several Hispanic individuals in Maryland. From this investigation, the government allegedly learned that some Hispanic males at some point were present at 9719 Summit Circle, Largo, MD and that Jones leased that apartment. A stakeout of the apartment led to the viewing of a black Cadillac registered to Jones pick up one of the males and drive him to BWI – Jones himself was never seen.

At some point after the Cadillac left the scene, ICE agents entered the apartment without a warrant and observed air mattresses, shrink wrap and devotional candles. At the prior trial, the government presented evidence of the same type of evidence being located at other locations associated with Jones. The government alleged that these items are common to narcotics trafficking. Thus, the government tried to connect the Summit Circle apartment to narcotics trafficking also.

Because the ICE agents conducted a warrantless search and there were not exceptions to the warrant requirement, any tangible evidence seized and testimony derived from their illegal entry must be suppressed as the fruit of the poisonous tree.

## ARGUMENT

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized ..." U.S. Const. amend. IV. The Supreme Court has consistently held that the Fourth Amendment only prohibits *unreasonable* searches and seizures. *See Maryland v. Buie,* 494 U.S. 325 (1990); *Skinner v. Railway Labor Executives' Assn.,* 489 U.S. 602 (1989).

In evaluating the reasonableness of a challenged governmental action, it is necessary to balance the intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests. *United States v. Villamonte-Marquez,* 462 U.S. 579 (1983); *Delaware v. Prouse,* 440 U.S. 648, 654 (1979). A search of a house, apartment, or office is generally unreasonable without a warrant issued on probable cause. The Court has consistently expressed a preference for the use of search warrants. *See United States v. Ventresca,* 380 U.S. 102 (1965). "Resort to the warrant process, the Court has declared, is to be preferred because it 'interposes an orderly procedure' involving 'judicial impartiality' whereby 'a neutral and detached magistrate' can make 'informed and deliberate determinations' on the issue of probable cause." 1 LaFave, Search & Seizure, § 3.1(b), 548-49 (1987) (citations omitted).

In this case, the government presented evidence at trial that Jones leased apartment 3B at 9719 Summit Circle, Largo, MD. The lead ICE Agent, Katarina Gikas, testified at trial that agents on her team went into the apartment without a warrant and purportedly with the consent of a maintenance man:

```
13   Q   Now, your team never went into Summit Circle, correct,
14   into the apartment itself?
15   A   Correct.
16   Q   That you subsequently identified Number Three -- what
17   was the number?  What was the apartment you later identified
18   as being rented by Antoine Jones?
19   A   3B.
20   Q   You never went into that apartment, right?
21   A   I didn't, no.
22   Q   Did any of your agents go into that apartment?
23   A   I think some did.
24   Q   Do you know when they went into that apartment?
25   A   I'm not exactly sure of the date.  It might have been
 1   February 7th, the second day.
 2   Q   Was that pursuant to a warrant?
 3   A   No, sir.
 4   Q   How did they get into there?
 5   A   The maintenance men.
 6   Q   So, you have an apartment that's rented presumably by
 7   Mr. Jones, am I correct there?  You have some interest in
```

    8  that apartment and your law enforcement capacity; is that

    9  correct?

10  A  Yes.

11  Q  Did you understand the question?

12  A  Yes.

13  Q  Okay.  You want to see what's going on in the apartment,

14  right?  You're interested in what's going on in there, right?

15  You can't see from outside.

16  A  Yes.

(Trial testimony of Katarina Gikas, Nov. 16, 2006, morning session at 72:13 – 73:10).  Agent Gikas further testified outside the presence of the jury:

13  Q  Now, when you were conducting the surveillance at Summit

14  Circle before you left, that would have been up until the

15  morning of the 7th; is that correct?

16  A  Early, late morning, yes.

17  Q  You actually saw individuals go up to the third floor;

18  is that correct?

19  A  Yes.

20  Q  That's the point you didn't know which apartment, but

21  you knew it was third floor?

22  A  Correct.

23  Q  Was there a discussion amongst yourself and the agents

24  that were with you as to, you know, we wonder which

25  apartment.  We want to know what's in the apartment.  We're

1   curious what was in the apartment?

2   A   We want to know which apartment, yes.

3   Q   And did you also want to know what was going on in the

4   apartment?

5   A   Well, we pretty much, you know, we were thinking that

6   there was money in the apartment, yes.

7   Q   Okay.  And money, the proceeds of drug sales?

8   A   Yes.

9   Q   And were you also assuming that there could be drugs in

10  the apartment as well?

11  A   Possibly.

12  Q   Was there any discussion that you had as to ways in

13  which you could answer that question, how you could find out

14  what was in the apartment?

15  A   No.

16  Q   Any discussion about the need for a warrant or the way

17  to go in there without a warrant?

18  A   Did I have any discussions?

19  Q   Yes.

20  A   No, I wasn't part of that at all.  No.

(Voir Dire testimony of Katarina Gikas, Nov. 16, 2006, morning session at 88:13 – 89:20).

Nathaniel Richburg, the maintenance man, testified as follows:

10    Q. Okay. Sorry.

11    Now, Mr. Richburg, did there come a time when you

12    actually went into that apartment in the company of some agents?

13    A. Yes.

14    Q. Okay. Tell the jury how that happened, that you went

15    into the apartment with agents.

16    A. Well, actually, one -- I think it was -- I'm not sure

17    what time it was. ==They had came to the rental office and they==

18    ==spoke to my manager and my manager called me over the radio and==

19    ==she asked me to come to the office.==

20    ==And I went to the office and she said you need to let==

21    ==them in the apartment. And I went up there into the apartment,==

22    ==you know, opened the door and everything, went in the apartment==

23    ==with them. And they basically was, you know, searching the==

24    ==apartment and stuff like that==.

25    THE COURT: Can you give us a date?

1    THE WITNESS: I'm not sure what really, date-wise, you

2    know.

3    BY MS. LIEBER:

4    Q. Do you remember generally, was it around the same time

5    frame that we've been talking about, February of 2004?

6    A. Yeah, yeah. Uh-huh.

7     Q. Okay. And did you go in with them at that time?

8     A. Yes.

9     ==Q. Okay. What did you see when you went in with them at==

10    ==that time?==

11    ==A. The only thing I saw was the blow-up mattress and the==

12    ==candle -- a candle on the breakfast bar. That was it.==

13    Q. Okay. Again, was there any other furnishing in that

14    apartment?

15    A. No, there wasn't.

(Trial testimony of Nathaniel Richburg, Nov. 29, 2006, afternoon session at 33:8 – 34:15). The testimony of Agent Gikas and Mr. Richburg indicates clearly that the ICE agents went the apartment without a warrant and conducted a search.

The Supreme Court has determined that a warrantless search of a person's home does not violate the Fourth Amendment where police officers have obtained the consent of a third party who possesses "common authority" over the premises. *See United States v. Matlock,* 415 U.S. 164, 171 (1974). The Court defined common authority as "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id.* n. 7. Such common authority does not include that of a landlord to consent to a search of a tenant's locked house or apartment. *See Chapman v. United States,* 365 U.S. 610, 81 S.Ct. 776 (1961); *McDonald v. United States,* 335 U.S. 451 (1948); *United States v. Warner,* 843

F.2d 401 (9th Cir.1988); *see also Stoner v. California,* 376 U.S. 483 (1964) (hotel clerk does not have authority to consent to search of guest's room).

Here, the agents could not reasonably have believed the landlord or maintenance man had authority to consent to this search. Under *United States v. Matlock,* 415 U.S. at 171 n. 7, "the authority which justifies third-party consent" rests on "*mutual use* of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their numbers might permit the common area to be searched" (emphasis added).  It is the government's burden to establish that a third party had authority to consent to a search. *See United States v. Rodriguez,* 497 U.S. 177 (1990).  The burden cannot be met if agents, faced with an unambiguous situation that Jones had a landlord/tenant relationship with the building manager nevertheless proceed to enter and search the apartment.

In this case, because the circumstances made it clear that the apartment was not subject to "mutual use" by the person giving consent, "then warrantless entry is unlawful . . . ." *Rodriguez,* 497 U.S. at 188-89 (emphasis added).  *See also* W. LAFAVE, SEARCH AND SEIZURE § 8.3(g), at p. 267 (1987).

The maintenance man was in the apartment at the request of his manager who apparently was told by the agents that they needed to go in the apartment.  Had it not been for the agents' illegal conduct, the maintenance man would not have been in the apartment and in position to see the items he claims he saw.  Because the warrantless entry and search into the apartment was illegal, any evidence either tangible or visual, derived from the search must also

8

be suppressed as the fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471 (1963).

**WHEREFORE** for the foregoing reasons, and any others that may appear to the Court, Mr. Jones respectfully requests that this Motion be **GRANTED**.

Dated: Washington, DC
       July 26, 2007                            Respectfully submitted,

                                           **LAW OFFICE OF A. EDUARDO BALAREZO**

                                                         /s/
                              By: _____
                                  A. Eduardo Balarezo (Bar # 462659)
                                  400 Fifth Street, NW
                                  Suite 300
                                  Washington, DC  20001
                                  (202) 639-0999

                                  *Attorney for Defendant Antoine Jones*

**CERTIFICATE OF SERVICE**

      I HEREBY CERTIFY that on this 26th day of July 2007, I caused a true and correct copy of the foregoing Defendant Jones' Motion to Suppress Tangible Evidence to be delivered to the parties in this matter via Electronic Case Filing (ECF).

_____
A. Eduardo Balarezo