1

**Instruction 1.03**

**PRELIMINARY INSTRUCTION BEFORE TRIAL**

Before we begin the trial, I want to explain some of the legal rules that will be important in this trial. I want to emphasize that these remarks are not meant to be a substitute for the detailed instructions which I will give at the end of the trial just before you start your deliberations. These preliminary instructions are intended to give you a sense of what will be going on in the courtroom and what your responsibilities as jurors will be.

When you took your seats, you probably noticed that each of you had a notebook and pencil waiting for you. It is my practice to allow jurors to take notes during the trial if they want to, and to have their notes with them during the jury's deliberations. I want to emphasize that none of you are required to take notes. Indeed, you should not do so if you think that note taking will distract your attention from the evidence or the testimony of the witnesses. On the other hand, if you think that taking notes might help you remember the testimony of the witnesses and the other evidence in the case, or might make you pay more attention during the trial, you are free to take notes. You should remember that your notes are only an aid to help

your memory.  They should not replace your own memory of the evidence.  Those jurors who do not take notes should rely on their own memory of the evidence and should not be influenced by another juror's notes.

Whenever there is a recess in the trial, you should leave your notebooks and pencils on your seats.  They will be collected by the clerk and given to me to keep.  No one, including myself, will ever look at any of your notes.  At the end of the trial, when you come back to the courtroom to deliver your verdict, your notes will be destroyed.  Again, neither I nor anyone else will look at any notes you have taken.

You have probably noticed that there are 16 of you sitting in the jury box.  Only twelve (12) of you will retire to deliberate in this matter.  In some courtrooms,  jurors in the last seats are automatically the alternates, but that is not how it works in this courtroom.  Instead, we chose the alternates' seats at the beginning of the trial prior to selecting you so that any seat combination  might turn out to be the seats of the alternates.

I will not disclose who the alternate jurors are until the end of my final instructions just before you begin your deliberations.  Therefore, it is important that all of you think of yourselves as regular jurors during this trial, and that all of you give this case your fullest and most serious attention.

At the beginning of the jury selection process, you were given lists of

individuals whose names might be mentioned or who are potential witnesses in the case. If, at any time during this trial, you suddenly realize that you recognize or might know any witness, lawyer, someone referred to in the testimony or evidence, or anyone else connected with this case in any way, you should tell the court immediately. You should not tell any other member of the jury about your discovery. If you realize you are acquainted with someone connected with this case while a witness is testifying, you should raise your hand immediately and ask to speak privately to the Marshal or with me at the bench.

Now let me explain briefly some of the procedures we will follow and some of the rules of law that will be important in this case. This is a criminal case which began when the grand jury returned an Indictment. Two Assistant United States Attorneys will present the evidence in support of the charges in the Indictment.

The defendants in this matter, Antoine Jones, also known as Toine, Lawrence Maynard, and Kirk Carter have been charged in an Indictment with one count of conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine and fifty grams or more of cocaine base, also known as crack. Count One of that Indictment, charges both of the defendants with conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine and fifty grams or more of cocaine base, also known as crack, reads:

A. **THE CONSPIRACY**

From at least sometime in 2003, the exact date being unknown to the Grand Jury, up to and including October 24, 2005, in the District of Columbia, the State of Maryland, the State of Texas, the State of North Carolina, and elsewhere, the defendants, ANTOINE JONES (hereinafter "Jones"), LAWRENCE MAYNARD (hereinafter "Maynard"), KIRK CARTER (hereinafter "Carter"), FRANCISCO-JAVIER GONZALEZ-RUAN (hereinafter "Gonzalez-Ruan"), GUADALUPE BARRONE (hereinafter "Barrone"), JOSE GARCIA (hereinafter "Garcia"), and CARLOS REYNA (hereinafter "Reyna"), did knowingly and willfully combine, conspire, confederate and agree together and with Roel Bermea (hereinafter "Bermea"), Alberto Rolando Carillo-Montelongo (hereinafter "Carillo-Montelongo), Ricardo Sanchez-Gonzalez (hereinafter "Sanchez-Gonzalez"), John Adams (hereinafter "Adams"), Demetris Johnson (hereinafter "Johnson"), Donald Hunter (hereinafter "Hunter"), and other persons both known to the grand jury (hereinafter individually referred to by the terms "unindicted co-conspirator-1," "unindicted co-conspirator-2," "unindicted co-conspirator-3," and "unindicted co-conspirator-4"), and

unknown to the grand jury, to unlawfully, knowingly and intentionally

distribute and possess with intent to distribute:

a) a mixture and substance containing a detectable amount of

cocaine, a schedule II narcotic drug controlled substance, and the

amount of said mixture and substance was 5 kilograms or more, in

violation of Title 21 United States Code, Sections 841(a)(1) and

841(b)(1)(A)(ii);

b) a mixture and substance containing a detectable amount of

cocaine base, in the form of "crack," a schedule II narcotic drug

controlled substance, and the amount of said substance was 50 grams or

more, in violation of Title 21, United State Code, sections 841(a)(1) and

841(b)(1)(A)(iii).

## B.  GOALS OF THE CONSPIRACY

It was the principal goal of the conspiracy that, in order to obtain

as much money and other things of value as possible, the defendants,

and co-conspirators not indicted herein, both known and unknown to the

grand jury, acquired, repackaged, stored, processed, sold, and

redistributed quantities of cocaine and cocaine base, in the form of

crack, in the District of Columbia, the State of Maryland, the State of

Texas, the Republic of Mexico, and elsewhere.

## C.    **MANNER AND MEANS TO EFFECTUATE THE CONSPIRACY**

1. The members of the conspiracy played various and interchangeable roles based upon the needs of the conspiracy. JONES was the primary supplier of cocaine to members of the organization in the District of Columbia and the State of Maryland, including CARTER, Adams, Johnson, Hunter, and others known and unknown to the grand jury. MAYNARD assisted JONES in his cocaine sales to these co-conspirators. JONES was supplied with cocaine by various individuals, to whom he referred as "the Mexicans," including GONZALEZ-RUAN, BARRONE, GARCIA, REYNA, Bermea, Carillo-Montelongo, Sanchez-Gonzalez, and others unknown to the grand jury.

**JONES's Mexican Suppliers**

2. On some occasions, JONES, and/or MAYNARD, traveled out of the area to pick up cocaine, and to deliver cash payment for the cocaine. On other occasions, individuals traveled to the Washington,

D.C., area, to deliver large quantities of cocaine to stash locations where it was given to JONES, and to collect money from JONES and/or MAYNARD. GONZALEZ-RUAN, BARRONE, GARCIA, and others unknown to the grand jury, located in the State of Texas, and the Republic of Mexico, employed other individuals to transport large shipments of cocaine – at times in excess of 200 kilograms – in large trucks from Mexico, through Texas, to the Washington, D.C. area. Once the cocaine arrived in the D.C. areas, other individuals, such as REYNA, Bermea, Carillo-Montelongo, Sanchez-Gonzalez and others, unloaded it into smaller vehicles and transported it to stash locations for storage and distribution.

3. In furtherance of this business relationship with their Mexican distributors, JONES and MAYNARD rented houses, apartments, storage units, and other locations in the Washington, D.C., area, where GONZALEZ-RUAN, BARRONE, GARCIA, REYNA, Bermea, Carillo-Montelongo, Sanchez-Gonzalez, and others stored their cocaine for as much as a month at a time. The cocaine distributors also stored in these stash locations large amounts of cash that JONES delivered to them in payment for cocaine, which they ultimately transported to

Mexico.  Over time, as JONES grew tired of renting stash houses for the suppliers, the suppliers themselves rented houses in the Washington, D.C., area, for the same purpose.

4.    From time to time, GONZALEZ-RUAN, BARRONE, GARCIA, REYNA, Bermea, Montelongo, Sanchez-Gonzalez, and others visited these stash locations to deliver cocaine and to collect, count, and package the money received from JONES in exchange for cocaine.  These individuals then transported the money back to Mexico, via the state of Texas, sometimes in cars and SUVs, and at other times in large trucks similar to those that transported the cocaine up from Mexico, driven by other individuals known and unknown to the grand jury.  These stash locations also served as temporary residences for GONZALEZ-RUAN, REYNA, Bermea, Montelongo, Sanchez-Gonzalez, and others.

5.    Beginning in April, 2005, REYNA, Bermea, Carillo-Montelongo, and Sanchez-Gonzalez used a house located at 9508 Potomac Drive, Ft. Washington, Maryland (hereinafter "the Potomac Drive house"), as a location in which they stored cocaine for distribution, including at one time as much as 97 kilograms of powder

cocaine. They also used this residence for storage of cash payments, including as much as $800,000, which they received in exchange for the cocaine. They also stored cash-packaging equipment in this residence, including plastic shrink-wrapping materials, a heat-sealing machine, and a money-counting machine. From time to time during this period they also resided in the house.

6. During the course of the conspiracy, JONES used a cellular telephone to set up meetings with REYNA and Bermea at the Potomac Drive house to drop off cash and collect multiple-kilogram quantities of cocaine from REYNA, Bermea, Carillo-Montelongo, and Sanchez-Gonzalez. During this time, JONES also spoke with GARCIA to discuss the timing of large shipments of cocaine from Mexico, through Texas, and into the Washington, D.C. area.

**JONES's D.C.-Area Customers**

7. From some time in at least 2003, as frequently as several times a week, JONES collected money from some of his local co-conspirators, including CARTER, Adams, Johnson, Hunter, unindicted co-conspirator-1, unindicted co-conspirator-2, unindicted co-conspirator-3, unindicted co-conspirator-4, and others known and

unknown to the grand jury.  JONES then visited a stash house, such as the Potomac Drive house, and met with REYNA, Bermea and others known and unknown to the grand jury, to deliver quantities of cash, and pick up multiple-kilogram quantities of cocaine for distribution to these co-conspirators.   A short time later, JONES and/or MAYNARD supplied these co-conspirators with wholesale quantities of cocaine obtained from REYNA, Bermea, and others.

8.  In terms of payment, JONES often "fronted," i.e., supplied on consignment, large quantities of cocaine to some of these co-conspirators.  At other times, the co-conspirators paid JONES cash for the cocaine in advance, which JONES in turn delivered to the suppliers at the stash house in exchange for cocaine.  Then JONES delivered this cocaine to the co-conspirators later in the day.  At still other times, the co-conspirators paid JONES for the cocaine at the time he delivered it to them.  The price JONES charged per kilogram varied between $20,000, and $23,000.

9.  To set up these meetings, JONES communicated with his co-conspirators on his cellular telephone, often several times a day, to arrange meeting times and places.  The physical transfer of cocaine and

cash between JONES and CARTER, Adams, Johnson, Hunter, unindicted co-conspirator-1, unindicted co-conspirator-2, unindicted co-conspirator-3, unindicted co-conspirator-4, and others known and unknown to the grand jury took place at Levels, a night club in the District of Columbia owned and operated by JONES and managed by MAYNARD; at Sam's Carwash and other commercial establishments along Branch Avenue in Temple Hills, Maryland; at the Prince George's County Sports and Learning Center near FedEx Field in Landover, Maryland; occasionally at their residences in the Washington, D.C. metropolitan area; and at other locations in the D.C. metro area known and unknown to the grand jury. JONES and his co-conspirators used plastic shopping bags, duffel bags, backpacks, and other bags to conceal the cocaine and money they were exchanging. MAYNARD occasionally accompanied JONES when he met with various co-conspirators to make deliveries of cocaine and to collect large cash payments. On other occasions, MAYNARD alone made deliveries of cocaine from JONES to the co-conspirators, and collected cash payments on behalf of JONES.

10. In addition to MAYNARD, JONES also employed other

individuals, both known and unknown to the grand jury, to assist in the day-to-day operations of his cocaine-trafficking business. For example, Adams broke down larger amounts of cocaine into smaller packages for JONES, or Adams, to deliver to other co-conspirators, including CARTER, and MAYNARD. Adams also collected drug payments for JONES from time to time, and also stored cocaine for JONES at his residence.

11. When communicating with some of these co-conspirators over the phone, to avoid detection by law enforcement, JONES used "code" to avoid reference to drugs, money, or meeting places for the transfer of drugs or payment for the drugs.

12. These co-conspirators  frequently stored the cocaine they obtained from JONES at their residences, and then repackaged the cocaine into smaller quantities, and distributed it either as cocaine hydrochloride or cocaine base, in the form of crack. At times, some of the co-conspirators redistributed the cocaine in kilogram form. The total quantity of cocaine JONES provided to these co-conspirators during this timeframe was in excess of 500 kilograms.

13. From at least 2003, the exact date being unknown to the

grand jury, up to and including October 24, 2005, JONES used his vehicle, a 2001 champagne-colored Jeep Grand Cherokee, MD license # M667480, to store cocaine and cash, which he had secreted in a variety of bags, including plastic shopping bags, duffel bags, and backpacks. JONES also used his Grand Cherokee to transport this cash to his suppliers, GONZALEZ-RUAN, REYNA, Bermea and others, and to transport cocaine from REYNA, Bermea and others and deliver it to CARTER, Adams, Johnson, Hunter, unindicted co-conspirator-1, unindicted co-conspirator-2, unindicted co-conspirator-3, unindicted co-conspirator-4, and other co-conspirators known and unknown to the grand jury.

The Indictment goes on to set out 146 separate acts, known in the law as overt acts, which the grand jury charges were committed by members of the conspiracy to advance the conspiracy and accomplish the goals of the conspiracy. I will discuss those overt acts with you in my final instructions to you at the close of all the evidence in this case. You should understand clearly that the Indictment that I just read is not evidence. The Indictment is just a formal way of charging a person with a crime in order to bring him to trial. You must not think of the Indictment as any evidence of the guilt of the defendants, or draw any conclusion about the guilt of the

defendants just because they have been indicted.

The defendants have been charged with conspiracy to distribute and possess with intent to distribute cocaine and cocaine base or crack. To prove this offense, the government must prove beyond a reasonable doubt each of the elements of that offense. The elements of the charge of conspiracy to distribute and possess with intent to distribute cocaine and cocaine base or crack are:

First, that between sometime in 2003 and October 24, 2005, an agreement existed between two or more people, to commit the crime of distribution and possession with intent to distribute cocaine and cocaine base. This does not have to be a formal agreement or plan, in which everyone involved sat down together and worked out the details. On the other hand, merely because people get together and talk about common interests, or do similar things does not necessarily show that an agreement exists to distribute and possess with the intent to distribute cocaine and cocaine base. It is enough that the government prove beyond a reasonable doubt that there was a common understanding among those who were involved to commit the crime of distribution and possession with intent to distribute cocaine and cocaine base. So, the first thing that must be shown is the existence of an agreement.

Second, the government must prove that defendant intentionally joined in that agreement. It is not necessary to find he agreed to all the details of the crime, or that he knew the identity of all the other people the government has claimed were participating in the agreement. A person may become a member of a conspiracy even if that person agrees to play only a minor part, as long as that person understands the unlawful nature of the plan and voluntarily and intentionally joins in it. Even if the defendant was not part of the agreement at the very start, he can become a member of a conspiracy later if the government proves that he intentionally joined the agreement. Different people may become part of the conspiracy at different times.

The elements of the offense of distribution of cocaine and cocaine base are:

First, that the defendant distributed a controlled substance. Distribute means to transfer or attempt to transfer to another person;

Second, that the defendant did so knowingly and intentionally. This means consciously, voluntarily and on purpose, not mistakenly, accidentally or inadvertently. The law makes cocaine and cocaine base controlled substances.

16

The elements of the offense of possession with intent to distribute a controlled substance, in this case, cocaine and cocaine base, are:

First, that the defendant possessed a controlled substance;

Second, that the defendant did so knowingly and intentionally. This means consciously, voluntarily and on purpose, not mistakenly, accidentally or inadvertently.

Third, that when the defendant possessed the controlled substance he had the specific intent to distribute it. Distribute means to transfer or attempt to transfer to another person.

Again, the law makes cocaine and cocaine base controlled substances.

Now let me explain to you how the trial will proceed. As I do that I will refer to the "government" and to the "defendant." When I mention the "government," I am referring to the two attorneys who are presenting the evidence in support of the charges contained in the Indictment. In this case, it is Assistant United States Attorney Rachel Carlson Lieber and Assistant United States Attorney John V. Geise. When I mention the defendant or the defense, I am referring either to the defendants, Mr. Jones, Mr. Maynard, and Mr. Carter or to their attorneys, Mr. Balarezo, Mr. Lyons, and Mr. McDaniel.

As the first step in this trial, the government and the defendants will have an

opportunity to make opening statements.  The government must make an opening statement at the beginning of its case.  Each defendant may make an opening statement immediately after the government's opening statement, or one or both of the defendants may determine *to* wait until the beginning of the defendant's case.  A defendant does not have to make any opening statement.  The opening statements are only intended to help you understand the evidence which will be introduced.  The opening statements are not evidence.

After the opening statement or statements, the government will introduce evidence to support the charge in the Indictment.  After the government presents its evidence, a defendant may present evidence, but he is not required to do so.  The law does not require a defendant to prove his innocence or to produce any evidence.

At the end of all of the evidence, each side will have an opportunity to make a closing argument in support of its case.  The lawyers' closing arguments, just like their opening statements, are not evidence in this case.  They are only intended to help you understand the evidence.

Finally, at the end of the evidence and after both sides have finished closing arguments, I will tell you in detail about the rules of law that you must follow when you consider what your verdicts shall be.  Your verdicts must be unanimous; that is, all twelve jurors must agree on the verdicts.

I want to briefly describe my responsibilities as the judge and your responsibilities as the jury. My responsibility is to conduct this trial in an orderly, fair and efficient manner, to rule on legal questions which come up in the course of the trial, and to instruct you about the law which applies to this case. It is your sworn duty as jurors to accept and apply the law as I state it to you.

Your responsibility as jurors is to determine the facts in the case. You -- and only you -- are the judges of the facts. You alone determine the weight, the effect, and the value of the evidence, as well as the credibility or believability of the witnesses. You must consider and weigh the testimony of all witnesses who appear before you. You alone must decide whether to believe any witness, and to what extent to believe any witness.

And remember, you must pay very careful attention to the testimony of all of the witnesses because you will not have any transcripts or summaries of the testimony available to you during your deliberations. You will have to rely entirely on your memory and your notes if you choose to take any.

During this trial, I may rule on motions and objections by the lawyers, comment to lawyers, question the witnesses, and instruct you on the law. You should not take any of my statements or actions as any indication of my opinion about how you should decide the facts. If you think that somehow I have expressed or even

hinted at any opinion as to the facts in this case, you should disregard it. The verdict in this case is your sole and exclusive responsibility.

You may consider only the evidence properly admitted in this case. That evidence includes the sworn testimony of witnesses and exhibits. If the evidence includes anything other than testimony and exhibits, I will instruct you about these other types of evidence when they are admitted during the trial.

During the trial, if the court or a lawyer makes a statement or asks a question that refers to evidence that you remember differently, you should rely on your memory of the evidence during your deliberations.

The lawyers in the case may object when the other side asks a question, makes an argument, or offers evidence which that lawyer believes is not properly admissible. You must not be prejudiced against the lawyer who makes the objection or the party he represents. Indeed, it is the lawyer's responsibility to object to evidence which he or she believes is not properly admissible.

If I sustain an objection to a question asked by a lawyer, you should forget about the question because the question is not evidence. You must not guess or speculate what the answer to the question would have been. If a question is asked and answered, and I then rule that the answer should be stricken from the record, you must forget about both the question and the answer that was stricken. You should

follow this same rule if any of the exhibits is stricken.

Every defendant in a criminal case is presumed to be innocent. This presumption of innocence remains with the defendant throughout the trial unless and until he is proven guilty beyond a reasonable doubt. The burden is on the government to prove the defendant guilty beyond a reasonable doubt, and that burden of proof never shifts throughout the trial. The law does not require a defendant to prove his innocence or to produce any evidence. If you find that the government has proven beyond a reasonable doubt every element of the offense with which the defendant is charged, it is your duty to find him guilty. On the other hand, if you find that the government has failed to prove any element of the charged offenses beyond a reasonable doubt, you must find the defendant not guilty.

During the course of this trial, you may hear certain recorded conversations which were obtained through the use of wire interceptions, commonly referred to as "wire taps." The term "intercept" means to obtain the contents of any wire or oral communication by using an intercepting device. The wire interceptions, or wiretaps, in this case were court-ordered, that is, they were approved by a judge, and the government's use of these interceptions was lawful.

During the course of this trial, you may also hear the phrase "consensual tape recording." This term should not be confused with the phrase "wire interception" or

"wiretap." A wire interception or wiretap is a court-ordered interception of communications which does not require the consent of the parties to the conversation. A consensual tape recording, on the other hand, is a recording where one party to the conversation consents to the conversation being tape recorded. It is lawful to conduct consensual tape recordings, and the other party or parties to the conversation do not have to consent to the taping. Consensual tape recorded conversations may occur over the telephone or face to face.

Although it will become clear to you during the presentation of the evidence that this case has been tried before, that is of no concern to you and should not enter into or influence your deliberations in any way. The law requires you to render your verdict based only on the evidence presented in this trial.

You must not be influenced by the nature of the charge in arriving at your verdict. Your responsibility is to decide this case solely on the evidence presented in the courtroom. As a result, you must not conduct any independent investigation of your own of the case -- like going to visit the scene.

In addition, you should disregard any statements made about the case by anyone outside the courtroom. You must not talk about the case with the lawyers, the defendant, witnesses, or anyone else connected with the case. If you see someone involved in this case, other than a fellow juror, outside the courtroom, you should not

speak with that person about anything.  If, at any time during the trial, anyone tries to discuss the case with you or if you hear anyone talking about the case, you should refuse to participate in or listen to the discussion.  If you speak with someone involved in the case outside the courtroom while the trial is still going on, we may have to stop the trial, pick a new jury and start all over again.  You must also completely disregard any press coverage, including newspaper, television or radio reports which you may read, see or hear.  If you are exposed to any news reports inadvertently, you should immediately disregard them and direct your attention elsewhere.

If you have heard any statements about the case, if anyone has tried to discuss the case with you or if you have been exposed to press coverage about the case, you must tell me about it immediately by informing the marshal or the courtroom clerk. You should not tell any of your fellow jurors or anyone else.  It is very important that you not discuss matters of this type with your fellow jurors or with anyone else until I have spoken to you.  You should tell only me, one of the  Deputy Marshals, or the clerk.

You must not discuss this case with anyone until this case is submitted to you for your decision at the end of my final instructions.  Until the case is submitted to you, you must not talk about it with your fellow jurors.  You must not talk about the

case to your friends or relatives, or even your spouse or partner, until it is over and you have completed your deliberations.

After I submit the case to you, you may discuss it only when I instruct you to do so, and only in the jury room and only in the presence of all your fellow jurors. It is important that you keep an open mind and not decide any issue in the case until after I submit the entire case to you with my final instructions.

**Instruction 1.05**

**CAUTIONARY INSTRUCTION**

**PRIOR TO FIRST RECESS**

We are about to take our first break during the trial and it is important that you follow certain instructions whenever the court is in recess.

First, until I submit this case to you at the end of my final instructions, you must not discuss it with anyone -- not with the parties, witnesses, attorneys or anyone else connected with the case.  You must not even discuss it with your fellow jurors, friends or family members.  To be fair to both the government and the defendant, you should keep an open mind throughout the trial.  You should reach your conclusion only during the final deliberations after all the evidence is in and you have heard the attorneys' closing arguments and my instructions to you on the law.

Second, do not permit any other person to discuss the case in your presence. This applies to anyone, including members of your family, friends or relatives, courtroom spectators, witnesses, reporters and parties to this case.  If anyone attempts to discuss the case with you, tell them not to talk to you.  If anyone attempts to discuss the case with you or you overhear any discussion of the case, you must report

that fact to me as soon as you can. However, you should not discuss with any of your fellow jurors the fact that someone tried to discuss the case with you or that you overheard a discussion, nor should you discuss with them any other fact that you feel necessary to bring to the court's attention. If you need to advise me of such matters, please do so through the marshal or clerk.

Finally, although it is a natural human tendency to talk with people with whom you may be thrown into contact, you must not talk to any of the parties or their attorneys or any witness in this case during the time you serve on this jury. If you encounter anyone connected with the case outside the courtroom, you should avoid having a conversation with them, overhearing their conversation or having any contact with them at all. For example, if you inadvertently find yourself in a courthouse corridor, elevator, the cafeteria or any other location where the case is being discussed by attorneys, parties, witnesses, or anyone else, you should immediately leave the area to avoid hearing such discussions. If you do overhear a discussion about the case, you should report that to me as soon as you can. Finally, if you see an attorney or witness involved in the case and they turn and walk away from you, they are not being rude. They are merely trying to avoid any contact with you as I have instructed them.