1                    UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF COLUMBIA

3    -----------------------------X

4    THE UNITED STATES OF AMERICA      Criminal Case No.

5                  v.                  05-386

6    ANTOINE JONES, et al,

7                  Defendants,

8    -----------------------------X   Washington, D.C.
                                       Wed., November 1, 2006
9                                      9:20 A.M.
                       VOLUME FOUR- A.M. SESSION
10                     TRANSCRIPT OF TRIAL
              BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
11            UNITED STATES DISTRICT JUDGE, and a jury

12   APPEARANCES:

13   For the Government:             JACK GEISE, ESQUIRE
                                     RACHEL LIEBER, ESQUIRE
14                                   Office of the U.S. Attorney
                                     555 4TH Street, N.W.
15                                   Washington, D.C.  20560
                                     (202) 616-9156

16

17   For Defendant Jones:           EDUARDO BALAREZO, ESQUIRE
                                     400 Fifth Street, N.W.
18                                   Suite 500
                                     Washington, D.C.  20001
19                                   (202) 639-0999

20

21   Court Reporter:                Lisa Walker Griffith, RPR
                                     U.S. District Courthouse
22                                   Room 6409
                                     Washington, D.C.  20001
23                                   (202) 354-3247

24   Proceedings recorded by mechanical stenography, transcript

25   produced by computer.

```
 1    APPEARANCES: (Cont'd.)

 2    For Defendant Jackson:        JON NORRIS, ESQUIRE
                                    641 Indiana Avenue, N.W.
 3                                  2nd Floor
                                    Washington, D.C.  20001
 4                                  (202) 842-2695

 5

 6    For Defendant Huggins:        RUDOLPH ACREE, ESQUIRE
                                    1211 Connecticut Avenue, N.W.
 7                                  Suite 303
                                    Washington, D.C.  20036
 8                                  (202) 331-0739

 9

10    For Defendant Holland:        BRIAN McDANIEL, ESQUIRE
                                    1211 Connecticut Avenue, N.W.
11                                  Suite 506
                                    Washington, D.C.  20036
12                                  (202) 331-0739

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          **P R O C E E D I N G S**

2              THE DEPUTY CLERK:  Criminal Case Number 05-386,

3    United States versus Antoine Jones, et al.

4              THE COURT:  Who's your next witness please?

5              MR. GEISE:  Officer Frederick Whitehead, Your

6    Honor.

7              (Jury Present.)

8              THE COURT:  Good morning, ladies and gentlemen.

9    We're ready to begin.  Mr. Geise, call your next witness

10   please.

11             MR. GEISE:  Yes, Your Honor.  The Government calls

12   Officer Frederick Whitehead.

13          FREDERICK WHITEHEAD, GOVERNMENT WITNESS, SWORN

14                       DIRECT EXAMINATION

15   BY MR. GEISE:

16   Q   Sir, for the record, would you please state your name

17   and spell your last name.

18   A   Frederick M. Whitehead, W-H-I-T-E-H-E-A-D.

19   Q   And how are you employed, sir?

20   A   With the Durham Police Department.

21   Q   How long have you been with the Durham Police

22   Department?

23   A   Almost ten years.

24   Q   How are you employed with the Durham Police Department?

25   A   Still currently assigned with the Durham Police

1    Department as a uniform patrol officer.

2    Q    Prior to working for the Durham Police Department, how

3    were you employed, sir?

4    A    I was assigned to the interstate criminal interdiction

5    unit.

6    Q    Prior to the Durham Police Department, how were you

7    employed?

8    A    I was in the United States Army.

9    Q    Where with the Army?

10   A    I was a member of a S.R.T. team, which is a 82nd

11   Airborne Division.

12   Q    What does a S.R.T. teams do?

13   A    Special Response Team, it's almost like a SWAT member

14   with the police force.

15   Q    I am going to ask you to turn your attention to Tuesday,

16   April 5th of last year, so Tuesday, April 5, 2005.  Were you

17   on duty that day, sir?

18   A    Yes, sir, I was.

19   Q    Approximately 2:30 in the afternoon, did something

20   occur?

21   A    Yes, sir, it did.

22   Q    Would you tell the members of the jury what happened at

23   that time?

24   A    My partner and I at the time were monitoring the

25   traffic, 85 southbound.  We were sitting on the southbound

1   side of the median monitoring the traffic coming into, coming

2   through Durham, North Carolina, when I observed a green Honda

3   Odyssey mini van travelling at a high rate of speed.

4           By the time I made a visual estimation and I

5   corroborated with my stationary radar unit, which is a

6   Customs K.R.T.N., I clocked the vehicle at 67 in a 55.  At

7   that point, I left from my parked position and turned around

8   and caught up with the vehicle where I made a traffic stop.

9   Q   Just if you would tell me, sir, what was the license

10  plate on that vehicle?

11  A   It was a Maryland tag.  I don't have the tag number.  I

12  can't remember what the tag number was, but it was a Maryland

13  tag.

14  Q   If I showed you your report, would that help, sir?

15  A   Yes, sir, it would.

16  Q   You did do a police report for that, sir?

17  A   Yes, I did.

18  Q   Let me show you a copy of your report, sir.

19          THE COURT:  What is that for identification?

20          MR. GEISE:  We'll call it NC 11 for identification,

21  Your Honor.

22  BY MR. GEISE:

23  Q   And while I'm up here, sir, let me show you, since I'm

24  up here anyway, a photo that's been marked NC Stop 6.  Let me

25  ask you, what was the license plate number on that car?

1    A    It was Maryland tag 273, M as in Mary, 195.

2    Q    Since you got it in front of you any way, let me ask you

3    if you recognize the photo NC Stop 6.

4    A    Yes, sir, I do.

5    Q    What's that a photo of?

6    A    It's a picture of a green Honda Odyssey mini van.

7    Q    Is that the one you stopped?

8    A    Yes, sir, it appears to be.

9    Q    Although that photo isn't at the stop point?

10   A    No, sir, it is not.

11            MR. GEISE:  Your Honor, I do move the admission.

12            MR. BALAREZO:  No objection.

13            THE COURT:  It will be admitted.  What page of the

14   exhibit list?

15            MR. GEISE:  We're on Page 29, Your Honor.

16            THE COURT:  Thank you.  All right.  That's

17   admitted.  Is it on the screen?

18            (Government Exhibit Number NC Stop 6

19              was admitted into evidence.)

20            MR. GEISE:  I don't believe yet, Your Honor.

21            THE COURT:  Where was this taken again?  Where was

22   the picture taken?  Oh, you didn't take it.  Okay.  I'm

23   sorry.

24            THE WITNESS:  No, ma'am.

25

1    BY MR. GEISE:

2    Q    Is that the vehicle you stopped?

3    A    Yes, sir, it is.

4    Q    But it's not at the location where you stopped it?

5    A    No, it's not.

6              THE COURT:   That's NC Stop 6?

7              MR. GEISE:   Yes, Ma'am, NC Stop 6.

8              THE COURT:   All right.   Six is admitted.

9              MR. GEISE:   Again, if I might approach the witness.

10   BY MR. GEISE:

11   Q    Sir, let me show you what's been marked NC Stop 10,

12   which is a Maryland Motor Vehicle Administration document.

13             MR. BALAREZO:   Your Honor, may we approach before

14   he gets into this.

15             THE COURT:   Yes.   Excuse us one minute.

16             (Bench conference.)

17             MR. BALAREZO:   Your Honor, my understanding is that

18   the Government is going try to use these documents to get

19   this witness to say that Mr. Jones was a registered, that the

20   car was registered to him.

21             THE COURT:   That's what the title says.

22             MR. BALAREZO:   I object because there is, right

23   here all we have is, if I could point out each item, we have

24   a temporary inspection waiver to Antoine Jones.   Does not

25   indicate necessarily that he owned it at the time of the

1   stop, which was in '05.  I think this document is dated '04.

2   I can look at mine.  This right here is an inspection

3   certificate that has nothing to do with Jones.

4          THE COURT:  It is a certificate of title.

5          MR. BALAREZO:  Again, date, about a year earlier.

6   Doesn't necessarily mean that Mr. Jones owned the car on the

7   date that it was stopped, which is in '05.

8          This right here is a, not a registration

9   certificate, this is a receipt.  We don't know whether

10  Antoine Jones paid for it.  We don't know whether this is

11  Antoine Jones.  It doesn't tell us anything.  There is a

12  certificate of title.  Again it's dated almost a year

13  earlier.

14         MR. GEISE:  This is the May 6, 2005, document from

15  M.V.A. of their records.  So this is what they have got in

16  their record about two months after the stop.

17         THE COURT:  I think it is pretty potent evidence.

18  He is the registered owner.  This is certainly a business

19  record.

20         MR. BALAREZO:  Your Honor, it may be a business

21  record, but all it shows is that Antoine Jones in 2004 at

22  some point had something to do with this car.  Does not show

23  that it was at the time he seized the money.

24         THE COURT:  It shows that it was registered to him

25  at the time of May 6, 2005.

1            MR. BALAREZO:  Do we know what that date is?

2            THE COURT:  It shows -- I don't know, fifth month

3    of the year.

4            MR. BALAREZO:  That's fine.

5            MR. GEISE:  5th month of the year.

6            THE COURT:  This is what they have to show who the

7    car was registered to.  Overruled.

8            MS. LIEBER:  So the record is clear.  There is also

9    a certificate from Mr. Jones's house that we're moving in

10   through another witness that shows insurance coverage for the

11   van between February of '05 and August of '05.

12           THE COURT:  Okay.  Overruled, that's ten.  That's

13   admitted over objection.

14           (Government Exhibit Number NC Stop 10

15              was admitted into evidence.)

16           (Open Court.)

17           THE COURT:  Okay.

18   BY MR. GEISE:

19   Q   Sir, I want to show you what's been marked as NC Stop

20   10, which is a Maryland Motor Vehicle Administration document

21   for vehicle tag Maryland 273M195.  That's the vehicle you

22   stopped?

23   A   Yes, sir.

24           MR. GEISE:  If I might approach the witness, Your

25   Honor.

1          THE COURT:   Okay.

2   BY MR. GEISE:

3   Q    There are a number of items on that, sir.  But I'd just

4   ask if you'd look at one of them, application for certificate

5   of title for that vehicle.   Whose name is that?

6   A    It reads Antoine Jones.

7   Q    And certificate of title for the vehicle showing a

8   transfer to, who does it show a transfer to, sir?

9   A    Antoine Jones.

10  Q    Now, sir, you've said you stopped the vehicle that's

11  pictured NC Stop 6, M.V.A. records showing Antoine Jones's

12  vehicle.  What did you do then, sir?

13  A    Then I exited my patrol vehicle and I walked up to the

14  right passenger's side of the vehicle where I made contact

15  with the driver.

16  Q    Would you please tell us what happened then?

17  A    Asked the driver for his license and registration which

18  he provided me.  At that point in time, I asked him if he

19  would step out of the driver's seat and step to the rear of

20  his vehicle between my vehicle and his vehicle.

21  Q    Officer Whitehead, at some point did you obtain the

22  driver's license from that individual?

23  A    Yes, I did.

24  Q    Did you make a copy of it?

25  A    Yes, sir, at some point, I did.

1   Q   Now, let me show you what's been marked as Government

2   Exhibit NC Stop 7 and ask if you recognize that?

3   A   Yes, I do.

4   Q   What is it?

5   A   It's a Maryland driver's license for a Lawrence Maynard.

6           MR. GEISE:  Your Honor, at this point --

7           THE COURT:  I'm sorry.  It's not coming up on

8   either screen.

9           MR. GEISE:  At this point, I move the admission of

10  the item, Your Honor, and ask that it be put in the screen.

11          THE COURT:  Any objection?

12          MR. BALAREZO:  No.

13          THE COURT:  Stop 7 is in.

14          (Government Exhibit Number NC Stop 7

15            was admitted into evidence.)

16          THE COURT:  Is the other one up?

17          MR. GEISE:  Yes, Ma'am.

18  BY MR. GEISE:

19  Q   And who is the driver of the vehicle, sir?

20  A   Mr. Lawrence Maynard.

21  Q   Just what address is that?  I don't know that we can all

22  see it?

23  A   XXXX XXXXXXXXX XXXX in Hyattsville, P.G. Maryland.

24  Q   Now, after Mr. Maynard, you say you had him exit the

25  vehicle?

1    A    Yes, sir.

2    Q    What happened then, sir?

3    A    I then informed him my reason for the stop.  He told me

4    that he --

5              MR. BALAREZO:  Objection.

6              MR. GEISE:  If we might approach briefly, Your

7    Honor.

8              THE COURT:  Okay.  Excuse us, ladies and gentlemen.

9              (Bench conference.)

10             THE COURT:  What's he about to say?

11             MR. GEISE:  I'll run through it all quickly.  What

12   he is going to describe is conversations with both Maynard

13   and the passenger, Derrick Gordon.  He questioned them where

14   they were going.  They had different stories, which, of

15   course, made him suspicious and a stop developed from then.

16             There are really two points, Your Honor.  From our

17   points of view it is truly not offered for the truth of the

18   matter because we don't think it is true.  Secondly, there

19   won't be testimony that this trip was to pick up drugs from

20   one of the cooperators.  So, this is actually in furtherance

21   of the conspiracy because they were trying to convince the

22   officer to let them go.  We think either theory is

23   appropriate.  But certainly we don't believe it is --

24             THE COURT:  Yeah, why is it offered for the truth

25   even?  They're going to say things about where they're going

1   or not going.  It is offered to show why he was suspicious I

2   think.

3           MR. GEISE:  Yes, Ma'am.

4           MR. BALAREZO:  Your Honor, I think he can say

5   something that caused me to do --

6           THE COURT:  They could but they don't have to.

7   There is no evidentiary reason.  I suspect we'll ultimately

8   find it was in furtherance of the conspiracy because at least

9   one of these guys, if not both, will be --

10          MR. GEISE:  Yes, Ma'am.

11          MR. BALAREZO:  It has to be to show that it is in

12  furtherance of the conspiracy.  I think you need to show more

13  than he was a co-defendant in this case.

14          THE COURT:  You have to show a lot down the road

15  apiece when you tie it all up.  But he can put it in subject

16  to being tied up later on.  So, more importantly, it is not

17  offered for truth so overruled.

18          (Open Court.)

19  BY MR. GEISE:

20  Q   Yes, sir.  You were describing your conversation with

21  Mr. Maynard.

22  A   Yes, sir, I was.

23  Q   Please proceed.

24  A   He had already given me his license and registration.

25  So I was just informing him of my reason for stopping him,

1   which was speeding.   I told him I clocked him at 67 in a 55.

2   And the 55 just so happened to be in a work zone.

3   Q   You said he was going, I'm sorry, he was doing what?

4   A   67 miles an hour in a 55 mile-an-hour work zone.

5   Q   What was your conversation with him after that?

6   A   I then asked him where was he coming from or what was

7   the origin of his trip.   He told me he was coming from the

8   Washington, D.C., Maryland area.   And he was headed to South

9   Carolina, a city in South Carolina I had never heard of

10  before.   But his reason for going there, he was going to pick

11  up a D.J. for an upcoming event that he had back up at his

12  nightclub in Washington, D.C., for the upcoming weekend.

13  Q   At that point, what did you do, Officer Whitehead?

14  A   I then asked him a couple of questions about his

15  passenger, who, when I initially made contact with the

16  vehicle, appeared to be asleep.

17  Q   Was it just the driver and the passenger?

18  A   Yes, it was.

19  Q   That's in the front passenger's seat?

20  A   Yes.

21  Q   Please proceed, sir.

22  A   When I asked him about his passenger, he could only tell

23  me his first name.   I then asked him, well, how long had he

24  known him.   He said that they worked together at the

25  nightclub.   I asked him do you have an age on him or

1    approximate age.  He couldn't tell me that either.  So at

2    that point, I asked Mr. Maynard if he would just stand at the

3    rear of the vehicle while I went up and talked with the

4    passenger, which I did.

5    Q    What happened when you went up to the passenger, sir?

6    A    When I went back up to the vehicle and made contact with

7    him, the passenger, who was now awake and he was still

8    leaning back in the seat.  I introduced myself to him and

9    asked him if he had any ID.  As soon as I asked him if he had

10   any ID, he kind of sat up real quickly and abrupt-like

11   offensively and asked me why did I need to see his

12   identification.

13           I told him that, you know, we'd like to know who

14   we're dealing with when we have cars stopped on the highway.

15   You know, he was a aware of the terrorists attacks.  Just for

16   identification purposes I needed to know who I was dealing

17   with.

18           At that point in time, with a little hesitation, he

19   told me that his identification was in his wallet in his back

20   pants pocket and asked if he could get it.  I told him he

21   could, and he reached in his back pants pocket, reached

22   inside of his wallet and produced a identification.

23   Q    Let me show you for the moment, Officer, what's been

24   marked as -- let me ask this.  At some point, did you makes a

25   Xerox copy of the identification that gentleman provided?

1    A    Yes, sir, I did.

2    Q    Let me show you what's been marked as NC Stop 8.  Let me

3    ask if you recognize that?

4    A    Yes, sir, I do.

5    Q    What is it?

6    A    It's a Washington, D.C., Learner's Permit for a Derrick

7    C. Gordon.

8         MR. GEISE:  Your Honor, I'd like to move the

9    admission of the item and ask that it be placed on the

10   screen.

11        MR. BALAREZO:  No objection.

12        THE COURT:  It will be admitted, 8.

13        (Government Exhibit Number NC Stop 8

14          was admitted into evidence.)

15   BY MR. GEISE:

16   Q    Now, you're saying it was a Learner's Permit for --

17   A    Derrick C. Gordon.

18   Q    Did the passenger in the vehicle identify himself as

19   Derrick Gordon?

20   A    Yes, sir, he did.

21   Q    What did you do then, Officer Whitehead?

22   A    At that point, I made some conversation with Mr. Gordon.

23   I asked him where was he coming from, and he informed me he

24   was coming from the Washington, D.C., Maryland area.  And I

25   asked him where he was headed to.  He told me he was headed,

1    he and Mr. Maynard were headed to Atlanta, Georgia to visit

2    some family and to visit some young ladies that they had met

3    on a previous visit to Atlanta, Georgia.

4    Q    Did you have further discussion with Mr. Gordon at that

5    point?

6    A    I did.

7    Q    What was that, sir?

8    A    I, in turn, asked Mr. Gordon was Mr. Maynard aware that

9    they were going to Atlanta, Georgia.  He said yes, that he

10   was aware of it.

11   Q    Now, did those conversations with Mr. Maynard and

12   Mr. Gordon cause any concern for you?

13   A    Yes, sir.

14   Q    Why was that?

15   A    Because it was a confliction of stories.  I had the

16   driver telling me that they were going to South Carolina to

17   pick up a disk jockey for an upcoming event at a nightclub

18   back in Washington, D.C.  I had the passenger telling me they

19   were going to Atlanta to hang out for the weekend with family

20   and some young ladies that they had met on a previous visit.

21   Q    You mentioned, sir, Mr. Maynard had said it was for his

22   nightclub.  Do you remember off hand what the name of that

23   nightclub was that he told you?

24   A    Club Levels.

25   Q    After you had that conversation with Mr. Gordon, what

1   did you do, sir?

2   A   Well, once I finished with Mr. Gordon, I turned and went

3   back to Mr. Maynard, and I asked Mr. Maynard, once again, I

4   said, well are you sure you're going to where you told me

5   you're going.  He said, yeah, I'm going to South Carolina to

6   pick up a D.J. for an upcoming event at the nightclub this

7   coming weekend.

8   Q   What did you do then, sir?

9   A   I then told Mr. Maynard he could stand in between the

10  vehicles or he could have a seat on the guardrail while I

11  went back to my vehicle and ran his information along with

12  Mr. Gordon's information.

13  Q   When you say "run their information," what do you mean,

14  sir?

15  A   Run it through the network, check their driver's license

16  status and the N.C.I.C., which is the National Crime

17  Information Center, to make sure they don't have any warrants

18  or anything like that on them.

19  Q   What did you do then, sir?

20  A   While I was waiting on that information to come, my

21  partner, he had arrived, and I pretty much explained to him

22  the conflicting stories, how nervous and agitated Mr. Gordon

23  seemed to be just to be the passenger of the vehicle.

24          And at that point in time, I pretty much told my

25  partner, I said well, I think I'm just going to write them a

1   warning ticket, Mr. Maynard a warning ticket.  So, I did

2   that, but prior to starting to write the warning ticket, I

3   said I'd call out a K-9 officer to come to our location.

4   Q   What happened then?

5   A   Before I was completed with the warning ticket and once

6   I ran all the information, the K-9 officer responded to the

7   location.  I got out of my vehicle, gave Mr. Maynard his

8   information back, and I told him that I was just giving him a

9   warning ticket because most people that are travelling

10  through the area kind of get a little confused about the

11  speeding signs.

12          So I was just going to give him a written warning

13  with no fines, no court costs or anything like that, but he

14  just needed to monitor his speed.  I told him if he would

15  just remain at the back of the vehicle while I went and

16  returned Mr. Gordon's identification back to him, he'd be

17  free to go.

18  Q   What did you do?  What happened at that point?

19  A   Once I returned Mr. Gordon's identification, I came

20  back --

21          MR. BALAREZO:  Objection, Your Honor.

22          THE COURT:  Objection?  He's going to tell us what

23  he did next.

24          MR. BALAREZO:  I don't know about that.

25          THE COURT:  That's what the question was.  What did

1   you do next, right?  Overruled.  Go ahead.

2          THE WITNESS:  I then came back to where Mr. Maynard

3   was.  We shook hands, and he turned around and went back to

4   his vehicle.

5          As he had gotten back to the vehicle, he pretty

6   much opened up the driver's door and was getting ready to

7   enter the vehicle, and I called out to him.  I said,

8   Mr. Maynard, do you mind if I ask you a couple of quick

9   questions.  He turned and looked in my direction.  He closed

10  the door back and he walked back to where I was.  He said,

11  yes, you can.

12         At that particular point in time, I walked to him

13  and I asked him, I said, by any chance are you transporting

14  any large sums of money, explosives or illegal weapons in the

15  vehicle.

16  Q   What happened at that point?

17  A   There was a momentary pause, and it was almost like he

18  held his breath, and he kind of, you know, he tried to say

19  something, but it just wouldn't come out.  And after about, I

20  guess, about 15 or 20 seconds, he responded back.  He was

21  like, no, I don't have anything in my vehicle, but I do have

22  a cooler in which I didn't put any ice in that's in the back

23  of the vehicle.  And that was totally off kilter of what I

24  had asked of him.

25  Q   What happened after that?

1    A    When he mentioned that he had a cooler in the rear or

2    the hatch back area of his vehicle, he went to reach to open

3    up the hatch back.  I told him, I said, you don't have to

4    open it up.  I said, you know, does this mean you're giving

5    me consent to search the vehicle or not.  He said yes, you

6    can search it.

7             So at that point in time, I asked him if he had any

8    weapons on his person.  He said no.  I then told him that I

9    was going to do a quick Terry frisk.  I just patted down his

10   outer clothing around his waistband.

11   Q    What's a Terry frisk, sir?

12   A    It's just an outer clothing frisk, not obtrusive, where

13   you just pat someone's outer clothing to see if they have any

14   weapons or anything on him.

15   Q    Did Mr. Maynard have any weapons on him?

16   A    No, sir, he did not.

17   Q    What did you do at that point?

18   A    I then informed Mr. Maynard, my partner had got out of

19   his vehicle by that time, and I asked him just to stand back

20   in between my vehicle and his vehicle with my partner.  At

21   that point in time, I went up to the passenger's side where

22   Mr. Gordon was located and asked Mr. Gordon to step out of

23   the vehicle.

24             And when I asked him to step out of the vehicle, he

25   wanted to know why he had to get out of the vehicle.  Then I

1   instructed him that Mr. Maynard had given me consent to

2   search the vehicle.

3   Q    What happened then with Mr. Gordon?

4   A    He was very methodical and very slow with exiting out of

5   the vehicle.  He actually, once he opened up the door, he

6   actually tried to get out of the van with the seatbelt on.

7   And I told him, I said, you know, you may want to take the

8   seatbelt off.  So he, in turn, took the seatbelt off.

9            I had him to turn around right in the door

10  threshold where I asked him the same thing.  I asked him if

11  he had any weapons or anything on him.  He said no.  Also

12  completed a Terry frisk of his outer clothing.

13  Q    Did he have any weapons?

14  A    No, sir.  He didn't have any weapons.

15  Q    What happened then?

16  A    While I was getting ready to pat him down, I noticed,

17  when he was sitting in the car, he had a large bulge in his

18  front right pants pocket.  I asked him what it was.  He told

19  me that was his money.

20           I then asked him, I said, well, I'm going to need

21  you to take it out just so that I can confirm that it is, in

22  fact, money, and he did.  When I asked him about how much

23  money it was, he told me it was about $900 or so.  At that

24  point, I had him step to the back of the vehicle with my

25  partner as well as Mr. Maynard.

1   Q   What did you or other officers do at that point?

2   A   At that point in time, the K-9 officer had already

3   responded with his dog.  I went ahead and gave him the okay

4   to go ahead and conduct a free air sniff around the vehicle.

5           MR. BALAREZO:  Objection at this point, Your Honor.

6   Can we approach?

7           THE COURT:  All right.  Excuse us, ladies and

8   gentlemen.

9           (Bench conference.)

10          MR. BALAREZO:  Your Honor, my understanding, based

11   on this officer's police reports, is that the officer, the

12   K-9 officer, came in and had the dog sniff around the car,

13   that the dog came up positive, however you call it.  But that

14   that was told to this officer by the other officer.  I don't

15   know if this officer in fact, A, saw what the dog did.  B, is

16   qualified to testify about that.  I would say that it is

17   entirely hearsay for him to come here and say the other

18   officer told him that the dog came up positive.

19          THE COURT:  So what do we care about all this?

20          MR. GEISE:  I can move it along.

21          MR. BALAREZO:  Your Honor, I don't want it to come

22   in that the dog came up positive for drugs.

23          MR. GEISE:  My next question would be after the dog

24   sniffed, what did you do, sir.

25          THE COURT:  We're just getting to the money.  I

1   don't think it adds anything.  All right.  Sustained.

2        (Open Court.)

3   BY MR. GEISE:

4   Q   Sir, you were explaining some of the questions you had

5   asked Mr. Maynard and Mr. Gordon.  Were there any guns or

6   weapons.  Your assignment that day, was it just to doing

7   speed checks or did you have some other assignment as well?

8   A   I guess I have dual tasks.  I have a responsibility of

9   enforcing the laws, the speeding laws through the, on the

10  highway and also, as a criminal interdiction officer, my

11  primary responsibility is the detection of illegal substances

12  on the highways.

13  Q   Why don't you just explain a little bit more about what

14  an interdiction officer is doing?

15  A   An interdiction officer, primarily you monitor the

16  highway, you monitor the speeds of vehicles, and people

17  travelling up and down the highways, speeding, no seatbelts,

18  careless or reckless driving.  And once you do that, most

19  people, I guess there's a right and a wrong way.  Most people

20  when they're doing things --

21        MR. BALAREZO:  Objection.

22        THE COURT:  Can we just move to the facts here?

23        MR. GEISE:  Yeah.

24  BY MR. GEISE:

25  Q   And so part of your function as an interdiction officer

1   is to do what, sir?

2              THE COURT:  I'm sorry, can we just get to the

3   search?

4              MR. GEISE:  Yes, Ma'am.

5   BY MR. GEISE:

6   Q   You were talking about the drug officer coming, the K-9

7   officer coming.  After the K-9 officer and the dog were at

8   the vehicle, what did you do then, sir?

9   A   I just stood back, and I just watched the K-9 officer.

10  Q   After the K-9 officer completed his duty, did you do a

11  further search?

12  A   Yes, sir, I did.

13  Q   Would you describe to the jury what happened then?

14  A   After the K-9 officer was done with the search, he came

15  back --

16  Q   Without going into what the K-9 officer told you, what

17  did you do in response to that?

18  A   I, in turn, searched the vehicle.

19  Q   Would you describe to the members of the jury what

20  happened?

21  A   Right.  There was a special area of attention --

22             MR. BALAREZO:  Objection.

23  BY MR. GEISE:

24  Q   Did you focus your attention on a particular place?

25  A   Yes, sir, I did.

1   Q    Where did you focus your attention?

2   A    The rear hatch back and the rear passenger's seating

3   area.   Once I got inside the van, I noticed that the floor

4   was elevated.   And I knew that this was not a common

5   practice, unless there was some type of modification that had

6   been made outside of what the manufacturer --

7             MR. BALAREZO:   Objection, Your Honor.   Beyond the

8   scope of his knowledge.

9             THE COURT:   I'm not sure it is.   How did you know

10  there was some kind of modification?   Are you familiar with

11  this kind of van?

12            THE WITNESS:   Yes, Ma'am, as a criminal

13  interdiction officer, we go through lots of training.

14  Actually the week prior to the stop, I had just completed a

15  week-long interdiction school, and one of the topics of

16  discussion were mini vans.

17            THE COURT:   Mini vans?

18            THE WITNESS:   Yes, Ma'am.

19            THE COURT:   Overruled.   Go ahead, Mr. Geise.

20  BY MR. GEISE:

21  Q    You were saying you had noticed a modification in the

22  vehicle?

23  A    At that particular point in time, I didn't notice the

24  modification.   I just noticed that the seats in the back was

25  higher than they were supposed to be.

1    Q    What did you do at that point?

2    A    I was inside the vehicle.  I then got underneath the

3    vehicle where I noticed that it appeared that the vehicle had

4    two gas tanks.

5              MR. GEISE:  Your Honor, at this point, I'd like to

6    show the witness NC Stop 1.

7              THE COURT:  These are photos.  Are you going to do

8    more than one?

9              MR. GEISE:  Yes, Ma'am.

10             THE COURT:  Any objection to -- what are the

11   numbers so we can move it on?

12             MR. GEISE:  We'll eventually do NC Stop 1, NC Stop

13   2, NC Stop 3, NC Stop 4 and NC Stop 5.

14             THE COURT:  All right.  Any objection to the first

15   five?  Six is in already.

16             MR. BALAREZO:  No, Your Honor.

17             MR. GEISE:  Six is in already.

18             THE COURT:  Okay.  Then fine, 1 through 5 are

19   admitted.

20             (Government Exhibit Numbers NC Stop 1

21               through 5 were admitted into evidence.)

22   BY MR. GEISE:

23   Q    You're saying, sir, then you got out of the vehicle, and

24   what did you do?

25   A    I crawled underneath the vehicle.  Once I crawled

1    underneath the vehicle, I observed what appeared to be two

2    fuel tanks or two gas tanks that were underneath the vehicle.

3    Q    Is that a picture of the underneath the vehicle in NC

4    Stop 1?

5    A    Yes, sir, it is.

6    Q    Let me also show NC Stop 2.  That also a picture of the

7    underside of the vehicle?

8    A    Yes, sir.

9    Q    Now, what did you do at that point when you noticed

10   there appeared to be two gas tanks?

11   A    I just, I knew, based on my training and experience,

12   that these vehicles were not equipped with two gas tanks.

13   So, I immediately started to trace the fuel line to the gas

14   tank to find the actual gas tank, which I was able to do, and

15   that left another area, which appeared to be a gas tank but

16   it actually wasn't a gas tank, a fuel tank.

17   Q    So what did you do after you traced the line and figured

18   out one of the tanks was not indeed a fuel tank?

19   A    The K-9 officer, also having the same training that I

20   had, he actually was working on the top, and he was

21   attempting to pull the carpet back that was in the rear hatch

22   back area.  Or the rear hatch area, kind of like the storage

23   area, extra space back behind the passenger's seats.  He said

24   that the carpet --

25              MR. BALAREZO:  Objection.

1   BY MR. GEISE:

2   Q   What did you do then, sir?

3        THE COURT:  Sustained as to the objection.  Go

4   ahead.  What did you do next?

5        THE WITNESS:  I got out from underneath the

6   vehicle.  I went to the rear passenger area and noticed that

7   the carpet to the van had been glued down.  I knew that the

8   manufacturer did not glue carpet down in any vehicles.  So I

9   thought that this was very, very strange.

10  BY MR. GEISE:

11  Q   What did you do at that point?

12  A   We began to start pulling up the carpet in the van, in

13  the rear area.  And once we started pulling up the carpet, we

14  could, after we got to a certain point, we could see that

15  there was a little opening that had been cut in the rear

16  hatch back area, almost underneath the passenger's seat.

17  Q   What did you do after you noticed this opening that had

18  been cut?

19  A   I knew that that definitely was not a manufacturer's

20  design and pretty much I assumed that it was a hidden

21  compartment that was inside the van.

22  Q   What is a hidden compartment?  The words are obvious

23  but, I mean, what's a hidden compartment?

24  A   It is a compartment or a space where people usually use

25  to hide contraband.

```
1              MR. BALAREZO:  Objection, Your Honor.

2              THE COURT:  Overruled.

3    BY MR. GEISE:

4    Q    What did you do once you noticed this area?

5    A    We started to, there were two wires that I could

6    actually trace to it.  So we took some alligator clips, and

7    that's just a police word for jumper cables, connected it to

8    the battery, in turn went and connected to these two wires to

9    get some type of electrocution to see if we could get the

10   compartment to rise.  That way --

11   Q    Do these things usually have like a hydraulic door?

12   A    Yes, sir.

13   Q    Please proceed.

14   A    But it was later determined that it didn't operate or

15   would not open due to electrification to the wires.  So we

16   then manually began to open up the trap door, the compartment

17   door.

18   Q    Let me show you what's been admitted as Government's NC

19   Stop 3.  Do you recognize that photo?

20   A    Yes, sir.

21   Q    What is it, sir?

22   A    That was the kind of like the initial stages, once we

23   were able to get the door opened, just observed white Target

24   store bags inside of the compartment.

25   Q    What did you do at that point?
```

1    A    We knew that this definitely was not anything from the

2    manufacturer.  So we continued to open up the door, the

3    compartment door, until we were able to actually get in and

4    pull the contents out.

5    Q    How many of these Target bags were in there if you

6    recall?

7    A    Five.

8    Q    What was in them, sir?

9    A    U.S. currency.

10    Q    Let me show you what's been marked as NC Stop 4, ask if

11    you recognize that?

12    A    Yes, sir, I do.

13    Q    What is what, sir?

14    A    That is money that was inside of the Target bags that

15    were inside of the compartment.

16    Q    Now, did you ultimately take all of the money out of

17    that compartment?

18    A    I did not.  The K-9 officer did.  My hands were too big.

19    Q    He reached it out?

20    A    Yes, sir.

21    Q    And then was the money ultimately processed at your

22    headquarters?

23    A    Yes, sir, it was.

24    Q    Let me show you what's been marked as NC Stop 5.  And

25    what is that, sir?

1    A    That's the money that was taken out of the bags that

2    were inside of the compartment.

3    Q    How much money was that?

4    A    It was $67,115 if I'm not mistaken.

5    Q    After you found this money in the compartment, and you

6    and the K-9 officer removed it, what did you do then?

7    A    At that point in time, I went to Mr. Maynard, since he

8    was driving the vehicle.  I asked him was he aware of the

9    money that was inside of the compartment in the vehicle.  He

10   told me that, no, he wasn't.  This was a company vehicle that

11   was utilized for the company.

12            MR. BALAREZO:  Objection, Your Honor.

13            THE COURT:  Overruled.

14            THE WITNESS:  I guess he meant that for the Club

15   Levels.

16            THE COURT:  Did he say that or just tell us what he

17   said.

18            THE WITNESS:  He told me that it was a company

19   vehicle that was used by the Club.

20   BY MR. GEISE:

21   Q    At that point, sir, what did you do?

22   A    I then informed him that the money belonged to someone.

23   And, I mean, no one could be arrested for it, but we could do

24   one or two ways.  Since the vehicle had an after market

25   compartment in it, we were going to seize the vehicle along

1     with the money.  That we could even, we could either count

2     the money on the highway, which we did not want to do.

3              We preferred to take it back to police headquarters

4     where we had a money counting machine that we could count the

5     money at.  And we could also give him a receipt for the

6     money.  So, they decided to go with option B, which was to go

7     with us back to police headquarters so they could get a

8     receipt for the money.

9     Q   What did you do then?

10    A   Mr. Maynard got in the vehicle with me.  The money was

11    secured in the trunk of my car.  Mr. Gordon was, he got in

12    the vehicle with my partner.  They were transported up to

13    police headquarters where the money was counted on a money

14    counting machine.

15    Q   What did you then do with the money and the vehicle?

16    A   The money was taken and it was turned over to the task

17    force person that's assigned with us on the Police

18    Department.  He, in turn, took the money to the bank and got

19    a certified check for it.  The vehicle was taken to our

20    impound lot where it was stored.

21    Q   And ultimately, both the money and the vehicle were,

22    what are called, forfeiture proceedings beyond?

23    A   Yes, sir.

24    Q   But you don't handle those?

25    A   No, sir.

1    Q    Now, a couple of questions.  How about Mr. Maynard and

2    Mr. Gordon?

3    A    Once they were, once the receipt was given to them at

4    headquarters, they were free to go at any point in time.  But

5    once they received the receipt, they just wanted to know

6    where the local Trailway station was at.  So, one of the guys

7    that worked with me actually gave them a ride down to the

8    Trailway station where I assume they caught a bus.

9    Q    A couple of other questions, after all of this, did you

10   do any more examination on the vehicle itself?

11   A    I did.

12   Q    When was that?

13   A    The following day.  I was somewhat, I guess, bewildered

14   that we couldn't electrify the cables or the wires that were

15   running to the compartment.  So I called up the instructor

16   who teaches.  I guess he's known as the interdiction guru.

17   And I talked with him and told him what type of vehicle it

18   was and some of the strange things that we had found.

19          One of the strange things that we had found in the

20   vehicle at that point in time, he just kind of talked me

21   through a couple of different series.  And later found out

22   that the compartment actually required a series of events to

23   take place in order to have the compartment open and close.

24   Q    Were you actually able to open and close it?

25   A    At some point I was later.

1   Q   And if you remember, only if you remember, what was the

2   series of things you had to do?

3   A   The ignition switch had to be turned, not so the engine

4   was running but in between.  You had to press the defrost,

5   the window defrost button, along with switching the

6   temperature gauge to the halfway point.  Then there was a

7   magnet that was located in the vehicle.  You took the magnet

8   and rubbed it across the dashboard, and that would cause the

9   compartment to open and close.

10          MR. GEISE:  Court's indulgence for one moment.

11  BY MR. GEISE:

12  Q   Sir, you mentioned that Mr. Gordon had some money on him

13  when you stopped him?

14  A   Yes, sir.

15  Q   Did Mr. Maynard have any money with him as well?

16  A   Yes, sir, he did.

17  Q   And approximately how much was that?

18  A   I don't know.  But I did fail to mention, prior to my

19  Terry frisk of him, I noticed that he also had a bulge that

20  was in his right front pants pocket also.  And he informed me

21  that it was money.  And I told him just to take it out just

22  so I could confirm that it was money.  He did tell me, but I

23  don't remember, how much money it was.  But it was a large

24  sum.

25  Q   Did you let Mr. Maynard and Mr. Gordon keep the cash

1    they had on them?

2    A    Yes, sir.  Also there was a jacket that was located in

3    the rear of the vehicle, like a bomber-type jacket, and it

4    also had money.  I think it was like $1,500 that was in the

5    pocket, inside pocket of the jacket.

6              MR. GEISE:  No further questions of this witness,

7    Your Honor.

8              THE COURT:  Any questions?

9              MR. BALAREZO:  Thank you.

10                       CROSS EXAMINATION

11   BY MR. BALAREZO:

12   Q    Good morning, officer.

13   A    Good morning.

14   Q    Officer, this stop took place back on April 5 of '05,

15   right?

16   A    Yes, sir.

17   Q    Given that it took place over a year and a half ago,

18   would it be fair to say that your testimony here today is

19   based mainly on your paperwork from that day?

20   A    Yes, sir, it is.

21   Q    That wasn't the only stop you've ever done, right?

22   A    No, it's not.

23   Q    And your testimony here today is not from your direct

24   memory of what took place that day, except for a few things

25   perhaps, right?

1    A    Right.

2    Q    Now, you've indicated that you stopped this van for

3    speeding?

4    A    Yes.

5    Q    And that you talked to Mr. Maynard and to Mr. Gordon and

6    something that they said made you suspicious, right?

7    A    Yes.

8    Q    First of all, Antoine Jones was not in that van, right,

9    I mean, just to make that clear?

10    A    I don't know who Antoine Jones is.

11    Q    So it's fair to say he wasn't in the van, right?

12    A    Yes.

13    Q    All right.  Now, once you talked to Maynard and Gordon,

14    you called out the K-9 unit, right?

15    A    Correct.

16    Q    And then after that is when you decided to search the

17    van after Mr. Maynard had given you consent as you say?

18    A    Actually before I had made a determination that I was

19    going to search the van.

20    Q    Before he gave you consent?

21    A    Yes.

22    Q    Okay.  So, asking him for consent was just for the heck

23    of it?

24    A    No.

25    Q    All right.  Well, you had already made the determination

1    that you were going to do it no matter what, right?

2     A    Not necessarily.  I mean it was based on a lot of other

3    things, but I was primarily dealing with the traffic stop

4    when I had made my mind up.  So this was just another part of

5    the stop when I determined that I was going to search the van

6    and I asked for his consent to search the van.

7     Q    But up until that point, there was nothing beyond the

8    speeding, let's say, that was a crime or an offense?

9     A    Other than the speed, at that point, there was no crime

10   that had been committed.

11    Q    All right.  Well let's get to the search.  You said

12   that, at first, you went to the back of the van and you

13   noticed that the floor was raised a little bit, right?

14    A    Right.

15    Q    And then it was very difficult for you to open it,

16   correct, to open the compartment as you said?

17    A    Yes.

18    Q    Now, you've indicated several times that, based on your

19   training, at least training that you had a week earlier, you

20   were positive that this was not a manufacturer-type

21   compartment, right?

22    A    Right.

23    Q    You kept saying that it was after market?

24    A    Right.  Manufacturers don't put compartments, single

25   compartments in vehicles.

1   Q   Well, did you at any point check this particular van and

2   this particular manufacturer, Honda Odyssey, to see?

3   A   That's one of the first rules of highway interdiction is

4   that any compartments that are put in the vehicles are after

5   market compartments.

6   Q   I'm not asking about the rules of interdiction.  I'm

7   asking you did you, at any point, check with Honda about this

8   particular van to see if that was done as an after-market

9   type compartment?

10   A   I did not specifically check with Honda, but I know that

11   the vehicles are not equipped with compartments.

12   Q   Well, during your week-long training and interdiction,

13   did they actually tell you the Honda Odyssey, whatever year

14   that van was, does not come with that type of compartment?

15   A   Yes, I have been told that no vans or cars --

16   Q   I'm not asking about no vans.  I'm asking about --

17       THE COURT:  Wait a minute.  No what?  The reporter

18   can't get it.  Sorry.  He can finish his answer.

19       MR. BALAREZO:  I'm not asking about the --

20       THE COURT:  I want to hear his answer.  That's the

21   problem.  You cut him off.  Go ahead.

22       THE WITNESS:  No.

23       THE COURT:  No what?  I'm sorry.

24       THE WITNESS:  That the Honda Odyssey does not have

25   an after-market compartment or that they don't put

1    compartments in the Honda Odyssey van.

2         MR. BALAREZO:  Now, you've made me forget the

3    question.

4         THE COURT:  Sorry, but you've got to go a little

5    slower please.

6         MR. BALAREZO:  Very well, Your Honor.

7    BY MR. BALAREZO:

8    Q   Now, so let's just get to the search.  You went to the

9    back of the van.  At first you noticed that it was raised a

10   little bit, right?

11   A   Yes.

12   Q   You couldn't pull the rug up, the carpet, right?

13   A   Right.

14   Q   As you've indicated, it was glued down?

15   A   Right.

16   Q   Then you went under it and you tried to follow the gas

17   line to the tank, right?

18   A   Right.

19   Q   Do you have any pictures up there?

20   A   No, I do not.

21   Q   Just so I know what you're talking about, I am going to

22   show you Government's NC Stop Number 1.  Do you see that?

23   A   Yes.

24   Q   And I'm pointing to this area here.  Is that a gas tank?

25   A   Yes, it is.

```
1    Q    Is that the real one or the fake one I'm pointing to?

2    A    That's the real one.

3    Q    And where is the after-market one?

4    A    The one that's, it was added in there.  I guess what

5    happened was --

6              THE COURT:  He just wants to know where is it in

7    the picture?

8    BY MR. BALAREZO:

9    Q    Well, don't guess.  I'm asking you, yeah, where is it?

10   A    I'm not guessing.  It's before, it's actually the very

11   front of the vehicle coming backwards, the contours of the

12   tank, it's that portion of it.

13   Q    So you're saying that this is the second gas tank?

14   A    No, that's not even the gas tank that you're pointing

15   out.

16   Q    Why don't you just get up and show us on that picture so

17   the jury can see?

18   A    I'm talking about this area right here.  This is the

19   area.

20             THE COURT:  I can't tell what he's --

21             MR. BALAREZO:  I'll trace it with this.  Go ahead.

22             THE COURT:  Go ahead.

23             THE WITNESS:  The area here is the area of concern.

24   BY MR. BALAREZO:

25   Q    This area?
```

1    A    Yes.

2    Q    So you're saying that there's another tank there?

3    A    Yes, the tank has been modified.  It's almost like the

4    tank, an addition has been made to the tank.

5    Q    I'm not asking, if you could just focus on what I'm

6    asking you.  In this particular picture though, it's not

7    readily apparent that there is a second gas tank or a

8    compartment, is there?

9    A    No, just by looking at it there, no, it's not.

10   Q    And Government's NC Stop 2, can you see it here?

11   A    Yes, you can.

12   Q    Where is it?

13   A    That blue area there, that's where the addition has been

14   made and that's where the extra had been added on.  That's

15   where the compartment is at.  That's actually a better view.

16   That's from the middle point of the van, pointing outward.

17   Q    So you're saying that that is different from this

18   particular tank?

19   A    Yes, it is.  No, it's the same tank, but it's just a

20   different view of it.

21   Q    And somewhere in there is that second compartment?

22   A    Yes.

23   Q    Now, they do look remarkably similar though, don't they?

24   A    They do.

25   Q    Like one tank?

1    A    They do.

2    Q    Now, you had problems opening the compartment from the

3    inside of the van, right?

4    A    Initially, we did, yes.

5    Q    All right.  So based on what you described that you have

6    to do to open the van, this is not something that someone

7    could just reach in, get anything out and close it back up,

8    right?  There was a whole procedure that had to be done

9    according to you?

10   A    Yes.

11   Q    When did you actually do that procedure that you

12   mentioned?

13   A    The following day.

14   Q    Based on what you had talked about to your instructor?

15   A    Yes.

16   Q    And the electricity that you ran through it the day

17   before when you ran the cords, that didn't affect it in any

18   way?

19   A    No, it did not.

20   Q    Now, when you talked to Mr. Maynard, at any time did

21   Maynard mention Antoine Jones to you?

22   A    Not specifically, no.

23   Q    Well, either he did or he didn't?

24   A    No.

25   Q    Now, Maynard, at some point after you stopped him,

1    seized the money and went back to the station, he did make a

2    statement, correct?

3    A    I don't know specifically what you're talking about.

4    Q    Well, you took him back to the station and asked him

5    questions about what was going on, correct?

6    A    Oh, yes.  They were interviewed separately, he and

7    Mr. Gordon.

8    Q    And you interviewed him?

9    A    I sat in on the interview, yes.

10   Q    Isn't it true that Maynard at some point indicated that

11   he was purchasing that van from Antoine Jones?

12              MR. GEISE:  Objection, Your Honor, if we could

13   approach.

14              THE COURT:  Okay.  Let's approach.

15              (Bench conference.)

16              THE COURT:  What is wrong with that?

17              MR. GEISE:  This time I think it really --

18              MR. BALAREZO:  This time I think it's --

19              MR. GEISE:  It really is hearsay.

20              THE COURT:  He is not offering it for truth.

21              MR. GEISE:  Yes, he wants to on, testify that

22   Maynard had control of that van and therefore it is not

23   Mr. Jones.  That's for the truth I think.

24              THE COURT:  This is all part of the conspiracy,

25   too.

```
 1              MR. GEISE:  Yes, except I can offer it --

 2              MR. BALAREZO:  I can't ask any questions he said.

 3              MR. GEISE:  If I offer it against him --

 4              THE COURT:  Are you offering this for the truth?

 5              MR. BALAREZO:  Your Honor, it is the same reason

 6   why this officer took the actions that he did.  It is the

 7   same thing.  That the Government was --

 8              THE COURT:  Why do we care what he did back at the

 9   station?  What is the relevance of that?

10              MR. BALAREZO:  That's why he let Maynard go.

11   Maynard said he was purchasing the car because he understood

12   the money --

13              THE COURT:  Who cares if he let him go.  What is

14   the relevance of that?  Sustained.  Okay.

15              (Open Court.)

16   BY MR. BALAREZO:

17   Q   Officer, at the time of this stop, you had no idea how

18   long Lawrence Maynard had been driving this van, right?

19   A   No.

20   Q   You had no idea how often he used it, correct?

21   A   Not really, no.

22   Q   Either you did or you didn't?

23   A   I mean, we talked about it briefly.  I mean --

24   Q   He drove it often, correct?

25   A   He drove it pretty often, yeah.
```

1    Q    Okay.

2    A    But it was a company van, so he was not the only one

3    that drove it.

4    Q    It was a company van.  And you said that that -- so he

5    did indicate that other individuals had access to that van

6    also, right?

7    A    Yes.

8    Q    At no point did he say Antoine Jones drove that van

9    regularly?

10           MR. GEISE:  Same objection, Your Honor.

11           THE COURT:  Overruled.

12   BY MR. GEISE:

13   Q    At no point did he tell you that Antoine Jones drove

14   that van, correct?

15   A    No.

16   Q    Now, you have no evidence and you can't tell this jury,

17   based on your training, your experience as the interdiction

18   officer, that or when that particular compartment was placed

19   in that van, correct?

20   A    No.

21   Q    You have no idea whether or not that -- well, you do

22   have some documents that indicate that the van was purchased

23   used, correct?

24   A    Yes.

25   Q    You have no evidence to show that that compartment --

1    you can't tell this jury that that compartment was not in the

2    van at the time of that purchase, correct?

3    A    I don't know, no.

4    Q    You can't tell them that?

5    A    No.

6    Q    So you don't know if the original owner put in that

7    compartment, correct?

8    A    Correct.

9    Q    Now, once you located this particular compartment, you

10   searched the van thoroughly, correct, you or the other

11   officers on the scene?

12   A    Right.

13   Q    There was absolutely no drugs found in that van,

14   correct?

15   A    No, there was not.

16   Q    Of any type?

17   A    No.

18   Q    There was nothing in that van tying it to Antoine Jones,

19   correct?

20   A    Yes, I did find something with Antoine Jones's name.

21   Q    Was that in these documents that you indicated earlier?

22   A    I'm not sure if I made a copy of it or not.  I'm pretty

23   certain that I did.

24   Q    Do you recall what it was?

25   A    It was a receipt for Jiffy Lube, actually it was two

1   receipts for Jiffy Lube for oil changes.

2   Q   All right.  But you don't have that now, do you?

3   A   I have them in my bag.  I do.

4   Q   Is this something that you produced to the Government

5   before?

6   A   I feel pretty certain that I did.  I'm not absolutely

7   certain, but copies of everything that I had, that I took, I

8   made copies of and I sent.

9   Q   When would you have produced that?

10  A   The same time I produced the notes and pictures and

11  everything else that I had given.

12  Q   But even if you had found a receipt for Jiffy Lube

13  containing -- was his name on there?

14  A   Yes, it was.

15  Q   That does not indicate that he owned the van, correct?

16  A   I would say it would.

17  Q   I'm not asking what you say or what you think?

18  A   The vehicle had the information on there.  He had to be

19  the one to give the information.  Whoever takes the vehicle

20  in for the oil change is normally who name they put down.

21  Q   Well, if I take my wife's car in for an auto [sic]

22  change, it doesn't mean that I own the car, right?  It just

23  means I took it in for an auto change or an oil change,

24  right?

25  A   Right.

1    Q    So you can't make that assumption, correct?

2    A    Correct.

3    Q    Now, with respect to these documents that the Government

4    mentioned in NC Stop Number 10, all that you had in there was

5    a temporary inspection waiver, correct?  That was one of the

6    documents that was included?

7         THE COURT:  Wait.  Ten, he didn't -- he didn't

8    retrieve results from the car, did he?

9         MR. BALAREZO:  These are in evidence, right?

10        THE COURT:  They're in evidence, yes, but he didn't

11   pick them up out of the car I assume, right?

12        THE WITNESS:  No, I did not.

13   BY MR. BALAREZO:

14   Q    Let me show you NC Stop 10.  Do you see a document in

15   there that's called an inspection certificate?

16   A    I do.

17   Q    Antoine Jones's name anywhere on that inspection

18   certificate?

19   A    No, it's not.

20   Q    And what's the date of that certificate?

21   A    May 11, 2004.

22   Q    How long before the stop was that?

23   A    Eleven months.

24   Q    And is there a certificate of title for a vehicle also

25   in that stack of documents?

1    A    Yes, it is.

2    Q    Antoine Jones's name does appear on that one, right?

3    A    It does.

4    Q    I draw your attention to Box A, towards the middle

5    bottom of the page.  There's also a date, correct?

6    A    Yes, it is.

7    Q    What is that date?

8    A    11 May 2004.

9    Q    How long before this stop was that?

10   A    Same time length, about 11 months.

11   Q    There is also an application for a certificate of title,

12   is there not?

13   A    Yes, it is.

14   Q    Antoine Jones's name is on there, right?

15   A    Yes.

16   Q    What date was that?

17   A    11 May 2004.

18   Q    Same time difference between that date and when it was

19   stopped?

20   A    Yes.

21   Q    Sir, a temporary inspection waiver?

22   A    Yes, it is.

23   Q    Antoine Jones's name is on there?

24   A    Yes.

25   Q    There's no date, correct?

1    A    No date.

2    Q    So, none of these documents did you find in the van,

3    correct?

4    A    No.

5    Q    And at no point, as they said, did Maynard tell you that

6    it was Jones's club or Jones's car, correct?

7    A    No.

8    Q    You yourself, you didn't run a registration on the car

9    to see who owned it, right?

10    A    I did.  That was part of running the vehicle's

11    information, yes.

12    Q    And that was part of it.  Now, you did write a report

13    memorializing this particular traffic stop, did you not?

14    A    Would you repeat that?

15    Q    You wrote a report which memorialized the traffic stop?

16    You wrote down what happened?

17    A    Yes.

18    Q    Right?  And that was actually a, if I'm correct, a

19    nine-page typewritten report of everything that happened,

20    right?

21    A    Yes.

22    Q    Did you write down anywhere in that nine-page report,

23    which was very detailed, that you ran a registration check on

24    the car and that Antoine Jones's name came up as the owner at

25    that time?

1    A    I did not.

2    Q    And you also did a Durham Police Department offense

3    report.  Do you remember doing that one?

4    A    Yes.

5    Q    That was a six-page, single-spaced, very detailed

6    report, correct?

7    A    Yes.

8    Q    And no where on there did you indicate that you did the

9    registration check at that time and Antoine Jones came up as

10   the owner, right?

11   A    No, I did not.

12   Q    Now, wasn't that important at that time considering that

13   you stopped this vehicle and you ended up seizing $67,000.

14   You didn't care to know or didn't think it was important to

15   write down who the owner was?

16   A    Oh, it was important.

17   Q    You just didn't write it down?

18   A    Just didn't need to be referenced in the report.

19   Q    You indicated that the currency that was found inside of

20   the -- I'm going to show you NC Stop 5.  The currency that

21   was found inside of the van was contained inside of plastic

22   Target bags?

23   A    Yes.

24   Q    And is that one of the bags?  I can't tell.  This one

25   right here.

1          THE COURT:  Do you see what he's talking about?

2          THE WITNESS:  Honestly, I have no idea what that

3    is.  I did not take the picture.

4    BY MR. BALAREZO:

5    Q    That's fine.  Did you preserve the bags in any manner,

6    so that you could obtain perhaps fingerprints or anything of

7    that nature?

8    A    No.

9    Q    Okay.  So, given that you didn't preserve, then it's

10   probably fair to assume that you didn't fingerprint the bags

11   in any way?

12   A    We did not.

13   Q    Okay.  So you can't tell the jury that Antoine Jones's

14   fingerprints were anywhere on that bag?

15   A    I could not.

16   Q    And you probably also didn't do any forensic testing,

17   right, that you found a hair belonging to Antoine Jones in

18   that bag or on the money?

19   A    I did not.

20   Q    You have nothing to tie that money to Antoine Jones,

21   right?

22   A    No.

23          MR. BALAREZO:  I have nothing else, Your Honor.

24                    CROSS EXAMINATION

25

1   BY MR. NORRIS:

2   Q    Good day, Officer Whitehead.

3   A    How you doing?

4   Q    For the record, Attorney John Norris on behalf of Mr.

5   Adrian Jackson.  Officer Whitehead, the only two occupants

6   were Mr. Maynard and Mr. Gordon; is that correct?

7   A    Yes, sir.

8   Q    Okay.  So Adrian Jackson was not in that van that day,

9   correct?

10  A    I don't know Adrian Jackson, so I know he was not in the

11  van.

12  Q    Okay.  And if you don't know him, his name wasn't

13  mentioned that day by either Mr. Maynard or Gordon, correct?

14  A    No.

15  Q    There is nothing, that you're aware of, connecting him

16  with that van, correct?

17  A    Not to my knowledge.

18            MR. NORRIS:  Thank you, sir.

19            MR. McDANIEL:  No questions, Your Honor.  Thank

20  you.

21            MR. ACREE:  No questions, Your Honor.

22            THE COURT:  Anything further from the Government

23  briefly?

24            MR. GEISE:  Yes, Your Honor.

25                         REDIRECT EXAMINATION

1   BY MR. GEISE:

2   Q   Mr. Balarezo asked you some questions about what

3   Mr. Maynard told you.  He never used the name Antoine Jones?

4   A   I don't remember.  I didn't make reference to it in my

5   report if so.

6   Q   Did he tell you who else drove the van, not by name but

7   by what they did?

8   A   He said his partner drove the van.

9   Q   And his partner in what?

10  A   The business that he owned and that they owned together.

11  Q   That business was what?

12  A   The Club Levels.

13  Q   Now, Mr. Balarezo was asking you some questions about NC

14  Stop 10, which was those M.V.A. documents?

15  A   Yes, sir.

16  Q   Which you did not obtain?

17  A   No, sir.

18  Q   I'm not sure you can read it here.  I'll bring the item

19  up.

20          MR. GEISE:  If I can approach the witness, Your

21  Honor.  I'm not sure it can be read.  Let me show him and

22  then I'll put it back.  I am going to ask you to note the

23  date on there.

24          THE COURT:  The document speaks for itself.  The

25  date is the date.

1          MR. GEISE:  Yes, Your Honor.  I just wanted to

2     note --

3          THE COURT:  May 6, 2005.

4          MR. GEISE:  May 6, 2005, is the date that this

5     document was obtained by its seal.

6          MR. BALAREZO:  Your Honor, there is no evidence

7     that that is the case.

8          THE COURT:  I think, as a public document, it does

9     say that.  It says it right to the left of the date.  Okay.

10    BY MR. GEISE:

11    Q   And May 6, 2005, how long after your stop was that?

12    A   One month.

13    Q   Now, Mr. Balarezo asked you if you know when that

14    after-market compartment was placed in the vehicle.  And you

15    don't know that?

16    A   No, sir.

17    Q   And you don't know, maybe somebody just left the $67,000

18    in there when they sold the car?

19    A   As far as I know, yes.

20    Q   Very likely?

21         MR. BALAREZO:  Objection.

22         THE COURT:  Sustained.  Strike the answer.

23    Anything else?

24         MR. GEISE:  No further questions.

25         THE COURT:  You can ask two questions.  They have

1    to relate to what he just did though.

2                    RECROSS EXAMINATION.

3    BY MR. BALAREZO:

4    Q   Officer, Mr. Geise just asked you questions about what

5    Maynard told you was the job or the occupation of the other

6    person that drove, one of the other persons who drove the

7    van?

8    A   Yes, sir.

9    Q   You didn't write that down in that nine-page or that

10   six-page report, did you?

11   A   I did not.

12   Q   Didn't include it in any way?

13   A   No.

14            MR. BALAREZO:  Nothing else.

15            THE COURT:  Okay.  Thank you, sir.  You may step

16   down.

17            (Witness excused.)

18            THE COURT:  Ladies and gentlemen, it's a good time

19   to take a break.  It's now about ten of, so we'll recess

20   until 11:00.  Thank you.  Leave your stuff there.  Don't

21   discuss the testimony.

22            (Jury Out.)

23            THE COURT:  The next witness is Mr. Bermea.  As I

24   said, we'll break by 12:30.

25            MS. LIEBER:  Just very quickly, as a follow-up to

1    yesterday, the Court noted that Juror Number Five admitted a

2    rather significant yawn.  I would also note that, again, he

3    was sleeping.  I saw a head bob.  If you want me to flag it

4    for the Court during the time, I will.  I don't want to

5    interrupt the proceedings.

6            THE COURT:  I guess you're going to have to

7    because, I mean, I heard the yawn, obviously, and there are

8    various techniques to keep people awake.  Sometimes they have

9    to stand up for a while.  I've been very attentive.  I'm

10   sorry, I did not see that.

11           You can ask to approach if you really, really

12   believe he's asleep.  We can figure it out.  Sometimes people

13   are slightly likely to close their eyes.  Anything else

14   before we break for ten minutes?

15           MR. GEISE:  No, Your Honor.

16           THE COURT:  Okay.  Thank you.  Ten minutes, please.

17           (A brief recess was taken.)

18           MR. BALAREZO:  I just asked the Government whether

19   or not they had any further -- whether the Government had any

20   further Jencks or any other statements of this witness.  They

21   have indicated that they do have some 302s from the

22   debriefings and whatnot, but that they will not turn them

23   over.

24           I believe that those should be turned over as,

25   first of all, record of the debriefings.  Number two, they

1    are Jencks.  They are statements that this individual made

2    that somebody else took down, and I think that that should

3    be --

4             THE COURT:  That's the problem.  It depends.  Are

5    they substantially verbatim?

6             MR. GEISE:  In the D.C. Circuit, as the Court

7    knows, I think the case is Tarrantino, although I can pull

8    it, says that generally 302 debriefings are not Jencks

9    material.

10            THE COURT:  Right.  How many are there?

11            MR. GEISE:  I think one, maybe two, Your Honor.

12            THE COURT:  Generally, I look at them.

13            MR. BALAREZO:  I would ask the Court at least, at

14   the very least, to look at them.

15            THE COURT:  If you give them to me before lunch,

16   I'll do it, as long as it's not terribly lengthy.  But if

17   they're not substantially verbatim, and only those parts that

18   are substantially verbatim is all you're entitled to, and

19   generally speaking, these people don't take it that way, if

20   they know what they're doing.

21            That's all we're talking about is 302s, correct?

22            MR. GEISE:  Yes, Ma'am.

23            THE COURT:  I generally feel perfectly comfortable

24   looking at the stuff.

25            MR. BALAREZO:  And just so the record is clear,

1    there is no other Jencks or any other material that the

2    Government has on this witness.

3              MR. GEISE:  No, we've given them everything.

4              THE COURT:  Is there grand jury?

5              MR. GEISE:  No.

6              THE COURT:  All right.  Your counsel is out there,

7    but once we start, sir, you're not able to discuss your

8    testimony with anybody.  Do you understand?

9              THE WITNESS:  Yes, Ma'am.

10              THE COURT:  Are we ready to go?

11              MR. GEISE:  Yes, Your Honor.

12              THE COURT:  Okay.

13              (Jury Present.)

14              THE COURT:  Okay.  Ladies and gentlemen, is

15    everybody ready?  Let us begin.  You can swear the witness

16    please.

17              ROEL BERMEA, GOVERNMENT WITNESS, SWORN

18                    DIRECT EXAMINATION

19    BY MR. GEISE:

20    Q    Good morning, Mr. Bermea.  Would you please state your

21    name and spell your last name for the Court Reporter.

22    A    Roel Bermea, B-E-R-M-E-A.

23    Q    Now, Mr. Bermea, just a little bit of brief background.

24    Would you tell us where were you born, sir?

25    A    I was born in McAllen, Texas.

1    Q    And when?

2    A    In 1969.

3    Q    What was your first language?

4    A    Spanish.

5    Q    And when did you learn to speak English, sir?

6    A    When I went to school.

7    Q    And when would that, five, six?

8    A    Five or six, yeah.

9    Q    Now, sir, would you just tell us a little bit.  Are you

10   married, sir?

11   A    Yes, sir.

12   Q    How many times have you been married?

13   A    Twice.

14   Q    When did your first marriage end?

15   A    In '98.

16   Q    How many children --

17   A    I mean '99.

18   Q    '99, excuse me.  Do you have children from that first

19   marriage?

20   A    Yes, two.

21   Q    Have you married again?

22   A    Yes, sir.

23   Q    When was that, sir?

24   A    In 2003.

25   Q    Do you have children with your second wife or her

1   children by that marriage?

2   A   She has two kids.

3   Q   Now, sir, how far did you go in school?

4   A   High school.

5   Q   And after you got out of high school, how were you

6   employed?

7   A   I worked in a convenient store.

8   Q   I'm sorry?

9   A   Convenient store.

10          THE COURT:   Where?

11          THE WITNESS:   In Mission.

12   BY MR. GEISE:

13   Q   Where is Mission?

14   A   Texas.

15   Q   What did you do in the convenience store?

16   A   I used to work overnight, night stocker.

17   Q   What does the night stocker do?

18   A   Puts the products on the shelves.

19   Q   Now, let me ask you this, sir.   Prior to last year, had

20   you had any criminal convictions of any kind?

21   A   No, sir.

22   Q   Sir, let me ask you to focus your attention on spring or

23   early summer of 2004, a little more than two years ago.   And

24   I'm also going to ask you, sir, is your memory great for

25   dates?

 1    A    Not that much.

 2    Q    I'm just going to ask you to do your best then, if you

 3  would, sir.

 4    A    Okay.

 5    Q    And just tell us when you testify what you remember and

 6  as close as you can on dates.  Sir, spring or early summer of

 7  2004, a little more than two years ago, what was your

 8  financial status?

 9    A    Not that great.

10    Q    Why don't you tell us why it was not that great?

11    A    I was supporting my first wife, my child support, and

12  like I had another wife.  She had kids herself.  So I

13  couldn't maintain all those bills.

14    Q    Now, at some point in that period, were you talking to

15  your brother-in-law?

16    A    Yes, I was.

17    Q    Would you tell us who is your brother-in-law?

18    A    This is my wife's brother.

19    Q    And this is your present wife's brother?

20    A    Yes, sir.

21    Q    What is his name?

22    A    Alberto Carrillo.

23         THE COURT:  How do you spell that?

24         THE WITNESS:  A-B-R-O [sic] C-A-R-R-I-L-L-O.

25

1    BY MR. GEISE:

2    Q   Where does your brother-in-law live, sir?

3    A   In Mexico.

4             MR. GEISE:   I think these have already been

5    admitted.

6             THE COURT:   Yes.

7    BY MR. GEISE:

8    Q   I'm going to show you what's already been admitted as

9    Government's Exhibit Photo 9.

10            THE COURT:   So he is Mr. Alberto

11   Carrillo-Montelongo?

12            THE WITNESS:   Yes, Ma'am.

13   BY MR. GEISE:

14   Q   Showing you Government's Exhibit Photo 9, which has

15   already been admitted, who is that, sir?

16   A   He's my brother-in-law.

17   Q   And Mr. Carrillo, Mr. Carrillo-Montelongo?

18   A   Yes, sir.

19   Q   You mentioned you were talking with him and where was

20   this?

21   A   In Mexico.

22   Q   What happened at that point?

23   A   This individual came up to my brother-in-law and asked

24   him --

25            MR. BALAREZO:   Objection.

1            THE COURT:  Sustained.

2            MR. GEISE:  If I may approach, Your Honor.

3            THE COURT:  Let's approach.

4            (Bench conference.)

5            MR. BALAREZO:  I don't think that was a yawn.

6            THE COURT:  Please.

7            MR. GEISE:  It's one of the people who had asked

8    him to join the conspiracy.

9            THE COURT:  Who?

10           MR. GEISE:  Well, he knows him as Joe.  He was

11   related to one of the main players, Pelos.  He goes up to

12   Carrillo-Montelongo and to Bermea and says do you want to

13   make some quick money.

14           THE COURT:  Wait a minute though.  Is he going up

15   to him.  He's talking directly to him?

16           MR. GEISE:  They're sitting together, I'll

17   establish that.  They're sitting there at his

18   brother-in-law's home in Mexico and he overhears it.

19           THE COURT:  He overhears it?  Want to make some

20   quick money?

21           MR. GEISE:  Essentially, he talks to them about how

22   they can make some money.

23           THE COURT:  You have put some dates on it, though.

24   He has to accept this in furtherance of the conspiracy, the

25   conspiracy is confined by certain dates.

1          MR. GEISE:  I focused on the spring and summer of

2     2004, Your Honor.

3          THE COURT:  All you have is summer of 2004.  What

4     is the date in the indictment?

5          MR. BALAREZO:  There is the issue of who is this

6     guy, Joe.  Is he a member of the conspiracy?

7          THE COURT:  Well, it's going to be apparent, fairly

8     quick order.  This conspiracy or a separate.

9          MR. BALAREZO:  This conspiracy or a separate

10    conspiracy?

11         THE COURT:  Don't forget he is entitled under the

12    law to elicit this.  At the end of the day, he is either

13    tying it up or not.  It comes in and is subject to some

14    problem down the road.  But he knows what he has to do to tie

15    it up.

16         You have to do a better job on foundation because I

17    don't know what is coming.  I don't know who Joe is.

18         MR. GEISE:  Actually I'm not, we'll tie it up.

19         THE COURT:  It is obvious that the drugs, he's

20    going to talk about the drugs that Joe talked about.  How

21    else were they going to make quick money?  All right.

22    Overruled.

23         MR. BALAREZO:  If we could get a proffer from them

24    what they're going to show that Joe was a member of this

25    conspiracy.  He could have been talking about any Joe out

1    there.

2          THE COURT:  You've seen his grand jury testimony?

3    All right.  How are you going to tie it up.

4          MR. GEISE:  This guy says to him, he says to Joe, I

5    think it's Joe says to Mr. Carrillo-Montelongo, you want to

6    make some quick money.  He says to Carrillo-Montelongo you

7    want to basically make some easy money.  They talk about it.

8    It's clear to both of them that it has something to do with

9    drug activity.

10          Carrillo-Montelongo goes and talks to Bermea, one

11    of the main players, who is named in the transcripts.

12    Carrillo-Montelongo comes back and says, basically what you

13    have to do is go and watch these drugs in the stash house.

14          THE COURT:  And that's when he goes to Potomac

15    Address?

16          MR. GEISE:  Actually, there are three other trips

17    first, Your Honor, to another stash house.

18          MR. BALAREZO:  Is that tied to this?

19          MR. GEISE:  I would say it's tied to that because

20    the guy who was buying all the drugs is Mr. Balarezo's

21    client.

22          THE COURT:  Are they houses that we know about?

23    There are a bunch of houses mentioned in the indictment.

24          MR. GEISE:  He can describe where they are.  There

25    are two houses.  There is the one at Potomac and there is the

1   first one they go to for a couple of trips.  He can describe

2   where it is, although we don't know precise location.  He

3   just knows in the Maryland area.

4           THE COURT:  Does he deal mostly directly by phone?

5           MR. GEISE:  He deals directly with Mr. Jones.

6           THE COURT:  Give the reporter a break.  Don't cut

7   me off so I can finish.  Don't cut your witness off.  We have

8   to have a record here.  That's fine.

9           Do you need to talk to me about, on the record or

10  not on the record?

11          MR. ACREE:  It could ultimately a scheduling issue.

12          THE COURT:  I'm not too patient.  You better solve

13  it.

14          MR. ACREE:  I can tell the Court what it is, my

15  Aunt died on Sunday night.

16          MR. ACREE:  Her funeral is Friday.  I had actually

17  asked, my mother was involved in the arranging.

18          THE COURT:  Friday morning we're not sitting.

19          MR. ACREE:  It's in Queens.

20          THE COURT:  New York?

21          MR. ACREE:  Yes.

22          THE COURT:  We can talk about it later.

23          I'm sorry to hear this.  I apologize, but I really

24  have run out of patience with the interruptions.  We'll talk

25  about it later.

```
 1              (Open Court.)

 2              THE COURT:  Okay.  I'm sorry.  Overruled.

 3              Can we get a little more time, place and who was

 4    present, foundation please?

 5              MR. GEISE:  Yeah, sure.

 6    BY MR. GEISE:

 7    Q   We were talking about the spring or early summer --

 8              THE COURT:  If you're going to make any objections,

 9    we're not going to take them down unless you have the mike.

10              MR. BALAREZO:  Can I leave it at the table, Your

11    Honor?

12              THE COURT:  Yes, you can.  That's what I'm telling

13    you.  Listen to the question.  Go ahead.

14    BY MR. GEISE:

15    Q   I'm asking you to focus, sir, on the spring or early

16    summer of 2004.  You mentioned you were with your

17    brother-in-law who you've identified.  Where were you all at

18    this point physically?

19    A   In Mexico.

20    Q   Where in Mexico?

21    A   In Matamoris.

22    Q   And where is Matamoris?

23              THE COURT:  Where?

24              THE WITNESS:  Matamoris.

25              THE COURT:  Can we spell that?
```

1          MR. GEISE:  M-A-T-A-M-O-R-I-S.

2   BY MR. GEISE:

3   Q   Where is that in relation to the border?

4   A   It's close to Hidalgo County, H-I-L-D-G-O [sic].

5   Q   Where were you all, where were you and your

6   brother-in-law at this point?

7   A   At his house.

8          THE COURT:  Whose house again?  Do you have a name?

9          THE WITNESS:  His house, his parent's house.

10          THE COURT:  Your brother-in-law's parent's house?

11          THE WITNESS:  Yes, Ma'am.

12          THE COURT:  That's Mr. Carrillo-Montelongo?

13          THE WITNESS:  Yes.

14   BY MR. GEISE:

15   Q   And if you happen to remember, where were you sitting at

16   the time?

17   A   We were sitting outside on the porch.

18   Q   What happened then?

19   A   One of his friends arrived and he asked him --

20   Q   No, do you remember, what is the friend's name?

21   A   I think his name is Joe.

22   Q   Do you know a last name?

23   A   No, sir.

24   Q   What did, had you ever met this person before?

25   A   No, sir.

1    Q    What happens then?

2    A    Then he was telling my brother-in-law that --

3    Q    Now, were you sitting there at the time?

4    A    Yes, I was.

5    Q    So you could hear what they were saying?

6    A    Yes.

7    Q    What did Joe tell your brother-in-law?

8              MR. BALAREZO:   Objection, Your Honor.

9              THE COURT:   Overruled.

10   BY MR. GEISE:

11   Q    Please proceed.

12   A    That he had some type of deal for him so he could make

13   some money.   And he said if you wanted, he could set it up so

14   he could meet somebody.

15   Q    Now, did at this point, did he tell what this money

16   making deal was?

17   A    Not, not to an extent.

18   Q    Did you have some sense of what he was talking about?

19   A    Just about.

20   Q    What was that?

21   A    He was talking about drugs.

22   Q    Now, after that conversation, do you know if your

23   brother-in-law went to talk further about this?

24   A    Yes, he did.

25   Q    How do you know this?

1           MR. BALAREZO:  Objection.

2           THE COURT:  Is it the same conversation we just

3    discussed up here?

4    BY MR. GEISE:

5    Q    After this first conversation with Joe, did you have

6    further discussions with your brother-in-law?

7    A    Carrillo-Montelongo?

8           THE COURT:  Carrillo-Montelongo?

9    BY MR. GEISE:

10   Q    Carrillo-Montelongo?

11   A    Yes.

12   Q    What did Mr. Carrillo-Montelongo tell you?

13          MR. BALAREZO:  Objection.

14          THE COURT:  Overruled.  Go ahead.

15          THE WITNESS:  That he, that the person he went to

16   meet, he said it was, we need to, for him to do, go up state

17   and lay on some couple keys and he was going to get paid $75.

18          THE COURT:  Up state what?

19          MR. GEISE:  I think, Your Honor, I'll ask a couple

20   of follow ups.

21   BY MR. GEISE:

22   Q    Did your brother-in-law tell you who he met with?

23   A    Yes.

24   Q    Who did he meet with?

25   A    Primo.  At that time, I didn't know who he was.

1    Q    At that point, you had never met Primo?

2    A    Exactly.

3    Q    How would you spell Primo, if you would, sir?

4    A    P-R-I, that's how I spell it.

5    Q    What did your brother-in-law tell you about the

6    discussion with Primo?

7            THE COURT:  How do you spell it?  P-R-I-M-O?

8            THE WITNESS:  M-O.

9            THE COURT:  All right, P-R-I-M-O.  Sorry.  And what

10   did your brother-in-law tell you about his meeting?

11           THE WITNESS:  That all he needed to do was go up

12   where they were going to have the drugs and just wait until

13   the person comes and buys the drugs.  And then, after that,

14   just deliver the money back the same way how they got it.

15   BY MR. GEISE:

16   Q    Now, at this point, did you know where this was going to

17   be, where the place was?

18   A    No.

19   Q    Now, did you have any discussion with your

20   brother-in-law about you getting involved in this deal?

21   A    Yes.

22   Q    And what was that discussion?

23   A    If he could mention, if he could take me with him.

24   Q    Why did you want to get involved?

25   A    Because I had money problems.

1    Q    Now, at this point, did you know how much money you were

2    going to get paid?  Did your brother-in-law have any idea how

3    much the money was going to be?

4    A    He told him it was going to be $75 per key.

5    Q    So it would be $75 per key?

6    A    Yes.

7    Q    Do you know whether your brother-in-law went to talk to

8    him about you getting involved?

9    A    He did.

10   Q    How do you know that?

11   A    Because he told me he was going to go talk to him.

12   Q    What happened after that?

13   A    He said --

14           MR. BALAREZO:  Your Honor, I need some

15   clarification about who was talking to whom?

16           MR. GEISE:  Yeah.  At this point though --

17           THE COURT:  Yes, but if you don't use the mike,

18   we're not going to take it down.  I'm sorry.

19           MR. BALAREZO:  Can we get clarification of who was

20   talking to whom?

21           THE COURT:  Yes.  His brother-in-law said he was

22   going to go talk to him.

23   BY MR. GEISE:

24   Q    Who was your brother-in-law going to go talk to?

25   A    Primo.

1    Q    Did your brother-in-law talk to Primo?

2    A    Yes, he did.

3    Q    How do you know that?

4    A    Because he told me.

5    Q    What did your brother-in-law tell you at this point?

6    A    He told me he was going to mention about me.  And he was

7    going to tell me if they were going to take me with them.

8    Q    Did your brother-in-law get back to you on that?

9    A    Yes, he did.

10   Q    What did he tell you?

11   A    He told me that they were going to take me because I was

12   born from over here.  I was a citizen, so they needed

13   somebody to translate and somebody to have a driver's

14   license.

15   Q    So you're a native born U.S. citizen?

16   A    Yes.

17   Q    How is your brother-in-law's English?

18   A    Not that good.

19   Q    Now, did you indicate you wanted to be part of this?

20   A    Huh?

21   Q    Did you tell your brother-in-law you wanted to be part

22   of this?

23   A    Yes, I did.

24   Q    What happens then?

25   A    They just said just hold on a couple of months and then

1   they'll get to us.

2   Q   Now, around July of 2004, what happened, sir?

3   A   My brother-in-law received a phone call.  And they told

4   him to get ready and to tell me to get ready because we were

5   about to be leaving on July.

6   Q   Did your brother-in-law talk to you about this?

7   A   Yes, he did.

8           THE COURT:  July of what year?  I'm sorry.

9           MR. GEISE:  2004, is this 2004, sir?

10          THE WITNESS:  2004.

11          THE COURT:  All right.

12   BY MR. GEISE:

13   Q   What did you do then?

14   A   As soon as he told me, we just got ready.

15   Q   What did you do about your job?

16   A   I just quit on the spot.

17   Q   Now, what happens then?

18   A   Then, we go to a location where we meet Primo and we get

19   our stuff ready so we can leave.

20   Q   Where did you all go if you remember?

21   A   We met at like a, we always meet in like a convenience

22   store.  From there, we took off.

23          THE COURT:  Where are we?  Convenience store?

24          THE WITNESS:  In McAllen.

25          THE COURT:  In McAllen, Texas?

1           THE WITNESS:  Yes, Ma'am.

2  BY MR. GEISE:

3  Q   Now, who was at this meeting?

4  A   It was my brother-in-law, Primo and Pelos.

5  Q   Had you ever met Primo before?

6  A   No.

7  Q   Had you ever met Pelos before?

8  A   No.

9           THE COURT:  Pelos, P, how do you spell it?

10          THE WITNESS:  P-E-S-O.

11          THE COURT:  P-E-S-O, Peso?  P-E-L-O-S?

12          MR. GEISE:  P-E-L-O-S, yes, Your Honor.

13          THE COURT:  Is there some other name for Pelos or

14  is that it?

15          MR. GEISE:  That's it, Your Honor.

16  BY MR. GEISE:

17  Q   After you all met at this convenience store, what

18  happened?

19  A   From there, we just talked a little, and from there we

20  took off.

21  Q   What kind of luggage did you have with you?

22  A   Not that much, just a couple little clothes, that's it.

23

24  Q   What was your discussion with Primo and Pelos?

25  A   Basically, they just told us about, what we were going

1   to need to do and that's it.

2   Q   What did they tell you you were going to need to do?

3   A   We were going to be going to a house and be stationed

4   there for like a month or so.  And from there, we just lay on

5   the keys until somebody will come and buy them.

6   Q   And by keys, you mean?

7   A   Kilos.

8   Q   Now, after you all had this discussion, did you head up

9   somewhere?

10  A   Yes.

11  Q   How did you come?

12  A   On a vehicle.

13  Q   And whose car, I mean, whose vehicle?

14  A   At that time, I didn't know whose vehicle.  But

15  actually, I found out it was Charlie.

16  Q   And Charlie is someone else who was involved?

17  A   Yes.

18  Q   Now, who left from the convenience store in the car?

19  A   It was my brother-in-law, Primo and Pelos and myself.

20  Q   Where do you all go?

21  A   We head up, up state.  At that time, I didn't know the

22  location until we got further ahead in the trip.

23  Q   Which way were you going?

24  A   Washington.

25  Q   And as you drive, is there any discussion in the car?

1    A    Yes.

2    Q    What is that discussion?

3    A    Pelos got into an incident in Mexico where he got beat

4    up and stuff like that.  I don't know if they were trying to

5    set up --

6              MR. BALAREZO:  Objection, Your Honor.

7              THE COURT:  Want to approach?

8              MR. GEISE:  Sure.

9              (Bench conference.)

10             THE COURT:  What does this have to do with in

11   furtherance of the conspiracy other than small talk in the

12   car?

13             MR. GEISE:  What he is going to say is he was

14   trying to intimidate him a little with the discussion so he

15   would not --

16             THE COURT:  Try to intimidate him?  You mean this

17   is somebody in Mexico that beat up Pelos?

18             MR. GEISE:  I think they want him to understand

19   that you better not get mixed up with the drug business.

20   That's really the only point.  He felt they were trying to

21   send a message that he better do his job right.

22             MR. BALAREZO:  I think that's kind of speculative

23   at the very least.  It has nothing to do with the conspiracy.

24             MR. GEISE:  It has to do with what he was doing.

25             THE COURT:  It is not really in furtherance.  It is

1    kind of tentative at best.  This guy said he got beat up in

2    Mexico.  But we don't know by whom.

3            MR. GEISE:  A little more would come out, Your

4    Honor, indicating that he thought they were trying to tell

5    him, if you are not careful in the drug business, bad things

6    can happen.

7            THE COURT:  I'm worried about the statement that is

8    being repeated.  I am going to sustain it.  It is too far

9    afield.  Okay.

10            (Open Court.)

11            MR. BALAREZO:  Your Honor, I would ask that you

12    strike that last statement from the witness.

13            THE COURT:  Right, I will.  The last statement will

14    be stricken, okay, about some incident in Mexico.  Ask your

15    next question, please.

16    BY MR. GEISE:

17    Q    As you all are driving up, does anybody else join you?

18    A    Yes.

19    Q    Who is that?

20    A    His name is, well, his nickname is Minito.

21    Q    Do you know his real name?

22    A    No, sir.

23    Q    Where did Minito join you?

24    A    In Houston, Texas.

25    Q    Now, just briefly, if you would describe Minito?

 1    A    He is Hispanic.  He is about five, ten, and a tattoo on

 2    the arms all the way.

 3    Q    Did the five of you continue after you picked him up in

 4    Houston?

 5    A    Yes, we did.

 6    Q    Where do you eventually end up, sir?

 7    A    In, here in Washington.

 8    Q    Now, do you remember where you went then?

 9    A    The location of the house, no.

10    Q    Was it a house?

11    A    It was a house.

12    Q    A single family dwelling?

13    A    Yes.

14    Q    And if you would, do you have a basic idea of where it

15    is?

16    A    I'm not, I'm not too sure where the location is at

17    because I never been up here.  So, and we didn't drive around

18    too much to know the area.

19    Q    Was this your first trip up here?

20    A    Yes, it was.

21    Q    Had you ever been out of Texas before?

22    A    Never.

23    Q    Well, when you get to that house, what happens?

24    A    I've been out of Texas, but it was like in high school,

25    summer track.

1   Q   Uh-huh.  So this was your first trip beyond high school?

2   A   Exactly.

3   Q   Now, when you get to the house, did someone have keys,

4   keys to the door?

5   A   Yes.

6   Q   Who was that?

7   A   Primo.

8   Q   What's the house like when you get in there?

9   A   It's, it has a basement and then it has like a middle

10  and then it has another floor on top.

11  Q   Now, just so it's clear, this is not the house at XXXX

12  XXXXXXX XXXXX?

13  A   No, it was not.

14  Q   But it was in the Washington area.  Was it in the

15  Washington area?

16  A   Yes.

17  Q   Now, when you get into the house, what's it like?  You

18  were describing the inside.

19  A   It was empty.  There was nothing in there, just

20  appliances, kitchen.

21  Q   What do you all do at that point?

22  A   We get there and we see what we need.  So we go to the

23  store, and buy air mattresses and pans and stuff like that.

24  Q   Anything else besides air mattresses?

25  A   We bought the sealing machine.

1    Q    Now, when you say a "sealing machine," what do you mean?

2    A    That's to seal the money.

3    Q    Seal the money in what?

4    A    In, there's like a, those type of, where you seal the

5    food in.  Those type of, that's how I know, sealing machines.

6    Q    Now, after you go out and buy those items for the house,

7    does anyone else join you?

8    A    Yes.

9    Q    Would you tell us what happened?

10   A    Later on, when we got there and got all the stuff, in

11   the afternoon we went and picked up another person named

12   Charlie.

13   Q    Now, did you later learn Charlie's real name?

14   A    That was his real name.

15   Q    Did you learn his full name I should say?

16   A    Yes.

17   Q    What was his full name?

18   A    Charlie Reyna.

19           THE COURT:  Where did you pick him up?  What do you

20   mean you picked him up?

21           THE WITNESS:  At a bus station.

22   BY MR. GEISE:

23   Q    Where was that bus station as best you recall?

24   A    Somewhere where the Capitol is.

25   Q    Now, after you pick Charlie up, does he come back to

1   that house with you all?

2   A   Yes, he does.

3   Q   Now, at this point, do you all have any phones?

4   A   Yes, we do.

5   Q   How did you get those phones?

6   A   Primo provided them.

7   Q   What kind of phones were they?

8   A   Nextel, prepaid Nextel.

9   Q   Now, did he tell you why he was giving you prepaid

10   Nextel phones?

11   A   You can change the chips on them with different numbers

12   and names you can get them.

13   Q   Why would you want to do that?

14   A   So, if ever they catch you, they won't know who it was,

15   whose phone.

16   Q   If who catches you?

17   A   The police.

18         THE COURT:  I'm sorry, maybe I missed something.

19   Did you have in this house in July of '04, had the drugs

20   arrived yet?

21         THE WITNESS:  Not at that point.

22         THE COURT:  I didn't understand that.  All right.

23         MR. GEISE:  As always, Judge, you're always a

24   couple of questions ahead of me.

25

1   BY MR. GEISE:

2   Q    Now, later that day or the next day, did you have a

3   discussion with Primo and Pelos or did they talk to you all

4   about what was going to happen?

5   A    Eventually, yes.  They told us that they were going to

6   get a call later on that day to receive the keys of coke.

7   Q    Now, at that point, did they tell you how the keys of

8   coke were going to come?

9   A    They didn't tell us, but he just told us to get ready.

10  Q    Who is he?

11  A    Primo.

12  Q    When you got ready, what did that mean?

13  A    Just to dress up in like in black clothes and get ready

14  in the morning because we were going to go pick up the keys

15  of coke.

16  Q    What happened that morning, in the morning?

17  A    He called us and told us the trailer -- at that point,

18  he already told us right there, the trailer was going to

19  arrive around in the morning.

20  Q    He said the what, sir?

21  A    The trailer.

22  Q    T-R-A-I-L-E-R?

23       THE COURT:  The trailer would arrive.  Like a

24  truck?

25       THE WITNESS:  It's a semi truck.

1          THE COURT:  Yes, a trailer.

2   BY MR. GEISE:

3   Q   And who told you this?

4   A   Primo.

5   Q   Was Primo with you all the time or was he phoning you?

6   A   He was phoning us.

7   Q   Do you know where Primo went when he left?

8   A   No, sir.

9   Q   Do you know why he didn't stay with you all?

10  A   Because eventually we were going to be receiving the

11  shipment of drugs.

12  Q   And he didn't want to be there with the drugs?

13  A   Exactly.

14  Q   Now, eventually he called you and said get ready.  What

15  happened then?

16  A   He gave us a call so we got ready.  And so we went over

17  there.  First, he showed us the area because they made me as

18  a driver.  So, I didn't know the area.  So, first they showed

19  me the area.

20  Q   Who showed you the area?

21  A   Primo.

22  Q   How did he do that?

23  A   He drove me over there.  We did like about two runs so I

24  could learn the area.

25  Q   Do you remember where this area was exactly?

1   A   Not exactly.

2   Q   In relationship say to the Beltway, do you remember?

3   A   Yes, it was on the Beltway.

4   Q   How was it related to the Beltway?

5   A   I remember the tower where it says -- what was it

6   called?  It was a big tower where the Police Station, a lot

7   of, Army or something like that it says.

8   Q   After he took you on a couple of practice drives, what

9   happened?

10   A   Finally, he said to get ready that night or in the

11   morning.

12   Q   And what did you do?

13   A   So we got ready.  So we took off from there and he gave

14   us a call that the truck would be within couple of minutes.

15   So, we could be driving around to it, the station.

16   Q   You're on your phone and he's on his phone?

17   A   Exactly.

18   Q   Now who went?

19   A   It was my brother-in-law.

20   Q   Mr. Carrillo?

21   A   Yes.

22   Q   And who else?

23   A   Myself.

24   Q   What happened then?

25          THE COURT:  Just the two of you?  I'm sorry.

1            THE WITNESS:  Three.

2            THE COURT:  Who was the third?  That's what I

3    meant.

4            THE WITNESS:  Minito and Charlie stayed at home.

5    BY MR. GEISE:

6    Q    What happens then?

7    A    Once they told us that the trailer was already

8    stationed, so we pulled up, we reversed to the box.  They

9    opened the door so there he had the drugs ready for us.

10   Q    Now you say "they."  Who opened the truck?

11   A    The persons that were driving the semi truck.

12   Q    Did you talk to them or see very much of them?

13   A    Not really.

14   Q    What happened then?

15   A    We just pulled up.  They just started handing us the

16   box.  We put them inside, on the vehicle, and we drove off.

17   Q    At this point, what kind of boxes were they?

18   A    They were like fruit boxes.

19           THE COURT:  Fruit boxes, I don't know what that

20   means.  What do you mean?

21           THE WITNESS:  It was little cardboard boxes where

22   they have the fruits.

23           THE COURT:  Were they covered or not covered?

24           THE WITNESS:  Covered.

25

1    BY MR. GEISE:

2    Q    Once you get the boxes, what do you do?

3    A    We go home.

4    Q    What happens when you get to the house?

5    A    We took the boxes out of the vehicle.  We took them to a

6    room.  And from there, I wasn't there so the other person

7    that went in, they help counted the keys.

8    Q    You said who took it to the room?

9    A    It was Minito and my brother-in-law.

10   Q    Who counts the kilos?

11   A    Minito.

12   Q    Now, do you later actually see the kilos?

13   A    Yes.

14   Q    And about how later is that?

15   A    When Mr. Jones arrives.

16   Q    We'll get to that in a moment.  Would you tell us what

17   the kilos look like?

18   A    They're black and they're in stacks of two.

19            THE COURT:  Stacks of what?

20            THE WITNESS:  Two, two keys combined in one.

21   BY MR. GEISE:

22   Q    When you say "stacks of two," what do you mean?

23   A    One key and another key, they're together, sealed.

24   Q    But separate keys but sealed together?

25   A    Exactly.

1   Q   Now, just if you remember, do you remember approximately

2   how many kilos there were?

3   A   I don't want to say a number because I'm not too sure,

4   but it was more than a hundred.

5   Q   After the kilos arrive, what happens?

6   A   They give a phone call to Mr. Jones.

7   Q   Now, wait a minute.  Let's go back a step.  Who phoned

8   who and what did you actually hear and see?

9   A   Well, Primo gave a call to Jones saying that the keys

10  already arrived.

11  Q   Were you there when Primo made a phone call?

12  A   On that instance, no.

13  Q   Let's go back a step then.  At some point, did somebody

14  else come to the house?

15  A   Primo came to the house.

16  Q   What did Primo tell you when he came to the house?

17  A   That Mr. Jones was going to be arriving.

18  Q   Now, what name did he actually use?

19  A   They used to call him Berio.

20          THE COURT:  Who?

21          THE WITNESS:  Berio.

22          THE COURT:  Beetle as in an insect, beetle?

23          THE WITNESS:  Not, like beetle, but Berio.  I don't

24  know how to spell it, but Berio.

25          MR. GEISE:  Berio, like in B-E-R-I-O maybe.

1          THE COURT:  Does that translate into something in

2     English?

3          THE WITNESS:  I have no idea.  That's how they used

4     to call him.  I don't know.

5          THE COURT:  Berio, okay.

6     BY MR. GEISE:

7     Q   At that point, did you know any name for him other than

8     Berio?

9     A   No, sir.

10         THE COURT:  We're still in July '04?

11         THE WITNESS:  Yes, Ma'am.

12    BY MR. GEISE:

13    Q   Now, at some point you were saying Primo comes to the

14    house and someone else arrives.  Now, who are you told is

15    going to be coming?

16    A   The person that's going to be buying the keys.

17    Q   All right.  And does that person eventually arrive?

18    A   Yes, he does.

19         THE COURT:  Approximately how long had gone by from

20    the time that you picked up the stuff from the trailer and

21    the time that somebody comes to pick up the drugs at the

22    house?

23         THE WITNESS:  In the morning they come and pick up

24    the drugs.

25         THE COURT:  The next morning you're saying?

1            THE WITNESS:  Yes.

2            THE COURT:  So at night you're unloading the

3    trailer, putting it in the car, drive back and then the next

4    morning?

5            THE WITNESS:  In the morning we received the

6    shipment, and the same morning the person came.

7            THE COURT:  About how long are we talking about?

8            THE WITNESS:  About 9:00 or 10:00 in the morning.

9    The shipment we received around 2:00 o'clock in the morning.

10           THE COURT:  I get it.  All right.

11   BY MR. GEISE:

12   Q    Who arrived at the house?

13   A    In the morning?

14   Q    Uh-huh.

15   A    Mr. Jones.

16   Q    I'm going to ask you to look around the courtroom today

17   and see if you see the person who arrived at the house that

18   morning?

19   A    Right there, Mr. Jones.

20           THE COURT:  You have to describe him in some way by

21   clothing.

22           THE WITNESS:  He is wearing a blue jacket.

23           THE COURT:  Where is he seated?

24           THE WITNESS:  He is sitting in the first seat.

25           THE COURT:  First seat to my right.

```
 1              THE WITNESS:  To my right, the man that just stood

 2    up.

 3              THE COURT:  The man that just stood up; is that

 4    right?

 5              THE WITNESS:  Yes, Ma'am.

 6              THE COURT:  Let the record reflect that he

 7    identified Mr. Jones.  Did he come by himself?

 8              THE WITNESS:  Yes, Ma'am.

 9    BY MR. GEISE:

10    Q    Now, when Mr. Jones arrived -- at that time you knew him

11    as Berio?

12    A    Yes.

13    Q    What happens?

14    A    Well, Primo, he was already there because it was going

15    to be the first time we ever met Mr. Jones.  And I think

16    Mr. Jones was going to be the first time he met us.  So, he

17    needed to be there.  So, we met right there.

18              THE COURT:  Who needed to be there?

19              THE WITNESS:  Primo.

20              THE COURT:  Okay.

21              THE WITNESS:  And from there, he came in the house.

22    He brought some bags of money.

23    BY MR. GEISE:

24    Q    Now, when you say the Defendant Jones "brought some bags

25    of money," what do you mean?
```

1    A    It was like in duffle bags and plastic bags with money

2    and stuff like that.

3    Q    And what happened when the defendant brought the money

4    in?

5    A    So, we started sorting out the bills in order like

6    fives, tens, twenties, hundreds.

7    Q    Now, who started sorting the money out?

8    A    It was my brother-in-law, Alberto Carrillo, Minito and

9    myself.

10   Q    Now, how did you know to do this?

11   A    Primo told us how.

12          THE COURT:  He's there too or Primo's not there?

13          THE WITNESS:  Primo is there.

14          THE COURT:  What about Charlie?

15          THE WITNESS:  Charlie, he's in another room, and

16   Pelos is in there, too.  Because where Primo goes, Pelos is

17   there with him all the time.

18   BY MR. GEISE:

19   Q    So Primo leaves?  Now, when you're counting the money,

20   you said you sorted it into denominations?

21   A    Yes.

22   Q    Now, do you count it all at once or do you count it per

23   bag?

24   A    At that time, we counted the whole thing together.

25   Q    What did you do after you counted the money?

1   A    We figured how much money it was.  And then, from there,

2   we backed out how many keys he would take.

3   Q    Now, who was sort of running things at this point?

4   A    At that point, it was, well right there at that time, it

5   was Primo telling us how to do it.

6   Q    And if you remember, how many kilos were involved?

7   A    Like I said, it was roughly a hundred and some.

8   Q    Total?

9   A    Total, yes.

10   Q    How many did the defendant get at that first deal if you

11   remember?

12   A    It was about over ten, because the first time he was

13   given the opportunity of taking a couple keys up front.

14   Q    And when you say "taking a couple of keys up front,"

15   what do you mean?

16   A    Well, basically the money, that he would be bringing the

17   money.  As he would be selling it, he would bring the money

18   to us.  So, eventually we'll give him about 20 keys.  And if

19   he's short of money, it didn't matter because eventually he

20   will be bringing it later on.

21   Q    Now, this first trip, after the first time the defendant

22   came, did he come again?

23   A    Yes.

24   Q    And approximately how many times did he come on that

25   first time?

1    A    A couple times.

2            THE COURT:  Well, what does that mean, once, twice,

3    three times?  What do you mean?

4            THE WITNESS:  I would say about eight or ten.

5            THE COURT:  He came eight or ten times in July

6    again?

7            THE WITNESS:  Yes, Ma'am.

8            THE COURT:  '04.

9            THE WITNESS:  Yes, Ma'am.

10           THE COURT:  Okay.  Just so we can keep things

11   straight, fine.

12           THE WITNESS:  The process was like a month that it

13   would take.

14           THE COURT:  Take a month to come get the drugs?

15           THE WITNESS:  Yes, Ma'am.

16           MR. BALAREZO:  I'm sorry, what was that last point?

17           THE COURT:  He said it took a month over a period

18   of -- over a period of four weeks.

19           THE WITNESS:  It would take a period of month to

20   sell just about a hundred some keys.

21           THE COURT:  That's what you sold total?

22           THE WITNESS:  Yes, Ma'am.

23   BY MR. GEISE:

24    Q    Now, as the money accumulated, as the defendant brought

25   more money, what was done with it?

1    A    We did what you call the process, we'll seal a pack of

2    threes, like.  All the twenties, we get them in pack of

3    threes and seal them.  All the hundreds we seal them

4    together, all the fifties together.

5    Q    Did anyone tell you why you would do it that way?

6    A    At that point, Primo told us so we can have a better

7    count, plus when they're going to receive it over there in

8    Mexico, they recount it again.

9    Q    Was somebody keeping track of the count?

10   A    Yes.

11   Q    Who was that?

12   A    At that moment, it was Minito.

13   Q    Now, after the first visit or two by the defendant, were

14   Primo and Pelos still around?

15   A    No.

16   Q    Who was running the operation then?

17   A    There was, it was a process of everybody joining

18   together, but basically it was more like Minito.

19   Q    Did anybody else come to the house to buy drugs besides

20   the Defendant Antoine Jones?

21   A    No.

22   Q    Now, if you know, how much was he paying per kilogram at

23   the time?

24   A    About 21.

25        THE COURT:  $2,100?

```
 1              THE WITNESS:  $21,000.

 2              THE COURT:  U.S.?

 3              THE WITNESS:  Yes, Ma'am.

 4    BY MR. GEISE:

 5    Q    Now, as the process continued and the money built up,

 6    what was done with it after the heat sealing?

 7    A    We just stored it there until Primo sold everything, and

 8    we do the same process as they brought the kilos, we wait for

 9    the truck and give it to the truck person and he'll take it

10    from there.

11    Q    Now, you said, you -- the same process, but what do you

12    mean by the same process?

13    A    The same process how they brought it to us, that's the

14    same process that they're going to take it, on the semi

15    truck.

16              THE COURT:  I'm sorry, I'm a little confused.  What

17    are they taking on the truck now?

18              THE WITNESS:  The money.

19              THE COURT:  While you were there, the drugs came

20    once?

21              THE WITNESS:  Exactly.

22              THE COURT:  All right.

23    BY MR. GEISE:

24    Q    How many times did the money get shipped back?

25    A    Only once.
```

1    Q    Now, towards the end of the time when you're almost out

2    of drugs, what occurs on this first trip?

3    A    I think one of the neighbors complained to the Police

4    Station because --

5              MR. BALAREZO:   Objection.

6              THE COURT:   Just tell us what happened.   Don't

7    speculate.   Did the police show up or something?

8              THE WITNESS:   Yes, they showed up.   And they

9    arrived at the house and knocked, but we didn't answer.   So,

10   from there, luckily, we just --

11   BY MR. GEISE:

12   Q    The police left then?

13   A    Yes, but they got the license plate and stuff like that.

14   And they went to the next door neighbors to talk to them.

15   Q    How do you know that?

16   A    Because we were looking at them through the window.   And

17   from there, they took off so immediately we called Primo.

18   Q    Now, who was at the house at this point?

19   A    It was my brother-in-law, Alberto Carrillo, Charlie,

20   Minito and myself.

21   Q    And so what did you do at that point?

22   A    From there, we called Primo and told him what was

23   happening.   And luckily, the truck was going to pass by.   And

24   the only thing we had was just money.   So he said just get

25   your stuff ready and get ready in the morning so we can drop

1   off the money.  And from there, you guys can go home.

2             THE COURT:  There was no more drugs, you mean?

3             THE WITNESS:  No more drugs.

4   BY MR. GEISE:

5   Q   Now, at this point, had the defendant paid for all the

6   drugs he had gotten?

7   A   No, he still owed us about 200 some thousand.

8   Q   What did Primo say about that?

9   A   We'll be getting it later on.

10  Q   So, what did you do with the money?

11  A   So, as soon as the morning came in, they give us a call

12  that the semi truck was arriving.  So we took off.

13  Q   Who gave you the call?

14  A   Primo.

15  Q   And?

16  A   He said take off within 30 minutes of that call.  So we

17  waited for 30 minutes and then we took off.

18  Q   Where did you go?

19  A   Same location where we received the drugs.

20  Q   What happened then?

21  A   Same process, we pulled a reverse behind the semi truck.

22  We had the money in duffle bags.  So we gave them the duffle

23  bags.  It was about four duffle bags.

24  Q   Now, let me ask you this.  When you all were at the

25  house, did you always all stay at the house or did you do

1   other things as well?

2   A   The only persons that were allowed to leave was myself

3   and Charlie.

4   Q   Why did you leave on occasion?

5   A   To buy groceries or stuff like that.  Once we went and

6   bought the counting machine because it was too much money to

7   be counting.  And because we didn't use a counting machine in

8   like the first two, three visits that Mr. Jones came.  And

9   then Primo told me if I could go buy a counting machine.  So,

10   we went and we bought one at Sam's.

11   Q   Now, a couple more questions about this first visit.

12   When the defendant came, how long would he usually stay to

13   pick up drugs and leave money?

14   A   As soon as we finished counting the money, about from 40

15   to an hour.

16   Q   Forty?

17   A   Forty minutes to an hour or something.

18   Q   While he was there, would you all talk?

19   A   Small talk.

20        THE COURT:  Was he always alone?

21        THE WITNESS:  Yes, Ma'am.

22   BY MR. GEISE:

23   Q   Now, you mentioned you talked a little bit about the

24   counting process and how it went on.  When the defendant

25   brought that money, would it be in separate bags usually?

```
 1    A    Yes, little different bundles.

 2    Q    And did you ever talk or understand why they were

 3    different bundles?

 4    A    At that moment, no.

 5    Q    Later?

 6    A    Later, yes.

 7    Q    When was that?

 8    A    About the second or third trip, the second trip, I knew

 9    why.

10    Q    We'll talk about the second trip in a little bit.  Now,

11    when you headed back at the end of this first trip, who went

12    back together?

13    A    What was that?

14    Q    The first trip, you said you dropped the money off and

15    you headed back.  Who was coming back together?

16    A    It was my brother-in-law, Alberto Carrillo, Charlie,

17    Minito and myself.

18    Q    Where did you all go?

19    A    Back to Texas.

20    Q    How about Minito, where did he go?

21    A    We dropped him in Houston.

22    Q    Where did the rest of you go?

23    A    I went to my house in Texas.  My brother-in-law and

24    Charlie, they went to Mexico.

25    Q    Charlie speaks English as well?
```

1   A   Yes.

2   Q   After you got back, did you get paid for this trip?

3   A   The following day, once we got there.

4   Q   How did that work?  How did you get paid?

5   A   The same money that we sent, they paid us from there.

6   Q   And who paid you?

7   A   Primo.

8   Q   And how did that work?  Describe it to us.

9   A   Well, he would give us a call and ask if everybody was

10  ready, and we will meet like in a mall or in a convenience

11  store or sometimes, me personally, I would get the money in

12  Texas and my brother-in-law and Charlie sometimes they would

13  get it in Mexico.

14  Q   Now, this first trip, this first time, do you remember

15  where you got paid?

16  A   We got paid in McAllen, Texas.

17  Q   And who got, did you get paid alone or were other people

18  with you?

19  A   It was my brother-in-law and Charlie.

20  Q   You all got paid together?

21  A   Yes.

22  Q   How much did you get paid?

23  A   The first trip was 10,000.

24  Q   After this first trip, did you have any reason to

25  believe there might be additional trips?

1    A    Yes.  He told us just to get ready because he was going

2    to give us a call pretty soon.

3    Q    Who told you that?

4    A    Primo.

5    Q    Now, did you get a call pretty soon?

6    A    Not really.  We got a call somewhere in 2005 because

7    eventually in 2004, they had a, something happened over in

8    Mexico that the drugs that they were going to --

9            MR. BALAREZO:  Objection.

10   BY MR. GEISE:

11   Q    Well let me ask, you said something happened in Mexico.

12   How did you know something happened in Mexico?

13   A    Because Primo told us.

14   Q    What did Primo tell you?

15           THE COURT:  Overruled.  Go ahead.

16           THE WITNESS:  The shipments that they were going to

17   be receiving, they had some difficulty in getting it.  They

18   couldn't get it.

19   BY MR. GEISE:

20   Q    Does this create problems for you?

21   A    Yes, very much.

22   Q    What was the problem it created for you?

23   A    Because 10,000, I already owed some of the money of the

24   10,000.  So I didn't work.  So I tried going back to my job.

25   Q    As a night stocker?

1    A    Yes, because I couldn't work because they said I needed

2    to wait a whole year because I just quit without giving them

3    notice.  And then I needed to go into my retirement money,

4    which I got that one on November, some retirement money from

5    where I used to work.

6    Q    Eventually, around April of 2005, do you hear from Primo

7    again?

8    A    Yes.

9    Q    And what does he tell you?

10   A    To get ready because for sure we had a trip over here

11   again, Washington.

12   Q    Does he tell you anything more about the problems in

13   Mexico that slowed things down at that point?

14   A    No.

15   Q    What happens then?

16   A    Eventually, he did give us a call in May or early April

17   to get ready in May, so we could start coming over here.

18   Q    This is April, May of last year?

19   A    Yes, 2005.

20   Q    What happens then?

21   A    He gave everybody a call and then to get ready to be

22   leaving in May.

23   Q    What happens at that point?  You said he gives everybody

24   a call.  Who do you know he actually contacted at the time?

25   A    He contacted my brother-in-law.

```
 1    Q   You know that because --

 2    A   He called me.

 3            THE COURT:   Your brother-in-law did?

 4            THE WITNESS:   Yes, Alberto Carrillo, and then he

 5    called Charlie and then they brought somebody else called

 6    Ricardo.

 7    BY MR. GEISE:

 8    Q   Now, how do you know all of this?

 9    A   Because when we met there, that's how -- because my

10    brother-in-law told me that.

11    Q   You said you met, who met?

12    A   Primo.

13    Q   Where did you meet Primo?

14    A   At a convenience store.

15    Q   Where?

16    A   In McAllen, Texas.

17    Q   Who was there when you met with Primo?

18    A   It was Charlie, my brother-in-law, Pelos, Primo and

19    myself.

20            THE COURT:   I'm sorry.   There's someone named

21    Ricardo.   When did he show up?

22    BY MR. GEISE:

23    Q   There was another individual eventually that showed up?

24    A   Yes.

25    Q   Who was that?
```

1    A    Ricardo.

2    Q    When does he come?

3    A    On the second trip.

4    Q    Does he show up at that same strip mall?

5    A    Yes.

6            THE COURT:   The convenience store?

7            THE WITNESS:   The convenience store, yes.

8            THE COURT:   Is he coming from Texas?

9            THE WITNESS:   From Mexico.

10   BY MR. GEISE:

11   Q    How is his English by the way?

12   A    Not that good.

13   Q    What's already admitted as Photo Number 10 and ask if

14   you recognize Photo Number 10?

15   A    Yes, that's Mr. Ricardo.

16           THE COURT:   Did he have any other name?

17           MR. GEISE:   Well, we do, Your Honor.

18   BY MR. GEISE:

19   Q    Did you know his name other than Ricardo at the time?

20   A    No, his nickname.

21   Q    What was his nickname?

22   A    Called him Chitty Wickeys (ph).   I used to call him Blue

23   Boy.

24           MR. GEISE:   Your Honor, this is, for the record,

25   already testimony, this is Ricardo Sanchez-Gonzalez.

1    BY MR. GEISE:

2    Q    But you knew him as Ricardo?

3    A    Yes.

4    Q    Now, at that point, when you all meet at the strip mall

5    convenience store, what happens?

6                THE COURT:  Are we in May of '05?

7                THE WITNESS:  Yes, Ma'am.  We gas up and we took

8    off over here again.

9    BY MR. GEISE:

10   Q    Now, you say you gas up and you took off.  Who took off?

11   A    It was Ricardo, Charlie, my brother-in-law and myself.

12   Q    What about Primo and Pelos?

13   A    Pelos said he was going to take off later on that day.

14   And, Primo, he was going to stay in Texas.

15   Q    Where do you all head?

16   A    To Washington.

17   Q    How do you know where to go in Washington?

18   A    Charlie already knew the area.

19   Q    Did Charlie know exactly where to go?

20   A    No.

21   Q    What happened when you got up in this area?

22   A    Once we got to Virginia, heading close to Maryland,

23   that's when Pelos give us a call, or we gave him a call and

24   find out the location where we were going to go.

25   Q    What did you do?

 1    A    He gave us directions through the phone how to get to

 2    the house.

 3              MR. GEISE:   Court's indulgence for one moment, Your

 4    Honor.

 5              THE COURT:   So you got your directions from Pelos?

 6              THE WITNESS:   Yes.

 7              THE COURT:   Who's driving?

 8              THE WITNESS:   At that moment I think I was.

 9    BY MR. GEISE:

10    Q    Did you drive straight through on these trips?

11    A    No, we alternate.

12              THE COURT:   You what?

13              THE WITNESS:   We change in drivers.

14    BY MR. GEISE:

15    Q    But other than changing drivers, did you like stop at a

16    motel or anything?

17    A    No, it was a straight trip.   The only stops we did was

18    gas up.

19    Q    Now, again, where do you go when you get here?

20    A    They gave us directions, which exit to get off and which

21    directions to take from there.   The names of the streets,

22    really, I'm not too good.

23    Q    Did you go to a different house this time?

24    A    Yes, we did.

25    Q    Sir, it has already been admitted as Government's

1    Exhibit 9508-SW-3, and ask if that looks familiar?

2    A   Yes, that's the house we were staying at.

3         THE COURT:  I'm sorry.  Remind me what's the

4    address of that house?

5         MR. GEISE:  It's the XXXX XXXXXXX XXXXX.

6         THE COURT:  Okay.  I know it's Maryland, but where

7    is it?

8         MR. GEISE:  Fort Washington, I believe, Your Honor.

9         THE COURT:  Okay.

10   BY MR. GEISE:

11   Q   Now, when you get to the house on XXXX XXXXXXX XXXXX,

12   how do you all get in?

13   A   We already had a key.

14   Q   Who had given you the keys?

15   A   Primo.

16   Q   What's the condition of the house when you get there?

17   A   It's the same like the other house, just appliances were

18   in there.

19   Q   What do you all do at that point?

20   A   We see what we need and we head to the store and buy.

21   Q   What kind of things do you get?

22   A   We bought the air mattresses, pots and pans and the

23   heating machine.

24   Q   When you say "heating machine," what do you mean?

25   A   To seal the money, to seal the money.

1    Q    I'm going to show you what's already been admitted as

2   Government's Exhibit 9508-SW-17 and 9508-SW-18.   All of these

3   machines may look basically alike, but are these the kinds of

4   machines you're talking about?

5    A    Yes.

6    Q    You mentioned you got the food, the shrink wrappers,

7   inflatable beds, any other kinds of things you get?

8    A    At that moment, no, that was basically it right there.

9    Q    Now, do you make later trips and get other kinds of

10   things?

11   A    Yes, we went and bought another machine, counting

12   machine for, because the other one we left at the house.   So

13   we needed to buy another one.

14   Q    The kind of machine you bought on the first trip you

15   left there?

16   A    Yes, at the same place at Sam's.

17   Q    Anything else?   Anything else to distract you?

18   A    We bought some weights.   And later on, we bought a pool

19   table.

20   Q    This is over the course of time?

21   A    Exactly.

22           MR. NORRIS:   What was the question?

23           MR. GEISE:   I said this was over the course of

24   time.

25           THE WITNESS:   And an exercise machine.

1    BY MR. GEISE:

2    Q    Just out of curiosity, who pays for all the supplies?

3    How is that worked out?

4    A    We got to put everything that we buy so they could put

5    in, it's like a budget.

6    Q    Like an expense account?

7    A    An expense account, yes, more likely.

8    Q    Now who, you said you all arrived at the house.  How

9    about Primo and Pelos, do they ever appear on this trip?

10   A    Primo from the first trip, he never, he never goes to

11   those trips any more.

12   Q    How about Pelos?

13   A    Pelos, yes.

14              THE COURT:  I'm sorry.  Am I missing, this is the

15   second trip?

16              MR. GEISE:  Yes, Ma'am.

17   BY MR. GEISE:

18   Q    So Primo was there to send you off in Texas?

19   A    Exactly, just to give us the money, just to, for the gas

20   and everything, until meanwhile, until Mr. Jones comes with

21   his first shipment of money.  From there, we get the money

22   for expenses and stuff like that.

23   Q    Does Pelos appear at some point on this second trip?

24   A    Once we get there, he gets there later that day.  That's

25   when we go to the store.

1    Q    You wait for him to go to the store?

2    A    Exactly because it's a new location and we don't know

3    the area.  So, and he did because they're the ones who came

4    up and found the house.

5    Q    How do you know they came up and found the house?

6    A    Because later on they told us.

7    Q    Who told you?

8    A    Primo and Pelos.

9    Q    Now, the day you arrive, after you buy the supplies and

10   all, what happens then?

11   A    I'm not sure if it's the same day or the following day,

12   we received a call from Primo saying that the truck was

13   coming in the morning and to get ready for the phone call.

14   Q    What happens?

15   A    Sure enough, they did call us in the morning.  So we did

16   the same process.

17   Q    Who calls you in the morning?

18   A    Primo.

19   Q    What process did you do?

20   A    How we did it last time, but first, Pelos showed me the

21   area because that's a new area.  I don't know the area.  So,

22   he showed me the route and --

23   Q    Where is Pelos at this point?

24   A    He is staying somewhere else.  I actually don't know.

25   Q    How do you know where to meet him to show you the route?

```
 1   A   He would be calling in the walkie talkie.

 2   Q   So he's calling you on the walkie talkie?

 3   A   Or on the Nextel.

 4   Q   The push to talk?

 5   A   Exactly.

 6   Q   Where does he take you to the best you can recall?

 7   A   It's in the same way, the Beltway, the same location.

 8            THE COURT:  Do you mean it's the same place you

 9   went to in July?

10            THE WITNESS:  Exactly.

11            THE COURT:  To meet the --

12            THE WITNESS:  Yes.

13   BY MR. GEISE:

14   Q   But you were coming from a different place?

15   A   A different direction, so I didn't know how to get

16   there.

17   Q   How many runs do you make with Pelos to see where it is?

18   A   Just one, because that one, I just needed the exit, and

19   once you got on the Beltway, it's the same process.

20   Q   After Pelos shows you the route, what happens?

21   A   That's when they told us to get ready later on in the

22   morning.

23   Q   What happens?

24   A   They call us in the morning.  We -- they tell us 30

25   minutes prior to when the truck gets there, you take off.
```

1    So, that's what we did.  You know, we did the same process.

2    Once we got there, we reversed the vehicle and they passed

3    the boxes out to us.

4    Q    Now, who went to make the pick up this time?

5    A    It was Ricardo, Alberto Carrillo and myself and Charlie

6    stayed at home.

7    Q    Now, you said it was the same process?

8    A    Yes.

9    Q    Just describe that briefly?

10   A    How we got the stuff?

11   Q    Yes.

12   A    We reversed on the semi truck.  They already had the

13   boxes ready for us.  Behind the box that opened the semi

14   truck, they already had them stacked.  So we just needed to

15   reverse.  They just passed the boxes to us.  And we just put

16   them in the truck.  It was two outside and I would stay

17   inside the vehicle.  So, once Ricardo and my brother-in-law

18   finished loading the boxes, they got in the car and we took

19   off.

20   Q    Where did you take the drugs?

21   A    We take them home.

22   Q    Home being?

23   A    To the same place.

24   Q    When you got there, what did you do with the drugs?

25   A    We went inside the garage and we took the boxes, we took

1    them to the main room.  And from there, we counted the keys.

2    Q    How many kilos were there this time?

3    A    It was a hundred and some.

4    Q    What did they look like this time?

5    A    It was the same.  It was two keys wrapped in those

6    shrink wrap.

7    Q    What color was the wrapping?

8    A    Black.

9    Q    Where do you ultimately store the kilos after you count

10   them?

11   A    It was the first time at the household, we found the

12   attic.  That's where we stored them.

13   Q    On the second trip, after you get the drugs, what was

14   your job supposed to be?

15   A    My brother-in-law, he didn't know how to speak English

16   and Ricardo, so I needed to translate to my brother-in-law

17   what Mr. Jones was saying.

18   Q    How about Charlie, is he along at this point?

19   A    Yes.

20   Q    He also speaks English?

21   A    Yes, but not too great, not too good I mean.  Plus, he

22   had a little addiction.  He drinks too much.  He was not too

23   reliable.

24   Q    Now, is this the first time you were dealing with the

25   Defendant Jones directly?

1    A    Yes.  The first time I was in the room but not talking

2    to him directly.

3    Q    The second trip, it was your job to actually do the

4    talking?

5    A    Yes.

6    Q    Now, does Primo give you any directions about how you

7    should do this sort of conversation thing?

8    A    He told me just to talk to him, have him happy in other

9    words, talk to him and how he's doing and stuff like that.

10    Q    This is when you're face to face?

11    A    Exactly.

12    Q    How about on the phone?

13    A    Just what, short calls, just where it is.

14    Q    Why keep it short on the phone?

15    A    Just in case they're tapping the phone call or

16    something.

17    Q    That can happen.  And if you have to have longer

18    discussions about the deals, how do you do those?

19    A    In codes in other words.

20    Q    And do you try and talk face to face if you can?

21    A    Exactly.

22              MR. McDANIEL:  Objection, Your Honor.

23              THE COURT:  As to form?

24              MR. McDANIEL:  Yes.

25              THE COURT:  Sustained.

1   BY MR. GEISE:

2   Q   Do you try to talk face to face if you can?

3   A   Yes.

4         THE COURT:   When there is an objection, please

5   don't talk over me.

6         MR. GEISE:   Sorry, Your Honor.

7   BY MR. GEISE:

8   Q   Now, after the drugs arrive, do you hear from the

9   Defendant Jones?

10  A   Usually Primo would do the talking, he will call him

11  then he will call, and Primo will call us and tell him or say

12  that he already called Mr. Jones, and Mr. Jones will be

13  arriving in the morning.   But Mr. Jones would give us a call

14  in the morning just to get ready for him.

15        THE COURT:   But he calls him what, Primo?   Does he

16  refer to him as Mr. Jones or something else?

17        THE WITNESS:   I really don't know because I don't

18  hear when he talks to Mr. Jones.

19        THE COURT:   Yeah, I know.   But when he calls you to

20  say --

21        THE WITNESS:   Oh, Berio.   He calls him Berio.

22  BY MR. GEISE:

23  Q   When did you actually learn that Defendant Jones's name

24  was Antoine Jones?

25  A   When I got arrested.

1    Q    So you always knew him by a nickname?

2    A    Exactly.

3    Q    Again, we were talking about the phone calls.  You

4    obviously had to have a phone to get phone calls?

5    A    Yes.

6    Q    How did you get those phones?

7              MR. BALAREZO:  Asked and answered, Your Honor.

8              THE COURT:  Is it any different?

9              MR. GEISE:  The second trip.

10             THE COURT:  The second trip, you were given phones

11   again?

12             THE WITNESS:  It was the same phones but it was a

13   different chip.

14   BY MR. GEISE:

15   Q    When you say "a different chip," what do you mean?

16   A    A different number.

17   Q    After the drugs arrived, did you hear from the Defendant

18   Jones?

19   A    He called in the morning.

20   Q    And what happened?

21             THE COURT:  When are we now in time please?

22             MR. GEISE:  We're in, is this in May?

23             THE COURT:  The witness?

24             THE WITNESS:  In May, May 2005.

25

1    BY MR. GEISE:

2    Q    What happens then?

3    A    He gives us a call and he says he's going to be within

4    10 to 15 minutes.

5    Q    What happens after those calls?

6    A    Sure enough, he gets there and he brings the money.

7    Q    Now, approximately how much money, if you recall, would

8    he bring in each time?

9    A    When it was the first trip, eventually he arranged from

10   300,000 to half a million.

11   Q    How much was he paying per kilo at this time?

12   A    21,000.

13            THE COURT:  21,000?

14            THE WITNESS:  21,000, yes, Ma'am.

15   BY MR. GEISE:

16   Q    But would there ever be, when you were selling the kilos

17   or handing them off, would they ever be separated or would

18   they always be in groups of two?

19   A    It was always in groups of two until later on.  One of

20   the trips, it came different.  But that trip it was the same

21   process like the first trip.  It was two combined in one.

22   Q    Now, when the defendant brought you money on the second

23   trip, how would it be packaged?

24   A    In different little bags.

25   Q    Now, did you learn more about the little bags on this

1   trip?

2   A   Yes.  Each little bag was different clients.

3   Q   How do you know?

4           THE COURT:  Different what?

5           THE WITNESS:  Different clients.

6   BY MR. GEISE:

7   Q   How do you know each bag was a different client?

8   A   Well I --

9           MR. BALAREZO:  Objection.

10          THE COURT:  Do you want to approach?

11          This might be actually a good time for everybody to

12  take a lunch break.  So you can stay over there.  Ladies and

13  gentlemen, we'll break now for lunch.  We'll resume at

14  quarter to 2:00.  Be in the jury room.  Thank you very much.

15          (Jury Out.)

16          THE COURT:  The witness can be excused?

17          MR. GEISE:  I think so.

18          THE COURT:  Do not discuss your testimony with

19  anyone over the lunch hour.

20          (Witness excused.)

21          THE COURT:  What's your objection?  How did you

22  know about the bags?

23          MR. BALAREZO:  He started to say he figured

24  something, so either he knows or he's just speculating about

25  it.  I don't know what's coming.

1          THE COURT:  What's coming?  What do you expect him

2     to say?  He said that the bags are for different clients.

3          MR. GEISE:  Yeah.

4          THE COURT:  How did he figure that out?

5          MR. GEISE:  I think what he's going to say is they

6     counted them individually.  Then, at that point, he

7     understood from what Jones, from what the defendant said,

8     that they were helping him keep track of what each customer

9     had paid.

10         THE COURT:  Just ask him what Jones said.  We don't

11    care what he figured.

12         MR. GEISE:  That's right, Your Honor, except I

13    think he can also tell us what he deduced based on what he

14    saw and heard.

15         THE COURT:  No, I'm not so sure about that.  Let's

16    first hear what he saw and what he heard before you start --

17         MR. GEISE:  Ask him what he concluded, fair enough.

18         THE COURT:  I don't see that he's here to make

19    conclusions, but what he saw and heard he can certainly

20    testify about.

21         Anything further until we resume?

22         MS. LIEBER:  Just one thing about sleeping.  I'm

23    getting concerned now.  At one point Juror Number Five fell

24    asleep.  Juror number six, the next juror sort of knocked him

25    with her elbow and he woke up.  I mean, this is good stuff,

1    we have a Mexican drug dealer.  I don't know.  I don't know

2    if we should have more standing breaks or something because

3    I'm worried that they're missing the good stuff.

4         THE COURT:  I watched Five.  They're not the only

5    people.

6         MR. BALAREZO:  One of the reasons I sat back there

7    so I could keep an eye on the jury.  I did not see him asleep

8    or getting knocked or anything else.

9         MS. LIEBER:  Your Honor, Special Agent Yanta can

10   testify about it.  Juror Number Six elbowed him and then

11   he --

12        THE COURT:  I don't want to put it on the record.

13   I want to wake him up when I see it.  If it is a problem or

14   it continues to be a problem, you know exactly what we're

15   going to end up on our hands.

16        MR. McDANIEL:  I have been watching Juror Number

17   Five since it became a issue.  His eyes were awake going back

18   and forth between Mr. Geise and Mr. Bermea.  If there is an

19   issue, I would suggest we offer him some water if somebody

20   sees him asleep.

21        THE COURT:  I am going to interrupt.  I will

22   embarrass him a couple of times.  If it keeps it up, I'll

23   worry about it.  So you have to tell me.  I'm watching a lot

24   of different things at a lot of times.  So I did watch him a

25   bit.

1          MS. LIEBER:  I was going to put it on the record.

2   I was about to do something to sort of get, that's when I saw

3   Juror Number Six elbow him.

4          THE COURT:  All right.  We're going to have a, all

5   the people stand up more often including some of the counsel.

6          Okay.  Thank you.  Quarter of please.

7          (A luncheon recess was taken.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **C O N T E N T S**

2   **WITNESS:**              **DIRECT   CROSS   REDIRECT   RECROSS**

3

4   FREDERICK WHITEHEAD

5      By Mr. Geise        3                    56

6      By Mr. Balarezo             36                      58

7      By Mr. Norris               55

8

9   ROEL BERMEA

10     By Mr. Geise       61

11

12                              EXHIBITS

13                                                    PAGE:

14

15  Government:

16  NC Stop  6                                          6

17  NC Stop 10                                          9

18  NC Stop  7                                         11

19  NC Stop  8                                         16

20  NC Stops 1 thru 5                                  28

21

22

23

24

25

1

2 **CERTIFICATE OF REPORTER**

3        I, Lisa Walker Griffith, certify that the

4 foregoing is a correct transcript from the record of

5 proceedings in the above-entitled matter.

6

7

8

9

10

11 _____    _____
Lisa Walker Griffith, RPR
12

13

14

15

16

17

18

19

20

21

22

23

24

25