# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 05-CR-386(1) (ESH)** |
| | : | |
| **ANTOINE JONES** | : | |

## DEFENDANT'S MOTION TO RECONSIDER DENIAL OF MOTION TO SUPPRESS EVIDENCE OBTAINED FROM INTERCEPTION OF WIRE COMMINICATIONS AND SEIZURE OF ELECTRONIC COMMUNICATION; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEROF

**DEFENDANT** Antoine Jones ("Jones"), by and through undersigned counsel, and pursuant to 18 U.S.C. § 2518(10), Rule 12(b)(3)(c) of the Federal Rules of Criminal Procedure, and the Fourth Amendment to the United States Constitution, hereby respectfully moves the Honorable Court to reconsider its denial of Jones' prior motions to suppress the contents of all intercepted wire communications and seized electronic communications, and all evidence derived from them (*See* Doc. Nos. 141, 369).  Pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), Jones requests a hearing on this motion.

In support of this motion, Jones states as follows:

1.     Jones incorporates by reference his prior Motions to Suppress Evidence Obtained from Interception of Wire Communications and Seizure of Electronic Communications (Doc. Nos. 142 & 369).[1]

---

[1]  Jones now asks the Court to reconsider its denial of his motion based on the newly filed declarations of Jessica Waddell, Carolynette Waddell, Anthony Koonce, Lawrence Maynard and Karissa Jones Johnson.  The Court has noted that the law of the case my bar the relitigation of this motion.  However, the term "law of the case" merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power. *See Missenger v. Anderson*, 225 U.S. 436 (1912).  Unlike *res judicata*, the practice of law of the case does not compel rigid adherence to the prior decision "because when a court becomes convinced that its declared law of the case is erroneous and would work a grave injustice, it should have the power to apply a different rule of law in the interest of getting the very case before it settled in a just manner." 1B Moore, Federal Practice P0.404 (1), p. 405 (2d ed. 1965).  Moreover, the practice only "applies to principles of law" enunciated by the court, 1B Moore, supra,

2.     Jones adopts the arguments of co-Defendant Lawrence Maynard in his Motion to Adopt Prior Motions Filed by Co-Defendant Antoine Jones (Docket No. 355).

3.     Jones incorporates FBI Special Agent Stephanie Yanta's testimony of October 27 and 30, 2006, regarding her sworn statements in the various affidavits she used to obtain authorization to seize text messages and for a Title III wire intercept. (*See* Exh. 1 and 2).[2]

4.     Title III requires that an application for a wiretap order contain "'a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.'" *United States v. Stewart,* 306 F.3d 295, 304 (6th Cir. 2002), *cert. denied*, 537 U.S. 1138 (2003) (quoting 18 U.S.C. § 2518(1)(c)).  This is referred to as the " necessity requirement." *Id.*  The purpose of the necessity requirement is "to ensure that a wiretap 'is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'"  *United States v. Alfano,* 838 F.2d 158, 163 (6th Cir.), *cert. denied,* 488 U.S. 821 (1988) (quoting *United States v. Kahn,* 415 U.S. 143, 153 n. 12 (1974)).  Further, the necessity requirement protects against the impermissible use of a wiretap as the " initial step in [a] criminal investigation." *United States v. Giordano,* 416 U.S. 505, 515 (1974).

5.     Although Title III sets forth elaborate procedures for obtaining permission to use a wiretap, "the government is not required to prove that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted."  *Alfano,* 838 F.2d at 163.  Rather, " [a]ll that is required is that the investigators give serious consideration to

---

P0.404(1), at p. 402, and does not bar consideration of the prior decision in the light of new evidence. *Cf. Gouled v. United States*, 255 U.S. 298, 312-313 (1921); *Anderson v. United States*, 352 F.2d 945 (DC Cir. 1965).  "In any new trial, the 'practice' of the law of the case would not operate to bar consideration of the admissibility of [new evidence] based upon material facts not heretofore adduced or supervening law." *United States v. Naples*, 359 F.2d 276, 278 (DC Cir. 1978).
[2] Citations to affidavits refer to exhibits that were attached to Jones' initial motion (Doc. No. # 142).

the non-wiretap techniques prior to applying for wiretap authority and that the court be informed

of the reasons for the investigators' belief that such non-wiretap techniques have been or will

likely be inadequate." *Id.* at 163-64 (internal quotation marks omitted).  "While the prior

experience of investigative officers is indeed relevant in determining whether other investigative

procedures are unlikely to succeed if tried, a purely <u>conclusory</u> affidavit unrelated to the instant

case and not showing any factual relations to the circumstances at hand would be . . . inadequate

compliance with the statute." *United States v. Landmesser,* 553 F.2d 17, 20 (6th Cir.), *cert.*

*denied,* 434 U.S. 855 (1977) (emphasis added).

      6.     The Court previously denied Jones' request for a hearing on this motion

pursuant to <u>Franks</u>.  Now, considering Agent Yanta's trial testimony and attached declarations,

Jones submits that Yanta's representation to the issuing judge were materially false, misleading

and demonstrated a reckless disregard for the truth.  Agent Yanta's trial testimony demonstrates

that her affidavits in support of an interception order consisted of uncorroborated thoughts and

opinions and were entirely conclusory.

      7.     <u>August 10, 2005 Affidavit</u>

      In his prior motion, Jones detailed the errors and omissions by Yanta in her

affidavits.  Jones will not rehash those points here, but simply directs the Court's attention to her

specific trial testimony that indicates the recklessness and falsity of her affidavits.

      Agent Yanta's August 10, 2005, Affidavit indicates that the government had used

the following as investigative techniques:

     **a.  oral and written law enforcement reports regarding this and other**
         **investigations**

      The August 10 Affidavit is devoid of mention of any evidence that was obtained

from oral or written law enforcement reports regarding the instant or other investigations.

### b.  physical surveillance

**Maynard and Jones opening the door to Levels with a key** (*See* August 10 Affidavit at 21) – Agent Yanta intentionally misleads the issuing court and shows a reckless disregard for the truth because Maynard was the manager of Levels.  Thus, his presence at the club and possession of a club key is not at all indicative of criminality.  Of course, Jones himself was known to be the owner of the club and his presence there again is also not indicative of criminality.  (*See* Exh. 1, Yanta trial testimony, Oct. 27, 2006, at 62:2 – 62:17)

**A number of known and unknown vehicles coming and going to Levels during daytime hours when Levels was not open for business** (*See* August 10 Affidavit at 21) – Yanta intentionally and knowingly misled the court and had a reckless disregard for the truth because she failed to state that there were at least two restaurants (one next door and one inside) in Level's vicinity that drew many patrons during hours that the club was closed. (*See* J. Waddell & C. Waddell Decls.; Exh. 3 & 4)  Additionally, as an ongoing business, Levels often received deliveries from various vendors who usually made these deliveries during Levels' off-hours.  Thus, that there were "known and unknown" vehicles coming to and from Levels is not indicative of criminality. (*See* Exh. 1 at 62:18 – 63:9).

**Substantial foot traffic into and out of Levels during daytime hours** (*See* August 10 Affidavit) – Agent Yanta cherry picks facts out of context to make certain conduct appear illegal.  As described above, there were two restaurants operating in the immediate vicinity of Levels.  The August 10 Affidavit further describes the foot traffic as "consists of both men and women, and occasionally small children, entering and exiting the establishment, often carrying over-the-shoulder bags, shopping bags, diaper bags, and backpacks."  (*See* August 10 Affidavit at 21; Exh. 1 at 63:23 – 63:7; Exhs. 3 &4).

**Nicholas Jones going into and coming out of Levels on several occasions during hours when the business is purportedly closed** (*See* August 10 Affidavit at 22) – Agent Yanta intentionally misleads the court by minimizing certain facts and maximizing others to make it appear that suspicious activity is taking place. Nicholas Jones' presence during the off-hours is not suspicious in the least. The Affidavit recklessly states that according to information on file with the District of Columbia Alcoholic Beverages Regulatory Agency, Nicholas Jones had no known business relationship to Levels. This statement is misleading because Nicholas Jones did not have to be registered with that agency if his involvement with Levels did not involve alcohol. In fact, had the government done minimal investigation it could easily have found out that Nicholas Jones worked at Levels. The Affidavit further points out that Nicholas Jones' vehicles were seen outside the club, a fact that is not at all out of the ordinary since he worked there. Finally, the Affidavit notes that Nicholas Jones was known to CS-1 (discussed, infra) to sell both heroin and cocaine. This information is completely irrelevant to the issue of probable cause and misleading to the court because the government had no evidence that Nicholas Jones and Antoine Jones were engaged in any type of illegal activity. (*See* Exh. 1 at 67:23 – 69:24).

**Jeep Cherokee registered to Denise Jones present at Levels** – this information is at best superfluous given that Jones used this vehicle and was the owner of Levels. Jones' presence there is indicative of nothing to inform probable cause. (*See* Exh. 1 at 69:25 – 70:7).

Agent Yanta's trial testimony makes painfully clear that the assumptions she made with respect to the physical surveillance of the Levels Nightclub were wholly baseless, reckless and intentionally designed to mislead the issuing Court. Such assumptions let her to make sworn representations to the issuing Court that the "issuing judge would mistakenly think

that the agents had conducted surveillance . . .and that [Agent Yanta] had information leading

[her] to believe" that the sworn representations were true.  *See United States v. Rice*, 478 F.3d

704, 707 (6th Cir. 2007).

### c.   review of dialed number recorder date (pen registers)

In an attempt bolster weak facts, the August 10 Affidavit states that from January

20, 2005 until July 29, 2005, Maynard's cellular telephone (301) 613-6293 had a total of 17,908

activations.[3]  Agent Yanta goes on to make a baseless allegation that "based on the affiant's

experience and training, even after accounting for calls to friends and family, the volume of calls

is consistent with the use of a cellular telephone to facilitate narcotics trafficking."  (August 10

Affidavit at 23).  Agent Yanta's assertions are intentionally misleading and reckless.  First, the

total number of "activations" includes calls hang-ups, dropped calls, calls to voice mail and other

non-conversational calls.  There is no information provided by Agent Yanta as to how many of

these activations actually resulted in some communication between Maynard and others.

Second, even if the total activations resulted in actual communications, the period described

covers 190 days, resulting in an average of 94 activations per day.  Basic investigation by the

government (including information available to its informants) would have informed it that

Maynard used his cell phone for business as well as personal calls.  Thus, the large number of

activations is not indicative of any illegal activity.  (*See* Exh. 1 at 70:10 – 73:6; Exh. 5 –

Maynard Declaration).

Agent Yanta's assertions regarding the pen registers indicated a pattern of contact

between Jones and Maynard and spouted the boilerplate language about the usefulness of pen

registers.  The only specific information relating to Jones was that he was linked to Maynard, a

---

[3] In January 2005, Agent Yanta obtained a pen register on 301-613-9263 (Maynard's cellular telephone).  She then obtained a pen register on Jones' phone (202-538-3946) in June 2005.

fact entirely unremarkable given that they were friends and work colleagues.

    d.   review of vehicle registration records and licenses

The only information provided by the August 10 Affidavit regarding vehicle registrations involve the revelation that Jones', Nicholas Jones', and Adrian Jackson's vehicles were seen at Levels.  Again, each of these men had a connection to Levels and the presence of their vehicles there does not inform probable cause.

    e.   review of criminal history records

The August 10 Affidavit states that Jones' last conviction occurred in 1994 and that Maynard had no convictions.  The only other mention of prior criminal history related to Donald Hunter and Adrian Jackson.  Their histories have nothing to do whether there existed probable cause that Jones and Maynard were involved in criminal activity.

    f.   debriefing of confidential informants.  (*See* Exh. 1 at 73:18 – 76:25).

From the face of the August 10 Affidavit it is evident that various cooperating individuals, CS-1, CS-2 and CS-3 provided information to the government.  CS-1 and CS-2 claimed to have purchased cocaine from Jones in the past. At some point CS-1 was arrested and charged with narcotics offenses.  Agent Yanta states in the August 10 Affidavit that Jones was somehow aware of the arrest and rebuffed CS-1 when he made an attempt to reestablish contact with Jones in the hopes of engaging in a controlled drug buy.  (*See* August 10 Affidavit at 12 n.2).  CS-1 claims to have had a drug relationship with Jones from the summer of 2003 until the fall of 2004.

At trial CS-2 identified Jones only after having identifying Michael Huggins and Adrian Jackson as Jones first.  He did not identify Kevin Holland as Jones because he knew Holland.  CS-2 apparently also was arrested and charged with narcotics offenses.  In fact, he was

7

arrested in 2004 "with a large wholesale quantity of cocaine that CS-2 had recently purchased from Jones." (*Id*. at 14-15).  However, there is no mention in the August 10 Affidavit that Jones was aware of CS-2's arrest, thereby preventing the use of CS-2 to make controlled buys from Jones.  Thus, the government could have used the services of CS-2 to make further purchases from Jones or made efforts to maker larger purchases requiring meeting the source of supply or at least, identification of higher echelon individuals.  As an experienced drug dealer, CS-2 would have had the experience for doing so.  This is supported by the fact that the August 10 Affidavit states that CS-2 bought kilogram quantities of cocaine from Jones approximately ten times between 2003 and 2004.  Additionally, CS-2 had clearly gained Jones' trust in that Jones allegedly fronted CS-2 at least $120,000 worth of cocaine.  (*See* August 10 Affidavit at 15).

CS-3 told the government that it had heard from Anthony Koonce that Koonce was buying large quantities of cocaine from the owner of Levels.  The August 10 Affidavit fails to mention whether CS-3 ever purchased narcotics from Koonce or whether any attempt was made to buy directly from Jones.  Additionally, the affidavit fails to state whether CS-3 ever even attempted to purchase drugs from Jones.  As it turns out, Koonce has never conducted any drug deals with Jones.  (*See* Exh 6 – Anthony Koonce Decl.)  This fact alone indicates that either Yanta did nothing to investigate the allegations CS-3 or that she knew the allegations were false and included them in the affidavit.

In fact, the August 10 Affidavit is devoid of any facts indicating that the government sought to make any undercover buys.  There is scant support for the claim that the efforts were unsuccessful to work up the ladder, if that was the purpose of seeking the wiretap.  There were no efforts to try and learn the sources through further surveillance or undercover purchases.  Thus, based on the allegations contained in the August 10 Affidavit, the government

has failed to demonstrate that normal investigative procedures had been tried and failed.  Rather, the government sought to short-circuit normal investigation and went right for the most intrusive methods without the requisite showing of necessity for such warrants.

        8.     <u>August 18 Affidavit</u>

        The August 18 Affidavit executed by Agent Yanta is for the most part a word-for-word rehashing of the August 10 Affidavit.  The only new information provided in the August 18 Affidavit is that pen-register data disclosed that Jones telephone received two calls from a number in Uzbekistan (998-885-3310).  These two calls lasted a total of zero and nine seconds respectively. The August 18 Affidavit further states that the same Uzbekistan number called Maynard's telephone for a period of almost seven-and-one-half minutes.  Agent Yanta misleadingly states that Uzbekistan is a major exporter of poppy, from which opium and heroin is derived.  What that information has to do with Jones' alleged cocaine business is anybody's guess.

        Finally, the August 18 Affidavit states that Maynard's telephone received three text messages stating: "I need ice 4my beer," "2 cokes & Malibu, pls. Ka[$]h Money," and "working with a monster."  Agent Yanta explains that in her training and experience narcotics dealers are known to use innocuous terms to refer to narcotics and narcotics transactions. (<u>Id</u>. at 28).  Agent Yanta is deliberately misleading in mentioning these text messages without further context.  The first two texts are from a Levels employee requesting supplies for the club.  The third text message, when read in the context of other messages, is clearly sexual in nature. (*see* discussion of text messages, *infra*).  (*See also* Exh. 7 – Karissa Jones Decl; K. Jones Testimony, Tr. Nov. 30, 2006, p.m., at 59-96).

        Based on the allegations contained in the August 18 Affidavit, which rehashes the

allegations contained in the August 10 Affidavit, the government again failed to demonstrate that normal investigative procedures had been tried and failed and failed to show the requisite showing of necessity for such warrants.  Additionally, her misleading and reckless assertions were necessary for a finding of probable cause.

9.      The September 2 Wiretap Affidavit

Agent Yanta's September 2 Wiretap Affidavit is generally a rehashing of the allegations contained in the August 10 and August 18 Affidavits and indicates that the government had used the following as investigative techniques:

**oral and written law enforcement reports regarding this and other investigations** - The September 2 Wiretap Affidavit is devoid of any facts to support probable cause that were obtained from oral or written law enforcement reports regarding the instant or other investigations.

**physical surveillance -** The September 2 Wiretap Affidavit presents an identical recitation of activity observed at Levels.  The only exception is that it mentions that another vehicle associated with Nicholas Jones was seen there as well as a vehicle associated with Carolynette Waddell.  Agent Yanta is again misleading in the presentation of facts because she fails to mention that Waddell was a Levels employee and thus her presence there is of no moment and surely not indicative of illegal activity.

From August 10, 2005, the date of the first Affidavit, until September 2, 2005, it appears that the government failed to attempt any of the normal means of investigation, such as surveillance inside Levels or surveillance of the targets' homes or workplaces to try to gather evidence of illegal activity.

**review of dialed number recorder data (pen registers) -** This section of the September 2 Wiretap Affidavit is also an identical recital of the earlier affidavits, with few exceptions.  The listing of the new and additional activations is of no moment given the entirely innocuous nature of the contacts.  Agent Yanta deliberately provided misleading information by cherry-picking information and stating certain facts out without context.

**review of vehicle registration records and licenses -** The September 2, Wiretap Affidavit does not state any new information relating to this topic and it appears that between August 10 and September 2, the government stopped conducting normal investigative techniques.

**review of criminal history records -** With the exception of mentioning the criminal histories of some of the listed targets of the interceptions, the September 2 Wiretap Affidavit does not add any new information to the prior affidavits' allegations nor explains how these criminal histories relate to Jones and his alleged activities.

**debriefing of confidential informants -** The September 2 Wiretap Affidavit provides scant new information from CS-1.  In particular it states that Donald Hunter told CS-1 that Hunter had purchased a "half a brick" of cocaine from Jones and that Hunter encouraged CS-1 to get back in the game and buy drugs from Jones and even offered to be a middleman between CS-1 and Jones.  Agent Yanta claims that it would have been impossible for CS-1 to buy from Jones because of Hunter's and CS-1's shared customer base.  (*See* September 2 Wiretap Affidavit at 21 n.4).  This explanation fails because CS-1 could easily have made a controlled purchase of drugs from Jones via Hunter.  CS-1 could then just as easily could have claimed to sell the narcotics to "new" customers unknown to Hunter.  This was a golden

opportunity for the government to make controlled buys from Jones, yet it failed to so in favor of

seeking the more expedient wiretap.

**text messages (*See* Exh. 2, Yanta trial testimony, Oct. 30, 2007 at 11:12 –**

**47:18) -** Having obtained a warrant for Jones' and Maynard's text messages, Agent Yanta

mentions several of them in the September 2 Wiretap Affidavit and remarks on their

"suspicious" nature.  Agent Yanta is misleading in that she pulls several messages out of context

and fails to mention that the large portion of Maynard's text messages are of a sexual nature.  For

example, Agent Yanta notes a text message from Maynard to number (301) 536-0913 on August

5, 2005, that stated "My man is working with a big monster –back up working with a monster."

(Id. at 26).  Agent Yanta fails to note, however, that this message includes a "smiley face" at the

end depicted as "):-)" and that other messages between Maynard number and that same number

include: "thank you baby . . . You're a very good lover," (August 4, 2005, at 21:57:57); "how are

you feeling?" (August 4, 2005, at 22:26:27); "You enjoy being teased and pleased" (August 5,

2005, at 06:07:49); "No is-your-wife a good --- [thank you baby . . . You're a very good lov[er]"

(August 5, 2005, at 06:10:13).  (*See* Exhibit 5, Docket ; Maynard's text messages).

As further evidence of drug activity, Agent Yanta further notes another series of

messages between Maynard's telephone and number (301) 379-4141, purportedly registered to

Wallace Ward.  For example, on August 4, 2005, Maynard allegedly sent a text message to

Wallace Ward again stating "My man is back up working with a monster."  (September 2

Wiretap Affidavit at 25).  Agent Yanta misleads once again because that particular message

actually states "Back up working with a monster ):-)" with a smiley face and makes no mention

of "my man." (See Exhibit 5; August 4, 2005, at 22:27:58.  Additionally, other messages

between the two numbers at around the same time include: "I'm sleepy," (August 4, 2005, at

22:48:10); "That's why you should come let me finish you off" (August 4, 2005, at 23:09:27);

"so you can sleep well" (August 4, 2005, at 23:11:26) and "kisses." (August 5, 2005, at

00:46:47).

        Had the government bothered to perform basic surveillance, it would have

discovered that Wallace Ward is a tall, large male and that Maynard was most likely not having a

"text message" romance with him.  In fact, a cursory review of the text messages involving

Maynard around the same time as the messages highlighted by Agent Yanta clearly indicates that

Maynard was engaged in sexually-related texting with various women and not engaging in

narcotics related coded messages.  For example, "Love you baby :-D" (August 5, 2005, at

08:16:13; the character ":-D" is related to a smiley face except that it is a face with a tongue

sticking out); "Morning honey!  I just woke up, I had a gooood dream about us.  Now I'm wet

and hot."  (August 5, 2005; at 08:16:55); "Hmmmm . . . let me taste" (August 5, 2005, at

08:18:41); "Lick it, Lick it Good" (August 5, 2005; at 08:55:28); and "My clit is throbbing, i

need u" (August 5, 2005, at 14:01:43).  It is a wonder that Agent Yanta did not try to allege that

these messages were also coded narcotics conversations.

        **other investigative techniques -** Besides cursorily stating that normal

investigatory procedures will be or have been unsuccessful or will be too dangerous to employ,

Agent Yanta fails to adequately describe why this is so.  She merely states that "the interception

of wire communications is the only available investigative technique which has a reasonable

likelihood of revealing and securing admissible evidence" against Jones and the target subjects.

(September 2 Wiretap Affidavit at 51).  She further states that "[n]ormal investigative techniques

have been tried and have failed, appear reasonably unlikely to success if tried or continued, or

are too dangerous to employ in this investigation to date . . . ." (*Id*.).  Her explanations are baldly

conclusory and insufficient. *See United States v. Spagnuolo*, 549 F.2d 705 (9th Cir. 1979);

*United States v. Lilla*, 699 F.2d 99 (2nd Cir. 1983); *United States v. Mondragon*, 52 F.3d 291

(10th Cir. 1995).

        10.    Yanta makes conclusory statements about why these techniques were of

limited success.  Agent Yanta notes that physical surveillance had been tried and was of limited

success. However, that assertion is belied by the fact that rather than limiting its surveillance

only to the exterior of Levels, the government could have conducted surveillance inside Levels

by introducing cooperators or undercover officers into the club itself, an easy enough task given

that the club was open to the public.  It would have been very easy for the government to send in

cooperating individual, special employee, undercover officer or any other personnel to gather

evidence inside Levels.  Furthermore, the government apparently never attempted to perform

surveillance of the homes or employment sites of the targets.  Agent Yanta also notes that

"prolonged or regular surveillance of the movement of the suspects would most likely be

noticed" – yet, she fails to note that surveillance of Levels began in the fall of 2004 and lasted

until August 2005, without any apparent discovery by the targets.  Continued surveillance of the

targets, including the use of pole cameras and roving surveillance, and the surveillance of homes

and workplaces, would have provided the government with much more information about the

movements of the targets and their associations, without the need to resort to electronic

surveillance.  In sum, Agent Yanta merely makes a bald assertion that further surveillance would

not be useful and fails to provide the issuing court "with sufficient information . . . to determine

whether physical surveillance was too dangerous to be attempted." *See Rice*, 478 F.3d at 707.

        Agent Yanta notes that Jones was very secretive and that the government knew of

"no source who is in a position to be able to purchase narcotics from Jones or to make an

introduction of an undercover officer for that purpose." (September 2 Wiretap Affidavit at 53).

This assertion of secrecy is belied by the alleged fact that "CS-2 was present and observed the

transaction in which the middleman purchased cocaine from [Jones] on behalf of CS-2." (*See*

August 10 Affidavit at 15; September 2 Affidavit at 33). How secretive could Jones have really

been if he is making a sale through a middleman in the presence of the ultimate buyer?

       As discussed previously, both CS-1 and CS-2 were in positions to purchase

narcotics from Jones. That that government chose not to use them for this purpose does not mean

that electronic surveillance was needed to obtain further evidence. Agent Yanta also cryptically

states that "CS-2 and CS-3 are unavailable to law enforcement." Presumably this means that CS-

2 is detained. However, as the court is well-aware, the government routinely requests the release

of cooperators for investigative purposes, something that could have been done here. What the

unavailability of CS-3 means is another matter considering that Agent Yanta states that CS-3 was

released into the community after pleading guilty. Moreover, the as is alleged in Maynard's

Motion to Adopt Prior Motions filed by Jones (at 6-7), the government had control of a

cooperator, Harold Holden, who was uniquely situated to infiltrate Jones' alleged conspiracy and

make undercover purchases. For whatever reasons, the government chose not to do so. Finally,

the government made no attempt to introduce an undercover officer or informant to any of the

other targets in an attempt to get to Jones. There is no indication in the affidavit that the

government took any steps to develop such a source (including Holden), nor is there any

information about Jones' alleged organization specifically that suggests that to do so would be

unlikely to succeed or dangerous. *See Rice*, 478 F.3d at 708.

       As for Agent Yanta's conclusions that search warrants would have been

unproductive, would have tipped off the organization, that the warrants would not give the

historical records and physical evidence sufficient to show the extent of the organization, or how proceeds are disposed of, part of this could have been accomplished through the grand jury, which the agent also did not adequately explain its non-use.  As the grand jury proceedings are secret, records of banks could have been obtained through non-disclosure subpoenas.  Witnesses could have been interviewed in the grand jury and while it might not have revealed each and every member of the conspiracy, coupled with search warrants and other records and surveillance would have done so.

   For Agent Yanta to also assert that pen registers and the analysis of them were of no further use is also seen as a baseless and boilerplate statement. Her affidavit noted that the analysis was providing investigative leads and intelligence, producing contact numbers and was useful in identifying alleged co-conspirators.  The complaint was not that the method was not providing information but that it was not producing "real time information."  However, the method should have been exhausted, as required by the necessity showing for a wiretap, to verify that all of the members of the alleged conspiracy could not be identified. These leads from the pen registers had not been exhausted by physical surveillance. All of the other techniques listed by the agent continued to produce results and appear to have so overwhelmed the government with information that they could not fully utilize it.  Thus, the government out of expediency rather than necessity sought to obtain the wiretap.

   If one would simply state Agent Yanta' affidavit concisely, the investigation had been going for only a short period of time and had not reached an impasse with traditional law enforcement techniques. The results of these techniques continued to grow exponentially and had not been exhausted. Yanta's assertions regarding the limited use and viability of other investigative techniques suffer from the problem that she discusses the typical problems with the

techniques in typical drug cases, but makes no reference to any facts about Jones specifically that would make these techniques ineffective or dangerous.  *See Rice*, 478 F.3d at 708.

       11.    In *United States v. Rice*, 478 F.3d 704 (6th Cir. 2007), the Sixth Circuit affirmed the trial court's granting of a motion to suppress wiretap evidence, where in circumstances similar to those here, the statements in the affidavit were misleading and were made recklessly.  Additionally, the Sixth Circuit found that the affidavit, when reformed for its factual deficiencies, failed to meet the necessity requirement under Title III.

       **WHEREFORE**, Jones submits that the government's affidavits offered in support of surveillance of electronic and wire communications and purporting to show that "normal investigative procedures have been tried and have failed" was inadequate and did not meet the requirements of the statute.  The explanations of why normal investigative procedures and alternatives were not available were conclusory; and, to the contrary, showed that normal investigatory methods were continually and successfully being implemented with significant results.  Accordingly, the government=s applications did not contain sufficient facts to satisfy 18 U.S.C. § 2518 (1)(c) and support the issuing court's § 2518(3)(c) findings.  Additionally, Jones submits that Agent Yanta intentionally misled the approving court and displayed a reckless regard for the truth by omitting certain facts and noting others out of context to enhance the allegations, which were essential to a finding of probable cause.

Based on the foregoing, Defendant Jones respectfully requests this Honorable

Court to enter an Order suppressing from use at trial all evidence that was obtained directly or

indirectly as a result of the unlawful interceptions.

Dated: Washington, DC
     May 22, 2012                    Respectfully submitted,

                                   **LAW OFFICE OF A. EDUARDO BALAREZO**

                           /s/
By: _____
          A. Eduardo Balarezo (Bar # 462659)
          400 Fifth Street, NW; Suite 300
          Washington, DC  20001
          (202) 639-0999

          *Counsel for Antoine Jones*

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on this 22nd day of May 2012, I caused a true and correct copy of the foregoing Defendant Jones' Motion to Reconsider Denial of Motion to Suppress Evidence Obtained from Interception of Wire Communications and Seizure of Electronic Communications and Incorporated Memorandum of Points and Authorities in Support Thereof to be delivered to the parties in this matter via Electronic Case Filing (ECF).

/s/
_____
A. Eduardo Balarezo