```
 1                 UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF COLUMBIA

 3   -------------------------------X

 4   THE UNITED STATES OF AMERICA        Criminal Case No.

 5              v.                       05-386

 6   ANTOINE JONES, et al,

 7              Defendants,

 8   -------------------------------X    Washington, D.C.
                                         Friday, October 27, 2006
 9                                       10:00 A.M.
                           VOLUME ONE
10                     TRANSCRIPT OF TRIAL
           BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
11        UNITED STATES DISTRICT JUDGE, and a jury

12   APPEARANCES:

13   For the Government:           JACK GEISE, ESQUIRE
                                   RACHEL LIEBER, ESQUIRE
14                                 Office of the U.S. Attorney
                                   555 4TH Street, N.W.
15                                 Washington, D.C.  20560
                                   (202) 616-9156
16

17   For Defendant Jones:          EDUARDO BALAREZO, ESQUIRE
                                   400 Fifth Street, N.W.
18                                 Suite 500
                                   Washington, D.C.  20001
19                                 (202) 639-0999

20

21   Court Reporter:               Lisa Walker Griffith, RPR
                                   U.S. District Courthouse
22                                 Room 6409
                                   Washington, D.C.  20001
23                                 (202) 354-3247

24   Proceedings recorded by mechanical stenography, transcript

25   produced by computer.
```

1  particular reason why I'm testifying first.
2      Q    Fair enough. Are you familiar with what's called a
3  historical investigation?
4      A    Yes, sir.
5      Q    Okay. And why don't you tell the jury what a
6  historical investigation is?
7      A    In my opinion, a historical investigation is where
8  you glean information from a number of people who have
9  knowledge, maybe not to the present, but of things that have
10 happened in the past.
11     Q    So let's say, in a typical investigation,
12 historically what you would do is talk to beat cops, right,
13 in the neighborhood where some activity is going on, ask them
14 what they know about the neighborhood, right?
15     A    That could be one technique, yes.
16     Q    What they know about people that do things in the
17 neighborhood, that sort of thing, right?
18     A    Yes.
19     Q    And there's also something called a proactive
20 investigation, right?
21     A    Yes.
22     Q    And that's at the point where you actually start
23 actively investigating a matter, right?
24     A    Proactively, yes.
25     Q    So, in this case, the historical investigation of

1  Mr. Jones let's say began with Kevin Ray; is that right?
2      A    Yes.
3      Q    Because, from that point on, Kevin Ray was giving
4  you information about what had happened in the past?
5      A    Yes.
6      Q    And that's when you decided to do other things,
7  such as get the pen register and then ultimately a wire and
8  those sorts of things?
9      A    Yes, that's correct.
10     Q    Now, you've indicated that Kevin Ray was arrested,
11 was it the fall of 2004?
12     A    Yes.
13     Q    When exactly was he arrested?
14     A    I believe it was October. I don't know the exact
15 date. It was October of 2004.
16     Q    And he was arrested, you said, as part of the 18th
17 and D investigation?
18     A    That's correct.
19     Q    And the 18th and D investigation dealt with
20 basically street-level sales of narcotics?
21     A    Yes.
22     Q    And Kevin Ray, he was on a street-level narcotics
23 dealer, right?
24     A    That's correct.
25     Q    You indicated that he supplied those guys?

47

1      A    Yes.
2      Q    So he was sort one level up from the street
3  hand-to-hand deals?
4      A    Yes, sir.
5      Q    And from Kevin Ray is how you developed my client
6  as a suspect, let's say, right?
7      A    Yes.
8      Q    Kevin Ray at that point was, had a prior criminal
9  history, did he not?
10     A    Yes, he did.
11     Q    And Kevin Ray, we'll hear from him but, based on
12 the arrest in the 18th and D investigation, was and is at
13 least now facing life in prison, is he not?
14         MS. LIEBER:  Objection.
15         THE COURT:  On the grounds that? What is your
16 basis?
17         MS. LIEBER:  She doesn't know. I think I can
18 further articulate it at the bench.
19         THE COURT:  I do think that it has to be hearsay as
20 to her. That will be sustained.
21         MR. BALAREZO:  Very well.
22 BY MR. BALAREZO:
23     Q    We'll come back to Kevin Ray in a little bit. As
24 part of your duties as lead agent --
25         THE COURT:  If there is an objection, just give me

48

1  a break. Don't answer.
2  BY MR. BALAREZO:
3      Q    As part of the lead agent in this case, you've had
4  the opportunity to execute various affidavits; is that right?
5      A    Yes, sir.
6      Q    You did one for -- do you remember which ones you
7  did personally?
8      A    I believe so, yes, sir.
9      Q    You did one for the pen register, correct?
10     A    No, sir, that's not an affidavit that I do.
11         THE COURT:  Pen register?
12         THE WITNESS:  That's not an affidavit that I do.
13 BY MR. BALAREZO:
14     Q    Excuse me, the text messages.
15     A    Yes.
16     Q    You did affidavits so you could get an order to
17 seize text messages between Mr. Jones, Mr. Maynard and
18 whoever else?
19     A    Yes, sir.
20     Q    You also did one for the, and that was in August of
21 '05, correct?
22     A    I don't remember the exact date, sir.
23     Q    And you also did one in September '05 for the first
24 wire that you sought, correct?
25     A    Yes, sir.

49

Q   And then you did one on the 30th of September for the extension of that wire?
A   Correct.
Q   And then subsequently you did one for the search warrant for the homes?
A   Yes.
Q   On the day of the take down?
A   Yes.
Q   So that's at least four affidavits that you completed. The reason you do an affidavit is because you're trying to get a judge to give you what you want, right?
A   Yes.
Q   And in the affidavit you put in everything that you've done, the techniques that you've tried; is that correct?
A   Yes.
Q   You put in information that you've gathered, right?
A   Yes.
Q   And you try to put in complete information so that the judge can make an informed decision about whether or not to grant you the order?
A   That's correct.
Q   And, of course, the information you put in the affidavits you want to be truthful, correct?
A   Of course.

50

Q   And you want it to be as complete as possible for the purposes that you're trying to achieve?
A   Yes, sir.
Q   For example, you wouldn't go to a judge and misrepresent something on the affidavit?
A   No, sir.
Q   When you do execute the affidavit, it is a sworn document, right?
A   That's correct.
Q   You go before the judge and say I swear I'm telling the truth and this is what it is?
A   Yes.
Q   Now, you've indicated on direct that, at least for the wire, the application for the wire that it was a very arduous process, right?
A   Yes.
Q   To go draft the affidavit, go to the judge and get it approved because you've got to have these meetings and all kinds of levels of supervision?
A   Levels of approval, yes, sir.
Q   Of approval. So now you've been an agent for how long to date, what's that eight years?
A   A little over eight years.
Q   In that eight years as an FBI agent, how many applications for a wiretap have you submitted?

51

A   Two.
Q   Or have you been involved with? Let me put it that way.
A   That I've been involved with?
Q   Right.
A   Quite a few.
Q   Five, ten, fifteen?
A   That I personally have sworn to or that I've been involved with?
Q   That you've been involved with.
A   At least half a dozen.
Q   So at least six?
A   Yes, sir.
Q   Involved in? So that would mean that you were personally drafting as fewer than six, am I right?
A   Say that again please.
Q   For the ones that you actually drafted were fewer than six; is that right?
A   Yes, sir, I drafted two.
Q   Two, okay. Out of the six that you were involved in, where you worked on an application for a wiretap, how many were granted?
A   All of them.
Q   All of them. So out of all the ones that you've been involved in, there's never been a wiretap -- in your

52

personal experience, no wiretaps were denied basically?
A   That's correct.
Q   So, it's an arduous process insofar as putting the information down on paper, but it's not really arduous getting the order from the judge, right?
    MS. LIEBER:   Objection.
    THE COURT:   Yeah. I think I'm the only one who can testify about that and I can't testify, so sustained. She doesn't know what the judge thinks or sustained. They're long affidavits we'll all agree.
BY MR. BALAREZO:
Q   So none have been denied is the bottom line, right?
A   Correct.
Q   All right. Now, in particular, I'm going to ask you some questions about an affidavit that for text messages. I am going to mark this document Jones Exhibit Number 1. May I approach, Your Honor?
    THE COURT:   This is Defense Exhibit 1?
    MR. BALAREZO:   I marked it as Jones.
    THE COURT:   Jones Exhibit 1 and everyone will use a similar whatever. Go ahead.
BY MR. BALAREZO:
Q   Have you had a chance to look at that?
A   Just now, yes, sir.
Q   What is that document, Number 1?

**Page 53**

1     A    This is a copy of the affidavit for Sprint and
2 Cingular.
3     Q    Sprint and Cingular what?
4     A    Telephone companies.
5     Q    When you drafted that affidavit, you were trying to
6 get access to text messages, correct?
7     A    Yes, sir.
8     Q    Now, that was the first affidavit that you drafted,
9 is that right, in this case?
10     A    I believe so.
11     Q    Okay. And the date was somewhere in August of
12 2005; is that right?
13     A    August 10, 2005, sir.
14     Q    In order for you to get to this point, you had
15 already done some proactive investigation in this case; is
16 that correct?
17     A    That's correct.
18     Q    You indicated that you got a pen register on
19 Maynard's phone some time in early 2005; is that right?
20     A    Yes, sir.
21     Q    And you didn't need an affidavit for that. You got
22 a Court order?
23     A    Correct.
24     Q    You made an application?
25     A    Yes.

**Page 54**

1     Q    And then you got Jones' pen register information.
2 When did that start?
3     A    Again, I believe that was some time in the early
4 summer of 2005.
5     Q    How did you get Jones' pen register information?
6 How did you obtain it?
7     A    I believe we got it off of Maynard's phone.
8     Q    Well, the pen register information, so the jury
9 knows what we're talking about, is just data which says a
10 number called this other number, and the time and the
11 duration of the calls? That's basically it, right?
12     A    Yes, that's correct.
13     Q    You can't hear anything that's being said, right?
14     A    That's correct. You cannot hear anything that's
15 being said.
16     Q    You don't know whether or not the person whose name
17 is on the phone bill is the person calling the other person,
18 right?
19     A    Absolutely.
20     Q    All you know is that there is some sort of
21 communication between one number and another number?
22     A    Yes.
23     Q    And you know what the duration of the calls are,
24 but you don't know the content, as I said, right?
25     A    Correct.

**Page 55**

1     Q    You can tell perhaps, because of the short duration
2 of the calls, that no communication was actually had, right?
3     A    If there is zero duration, then, yes, obviously
4 there was no communication.
5     Q    Or even if there's five seconds' duration, you
6 don't know if there was a hang up or if there was a
7 conversation?
8     A    That's correct.
9     Q    And the pen register would actually record each and
10 every actual communication or contact between these numbers,
11 right?
12     A    Yes.
13     Q    So if they, just as an example, if a pen register
14 data base said there was 10,000 phone calls, it doesn't
15 necessarily mean that there were 10,000 conversations,
16 correct?
17     A    That's correct. It was actually 10,000
18 activations. They wouldn't be referred to as phone calls.
19     Q    Activations, I'm sorry.
20     A    That's okay.
21     Q    So, but there was 10,000 activations does not mean
22 that there were 10,000 phone calls?
23     A    That's correct.
24     Q    After you got the pen registers in January and some
25 time in the summer, for Maynard in January of '05, and then

**Page 56**

1 the summer of '05 for Jones, what was the next investigative
2 technique, as Ms. Lieber likes to call it, that you did?
3     A    I believe we were continuing to do surveillance.
4 We were continuing to talk to people. At that point, I think
5 we decided that we were going to try to obtain a court
6 ordered wire intercept.
7     Q    Okay. When did the pole camera go up at Levels?
8     A    I don't recall the exact date, but I believe it was
9 early 2005 or some time fairly early in 2005.
10     Q    Some time shortly after the pen register for
11 Maynard went into effect, right?
12     A    I believe so, but I'm not certain.
13     Q    And this camera that was outside of Levels
14 nightclub was a 24-hour-a-day camera?
15     A    Yes, sir.
16     Q    So it was going continuously?
17     A    Yes, sir.
18     Q    And you have now, at least in the Government's
19 possession, have all the videos of those of whatever was
20 recorded, correct?
21     A    Yes.
22     Q    Because it was being recorded, it just wasn't a
23 monitor?
24     A    Correct.
25     Q    So now you have the pole cameras. You have the pen

57

1  registers.  And you've talked to Kevin Ray obviously at that
2  point?
3     A     Yes, sir.
4     Q     So you're doing also physical surveillance of
5  Levels nightclub, is that right?
6     A     Yes, sir.
7     Q     And one of the things that you said earlier on
8  direct examination was that you developed names, targets
9  basically, part of it was based on cars that you saw at
10 Levels nightclub, right?
11    A     Yes.
12    Q     Now, you were aware at that time that Levels
13 nightclub was a nightclub, correct?
14    A     Correct.
15    Q     And you did know that there were two restaurants at
16 least that were more or less associated with Levels?  One was
17 actually in the restaurant and there was one right next to
18 it, correct?
19    A     Correct.
20    Q     All right.  And these restaurants were open for
21 business, correct?
22    A     Yes.
23    Q     And there was a body shop on the other side of
24 Levels?
25    A     Correct.

58

1     Q     There was, there were several businesses in that
2  area.  I think a warehouse and some other types, right?
3     A     I don't know if there was a warehouse.  There was a
4  U-Haul across the street and there's another, you know, body
5  shop down the street.
6     Q     All right.  That particular block was not a
7  deserted block by any means, was it?
8     A     It was not, no, sir.
9     Q     There was a lot of activity day and night, correct?
10    A     There was activity day and night.
11    Q     So according to you, you developed suspects solely
12 based on cars that you saw outside of Levels?
13    A     No, sir.  That's not true.
14    Q     Well, I believe that's what you said on direct
15 examination.  You said --
16    A     Part of it, sir, was pen register analysis, and
17 part of it was actual physical surveillance.
18    Q     All right.  Now, the only thing you could see with
19 the physical surveillance was people coming and parking in
20 front of Levels or somewhere around it, right?
21    A     Correct.
22    Q     And then you could see people going into the Club?
23    A     Yes.
24    Q     In and of itself, that's not an illegal activity,
25 correct?

59

1     A     That's correct.
2     Q     In and of itself, that's not suspicious activity,
3  is it?
4     A     I guess it depends on what you would consider
5  suspicious.
6     Q     Well, a person walking into a nightclub, in your
7  mind, is that suspicious?
8     A     No.
9     Q     That's all I'm asking.  Now, when you did this
10 first affidavit on August the 10th of 2005 for the text
11 messages, how many targets did you list?
12    A     On this affidavit, I believe we were asking for
13 text message information on both Lawrence Maynard as well as
14 Antoine Jones.
15    Q     So just two targets at that point, right?
16    A     Those were the two phones that we were targeting,
17 yes.
18    Q     All right.  I mean you had the pen register data
19 for the rest of the year, so you, at least at that point, you
20 then developed any other targets that you wanted to put in
21 that affidavit, right?
22    A     We only had two people on this affidavit, sir.
23    Q     But again, you said that you had done surveillance.
24 You had a video camera.  You had pen registers, which began
25 earlier that year.  So up in August, all you had was these

60

1  two people that you were interested in getting text messages
2  from?
3     A     Correct.
4     Q     Now, the subsequent affidavit that you did was on
5  August 18th, I believe, right?  It was to get an extension if
6  you will of that order?
7     A     I know we did get an extension.  I don't know the
8  exact date.
9     Q     But you did a few weeks later?
10    A     Yes, sir.
11    Q     And then you did another affidavit, as you said the
12 first wire affidavit, on September the 2nd?
13    A     Yes, sir.
14    Q     And in that first wire affidavit you included many
15 more targets than you did in that one, right?
16    A     Yes, sir.
17    Q     Now, let's talk about for a second the, that
18 affidavit that you have in front of you.  On Page 25, in
19 particular, if you could go to that page -- well, before we
20 get there, that affidavit again was under oath when you
21 signed it in front of Magistrate Judge Facciola, I believe,
22 right?
23    A     Kay.
24    Q     Excuse me, Magistrate Judge Kay?
25    A     Yes, sir.

62

1  Q  Who's a U.S. Magistrate Judge in this courthouse?
2  A  Yes, sir.
3  Q  And it was under oath and you were telling him the truth, right?
4
5  A  Yes.
6  Q  Now, the information that was contained in this particular affidavit, and let's call it the August 10th text message affidavit so we can keep them straight, you were trying to get him to authorize the FBI to get text messages from Maynard and Jones?
7
8
9
10
11  A  Correct.
12  Q  And the evidence you were giving him was based on pen register information mainly at that point, right?
13
14  A  That, I don't recall. I would have to look through this.
15
16  Q  Go ahead. You can take a quick look if you like.
17  A  Sir, it was not based solely on pen register information.
18
19  Q  You had other information including surveillance and that sort of thing, right?
20
21  A  We had criminal histories. We had addresses. We had surveillance. We had source information.
22
23  Q  Well, let's take a look at Page 21 of the affidavit. In that, beginning on that page, you describe the physical surveillance that you had done, correct?
24
25

1  A  Yes.
2  Q  And one of the things that you had, that you noted was that you had seen Maynard and Jones opening the door to Levels with a key, right?
3
4
5  A  Correct.
6  Q  You were aware at that time that Jones was the owner of the nightclub, right?
7
8  A  Yes.
9  Q  And you were aware at that time that Jones was a manager who worked at the nightclub, right?
10
11  A  But Jones was the owner of the club.
12  Q  Excuse me, Maynard I meant.
13  A  That Maynard, yes, he was a manager.
14  Q  So that Jones and Maynard had been seen opening the club with a key, that's neither here nor there, is it, really?
15
16
17  A  That depends on how you look at it, sir.
18  Q  Well, let's keep looking. Same affidavit, Page 21 again, you indicate that a number of known and unknown vehicles were coming and going to Levels during daytime hours when Levels was not open for business.
19
20
21
22  A  Yes.
23  Q  You indicate that, right?
24  A  Yes, sir.
25  Q  Well, what you did not indicate in that affidavit

63

1  was that there was those two restaurants on the bottom floor that people came and went to, correct?
2
3  A  Correct.
4  Q  Now, you didn't include that because that would not make your case for getting the text messages, correct?
5
6  A  No, sir.
7  Q  So you just decided to leave that little part out?
8  A  I didn't just decide to leave it out. It just wasn't included.
9
10  Q  Well, it wasn't included because the way you've put it that a number of vehicles, known and unknown, coming and going at Levels. That's not suspicious, right? That's why you wrote it that way, correct?
11
12
13
14  A  Yes, I thought it was suspicious.
15  Q  And so you didn't think that Magistrate Kay would want to know, well, there were restaurants. There were other businesses where people parked and came and went. You didn't think that was important at that time?
16
17
18
19  A  Are you asking if I thought that was important?
20  Q  Yes.
21  A  No, I guess I did not think that that was important.
22
23  Q  Now, you also indicate in the same section of the affidavit that there was substantial foot traffic in and out of Levels during daytime hours, right?
24
25

64

1  A  Yes.
2  Q  That's how you put it in the affidavit?
3  A  Yes.
4  Q  Again, you didn't indicate about the restaurants and the other businesses that might generate that foot traffic, right?
5
6
7  A  That's correct.
8  Q  And again, because you're trying to tell Magistrate Kay, hey, I want to get the text messages. This is really suspicious, so you just left it out, right?
9
10
11  A  No, sir.
12  Q  It's not in the --
13  A  Sir, there's a separate door for the restaurant next door. So it's very easy to see from physical surveillance which door they're actually going in, whether they're going into Club Levels or if they're going into the restaurant next door.
14
15
16
17
18       THE COURT:  What's the name of the restaurant?
19       THE WITNESS:  I don't know. I know people called it Mikes. I don't know if that was the name of it. I know a lot of cops ate there.
20
21
22  BY MR. BALAREZO:
23  Q  Do you see that?
24  A  Yes.
25  Q  This is Government's Exhibit Number 36, right? Do

```
1  you see it?
2       A    Yes.
3       Q    Do you see this, I'm pointing with my pen where it
4  says Levels that awning on the left side?
5       A    Yes.
6       Q    That's an entrance to the nightclub, right?
7       A    Yes.
8       Q    Do you see this side over here?
9       A    Yes.
10      Q    Okay.  Where the Levels sign is?
11      A    Yes.
12      Q    That's another entrance to the nightclub, is it
13 not?
14      A    I believe so, yes, sir.
15      Q    And do you see a little Scoopies Soul Food Cafe?
16      A    I do.
17      Q    It's basically the same entrance, is it not?
18      A    It is.
19      Q    And do you see this little red and white awning
20 right here?
21      A    Yes.
22      Q    I don't think you can see it on the screens but --
23 well, let me ask you what it says.
24      A    That says restaurant only.
25      Q    So it says restaurant only on this line right here,
```

```
1  right?
2       A    Yes.
3       Q    So when you were doing physical surveillance of
4  this area at least, where were you sitting or where were you
5  watching from?
6       A    We were watching from all different vantage points.
7       Q    And that's when you saw this, how did you call it,
8  substantial foot traffic?
9       A    Yes.
10      Q    And unknown cars coming and going, right?
11      A    Yes.
12      Q    But none of these restaurant, Scoopies or this
13 restaurant opened, none of that made it into your affidavit?
14      A    That's correct.
15      Q    Now, you also indicate, regarding that substantial
16 foot traffic, that the foot traffic consisted of both men and
17 women and occasionally small children entering and exiting
18 the establishment often carrying over-the-shoulder bags,
19 shopping bags, diaper bags and back packs, right?
20      A    Yes.
21      Q    Now, give me one second.  Again, you didn't
22 indicate whether most of these people, men, women, children
23 were going into the restaurants, right?
24      A    Say that again, sir.  I'm sorry.
25      Q    You didn't indicate that most of these people were
```

67

```
1  actually going into the restaurant, into Scoopies for
2  instance?
3       A    I did not?
4       Q    Right.
5       A    Is that what you're saying?  Correct
6       Q    All right.  Because it's really not a suspicious
7  thing for people to go into a restaurant and come out with a
8  bag, especially a carry-out like Scoopies, right?
9       A    That's not suspicious, no.
10      Q    All right.  So again, you chose not to put that in
11 the affidavit?
12      A    Correct.
13      Q    You don't think Magistrate Kay would have wanted to
14 know, well, gee, maybe these people were carrying food rather
15 than drugs, which is the impression you were trying to make
16 to him, correct?
17      A    I was not intentionally trying to leave anything
18 out.
19      Q    Now, you did draft this affidavit though, right?
20      A    Along with members of my team, yes, sir.
21      Q    But it's your signature on it?
22      A    Absolutely.
23      Q    Now, in that same affidavit, you indicate Nicholas
24 Jones was going into and coming out of Levels on several
25 occasions during hours when the business is purportedly
```

68

```
1  closed.
2       A    What page are you on, sir?
3       Q    I believe that is Page 21, excuse me, no, Page 22.
4       A    Yes.
5       Q    You did put that down?
6       A    That's correct.
7       Q    And somewhere in this, in the affidavit you had
8  some information on Nicholas Jones, right?
9       A    I believe so.
10      Q    Okay.  And Nicholas Jones, at least according to
11 the information that you put in here, I believe has a
12 criminal record?
13      A    Yes.
14      Q    Because you mentioned that's the kind of stuff
15 that's also included in this?
16      A    Yes.
17      Q    So, you did not put in the affidavit that Nicholas
18 Jones actually worked in that nightclub, did you?
19      A    I don't know, sir, I would have to --
20      Q    Go ahead.
21      A    Is that the first place that Nicholas Jones is
22 mentioned?
23      Q    As far as that, yes.  In fact, just so that you're
24 aware, it says Nicholas Jones had no known business
25 relationships to Levels, right?
```

69

```
1      A     Can you tell me what page that is on, so I can take
2   a look at it?
3      Q     Page 22, first paragraph, six lines down.
4      A     Sir, I say that according to the District of
5   Columbia Alcohol Beverage Regulatory Agency, Nicholas Jones
6   is not listed on any of their documentation as having a
7   business relationship with Levels.
8      Q     Well, did you ask the D.C. Alcohol Beverage
9   Regulatory Agency, did you ask them if Nicholas Jones works
10  here, does he need to be registered with you?
11     A     No, sir.
12     Q     So, in a way, that's a little misleading, right,
13  because Nicholas Jones actually worked in the club?  He just
14  wasn't registered with this ABRA agency, right?
15     A     I don't know that, sir.
16     Q     So, as the lead agent, you never found that out
17  that he worked there?
18     A     Later, we found out because he was actually on TV
19  talking about Levels.
20     Q     So, you did find out later that he did work there?
21     A     Yes.
22     Q     Although you've stated in this affidavit under oath
23  that he has no known relationship to Levels?
24     A     Obviously, at that time I didn't know that.
25     Q     Okay.  Now, you also note that Mr. Jones' jeep was
```

70

```
1   seen many times at Levels, right?
2      A     Correct.
3      Q     Of course, that's his Club.  There's nothing wrong
4   with that, right?
5      A     Not if you're a business owner.
6      Q     And did he own it?
7      A     Yes, sir.
8      Q     Okay.  So there's nothing wrong with that?  All
9   right.
10          Now, let's look at the part where you talk about
11  the pen register information that you had gathered up to that
12  point.  And I believe that starts off on Page 23 so you're
13  aware.
14          In the affidavit you go on to state, again under
15  oath, that Maynard's telephone number, which is (301)
16  613-6293, had a total of 17,908 activations from January the
17  20th until July the 29th of '05, is that right?
18          THE COURT:  Say that again for me?
19          MR. BALAREZO:  17,908.
20          THE WITNESS:  Yes, sir.
21  BY MR. BALAREZO:
22     Q     Those are activations as you said earlier.  So
23  those are all the activations?
24     A     Yes, sir.
25     Q     All the calls, the hang ups, the five second oh no
```

71

```
1   one's answering, put the phone down, right?
2      A     Yes, sir.
3      Q     So you put in all of these activations basically to
4   show the Magistrate Judge that, man, this guy is using the
5   phone a lot, right, and it's suspicious, correct?
6      A     Yes, sir.
7      Q     Now, you don't indicate and you can't and you
8   didn't do any investigation as to how many of those calls or
9   activations involving Maynard were to family members, did
10  you?
11     A     We took a look at the most active, the most active
12  numbers to and from that telephone.  And, yes, we did take a
13  look at that.
14     Q     Well, out of those almost 18,000 activations, you
15  indicated that 225 activations were between Maynard and
16  Levels, right?
17     A     Yes, sir.
18     Q     But, again, in and of itself, that's really not a
19  problem because Maynard works at Levels, right?
20     A     Maynard does work at Levels, yes.
21     Q     So, for someone to be calling their place of work
22  is not really a criminal act or a suspicious act even, is it?
23     A     Sir, I think it's suspicious because I know I don't
24  call my work 225 times.
25     Q     Fair enough.  Now 1,477 activations between Maynard
```

72

```
1   and Jones' cell phones, that's out of the almost 18,000 calls
2   or activations?
3      A     Yes, sir.
4      Q     All right.  Again, they both work at the Club.
5   Jones is Maynard's boss.  Over a period of many, many months,
6   that's not really that many calls, is it?
7      A     I don't know, sir.
8      Q     You also indicate that there were 593 activations
9   between Maynard's cellular telephone and Adrian Jackson's
10  phone?
11     A     Correct.
12     Q     All right, 147 between Jones and Jackson, right?
13     A     Yes, sir.
14     Q     And a total of 68 between Jones and Donald Hunter?
15     A     Yes, sir.
16     Q     And 22 between Maynard and Donald Hunter?
17     A     Correct.
18     Q     So, even if you add all of those up, that's
19  probably less than a thousand calls, correct, or activations?
20     A     I'm not very good at math, sir.
21     Q     593, that's about 600.  225, that's about 825.  I
22  was mistaken, there was the 1,477.  So about 2,000, 2,500
23  calls out of 18,000 activations, right?
24     A     Yes, sir.
25     Q     Over a period of months, that's not really much of
```

74

```
1   a suspicious activity, is it?
2       A    I don't know, sir. It depends on what you define
3   suspicious as.
4       Q    Well, it seems that you thought everything was
5   suspicious that he's doing, right?
6       A    Yes, sir, I did.
7            THE COURT: What did you ask? You asked if that
8   was 2000 some calls?
9            MR. BALAREZO: 2000 or 2500 calls out of 18,000
10  activations.
11           THE COURT: 18,000 activations.
12           MR. BALAREZO: Ms. Lieber reminded me that I asked
13  is that suspicious.
14           THE COURT: Right, and then you've withdrawn that
15  question.
16           MR. BALAREZO: Right.
17  BY MR. BALAREZO:
18      Q    You also included information there about your
19  conversations with confidential informants, right?
20      A    Yes, sir.
21      Q    You had a CS 1?
22      A    Correct.
23      Q    And correct me if I'm mistaken, but that is Kevin
24  Ray, correct?
25      A    Yes, it is.
```

```
1       Q    And you had a CS 2, right?
2       A    Yes, sir.
3       Q    That is an Anthony Givens?
4       A    Correct.
5       Q    And you have a CS 3?
6       A    Yes.
7       Q    Whose information you included in the affidavit,
8   right?
9       A    Yes.
10      Q    And, as far as you know being the lead agent in
11  this case, CS 3 is not testifying in this case, right?
12      A    Correct.
13           MS. LIEBER: Objection.
14           THE COURT: What is the basis?
15           MS. LIEBER: Relevance.
16           THE COURT: Well, it's too late now. CS 3 is not
17  testifying. Everybody doesn't have to testify. How much
18  longer do you think?
19           MR. BALAREZO: More than 15 minutes, Your Honor.
20  Can we call it an early weekend?
21           THE COURT: We are going to. Go another five or
22  ten minutes more.
23  BY MR. BALAREZO:
24      Q    Now, you indicated in there the discussions you had
25  had with CS 1, Kevin Ray at that point, right?
```

75

```
1       A    Yes, sir.
2       Q    And what he had told you that he had done with my
3   client at least, right?
4       A    Yes.
5       Q    Now, when you had these debriefs with Kevin Ray, he
6   had already been arrested, right?
7       A    Correct.
8       Q    He already had a lawyer?
9       A    Yes.
10      Q    And he had already agreed to cooperate with the
11  Government?
12      A    Yes.
13      Q    Would it be accurate to say that Mr. Jones was not
14  the only person that he was pointing a finger at? I'm not
15  asking for names.
16      A    Sir, I would say that he was not the only person
17  that Mr. Ray was providing information about.
18      Q    That's not what I asked.
19      A    I don't think he was pointing the finger, no.
20      Q    Listen to my listen. Is Mr. Jones the only person
21  that Mr. Ray was giving you information about?
22      A    No.
23           MS. LIEBER: Your Honor, if we may approach. I'm
24  just concerned about where this is going.
25           THE COURT: Yeah.
```

76

```
1            (Bench conference.)
2            THE COURT: Where are you going with all this? Who
3   cares about other people?
4            MS. LIEBER: If I may, he is opening the door to
5   everything the Court did not let me get into it. He's
6   referring to specifics in the affidavits, text messages about
7   what Kevin Ray said in substance, so now I can go into what
8   Kevin Ray said in substance.
9            THE COURT: I don't know. I'm a little confused
10  where we're going with any of this. Who cares about what
11  should be in the affidavit?
12           MR. BALAREZO: Your Honor, my client cares. He is
13  looking at a life sentence here.
14           THE COURT: The point being that, I've already had
15  to rule on whether or not you mislead the Magistrate Judge.
16  I find it's okay to do a little of this. But it's really,
17  ultimately you are going to buy a ruling from me to tell the
18  jury that I've already ruled on this issue. You are making
19  it sound like she is misleading the Magistrate Judge. I
20  ruled on this.
21           But anyway, put that aside. Where do you want to
22  go?
23           MR. BALAREZO: With Ray, all I'm asking is was Ray
24  getting information on other people. All I'm trying --
25           THE COURT: She said yes.
```