```
 1                UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF COLUMBIA

 3    --------------------------------X

 4    THE UNITED STATES OF AMERICA        Criminal Case No.

 5               v.                       05-386

 6    ANTOINE JONES, et al,

 7               Defendants,

 8    --------------------------------X   Washington, D.C.
                                          Monday, October 30, 2006
 9                                        9:30 A.M.
                         VOLUME TWO
10                    TRANSCRIPT OF TRIAL
            BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
11          UNITED STATES DISTRICT JUDGE, and a jury

12    APPEARANCES:

13    For the Government:           JACK GEISE, ESQUIRE
                                    RACHEL LIEBER, ESQUIRE
14                                  Office of the U.S. Attorney
                                    555 4TH Street, N.W.
15                                  Washington, D.C.  20560
                                    (202) 616-9156
16

17    For Defendant Jones:          EDUARDO BALAREZO, ESQUIRE
                                    400 Fifth Street, N.W.
18                                  Suite 500
                                    Washington, D.C.  20001
19                                  (202) 639-0999

20

21    Court Reporter:               Lisa Walker Griffith, RPR
                                    U.S. District Courthouse
22                                  Room 6409
                                    Washington, D.C.  20001
23                                  (202) 354-3247

24    Proceedings recorded by mechanical stenography, transcript

25    produced by computer.
```

10

1  Strategy is not his call. It's yours, and you know what she
2  wants to do and that's fine. If you don't object to it, I
3  don't have any problem. The stuff isn't really relevant to
4  your guy at this moment, right?
5       MR. McDANIEL: It's not, but just for the record,
6  Your Honor, any continued questioning of Detective Yanta
7  which may lead to any instruction from this Court as it
8  relates to the authenticity, if you will, of the search
9  warrants and/or any further consideration by the jury of the
10 substance of the affidavits we would object to.
11      THE COURT: Well, I know. So far you haven't
12 opened the doors as to your fellow anyway since there is very
13 little. I don't remember anything specific other than some
14 phone calls. But we're on the wrong witness for attacking
15 credibility. Why don't you wait until the C 1 and CS's 1, 2,
16 3 come? But I understand your point.
17      MR. McDANIEL: We're in a joint trial, Your Honor,
18 so certainly the fact that --
19      THE COURT: Ms. Lieber will be careful in that
20 regard. They're not all joining in this approach. Don't
21 forget, Mr. Jones. You've got a lawyer here. You're not for
22 strategy decisions. It's not your call.
23      Okay. I don't know what else to say. We'll have
24 to take it up when he finishes. You're going to do your
25 redirect at the end of all these gentlemen, frankly. So we

1  have a ways to go. I mean you've given them fair notice.
2       I understand your points, and I think that the way
3  she testified in direct, I reread it last night, you know, if
4  I were anybody, frankly, and I don't mean to be giving
5  advice, get her off the stand. She's got nothing to add
6  here. Okay. But if you want her to stay on the stand, then
7  they get to have her stay on the stand, too.
8       MS. LIEBER: Your Honor, just on that note, if I
9  could step out and actually get the witness?
10      THE COURT: Oh, yeah, but are we finished talking?
11      MS. LIEBER: I'm sorry.
12      THE COURT: Fine. If I hadn't reviewed these
13 affidavits so thoroughly once before, I would be less
14 adamant, but I have reviewed them. Okay. We're ready? Good
15 morning.
16      THE WITNESS: Good morning.
17      THE COURT: If you take the stand, we can bring in
18 the jury.
19      The witness is still on the stand. And Mr.
20 Balarezo is resuming cross examination.
21       STEPHANIE YANTA, GOVERNMENT WITNESS, PREVIOUSLY SWORN
22      (Jury Present)
23            CROSS EXAMINATION resumed
24 BY MR. BALAREZO:
25 Q    Good morning, Agent Yanta.

11

1  A    Good morning.
2  Q    How are you?
3  A    Good.
4  Q    When we left off on Friday, we were talking about
5  some affidavits that you had completed in relation to this
6  case, do you remember that?
7  A    Yes, sir.
8  Q    And I asked you about the August 10th affidavit and
9  where you were trying to get an order to get text messages
10 from Maynard and Jones?
11 A    Yes.
12 Q    Do you recall also doing an affidavit on August the
13 18th of '05?
14 A    I believe that was the extension for the text
15 messages?
16 Q    Right. And that's another affidavit that you
17 yourself completed, correct?
18 A    Correct.
19 Q    Let me show you what I'll mark as Exhibit Number 2.
20      THE COURT: This is Jones 2 for identification
21 only.
22 BY MR. BALAREZO:
23 Q    Take a look at it and let me know when you're done
24 please. Was that the affidavit for the extension?
25 A    Yes, sir.

12

1  Q    You swore out that affidavit to a judge in this
2  courthouse, correct?
3  A    Yes, I did.
4  Q    Now, once you swore out this particular affidavit,
5  you had already obtained some text messages from the previous
6  order, right?
7  A    Yes.
8  Q    Or as a result of the previous order?
9  A    Yes.
10 Q    When you went to the judge to try to get an
11 extension, you wanted to provide him information that you had
12 obtained from the previous affidavit plus what other
13 investigations you had done before that, right, in order to
14 get the extension?
15 A    I believe that's what I put in the affidavit, yes.
16 Q    Now, let me point you specifically to Page 28 of
17 that affidavit, the first full paragraph in the middle. Do
18 you see that?
19 A    Yes, sir.
20 Q    Now, in that affidavit you include two specific
21 text messages which at some point you indicated, and I'll
22 point you to the last sentence of that paragraph, that it is
23 your affiant's conclusion that the aforementioned text
24 messages are in fact encrypted messages relating to narcotics
25 trafficking. Do you see that?

13

```
1       A    Yes, sir.
2       Q    Now, you're the affiant in that case, right?
3       A    Correct.
4       Q    So that is your conclusion?
5       A    Yes, sir.
6       Q    All right. And the two messages that we're talking
7  about in particular, and these are text messages to the
8  number (301) 613-6293?
9       A    Yes, sir.
10           THE COURT: I'm sorry, whose number is that?
11 BY MR. BALAREZO:
12      Q    That's Maynard's number, correct?
13      A    Correct.
14      Q    So these are text messages to Lawrence Maynard?
15      A    Yes, sir.
16      Q    And as you said on Friday, Lawrence Maynard was the
17 manager as Levels nightclub?
18      A    Correct.
19      Q    Now, that particular, the first text message that
20 you mentioned, quote, I need ice, the number four, my beer.
21 "I need ice for my beer"; is that correct?
22      A    Yes.
23      Q    Okay. And you also mention a text message --
24           THE COURT: I'm sorry, do we know, is this going to
25 Maynard or coming from Maynard? I wasn't clear. This is a
```

14

```
1  message sent to Maynard?
2            THE WITNESS: Correct, ma'am.
3  BY MR. BALAREZO:
4       Q    And did you know what number that came from?
5       A    I do not recall that, sir.
6       Q    Show you what I'll mark as Jones Exhibit Number 3,
7  showing it to the Government.
8            THE COURT: Do you want this, is this on my screen
9  or anybody's --
10           MR. BALAREZO: No. I'll take it off, Your Honor.
11           THE COURT: This is not in evidence I don't think.
12           MR. BALAREZO: No, I was just putting it down.
13           THE COURT: Okay.
14 BY MR. BALAREZO:
15      Q    Have you had a chance to look at that?
16      A    Yes, sir.
17      Q    What does that document represent, Jones Number 3?
18      A    This is the actual text messages that were provided
19 by the phone company.
20      Q    Now, I think I labeled them at the upper right with
21 a handwritten number for ease of use. Do you see those?
22      A    No.
23      Q    Why don't you turn to Page 8, the 8th page I mean?
24           THE COURT: Of three?
25           MR. BALAREZO: Of Jones 3, yes.
```

15

```
1  BY MR. BALAREZO:
2       Q    I'll point your direction to the almost the exact
3  middle of that list. Let me ask you a couple questions about
4  that document. Jones 3 is a printout of the text messages
5  that you obtained from the phone company relating to Lawrence
6  Maynard's phone number; is that correct?
7       A    That's correct.
8       Q    And the Jones Number 3 that you have in front of
9  you indicates the numbers that were being used, calls or text
10 messages that were sent to a number from a number, correct?
11      A    Yes.
12      Q    And included the time and the date; is that right?
13      A    Yes.
14      Q    And also included what the text message was?
15      A    That's correct.
16      Q    The middle one, the middle text message on that 8th
17 page, do you see that, the one that indicates that the
18 message was "I need ice for my beer"?
19           THE COURT: Four with the number four you mean?
20           MR. BALAREZO: Right, four, right, the number four,
21 M-Y.
22 BY MR. BALAREZO:
23      Q    Do you see that one?
24      A    No, sir. I don't see that one.
25      Q    Let's mark that for you. Do you see that message?
```

16

```
1       A    Yes.
2       Q    Now, what number was that from?
3       A    It says 6245. I believe that's, actually it's
4  9668069, that's SkyTel dot com.
5       Q    And there's also a name associated with that
6  particular text message, correct?
7       A    Yes.
8       Q    That's Anita Worley?
9       A    Correct.
10      Q    Now, you also indicate in your affidavit --
11           THE COURT: Please spell Worley please, Anita?
12           MR. BALAREZO: W-O-R-L-E-Y.
13 BY MR. BALAREZO:
14      Q    If you go back to the affidavit that I gave you for
15 the August 18th date, the same paragraph, you indicate that
16 there were two other text messages to that target phone
17 number. One said, the number two, two cokes and Malibu, pls,
18 please, cash money. K-A dollar sign H money, right?
19      A    Yes, sir.
20      Q    The other one was, quote, working with a monster?
21      A    Yes.
22      Q    All right. And you also indicated in your
23 affidavit that it was your conclusion that those text
24 messages were encrypted messages related to narcotics
25 trafficking?
```

17

```
1    A    Yes.
2         THE COURT:  Can you tell us what the first one was
3    again?  Are you saying Cooks?  C-O-K-E-S and then what?
4         THE WITNESS:  And the "and" sign, Malibu.
5         THE COURT:  "& Malibu."  Anything else, is that the
6    end of that one?
7         THE WITNESS:  No, it says comma, pls.
8         THE COURT:  Cash?
9         THE WITNESS:  Then it's cash, K-A dollar sign H
10   money.
11        THE COURT:  Spelled out M-O-N-E-Y?
12        THE WITNESS:  Yes, Ma'am.
13        THE COURT:  KA$H money?
14        THE WITNESS:  Yes.
15        THE COURT:  Okay.
16   BY MR. BALAREZO:
17   Q    Now, let me, I want to go back to Jones Number 3,
18   the list of the text messages.
19   A    Okay.
20   Q    Flip over to the next page from what we had the
21   first one on, the top two messages.  Do you see those text
22   messages listed?
23   A    Yes.
24   Q    Okay.  Are there phone numbers associated with
25   whomever sent those messages?
```

18

```
1    A    Yes.
2    Q    Any names associated with those messages?
3    A    Just the cash money.
4    Q    What name was that?
5    A    What do you mean, sir?
6    Q    I said were there any names associated with those
7    --
8    A    I said just the cash money.
9    Q    What's the name associated with them?
10   A    I don't know.  It doesn't say on this document.
11   Q    Okay.  Well, when you reached the conclusion that
12   these messages were encrypted messages relating to narcotics
13   trafficking, were you aware that that first message was sent
14   by Anita Worley, the one dealing with ice?
15   A    Was I aware that it was sent my Anita Worley?
16   Q    Right.
17   A    I have an idea that that was the name associated
18   with the text message.
19   Q    Okay.  At that point did you have any evidence
20   Anita Worley that involved in drug trafficking?
21   A    At that point, no.
22   Q    Do you have any now?
23   A    No.
24   Q    The second two messages, at the time that you
25   reached that conclusion about those messages being related to
```

19

```
1    narcotics trafficking, were you aware that they were sent by
2    someone named Carissa Jones?
3    A    I believe we named these folks in the affidavit at
4    some point.  So I know that we did obtain information as to
5    who was actually sending these.
6    Q    Now, if you look at the Jones 2, you don't list
7    Carissa Jones anywhere in that affidavit, right, I don't
8    believe?
9    A    If I could take a second look.
10   Q    Actually I'll make this a little easier.  I'll
11   withdraw that question.  Let me show you what I've marked as
12   Jones Number 4.  Do you recognize that document?
13   A    Yes, sir.
14   Q    What is Jones Number 4?
15   A    This is an application for a Court authorized wire
16   interception of Mr. Jones's cellular telephone.
17   Q    And that was an affidavit that you swore out to
18   another judge, Judge Friedman I believe, on September 2nd of
19   '05, right?
20   A    Yes, sir.
21   Q    And it was at this point that you were ready to
22   seek the wiretaps on Mr. Jones's phones?
23   A    Yes, sir.
24   Q    And this was, and what you included in this
25   affidavit was more or less everything that, well not
```

20

```
1    everything, but a lot of what you had done previously with
2    respect to investigating and trying to get more evidence on
3    Mr. Jones, right?
4    A    Yes.
5    Q    You included the text messages, the pen registers,
6    the surveillance, the informants that you had spoken to, all
7    of that stuff is included in there, right?
8    A    Yes, sir.
9    Q    Now, with respect to this one, Jones Number 4, the
10   September 2nd affidavit, you do list targets, correct?
11   A    Yes, sir.
12   Q    And in this particular affidavit you list, I
13   believe, 18 targets?
14   A    I could count them if you'd like.  There are a
15   number.
16   Q    Does that sound about right?
17   A    I could count them if you like.
18   Q    Sure, go ahead.  Let me point you to Page 15,
19   Targets Number Q and R., whatever those letters correspond to
20   in the alphabet.
21   A    Okay.
22   Q    In that particular affidavit, under Q you indicate
23   that Carissa Jones is believed to be a fictitious person,
24   right?
25   A    Yes.
```

21

```
 1      Q    Investigators can find no information of any kind
 2  regarding her?
 3      A    Yes.
 4      Q    And that is the same Carissa Jones that you believe
 5  sent those two messages regarding cash money and two cokes
 6  and a Malibu; is that right?
 7      A    Yes.
 8      Q    Now, let me turn your attention in that particular
 9  affidavit to Page 26, Paragraph 29.  You once again include
10  the two text messages regarding two cokes and a Malibu, cash
11  money, in this affidavit, right?
12      A    Yes.
13      Q    So it's the second time you're including it in your
14  statement?
15      A    Yes.
16      Q    And in Paragraph 29, you do indicate that the phone
17  number that sent that text message, 528-3405, was registered
18  to Carissa Jones?
19      A    Yes, sir.
20      Q    In that affidavit, you do indicate an address for
21  Carissa Jones, a specific street address?
22      A    Yes.
23      Q    Okay.  So it didn't appear that she was fictitious,
24  and you were able to get some information on a Carissa Jones,
25  correct?
```

22

```
 1      A    Sir, I think we got that information from the
 2  actual telephone itself.  That still does not indicate that
 3  that's an actual person.  We came across a number of
 4  instances throughout this investigation where there were
 5  phones registered in other people's names if you will that we
 6  couldn't find any information on.
 7      Q    Right, but with respect to this particular
 8  incident, on Page 15 you indicate investigators could find no
 9  information of any kind regarding this individual, Page 26
10  you indicate a street address for her, right?
11      A    Yes.
12      Q    Okay.  Now, although you had a street address, did
13  you or any of your agents investigate in any manner Carissa
14  Jones?
15      A    Yes, sir.
16      Q    Was she involved in drug trafficking with Antoine
17  Jones?
18      A    We were unable to determine that.
19      Q    You can't tell this jury today that that is the
20  case, correct?
21      A    That is correct.
22      Q    Now, let's go back to my initial questions
23  regarding that first affidavit, the "I need ice for my beer."
24  You were aware at the time that Anita Worley was a bartender
25  at Levels, correct?
```

23

```
 1      A    No.
 2      Q    Are you aware of it now?
 3      A    If that's what you're telling me, yes, sir.
 4           THE COURT:  No, he can't testify.  Are you aware of
 5  it now?
 6           THE WITNESS:  No.
 7  BY MR. BALAREZO:
 8      Q    So then you're not aware that she was asking for
 9  ice for the bar where she was working that night?
10      A    No, sir.
11      Q    Same thing with Carissa Jones, were you aware that
12  she was a bartender at the nightclub?
13      A    No, sir.
14      Q    So you're not aware that she was asking for Cokes,
15  Coca Cola and Malibu liquor for her bar?
16      A    No, sir.
17      Q    I don't know if I asked you about her second text
18  message about needing a can opener.  Do you remember that
19  one, need a can opener, cash money?
20      A    Yes, sir.
21      Q    What about need a can opener, cash money led you to
22  conclude that that was a narcotics related text message?
23      A    Because in my training and experience, often times
24  people that are engaged in illegal activities often use codes
25  in order to encrypt what they're actually doing.
```

24

```
 1      Q    But you can't tell this jury today that can opener
 2  refers to any amount of cocaine or any amount of illicit
 3  drugs, correct?
 4      A    I cannot say that, correct.
 5      Q    Given that, well, if she did work at the bar, at
 6  Levels, can opener isn't necessarily a --
 7           MS. LIEBER:  Objection.
 8           THE COURT:  What's the basis?
 9           MS. LIEBER:  Argumentative and speculative.
10           THE COURT:  Well it is.  We don't have any
11  evidence.  He can ask but obviously the lawyer's questions
12  are not evidence.  But what is the question?  I didn't get to
13  hear the whole --
14           MR. BALAREZO:  That's all right, Your Honor.  I'll
15  move on.
16  BY MR. BALAREZO:
17      Q    So on August the 18th you include those two text
18  messages and you say that they were narcotics related text
19  messages, right, with Antoine Jones, correct?
20      A    On September 2nd.
21      Q    But you included them first on August 18th, the
22  affidavit --
23      A    Okay.
24      Q    -- the renewal affidavit for the text message?
25      A    Yes, sir.
```

25

```
1    Q    Now, on September 2nd, so you got about two weeks
2  later, you include the same messages, and between September
3  2nd and August 18th, did you contact Anita Worley or go to
4  Carissa Jones's home address or any agents go to those
5  addresses?
6    A    Of course not, no.
7    Q    You don't want to tip them off in case they were
8  involved in any way with Antoine Jones, right?
9    A    We just didn't find it necessary to go and speak
10 with them.
11   Q    So, besides those two text messages or three text
12 messages that we've talked about, you had no evidence
13 whatsoever that Anita Worley or Carissa Jones were involved
14 in narcotics trafficking with Antoine Jones, right?
15   A    Just my training and experience, sir.
16   Q    And that training and experience is what, on
17 September the 2nd, caused you to say that you believed that
18 those messages were encoded narcotics trafficking messages by
19 which the sender is indicating a desire to purchase a
20 wholesale quantity of cocaine from Jones through Maynard.
21   A    Can you direct me to that page?
22   Q    That would be the September 2nd affidavit, Page 26
23 I believe.  It's actually at the top of Page 27.  Paragraph
24 29 on Page 26 goes over to Page 27.
25   A    Yes, sir, that's correct.
```

26

```
1    Q    So that was your belief based on your training and
2  experience at that time?
3    A    Absolutely.
4    Q    And as you sit here today after a year or more of
5  investigations, you have no evidence that Carissa Jones and
6  Anita Worley were involved in drug trafficking with Antoine
7  Jones; is that correct?
8         MS. LIEBER:  Objection, goes to what was in her
9  mind at the time.
10        THE COURT:  Right.  Sustained.  Not relevant to
11 what she knows today.
12 BY MR. BALAREZO:
13   Q    Now, let me ask you a couple more questions about
14 the September 2nd affidavit, which I think is Jones Number 4.
15   A    Yes, sir.
16   Q    Now, in that particular affidavit, it said you
17 named several targets, correct?
18   A    Yes, sir.
19   Q    And part of the reason you named some of these
20 individuals as targets was because they had had contact of
21 some kind with Antoine Jones?
22   A    Yes.
23   Q    That was part of it, right?
24   A    Yes, sir.
25   Q    And you also had some other information which
```

27

```
1  caused you to list them as targets?
2    A    Yes, sir.
3    Q    One in particular, someone by the name of Damien
4  Broussard, and he is mentioned in --
5         THE COURT:  How do you spell it?
6         MR. BALAREZO:  B-R-O-U-S-S-A-R-D.
7  BY MR. BALAREZO:
8    Q    You mention him as a target, do you not?
9    A    Yes, sir.
10   Q    You did some investigations which led you to
11 believe or understand that Mr. Broussard had a criminal
12 record; is that correct?
13   A    That's correct.
14   Q    And that was also one of the reasons why you
15 included him as a target?
16   A    Correct.
17   Q    Now, if you take a look at Page 24, Paragraph 26 in
18 particular, you indicate that there were four messages.
19 These are text messages that you're talking about from the
20 number (301) 768-8466, the telephone list that you contest of
21 Broussard, right?
22   A    Yes.
23   Q    You indicate that you believe that it was used by
24 Damien Broussard?
25   A    Correct.
```

28

```
1    Q    You go on and you list several text messages that
2  you believed were sent by Damien Broussard to Antoine Jones,
3  correct?
4    A    Yes, sir.
5    Q    On April 29, '05, you quoted, need ones as being a
6  text message, N-E-E-D O-N-E-S, need ones, right?
7    A    May 29th, sir?
8    Q    Right.
9    A    Yes.
10   Q    On June the 4th, need ones bad, correct?
11        THE COURT:  Need one or ones?
12        MR. BALAREZO:  Ones, O-N-E-S.
13        THE COURT:  O-N-E-S.
14 BY MR. BALAREZO:
15   Q    These are, quote, need ones bad, unquote?
16   A    Yes, sir.
17   Q    Then you have another one on June 27th, need to
18 talk you tonight please.  Are you coming in?  And it uses
19 some abbreviations like the number 2 for the word to and the
20 letter R for the word are.  Is that fair to say?
21   A    Yes, sir.
22   Q    All right.  On July the 1st, there's another one
23 that says have your package, will see you tonight at work if
24 that's okay, right?
25   A    Yes, sir.
```

30

Q So you attributed those messages to Damien Broussard?

A Yes, sir.

Q You believed at that time that those messages, and I'll point you to the last four lines of Paragraph 26, those messages are consistent with the encryption frequently used by narcotics traffickers in an effort to elude law enforcement and are in fact related to Damien Broussard's repeated efforts to purchase kilograms of cocaine, quote unquote, ones from Antoine Jones in late June or early July of 2005, right?

A Yes, sir.

Q Okay. At the time that those text messages were going, were taking place, you got them, and you reached that conclusion that Mr. Broussard was trying to buy cocaine from Antoine Jones, right?

A Yes, sir.

Q You did not know whether or not Damien Broussard was in fact using that telephone, did you?

A I don't know how we actually came to the conclusion that he was using the phone. I don't recall that, sir.

Q Because in fact the phone was registered to Contessa Broussard, right?

A Correct.

Q Who also worked at Levels nightclub, right?

A I don't know, sir.

Q You never found that out?

A No.

Q So you never found that out that those messages, that Contessa Broussard was a bartender at the nightclub?

A No, sir.

Q And that when the text came in need ones, she was asking for one dollar bills for the bar?

MS. LIEBER: Objection, asked and answered.

THE COURT: She doesn't know. Sustained.

BY MR. BALAREZO:

Q So by the same token, you don't know that Contessa Broussard had gotten a loan from Antoine Jones and was seeking to pay it back, right?

MS. LIEBER: Objection.

THE COURT: She doesn't know. Sustained.

MR. BALAREZO: Very well.

THE COURT: Again, the questions, ladies and gentlemen, are not evidence.

BY MR. BALAREZO:

Q So you actually had no evidence whatsoever, and as you say you don't even remember how Damien Broussard came into this, that Damien Broussard was seeking to buy drugs from Antoine Jones, right?

A Can you say that again, sir?

31

Q You had no evidence of that. You had no facts to support the fact that you indicated that Damien Broussard was trying to buy drugs from Antoine Jones based on those text messages?

A No, sir, training and experience.

Q So you assumed that basically?

A Yes, sir.

Q Now, did you ever interview Contessa Broussard?

A No, sir.

Q Well, you never knew her you said, right?

A Correct.

Q So you didn't interview her. Now, in those text messages related to Damien Broussard, you list a time that they were sent. Do you see that?

A Yes, sir.

Q The one on May 29th was at 5:21 in the morning, right?

A Yes, sir.

Q The one on June 4th at 5:36 in the morning; June 27th, 4:46 in the morning; and then July 1st at 7:20 in the evening, right?

A Yes, sir.

Q So, in your, at least based on your investigation, I guess it would be fair to say that the nightclub was not opened at, open at 5:21 or at 5:36 or at 4:46 in the morning,

32

right?

A I don't know if the Club is open or not, sir. I can refer to the times of operation that we knew of.

Q Go ahead.

A Okay. I don't see it off hand. I know that we were able to obtain the hours of operation from the Alcoholic Beverage Regulatory Agency, but I don't recall them offhand.

Q Let me show you what I've marked as Jones Number 5. Do you recognize that?

A Yes. These are the text messages for Mr. Jones's telephone.

Q And the text messages that you attribute to Damien Broussard that we've just gone over, they're included in that printout, correct?

A Yes, sir.

Q And that is what you got from the phone company as a result of your, the order that you received to obtain the text messages?

A Yes, sir.

Q Now, let me point you -- I'll just do one -- Page 12 of 42. If you look under the little table, there is a page number.

A Yes, sir.

Q And about six pages up from the bottom, there appears that text that says need ones, which you interpret it

33

1  to mean he was looking to buy drugs, right?
2  A    Yes, sir.
3  Q    And the time that indicates on there is 5:21 in the
4  morning?
5  A    Correct.
6  Q    Now, if you look at the top of these pages, at the
7  very top there's a little caption. Do you see that, where it
8  says text messages are?
9  A    Yes.
10 Q    What does that say?
11 A    Text messages are provided in GMT time.
12 Q    Do you know what GMT is?
13 A    I believe it's Greenwich Mean Time.
14 Q    So what that means basically is that the time
15 that's indicated on there is indicated in Greenwich Mean
16 Time?
17 A    Yes.
18 Q    All right. Which, depending on whether we are on
19 Eastern Time or Daylight Savings Time, it could be our time
20 is either five hours or four hours earlier, correct?
21 A    If you say so, sir, I don't know.
22 Q    You weren't aware of that?
23 A    No.
24 Q    Okay. So basically the hours, the times that are
25 mentioned for those text messages, 5:21, 5:36 in the morning,

34

1  4:46 in the morning, you're not sure if that was the actual
2  time that it was sent in our time, right?
3  A    That's correct.
4  Q    Now, for the September 2nd affidavit, you also
5  indicated a gentlemen by the name of Wallace Ward was a
6  target; is that right?
7  A    Yes.
8  Q    And he became a target also because you discovered
9  or investigated and you found out that he was, or at least a
10 number associated with him was communicating with Antoine
11 Jones, correct?
12 A    Correct.
13 Q    And I believe that, if you look on Page 15, you had
14 it found out that he had, he did have a prior criminal
15 history of one case, right, one charge against him?
16 A    That's correct.
17 Q    You also had a description of him and an address
18 for Wallace Ward; is that correct?
19 A    Yes.
20 Q    His description was a 6 foot 2, black male, 335
21 pounds?
22 A    Yes.
23 Q    You never made contact with Wallace Ward, right?
24 A    I did not.
25 Q    Did anyone, any of your agents or anyone else

35

1  working on this case have any contact with Wallace Ward?
2  A    No, sir.
3  Q    Now, you also, one of the other reasons that he
4  became a target is because his text messages or text messages
5  associated with him came to your attention, right?
6  A    Yes.
7  Q    Now, with respect to the text messages dealing with
8  Mr. Ward, you believed, and this is a quote from your
9  application, your affidavit, you believed that these are
10 encoded messages from Ward to Jones intended to alert Jones
11 that Ward wished to purchase narcotics. Do you remember
12 that?
13 A    Can you point me to that page, sir?
14 Q    I'll try. It is around Page 27, 28, actually Page
15 25, the last sentence in Paragraph 27.
16 A    What did you ask me? I'm sorry.
17 Q    Based on your training and experience, as you said
18 for the prior e-mails, based on Mr., at least in part, on
19 Mr. Ward's prior criminal history and based on the fact that
20 he at least a text message associated with him, let's say at
21 this point, and Mr. Jones, you concluded that these messages
22 that we're about to discuss were encoded messages from him
23 to Jones intended to alert Jones that Ward wished to purchase
24 narcotics; is that right?
25 A    Correct.

36

1  Q    That was your conclusion at that point?
2  A    Yes, sir.
3  Q    Now, the messages that you talk about in particular
4  are, quote, you should get at me as soon as you get a chance.
5  You will like me. I promise. Check me out. Is that one of
6  the messages?
7  A    Yes.
8  Q    And that message was June the 12th, correct?
9  A    Yes.
10 Q    And the other message you attribute to Wallace Ward
11 was just between you and me, get at me ASAP. And actually
12 there's a third one, quote, you should get at me as soon as
13 you get a chance, you would and then it seems to be cut off?
14 A    Yes.
15 Q    Now, besides those text messages, there were no
16 other text messages between the two of them, were there?
17 A    I don't recall, sir.
18 Q    And as you sit here today with the benefit of hind
19 sight, there were no telephone calls between Mr. Jones and
20 Wallace Ward, were there?
21 A    I don't recall that either, sir.
22 Q    And you have no record of Antoine Jones responding
23 in any way to these particular text messages that you seem to
24 believe Wallace Ward was trying the get drugs from Antoine
25 Jones, right?

```
 1    A    Correct.
 2    Q    Now, let's skip up a little bit to Page 28 of your
 3  affidavit, excuse me, Paragraph 28.  You indicated that
 4  Lawrence Maynard had also texted, if that's a verb, with
 5  Wallace Ward, correct, sent text messages?
 6    A    Yes.
 7    Q    To Maynard, correct?
 8    A    Yes.
 9    Q    And based on the text messages that you believe
10  were from Ward to Maynard, you believe that those messages to
11  Maynard, quote, were similarly intended to indicate to
12  customers that Jones had received his latest shipment of
13  cocaine which was available for pick up, right?
14    A    Are you quoting from my affidavit, sir?
15    Q    I am quoting Paragraph 28, I believe I said, right?
16    A    Yes.
17    Q    The last sentence of that paragraph on Page 26,
18  right after "from Antoine Jones."
19    A    Yes.
20    Q    The sentence that begins with "given."
21    A    Yes, sir.
22    Q    You talk about in that sentence the close timing of
23  the messages, right?
24    A    Yes.
25    Q    The coincidence with the fact that you believe that
```

```
 1  another transaction had taken place involving Mr. Jones,
 2  correct?
 3    A    Yes.
 4    Q    And then again your training and experience
 5  indicated to you that this was a drug related text message?
 6    A    Yes.
 7    Q    Now, that particular text message that you mention
 8  in there is from August the 4th, quote, my man is working
 9  with a big monster, back up working with a monster?
10    A    Yes, sir.
11    Q    Now, that actual message that you believe was drug
12  related actually had a smiley face at the end, did it not?
13    A    Yes.
14    Q    And you also were aware, given that you had that
15  printout of the text messages, that there were other text
16  messages between Lawrence Maynard, who had just sent that
17  message with the smiley face, and Wallace Ward, correct?
18    A    Yes.
19    Q    In fact on August 4th, at 22 hours and 24 minutes,
20  which I think is 10:24 in the evening, about half an hour
21  before that smiley face message, there was another text
22  between those two which said you should come over before you
23  go home tonight, right?
24    A    I don't know where you are, sir.
25    Q    Do you have the printout of Lawrence Maynard's text
```

```
 1  messages?
 2    A    Yes, sir.
 3    Q    The first page right in the middle.
 4    A    Yes, got it.  Yes, that's correct.
 5    Q    Okay.  Did your training and experience indicate to
 6  you that that was also a drug related text message?
 7    A    It certainly sounded suspicious in keeping with the
 8  others.
 9    Q    How about the one on the same date at 22:33 time,
10  quote unquote, stop being scared.  Did that one also suggest
11  to you as being drug related?
12    A    If you take them in context, it could have been,
13  sure.
14    Q    How about the one at 22:48, quote unquote, I'm
15  sleepy?  Was that one also drug related?
16    A    It could be or it could be just they were sleepy.
17    Q    How about the one at 23:09.  Quote, that's why you
18  should come.  Let me finish you off.  Do you believe that one
19  was drug related also?
20    A    No, sir.
21    Q    How about the one at 23:11, quote, so you can sleep
22  well?  Did you think that one was drug related?
23    A    No.
24    Q    How about August 5th at 12:46 in the morning, right
25  after midnight, kisses.
```

```
 1    A    Those sound sexual in nature to me.
 2    Q    K-I-S-S-E-S.
 3    A    Those sound sexual in nature to me.
 4    Q    Okay.  And if you turn, there is another one, and
 5  that will be it for that, on August the 5th at 14:07, 20:07
 6  P.M., another text message, sweety, while I'm out having a
 7  little in the sun later kisses.  There seems to be a word
 8  missing but that was what was texted.  Do you see that one?
 9  If you look at your list --
10    A    Is it on the next page?
11    Q    Fifth page of the printout.
12    A    Yes.
13    Q    Do you see that text message?
14    A    Yes, I do.
15    Q    And all those other text messages that you indicate
16  are sexually related, are from that same phone number that
17  you associated with Wallace Ward, a 6 foot 2, 335-pound black
18  man, right?
19    A    Yes.
20    Q    So a couple of them you indicated were drug
21  related.  The other ones are sexually related?
22    A    This is just my perception, sir.  I don't know for
23  sure what it was.
24    THE COURT:  Mr. Balarezo, how much longer are you
25  going to take?
```

```
 1         MR. BALAREZO:  Fifteen minutes maybe, Your Honor.
 2         THE COURT:  We need to take a recess.  At this
 3  time, ladies and gentlemen, we'll take a ten-minute recess.
 4  Please do not discuss the case.
 5         (Jury Out)
 6         (A brief recess was taken.)
 7         MS. LIEBER:  Your Honor, very briefly, I think at
 8  this point, given, you know, sort of repeated questioning by
 9  Mr. Balarezo, I would ask for the instructions to the jury
10  that in fact this has all been litigated and a decision has
11  been made that there is no dishonesty by Special Agent Yanta,
12  and it just goes on and on all the questions.
13         THE COURT:  Well, I am going to tell them at some
14  point.  Let him finish and then we'll figure it out.  I mean
15  these things were approved and whether or not they,
16  everything added up to what she suspected.  The jury is not
17  here to pass on the legality of any of these.  They're going
18  to have to be told this on any of the warrants.
19         It's not for them to decide the sufficiency of the
20  evidence or the legality of them.  But let him finish, and
21  then if we can come up with some precise words, before Mr.
22  Norris starts, they will have to be told.
23         MR. NORRIS:  Fine.  I can tell you my cross will at
24  least be half of what Mr. Balarezo has done.
25         THE COURT:  You know, I only want it to be valid to
```

```
 1  what he has done, so I have to say it before you get up
 2  because some of this, it is inevitable that there is some
 3  theory that they're supposed to be thinking about whether or
 4  not this is sufficient.  Her credibility is to them, but the
 5  sufficiency of these affidavits and the legality of the
 6  warrants is not.
 7         MR. BALAREZO:  Can I approach and just have Mr.
 8  Jones listen in just before the jury comes out?
 9         THE COURT:  Without the Government?
10         MR. BALAREZO:  Yes.
11         THE COURT:  I don't know why.
12         MR. BALAREZO:  I'll tell you.
13         (Jury Present)
```

43

44

```
 4         (Open Court)
 5         THE COURT:  All right.  Let us proceed.
 6         MR. BALAREZO:  Thank you, Your Honor.
 7  BY MR. BALAREZO:
 8     Q    Agent Yanta, I just have one other person to talk
 9  about in that September 2nd affidavit, a Tymira Hunter.  Do
10  you remember her?
11     A    Yes, sir.
12     Q    And you did include her as a target, at least
13  listed her as a target in that affidavit, correct?
14         THE COURT:  What's her first name?
15         MR. BALAREZO:  T-Y-M-I-R-A Hunter.
16         THE WITNESS:  Yes.
17  BY MR. BALAREZO:
18     Q    Correct?
19     A    Yes.
20     Q    As in the case of Wallace Ward, Damien Broussard,
21  you included her as a target because of contacts that she had
22  had with Antoine Jones; right?
23     A    That's correct.
24     Q    Also because some text messages relating or
25  associated with her appeared on Maynard's text message
```

Page 45

```
 1  record; is that correct?
 2       A    Can you direct me to a particular page?
 3       Q    Let's try Page 25, Paragraph 28, and the top of
 4  Page 26.
 5       A    Yes, sir.
 6       Q    And you had done some background check on her.  You
 7  found out where she lived.  You had an address, right?
 8       A    Yes, sir.
 9       Q    And I believe she also had a light criminal record,
10  nothing major, nothing?  And that's towards the front of your
11  affidavit.
12       A    One second, okay.  She did have a criminal history,
13  yes.
14       Q    Okay.  Her criminal history, at least from what I
15  can see, had nothing to do with narcotics or anything of that
16  nature, correct?
17       A    Correct.
18       Q    Now, the two text, or the text messages that you
19  attribute to Tymira Hunter, you also believe that they were
20  drug related, I believe, correct?
21       A    Correct.
22       Q    Just like you had for the other messages related to
23  Mr. Ward, you believed that those messages were intended to
24  indicate to customers that Jones had received his latest
25  shipment of cocaine which was available for pick up, right?
```

Page 46

```
 1       A    Yes, sir.
 2       Q    Now, in particular, for Tymira Hunter on August the
 3  5th of '05, and that's Page 4 of the Maynard printout, quote,
 4  my man is working with the big monster, back up working with
 5  a monster and a smiley face, right?  The fifth one down from
 6  the top, Page 4.
 7       A    Yes, sir.  That's correct.
 8       Q    And other messages between that number that you
 9  attribute to Tymira Hunter and Maynard include one on August
10  the 4th at 21:57, which would be 9:57 in the evening?  That's
11  Page 1 of the Maynard printout, fifth down from the bottom --
12  from the top, excuse me?
13       A    Okay.  Yes.
14       Q    So there's another text message between, according
15  to you, Tymira Hunter's phone and Lawrence Maynard relating
16  to drugs, right?  Thank you, baby, you're a very good lover.
17  Did your training and experience indicate to you that that
18  was a drug related call or a text message?
19       A    No.  I believe that was sexual in nature.
20       Q    Okay.  How about August 4th at 22:26 hours, quote,
21  how are you feeling?  Was that in your mind drug related in
22  anyway?
23       A    Could be.
24       Q    How about August the 5th at 06:07 in the morning,
25  quote, you enjoyed being teased and pleased?  How about that
```

Page 47

```
 1  one?
 2       A    I would think that was sexual in nature.
 3       Q    Now, you never interviewed Tymira Hunter in any
 4  manner, did you?
 5       A    No, sir.
 6       Q    Okay.  And she was never arrested in relation to
 7  this case, was she?
 8       A    No, sir.
 9       Q    Neither was Wallace Ward, correct?
10       A    Correct.
11       Q    Neither was Damien Broussard?
12       A    Correct.
13       Q    In fact, I think Wallace Ward had passed away prior
14  to this investigation.  Were you aware of that?
15       A    No, sir.
16       Q    But you did indicate that he had texted Antoine
17  Jones for the purposes of obtaining narcotics?
18       A    Yes, sir.
19       Q    Now, now, you also executed -- strike that.
20            On that same affidavit, the September 2nd
21  affidavit, Page 49 and 50, beginning on Page 49, you indicate
22  that, based on your analysis of text and calls and other
23  investigations that you had done, you said that Jones' phone
24  had a, quote, unusual pattern of activity consistent with
25  information given to you by informants.  That Jones and
```

Page 48

```
 1  Maynard had obtained shipments of cocaine or were about to
 2  obtain shipments of cocaine, correct?
 3       A    Yes, sir.
 4       Q    Okay.  And in particular, you list a couple of
 5  calls that were made, one to Jamaica, I believe, or to and
 6  from Jamaica?
 7       A    Yes, sir.
 8       Q    And one or a few to Texas and then some from
 9  Uzbekistan, I believe, right?
10       A    Yes.
11       Q    And the one to Uzbekistan kind of got your
12  attention because Uzbekistan is a poppy-growing area where
13  heroin is produced basically, right?
14       A    Yes.
15       Q    You indicated, well, at this point you did have pen
16  register information, right?
17       A    Correct.
18       Q    The pen register information, as you said, showed
19  the time and the duration of the calls, right?
20       A    That's correct.
21       Q    Were you able to -- have you been able to review
22  the pen register data information?
23       A    Have I been able to?
24       Q    Yes.
25       A    I have not prior to trial, no, sir.
```