# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No. 05-CR-386(1)(ESH)** |
| | **:** | |
| **ANTOINE JONES** | **:** | |
| **Defendant**. | **:** | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTIONS FILED AS OF MAY 22, 2012[1]

RONALD C. MACHEN Jr.
**United States Attorney**

ARVIND K. LAL
**DARLENE M. SOLTYS**
**COURTNEY D. SPIVEY**
**Assistant United States Attorneys**

---

[1] Defendant's Motion to Suppress Cell Site Data (Document # 606) will be addressed in a separate opposition, which is subject to a different briefing schedule.

## <u>TABLE OF CONTENTS</u>

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

**I.**     **Law of the Case Requires the Denial of all Defense Motions to Reconsider** . . . . . .  **2**

**II.**    **Motion to Suppress Fruits of Illegal Search and Seizure** . . . . . . . . . . . . . . . . . . . . . .  **4**

**II.**    **Motion in Limine to Preclude Evidence of Cell Phone "Pinging".** . . . . . . . . . . . . . . **11**

**III.**   **Motion to Reconsider Denial of Motion to Suppress Evidence Obtained
         from Interception of Wire Communications and Seizure of Electronic
         Communications** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**12**

**IV.**    **Motion to Reconsider Motion to Suppress Evidence Seized from 10870 Moore St. 15**

**V.**     **Motion to Reconsider Motion to Suppress Evidence Related to Search of 400
         Hampton Park Boulevard Warehouse** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **19**

**VI.**    **Motion to Reconsider Motion to Suppress Evidence Seized at Level's Nightclub. . 21**

**VII.**   **Motion to Reconsider Motion to Suppress Fruits of Search and Seizure of a Honda
         Minivan in North Carolina** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **26**

**List of Exhibits** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

**INTRODUCTION**

Pursuant to the arguments set forth in the following response, and any other arguments which may be made at a hearing on this matter, the United States of America, by its attorney, the United States Attorney for the District of Columbia, respectfully opposes defendant's "Motion to Suppress Fruits of Illegal Search and Seizure" (Document # 605) and five Motions to Reconsider decisions of this Court on earlier motions (Documents # 617, 618, 619 and 620).[2] As to defendant's "Motion In Limine to Preclude Evidence of Cell Phone 'Pinging'" (Document # 607), the government does not intend at trial to produce specific details of the geolocation information for a phone used by Carlos Reyna given to law enforcement by the service provider, although, as discussed below, there may be some reference to it as part of an explanation of why agents undertook certain investigative steps.

## I.  Law of the Case Requires Denial of all Defense Motions to Reconsider

The five motions to reconsider have already been heard and denied, sometimes repeatedly, by this Court.  Furthermore, at least two of the motions to reconsider raise issues that were heard and rejected by the United States Court of Appeals for the District of Columbia Circuit in the appeal of this case.  In United States v. Maynard, 615 F.3d 544 (D.C. Cir. 2010), the D.C. Circuit rejected the defendant's challenge to this Court's denial of his motion to suppress wiretap evidence based on the 'necessity/ exhaustion' argument, this Court's denial of his request for a Franks[3] hearing and this

---

[2]  The defense filed amended motions to reconsider (which merely contain additional attachments) to his earlier documents # 617, 618 and 620.  The newest motions to reconsider are now document # 622, 623 and 624, respectively.  Due to the extremely late filing of these pleadings, this document will refer to motions to reconsider by their earlier document numbers.

[3] Franks v. Delaware, 438 U.S. 154 (1978).

2

Court's denial of his motion to suppress evidence of the $67,000 in U.S. currency found hidden in

a secret compartment of Jones' vehicle, driven by Jones' prior co-defendant, Lawrence Maynard, in

North Carolina, during an April 5, 2005 traffic stop.

None of the motions to reconsider present new, substantive issues which would require an

evidentiary hearing.[4]   In an attempt to contradict or challenge previously provided sworn trial

testimony of government witnesses, the defendant attaches to his motions unsworn declarations

made by himself, his wife Deniece Jones, his son Antoine Jones Jr., Lawrence Maynard, Derrick

Gordon, Karissa J. Johnson, Gregory Wills, Jessica Waddell, Carolynette Waddell, Annette Bigesby,

Shenese Gilmore, and the sworn affidavits of Nimrod Babylon and  Anthony Koonce.  None of these

attachments present a reason for the Court to reconsider the motions.  This is because a fundamental

precept of common-law adjudication is that an issue, once determined by a Court, is conclusive.

Arizona v. California, 460 U.S. 605, 619 (1983).  This precept is conceptualized in the doctrine of

'law of the case,' which posits that when a court decides upon a rule of law, that decision should

continue to govern the same issues in subsequent stages of the same litigation.  Id. at 618.  This

practice serves to "direct the court's discretion."  Id.  The 'law of the case' doctrine does not bar

courts from reconsidering prior rulings on the admissibility of evidence based upon "material facts

not [previously] adduced or supervening law."  Naples v. United States, 359 F.2d 276, 277 (D.C.

---

[4]  While repeating the same arguments challenging the search of Jones' residence, the defendant now challenges the entry on the grounds that entry was made into the house at 4:45 a.m., as opposed to after 6:00 a.m., as the warrant prescribed, and as law enforcement officers testified.  As we discuss herein, even this issue can be resolved on the pleadings.  While repeating the same arguments challenging the search of Level's Nightclub, the defendant now alleges for the first time that the mere presence of two individuals who were not sworn law enforcement officers taints the search process.  This issue also can be resolved on the pleadings, without the need for an evidentiary hearing, and should be summarily denied.

Cir.1966).  However, the 'law of the case' doctrine should be applied unless the Court is "convinced that its prior decision is clearly erroneous and would work a manifest injustice." Agostini v. Felton, 521 U.S. 203, 236 (1997).  The numerous declarations the defendant attaches to his motions contain no information that would establish that this Court's prior rulings were not entirely just, accurate and appropriate.  Therefore, all the motions to reconsider should be denied summarily.

A procedural history of the motions, oppositions and court rulings is set forth at the beginning of each section related to each of the defendant's motions.

## I.   Motion to Suppress Fruits of Illegal Search and Seizure at the Stash House

After presiding at two trials and numerous motions hearings, this Court does not need an extensive recitation of the facts surrounding 9508 Potomac Drive in Fort Washington, Maryland. The Court will recall that on October 24, 2005, FBI agents executed a search warrant at that location. During the execution of that search warrant, FBI agents found 97 kilograms of cocaine, one kilogram of crack cocaine, $850,000 in U.S. currency, drug paraphernalia and several men.  In Document # 606, the defendant seeks suppression of all evidence found by agents during the execution of the search warrant, contending that the contraband is the fruit of information from a GPS device placed on his vehicle.[5]  As laid out below, the claim is factually incorrect.  The GPS data from the vehicle tracker played no role in the FBI's discovery of 9508 Potomac Drive.  Even if the GPS had in some way contributed to finding the house, which it did not, suppression would be inappropriate because there was an "independent source" for locating 9508 Potomac Drive and the stash house would have been "inevitably discovered" because of the direction in which the investigation was proceeding.

_____

[5] The placement and monitoring of the device was later held to be in violation the Fourth Amendment.  See United States v. Maynard, 615 F.3d 544, 568 (D.C.Cir 2010) aff.d sub. nom. United States v. Jones, 132 S. Ct. 945, 953 (2012).

### A. **Locating 9508 Potomac Drive**

The attached affidavit of Special Agent Kellie O'Brien (Exhibit #1) lays out in detail the route by which law enforcement focused on 9508 Potomac Drive.[6]  From early on in the investigation, well before the wire interception began,  based upon information from cooperating witnesses and sources, it was clear that Jones used various locations other than his home(s) and Levels, Jones' nightclub, to store his drugs.  See Exhibit #1, O'Brien Affidavit at ¶¶ 2-5.  Given the seizure in North Carolina in April, 2005, of a substantial amount of cash found in a hidden compartment in Jones' vehicle, driven by his co-conspirator Maynard, there was reason to believe that Jones was obtaining at least some of his cocaine from sources closer to Mexico.  The investigators were also aware of a common distribution pattern in which Mexican cartels place large quantities of drugs in stash houses in cities where major customers are located.   In this scenario, the drugs are usually supervised by cartel workers with the customers periodically purchasing multi-kilogram quantities of drugs either at the stash house itself, or at other locations with deliveries being made by the cartel's workers.  See Exhibit #1, O'Brien Affidavit at ¶¶ 2-6.

From the beginning of the first interception period on September 2, 2005, there was a  pattern of calls between Jones and three individuals believed to be Hispanic, using out-of-region telephone numbers: (678) 330-7712, (713) 386-9548, and (909) 975-0957, all of which were subscribed to in fictitious names, but which the investigation later revealed were being used by Jose Carlos Reyna, a.k.a. Charlie, Jose Guadencio Garcia, a.k.a. Primo, and Roel Bermea, Jr., a.k.a. H.E.B., respectively.

---

[6] At any evidentiary hearing on this matter, for efficiency's sake, the government intends to have Special Agent O'Brien adopt the affidavit and summarize the main points.  In resolving this motion the Court can also obviously rely on the testimony it heard in earlier proceedings in this case.

See Exhibit #1, O'Brien Affidavit at ¶ 4.  From the beginning of the interception, calls between the

defendant and Reyna, and the defendant and Garcia, led law enforcement to believe that Reyna and

Garcia were involved in supplying the defendant with large amounts of narcotics.

In the period from September 2, through September 20, 2005, as the agents listened to

intercepted calls between the defendant and Reyna (using (678) 330-7712)), the brief conversations

indicated that Reyna and Jones were meeting on an almost daily basis.  This suggested the possibility

that Reyna was the guardian of a stash house where significant quantities of drugs were being stored

for purchase by Jones.  On  September 20, 2005, a conversation occurred between Jones and Garcia

(using (713) 386-9548).  The agents' interpretation of this conversation was that Garcia was the

upper level source of supply to Jones and that they were discussing, among other things, the where

and when of the next shipment, which also strongly supported the view that Reyna was the custodian

of a stash house. See Exhibit #1, O'Brien Affidavit at ¶ 6.

Given this, investigators were understandably interested in locating the stash house they believed

was being supervised by Reyna.  In an effort to locate Reyna, in hopes of thereby finding the stash

house, on or about September 26, 2005, one of the investigators contacted Nextel by telephone to

request global positioning ("GPS") information for the  Reyna telephone (678) 330-7712.[7]  An

employee at Nextel verbally provided the latitude and longitude coordinates for the Reyna telephone,

(678) 330-7712, for that single moment in time.  Agents then entered the latitude and longitude

---

[7]  This GPS information was obtained pursuant to a pen register Order for (678) 330-
7712, that was signed by Magistrate Judge John Facciola on September 16, 2005.  (Attached as
Exhibit #2).  Although the government's use of the latitude and longitude coordinates for the
Reyna telephone (678) 330-7712, which was provided by Nextel, is not the subject of the instant
motion, the government notes that Jones has no standing to challenge the GPS locating of (678)
330-7712, Reyna's telephone.  See United States v. Forest, 355 F.3d 942, 948 (6th Cir. 2004).

coordinates into Google Maps and identified the 9500 block of Potomac Drive, Fort Washington, Maryland, as the area corresponding to the coordinates.  The exact location given by the coordinates, while not inside any structure, was closest to the driveway of 9508 Potomac Drive.  See Exhibit #1, O'Brien Affidavit at ¶ 7.

Armed with that information, on September 26, 2005, Special Agent O'Brien researched the on-line database for the Maryland Department of Assessments and Taxation real property records for information pertaining to the homes on Potomac Drive. See Exhibit #1, O'Brien Affidavit at ¶ 8.[8] On the same day, Special Agent O'Brien drove to the 9500 block of Potomac Drive to conduct visual surveillance and to video record the properties.  Based upon her review of the property records, Special Agent O'Brien determined that in all probability the stash house was only one of two locations, 9508 or 9509 Potomac Drive, because all other properties were owner-occupied.  These two were the only rental properties.  Based upon her physical surveillance, from its physical appearance and secluded location, Special Agent O'Brien concluded that 9508 Potomac Drive was the likely stash house.[9]

On October 4, 2005, based on the intercepted calls between the defendant and Roel Bermea, another stash house guardian who used telephone number (909) 975-0957, and without any reliance on the GPS device on Jones' vehicle, agents conducted physical surveillance by positioning

---

[8]  It was not until the next day, September 27, 2005, that the GPS device on the defendant's car was activated.  (See Exhibit #1, O'Brien Affidavit at paragraph 16).

[9]  9509 Potomac Drive is waterfront property on the Potomac River. According to the tax records, it had a higher property value than 9508 and presumably rented for more than 9508. 9509 Potomac Drive, which is situated along the Potomac River, is also more open and visible to surveillance – from both land and river, unlike 9508 Potomac which is secluded and set back from the road and surrounded by trees and foliage.  Consequently, 9508 Potomac Drive made for a more ideal stash house.

themselves at the intersection of Montezuma Drive and Sandy Bar Drive, looking down Sandy Bar

Drive towards Potomac Drive.   Agents observed Jones, who was driving in the company of a

Hispanic male (later identified as Bermea), drive down Sandy Bar Drive to Potomac Drive, as the

agents expected he would.[10]   Based on the wire intercepts, the location information for Reyna's

phone, the property tax records and the agents' own physical observations, on or about October 7,

2005, a static camera was placed at 9509 Potomac Drive to watch 9508 Potomac Drive and its

driveway.   Jones' Jeep Cherokee was thereafter observed by the video camera going to and from

9508 Potomac Drive.   See Exhibit #1, O'Brien Affidavit at ¶ 15.

B. **The Defendant Can Make No Prima Facie Case of Taint**

The Court of Appeals for this Circuit and the U.S. Supreme Court have ruled that the GPS

information concerning the defendant's vehicle was obtained in violation of the Fourth Amendment,

but that is only the first step in determining whether any particular piece of evidence, other than the

GPS data itself,  must be excluded at trial.   "Next, the defendant must make a prima facie showing

of a causal nexus between the Fourth Amendment violation and the evidence he seeks to suppress."

United States v. Holmes, 505 F.3d 1288, 1292 (D.C. Cir. 2007); accord, United States v. Jari, 537

F.3d 1256, 1259 (10th Cir. 2008) (precedents "place the burden on the defendant to demonstrate a

'factual nexus' between a violation of his own Fourth Amendment rights and the discovery of the

challenged evidence."); United States v. Kornegay, 410 F.3d 89, 93 (1st Cir. 2005) ("To succeed on

a motion to suppress, a defendant must establish a nexus between the Fourth Amendment violation

and the evidence he seeks to suppress.").

---

[10]  Potomac Drive runs perpendicular to the river and there is only one way in and one
way out, by way of Sandy Bar Drive.

And this must be "**specific** evidence demonstrating taint." Alderman v. United States, 394 U.S. 165, 183 (1969) (emphasis added). A defendant must adduce proof "showing the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct." United States v. Nava-Ramirez, 210 F.3d 1128, 1131 (10th Cir. 2000). "[I]nference, innuendo, and speculation . . . will not suffice to meet the initial burden of showing specific evidence of taint." United States v. Ivanov, 342 F. Supp. 928, 937 (D. N.J.1972). It is certainly possible to speculate that a GPS system on a vehicle could be a critical component in finding a particular location visited by that vehicle. But, that is not the question that matters here. The issue as to the evidence seized at 9508 Potomac Drive is whether the defendant can demonstrate that the GPS data played that role here, and he simply can not make that showing.

C. **Even If the GPS Data Had Assisted in the Discovery of 9508 Potomac Drive, Locating the House Was Both"Independent" and "Inevitable"**

Even if the GPS data from the defendant's vehicle had played some role in confirming the stash house at 9508 Potomac Drive – which it did not – the investigators found the house "independently" of the GPS data and would have "inevitably" found it if there had been no GPS data. Thus, exclusion of the evidence seized there would be inappropriate. The contours of the closely related doctrines of "independent source" and "inevitable discovery" are outlined in Nix v. Williams, 467 U.S. 431 (1984) and Murray v. United States, 487 U.S. 533 (1988).[11] Both doctrines rest on the premise that, given the significant costs exclusion of probative evidence imposes on society, the exclusionary rule should be applied so that while 'the prosecution is not to be put in a better position

---

[11] In Murray, 487 U.S. at 539, the Court held that inevitable discovery is extrapolated from the independent source doctrine; because tainted evidence would be admissible if discovered through an independent source, it should be admissible if it would inevitably have been discovered.

that it would have been if no illegality had transpired," there must be means to ensure that  the "prosecution is not put in a worse position simply because of some earlier police error or misconduct." <u>Nix</u> at 443.

The "independent source" doctrine "allows admission of evidence that has been discovered by means wholly independent of any constitutional violation,"even though it was also found through some constitutional violation. <u>Id.</u> Otherwise, "[w]hen the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation." <u>Id.</u> The "inevitable discovery" doctrine assumes that an ongoing proper investigation that would have located particular evidence was truncated by some constitutionally infirm means that led to the same evidence, but absent the constitutional violation, the legal route would have eventually led to the evidence.  Thus, such evidence is admissible where the "prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . ." <u>Id.</u> at 444.

As describe above, on the day before the GPS was activated on Jones' Jeep, investigators had already focused their investigation on 9508 Potomac Drive as the stash house where the defendant was obtaining substantial amounts of cocaine, a process that continued without any assistance from the GPS data.[12]  Additionally, even if law enforcement had consulted the GPS data to confirm the location of Jones' visits, the GPS data would not have given law enforcement any information that they did not already know because the GPS data never specifically placed the vehicle at 9508

---

[12]  That their focus was on 9508 Potomac Drive and that investigators were using various means to determine the occupants is further reinforced by the issuance of the two subpoenas to Verizon, the telephone company who would have provided land line service, on September 29, 2005.  <u>See</u> Exhibit #1, O'Brien Affidavit at ¶ 11.

Potomac Drive.  Rather, the GPS data merely placed the Jeep in the general vicinity of 9508.  Indeed, this was no more, and perhaps less, accurate than the information which had already been provided by the geolocation data from Reyna's phone.  See Exhibit #1, O'Brien Affidavit at ¶ 16.  Therefore the locating of 9508 Potomac Drive, Fort Washington, Maryland was not fatally tainted by the GPS data obtained from the vehicle tracker, and no evidence found at that location should be suppressed. See United States v. Luna-Santillanes, 2012 WL 1019601*8 (E.D. Mich.) (denying motion to suppress evidence seized from drug house where evidence showed that investigators had both an independent basis to know of its location and would have inevitably discovered its importance irrespective of information gleaned from GPS devices affixed to automobiles).

## II.  Motion in Limine to Preclude Evidence of Cell Phone "Pinging"

In Document # 607, the defendant moves in limine to preclude the government from offering testimony of the cell phone "pinging, without any evidentiary support" and presumably coupled with "testimony regarding the reliability and accuracy of pinging," see Document # 607 at 2, on the grounds that such evidence violates the dictates of Federal Rule of Evidence 403.  The government represents to the Court that it does not intend to offer testimony regarding the actual longitude and latitude coordinates that it received from the service provider.  However, while demonstrating to the jury how 9508 Potomac Drive became a place of interest and why a search warrant was eventually sought for the house, there may be testimony that the agents contacted the service provider for the 678 number referenced in the prior section.  The testimony will explain that agents inquired where that telephone was physically located and based on that exchange, focused on the houses along on

Potomac Drive, as explained herein, and then specifically on 9508.[13]

### III.   Motion to Reconsider Denial of Motion to Suppress Evidence Obtained from Interception of Wire Communications and Seizure of Electronic Communications[14]

The defendant filed a motion to reconsider the denial of the motion to suppress evidence obtained from interception of wire communications and seizure of electronic communications (Document # 618).   In this pleading, the defendant asserts that the August 10 and August 18, 2005 affidavits in support of search and seizure warrants for *stored* text messages and the September 2, 2005 affidavit in support of court-approved interceptions of wire communications were inadequate for two reasons.   First, he claims that they failed to meet the so-called 'necessity/ exhaustion' prong of 18 U.S.C. §2518(1)(c).   Second, he claims that because Special Agent Stephanie Yanta's statements were "materially false, misleading and displayed a reckless regard for the truth," see Document # 618 at 3, a Franks hearing is necessary.   To make a showing that the Agent engaged in a reckless disregard for the truth, the defendant makes the following arguments: (1) the August 10, 2005 search and seizure affidavit to obtain stored text messages from Maynard's cell phone contained misleading information including: Maynard and Jones were seen opening the door to Level's with a key,

---

[13] See infra footnote 6.   We reiterate that Jones has no standing to challenge the government's investigation into the whereabouts of the Reyna cell phone.

[14] See Document # 142, filed July 12, 2006 (Defendant's Motion to Suppress Evidence Obtained from Interception of Wire Communications and Seizure of Electronic Communications); Document # 151 at 6, filed July 24, 2006 (Government's Omnibus Response to Defendant's Legal Motions); this Court's opinion on August 10, 2006, published at 451 F. Supp.2d 71, 75 (D.D.C. 2006); Document # 369, filed July 26, 2007 (Defendant's Motion to Reconsider Denial of Motion to Suppress Evidence Obtained from interception of Wire Communications and Seizure of Electronic Communications); Document #381 at 6, filed August 22, 2007 (Government's Omnibus Response to Defendant's Legal Motions), Document # 383, filed September 4, 2007 (Defendant's Reply to Government's Omnibus Response), this Court's opinion on September 5, 2007, published at 511 F. Supp.2d 74,   (D.D.C. 2007) and United States v. Maynard, 615 F.3d 544, 550-51 (D.C. Cir. 2010).

12

vehicles were coming and going at a time when Level's was not open for business, there was substantial foot traffic in and out of Level's during daytime hours, Nicholas Jones was seen coming and going into Levels, the Jeep Cherokee registered to Deniece Jones' was present at Levels, and there was a high volume of calls on Maynard's pen register indicative of drug dealing and, (2) the August 18, 2005 search and seizure affidavit to obtain Jones' stored text messages contained misleading information, including listing the phone calls from Uzbekistan and proffering text messages sent to and from Maynard that the defendant asserts were either work-related or sexual in nature. The defendant then argues that (1) with the August 10, 2005 search warrant affidavit, "the government sought to short-circuit normal investigation and went right for the most intrusive methods without the requisite showing of necessity for such warrants," Document # 618 at 9, and (2) the August 18, 2005 search warrant affidavit "failed to show the requisite showing of necessity[15] for such warrants," Document # 618 at 10.  The defendant next argues that the September 2, 2005 wiretap interception affidavit contained misleading information that was simply rehashed from the August 10 and August 18 allegations, and the wiretap affidavit failed to show attempts to use normal means of an investigation proffered conclusory statements regarding why normal means of an investigation were either too dangerous or unlikely to yield results.  In support of the instant motion to reconsider, the defendant attaches Special Agent Yanta's fall 2006 trial testimony and declarations from people purporting to show either the innocuous nature of the text messages or non-criminal

---

[15]  As the government pointed out in its first omnibus opposition, starting at page 7 (Document # 151), the necessity/ exhaustion requirements of Chapter 119, 18 U.S.C. § 2510 *et seq.*- Wire and Electronic Communications Interception and Interception of Oral Communications simply do not apply to Chapter 121, 18 U.S.C. § 2701 *et seq.* - Stored Wire and Electronic Communications and Transactional Records Access. Necessity need not be demonstrated prior to seeking a Rule 41 search warrant to obtained *stored* text messages.

reasons why people were in the vicinity of Level's during non-business hours.

The defendant's Motion to Reconsider (Document # 618) offers nothing new for the Court to reconsider.  This Motion to Reconsider is substantially verbatim to his first motion to suppress (Document # 142), and with the exception of the sentence on page 8 discussing the attached declaration of Anthony Koonce, wholly identical to his earlier motion to reconsider (Document # 369).  Although the Koonce affidavit and the unsworn declarations of other people were not submitted with either of the prior motions,[16] they merely attempt to bolster the previous identical arguments. The earlier motion to reconsider (Document  # 369) included the same attack made herein on Agent Yanta's integrity, and attached her fall 2006 trial testimony to support his argument. In sum, the government avers that nothing new has been raised or added which would justify reconsidering three previous rulings.

The government submits that this Court gave the defendant a fair and complete hearing on his original motion, raising exactly the same issues, and rejected his arguments on August 10, 2006. One year later, the Court gave the defendant a second opportunity to litigate exactly the same issues presented by his instant motion to reconsider and denied it on September 5, 2007, noting

> . . . Jones's motion for reconsideration is 'an essentially verbatim repetition' of his original motion. . . . Although Jones has added a few citations to the trial record and discussed one additional case, he has failed to raise any new facts or arguments that would cause the Court to revise its prior Order.  The Court has already considered and addressed Jones' s arguments at length, and nothing in his motion for reconsideration or his reply affects the Court's prior analysis.

---

[16]  The declarations do not provide any reason for reconsideration.  At the time of the August 2006 and September 2007 motions hearings, the Court was fully aware of the defense claim that some of the text messages were taken out of context and that Koonce and Jones purportedly had no relationship with each other.

511 F.Supp. 2d at 77.   Thereafter, on appeal, the defendant raised exactly the same issues he again raises herein, in Document # 618.  The Court of Appeals rejected those claims and affirmed this Court's decisions, noting that  the appellant's suggested investigative techniques "give us no reason to doubt the district court's conclusion that '[h]aving engaged in an adequate range of investigative endeavors, the government properly sought wiretap permission and was not required to enumerate every technique or opportunity missed or overlooked.'"(Citations omitted).  <u>Maynard</u>, 615 F. 3d at 550.  With respect to the request for a <u>Franks</u> hearing, again, the Circuit affirmed this Court observing, "even proceeding *de novo* we would agree with the district court: The appellants did not make the requisite substantial preliminary showing that Yanta, in her affidavit, intentionally or recklessly either described the evidence in a misleading way or failed to mention Holden." <u>Id</u> at 551. The government submits this Court should again, for the third time, deny the challenge to the wiretap interceptions.

**IV.  <u>Motion to Reconsider Motion to Suppress Evidence Seized from 10870 Moore Street</u>[17]**

The defendant filed a motion to reconsider the denial of the motion to suppress evidence obtained from the search at his residence at 10870 Moore Street, Waldorf, Maryland (Document  # 619).  In this pleading, the defendant now asserts that Special Agent Stephen Naugle lied in November, 2006 when he testified under oath that entry into Jones' home was made after 6:00 a.m. Jones now claims that the FBI entered at 4:45 a.m., well before the 6:00 a.m. hour, which was the time permitted by the search warrant.  The defendant again re-asserts his previously made  arguments

---

[17] <u>See</u> Document # 144 at 14, filed July 12, 2006 (Defendant's Motion to Suppress Tangible Evidence Obtained from Jeep Cherokee); Document # 151 at 43, filed July 24, 2006 (Government's Omnibus Response to Defendant's Legal Motions); and this Court's opinion on August 10, 2006, published at 451 F. Supp.2d 71, 85 (D.D.C. 2006).

that all evidence should be suppressed because law enforcement did not present any member of the Jones family with a copy of the warrant,[18] Jones never received a copy of Attachment A[19] to the search warrant and the FBI forged Jones' signature on the consent to search form authorizing a search of his Jeep Cherokee which contained $69,000.[20]

As noted herein, this Court has already rejected the defendant's previous arguments and should do so again.  As to the remaining issue regarding whether entry was made into the house prior to 6:00 a.m., the government submits that while the Court needs to make findings of fact, it has in front of it all the testimony and evidence necessary to do so without conducting an evidentiary hearing. Supporting the position that the FBI agents did not make entry into the defendant's home until shortly after 6:00 a.m. is the sworn testimony of Special Agent Stephen Naugle.[21]  Corroborating his

---

[18]  This precise argument was previously denied by the Court. See Jones, 451 F. Supp.2d at 86.

[19]  In fact, the defendant does have a copy of the Attachment A (which was attached to his motion, Document # 619 as Exhibit # 6).  Consequently, his argument that the search exceeded the scope is simply without merit.

[20]  Despite an initial concession in 2006 that he did sign the consent form authorizing a search of the Jeep Cherokee (see defendant's Document # 144 at 15, "Jones . . . felt no choice but to sign the paper, which turned out to be a consent form. When Jones signed the consent form, it was blank and did not list what item he was consenting to be searched."), before the first motions hearing, Jones had changed his mind and claimed the signature was a forgery. See government's Document # 151, footnote 10.  In any event, the challenge to the search based on consent is of no import in that this Court ruled, ". . . the officers did not need to rely on his consent to search the Jeep; the search of the vehicle was authorized by the original search warrant.  Courts have consistently held that a search of the premises of a home includes vehicles located within its curtilage."  (Citations omitted). See Jones, 451 F.Supp.2d at 87.  Jones chose not to pursue this issue on appeal.

[21]  Special Agent Stephen Naugle testified– "Q: Now, it is correct to say that when you went into the house on Moore Street, that was at sometime – well, what time did you go into the house? A: Well, it was **after 6:00 a.m.**"  Trial Tr. 96:19-22 Nov. 6, 2006 (PM Session).

testimony is that of Special Agent Stephanie Yanta[22] who was positioned at the FBI Command

Center to coordinate the 6:00 a.m. "take down" which consisted of hundreds of law enforcement

personnel on assignment on the early morning hours of October 24, 2005 executing arrest and search

warrants.   Supporting the government's assertion that agents were given the go-ahead and began

simultaneously executing the search warrants moments after 6:00 a.m. is the testimony of all the

other team leaders and agents who were searching properties that morning: Det. Thomas Webb at

9508 Potomac Drive, Ft. Washington;[23] Special Agent Kevin Ashby at 5119 Barto Avenue,

Suitland;[24] Special Agent Scott Turner at 10441 Crescent Parkway, Waldorf;[25] Special Agent Mary

---

[22]   Special Agent Stephanie Yanta testified– "A: Okay. We decided that we were going to execute the warrants that Monday morning. The Court: Execute the warrants? A: The warrants, yes, ma'am. We alerted all of the team leaders who, in turn, notified their teams members. Everyone met between 4:30 in the morning all the way up to the **6:00 o'clock in the morning execution time**. Q: Where were you personally when the search warrants were executed? A: I was actually in our command center." Trial Tr. 37:16-38:1 Oct. 27, 2006 (AM Session).

[23]   Detective Thomas Webb testified– "Q: Now, sir, when you all made entry to that location, I guess actually the SWAT team made the initial entry, about what time in the morning was it? . . . A: It was just before sun up. It was very early, **about 6:00** or so." Trial Tr. 74:19-75:3, Nov. 26, 2007 (AM Session).

[24]   Special Agent Kevin Ashby testified– "Q: If you will, tell the jury about how entry was made into that residence, 5119 Barto Avenue in Suitland? A: That morning, we had a legal search warrant for that premise. At approximately **6:15 in the morning**, we knocked and announced the presence of the police at the door, with the search warrant." Trial Tr. 57:10-16 Dec. 17, 2007 (PM Session).

[25]   Special Agent Scott Turner testified– "Q: Approximately what time? A: A little bit **after 6:00 o'clock** in the morning." Trial Tr. 16:20-21 Dec. 10, 2007 (AM Session).

Counts at 7921 Allendale Road, Landover;[26] Det. Norma Horne at Level's Nightclub[27] and Det. Steven Kirschner at 5703 Gloria Drive, Suitland.[28]  Conversely, there is the unsworn declaration from the defendant who claims entry occurred at 4:45 a.m.  It is important to point out that he has flip-flopped as to whether he signed the consent to search form, claiming first duress and now that the FBI forged his signature; this demonstrate that his recall of events on the morning of his arrest is shaky, at best.[29]  He also proffers the declaration of his wife, Deniece Jones[30] and the unsworn declaration of his son, Antoine Jones Jr., which are attached to the instant motion to reconsider. Both claim entry was made at 4:45 a.m.  The Court should give great weight to the sworn testimony of the numerous law enforcement officers and make findings of fact that the search of the Moore Street residence began after 6:00 a.m., a time consistent with Magistrate Judge Charles Day's

---

[26]  Special Agent Mary Counts testified– "Q: Specifically, about what time did you all execute the search warrant that morning? A: About **6:15, 6:20** in the morning." Trial Tr. 17:24-18:1 November 20, 2007 (PM Session).

[27]  Detective Norma Horne testified– "Q: First of all, tell the jury about what time did you all make entrance into Level's Night Club? A: Actually, because we were doing numerous search warrants on this take-down day, it was around **6:00 a.m.**, was the, as we call it, the stepping off point or the time that we were supposed to actually reach the doors." Trial Tr. 24:21-25:2 Nov. 30, 2007 (AM Session).

[28]  Detective Steven Kirschner testified– "Q: Was entry made? A: Yes. Q: At approximately what time? A: About **607 hours**."  Trial Tr. 75:9-12 Dec. 17, 2007 (PM Session)..

[29]  The government notes that the so-called forged signature on the consent to search form bears a remarkable similarity to the signatures Jones himself affixed to several *pro se* motions. (Compare Exhibit #3 with Exhibit #4 and Exhibit #5).

[30]  Deniece Jones testified as follows – "Q: Do you recall what time it was that they showed up to arrest your husband? A: 4:45 in the morning." Trial Tr. 33:10-12 Dec. 5, 2006 (PM Session).

Order.[31]

## V.   Motion to Reconsider Motion to Suppress Evidence Related to Search of 400 Hampton Park Boulevard Warehouse[32]

The defendant filed a motion to reconsider the motion to suppress evidence related to a search

of 400 Hampton Park Boulevard Warehouse (Document # 620).   In this pleading, the defendant

asserts that ICE Agent Katerina Kane lied when she testified under oath in 2007[33] about the date –

April 30, 2004 – when she and other ICE agents entered Jones' vacated warehouse and observed

inflatable mattresses, plastic wrap and other evidence similar to that seen inside the Myrtle Avenue

home and consistent with narcotics trafficking.   The defendant's argument is premised upon the

faulty assertion that ICE Exhibit #12, a photograph taken on April 30, 2004 of the interior of the

warehouse, appears not to show the peg board which was installed in February 2004, and therefore

ICE agents must have entered the warehouse prior to its installation (thus they are simply lying about

---

[31]   Moreover, it is far from certain that application of the exclusionary rule would be appropriate for what would be a 'procedural' violation of Fed. Rule Crim. Proc. 41 (e).   See e.g. Youngbey v. March, 676 F.3d 1114, 1124 (D.C. Cir. 2012) (in resolving the question of whether police officers who conducted a night time search were entitled to qualified immunity, the panel noted, "[t]he Supreme Court ... has never held that the Fourth Amendment prohibits nighttime searches. (Citations omitted). We agree. Appellants acknowledge that 'the timing of a search might affect its reasonableness,' but they rightly argue that 'the Fourth Amendment does not include a specific protection against executing a warrant at night." Id.).

[32]   See Document # 437, filed January 1, 2008 (Defendant's Motion to Suppress Evidence Related to Search of 400 Hampton Park Boulevard Warehouse), Document # 441, filed January 8, 2008 (Defendant's Pro Se Motion for Reconsideration of Denial of Defendant's Motion to Suppress Evidence Related to Search of 400 Hampton Park Boulevard Warehouse).   This Court orally denied the motion, in open court, on January 2, 2008 (Trial Tr. 49 Jan. 2, 2008 (AM session).   It does not appear that the Court ruled on the second motion to reconsider or that the government filed a written opposition to either the first or second motion.

[33]   ICE Agent Katerina Karousos testified: "Q: Ok. So on April 30, of 2004, did you actually go into that warehouse facility once Mr. Jones had vacated?  A: Yes." Trial Tr. 63:8-10 Nov. 19, 2007 (PM session).

the date of entry).  In support of this argument, the defendant attaches unsworn declarations from

Maynard and Wills.  Maynard claims they cleaned out the warehouse when they left. Wills asserts

he built and installed the peg board, wooden shelves and window inside the warehouse, all at the

same time.[34]  The Wills' declaration presents no new facts, it is simply a repeat of his trial testimony.

This motion was first argued late in the trial on January 2, 2008, and on that date, this Court

orally denied the motion noting that there was no testimony from which anyone could infer that the

ICE agents came in before the pegboard was installed and took pictures.   The Court indicated that

it was not in any position to say whether ICE Exhibit #12 had a pegboard or did not, noting, "But

we all agree the pegboard is white, the closer you are to it, the more striations you see.  The farther

away you get from this white pegboard, the more likely it is that you don't see the fine lines . . . . so

the picture, the photograph is less than perfect on all sides.  And they are not focusing on the

pegboard; they're focusing on completely different things in this picture." See Trial Tr. 53:15-23 Jan.

2, 2008 (AM Session).[35]

In fact, as the second affidavit from Special Agent O'Brien demonstrates, the peg board was on

the wall at the time that the ICE Exhibit #12 was taken.   See Exhibit #6, O'Brien Affidavit at

paragraphs 5-7.   Given the lack of contrast between white on white, the distance and the lighting,

---

[34]  It is highly significant that the wooden shelves, which Wills testified that he built and installed at the same time as the peg board, are clearly visible in ICE Exhibit # 12 (the April 30, 2004 ICE photograph).  This supports the government's argument that the peg board was also there, in the photo, just not visible in the picture because the white on white background is viewed in the distance.

[35]  Moreover, during the testimony of Wills, when defense counsel first brought up the issue of whether the peg board did or did not appear in ICE Exhibit #12, this Court, looking at the pictures opined "I guess, you know, I don't agree. I think I see the Peg board." See Trial Tr. 32:12-13 Dec. 20, 2007 (AM session.)

it is very difficult to see the peg board in ICE Exhibit #12, as the Court so astutely noted.  There has

never been any doubt that the wooden shelving – which was installed at the same time as the peg

board – is clearly visible in ICE Exhibit #12.

Finally, in his supplemental attachment to the motion to reconsider, Jones now provides a typed

affidavit (dated 6/10/09) and a written statement claiming that personal property depicted in the

various ICE photographs was retrieved from the warehouse prior to the time it was vacated and then

stored at Level's, such that the existence of the personal property at Level's on October 24, 2005

proves that ICE agents entered prior to April 30, 2004.  With this newest attachment, claiming that

Jones emptied the warehouse prior to April 30, 2004, the Court must make a credibility finding. In

doing so, the Court should consider the piecemeal approach presented by the defendant – this casts

doubt on his believability.   Everything in this record demonstrates that ICE Agent Karousos

truthfully testified that entry was made into the warehouse on April 30, 2004, a date *after* Jones

terminated his lease.  This motion to reconsider should be summarily denied.

**VI.    Motion to Reconsider Motion to Suppress Evidence Seized at Level's Nightclub[36]**

Despite an order from the Court that the defendant not file any *pro se* motions, defense counsel

– who concedes that this motion to reconsider is "not well grounded in fact and law nor present[s]

a good-faith argument for change in the law," – asks the Court to accept this motion as if filed *pro

se.*  See Document # 617 at 1.  This motion to reconsider the motion to suppress evidence seized at

Level's Nightclub (Document # 617) claims, as the defendant stated before, that the search warrant

---

[36]See Document # 144 at 21, filed July 12, 2006 (Defendant's Motion to Suppress
Evidence Seized at Level's Nightclub), Document # 151 at 43, filed July 24, 2006
(Government's Omnibus Response to Defendant's Legal Motions); and this Court's opinion on
August 10, 2006, published at 451 F. Supp.2d 71, 89 (D.D.C. 2006).

was invalid because the affidavit relied on contested information contained in the wiretap affidavit; that is, Agent Yanta's statements which the defendant claims were intentional misstatements or made with a reckless disregard for the truth.   This argument was rejected by this Court on August 10, 2006.   Moreover, challenges to the wiretap affidavit based on an allegation that the Special Agent either intentionally or recklessly mischaracterized evidence and a request for a Franks hearing was rejected by the Maynard Court, see supra at 17.

The defendant presents a new challenge to the validity of the search, relying on 18 U.S.C. § 3105, by arguing that two individuals who were not sworn law enforcement officers were present during its execution – Ms. Delaney, a D.C. Alcoholic Beverage Control Regulation Administration ("ABRA") officer and Ms. Shaw, a paralegal specialist from the FBI's asset forfeiture section.   The defendant fails to cite to any cases to support his position. That is because the presence of third-parties (like the ABRA officer) whose presence aid in the warrant's execution, do not violate the Fourth Amendment.   In Wilson v. Layne, 119 S.Ct. 1692, 1698 (1999), the Supreme Court (in the context of an appeal involving Bivens and § 1983 qualified immunity law suit) noted that while the presence of Washington Post photographers and reporters inside the homeowner's home[37] was not related to the U.S. Marshal's objectives in locating his fugitive son, and thus unjustified, the presence of third parties would not be improper if they "directly aided in the execution of the warrant." Id. The Supreme Court noted, for instance, that the "presence of third parties for the purpose of identifying stolen property has long been approved by this Court and our common-law tradition."

---

[37]   The facts in Wilson involved a man's home, and in reaching its conclusion, the Court noted the often repeated adage dating back to 1604, that, "the house of everyone is to him as his castle." Id. at 1697.   The centuries old respect for the sanctity of one's home (or castle) would not extend to Level's Nightclub, a business establishment.

Id.  Here, an officer from ABRA aided in the execution of warrant.  ABRA is a regulatory agency

in the District of Columbia government tasked with issuing liquor licenses and enforcing the laws

regarding sale of liquor, and other licensing regulations.  The agency had previously inspected the

establishment and, through photos, was familiar with its layout.  Moreover, the agent took physical

possession of the liquor license during the execution of the warrant.[38]  The paralegal specialist from

the FBI (who was assigned to the asset forfeiture section) aided in the execution of the warrant by

being able to examine the night club for forfeiture potential and to identify documents relevant to

a money laundering investigation.  This argument should be summarily denied.[39]

---

[38]  The liquor license was seized because under the ABRA regulations, the defendant
never should have received a liquor license in the first place – he was a convicted felon and on
his application, falsely claimed he had no criminal record.

[39]  Even the supplemental attachment from Lawrence Maynard adds nothing to the
analysis. Maynard's chief complaint seems to be that he never found a copy of a search warrant
or Attachment A when cleaning up Level's.  Defense counsel fails to suggest the relevance of
this claim.

**VII.   Motion to Reconsider Motion to Suppress Fruits of Search and Seizure of a Honda Minivan in North Carolina[40]**

This motion to reconsider is likewise submitted with a request to be treated as a *pro se* motion to reconsider and a concession that motion to reconsider is "not well grounded in fact and law nor present[s] a good-faith argument for change in the law." See Document # 617 at 1.  In this motion to reconsider the motion to suppress fruits of search and seizure of a Honda Minivan in North Carolina, (Document # 617), the defendant claims again that upon learning Maynard was not the owner of the Honda minivan, Officer Frederick Whitehead should have known he could not ask Maynard for lawful authority to search the minivan as Maynard could not give lawful consent.[41]  The defendant adds two new arguments – only a sentence long – that the unsworn declarations of Maynard and Gordon[42] demonstrate there was no probable cause to search the Honda minivan and that the search exceeded the scope of the consent given by Maynard.

---

[40]See Document # 144 at 19, filed July 12, 2006 (Defendant's Motion to Suppress Tangible Evidence Seized from Green Honda Odyssey Minivan), Document # 151 at 56, filed July 24, 2006 (Government's Omnibus Response to Defendant's Legal Motions); this Court's opinion on August 10, 2006, published at 451 F. Supp.2d 71, 85 (D.D.C. 2006); Document # 357, filed July 5, 2007 (Maynard's Motion to Suppress Evidence of the Durham, North Carolina Traffic Stop), Document # 381 at 37, filed on August 22, 2007, (Government's Omnibus Response to Defendants' Legal Motions), Document # 382, filed on August 30, 2007 (Maynard's Reply to Government's Omnibus Response), Document # 397, filed November 1, 2007, (Maynard's Supplement to his Motion to Suppress), Document # 402, filed November 5, 2007 (Government's Response to Maynard's Supplement), this Court's denial on November 7, 2007, (Document # 414) and United States v. Maynard, 615 F.3d 544, 551-53 (D.C. Cir. 2010).

[41] This Court conducted an evidentiary hearing on November 6, 2007 and heard testimony from Officers Whitehead and Sole (the handler of the canine "Bruno") from the Durham Police Department.

[42]  In the unsworn declarations, Maynard acknowledges that he gave consent to search the Honda Minivan while Gordon claims he did not name Atlanta as their destination.

Quite simply, the defendant's arguments are foreclosed by the <u>Maynard</u> opinion.

> The parties also dispute whether Maynard's consent to the search of the van was voluntary and whether Jones has standing to challenge that search. Those issues are mooted by our holding the extension of the stop to ask Maynard a few additional questions was not a seizure and any subsequent extension of the stop leading up to the canine sniff was supported by reasonable suspicion.  The appellants do not dispute the district court's determination that the police had probable cause to search the van once the dog alerted. Accordingly, we hold that the district court properly admitted evidence the police discovered by searching the van.

<u>Maynard</u>, 615 F.3d at 553.  Neither consent nor exceeding the scope of the search are viable arguments; the  Court of Appeals affirmed the Honda Minivan's search based on Bruno's alert that there was likely contraband in the vehicle.

## **CONCLUSION**

The Motion to Suppress Fruits of Illegal Search and Seizure (Document # 605) will require an evidentiary hearing but should be denied given that the government will be able to demonstrate that the GPS data from the vehicle tracker did not contribute in any way to determining the location of the stash house – 9508 Potomac Drive, Fort Washington, Maryland.  The remaining motions to reconsider do not require evidentiary hearings.  The government urges the Court to summarily deny the remaining motions to reconsider (Documents # 617, 618, 619 and 620) in that none of the motions to reconsider present new, substantive issues which would require evidentiary hearings, none present new evidence which would indicate that the Court's prior decisions were clearly erroneous or that a manifest injustice would be committed by refusing to revisit an issue, and all have, quite simply, been given years worth of fair and thorough considerations of the issues raised therein.

Respectfully submitted,
RONALD C. MACHEN Jr.
UNITED STATES ATTORNEY

By:

_____

ARVIND K. LAL
DARLENE M. SOLTYS
COURTNEY D. SPIVEY
Assistant United States Attorneys
D.C. Bar No. 389-496
D.C. Bar No. 431-036
New York Bar
555 4th St. N.W.
Washington, D.C. 20530
(202) 252-7685
**Darlene.Soltys@usdoj.gov**

**List of Exhibits**

1.  Special Agent Kellie O'Brien, First affidavit. Attachments include A (two Google earth maps, with original handwritten comments), B (various Maryland Dept. Of Assessments and Taxation printouts which were generated on 9/26/2005) and C (subpoenas to Verizon which were generated on 9/29/2005).

2.  Court Order in Misc. No. 05-361, dated September 16, 2005, pertaining to 678-330-7712.

3.  FBI Consent to Search Form dated October 24, 2005 pertaining to Jeep Grand Cherokee.

4.  Signature page of defendant's *pro se* motion, submitted in Document # 440.

5**.** Signature page of defendant's *pro se* motion, submitted in Document # 441.

6.  Special Agent Kellie O'Brien, Second affidavit. Attachments include 5 photographs.