SWORNED DECLARATION TO SUPPRESS EVIDENCE
GOVERNMENT
to SEARCH of 400 HAMPton PK BlVD WAREHOUSE

PURSUANT to 28 U.S.C § 1746, I
Antoine Jones SR, declARe, veRiFy And
state under PenAlty of PeRjURY that
the foregoing is true And correct.

Antoine Jones SR Reply

FAIR OPPORTUNity to A HeARing

THe GoveRnment is oFF the MARk
on thinKing this court denied deFendAn
JANUARY 1 2008 Filing of DocumentH
441 on JANUARY 2 2008 becAuse As the
GoveRnment conceded the goveRnment
neveR Filed A wRitten oppositon to
niether motions noR wAs deFendAnt
AFFORDeD A FAIR oppoRtunity to
An EviDentiARy HeARing to HAve,
FAct Finding And complete the Recor

EXHibit #1 - sHows DeFendAnt Jone
count DocKet, 12-20-2007 no DocKet
number, but it sHows DeFense witne
GRegoRy Wills testiFied.
On DocKet # 437 - MR BAlARezo
submitted (on 1-1-08) motion to suppRe
Evidence RelAted to seARcH of 400
HAMpton PK BlVD.

P 2  on 1-8-2008 - Docket 441 Defendant
Jones submitted a Prose motion to
suppress evidence at the warehouse

Theres no 1-2-2008 docket entry
nor is there any where between 1-1-08
thru the time the trial was over where
it shows the court denied the two
motion or defendant was allow a
fair opportunity for an evidentiary
hearing.

Defendant Jones dont dispute, argue
or care if the I.C.E agents enter the
warehouse on April 30 2009 after
defendant vacated the warehouse lease.

Defendant Jones argument is the
I.C.E agent unlawful enter the
warehouse before April 30 2009 the
day I vacated the warehouse lease.

## PEG BOARD ISSUE

The missing Peg Board in ICE
Exhibit #12, is Just one point of
evidence the I.C.E agent unlawfully
enter the ware House in some time
in February violating 18USC §2236

SEARCH without A WARRANT.

Defendant's Jones lease the WareHous
for some months And know the WareHou
interior very well, Also Defendant Jones
was present when MR Gregory Wills
built the shelves And Peg BOARD, And
the window. I Request MR Wills to
build A window from the office to
the ware House And I was present when
He put the window in.

Defendant Jones know wHAt the
Peg BoAR look like, (ExHibit #2) Are
some close up of the WareHouse Peg BoAre
showing two yellow Hooks, A Socket, A
small cover And Hundres of Holes, And
this is the same Peg BOARD MR Greg
Will place up in sometime February 2004.

Defendant is Also Familiar with
ICE PHoto (ExHibit 12) (THe WareHouse)
Defendant Jones swears under
Penalty of perJuny the ICE PHoto
(ExHibit #12) is lacking the Presence
of the PegBoARD MR Will installed
on that wall.
Yes, MR Will built the sHelves in
ICE PHoto (ExHibit 12) And built A

PGY window but He built the shelves before He built the window or installed the PegBoard. The theory the government believe that because they visibly see the shelves in Exhibit #12) so the PegBoard Has to be Present is incorrect and not true.

To support my truthful claims, I refer the court to Defense Witness Will testimony and Defense Witness Howard scott Pescock testimony, Exhibit #3 And Exhibit #4.

As you Read (Exhibit #3) Greg Wills testimony Page 16 thru Page 40, mr Lyon Point to (Exhibit 12) ICE photo of the Wall where the PegBoard is clearly missing and during the Crossexamination mr Wills testified about the PegBoard that was missing from the wall.

In (Exhibit #4) mr Howard scott Pescock testimony. Page 101-103,
   Page 101 Line 11-18
   Line 11 (G) Let me ask you know, Im going to zoom in really Quickly to this Particular Area in this corner. In your facility

Right now, is THERE some sort of structure
there that is not shown in this picture?
   (A) yeah there's like pegboard that
covers like Right that white area.
   (Q) THIS one or this one?
   (A) THAT white AREA where your finger
is now yeah.


   Even Honorable Judge Huvelle Agree
with the defense
   Gary will testimony page 40 line 20
thru line 23
   The court: Mr Peacock was asked
about the pictures. He said He didn't
see the PegBoards
   Mr Lyon: THAt's the whole Point
   The court: The Picture speaks for
itself.


   Now that Defendant Jones swears
under penalty of perjury that ICE
Photo (Exhibit 12) doesn't have the
presence of the PegBoards And Mr
Gray wills and Mr Howard scott
Peacock all who familiar with
the warehouse structure and the
PebBoard, How could about Melie
OBrien Hearsay assumption And

P6b conclusory belief be significant with relating to the Ware House structure and the significant peb Board Back in Feb 2004 or April 2004.

Even in Exhibit 4 - especially and in all of Kilie OBrien Photo's taskin in a much darker ware house with out a flash, the photo's still show a presence of a peb Boards and even the Hooks supporting defendant argument that ICE Photos (Exhibit 12) don't show the presence of the peb Board or visible Hooks.

Defendant submit (Exhibit 5). Another photo of the peb Board on the ware House wall - far away, taken by Investigator Glick in 2006. This photo is already on record from the second trial.

Even at a distance the photo clearly show the Hundreds of Holes, the small panel, the socket and the yellow Hooks.

Defendant Jones will point out more evidence that the ICE agents took the ICE photo's before April 30

2004 beFoRE I VAcAte the lease.

(EXHibit #6) Is LeyVANce HOWARD
swoRNeD AFFiDAvit,
    In MR HOWARD swoRNeD AFFiDAvit
He swoRNeD in FRont oF A notARy
that the H.&m spoRt Jacket in the
I.C.e pHoto's waS given to Him by
MR LAWReNce MAYNARD some time
MiD 2004 beRoRe ApRil 30 2004 AnD
FRom that DAy He still HAve the
same spoRts Jacket At Home,

    MR LeyVANce HOWARD mentioned
to me He not only Willing to
testiFied to the tRuth oF the mAtter
He is Willing to submit to A polygRAph
AnD Will bRing the same Jacket in
the I.C.e pHoto's to the HeoRing, THis
Alone wARRAnt An oppoRtunity FoR
A FAiR HeoRing.

(EXHibit # 7) ARe items FRom the FBI
club levels pHoto's that wAS At the
wARe House beRoRe I vAcAted the
lease. me, MR MAYNARD And some
oF my club levels stARF put the
wARe House pRopeRty on DeReNDANt
WHite box tRuck And took some of

The Government must concede
to the truthful claims that the
warehouse property was place on the
white box truck And some property
is shown in the club level photo's because
the Government didn't produce
Any sworned written statement by
Albert Gikas nor did the Government
oppose or reply to defendant Pro se
motion "Defendant motion to suppress
evidence related to search of 400
Hampton Pk Blvd warehouse," Page 7,
9 and page 10, nor did the Government
reply to Defendant Jones sworned
Affidavit on the statements of the
(Large office chair, the small black
chair, the inflatable mattress, the
complete glass table, the long sleeves
shirt, the sports Jacket, the skill
saw of Gregory Wills, the valentines
Gift basket, the Blue-furniture
blankets, the Boxes of Rolls of
Plastic furniture wraps, the two
Roledex card, the club level business
cards and the photo of the window
which is missing in the I.C.E photo.
   This Hand written Affidavit was

sworned under penalty of perjury and
in front of a notary which make it
a sworned affidavit and unless the
Government Has conceded they
should Had Respose or oppose
Defendant Sworned Affidavit and
defendant Prose Motion.

(Exhibit # 7) Are the items
in the club level Photo's that was.
at the warehouse before we took
then from the warehouse, before
I vacated the Lease.

With Howard Scott Peacock testimony,
Greg Wills testimony, Defendant Jones
sworsed affidavit and the motion
to suppress, Along with lawrence
maynard sworned declaration,
should warrant An opportunity to
complete the Record and prove their
was a 4th amendment Violation the
unlawful entry of the warehouse
without a warrat Violating 18 USC § 2236.

<u>Conclusion</u>

It's obstruction of Justice every
time the I.C.E Agents or Kg officer
writes or Represent "April 30 2004" on the

document (Exhibit #8), The sketch of the warehouse with the Allege Persons property that was left behind, the ICE agent writes "4-30-04" 11:15 PM,

The Index Paint 35, the Agent writes 4-30-04, the US custom and Border memorandum the Date April 30 2004 is bogus because none of the property was left behind, the I.C.E report - Page 3 the information written Dated April 30 2004 is false information, ICE Report on Page 1, false date of April 30 2003 on the information mentioned, the Grand Jury of Agent Gikas Page 41-43 is a violation of 18 USC 1623 and even in the superseeding indictment continue the obstruction on page 5.

Just these Extraordinary circumstances of the agent once again violating 2236 - search without a warrant just like summit circle apartment but much severe because these conceal their obstruction of justice, manufacturing of evidence, Perjury and with all of this outrageous misconduct this court should have an evidentiary Hearing so defendant could show and prove his 4th Amendment Violation,

Respectfully Submitted

Sign Antoine Jones
Date 7-2-2012
1951 D St SE
W.D.C 20003

Joy Thomas
Notary Public, District of Columbia
My Commission Expires 9/2013

| | | Shanese Gilmore, Karissa Jones) (hsj, ) Modified on 1/2/2008 (hsj, ). (Entered: 12/27/2007) |
|---|---|---|
| 12/20/2007 | 🌑 434 | MOTION for Reconsideration *of Ruling Denying Defendants Request to Call Anthony Koonce as a Witness* by ANTOINE JONES. (Attachments: # 1 Exhibit # 2 Exhibit # 3 Exhibit # 4 Exhibit # 5 Exhibit # 6 Text of Proposed Order)(Balarezo, A.) (Entered: 12/20/2007) |
| 12/20/2007 | 🌑 | Minute Entry for proceedings held before Judge Ellen S. Huvelle: Jury Trial resumed as to ANTOINE JONES, LAWRENCE MAYNARD held on 12/20/2007. LAWRENCE MAYNARD (10) Count 1s and ANTOINE JONES (1) Count 1sssss. Same jury of 12 and 3 alternate jurors. Jury Trial continued to 1/2/2008 11:00 AM in Courtroom 14 before Judge Ellen S. Huvelle. 434 Motion for reconsideration, denied. (Bond Status of Defendant: Defendants Committed/Commitment Issued) (Court Reporter: Lisa Griffith (A.M.))(Defense Attorney: Eduardo Balarezo-#1, James Lyons-#10; US Attorney: Rachel Lieber and John Giese) (Defendant's Witnesses: Mr. Willis, Mrs Jones) (hsj, ) Modified on 1/2/2008 (hsj, ). (Entered: 12/27/2007)   Gary Willis |
| 12/26/2007 | 🌑 435 | Memorandum in Opposition by USA as to ANTOINE JONES, LAWRENCE MAYNARD re 431 MOTION Renewed Motion for Instruction on Multiple Conspiracy; Request for Other Instructions; and Objections to Governments Proposed Instruction (Geise, John) (Entered: 12/26/2007) |
| 12/30/2007 | 🌑 436 | Objection to Proposed Jury Instructions by ANTOINE JONES (Balarezo, A.) Modified on 12/31/2007 (mlp) (Entered: 12/30/2007) |
| 01/01/2008 | 🌑 437 | MOTION to Suppress *Evidence Relating to Search of 400 Hampton Park Boulevard* by ANTOINE JONES. (Attachments: # 1 Text of Proposed Order)(Balarezo, A.) (Entered: 01/01/2008) |
| 01/01/2008 | 🌑 438 | REPLY by ANTOINE JONES to 435 Government's Memorandum in Opposition to Giving of Multiple Conspiracy Instruction. (Balarezo, A.) Modified on 1/2/2008 (tnr, ). (Entered: 01/01/2008) |
| 01/01/2008 | 🌑 | NOTICE OF CORRECTED DOCKET ENTRY: 438 Response to document was modified to read as a Reply and link was added as to ANTOINE JONES. (tnr, ) (Entered: 01/02/2008) |
| 01/03/2008 | 🌑 | Minute Entry for proceedings held before Judge Ellen S. Huvelle: Jury Trial resumed as to ANTOINE JONES, LAWRENCE MAYNARD held on 1/3/2008. LAWRENCE MAYNARD (10) Count 1s and ANTOINE JONES (1) Count 1sssss. Same jury of 12 and 3 alternate jurors. Jury Trial continued to 1/7/2008 09:00 AM in Courtroom 14 before Judge Ellen S. Huvelle. Defendants Jones and Maynard's oral request for judgment and acquittal, heard and denied. (Bond Status of Defendant: Defendants Committed/Commitment Issued) (Court Reporter: Lisa Griffith) (Defense Attorney: Eduardo Balarezo-#1, James Lyons-#10; US Attorney: Rachel Lieber and John Giese) (Defense Witness: Deniece Jones, Government Rebuttal Witnesses: Kellie O'Brien, Det. Kirschner) |

| | | |
|---|---|---|
| | | (hsj, ) (Entered: 01/07/2008) |
| 01/07/2008 | 🌐 | Minute Entry for proceedings held before Judge Ellen S. Huvelle: Jury Trial resumes as to ANTOINE JONES, LAWRENCE MAYNARD held on 1/7/2008. LAWRENCE MAYNARD (10) Count 1s and ANTOINE JONES (1) Count 1sssss. Same jury of 12 and 3 alternate jurors. Jury Trial continued to 1/8/2008 10:00 AM in Courtroom 14 before Judge Ellen S. Huvelle. (Bond Status of Defendant: Defendants Committed/Commitment Issued) (Court Reporter: Lisa Griffith) (Defense Attorney: Edward Balarezo-#1, James Lyons-#10; US Attorney: Rachel Lieber and John Giese) (hsj, ) (Entered: 01/11/2008) |
| 01/08/2008 | 🌐 439 | MOTION to Continue by ALBERTO ROLANDO CARRILLO-MONTELONGO. (Attachments: # 1 Certificate of Service# 2 Text of Proposed Order)(Kowalski, Fred) (Entered: 01/08/2008) |
| 01/08/2008 | 🌐 440 | MOTION for Leave to File *Motion to Dismiss for Prosecutorial Misconduct and Outrageous Conduct* by ANTOINE JONES, LAWRENCE MAYNARD. (Attachments: # 1 Text of Proposed Order # 2 Appendix # 3 Attachment # 4 Attachment # 5 Attachment # 6 Attachment)(Balarezo, A.) (Entered: 01/08/2008) |
| 01/08/2008 | 🌐 441 | MOTION for Leave to File *Defendants' Pro Se Motion to Reconsider Denial of Defendants' Motion to Suppress Evidence Related to Search of 400 Hampton Park Warehouse* by ANTOINE JONES, LAWRENCE MAYNARD. (Attachments: # 1 Text of Proposed Order # 2 Appendix) (Balarezo, A.) (Entered: 01/08/2008) |
| 01/08/2008 | 🌐 | Minute Entry for proceedings held before Judge Ellen S. Huvelle: Jury Trial resumed and concluded as to ANTOINE JONES, LAWRENCE MAYNARD held on 1/8/2008. LAWRENCE MAYNARD (10) Count 1s and ANTOINE JONES (1) Count 1sssss. Same jury of 12 and 3 alternate jurors. Three (3) alternate jurors in seats 1, 3, and 8 discharged. Jury Deliberation begun and continued to 1/9/2008 09:00 AM in Courtroom 14 before Judge Ellen S. Huvelle. Oral motion by Defendants Jones and Maynard for judgment of acquittal, denied. (Bond Status of Defendant: Defendants Committed/Commitment Issued) (Court Reporter: Lisa Griffith) (Defense Attorney: Eduardo Balarezo-#1, James Lyons-#10; US Attorney: Rachel Lieber and John Giese) (hsj, ) (Entered: 01/11/2008) |
| 01/09/2008 | 🌐 | Minute Entry for proceedings held before Judge Ellen S. Huvelle: Jury Deliberations resumed as to ANTOINE JONES, LAWRENCE MAYNARD held on 1/9/2008. LAWRENCE MAYNARD (10) Count 1s and ANTOINE JONES (1) Count 1sssss. Same jury of 12. Jury Deliberation continued to 1/10/2008 09:00 AM in Courtroom 14 before Judge Ellen S. Huvelle. Motions by defendant for leave to file Pro Se, granted. Motion to Suppress, denied. (Bond Status of Defendant: Defendants Committed/Commitment Issued) (Court Reporter: Lisa Griffith) (Defense Attorney: Eduardo Balarezo-#1, James Lyons-#10; US Attorney: Rachel Lieber and John Giese) (hsj, ) (Entered: 01/11/2008) |











EXHIBIT#3

*Exhibit #3   Gary Mills Testimony*

*The Hand, - man who put up the peg boards and the window   16*

1    Q. Are you familiar with Club Levels?

2    A. Yes, I am.

3    Q. Directing your attention in 2004, 2005, did *you* ever do

4    any handy man work at Club Levels?

5    A. Yes, I did.

6    Q. Who hired you to do that work?

7    A. Antoine.

8    Q. Was the Club opened for business when you first started

9    doing some work at Levels?

10   A. No.

11   Q. Describe generally what **type** of work you did there?

12   A. Punch out work, demolition. And then I built a room, a

13   VIP room and kind of a **lot** of little things. I put in toilets.

14   I put in light switches.

15   Q. Now, before you started doing some work at Club Levels,

16   did you do, in 2004, did you do any handy man work for

17   Mr. Jones and Mr. Maynard at another commercial premises,

18   specifically 400 Hampton Park Boulevard?

19   A. Yes, I did.

20   Q. What type of work did you do at the 400 Hampton Park?

21   Explain that to the jury.

22   A. I replaced drywall, put in a toilet tank. I put in a

23   small window, replaced **some**, mainly drywall. I built a **stand**.

*Sch A-1*
*Idrw*
24   I put up a picket board to hang tools on. And I installed the

25   floors, just general things after that.

*P 664*

Case 1:05-cr-00386-ESH  Document 629-4  Filed 07/26/12  Page 20 of 42
Case: 09-5085     Document: 1244623     Filed: 05/06/2010     Page: 69

17

1    Q. Now, I want to focus on the peg board that you just

2    mentioned.  Do you recall where did you get that peg board to

3    put up?

4    A. I bought it from Home Depot.

5    Q.. Home Depot?

6    A. Yes.

7    Q. And was there a Home Depot --

8    A. Right down the street from the building.

9    Q. What was the peg board for?

10   A. To hang tools on.

11   Q. Do you remember the specific date that you put the peg

12   board up?

13   A. No, I know it was cold.  It was really cold.

14   Q. Was it a time when Mr. Maynard and Mr. Jones were using --

15   A. Yes, yes.

16   Q. At the warehouse?

17   A. Yes.

18   Q. Now, I'm going to show you a photograph.  Have this marked

19   as Maynard's Number 9 for identification.

20            THE COURT:  Has the government seen it?

21            MR. GEISE:  No objection.

22            THE COURT:  No objection.  It will be admitted then.

23   We can put it on the screen.

24            (Defendant Maynard Exhibit Number 9 was

25                admitted into evidence.)



1    ICE 12.  And you didn't ask Mr. Peacock anything about these?

2           MR. BALAREZO:  I believe I actually asked him here if

3    he sees a peg board in this picture and I believe he said no.

4    And then he did say --

5           COURT REPORTER:  Wait, there's too much going on.

6           THE COURT:  To answer your question, you can't get

7    these exhibits.  He wasn't anywhere around during exhibit 10

8    and 11, this particular witness, so put your guy on notice.

9    We'll have to take it up until he testifies.

10          (There was a pause in the proceedings.)

11          THE COURT:  Have you been able to authenticate the

12   pictures taken some time in '06?  They have to know that.

13          MR. BALAREZO:  October 18 of '06.

14          THE COURT:  There are two photos here, October 18 of

15   '06 by Mr. Balarezo's investigator?

16          MS. LIEBER:  That's correct.  The discoloration is

17   bluish colors is in fact shadows.

18          THE COURT:  Nobody painted the walls?

19          MS. LIEBER:  Nobody painted.

20          THE COURT:  Mr. Peacock was asked about the pictures.

21   He said he didn't see the peg board.

22          MR. LYONS:  That's the whole point.

23          THE COURT:  The picture speaks for itself.

24          MR. LYONS:  We've got two to one.

25          THE COURT:  Beyond that, how much you can argue from

Case 1:05-cr-00386-ESH   Document 629-4   Filed 07/26/12   Page 22 of 42
Case: 09-5085    Document: 1244623    Filed: 05/06/2010   Page: 71

19

1    represent the peg board.  Is that fair?

2              THE WITNESS:  Yes.

3              THE COURT:  All right.

4    BY MR. LYONS:

5    Q.  Just for clarity, would you point, draw an arrow to

6    exactly where it was that you placed the peg board?

7    A.  (Complying.)

8    Q.  Now, I'm going to show you what has been marked as

9    Government Exhibit Number ICE Number 12.  Can you identify

10   that, sir?

11   A.  Yes.

12   Q.  Is that the same --

13   A.  That's the same.

14   Q.  Same photograph?

15   A.  Right.

16   Q.  I'm going to point to the area that you outlined in red, a

17   square area of that white wall.  Is that where you put the peg

18   board up?

19   A.  Yes, it is.

20   Q.  Now, after you put the peg board up --

21             THE COURT:  You know it was cold.  But can you give

22   us any better date by month or what have you?

23             THE WITNESS:  January or February, somewhere in

24   February.

25             THE COURT:  '04?

Very Important

2667

20

1            THE WITNESS:   '04.

2     BY MR. LYONS:

3       Q. It was some time prior to you starting doing work for

4     Levels?

5       A. Right.   Maybe --

6            THE COURT:   Maybe what?

7            THE WITNESS::   About a month, two months after that,

8            THE COURT:   After what?  I'm sorry.

9            THE WITNESS:   In February.   I know I stopped working     ???

10    a little bit after February.      Very important

11           COURT REPORTER:   Stopped working, you said?  You said

12    I know I stopped --

13           THE COURT:   What happened in February?

14           THE WITNESS:   I was working there about the end of

15    Febru..

16           THE COURT:   Where is there?

17           THE WITNESS:   At the warehouse.

18           THE COURT:.   End of February you think?

19           THE WITNESS:   Around there.   I'm not exactly for

20    sure.  I just know it was really cold, but I'm pretty sure it

21    was some time around there.  I'm not for sure.

22    BY MR. LYONS:

23      Q. I'm going to show you what has been introduced into

24    evidence as Government Exhibit 15, ICE Number 15.  Do you see

25    some items of clothing hanging up there?

18

1   BY MR. LYONS:

2   Q. Mr. Wills, can you identify that photograph?

3   A. Yes, I can.

4   Q. What is that photograph?

5   A. It's a picture of the warehouse.

6   Q. All right. Now, I'm going to take Maynard's Number 9, and

7   I'm going to ask you, with this pencil -- first of all, let me

8   ask you this question. Does that photograph depict the area

9   that you put the peg board up on?     Very Important

10  A. Yes.

11  Q. And would you take the red pencil and outline where it was

12  that you put the peg board on?

13  A. (Complying.)

14          THE COURT:  It's red?  He did it in red ink?

15          MR. LYONS:  Yes.

16  BY MR. LYONS:

17  Q. And that outline in the red ink, that is the area that you

18  put the peg board on, on that wall?

19  A. Yes, that's the area I put the peg board on?

20          THE COURT:  It's like a square?  Is that fair for the

21  record, the red ink?

22          MR. LYONS:  Well, Your Honor, this is going to be

23  introduced as an exhibit,

24          THE COURT:  I'm describing it for the record though,

25  what he has done is drawn a square shape in red ink to

P 6 6 6

1  Number 12. Do you see that, sir?
2  A.  Yes, sir.
3  Q.  what do you recognize that to be?
4  A.  That's the inside of 400.
5  Q.  when did you move into 400?
6  A.  Approximately June of that year, you know, the year in
7  question.
8  Q.  When you moved into 400, were all of these items that
9  shown in the picture in 400?
10  A.  No, these items weren't here.
11  Q.  Let me ask you know, I'm going to zoom in really quickly
12  to this particular area in this corner.  In your facility right
13  now, is there some sort of structure there that is not shown in
14  this picture?
15  A.  Yeah, there's like pegboard that covers like right in that
16  white area.
17  Q.  This one or this one?
18  A.  That white area where your finger is now, yeah.
19  Q.  What do you mean, pegboard?
20  A.  You know, what you would typically hang tools from.
21  Q.  Did you put that pegboard there?
22  A.  NO.
23  Q.  And was that pegboard there when you moved in?
24  A.  Yes.
25  Q.  Do you now if that pegboard was placed in that location

---

1  before Mr. Jones -- well, Excuse me, Mr. Maynard, vacated the
2  premises?
3  A.  Say that again.
4  Q.  Are you aware of whether or not that pegboard was on that
5  wall at the time that Mr. Maynard vacated the premises?
6  A.  I'm not aware of that because I was never in that facility
7  when he was there.
8  Q.  well, a few -- maybe an hour or so ago we spoke outside?
9  A.  Right.
10  Q.  And I asked you that same question?
11  A.  okay.  Maybe I missed --
12  Q.  The pegboard that you say is on this particular wall now?
13  A.  Right.
14  Q.  was that pegboard there when you moved in, first of all?
15  A.  Yes, it was there when I moved in.
16  Q.  All right.
17      THE COURT:  But there was some break between when you
18  moved in and when Mr. Maynard was there, is what he's saying,
19  right?
20      THE WITNESS:  Yeah.
21      THE COURT:  You didn't follow directly?
22      THE WITNESS:  No, there was a break.  Yes.
23  BY MR. BALAREZO:
24  Q.  Do you recall mentioning something about a handyman?
25  A.  Yeah, I think Lawrence had a handyman that worked in

---

                                                    103

1  there.
2  Q.  Do you recall informing me that the handyman had placed
3  the pegboard there before Maynard left the premises?
4  A.  Yeah.
5  Q.  you did mention that earlier?
6  A.  I don't know what you're asking me really because what I
7  saw, when I moved in, there was pegboard there.  I don't know
8  when this picture was taken.
9  Q.  okay.
10  A.  okay.  So when I moved in, it was pegboard.  If it was a
11  six-month time, I find it highly unlikely for someone to bring
12  pegboard in.  usual they take stuff out.
13      THE COURT:  You don't know how the pegboard got
14  there, is what---
15      THE WITNESS:  Right.  I don't know.
16      THE COURT:  Move on.
17      THE WITNESS:  I would assume that the handyman would
18  have --
19      THE COURT:  you assume, but you don't know.
20      MR. BALAREZO:  That's fine, Your Honor.  I'm done.
21      THE COURT:  Does the government have anything for
22  this witness?
23      MS. LIEBER:  Two questions.
24      THE COURT:  Fine.
25      Mr. Lyons, do you have questions?

---

                                                    10

1      MR. LYONS:  NO, Your Honor.
2      MR. BALAREZO:  That's all I have, Your Honor.
3      THE COURT:  Thank you.
4              CROSS EXAMINATION
5  BY MS. LIEBER:
6  Q.  Good afternoon, sir.
7  A.  Hi.
8  Q.  I'll be quick.
9      sir, just so we're clear, you never set foot inside that
10  warehouse space when Mr. Maynard had his business there; is
11  that right?
12  A.  NO.
13  Q.  okay.  So basically, you just saw a truck come and go
14  every once and a while; is that right?
15  A.  Yes.
16      MS. LIEBER:  .That's all I have.
17      THE COURT:  Anything else?
18      MR. BALAREZO:  No.
19      THE COURT:  All right.  Thank you, sir, you may step
20  down.
21      (witness excused.)
22      THE COURT:  Ladies and gentlemen, tomorrow we'll
23  start at -- will we be ready at 9:30?  okay.  Good.  And I'll
24  have more specific instructions then.
25      Thank you, have a good evening.  Do not discuss the





(Exhibit # 5)

Sworned Declara
LeyVANce Howard

I, LeyVANce Howard swears under Penalty of
perjury (28 U.s.c.1746) That This sworn
declaration is correct accurate and true

On Saturday, June 23 2012, I was Shown two Photo's
one where it's Three significant items, a Long sleeves-
shirt, some work overall and, a H+M. sport jacket
which was given to me Lawrence Maynard
some time after February, 2004 but befor June 30, 2004
The reason, I remember This Time because it was
Club Levels Grand Opening in, February 2004 and it
was very cold out side.

I also view another Photo with the same sport Jacket
Lawrence Maynard gave me in the Mid 2004, The work-
coverall and a box with Valentine's gift baskets

I sign and initials both Photo's and dated Them,
I want to note That, I was employed by Club levels
from day one, Antoine Jones allow me to Live in the
Club Levels and during my Stay at Club levels Lawrence
gave me The sports jacket sometime mid 2004 and
until today, I have That same sport jacket Lawrence
gave me at home.

also as an employee at club level, I work as Security
inside the club and at the front door, I would do
Handy man work and pass out ClubLevel's and Scoopie-
Soul food Cafe Flyers, during Morning of Scoopie Cafe
Hours of operation

I, LeyVance Howard, willing to take a polygraph-
Examination and Testified under oath in a
Hearing that everything, I mentioned in This sworned
Declaration Under Penalty of Perjury, is correct
Accurate and True


Respectfully Submitted by
6-23-12
LeyVance S Howard
1104 Queen st NE #1
Washington DC 20002
02

Joy Thomas
Notary Public, District of Columbia
My Commission Expires 8/2013

2245 16. st NE
Washington DC 20018



Lawrence
Shirt

Lawrence
Jacket

(Coverall)



Box of
Valentine's
Day Gift
Baskets
∨

TASTYKAKE

↑
Lawrence
Jacket

He
Took
Home

Brand
New
Window
Table
At club
Levels

( Exhibit # 7 )

Need to ADD

photos from

Club levels

Property from
the warehouse



Ice
Bill
KAT
Fred.

① ✳ LiTE Blue moving BLANKETS
② ✳ white Box - Shrink wrap
③ ✳ BRown coverAlls - HAnging on wall

4/30/04   11:15 P?

OBSTRUCTION
OF JUSTICE
18 USC 1001
18 USC 1519

K9 Scratched Real Close to FLOOR (concreT) And
DRYWAll



* Photo index from search of warehouse (4/30/08)
post recovery of 30NES (HAYWARD.
Customs K-9 positive hit for narcotics

*obstruction of Justice*



# U.S. CUSTOMS AND BORDER PROTECTION
## Department of Homeland Security

*Memorandum*

TO        : SAIC Baltimore Airport Group

SUBJECT:  CBP K-9 Assist P.G. County Maryland

DATE      : April 30, 2004 (Search Date)

CBP K-9 assisted the Baltimore ICE Airport Group with searching a warehouse in P.G. County Maryland. Customs Narcotics Detector Dog (NDD) Kally #CA22 searched intently the concrete floor and the interior walls of the warehouse and gave a positive alert to the scent of narcotics to a white box that contained rolls of plastic shrink-wrap. A pair of brown coveralls that were hanging on the wall and blue moving blankets that was stored on top and below a table. All areas that the K-9 alerted to were conveyed to the ICE Agents on the scene

Michael G. Sharpe
Canine Enforcement Officer
Baltimore, Maryland

*Vigilance*  ★  *Service*  ★  *Integrity*

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | 1. PAGE   3 |
|---|---|
| | 2. CASE NUMBER BA02BR04BA0012 |
| R E P O R T   O F   I N V E S T I G A T I O N C O N T I N U A T I O N | 3. REPORT NUMBER: 005 |

* A white Mercury two-door vehicle, MD registration HDC762 to Lawrence MAYNARD, was continuously parked in the parking area in front of the warehouse. This vehicle never left the parking area and remained there some time after JONES et al vacated the warehouse premises.
* MAYNARD frequented the warehouse several times during the week but not on a daily basis, driving the white Isuzu box truck (MD 63M462) which is registered to JONES. He usually parked the box truck outside. Only twice during the 35-day surveillance period did MAYNARD drive the truck into the loading area. The box truck remained in the loading area with the garage door closed in both instances for approximately one hour. Video surveillance was unable to record any activity occurring inside of the warehouse.
* JONES frequented the warehouse only a few times during the 35-day surveillance for short periods of time. JONES always drove a silvery/champagne 2001 Jeep Cherokee registered in his name (MD M667480). JONES parked his Jeep Cherokee in the loading area behind a closed door on one occasion.
* Deniece JONES, a.k.a. Deniece JOHNSON did not appear at the warehouse at all during the surveillance.
* Four unidentified vehicles, a dark green van, a dark green sedan, a dark sedan and a small white box truck with a black stripe, also visited the warehouse and parked inside the loading area for a short period of time each. The individuals driving the vehicles were also not identified.
* During the 35-day surveillance period, no deliveries were ever made and no apparent legitimate business activity was observed, but basically only the comings and goings of MAYNARD and JONES.

On April 13, 2004, JONES notified the landlord in writing that he was breaking the lease early and vacating the warehouse on April 30, 2004. The letterhead for this communication displayed JONES' 12221 Brandywine Road address as the address of FTN Consultants.

On April 30, 2004, after JONES et al had vacated, your writer obtained permission and keys from the landlord to enter and search the warehouse. In the evening of April 30, 2004, SAC Baltimore agents and CBP Canine Enforcement Officer (CEO) Michael G. Sharpe entered and searched the warehouse. Agents observed several large boxes of shrink wrap, battery operated inflatable mattresses and several moving blankets. Agents also observed that the small windows on the garage door had been covered from the inside by a vinyl and cloth material.

CBP Narcotics Detector Dog Kally #CA22 gave a positive alert to the scent of narcotics, concentrating on three areas:

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

18 USCS 1001
) 519

Obstruction of Justice

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | 1. PAGE   4 |
|---|---|
| | 2. CASE NUMBER BA02BR04BA0012 |
| R E P O R T   O F   I N V E S T I G A T I O N  C O N T I N U A T I O N | 3. REPORT NUMBER: 005 |

* a white box that contained rolls of plastic shrink wrap;
* a pair of brown coveralls that were hanging on the wall and
* blue moving blankets that were stored on top of and below a table.

Photographs were taken of the warehouse, including the narcotics alert areas, but nothing was removed from the premises. Agents and officers departed the warehouse without incident and your writer returned the keys to the landlord the next business day on May 3, 2004.

This investigation continues.

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

REQUESTED BY:  GIKAS, KATERINA
O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N | 1. TECS ACCESS CODE 3 |
|---|---|
| | 2. PAGE    1 |
| | 3. CASE NUMBER BA02BR04BA0012 |

4. TITLE: 3 UNKNOWN HISPANIC/MEXICAN MALES

5. CASE STATUS:    INTERIM RPT

| 6. REPORT DATE<br>050605 | 7. DATE ASSIGNED<br>022704 | 8. CLASS<br>3 | 9. PROGRAM CODE<br>153 | 10. REPORT NO.<br>005 |
|---|---|---|---|---|

11. RELATED CASE NUMBERS:    MC13CR04MC0106

12. COLLATERAL REQ:

13. TYPE OF REPORT:
   INVESTIGATIVE FINDINGS

TOPIC: ID AND SURVEILLANCE OF WAREHOUSE IN CAPITOL HGTS, MD

14. SYNOPSIS:
On February 6, 2004 the Office of the Special Agent in Charge, Baltimore (SAC
Baltimore) initiated an investigation on three unknown Hispanic males while on
surveillance in Hanover, Maryland who are believed to be part of a narcotics
organization and involved in the transportation of narcotics proceeds from
Maryland to Mexico.

SAC Baltimore identified a <u>warehouse in Capitol Heights, Maryland</u> leased by
Antoine JONES in November, 2003 to facilitate the collection and
transportation of illegal narcotics proceeds on behalf of a Mexican-based
narcotics organization, and possibly the packing and distribution of
narcotics.  SAC Baltimore conducted 24-hour surveillance of the warehouse and
observed JONES and Lawrence MAYNARD frequenting the warehouse but observed no
apparent legitimate business activity.  A consent search of the location with
a <u>Customs and Border Protection (CBP) Narcotics Detector Dog, after JONES</u> et
al vacated the premises, <u>resulted in a positive alert for narcotics.</u>  18USC/001
                                                                              1519

| 15. DISTRIBUTION:<br>SACBA | 16. SIGNATURE: _____<br>   GIKAS        KATERINA     SENIOR SPEC AGENT |
|---|---|
| | 17. APPROVED: _____<br>   SNYDER       STEPHEN    P  SENIOR SPEC AGENT |
| | 18. ORIGIN OFFICE: BA<br>    BALTIMORE, MD - SAC | 19. TELEPHONE: 703 658 7844 |
| | | 20. TYPIST: GIKAS |

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY
OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR
DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED
TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

41

1   them.  Mrs. Jones, or Denise Jones never appeared there.

2   Antoine a handful of times.  Maynard not every day, but most

3   frequently he would show up.

4       Q.   And did he ever actually take that Isuzu box truck

5   all the way into the storage facility and shut the door?

6       A.   He did on two occasions.  But unfortunately, when he

7   did pull it into the garage, the door was closed behind him

8   and, you know, nothing could be observed as to what was

9   happening on the inside.

10      Q.   Did you or did the surveillance ever pick up anybody

11  making any legitimate deliveries to that place, supplies for

12  some sort of consulting service business or anything like

13  that?

14      A.   No, apart from the sparse comings and goings of

15  Maynard and Antoine Jones, no legitimate business activity

16  could be discerned from watching this place 24/7 for a period

17  of 35 days.

18      Q.   Okay.  And by the way, did there come a time that

19  Mr. Jones broke the lease early on that Hampton Park Boulevard

20  warehouse facility and you actually got consent to search it?

21      A.   Yes.  He, in writing, notified the landlord that he

22  was vacating by April 30th.  And on that same day, when he

23  turned the keys in to the landlord, the landlord -- so he had

24  vacated the premises.  The landlord allowed us, allowed me, he

25  gave me the key and allowed me to go in with a few other

1   agents and a customs inspector with a drug dog.

2       Q.   Okay.  And remarkably, what did you find inside the

3   security storage facility?

4       A.   In the depot area, the garage area, there were

5   several crates, boxes of shrink wrap.  There were also several

6   inflatable mattresses.  I mean, they were deflated, but there

7   were the inflatable mattresses, I mean, several inflatable

8   mattresses, some coveralls.

9       Q.   How about the windows.  Were there any windows in

10   this warehouse space?

11       A.   Yes.  The garage windows had just, you know, small

12   windows.  You probably wouldn't be able to see much in those,

13   but true to form with all their other locations, they had

14   those covered up with like pieces of carpet.  They had the

15   windows covered.  Another interesting thing, the landlord told

16   me that he thought it was odd, soon after Antoine had leased

17   this place, he had ordered a very expensive overhead door,

18   like, you know, the warehouse had locks and, you know, its own

19   locks on both the office door and the garage door, but he

20   ordered this extra -- the company is Overhead Door, and they

21   sell security doors.

22           The landlord just thought it was odd because these

23   doors are very -- he thought they were several thousand

24   dollars and he just thought it was odd that he had paid for

25   this at his own expense to secure the office area, which

1    connected to the warehouse area, because what he had been told
2    was that they were a delivery service, you know, not that they
3    would be housing or keeping any expensive merchandise at the
4    warehouse.  So he just thought that was odd.

5        Q.   When the drug dog went through, what, if anything,
6    did that dog do?

7        A.   The drug dog alerted to the presence of narcotics in
8    several areas in the depot area of the warehouse.  He alerted
9    close to the shrink wrap boxes, he alerted close to the
10   coveralls which were left kind of hanging on hooks, and near a
11   table where the deflated inflatable mattresses were near.

12       Q.   Okay.  Were any drugs actually found in that
13   warehouse space?

14       A.   No.

15       Q.   After this -- after your investigation of this
16   warehouse facility, did your personal investigation of Jones
17   sort of come to a close for the time?

18       A.   Yes.  Unfortunately, I was assigned to another
19   detail, and then subsequently, I was transferred to another
20   office.  So I was -- I had to leave the case behind because I
21   was transferred to another geographic location.  And the agent
22   who had been my group member who was also very familiar with
23   the case was slotted to get the case, and she did get it, but
24   she went out on maternity leave for almost a year, for like
25   ten months.

7. The suppliers often used large trucks to transport large shipments of cocaine, often in excess of 200 kilograms, to the Washington, D.C., area, where they unloaded it into smaller vehicles and transported it to the stash locations for storage for as much as a month at a time.

8. **JONES** also rented warehouse facilities for the same purpose. For example, on or about April 30, 2004, a search of **JONES's** warehouse space, located at the Hampton Park Storage Facility, 400 Hampton Park Boulevard, Capitol Heights, Maryland, which he rented from November 17, 2003, until he broke the lease on April 30, 2004, revealed several boxes of heat sealing wrappings and air mattresses, as well as the scent of cocaine, which was detected by a narcotics-sniffing canine.

9. **JONES** periodically collected money from some of his co-conspirators, including **JOHNSON, JACKSON, HUGGINS, HOLLAND, CARTER,** and others known and unknown to the Grand Jury. **JONES** then visited a storage location, and met with **BREMEA** and others, known and unknown to the Grand Jury, to deliver quantities of cash, and pick up multiple-kilogram quantities of cocaine for distribution to these co-conspirators. For example, on September 28, 2005, **JONES** met with **HUGGINS** at his residence in Suitland, Maryland, where he remained for approximately 20 minutes. From there, **JONES** drove directly to the residence of a co-conspirator not indicted herein, but who is known to the Grand Jury, and remained for approximately 20 minutes. After another similar meeting with an individual unknown to the Grand Jury, at 9:35 p.m., **JONES** drove to a stash location, 9508 Potomac Drive, Ft. Washington, Maryland, where he met with **BREMEA** for approximately 45 minutes.

10. From at least some time in 2003, the exact date being unknown to the Grand Jury, through October 24, 2005, **JONES** supplied a number of unindicted co-conspirators, who are known to the grand jury, with kilogram and half-kilogram quantities of cocaine. **JONES** regularly

5

AFFIDAVIT

I, Gregory K. Wills was shown a photo copy of the warehouse on Hampton Park Boulevard.  It was at an angle of the entire section of the warehouse displaying the things I built. Namely,  the stand for the air conditioner, the window for the office, the shelves under the wall that the peg board was to be built.  This is the photo of Ice Exhibit # 12 and it clearly shows in this picture that there is no pegboard.  If there was a pegboard you would be able to see the dark holes and hooks on the wall, and this is one way that you could tell other than being the person who actually built it.  This also shows that I have not completed my work in the warehouse yet.

I, Gregory K. Wills swears under penalty of perjury (28 U.S.C. § 51746) that this sworn affidavit

is correct and true.

Date: _7 - 7 - 12_

Gregory K. Wills