UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES : | |
| : | |
| *v.* : | |
| : | Criminal No. 05-386(1) (ESH) |
| ANTOINE JONES : | |
| : | |
| *Defendant.* : | |

# DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTIONS

**DEFENDANT** Antoine Jones, by and through undersigned counsel, hereby submits his reply to the government's response to his pre-trial motions and as follows:

**A.     Motion to Suppress Evidence Seized at 9508 Potomac Avenue**

Jones moved to suppress all evidence seized at 9508 Potomac Drive, Ft. Washington, MD as being the derived from the illegal use of a GPS device used to track Jones. The government claims that the "GPS data from the vehicle tracker played no role in the FBI's discovery of 9508 Potomac Drive." Gov. Resp. at 4.

There is no dispute that the FBI installed the GPS device on Jones' vehicle on September 27, 2005, and that the tracking began the same day. The government's explanation for how it located the Potomac Drive house is that the day before the GPS was installed, agents contacted Nextel and received coordinates for a telephone believed to belong to a Hispanic male that had been in contact with Jones. The government's explanation is too convenient.

In considering the government's story, it is worth assessing what the government did not know at the time. First, the government asserts that "agents contacted Nextel" (O'Brien Affid. at ¶ 7 and that "one of the investigators contacted Nextel" (Gov. Resp. at 6) – thus, it

1

appears that the government cannot even identify exactly whom it was that contacted Nextel. Second, the government cannot identity whom at Nextel provided the information. Third, the government has not identified the coordinates allegedly provided to it by Nextel. Fourth, the government has not provided any documentation memorializing this purported exchange with Nextel. Fifth, the government claims that on September 26, 2005, agent O'Brien conducted visual and video surveillance of Potomac Drive once the coordinates were received. The government has provided the defense – in April 2012 and not as part of pre-trial discovery – a video purporting to be the recording of Agent O'Brien's surveillance. The sum total of the video is a littler over six minutes that does not even show a street name, let alone Potomac Drive or more importantly, when it was made.

It is also notable that the government concedes that the coordinates provided by Nextel for Reyna's telephone was "only for the moment when the request was being answered." O'Brien Affid. at ¶ 7. Therefore, if the coordinates given to the government by Nextel were for a single moment in time, how did the government know that at that time Reyna was at the stash house at that specific moment in time? The coordinate could have been for any location, yet the government claims that it immediately undertook a real estate search for houses in the area of the coordinates and then conducted surveillance. O'Brien's avers that after the coordinates were obtained, agents "entered the latitude and longitude coordinates … into Google maps which identified a location. … This location was not inside any structure, but closest to the driveway of 9508 Potomac Drive." O'Brien Affiv. at ¶ 7. Belying O'Brien's assertion is the fact that the Google maps attached to O'Brien's Affidavit, purporting to mark the coordinates near the Potomac Drive house, do not show any identifying information such as street names, city, etc. O'Brien does not explain how she knew the coordinates were for Potomac Drive. This begs the

question: how did O'Brien know that the location of the coordinates was closest to 9508 Potomac Drive?

The government also alleges that on October 4, 2005, agents surveilled Jones and Roel Bremea riding together in a vehicle near Potomac Drive. Gov. Resp. at 8. However, there is no dispute that the agents did not see Jones or Bremea go to 9508 Potomac Drive. The government further argues that

> Based on the wire intercepts, the location information for Reyna's phone, the property tax records and the agents' own physical observations, on or about October 7, 2005, a static camera was placed at 9509 Potomac Drive to watch 9508 Potomac Drive and its driveway. Jones' Jeep Cherokee was thereafter observed by the video camera going to and from 9508 Potomac Drive.

Gov. Resp. at 8.[1] Curiously, the government excludes the GPS evidence from the evidence it relied upon to place the pole camera at Potomac Drive. This assertion is nonsensical because the very reason that the GPS was installed was to track Jones' movements continuously.

What the government did know at the time is even more important. At 7:54 p.m., September 27, 2005, the wiretap records Jones speaking with alleged co-conspirator Demetris Johnson, where Jones tells Johnson that he is "waiting on a few phone calls." *See* Exh. 1 – Gov. Timeline at 20; call 2585. At 8:43 p.m., Jones is recorded speaking with John Adams, where Adams asks if anything is happening and Jones responds that he needs to get these people to go so they can come back. *Id.*; call 2585. At 8:47 p.m., Jones called Mike Huggins and talked about "these people gonna be mad at me." *Id.*; call 2600. At 8:48 p.m., Jones called Johnson again asking for some good news to give these people. *Id.*; call 2601. Then, at 8:54 p.m., the wiretap picked up a conversation between Jones and Reyna, where Jones tells Reyna that he will "see him later on" and Reyna responds that he has "more work for" Jones. *Id.*; call # 2602. At

8:57 p.m., Jones calls Adams again and tells him Jones has to run around there because he did not keep his word. *Id.* at 21; call 2603. At 9:25 p.m., Jones calls Pauline Spence and asks if anything is happening and that he is trying to get these people to go. *Id.*

Shortly after installing the GPS device on Jones' vehicle, the government had data in its possession that put Jones directly on Potomac Drive. For example, at approximately 9:27 p.m., September 27, 2005, right after Jones speaks with Johnson, Huggins, Adams, Spence[2] and Reyna, Jones' vehicle begins moving from Montana Avenue, NE (where Levels Nightclub was located) an arrives at Potomac Drive at approximately 9:50 p.m., where it remained for forty minutes before returning to Montana Avenue. *See* Exh. 2 - GPS Data.

Trial transcripts further support Jones' argument that the government located the Potomac Drive house using the illegal GPS. First, AUSA Rachel Lieber concedes as much:

> Q. And Roel Bermea, what did you and members of your team want to start doing? Did you begin to start looking for something in particular based on those calls?
> A. Yes.
> Q. What were you looking for in particular?
> A. You'd have the -- *what we're looking for actually is the stash house*. And we were trying to figure out, because generally when Mr. Jones would go to the stash house --
>
> MR. BALAREZO:     Objection. Move to strike, your Honor.
> THE COURT:          Let's approach. Excuse us, ladies and gentlemen.
> (Bench conference on the record as follows):
>
> THE COURT:          Apparently it's not in anybody's interest to have her characterizing. She's going way overboard, and I have –
>
> MS. LIEBER:          I'm happy to instruct her to wait. I can her call. They were looking for where they thought the drugs are.

---

[1] Kirschner testified that the pole camera was installed on October 12, 2005. Tr. 11/21/07 a.m., at 140:16-19.
[2] Huggins, Johnson, Adams and Spence were listed as targets in the September 30, 2005 wiretap affidavit.

    THE COURT:        Can't you just say what did they do. I don't really want, you know, we're looking for a stash house. I find that highly objectionable.

    MS. LIEBER:        We're looking for where the cocaine, this is a drug.

    THE COURT:        Tell us what you did and stop making it so that she's supposed to somehow carry this case. It's a simple case. They identified a house. How did they identify the house. Why did they identify it. She doesn't have to call it a stash house, and calling people suppliers, I really think that the defense's objection, get to the case and what she did, not that I was looking for a stash house. Sustained.

    MS. LIEBER:        Your Honor, she has to be able to say why she was looking for a particular house. She's looking for a house because they think there's drug dealing going on. That's part of the case

    THE COURT:        There's a simple way to do this. Did you in fact address why did you go there? It would be so much clearer to the jury then trying to tell them in some convoluted way how they ended up identifying this house. You could do this so much more simply and directly. We could probably get it finally.

    MS. LIEBER:        I'd be happy to do it --
    THE COURT:        Did they come to identify a house? Yes.

    MS. LIEBER:        ***Yes, but we have to talk about the GPS, because they're challenging the GPS. If we would just have everyone agree that they found it because they had good technology then we wouldn't have to go through the exercise***.

    THE COURT:        The point is, they identified this house. What did they find there? If we could get the stuff in from the house it would be so much simpler.

Tr. 11/21/07 a.m., at 99:24 – 101:23 (Norma Horne testimony) (emphasis added). During this same line of questioning, Norma Horne testified:

    Q.    And give the jury a sense of the types of ***tools you all used to help you locate this particular house*** of interest.
    A.    ***Based on GPS***, the phones, and then once we located the address we actually used the video.

Tr. 11/21/07 a.m., at 103:24 – 104:2 (emphasis added). Further, Steve Kirscher testified as follows:

5

> Q    Now, Detective Kirschner, did there come a time that your team of investigators decided to employ a GPS device on a particular vehicle with respect to this investigation?
> A    Yes, there was.
> Q    What vehicle was that?
> A    It was a jeep that was used by Antoine Jones.
> Q    Why did you all decide that that might be a helpful investigative tool?
> A    He was very mobile, driving a car to a lot of meets and stuff, which we picked up on the Title 3 wire. And to do physical surveillance it's too easy to get spotted. When you have all the time and energy invested in a Title 3, you try to do the best you can. ***So we went with the GPS so we could mark and watch where he was going***.

Tr. 11/6/06 a.m., at 32:1 – 14 (emphasis added).  Kirschner continued:

> Q    Detective Kirschner, give the jury a sense of this. After you all installed the GPS tracking device on Mr. Jones' jeep, were you able to monitor in real time where he was going?
> A.   Yes. We had a computer that had mapping software on it. And when it connected on real time, we were able to monitor where he was going.

Tr. 11/6/06 a.m., at 32:1 – 14 (emphasis added).

> Q.   And tell the jury, in your mind during the course of the investigation, how did 9508 Potomac Drive become important to you?
> A.   It became identified as the location where the supply of drugs we believed were located.
> Q.   How did you actually pinpoint that specific residence, 9508?
> A.   I didn't actually pinpoint it, but I know the method that was used.
> Q.   What method was used?
> A.   GPS through cell phones.
> Q.   Okay. When you say "through cell phones," what does that mean?
> A.   Through a cell phone company, you can, on certain phones, maybe all by now, you can pinpoint –

Tr. 11/6/06 a.m., at 32:1 – 14 (emphasis added).  Notably, the prosecutor only asked what Kirscher meant by "through cell phones" and not what he meant by "GPS."  Kirschner further testified:

> Q.   And through the use of the GPS technology *were you able to up with any association between Mr. Jones and that house*?
> A.   Yes.
> Q.   And tell the jury about that.

  A. We, *through the GPS*, we were able to monitor through the mapping software.

Tr. 11/21/07 a.m., at 120:7-12 (emphasis added).

  In her affidavit, O'Brien makes clear that based on calls to or from Jones intercepted line, "agents believed that Jones was arranging to drop off money to, or pick up cocaine from, the user of [Reyna's telephone]" who agents believed to be in the Washington DC area. *See* O'Brien Affid. at ¶ 5. O'Brien also states that based on a call on September 26, 2005, "[i]t was believed that this conversation was referring to the next shipment of cocaine to the Washington DC area." *Id*. at ¶ 6. The government obtained the wiretap order to listen to Jones calls. It placed the GPS tracker on Jones' vehicle to track him. As of September 27, 2005, the government could listen to Jones calls and track his movements. Now, it wants the Court to believe that the illegally obtained GPS had nothing to do with finding the Potomac Drive house. Gov. Resp. at 4.

  These facts more than make a *prima facie* showing of a causal nexus between the illegally obtained GPS data and the 9508 Potomac Drive house. Thus, any and all evidence seized at that location must be suppressed.

  **B.** **Independent Source and Inevitable Discovery**

  The government argues that even if the GPS had played a role in locating the 9508 Potomac Drive house, it located the house independent of the GPS and would have inevitably found it even if there had been no GPS data. Both arguments fail.

  The government claims that the day before the GPS was activated it had already "focused their investigation on 9508 Potomac Drive …." Gov. Resp. at 10. According to the government, that should be the end of the Court's inquiry. Assuming, *arguendo*, that the

government's assertions are correct, at most they had a general location that had no direct connection with Jones.  It was the GPS that put Jones on Potomac Drive.  Kirschner testified that the government thought installing a GPS was a good idea because "physical surveillance is actually hard, you know.  There's always chances of getting spotted, you know, the same vehicle always around, so we decided to use GPS technology." Tr. 11/21/07 a.m., 119:17-22.  Considering that Potomac Drive is a "quiet, dead-end street" *Id.* at 103:18, surveillance of Jones going to 9508 Potomac Drive would have been almost impossible.  As Kirshner said, that's why the government decided to use the GPS.  For the government to argue that the GPS had nothing to do with locating the house is simply not credible.

       Jones respectfully requests the Court to hold an evidentiary hearing, where Jones intends to call O'Brien, Kirchner, Horne, Yanta and Lieber[3] among others to elicit testimony that the house was located through the GPS.  Only after hearing testimony can the Court determine the extent of the taint caused by the government's use of the illegal GPS and whether the government would have inevitably found the house independent of the GPS.

---

[3] Jones asks the Court to direct the government to make these individuals available to testify at a hearing on this Motion.

**WHEREFORE**, for the foregoing reasons and any other that may become apparent, undersigned counsel respectfully requests that his Motion to Suppress Evidence Seized at 9508 Potomac Drive be **GRANTED**.

**Dated**: Washington, DC
August 8, 2012

Respectfully submitted,

**BALAREZO LAW**

By: _____
A. Eduardo Balarezo
D.C. Bar # 462659
400 Fifth Street, NW
Suite 300
Washington, DC  20001

*Counsel for Antoine Jones*

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on this 8th day of August 2012, I caused a true and correct copy of the foregoing Defendant's Reply to Government's Response to Defendant's Motions to be delivered via Electronic Case Filing to the Parties in this case. A copy has also been sent via United States Mail, postage pre-paid to:

> Antoine Jones
> DCDC # 241912
> Central Detention Facility
> 1901 D Street, SE
> Washington, DC  20001

_____
A. Eduardo Balarezo