**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| v. | ) | **Criminal Action No.  05-0386 (ESH)** |
| | ) | |
| **ANTOINE JONES,** *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

_____)

**MEMORANDUM OPINION AND ORDER**

On January 23, 2012, the Supreme Court vacated Antoine Jones' conviction under 21

U.S.C. § 846, unanimously ruling that the government's installation of a GPS device on Jones'

Jeep Cherokee and use of the device to track the Jeep's movement for a period of twenty-eight

days constituted a Fourth Amendment search.  *United States v. Jones*, 132 S. Ct. 945 (2012).

Defendant has moved to suppress all evidence seized, pursuant to a search warrant issued by a

magistrate judge, from a stash house at 9508 Potomac Drive, Fort Washington, Maryland, as the

fruits of the illegal GPS search.  (Motion to Suppress Fruits of Illegal GPS Search and Seizure,

Mar. 29, 2012 [ECF No. 605] ("Mot.").)  This evidence, which was seized on October 24, 2005,

included $850,000 in cash and 97 kilograms of powder cocaine.  The government responds that

it had identified the location of the stash house prior to installing the GPS tracking device on

Jones' Jeep, and that, regardless, it would have identified the location of the stash house and

obtained a search warrant for the premises even without the GPS data.  Thus, according to the

government, the items seized at 9508 Potomac Drive are admissible since they were not the

product of the illegally obtained GPS data.

1

At an evidentiary hearing on December 12-13, 2012, the Court heard live testimony from four witnesses: FBI Agents Yanta and O'Brien; retired MPD Detective Kirschner, and Rachel Lieber, the AUSA who oversaw the investigation and prosecuted the case at the two prior trials.[1] The parties also introduced exhibits of search warrant affidavits and documents and photos that were generated prior to the search on October 24, 2005. Based on the evidence at the hearing, the applicable case law, and the entire record, the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1.      The team of law enforcement officers investigating the drug conspiracy at issue in this case consisted of four members: FBI Special Agents Kellie O'Brien and Stephanie Yanta, and MPD Detectives Steve Kirschner and Norma Horne.

2.      Prior to September 2005, law enforcement officials knew that Jones was involved in a drug trafficking conspiracy and that he was being supplied with cocaine by individuals "belonging to or associated with Mexican cartels." (Gov. Ex. 1, O'Brien Affidavit ¶ 3.) In 2004, ICE agents had tracked several Hispanic individuals believed to be involved with a Mexican cartel to Maryland, where they went to a residence that was leased to Jones. (Kane Affidavit, Sept. 13, 2012 [ECF No. 649-1] ¶¶ 2-5.) One of the Hispanic men was driven from the airport in a vehicle with Maryland tags that was registered to Jones. (*Id.* ¶ 4.) ICE agents also saw, on a subsequent occasion, another vehicle registered to Jones outside another property used by those same Hispanic men. (*Id.* ¶¶ 6-7.) The FBI also had information from a confidential source that

---

[1] The facts relevant to this case are set forth in this Court's opinions in *United States v. Jones*, 451 F. Supp. 2d 71, 73-74 (D.D.C. 2006), and *United States v. Jones*, 511 F. Supp. 2d 74, 77-78 (D.D.C. 2007), as well as the Court's recent Memorandum Opinion relating to the admissibility of cell-site data derived from the phones that Jones was using. *See United States v. Jones*, 2012 WL 6443136 (D.D.C. Dec. 14, 2012).

Jones and his associate Lawrence Maynard mentioned narcotics coming from "the Mexicans" and "Texas."  (Yanta Affidavit, Sept. 2, 2005 [ECF No. 142-3] ¶ 33.)

3. On September 2, 2005, the FBI activated a Title III wire intercept on the cellular telephone used by Jones.  (Gov. Ex. 1, O'Brien Affidavit ¶ 4 n.1.)  With that wiretap, the FBI intercepted numerous calls between Jones and several Hispanic males, including individuals at the numbers (678) 330-7712, (713) 386-9548, and (909) 975-0975.  (*Id.* ¶¶ 4-6.)  Jones' regular contact with at least three Hispanic individuals further confirmed the FBI's understanding that Jones was involved with a Mexican drug cartel.

4. During the month of September 2005, law enforcement officers—in particular Agent O'Brien, who was the Title III administrator—intercepted several calls involving Jones and a Hispanic male at (678) 330-7712.  (*See* Gov. Ex. 4, wire intercept transcripts, at 00001-28.) These calls occurred roughly every other day, and all followed the same pattern, as exemplified by the call placed by Jones on September 7, 2005:

> [678]:  Yeah.
> Jones:  Hey, five minutes.
> [678]:  Okay man.

(*Id.* at 0004.)  Based on this pattern of phone calls, the agents believed that Jones was receiving cocaine from the person on the other end of the 678 number.  Given the agents' familiarity with the workings of Mexican drug cartels, they also believed that the Mexicans were maintaining a "stash house" for drugs and drug supplies and that the location where Jones was meeting the 678 cell phone holder was likely to be the stash house.

5. On September 15, 2005, the government sought a Pen Register and cell-site information for (678) 330-7712 to help determine who else that individual was communicating with and to identify the location of the stash house.  (Gov. Ex. 5, Pen Register Order.)

Magistrate Judge Facciola granted the application on September 16, 2005 (*id.*), and the FBI began receiving the requested information on Monday, September 19, 2005.

6.      The pattern of phone calls between Jones and the 678 number continued throughout September, including one call on September 21, 2005, two calls on September 23, 2005, and another on September 25, 2005.  (Gov. Ex. 4 at 00015-18.)

7.      On or before September 26, 2005, law enforcement officers contacted Nextel to "ping" the 678 phone and determine its location.  Agent Yanta testified that the phone call to Nextel was likely made either by herself or by Agent O'Brien; Detective Kirschner testified that he was present when the call was made and he believes it was made by Agent Yanta.  Nextel provided the latitude and longitude coordinates for the 678 phone at the particular moment in time when it was "pinged."

8.      The agents attempted to plot the coordinates on a map, but were unable to figure out how to do so.  They therefore enlisted the help of FBI Agent Tim O'Neil.  Agent O'Neil provided the team with two satellite images from Google maps showing the location of the GPS coordinates.  One contained handwriting that read: "Kelly, GPS position from Nextel, Tim O."  (Gov. Ex. 1A, satellite image.)  It contains an arrow from that text to the specific GPS coordinates provided by Nextel, which are in the driveway in the front yard of one of the houses depicted in the image.  (*Id.*)  The street is identified as "Potomac Dr."  (*Id.*)  The second image is of the same street, zoomed out, with an arrow pointing to the house nearest those GPS coordinates.  (Gov. Ex. 1B, satellite image.)

9.      Sometime during the day on September 26, 2005, and after receiving the Google maps, Agent O'Brien visited the website of the Maryland Department of Assessments and Taxation and obtained property records for every house on Potomac Drive.  (Gov. Ex. 1C,

property records.)  This date is corroborated by the footer at the bottom of the property record printouts, which show that the website was accessed and the records were printed on September 26, 2005.  (*Id.*)  Using the community plat, which identified the lot numbers, along with the property records for each lot, which provided the street address associated with each lot, Agent O'Brien was able to determine that the house closest to the Nextel coordinates was 9508 Potomac Drive.  (*Id.*)  She further determined that this house was owned by Delia Alvarez.  (*Id.*)

10.     The property records also revealed that all of the houses on Potomac Drive were owner-occupied except for two: 9508 and 9509.  (*Id.*)  The law enforcement officers believed that the stash house was unlikely to be owner-occupied because Mexican cartels do not usually keep their cocaine in locations that they can easily be connected to.

11.     Also, on September 26, 2005, Agent O'Brien and Detective Kirschner drove to Potomac Drive to conduct physical surveillance of the street.  Agent O'Brien videotaped their surveillance.  The video showed the agents driving up and down Potomac Drive twice, filming each house and catching the license plate numbers of any vehicles that could be seen in the driveways or on the street.  (*See* Gov. Ex. 6.)  During the 6-minute video, the officers trained their camera on 9508 Potomac Drive on four separate occasions, more than any other residence. From watching the video, it is clear that the officers were focused primarily on 9508. Significantly, the mini-cassette tape from which the DVD was made and the case it was stored in both bore the date September 26, 2005 (Gov. Ex. 6A), and Detective Kirschner testified that he wrote that date on the tape after they watched the video upon returning to the office.

12.     Their physical surveillance of Potomac Drive confirmed the agents' suspicion that 9508 was the likely stash house.  The front lawn was unkempt, the blinds were drawn, the house was set back from the street and partially secluded by trees, and there were no signs of

inhabitation, such as outdoor furniture or tools, except there was a white van with a temporary

Delaware plate.  (*See* Gov. Ex. 6.)  The house at 9509 had a much shorter driveway and so was

more visible from the street; it was waterfront property which meant that it was susceptible to

surveillance from the Potomac River (*see id.*), and it had a considerably higher property value

than 9508.  (*See* Gov. Ex. 1C.)

13.     Thus, based on the GPS coordinates provided by Nextel, the property records for

the Potomac Drive residences, and the officers' physical surveillance, Yanta, Kirschner, O'Brien

and Lieber knew that 9508 Potomac Drive was the stash house that was being used by Jones and

his associates.  As Lieber explained, on September 26 they had an "a-ha moment."

14.     Additionally, sometime after obtaining the property records for Potomac Drive

(but before any GPS data was accessed), the agents consulted the public records for the owners

of both 9508 and 9509.  As noted, they already knew that the owner of 9508 was a Hispanic

woman, Delia Alvarez.  The agents knew that Mexican cartels usually prefer to work with people

they are familiar with and who speak their language.  The officers consulted the public records

for Ms. Alvarez and determined that she owned several homes along the Eastern seaboard, which

was surprising given her age and income.  The owner of 9509, on the other hand, was much

older and a resident of Northwest Washington, D.C.

15.     Based on their belief that 9508 was the stash house, Detective Horne and Agent

Yanta reached out to the owner of 9509 to obtain permission to place a stationary video camera

on her property to track the comings-and-goings at the 9508 address.  None of the witnesses who

testified knew exactly when this process was initiated or what day they visited the owner of

9509.  However, the camera was eventually placed on the 9509 property around October 7, 2005,

and there was consistent testimony that it took a long time—roughly 10 days—to get the camera

installed because it took some time to get permission from the owner of the 9509 house and to complete the complicated process of getting approval and drafting a contract so the FBI could pay the owner for use of her property.  The witnesses were, however, confident that they began the process very shortly after determining, on Monday, September 26, that 9508 was the likely stash house.  Moreover, Yanta testified that the visit to the owner occurred sometime before the weekend (meaning before October 1).[2]  Given this timeline, and the fact that access to the GPS data was not immediate (*see infra* Findings of Fact ¶ 17), the Court can conclude that prior to accessing any GPS tracking data, law enforcement officials had focused *only* on 9508 Potomac Drive as the probable location of the stash house.

16.     On Tuesday, September 27, 2005—the day *after* law enforcement officers had determined that 9508 was the stash house—the GPS tracking device was placed on Jones' Jeep at approximately 4:00 p.m.

17.     The team did not begin receiving data from the GPS device until several days after its installation since there was a technical glitch with the device that prevented it from connecting to the computer in the FBI's office for the first few days.  In addition, even after the technical problem was solved, some time elapsed before Kirschner actually began to monitor and analyze the output from the GPS.  While he periodically reported on his analysis, no one could say when they first learned that the GPS showed that Jones' Jeep had been to Potomac Drive, and, in fact, as the GPS data demonstrated, the coordinates never reflected the address as 9508 Potomac Drive, but only other addresses nearby that house.  (Gov. Exs. 13, 14, 15.)  According to Agent O'Brien, the GPS data did not influence the investigators in any way, and in fact, she

---

[2] Kirschner testified that he thought he was along for the visit to the owner of 9509 Potomac Drive, but he remained in the car and did not go in to meet with her.  He could not recall if that visit occurred before or after the GPS data was accessed.

believed that she did not learn about the results of the GPS tracking until after the search was conducted on October 24, 2005.  Lieber also testified that they could not access the GPS data "for days," which was frustrating to her, and it played *no* role in their investigation in September and early October.  Rather, at some later point it served as confirmation of what they already knew.

18.     Even after agents had identified 9508 Potomac Drive as the stash house, they continued their investigation through multiple means, of which the GPS tracking device was only one.

19.     First, the agents continued to track Jones' calls through their Title III wiretap.  In response to intercepted calls, they also conducted physical surveillance of Potomac Drive.  For example, on October 4, 2005, agents intercepted a phone call at 11:19 a.m. suggesting that Jones would be heading to the stash house "in about ten minutes" to meet Roel Bermea.  (*See* Gov. Ex. 4 at 00033.)  Agent O'Brien then went out to conduct physical surveillance of the Potomac Drive area and saw Jones turn onto the neighboring street—Sandy Bar Drive—in the direction of Potomac Drive at approximately 11:30 a.m.  He and Bermea then drove back by Agent O'Brien's position several times, allowing her to photograph them in their vehicles.  (*See* Gov. Exs. 8A-8D.)

20.     Law enforcement officers also installed a stationary camera in a drop vehicle at 9509 Potomac Drive on October 7, 2005, to track activity at 9508.  Still images from that camera were taken on October 14 and October 20 and showed the cars previously driven by both Jones and Bermea coming and going from 9508 Potomac Drive.  (*See* Gov. Exs. 9-12.)

21.     Thus, using means entirely separate and apart from the illegal GPS tracking device, law enforcement officers were able to confirm that 9508 Potomac Drive was being used

as a stash house, that Jones communicated with Hispanics at that location, and that he traveled there in his Jeep.

22. On October 22, 2005, Agent Yanta submitted an affidavit seeking authorization to conduct searches as to several residences, including 9508 Potomac Drive. That affidavit detailed many of the calls that had been intercepted through the Title III wiretap. It explained that several calls had been intercepted in which Jones arranged to meet with a Hispanic male, and that shortly after those calls, Jones was "surveilled at 9508 Potomac Drive in Ft. Washington, Maryland, which is believed to be a stash location." (Gov. Ex. 16, October 22, 2005 Affidavit ¶ 28.) Later, it described the same process, stating that "after some of these calls, physical surveillance of JONES revealed that JONES was at the suspected stash location on Potomac Drive in Ft. Washington, Maryland." (*Id.* ¶ 40.) It cannot be determined what is encompassed by the reference to "surveilled." The officers obtained a search warrant for 9508 Potomac Drive on October 22, 2005, and executed the warrant on October 24, 2005.

23. The defense insists that it is not credible that law enforcement had identified 9508 Potomac Drive as the stash house prior to attaching the GPS tracking device to Jones' Jeep on September 27, 2005. As argued by defense counsel, the prosecutors did not rely on any of this as evidence to demonstrate how they found 9508 Potomac Drive at either of the first two trials, and thus, defense counsel suggested that the evidence did not exist in late September 2005 but was created after the Supreme Court's decision in this case banning the use of the GPS data. In support of this claim, defense counsel introduced a subpoena he had served on Sprint requesting any records they had provided in response to a request for information relating to the 678 number on or before September 26, 2005. (Def. Ex. 4, subpoena and response.) Sprint responded that "a

thorough search has been completed and no records were found for the requested numbers during the requested time period." (*Id.*)

24.     The Court rejects counsel's attempt to discredit the government's persuasive evidence, for it finds that the testimony of the law enforcement witnesses was credible, consistent, and corroborated by a wealth of physical evidence.  It is not surprising that the government did not rely on this evidence in previous trials; in light of the GPS data that connected Jones to the stash house at 9508 Potomac Drive, the government did not need to spend time at trial explaining all of the other investigative techniques they used to identify that location. Additionally, there is no evidence as to whether or how records of law enforcement requests for information were kept by Nextel in 2005 or by Sprint, which acquired Nextel in 2005. Moreover, his subpoena sought "all *recorded, written, and electronic* records and notes" regarding the ping of the 678 phone, but Agent Yanta testified that the coordinates were provided orally by Nextel during a phone call.  Thus, the Court's findings are not undermined by the current absence of any document reflecting Nextel's ping of the 678 number.

## CONCLUSIONS OF LAW

1.     The Supreme Court in *Jones* held that the government's installation of a GPS device on Jones' Jeep and use of that device to track the Jeep's movement for a period of twenty-eight days violated the Fourth Amendment.  132 S.Ct. at 949.  Thus, the GPS data itself is clearly inadmissible at trial.  Defendant, however, argues that law enforcement officers utilized the GPS data to locate the stash house at 9508 Potomac Drive, and thus all evidence found in the stash house must also be suppressed as the "fruit of the poisonous tree."  *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).  (Mot. at 3.)

2.      It is true that "the exclusionary rule applies not only to the illegally obtained evidence itself, but also to other incriminating evidence derived from the primary evidence." *Nix v. Williams*, 467 U.S. 431, 441 (1984) (citing *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920)).  To prevail on a motion to suppress derivative evidence, "the defendant must make a prima facie showing of a causal nexus between the Fourth Amendment violation and the evidence he seeks to suppress." *United States v. Holmes*, 505 F.3d 1288, 1292 (D.C. Cir. 2007). If the defendant meets that burden, "the evidence must be suppressed unless the government proves, by a preponderance of evidence, that the evidence would have been discovered inevitably, [or] was discovered through independent means." *Id.* at 1293 (citing *Alderman v. United States*, 394 U.S. 165, 183 (1969)).

3.      The independent source exception to the exclusionary rule "allows admission of evidence that has been discovered by means wholly independent of any constitutional violation." *Nix*, 467 U.S. at 443.  This is appropriate because "exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation." *Murray v. United States*, 487 U.S. 533, 537 (1988) (quoting *Nix*, 467 U.S. at 443).

4.      The inevitable discovery exception is an extension of the independent source doctrine; "[s]ince the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered." *Id.* at 539.  Thus, the inevitable discovery exception will prevent exclusion of evidence "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix*, 467 U.S. at 444.

5.      Here, the Court concludes that defendant has not met his burden of establishing that, "but for the illegal [GPS search], the officers likely would not have discovered [the stash

house and the evidence contained therein]." *Holmes*, 505 F.3d at 1292. To the contrary, on September 26, 2005, a day *before* the GPS device was even attached to Jones' car, law enforcement officials had determined that 9508 Potomac Drive was the likely stash house based on: (1) the GPS coordinates from the "ping" to the 678 cell phone; (2) property records confirming that only 9508 and 9509 Potomac Drive were not owner-occupied; and (3) the physical appearance of 9508 Potomac Drive as compared to the other houses on the street. (*See supra* Findings of Fact ¶¶ 7-13.) They had also initiated the process of installing a stationary camera at 9509 Potomac Drive before they began accessing data from the GPS device. (*See supra* Findings of Fact ¶¶ 15-17.)

6.     The Court further concludes that even if defendant could demonstrate a causal nexus between the GPS data and the location of the stash house, the evidence would be admissible under the inevitable discovery doctrine. After the GPS device was installed on Jones' Jeep, law enforcement officers continued to obtain information from independent—and lawful— sources that confirmed that 9508 Potomac Drive was in fact the stash house. For example, they continued to monitor the Title III wiretap and on October 4, 2005, they observed Jones and his associate Roel Bermea driving to and from the Potomac Drive area. (*See supra* Findings of Fact ¶ 19.) They also succeeded in installing a stationary camera at 9509 Potomac Drive and obtained visual confirmation that Jones and Bermea frequented the 9508 address. (*See supra* Findings of Fact ¶ 20.) Thus, even if the Court were not convinced that law enforcement officers had in fact identified 9508 Potomac Drive as the stash house prior to the installation of the GPS device on defendant's Jeep, the government has met its burden of showing that, absent the constitutional violation, it would inevitably have confirmed the location of the stash house using entirely lawful

means, and would have been able to demonstrate probable cause sufficient to obtain a search

warrant for the 9508 Potomac Drive residence without any reliance on the illegal GPS data.

7.      At the hearing, defense counsel argued that the unlawful GPS data is inextricably

intertwined with the lawful investigative techniques that were also used by law enforcement

officers to identify the stash house, so that a court cannot possibly determine what would have

happened absent that data.  This same argument was raised and rejected in a similar case in

Michigan earlier this year.  In *United States v. Luna-Santillanes*, 2012 WL 1019601 (E.D. Mich.

Mar. 26, 2012), the government had installed GPS devices on three vehicles used by various

members of a drug conspiracy and eventually used information obtained from the tracking

devices—among other things—to get a warrant for a residence that was being used for drug

activity.  *Id.* at *1-4.  In moving to suppress the evidence found in the cars and at the residence,

one of the defendants argued that "it is impossible for the government to untangle the

information gleaned from the unwarranted use of the three GPS devices and the actions taken by

law enforcement in their investigation."  *Id.* at *4.  The court disagreed.  It noted that law

enforcement officers had already tied the residence to the defendants, their cars, and to drug

trafficking activities prior to the installation of the GPS devices.  *Id.* at *8.  Additionally, even

after the GPS devices had been installed, the officers continued to obtain information from cell-

site information obtained pursuant to a valid search warrant, from their confidential source and

from physical surveillance.  *Id.* at *9.  Thus, the court held:

> Ignoring the monitoring information obtained by the GPS devices, probable cause
> existed to search the River Rouge residence.  Because the evidence seized from
> that residence during the July 8, 2011 execution of the search warrant inevitably
> would have been discovered absent use of any GPS monitoring, Defendants'
> motions seeking to suppress this evidence are denied.

*Id.* Here, as in *Luna-Santillanes*, the Court has no trouble separating the lawful and unlawful investigative activities and is confident that law enforcement officials would have obtained a search warrant[3] for 9508 Potomac Drive absent use of any GPS monitoring.[4]

## CONCLUSION

For the reasons set forth above, defendant's Motion to Suppress the Fruits of the Illegal GPS Search and Seizure will be **DENIED**.

/s/<br>
ELLEN SEGAL HUVELLE<br>
United States District Judge

Date:   December 20, 2012

---

[3] In fact, as indicated by Findings of Fact ¶ 22, *supra*, and note 4, *infra*, the officers may in fact have obtained the warrant to search 9508 without reliance on the GPS data, but the Court cannot, based on the record before it, make that finding.  (*See also infra* note 4.)

[4] In declining to apply the exclusionary rule, the Court does not rely on the independent source doctrine laid out in *Murray*.  There, law enforcement officers unlawfully entered a warehouse without a search warrant; however, they later obtained a search warrant without relying on any observations they made during that unlawful entry, and legally searched the property.  487 U.S. at 535-36.  The Supreme Court held that if the later acquisition of the warrant was unrelated to the earlier unlawful entry, then the evidence obtained from the search of the warehouse need not be excluded.  *Id.* at 541.  Here, the Court cannot say with confidence that the search warrant for the 9508 Potomac Drive property was obtained independently from the GPS data.  Although the affidavit supporting the warrant does not reference "GPS" data, it repeatedly references "surveillance" or "physical surveillance" without specifying the type of surveillance conducted.  (*See* Gov. Ex. 16, October 22, 2005 Affidavit ¶¶ 28, 40; *see also supra* Findings of Fact ¶ 22.)  Thus, the Court is hesitant to conclude that the officers in fact obtained the search warrant for the 9508 property independently of the illegally-obtained evidence.