PE₁

CLERK OF COURT OFFICE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA CIRCUIT

UNITED STATES

        v              CR NO - 05 - 386 (ESH)

ANTOINE JONES

        DEFENDANT


DEFENDANT'S PRO SE MOTION TO RECONSIDER
MOTION TO SUPPRESS EVIDENCE SEIZED FROM
10870 MOORE STREET, WALDORF, MD.


    DEFENDANT ANTOINE JONES (PRO SE REPRESENTA-
TION) RESPECTFULLY MOVES THIS HONORABLE COURT
PURSUANT TO FEDERAL CRIMINAL RULES OF CRIMINAL
PROCEDURE 41, 180 SC § 2234, 180SC 2236, 180 SC
3109 AND THE FOURTH AMENDMENT AND THE DUE
PROCESS CLAUSE OF THE UNITED STATES CONSTITUTION,
TO RECONSIDER IT'S DENIAL OF DEFENDANT JONES
PREVIOSLY FILED MOTIONS TO SUPPRESS EVIDENCE
SEIZED FROM 10870 MOORE STREET, WALDORF, MD.


    IN SUPPORT THERE OF JONES STATES THE FOLLOW-
ING FACTS.


    DEFENDANT JONES IN THE PAST TWO PRETRIALS
HAS DUE DILIGENTLY PRESENTED EVIDENCE OF AN
UNLAWFUL SEARCH OF THE MOORE STREET HOUSE.

PG 2

IN THIS 3RD PRETRIAL DEFENDANT JONES HAS SUBMITTED SWORN DECLARATIONS UNDER PENALTY OF PERJURY BY DEFENDANT JONES, MRS DENECE JONES AND ANTOINE JONES JR. ON THE UNLAWFUL SEARCH OF THE MOORE STREET HOUSE.

EVEN ON THE TUE, APRIL 3, 2012 - 2:13 PM STATUS HEARING PG 5 LINE 14-25 AND PG 6 LINE 1-15 (EXHIBIT #1) DEFENDANT JONES SPOKE IN OPEN COURT ON THIS UNLAWFUL SEARCH OF THE MOORE STREET HOUSE.

## STATEMENT OF FACTS

IN THE FIRST TRIAL DEFENDANT JONES' WIFE MRS DENECE JONES TESTIFIED UNDER OATH THAT THE FBI AGENTS ENTERED THE MOORE STREET HOUSE AT 4:45 AM. (EXHIBIT #2) PG 33 LINE 7-12

Q: MR BALAREZO: MRS JONES, ON OCTOBER @OCTOBER 24, WHEN LAW ENFORCEMENT CAME TO ARREST YOUR HUSBAND, WERE YOU ASLEEP?

A: YES, I WAS

Q: DO YOU RECALL WHAT TIME IT WAS THAT THEY SHOWED UP TO ARREST YOUR HUSBAND?

Pg 3

A: 4:45 IN THE MORNING

IT'S CLEAR LEGAL LANGUAGE THAT READS 41 (A) (2) (B): "DAYTIME MEANS THE HOURS BETWEEN 6:00 AM AND 10:00 PM ACCORDING TO LOCAL TIME (EXHIBIT #3)

THE BOTTOM LINE IS THAT THE MOORE STREET SEARCH SHOULD HAVE BEEN EXECUTED DURING THE DAYTIME - MEANING 6:00 AM TO 10:00 PM

SPECIAL AGENT NAUGLE DID NOT COMPLY WITH TERMS OF THE SEARCH WARRANT AND WHEN AGENT NAUGLE AND HIS SEARCH TEAM ENTERED THE MOORE STREET RESIDENCE AT NIGHT (4:45 AM) WITH A WARRANT THAT ONLY AUTHORIZED DAY TIME SEARCH (6:00 AM TO 10:00 PM) IS THE EQUIVALENT OF ENTERING WITHOUT A WARRANT AT ALL. O'ROURKE 875 F.2D AT 1974, SEE E.G. ELEUTERI V. RICHMAN 43 NJ SUPER. 303 128 A.2D 743, 747 (NJ SUP. CT 1956) (HOLDING THAT AN ILLEGAL SEARCHES IS ACTION-ABLE TRESPASS) WALSH V TAYLOR 39 MD 592 (MD 1874) WHERE A PERSON HAS... EXCEEDED HIS AUTHORITY BY DOING WHAT HE WAS NOT AUTHORIZED OR JUSTIFIED IN DOING HE BECAME A TRESPASSER ... ASSOCS. DISCOURT CORP V. HILLER 262 MD 570, 278 A.2D 592, 596 (MD 1971)

Pg 4

ON THE THIRD TRIAL ON FEBRUARY 14, 2013 DEFENSE WITNESS MRS DENIECE JONES TESTIFIED UNDER OATH THAT THE AGENTS ENTERED THE MOORE STREET HOUSE AT 4:45 AM, THEY NEVER SHOWED OR PRESENTED A SEARCH WARRANT OR ATTACHMENT A, AND MRS DENIECE JONES TESTIFIED THAT AT THE 4:45 AM TIME SHE HEARD THE AGENT OPENED THE FRONT DOOR WITH A KEY.

SPECIAL NOTE: THE FRONT DOOR WAS A SPECIAL LOCK AND ONCE IT IS OPEN YOU WILL HEAR A LOUD CLICK THROUGH THE HOUSE.

RULE 41 F VIOLATION

DEFENSE WITNESS MRS DENIECE JONES TESTIFIED THAT THE AGENTS DID NOT PRESENT A COPY OF THE WARRANT OR THE ATTACHMENT A.

RULE 41 (F) MANDATES THAT THE OFFICERS EXECUTING THE WARRANT MUST... GIVE A COPY OF THE WARRANT AND A RECEIPT FOR THE PROPERTY TAKEN TO THE PERSON FROM WHOM, OR FROM WHOSE THE OFFICER TOOK THE PROPERTY.

RULE 41 (F) MUST BE INTERPRETED IN THE LIGHT

P6

OF THE IMPORTANT POLICIES UNDERLYING THE
WARRANT REQUIREMENT TO PROVIDE THE PROPERTY
OWNER ASSURANCE AND NOTICE DURING THE SEARCH.

THE SUPREME COURT HAS REPEATEDLY HELD THAT
AN ESSENTIAL FUNCTION OF THE WARRANT IS TO
ASSURE THE INDIVIDUAL WHOSE PROPERTY IS SEARCHED
OR SEIZED OF THE LAWFUL AUTHORITY OF THE EXECUT-
ING OFFICER, HIS NEED TO SEARCH, AND THE LIMITS
OF HIS POWER TO SEARCH.

UNITED STATES V. CHADWICK 733 US 1, 9 (1977)
SEE ALSO MICHIGAN V. TYLER 436 US 499 (1978) (A
MAJOR FUNCTION OF THE WARRANT IS TO PROVIDE
THE PROPERTY OWNER WITH SUFFICIENT INFORMA-
TION TO ASSURE HIM OF THE ENTRY'S LEGALITY)
UNITED STATES V. MARTINEZ 428 US 543 (1976)
(WITHOUT A WARRANT THE OCCUPANT HAS NO WAY
OF KNOWING WHETHER THE INSPECTOR HIMSELF IS
ACTING UNDER PROPER AUTHORIZATION). (QUOTING
CAMERA V MUNICIPAL COURT 387 US 523, 532
(1967)

GOVERNMENT WITNESS AGENT NAUGLE WASN'T
SURE HE SHOWED MRS DENEECE JONES A SEARCH
WARRANT. BUT HE STATED HE THINKS HE LEFT THE

PG
6

WARRANT BEHIND ON THE DINING ROOM TABLE

PG 81 LINE 6-12

(Q): SO YOU SAID THAT YOU PUT HANDCUFFS ON
MR AND MRS JONES, CORRECT? AND YOU
BROUGHT THEM DOWN STAIRS, AND YOU'RE NOT
SURE - YOU'RE NOT FOR SURE WHEN DID YOU
SHOW MR. OR MRS JONES THIS SEARCH WARRANT,
DO YOU?

(A): YEAH, I DON'T KNOW IF WE SHOWED IT TO
YOU AND MRS. JONES AT THE TIME RIGHT
WHEN WE GOT IN THERE. ONCE THINGS CALMED
DOWN WE MAY HAVE SHOWED THIS.

PG 82 LINE 17-20

(Q): AGENT NAUGLE, WHEN YOU SAID YOU LEFT
BEHIND THE SEARCH WARRANT, WHERE DID
YOU LEAVE THE SEARCH WARRANT AT?

(A): I THINK IT WAS ON THE TABLE. I THINK
MAYBE LIVING ROOM, DINING ROOM TABLE.


IT'S ON RECORD THROUGH MRS. RENIECE JONES
TESTIMONY AND THROUGH AGENT NAUGLE TESTIMONY
THAT MR JONES AND MRS. JONES WAS IN THE NUDE,
NO THREAT TO THE AGENTS. ONCE MR. AND MRS.
JONES PUT SOME CLOTHES ON, AGENT NAUGLE
HAD NO EXCUSE IN PRESENTING THE SEARCH
WARRANT TO THE JONES ESPECIALLY AFTER MR JONES

PG 7

ON NUMEROUS ~~OO~~ OCCASIONS REQUESTED THE
SEARCH WARRANT FROM THE AGENTS, AND THE
AGENTS STILL DECLINE TO GIVE MR. JONES THE
SEARCH WARRANT.

PG 77 LINE 10-13
(Q): AGENT NAUGLE, WHEN YOU SAID YOU LEFT
BEHIND THE SEARCH WARRANT, WHERE DID
YOU LEAVE THE SEARCH WARRANT AT?
(A): I THINK IT WAS ON THE TABLE. I THINK
MAYBE LIVING ROOM, DINING ROOM TABLE.

~~GT'S ON RECORD THROUGH MRS~~
PG 78 LINE 18-20
(Q): DID MR. JONES LOOK LIKE HE WAS A
THREAT TO THE AGENTS WHEN HE WAS
ON THE NUDE
(A): NO, NOT AT THAT POINT

PG 81 LINE 6-11
(Q): SO YOU SAID THAT YOU PUT HANDCUFFS ON
MRS. JONES AND MR JONES CORRECT, AND YOU
BROUGHT THEM DOWNSTAIRS, AND YOU'RE NOT
SURE - - YOU'RE NOT SURE WHEN DID YOU
SHOW MR. OR MRS. JONES THIS SEARCH
WARRANT, DO YOU?
(A): YEAH, I DON'T KNOW IF WE SHOWED

PG 8

IT TO YOU AND MRS. JONES AT THE TIME RIGHT
WHEN WE GOT IN THERE.

PG 82 LINE 17-20
(Q): AGENT NAUGLE, WHEN YOU SAID YOU LEFT
BEHIND THE SEARCH WARRANT, WHERE DID YOU
LEAVE THE SEARCH WARRANT?
(A): I THINK IT WAS ON THE TABLE. I THINK
MAYBE LIVING ROOM, DINING ROOM TABLE

~~EXHIBIT~~

(EXHIBIT #3) IS THE PROPERTY RECEIPTS THAT
MRS. JONES TESTIFIED SHE SIGNED AND THE
SEARCH WARRANT RETURNED IS THE DOCUMENT
THAT AGENT NAUGLE TESTIFIED THAT HE PRINTED
MRS. JONES NAME.

THERE IS NO SEARCH WARRANT OR ATTACHMENT
A SHOWN IN THIS PHOTO AND MRS. JONES TESTIFIED
THAT THE PROPERTY RECEIPTS WAS THE ONLY THING
THAT WAS GIVEN TO HER TO SIGN AND THE ONLY
THING MRS. JONES WAS LEFT WITH WAS THE FIVE
PROPERTY RECEIPTS AND THE SEARCH WARRANT RETURNED
WHICH IS A CLEAR AND DELIBERATE VIOLATION OF
RULE 41(F).

(EXHIBIT #5) ARE SEARCH WARRANT SHOWN IN JOHN ADAM'S HOUSE, WHERE YOU CAN SEE THE SEARCH WARRANT PRESENT WITH MRS. AND MR. ~~????~~ ADAMS.

(EXHIBIT #6) ARE SEARCH WARRANTS ON THE TABLE OF MIKE HUGGINS WITH HIS SON PRESENT IN THE PHOTO.

(EXHIBIT #7) THE SEARCH WARRANT IS PRESENT ON THE WALL OF THE POTOMAC DRIVE HOUSE.

THE POINT MADE IN THE OTHERS' SEARCH, THE SEARCH WARRANT AND ATTACHMENT A IS CLEARLY SEEN IN THE PHOTOS AND THE MOORE STREET HOUSE THERE'S NO SEARCH WARRANT OR ATTACHMENT A SEEN.

18 USC § 3109
AGENT NAUGLE VIOLATED 18 USC § 3109 WHEN HE USED AN UNAUTHORIZED DOOR KEY TO UNLAWFULLY OPEN AND ENTER THE MOORE STREET HOUSE.

THE 18 USC § 3109 STATURE WAS SET TO GIVE THE OCCUPANT TIME TO PUT THEIR CLOTHES ON AND LET THE OFFICER INTO THE RESIDENT.

SPECIAL NOTE : DEFENDANT JONES ALREADY SUBMITTED TWO SWORN AFFIDAVITS ON THE UNLAWFUL SEARCH OF THE MOORE STREET HOUSE AND NOW DEFENDANT JONES SUBMITTING A JANUARY 19, 2013 POLYGRAPH EXAMINATION MR. JONES TOOK AT DC JAIL WHERE HE PASSED THE QUESTION #6. BEFORE 6:00 AM. ON OCTOBER 24, 2005, DID YOU OBSERVE THE FBI AGENTS TRYING TO UNLOCK YOUR MOORE STREET DOOR? ANSWER, YES QUESTION #7 BEFORE 6:00 AM ON OCTOBER 24, 2005, AFTER THE FBI AGENT ACTIVATED YOUR ALARM, DID THEY GET THE CODE FROM YOUR WIFE TO DEACTIVATE THE ALARM? ANSWER YES

AGENT NANGLE AND HIS TEAM NOT ONLY UN-LAWFULLY ENTERED THE MOORE STREET HOUSE BEFORE 6:00 AM, THEY USED AN UNAUTHORIZED KEY TO UNLAWFULLY ENTER THE HOUSE, TO EXCEED THEIR AUTHORITY, THE AGENTS NEVER PRESENTED A SEARCH WARRANT OR SHOW AN ATTACHMENT A, NOR DID THE AGENT PROPERLY GO OVER THE PERSONAL PROPERTY THAT SHOULD HAVE BEEN SEIZED.

THE AGENTS EXCEEDED THEIR AUTHORITY BY CONFISCATING APPROXIMATELY 40 BOXES OF THE JONES PERSONAL, BUSINESS AND PRIVATE PROPERTY.

MRS. DENEECE JONES AND MR. ANTOINE JONES
JR. IS ALSO PREPARING TO TAKE A POLYGRAPH EXAM-
INATION ON THE UNLAWFUL SEARCH OF MOORE STREET
HOUSE

(EXCEEDED) (EXHIBIT #9) IS THE SWORN DECLARATION
FROM ANTOINE JONES, MRS DENEECE JONES AND
ANTOINE JONES JR.

18 USC § 2234

THE AGENTS HAVE EXECUTED THE SEARCH WARRANT
BY WILLFULLY EXCEEDING HIS AUTHORITY AND EXER-
CISING WITH UNNECESSARY SEVERITY.

AGENT NAUGLE AND HIS TEAM NOT ONLY UNLAWFULLY
ENTERED THE MOORE STREET HOUSE BEFORE 6:00 AM, THEY
USED AN UNAUTHORIZED KEY TO UNLAWFULLY ENTER
THE HOUSE. TO EXCEED THEIR AUTHORITY, THE AGENTS
NEVER PRESENTED A SEARCH WARRANT OR SHOW AN
ATTACHMENT A, NOR DID THE AGENT PROPERLY GO OVER
THE PERSONAL PROPERTY THAT SHOULD HAVE BEEN SEIZED.

THE AGENTS EXCEEDED THEIR AUTHORITY BY CONFISCA-
TING APPROXIMATELY 40 BOXES OF THE JONES'
PERSONAL, BUSINESS AND PRIVATE PROPERTY.

THE JEEP CHEROKEE AND THE TOYOTA SEQUOIA WASN'T

ON ATTACHMENT A FOR PROPERTY TO BE SEIZED, WITH-
OUT THE JONES PERMISSION AND ANY LEGAL
AUTHORITY THE AGENTS STILL ILLEGALLY SEIZED
BOTH VEHICLES.

CONCLUSION

THE FOURTH AMENDMENT IS A CURB ON THE
POLICE POWER. IT GUARANTEES THE RIGHT OF THE
PEOPLE TO BE SECURE IN THEIR PERSONS, HOUSE PAPER
AND EFFECTS AGAINST UNREASONABLE SEARCHES AND
SEIZURES. SHALL NOT BE VIOLATED AND NO WARRANTS
SHALL BE ISSUED BUT UPON PROBABLE CAUSE SUPPORTED
BY OATH OR AFFIRMATION AND PARTICULARLY
DESCRIBING THE PLACE TO BE SEARCHED AND THE
PERSON OR THING TO BE SEIZED" US CONST, AMEND 4

IT IS BEYOND DISPUTE THAT THE HOME IS ENTITLED
TO SPECIAL PROTECTION AS OF THE PRIVATE LIVES
OF THE PEOPLE.

AT THE VERY CORE OF THE FOURTH AMENDMENT STANDS
THE RIGHT OF A MAN TO RETREAT INTO HIS OWN HOME
AND THERE BE FREE FROM UNREASONABLE GOVERNMENT
INTRUSION. IN RECOGNITION OF THIS BASIC FOURTH
AMENDMENT PRINCIPLE, SEARCHES AND SEIZURE
INSIDE A HOME WITHOUT A WARRANT ARE PRE-

SUMPTIVELY UNREASONABLE ABSENT EXTINGENT
CARCUMSTANCES.

AGENT NAUGLE SHOULD HAVE CONDUCTED THE
SEARCH IN A REASONABLE MANNER. THE UNWILL-
INGNESS OF A WELL EXPERIENCED AND TRAIN-
ED SPECIAL AGENT TO NOT PRESENT A SEARCH
WARRANT AND ATTACHMENT A TO AN OCCUPANT
WHEN ASKED GOES TO THE UNREASONABLENESS OF THE
SEARCH.

AS PART OF THE WARRANT REQUIREMENT FED R.
CROM P. 41(E)(1)(C) STATES THAT AN OFFICER EXECUTING
THE WARRANT MUST GIVE A COPY OF THE WARRANT AND
RECEIPT FOR THE PROPERTY TAKEN TO THE PERSON FROM
WHOM, OR FROM WHOSE PREMISES, THE PROPERTY WAS
TAKEN

A WARRANT ASSURE THE INDIVIDUAL WHOSE
PROPERTY IS SEARCHED OF THE UNLAWFUL AUTHORITY
OF THE EXECUTING OFFICER, HIS NEED TO
SEARCH AND THE LIMITS OF HIS POWER TO SEARCH.

WITH THE SEARCH WARRANT AND ATTACHMENT A
BEING PRESENTED, MR JONES AND MRS JONES WOULD
HAVE KNOWN THAT THE AGENTS BEING IN THEIR HOUSE
BEFORE 6:00 AM WAS UNLAWFUL AND WHAT PROPERTY

THE AGENT COULDN'T SEIZE FOR EXAMPLE THE JEEP CHEROKEE, TOYOTA SEQUOIA AND THE JONES' PERSONAL PROPERTY

DEFENDANT POINTS OUT TO THE COURT THAT AFTER THE EXAMINATION OF MRS. DENEECE JONES THE GOVERNMENT MUST CONCEED THAT THEY NOT ONCE CROSSED OR ASKED MRS. JONES ONE QUESTION ON THE MOORE STREET'S UNLAWFUL SEARCH.

WITH THE CLEAR AND CONVINCING EVIDENCE BY MRS. JONES, DEFENDENT JONES IS REQUESTING THAT THE COURT SUPPRESS THE MOORE STREET SEARCH EVIDENCE DUE TO THE RULE 41, 18 USC § 2234, AND 18 USC § 2236 VIOLATIONS AND STRIKE AGENT NAUGLE'S TESTIMONY DUE TO HIS PERJURY TESTIMONY ON THE MOORE STREET ISSUE.

RESPECTFULLY SUBMITTED

ANTOINE JONES
241 912
1901 D ST SE
WASH DC 20003
SIGN :
DATE :

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,  :
                           :
                           :  Docket No.: CR 05-386-1
      vs.                  :
                           :      Washington, DC
ANTOINE JONES,             :   2:13 p.m., Tuesday
                           :      April 3, 2012
          Defendant.       :
                           :
_____X

REPORTER'S OFFICIAL TRANSCRIPT OF STATUS HEARING
       BEFORE THE HONORABLE ELLEN S. HUVELLE
         UNITED STATES DISTRICT JUDGE


APPEARANCES:

  For the Government:    JOHN V. GEISE, ESQ.
                         ARVIND K. LAL, ESQ.
                         COURTNEY D. SPIVEY, ESQ.
                         U.S. Attorney's Office
                         555 Fourth Street, NW, Room 217
                         Washington, DC 20530
                         (202) 292-7965


  For the Defendant:     JENIFER WICKS, ESQ.
                         A. EDUARDO BALAREZO, ESQ.
                         (Via Telephone)
                         Balarezo Law
                         400 Fifth Street, NW, Suite 300
                         Washington, DC 20001
                         (202) 639-0999


  Court Reporter:        CHANTAL M. GENEUS, RPR, CRR
                         Certified Realtime Reporter
                         Registered Professional Reporter
                         United States District Court
                         333 Constitution Avenue, NW
                         Washington, DC 20001


Proceedings reported by machine shorthand. Transcript
produced by computer-aided transcription.

```
 1 | challenging.  Okay.  We have the warrantless GPS.
 2 |           THE COURT:  Yeah.  That's a big one.
 3 |           THE DEFENDANT:  We have the two cell sites.
 4 |           THE COURT:  Cell site data and GPS.
 5 |           THE DEFENDANT:  What I'm asking my lawyer to
 6 | put in, first of all, is my right to a detention
 7 | hearing so I can challenge this proper cause.
 8 |           THE COURT:  Sir, you were indicted.
 9 | Probable cause is equivalent to being indicted.  But
10 | anyway -- I've written on this a lot.
11 |           THE DEFENDANT:  I'm just asking for my
12 | rights.
13 |           THE COURT:  Okay.
14 |           THE DEFENDANT:  The lawful search of Moore
15 | Street house, when you ruled on it, your ruling was
16 | that Miss Deniece Jones, my wife, signed the return.
17 | She put in a sworn declaration, and I put in a sworn
18 | declaration.
19 |           THE COURT:  Signed the return?  You mean the
20 | return --
21 |           THE DEFENDANT:  Yes.  This is what your
22 | ruling is.  We've never had a hearing on this, so we
23 | never completed the record.  And you never really
24 | addressed it, because if you go back to your ruling,
25 | she never -- she never signed that return.  If you
```

```
1    look --
2              THE COURT:  Which return, sir?
3              MR. BALAREZO:  Judge.  Judge -- Antoine --
4    Mr. Jones.
5              Judge, if I can interrupt for a second.
6              THE COURT:  Yeah.
7              MR. BALAREZO:  I believe the Court's ruling
8    at the time was on the papers, and it indicated that
9    because the government had indicated or presented what
10   was termed a return of the search warrant signed by
11   Mrs. Jones, that, therefore, she had gotten notice of
12   the search and she had --
13             THE COURT:  She had not what?
14             MR. BALAREZO:  That she had gotten notice of
15   the search, like a Rule 41 issue.
16             THE COURT:  Uh-huh.
17             MR. BALAREZO:  But what Mr. Jones is
18   indicating to me -- and I understand where he's coming
19   from -- is that Mrs. Jones never signed a return or
20   what the Court termed a return.  She signed another
21   document, which should not be dispositive of the issue
22   of whether or not she got notice of the search or
23   whether she consented to the search or anything like
24   that.  So, arguably --
25             THE COURT:  Sorry.  Did you bring this up
```

```
 1   before?  Am I hearing about this for the very first
 2   time?  Didn't you tell me this before?
 3             MR. BALAREZO:  No.  I don't think that we
 4   brought up that issue that is being raised right now
 5   before.
 6             THE COURT:  What difference does it make if
 7   she signed the return or not?  I don't understand what
 8   you're saying.
 9             THE DEFENDANT:  Because --
10             THE COURT:  Quiet.  I can't listen to
11   everybody at the same time.
12             MR. BALAREZO:  Judge, Mr. Jones actually has
13   the factual basis for it much clearer than I do, and I
14   would ask the Court to let him speak on that issue
15   right now.
16             THE COURT:  Okay.  Go ahead.
17             THE DEFENDANT:  Right now, FBI agent Stephen
18   Naugle --
19             THE COURT:  Who?
20             THE DEFENDANT:  FBI Agent Stephen Naugle --
21             MR. BALAREZO:  N-A-U-G-L-E.
22             THE DEFENDANT:  -- he signed this return.
23   He printed my wife's name on there.  My wife never
24   signed that return.  My wife testified in this
25   courtroom that they came in at 4:45, not at 6:15, with
```

1    THE COURT:  Mr. Balarezo, was this a motion

2  raised pretrial or during the second trial or during

3  the first trial?  I remember the pegboard.

4    THE DEFENDANT:  It was the second trial --

5    THE COURT:  Can I ask him?

6    THE DEFENDANT:  Oh, I'm sorry.

7    THE COURT:  Mr. Balarezo, can you hear me?

8    Mr. Balarezo?

9    Gwen?

10    THE COURTROOM DEPUTY:  I don't know.  I

11  still have him connected.

12    THE COURT:  Mr. Geise, are you on the phone?

13    MR. GEISE:  I'm on the phone, yes, Your

14  Honor.

15    THE COURT:  Mr. Balarezo, are you on the

16  phone?

17    Well, get him back in.  See, if I don't ask

18  if he's there, I don't know if he's there.

19    THE COURTROOM DEPUTY:  Let me call and see

20  if he got dropped.

21    (Pause.)

22    THE COURTROOM DEPUTY:  His service dropped.

23  He's going to have to wait for me to call him back.

24    THE COURT:  Yeah, I know.  I want him to

25  hear you, so give us a break here.

1              (Pause.)

2              MR. BALAREZO:  I'm here.  I'm sorry, Your

3   Honor.

4              THE COURT:  I must say, Mr. Geise, it might

5   be much easier if you were here, I have to tell you.

6              MR. GEISE:  I can walk down, Judge.

7              THE COURT:  I think so.  How long is it

8   going to take you?

9              MR. GEISE:  Ten minutes.

10             THE COURT:  I really do think it makes much

11  more sense.

12             Mr. Balarezo, you're on the phone.

13             Mr. Geise, it would accommodate the Court

14  greatly.

15             MR. GEISE:  I will be down in ten minutes,

16  Your Honor.

17             THE COURT:  Okay.  Thank you.  You hang up.

18             Mr. Balarezo --

19             MR. BALAREZO:  Yes, Judge.

20             THE COURT:  -- the first motion we talked

21  about -- I wanted to get some clarity here, because

22  you were in the same two trials I was.

23             The first motion has to do with the search

24  at Moore Street, right?

25             MR. BALAREZO:  Yes, Judge.

1      THE COURT:  Are you saying that no one

2  brought to my attention at any point in time that she

3  had not -- or something to do with 4:45 versus 6?

4      I mean, where it gets you, I don't know,

5  but --

6      MR. BALAREZO:  Judge --

7      THE COURT:  Are you on a cell phone

8  someplace where you're going --

9      MR. BALAREZO:  I'm on a landline right now.

10      THE COURT:  Because you're cutting out.

11      Go ahead.

12      MR. BALAREZO:  I can try to move closer into

13  the house.  I'm outside right now.

14      THE COURT:  Okay.  All right.  I'm sorry.

15      MR. BALAREZO:  We filed a motion to suppress

16  the search of Moore Street, and I think the Court

17  denied that on grounds separate and apart from what

18  Mr. Jones wants to raise now.

19      THE COURT:  Right.  But that separate and

20  apart was not raised before?

21      MR. BALAREZO:  I'm sorry?

22      THE COURT:  When you say it was separate and

23  apart from what he wants to raise now, which has

24  something to do with the time when they executed the

25  search warrant, whether it was 4:45 or 6:00, my

1   view --

2          You didn't raise that before; is that what

3   you're telling me?

4          MR. BALAREZO:  I didn't raise that before,

5   but I don't believe that the Court let us explore it

6   either at a hearing or at trial, because I recall that

7   I was trying to ask Mrs. Jones about when the search

8   happened, and the Court prevented me from doing so.

9          THE COURT:  You were trying to ask

10  Mr. Jones?  He didn't testify.

11         MR. BALAREZO:  No.  Mrs. Jones.

12         THE COURT:  Oh, Mrs. Jones.

13         Okay.  But one problem is, did anybody raise

14  this on appeal?  You know, you can't -- this is not an

15  opportunity for collateral attack.  This is an

16  opportunity to go forward on the issues that the

17  Supreme Court -- you can't just come back and raise

18  all kinds of new issues, even if they weren't raised

19  before.  They should have been raised on appeal.

20         Was that part of the appeal?

21         THE DEFENDANT:  I raised --

22         MR. BALAREZO:  Judge, I did not handle the

23  appeal for Mr. Jones, but I do not believe that that

24  was one of the issues that was raised on appeal.

25         THE DEFENDANT:  That's not true.

```
 1              THE COURT:  He says it was.  Well, that's
 2    fine.  That would be helpful, if I can find it.
 3              I'm bound by whatever happened above.
 4              Huh?
 5              THE DEFENDANT:  I raised it on appeal pro
 6    se.  The government opposed it because I had a lawyer,
 7    so it's back to the same situation.  They didn't
 8    address the issue because I have a lawyer and the
 9    lawyer did not put it in.
10              THE COURT:  Yeah.  You were always your own
11    lawyer.  That's a pity.
12              Okay.  The search of Hampton Boulevard
13    warehouse.  I don't quite understand -- we certainly
14    addressed that before.
15              Does he have standing, in your opinion?  Who
16    owned this boulevard warehouse -- Hampton?  It's my
17    recollection that --
18              Were you the owner?
19              THE DEFENDANT:  I was the leaser.
20              MR. BALAREZO:  It was a rental, Your Honor.
21    And I believe that the government alleged that
22    Mr. Jones was the lessor -- or the lessee of that
23    property.
24              THE COURT:  Okay.  Was there a motion about
25    Hampton Boulevard before, the warehouse?
```

Ex 14 15 14 FC

```
 9          MR. BALAREZO:  Right.  But I would like the jury to
10   know.  I mean, it's not what we talk about here.  They are the
11   ones that's going to have to decide, so they need to hear.
12          THE COURT:  Fine.  That's fine.  The government likes
13   that.  Bring that right up that she doesn't know where the
14   money came from.  Excellent.  The government has no objection
15   to that.  What else?
16          MR. BALAREZO:  I think that might be it.  I will have
17   to consult with Mr. Jones.
18          THE COURT:  The hour is sustained.  But what else is
19   there?  The hour, I have sustained.  Sixty thousand she can
20   explain, she doesn't know about.  What else happened?
21          MISS LIEBER:  Gestapo tactics.
22          THE COURT:  We are not getting into how they executed
23   the whole thing.  I don't see any relevance other than the
24   60,000.  Sustained.  Thank you.
25          (Open court)
```

33

```
 1          THE COURT:  Ma'am, come on back.
 2          MR. BALAREZO:  If I could just have one second, Your
 3   Honor?
 4          THE COURT:  Yes.
 5          MR. BALAREZO:  Thank you, Your Honor.
 6   BY MR. BALAREZO:
 7   Q.  Mrs. Jones, on October 24th, when law enforcement came to
 8   arrest your husband, were you asleep?
 9   A.  Yes, I was.
10   Q.  Do you recall what time it was that they showed up to
11   arrest your husband?
12   A.  4:45 in the morning.
13          MR. BALAREZO:  I have nothing further at this time,
14   Your Honor.
15          THE COURT:  Okay.
16          MR. NORRIS:  I have a few questions.
17          THE COURT:  Fine.  Go right ahead, Mr. Norris.
18                      CROSS-EXAMINATION
19   BY MR. NORRIS:
20   Q.  Good afternoon, Miss Jones.
21   A.  Good afternoon.
22   Q.  Now, Miss Jones, you testified on direct that one of your
23   businesses was as a real estate agent; is that correct?
24   A.  Yes.
25   Q.  And were you actively working as a real estate agent in
```

34

4 1 (A) (2) (B)

Rule 41.    Search and Seizure [Caution: For amendments effective December 1, 2011, see prospective amendment note to this rule.]

**(a) Scope and Definitions.**

(1) *Scope.* This rule does not modify any statute regulating search or seizure, or the issuance and execution of a search warrant in special circumstances.

(2) *Definitions.* The following definitions apply under this rule:

(A) "Property" includes documents, books, papers, any other tangible objects, and information.

(B) "Daytime" means the hours between 6:00 a.m. and 10:00 p.m. according to local time.

(C) "Federal law enforcement officer" means a government agent (other than an attorney for the government) who is engaged in enforcing the criminal laws and is within any category of officers authorized by the Attorney General to request a search warrant.

(D) "Domestic terrorism" and "international terrorism" have the meanings set out in 18 U.S.C. § 2331.

(E) "Tracking device" has the meaning set out in 18 U.S.C. § 3117(b).

**(b) Authority to Issue a Warrant.**  At the request of a federal law enforcement officer or an attorney for the government:

(1) a magistrate judge with authority in the district-or if none is reasonably available, a judge of a state court of record in the district-has authority to issue a warrant to search for and seize a person or property located within the district;

(2) a magistrate judge with authority in the district has authority to issue a warrant for a person or property outside the district if the person or property is located within the district when the warrant is issued but might move or be moved outside the district before the warrant is executed;

(3) a magistrate judge - in an investigation of domestic terrorism or international terrorism - with authority in any district in which activities related to the terrorism may have occurred has authority to issue a warrant for a person or property within or outside that district;

(4) a magistrate judge with authority in the district has authority to issue a warrant to install within the district a tracking device; the warrant may authorize use of the device to track the movement of a person or property located within the district, outside the district, or both; and

(5) a magistrate judge having authority in any district where activities related to the crime may have occurred, or in the District of Columbia, may issue a warrant for property that is located outside the jurisdiction of any state or district, but within any of the following:

(A) a United States territory, possession, or commonwealth;

(B) the premises - no matter who owns them - of a United States diplomatic or consular mission in a foreign state, including any appurtenant building, part of a building, or land

USCSRULE                              1

© 2011 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

(Exhibit #9)



Deniece Jones may have signed the inventory sheets (*See* Exh. 7 – Inventory Sheets), but contrary to the mandates of Rule 41(f), a warrant was never presented.

This failure to provide a copy of the warrant with attachment merits suppression of any evidence recovered as result. *See United States v. Gantt*, 194 F.3d 987 (9th Cir. 1999). For these reasons, Jones respectfully moves the honorable Court to suppress as evidence at trial in this case all evidence obtained as a result of the search of 10870 Moore Street, Waldorf, Maryland, including items recovered from the garage and the Jeep Cherokee in the garage.

**D.** **Agents forged Jones' signature on a consent-to-search form for the Jeep Cherokee in the garage**

In his initial motion, Jones claimed that the he had involuntarily signed the consent form for the Jeep Cherokee in his garage. (Mot. Doc. 144 at 15; Exh. 8 – Jeep Consent Form). After much reflection on the events of the night of his arrest, Jones maintains that he never signed the consent form, but rather that the consent form was forged by agents in their









*Security Secrets, LLC*

2201 Cooperative Way
Suite 600
Herndon, VA 20171

Office: 703-788-6763

Fax:  703-449-0654

January 21, 2013

To: Alonzo Gibson

Re:  Polygraph Examination
     Antoine Jones

Dear Mr. Gibson:

Pursuant to your request, the above mentioned examinee was extensively interviewed and afforded a series of polygraph examinations at the Washington, D.C. Detention Center on January 19, 2013. I had been advised the examinee wanted to make certain some statements and facts about his case were true and accurate. The purpose of this examination would be to check the truthfulness of some of those statements made by the examinee.

Prior to the interview and examination the examinee signed the necessary consent forms and voluntarily submitted to the polygraph examination.  These forms will become a permanent part of this agency's files.

The examination was conducted on a Stoelting CPS II Computerized Polygraph System, an instrument capable of measuring respiratory, cardiovascular and electrodermal reactions.

During the pretest interview, the examinee was extensively questioned concerning the facts of his case as he remembered and related them. The examinee was advised a polygraph examination may not be what he needs or accepted in this case. The examinee said it was important to him that this test be performed so certain people could see he is telling the truth. The purpose of this examination would be to see if the examinee was being truthful in his recollection and presentation about the following statements involving his case.

During the pretest interview the following questions were formulated, reduced to writing, and reviewed with the examinee prior to administering the test:

1.  Is this the year 2013?
Answer:  Yes

2.  Regarding the facts in your case, do you intend to answer truthfully each question?
Answer:  Yes

3.  On October 24, 2005, did you enter your residence through your garage door and trigger the alarm?
Answer:  Yes

4.  Before 6:00 a.m. on October 24, 2005, are you the person that activated and deactivated your alarm to secure your residence?
Answer:  Yes

5. Is this the month of January?
Answer: Yes

6. Before 6:00 a.m. on October 24, 2005, did you observe the FBI agents trying to unlock your Moore St. door?
Answer: Yes

7. Before 6:00 a.m. on October 24, 2005, after the FBI agents activated your alarm, did they get the code from your wife to deactivate the alarm?
Answer: Yes

8. Are you now in the D.C. Jail?
Answer: Yes

9. On October 24, 2005, did you sign any forms consenting to the search of your Jeep Cherokee?
Answer: No

10. Did Gregory Wills install a pegboard, tool stand, and window in the Hampton Park warehouse before April 30, 2004?
Answer: Yes

11. Is your last name Smith?
Answer: No

12. Is the window and pegboard that were installed in the warehouse in the ICE photos?
Answer: No

13. Were you told by Lawrence that the personal items in the ICE photos were removed before April 30, 2004?
Answer: Yes

14. Did you and Lawrence remove your personal items from the warehouse before April 30, 2004?
Answer: Yes

An I/R (Irrelevant/Relevant) format test was used. Subsequent to a series of polygraph examinations, it was the opinion of this licensed state examiner, based upon careful analysis of the tests results that the examinee **did not show significant reactions** to the majority of the questions asked.

I would like to take this opportunity to thank you for allowing me to be of service. Should any additional information or clarification pertaining to this interview and/or examination be necessary, please do not hesitate to contact me.

Sincerely,

Danny W. Bragg
Licensed State Polygraph Examiner

Antoine Barrington Jones, Jr.

Declaration

I, Antoine Barrington Jones, Jr., declare under penalty of perjury (28USC§1746) that this declaration is correct, accurate and true.

On Monday morning October 24, 2005, I was awakened before 5:00 a.m. by a loud noise. (I know it was before 5:00 a.m. because my alarm clock had not gone off to wake me up yet.) I got up to see what the noise was and immediately some people (FBI agents) came into my room and threw me on the floor. They had guns pointed at me and were yelling and screaming for me to get down on the floor. Since I was still asleep when they came in, I was wearing my boxers underwear only. I was baffled by their presence and before I knew anything I was thrown on the floor and handcuffed. Eventually I heard my alarm clock while they were still in my room so I knew it was 5:00 a.m. at that time.

The agents took me downstairs and sat me in the family room. My dad was down there in a chair handcuffed too. They brought my mom down stairs minutes later, I was shocked to see my mom handcuffed. I was mindful of the time because I would have been on my way to pick up my classmates who rode to school with me. I had no way to call them and let them know I could not pick them up. It was getting later and I would have been on my way by now.

I heard my dad ask the agents can he see the search warrant. (I was comforted for some reason because I believed they were in the wrong house and felt

that the search warrant would clarify everything and I could be on my way to school) and this nightmare would be over. However, I noticed they never showed him the search warrant but just kept ignoring him (this was confusing to me but as I had never been in a situation like this before I did not know what to think). They were all through the house, upstairs, downstairs and even in the garage. I kept thinking why are all of these people in our house. After they took my dad out of the house, one of the agents asked me if he could search the Cadillac. I told him no, it's not my car, it's my dad's car. He said if I did not cooperate they would just continue to take their time but if I gave them permission to search the Cadillac then he would let me leave out so I could go to school. I just looked at him and he said, well, we're going to search it anyway whether you give us permission or not. They search the car and he was on the phone with a woman who told him to bring the car in. He told her that the car was "a piece of shit" and he was not bringing it in. They continued to search the house and then they eventually left. I just remember feeling confused, violated and empty, not to mention helpless because we had been handcuffed and never explained why they were there, what they were looking for or why they took my dad away in handcuffs.

Antoine Jones

3-24-12

Signed:                                    Date:

Deniece Jones

Declaration

I, Deniece Jones declare under penalty of perjury (28USC§1746) that this declaration is correct, accurate and true.

On Sunday October 23, 2005, me, my husband, and son Antoine Jones Jr. arrived home from a church event, an out-of-town. We followed our normal routine of parking the vehicle in the garage and entering the house through the garage door.

That evening my son went out for a brief time. He was in college and he returned home before midnight. He followed his routine of entering the house through the garage door. He had a garage door opener in his car and a key to the side-entry door so it was always his routine to come through that door when he came home. When my son returned home that evening, he reset the alarm and came upstairs and went to bed. (I know he reset the alarm because I had already gone upstairs when he got home and I had set the alarm before I went upstairs).

My husband also went out for a little while that evening after we returned home from church. He left in the Jeep Cherokee which had been parked in the garage. He also left the house through the garage (side-entry) door. My husband returned home and he came in through the garage (side-entry) door. I was awakened by the opening of the actual garage door, then I heard him pull the Jeep into the garage and close the garage door. (Our master bedroom was over the

garage so I always heard the garage door when it opened and closed.) When he (my husband) came into the house, I heard him deactivate and reset the alarm before coming upstairs (the alarm control panel is in the downstairs hallway just below the master bedroom and the foyer is an open 2-story foyer so I could easily hear activity going on downstairs).

As he usually does, he checked on my son and then came to our bedroom and took a shower. I got out of bed and went into the bathroom and got into the shower with my husband. After showering, I got in the bed naked. Amongst other things, my husband and I were discussing the sale of the Club Levels which was to take place later that morning. He let me know that he had to leave out early so he could do a final cleaning and walk-through at the club. He mentioned that he and Lawrence (Maynard) would need to be at the club at 6:00 a.m. Monday morning to do the final walk-through and cleaning of the Club before meeting with the buyer and his attorney to sign the sales contract.

Shortly after we got in bed, I remember hearing a loud noise at the front door. (I thought someone was breaking in.) I reached for the telephone which was on my nightstand beside the bed. There was so much going through my mind. It was still dark outside and when I reached for the phone I noticed the clock said 4:45 a.m. I was going to call the police because the noise was clearly someone breaking into our house. (I remember thinking, "it's still dark outside now but soon our neighbors will be getting up and going to work so someone will see that we need help.") Then I heard the sound of the front door being unlocked. (I was confused by

this because robbers don't use a key but I remembered that my husband's front door key had been mysteriously missing from his key ring – mysterious because it was the only key that was missing from the ring.) Now, I was really scared, shaken and confused. I thought I was the only one with a key to the front door since my husband's front door key had mysteriously disappeared off his key ring a few weeks earlier. (The house was custom built by a builder and he had installed very tall custom doors and a specialty lock on the front door. I could hear the door being unlocked throughout the house because of the specialty lock and the open foyer so the noise very easily could be heard in my bedroom.) Before I could dial 911, I heard a bunch of footsteps running up the stairs, and someone was (a man's voice) yelling repeatedly "get the son's room, get the son's room". Thoughts were swirling through my head faster than I could capture them. I was wondering who was saying "get the son's room, and why. I was wondering why there were so many (it sounded like an army) people running up the stairs and the next thing I knew there were a bunch of guns pointed at me and my husband. I was scared and even paralyzed. Someone turned on the light in my bedroom; my bedroom was filled with men (with guns pointed at us) yelling at me and someone pulled me out of bed. I remember someone snatched the telephone out of my hand and hung it up (before I could dial 911) and yelled "get on the floor, get on the floor". I was immediately handcuffed, hands behind my back, while on the floor. (Everything was happening so fast, this occurred over seconds, not minutes.) I was now feeling really scared, violated and degraded and embarrassed because I was totally naked, and surrounded by a bunch

of strange men with guns pointed at me in my bedroom. The house alarm went off and the agents kept asking for the code to turn it off. It took me a minute to get it together because I could not think clearly. The agents disarmed the house alarm.

I was scared so bad that I had to use the bathroom so I asked (again feeling even more degraded and violated now) if I could use the bathroom. The agents had a female agent to come into the room and take me into the bathroom. I asked her if I could put something on so I don't have to go back into the room naked. I was taken back to the bedroom and positioned on the bed in a sitting position after I used the bathroom. At around this time the television in the upstairs hallway loft came on with the volume very loud. I had the alarm set on that television so I could get up and see my son off to school (Coppin State College in Baltimore) each morning. He had to leave the house between 5:45 – 6:00 a.m. to be in class at 8:00 a.m. The sound startled the agents and they asked me what it was. I told them it was the tv.

The agents searched the entire house. They moved all three of us from our bedrooms to the downstairs family room (I saw my son downstairs in cuffs and was really upset by that). The entire ordeal was upsetting to me. My husband started questioning the agents about a search warrant. One of the men said, go ahead and take him "downtown". After they took him out of the house, they asked my son if they could search the black Cadillac. He hesitated and the agent told him if he did not give them permission they would search it anyway but if he cooperated with them and gave them permission then they would finish up and get out of the way.

Then one of the agents (an Asian man) kept asking for the search warrant so he could photograph it. He asked them repeatedly and they kept avoiding the request. When he persisted, they told him to go into the garage and search for evidence there. At the end of the search, the lead agent told me I had to sign off on some Inventory Sheets which outlined what he had taken out of the house. Agent Naugle only gave me the Inventory Sheets. He never gave, showed or produced a Search Warrant or Attachment A, nor did he give me a Search Warrant return to sign.

Special note: The printed name on the Search Warrant Return (Deniece Jones) is a forgery and I am willing to submit to a polygraph exam and testify under oath that I didn't sign that document. Also the entry time was falsified (6:15 a.m.). The agents came into the house at 4:45a.m. as I testified under oath in trial.

Signed: _____          Date: 4-17-2012

E x H i b i t 1   Case: 09-5685   Document: 1244623   Filed: 05/06/2010   Page: 101

## AFFIDAVIT OF ANTOINE JONES

Pursuant to 28 U.S.C. **1746**, I Antoine Jones Sr. do declare, certify, verify and state under penalty of perjury that the foregoing is true and correct.

## Statement of Facts

On April 30, 2004, I Antoine Jones terminated my lease on the **400** Hampton Park Blvd warehouse and vacated the building.

I, Antoine Jones Sr, and Mr. Schaffer did conduct a "walk-through" inspection of the **400** Hampton Park Blvd warehouse to check for any damages to the warehouse and any lease termination violations.

During the walk through and inspection on April 30, 2004, there were no items or property left behind. There were items pictured in the photographs taken by the I.C.E. agents. The I.C.E. photographs were submitted into evidence at trial. The items were not present in the warehouse when Mr. Schaffer and I (Antoine Jones) conducted our walk-through and inspection of the warehouse the date the lease was terminated.

The week and days before April 30, 2004, Mr. Maynard and I emptied the warehouse. We threw out the trash and over filled the dumpster outside the warehouse. We used a power washer and power washed the entire warehouse walls and floors and left no property remaining in the warehouse.

The pegboard that Mr. Gregory Wills and Mr. Lawrence Maynard had placed on the warehouse wall was still on the wall on April 30, 2004 when Mr. Schaffer and I conducted the walk-through inspection.

P 6 9 7

On April 30,2004, Mr. Schaffer was so satisfied with the clear and clean condition the warehouse was left in after I moved out. Mr. Schaffer returned the full security deposit and noted that I had no security deposit or lease violations.

Special Note:  The Office Chair pictured in Exhibit Photo **15A** was **taken** to Club Levels and used in the main office of the Club as pictured in S.W.2 – Club Levels Photo.

The blow **up** mattress in Prints 17A and 1OA was used at Club Levels and stored in the closet located in the main office at the club.

The small black chair in Print 16A belonged to Club Levels and was taken back to Club Levels. You can see the same style chair in the Club Levels Photos (upstairs office). In both photos the small black chair is present, At the front entry you will see stack of that similar small black chair (right next to the metal detector).

The small radio in Print 16A on the blue blanket (plug in) is my personal radio. The handyman (Greg Wills) took it from my house on Brandywine Road when he was doing work at the house. He asked if he could use it to entertain him while working at the Hampton Road warehouse. I took the radio fiom the Hampton Road warehouse to Club Levels when we vacated the warehouse.

The Jacket in 19A and 21A, belongs to Mr. Lawrence Maynard. Mr. Maynard took the jacket to the Club and gave the jacket to Club Levels employee Lavance Howard and Mr. Howard wore the jacket many days. **Mr.** Howard **can** be seen wearing the jacket in the FBI surveillance tape in fiont of Club Levels on the rainy day (I believe the date is October 14,2005).

Also in photos 19A and 21A Valentine **Day gift** baskets can be seen. These baskets were sold by **Mr. Maynard** and the ones pictured in the photographs were the last of the baskets remaining. Mr. Maynard took the remaining baskets home with him long before the April 30th date.

P 6 9 8

Also focus on photos **19A** and **21A** again, there **is a box** with a **glass** table (laying on the floor next to the Valentine's gift basket). The glass table was taken to Club Levels and set up in the upstairs office of the Club. In the Photos taken at Club Levels, the **glass** table can be seen in **the office** next to **the** wall.

The Skill Saw on the table was used by the **Handyman** Greg Wills. Mr. Wills was working at Club Levels renovating the Club and the saw was taken from the Hampton Park Blvd warehouse long before **the** warehouse was vacated, Mr. Wills was already working as a handyman at Club Levels months before the April 30* lease termination date. [Mr. Wills testified he took his Skill Saw with him to the Club Levels in trial during Mr. Lyons' crossexamination.]

The 2 trashcans were **also** taken from the Hampton Park Blvd warehouse to Club Levels and were **used** both inside and outside the Club.

The 2 new boxes of shrink wrap were put on the white **box truck** and used in transporting furniture and large items to Club Levels and **Mr.** Maynard also continued to book moving jobs and used the shrink wrap **to** wrap **furniture** for the moving jobs.

The blue moving blankets were stored on the box truck and were **used** to wrap furniture for moving jobs.

The joint compound pictured under the table and the other compound in the middle of the floor was taken to Club Levels and used for the many renovation projects at the Club.

The 2 Rolodex File cards, one with a Baltimore **number** (443-340-5936 and with Mr. Maynard's address and number **301-350-7778)** were not **left** behind at the Hampton Park Blvd warehouse because prior to the walkthrough he entire warehouse floor was power washed. Nothing was **left** on the floor of the warehouse.

The photos are proof that the I.C.E. team entered the warehouse and took the photos long before April 30, 2004. Mr. Wills' Skill Saw is indicative that renovations were still going on at the warehouse. The trashcans were full of debris in the warehouse photos.

The photos submitted into evidence by the I.C.E. team along with the photographs taken at Club Levels during the search on October 24, 2005 prove the I.C.E. agents entered the Hampton Park Blvd warehouse without a Search Warrant long before I vacated the warehouse on April 30, 2004.

Signed, _Antoine Jones_                    Date:  6 - 1 0 - 0 9

Antoine Jones
Address:   18600-016, USP Florence, PO Box 7000, Florence, CO 81226-7000

Notary:
L. Klein
my commission
expires 3.18.2010

P 6 100