PERJURY AND OBSTRUCTION OF JUSTICE

## CHART

18 U.S.C.S. §1621, 1622, 1623

(EXHIBIT #1)   PERJURY BY AGENT NAUGLE ~~AND~~

~~OBSTRUCTION OF JUSTICE~~

MONDAY, NOV. 6, 2006   1:45 PM SESSION   PG 96 LINE 19-22
PERJURY #1

MR. BALAREZO: (Q) OKAY NOW, IT IS CORRECT TO SAY THAT
WHEN YOU WENT INTO THE HOUSE AT MOORE STREET, THAT
WAS AT SOMETIME -- WELL, WHAT TIME DID YOU
GO INTO THE HOUSE?
AGENT STEPHEN NAUGLE : (A) WELL IT WAS "AFTER 6:00 AM"

(EXHIBIT #2)   PERJURY BY AGENT STEPHEN NAUGLE

FEBRUARY 11, 2013   9:41 AM SESSION   PG 42 LINE 1-4
PERJURY #2
AGENT NAUGLE : (A) ... ONCE IT WAS 6:00, WE RECEIVED
PERMISSION TO EXECUTE THE SEARCH WARRANT. WE THEN
GOT INTO OUR VEHICLES, WE DROVE UP TO MR. JONE'S
RESIDENCE. AND AT APPROXIMATELY 6:15 AM, WE
ENTERED THE RESIDENCE."

(EXHIBIT #3)   PERJURY BY AGENT STEPHEN NAUGLE

FEBRUARY 11, 2013   9.41 AM SESSION   PG 75  LINE 19-21
PERJURY #3

MR. JONES: (Q) NOW WHEN YOU CAME ONTO THIS HOUSE, YOU
SAID IT WAS AFTER 6:00 ?

AGENT STEPHEN NAUGLE: (A)  YEAH. IT WAS APPROXIMATELY "6:15 AM"

(EXHIBIT #4)  PERJURY BY M.P.D DETECTIVE JOSEPH SOPATA

FEBRUARY 11, 2013                    PG 98  LINE 8-14

        (Q) AND WHAT WAS THE TIME THAT THIS PARTIC-
ULAR ~~CONGRESS PARTICULAR SEARCH, PARTICULAR HOUSE~~ SEARCH
WARRANT WAS EXCECUTED?

        (A) YOU CAN'T EXECUTE - - AT THIS PARTICULAR
- - THIS PARTICULAR EVENT, THIS TAKEDOWN, 6:00 ON THE
MORNING. HAS TO BE PAST 6:00 IN THE MORNING.

        (Q) 6:00 AM?

        (A) 6:00 AM.

(EXHIBIT #5)   OBSTRUCTION OF JUSTICE, 18 U.S.C.§ 1001, 1519
                BY AGENT STEPHEN NAUGLE

MOORE STREET SEARCH WARRANT RETURNED, AGENT NAUGLE
WRITES: 10/29/05, 6:15AM - DATE AND TIME WARRANT

EXECUTED.

AGENT NAUGLE FALSIFIED THE 6:15AM ENTRY TIME AND WROTE DENISE JONES, WHERE IT SAYS COPY OF WARRANT AND RECEIPT OF ITEM LEFT WITH.

(EXHIBIT #6)   OBSTRUCTION OF JUSTICE BY AGENT STEPHEN
              NAUGLE   18 USCS. 8 1001, 1519

FD 302 - DATE OF TRANSCRIPTION 10/24/05.
FBI AGENT NAUGLE WRITES: ON 10/24, AT APPROXIMATELY
"6:15 AM" A FEDERAL SEARCH WARRANT WAS EXECUTED AT
10820 MOORE STREET WALDORF, MD

CLEAR AND CONVINCING EVIDENCE THAT THE FBI AGENTS
UNLAWFULLY ENTERED THE MOORE STREET HOUSE BEFORE 6AM

(EXHIBIT #7)   POLYGRAPH EXAMINATION BY SECURITY
              SECRETS LLC.

MR JONES TOOK A POLYGRAPH EXAMINATION BY MR.
DANNY W. BRAGG ON JANUARY 19, 2013. QUESTIONS
#3, 4, 6, 7 RELATES TO THE MOORE STREET HOUSE.

QUESTION #3  ON OCTOBER 24, 2005, DID YOU ENTER
YOUR RESIDENCE THROUGH YOUR GARAGE DOOR. AND

TRIGGER THE ALARM? ANSWER YES

QUESTION #4 BEFORE 6:00 AM ON OCTOBER 24, 2005, ARE YOU THE PERSON THAT ACTIVATED AND DEACTIVATED YOUR ALARM TO SECURE YOUR RESIDENCE? ANSWER YES

QUESTION #6 BEFORE 6:00 AM ON OCTOBER 24, 2005, DID YOU OBSERVE THE FBI AGENTS TRYING TO UNLOCK YOUR MOORE STREET DOOR? ANSWER YES

QUESTION #7 BEFORE 6:00 AM ON OCTOBER 24, 2005, AFTER THE FBI AGENT ACTIVATED YOUR ALARM, DID THEY GET THE CODE FROM YOUR WIFE TO DEACTIVATE, THE ALARM? ANSWER YES

TO CONFIRM AND CORROBERATE THE POLYGRAPH'S TRUTHFUL ANSWERS MR. JONES REFERS O.C.G. TO MRS. DENEECE JONES' TRIAL TESTIMONY UNDER OATH.

(EXHIBIT #8)  TRIAL TESTIMONY BY DENEECE JONES
1ST TRIAL  PG 34 LINE 7-12

MR. BALAREZO: (Q) MRS JONES, ON OCTOBER 24 TH, WHEN LAW ENFORCEMENT CAME TO ARREST YOUR HUSBAND, WERE YOU ASLEEP?
MRS. JONES: (A) YES, I WAS.

(Q) DO YOU RECALL WHAT TIME IT WAS THAT THEY SHOWED UP TO ARREST YOUR HUSBAND?

(A) "4:45" IN THE MORNING.

(EXHIBIT #9)      TRIAL TRANSCRIPT

FEBRUARY 19, 2013      AM SESSION   P6 26 LINE 11-13

MR. JONES: (Q) ON OCTOBER 24, 2005, WHAT TIME DID THE AGENTS COME ONTO THE MOORE STREET HOUSE?

MRS. JONES: (A) THEY CAME IN AT "4:45 AM".

DISCUSSION OF ALARM CODE

(EXHIBIT #10)      TRIAL TRANSCRIPT

FEBRUARY 19, 2003      AM SESSION   P6 28 LINE 22-25 AND
                                    P6 29 LINE 1-7

MR JONES: (Q) MRS JONES, DID ONE OF THE AGENTS ASK FOR THE ALARM CODE?

MRS. JONES: (A) YEAH. THE -- WHEN THE NOISE STARTED GOING OFF, THEY -- IT WAS LIKE THEY WERE ALL IN SHOCK LIKE, WHAT IS THAT? WHAT IS THAT? AND I GUESS THERE WAS SOMEBODY DOWNSTAIRS AND THEY YELLED UP AND SAID, "IT'S THE ALARM". AND THEN THE ASKED FOR THE

166

CODE. AND I GAVE THEM THE CODE TO TURN OF THE
ALARM."
MR. JONES: (Q) DID THE AGENTS CUT THE ALARM OFF AFTER
YOU GAVE THEM THE CODE?
MRS. JONES: (A) THEY DID


DISCUSSING ALARM CLOCK


(EXHIBIT #11)     TRIAL TRANSCRIPT


FEBRUARY 19, 2013    AM SESSION     PG 30 LINE 3-25


MR. JONES: (Q) MRS JONES, WHAT TIME DO THE ALARM WAKE
ANTOINE JONES, JR., UP?
MRS. JONES: (A) I DON'T KNOW WHAT TIME HIS ALARM
IN HIS ROOM WAKES HIM UP, BUT I HAD SET THE - -
UPSTAIRS IN THE HALLWAY THERE - - THERE'S A TV - -
THERE WAS A TV VIEWING AREA. AND I HAD SET THE
TV TO COME ON AT 6:00 EVERY MORNING" SO THAT I
COULD GET UP AND TELL HIM BYE WHEN HE LEFT THE
HOUSE.

        (Q) MRS. JONES, ISN'T IT A FACT THIS WAS OVER
APPROXIMATELY AN HOUR LATER WHEN THIS TV CAME ON?
AND THE OFFICERS PANICKED?
MS. SOLTYS: OBJECTION, YOUR HONOR
THE COURT: OFFICE - -
MR. JONES: PANICKED. THEY DIDN'T KNOW WHERE - -

HOW TO CUT IT OFF.

THE WITNESS: THEY DON'T KNOW WHAT IT WAS.

THE COURT: SUSTAINED DON'T ANSWER.

THE WITNESS: OH, I'M SORRY.

MR. JONES: (Q) CAN YOU EXPLAIN TO THE JURY WHAT HAPPEN-
ED WHEN THIS TV ALARM CAME ON?

MRS JONES: (A) I GUESS IT JUST TOOK THEM BY SURPRISE
AND IT SHOCKED THEM, AND EVERYBODY KIND OF LIKE
PANICKED. LIKE, WHAT IS THAT NOISE?


## SWORN DECLARATION AND SWORN AFFIDAVITS


MR JONES, MRS JONES AND ANTOINE JONES JR SWORN
DECLARATIONS CORROBORATE THE UNLAWFUL ENTRY OF
THE MOORE STREET HOUSE &


(EXHIBIT #12)   JULY 23, 2011 - AFFIDAVIT OF ANTOINE JONES


PG 2 PARAGRAPH 2 LINE 2


LATER MY SON'S ALARM CLOCK WENT OFF AND I REALIZE
IT WAS 5:00AM BECAUSE MY SON'S ALARM CLOCK WAS
SET FOR 5:00AM. MY SON WAS ATTENDING COPPIN
UNIVERSITY IN BALTIMORE AND HE GOT UP AT 5:00AM
AND LEFT THE HOUSE AT 6:00 AM EACH MORNING AND
STOPPED AT THE METRO STATION TO PICK UP HIS CLASS -

MATES TO GET TO SCHOOL ON TIME FOR HIS 8:00 AM CLASS.

THEY TOOK ME DOWNSTAIRS TO THE FAMILY ROOM WHERE I HAD FULL VIEW OF 2 CLOCKS, THE GRANDFATHER CLOCK ON THE HALLWAY AND THE CLOCK SITTING ON THE FIRE PLACE MANTLE. IT WAS JUST PAST 5:00 AM AT THIS TIME.

(EXHIBIT #12)    SWORN DECLARATION UNDER PENALTY
                 OF PERJURY (18 U.S.C.S. §1796)
                 ANTOINE JONE, SR

APRIL 17, 2012    PG 2  PARAGRAPH 2

IT WAS STILL DARK OUTSIDE AND STILL VERY EARLY (NOT 5:00 AM YET) AS I COULD SEE THE CLOCK.

                 ANTOINE BARRINGTON JONES JR

MARCH 24, 2012    PG 1 PARAGRAPH 2

ON MONDAY MORNING OCTOBER 24, 2005, I WAS AWAKENED BEFORE 5:00 AM BY A LOUD NOISE. (I KNOW IT WAS BEFORE 5:00 AM BECAUSE MY ALARM CLOCK HAD NOT GONE OFF TO WAKE ME UP YET)... EVENTUALLY I HEARD MY ALARM CLOCK WHILE THEY WERE STILL IN MY ROOM SO I KNEW IT WAS 5:00 AM AT THAT TIME."

MRS DENEECE JONES

~~ADDRESSED~~ APRIL 17, 2012     PG 2 PARAGRAPH 2

IT WAS STILL DARK OUTSIDE AND WHEN "I REACHED
FOR THE PHONE I NOTICED THE CLOCK SAID 4:45 AM "

PG 4 PARAGRAPH 1

AT AROUND THIS TIME THE TELEVISION IN THE UPSTAIRS ~~HAVE~~
HALLWAY LOFT CAME ON WITH THE VOLUME VERY LOUD. I
HAD THE ALARM SET ON THAT TELEVISION SO I COULD GET
UP AND SEE MY SON OF TO SCHOOL (COPPIN STATE COLLEGE
IN BALTIMORE) EACH MORNING. HE HAD TO LEAVE THE HOUSE
BETWEEN 5:45 - 6:00 AM TO BE IN CLASS AT 8:AM THE SOUND
~~STARTED~~ STARTLED THE AGENTS AND THEY ASKED ME WHAT IT
WAS. I TOLD THEM IT WAS THE TV.

(EXHIBIT #8) MORE DISCUSSION OF THE ALARM CODE

EVEN IN OUR SWORN DECLARATION MR AND MRS
JONES MENTIONS THE ALARM CODE.

JULY 23, 2011    ANTOINE JONES AFFIDAVIT    PG 2

AT ABOUT THIS TIME THE ALARM STARTED SOUNDING

AND THE OFFICERS MADE MY WIFE GIVE THEM THE CODE TO TURN OFF THE ALARM. SHE GAVE THEM THE CODE AND THEY TURNED OFF THE ALARM.

APRIL 17, 2012   DENIECE JONES SWORN DECLARATION UNDER PENALTY OF PERJURY PAGE 4

THE HOUSE ALARM WENT OFF AND THE AGENTS KEPT ASKING FOR THE CODE TO TURN IT OFF. IT TOOK ME A MINUTE TO GET IT TOGETHER BECAUSE I COULD NOT THINK CLEARLY. THE AGENT DISARMED THE HOUSE ALARM

====================================

## PERJURY – 18 U.S.C.S. § 1621, 1622, 1623 VIOLATION

THE TESTIMONY OF AGENT NAUGLE WHEN HE STATES THAT THE MOORE STREET HOUSE, FRONT DOOR WAS "OPEN" OR "AJAR" WAS CLEARLY PERJURY AND A FABRICATED STORY.

(EXHIBIT #13)   FIRST TRIAL TESTIMONY – AGENT NAUGLE

PG 64 LINE 14-18

MS. LIEBER: (Q) NOW, TELL THE JURY ABOUT HOW YOU ALL

6 11

MADE ENTRY ENTO THAT LOCATION ON OCTOBER 29TH.

AGENT NAUGLE (A) YES. AS I SAID, I WAS THE KNOCK
AND ANNOUNCE AGENT. I KNOCKED ON THE DOOR ON THIS
-- AFTER I KNOCKED ON THE DOOR, "THE DOOR WAS
OPENED;" WE WENT INSIDE THE DWELLING.

PG 96 LINE 25, PG 97 LINE 1-11

(Q) YOU INDICATED THAT THE DOOR WAS OPEN. HOW
WAS THE DOOR OPEN?

(A) I KNOCKED ON THE DOOR TWICE, AND THE
SECOND KNOCK, THE DOOR CAME OPEN.

(Q) SO THE DOOR JUST HAPPENED TO OPEN?

(A) IT WAS AJAR, I'M ASSUMING. IT WASN'T
LOCKED.

(Q) ALRIGHT. SO YOU DIDN'T PICK THE LOCK?

(A) NO

(Q) YOU DIDN'T KNOCK THE DOOR DOWN?

(A) NO

(Q) YOU KNOCKED, AND THE DOOR JUST OPENED?

(A) THAT'S CORRECT

(EXHIBIT #13 B)     TRIAL TESTIMONY AGENT NAUGLE

FEBRUARY 11, 2013     AM SESSION     PG 44 LINE 10-12

(A) WELL, I WAS KNOCKING ON THE DOOR AND SCREAMING, "FBI, SEARCH WARRANT." AND THEN ONCE, AS I SAID, THE DOOR CAME OPEN, WE WENT INSIDE.

(EXHIBIT #13C)    TRIAL TESTIMONY AGENT NAUGLE

FEBRUARY 11, 2013     AM SESSION     PG 79 LINE 8-15

(Q) NOW, YOU SPOKE OF THIS DOOR RIGHT HERE (INDICATING) BEING OPEN OR -- YOU SAID YOU KNOCKED TWICE AND IT JUST MYSTERIOUSLY OPENED? IS THAT CORRECT?

(A) YES AFTER I KNOCKED THE SECOND TIME THE DOOR OPENED UP.

(Q) SO NOBODY OPENED THE DOOR. IT JUST POPPED OPEN.

(A) NO ONE OPENED IT, AS FAR AS I KNOW.

(EXHIBIT #14)    MRS DENIECE JONES TRUTHFUL TESTIMONY UNDER OATH

TRIAL TESTIMONY MRS DENIECE JONES

FEBRUARY 14, 2013     AM SESSION     PG 27 LINE 3-16

. . . DID YOU HEAR THE DOOR OPEN?
THE COURT: FRONT DOOR?

% 13

MR. JONES: (Q) THE FRONT DOOR?

(A) WHAT I HEARD WAS I HEARD THE DOOR
BEING UNLOCKED. THE DOOR -- IF YOU LOOK BACK AT
THE HOUSE -- THE GENTLEMAN THAT BUILT THE HOUSE,
HE'S 6 FEET 7 INCHES TALL, SO HE HAD CUSTOM DOORS
AND CUSTOM DOORWAYS AND A CUSTOM LOCK ON THAT
FRONT DOOR. AND WHEN IT'S UNLOCKED, YOU CAN
HEAR IT VIBRATING OR VERBERATING (sic) THROUGH-
OUT THE HOUSE. SO I WAS REALLY CONFUSED BECAUSE
I THOUGHT SOMEBODY WAS BREAKING IN; AND THEN
WHEN I HEARD THAT DOOR, THAT UNLOCK GO, I WAS LIKE,
WELL WAIT A MINUTE, SOMEBODY'S BREAKING IN, BUT
WHOEVER'S BREAKING IN HAS A KEY...

    JULY 23, 2011 ANTOINE JONES SR.
    SWORN AFFIDAVIT   PAGE 1


I HEARD SOME LOUD NOISES SOUNDING LIKE SOME-
ONE WAS BREAKING INTO MY HOUSE.
I INSTANTLY JUMPED UP AND RAN TO THE HALLWAY
TO SEE FROM THE STREET LIGHTS "THAT THERE WAS SOME-
ONE TRYING TO OPEN THE DOOR WITH A KEY" OR TO
PICK THE LOCK.

    APRIL 17, 2012 ANTOINE JONES SWORN DECLARATION
    UNDER PERJURY PENALTY   PAGE 1

14

I WENT INTO MY BEDROOM, MY WIFE WAS AWAKE
AND SHE GOT UP AND GOT INTO THE SHOWER WITH ME.
AFTER TAKING A SHOWER WE GOT ON THE BED, NOT LONG
AFTER WE WERE RELAXING IN BED. I HEARD SOME LOUD
NOISES AT THE FRONT DOOR. I JUMPED UP TO IN-
VESTIGATE THE NOISES. "I COULD SEE SOMEONE USING
A KEY TO OPEN THE FRONT DOOR AND I HEARD THE
LOCK WHEN IT WAS TURNED"

APRIL 17, 2012   DENEECE JONES SWORN DECLARATION
UNDER PENALTY OF PERJURY   PAGE 2, 3

SHORTLY AFTER WE GOT INTO BED, I REMEMBER
HEARING A LOUD NOISE AT THE FRONT DOOR. (I THOUGHT
SOMEONE WAS BREAKING IN) I REACHED FOR THE
TELEPHONE WHICH WAS ON MY NIGHTSTAND BESIDE
THE BED. THERE WAS SO MUCH GOING THROUGH MY
MIND. IT WAS STILL DARK OUTSIDE AND WHEN I REACHED
FOR THE PHONE I NOTICED THE CLOCK SAID 4:45 AM I
WAS GOING TO CALL THE POLICE BECAUSE THE NOISE
WAS CLEARLY SOMEONE BREAKING INTO OUR HOUSE. (I
REMEMBER THINKING, IT'S STILL DARK OUTSIDE
NOW BUT SOON OUR NEIGHBORS WILL BE GETTING
UP AND GOING TO WORK SO SOMEONE WILL SEE
THAT WE NEED HELP)
  "THEN I HEARD THE SOUND OF THE FRONT DOOR BEING

15

UNLOCKED " (I WAS CONFUSED BY THIS BECAUSE ROBBERS
DON'T USE KEYS, BUT I REMEMBERED THAT MY HUSBAND'S
FRONT DOOR KEY HAD BEEN MYSTERIOUSLY MISSING
FROM HIS KEY RING - MYSTERIOUS BECAUSE IT WAS
THE ONLY KEY THAT WAS MISSING FROM THE RING)
NOW I WAS REALLY SCARED, SHAKEN AND CONFUSED. I
THOUGHT I WAS THE ONLY ONE WITH A KEY TO THE FRONT
DOOR SINCE MY HUSBAND'S FRONT DOOR KEY HAD
MYSTERIOUSLY DISAPPEARED OFF THE KEY RING A FEW
WEEKS EARLIER. (THE HOUSE WAS CUSTOM BUILT BY A
BUILDER AND HE HAD INSTALLED VERY TALL CUSTOM
DOORS AND A SPECIALTY LOCK ON THE FRONT DOOR.
I COULD HEAR THE DOOR BEING UNLOCKED THROUGHOUT
THE HOUSE BECAUSE OF THE SPECIALTY LOCK AND THE OPEN
FOYER SO THE NOISE VERY EASILY COULD BE HEARD IN
MY BEDROOM.

## 18 U.S.C. § 2239 - EXCEEDING THEIR AUTHORITY

THE AGENTS HAVE EXECUTED THE SEARCH WARRANT BY
WILLFULLY EXCEEDING HIS AUTHORITY AND EXERCISING
WITH UNNECESSARY SEVERITY.

THERE IS TESTIMONY AND EVIDENCE THAT SPECIAL
AGENT NAILLE AND HIS TEAM USED AN UNAUTHORIZED
DOOR KEY TO ENTER AND SEARCH THE MOORE STREET HOUSE

PG 16

BEFORE 6AM, WHILE MR AND MRS JONES WAS IN THE NUDE, DIDN'T SHOW, PRESENT OR LEAVE THE SEARCH WARRANT OR ATTACHMENT A WITH THE JONES BUT YET STILL EXCEEDED THEIR AUTHORITY BY CONFISCATING APPROXIMATELY 30 TO 40 BOXES OF THE JONES' PERSONAL AND BUSINESS PROPERTY.

(EXHIBIT #15)    TRIAL TESTIMONY FBI AGENT NAUGLE

FEBRUARY 11, 2013          PAGE 25-87

THERE IS NO EXCUSE THAT AGENT NAUGLE DIDN'T PRESENT MR OR MRS JONES A COPY OF THE SEARCH WARRANT TO SHOW WHAT AUTHORITY THEY HAD ENTERING AND SEARCHING THE MOORE STREET HOUSE.

THERE WAS NO DANGER OR THREAT TO THE ARMED AGENTS

FEBRUARY 11, 2013          PAGE 77 LINE 10-16

(Q) WAS MR JONES IN THE NUDE?
(A) YES, YOU DIDN'T HAVE ANY CLOTHES ON.
(Q) SO YOU EXPECTED MR JONES TO WALK DOWN THE STAIRS IN THE NUDE?
(A) YES. I DID

S 17

FEBRUARY 11, 2013                    PAGE 78 LINE 13-20


(Q) OKAY. NOW DID THE AGENTS HAVE THEIR GUNS
OUT?

(A) YES

(Q) WAS THE AGENTS POINTING THE GUNS AT MR JONES?

(A) I HAD MY GUN OUT AND I WAS POINTING AT YOU
BECAUSE YOU WERE NOT OBEYING ANY COMMAND.

(Q) DID MR JONES ~~exted~~ LOOK LIKE HE HAD A THREAT
TO THE AGENTS WHEN HE WAS IN THE NUDE?

(A) NO, NOT AT THAT POINT.


FEBRUARY 11, 2013              PAGE 80 LINE 1-15


AGENT NAUGLE (A) I HANDCUFFED YOU AT THAT POINT. AND
THEN YOUR WIFE WAS - - IF I REMEMBER CORRECTLY - -
BEHIND YOU STANDING IN THE BEDROOM. AND AT THAT
POINT WE - - I THINK WE HANDCUFFED HER AND WE
TOOK YOU AND HER ~~crossed~~ DOWNSTAIRS.

(Q) SO YOU HANDCUFFED MR JONES AND MRS
JONES AND YOU TOOK THEM DOWNSTAIRS. THEN WHAT
HAPPENED?

(A) YOUR SON WAS THERE. HE WAS BROUGHT DOWN-
STAIRS, ALSO. AND THEN WE STARTED THE PROCESS TO
CONDUCT A SEARCH AT YOUR RESIDENCE.

(Q) "AT THIS TIME DID YOU PRESENT A SEARCH
WARRANT TO LET THEM KNOW WHY YOU WERE THERE"

(A) "I DON'T KNOW IF WE PHYSICALLY SHOWED YOU OR HER SEARCH WARRANT AT THAT POINT. I VERBALLY TOLD YOU AND HER WHY WE WERE THERE AND EXPLAINED TO BOTH OF YOU WHAT WE WERE DOING AND WHAT OUR INTENT WAS."

FEBRUARY 11, 2013          PAGE 81 LINE 6-12

(Q) SO YOU SAID THAT YOU PUT HANDCUFFS ON MRS JONES AND MR JONES, CORRECT? AND YOU BROUGHT THEM DOWNSTAIRS. AND YOU'RE NOT SURE - - YOU'RE NOT FOR SURE WHEN DID YOU SHOW MR JONES OR MRS JONES THIS SEARCH WARRANT, DO YOU?

(A) YEAH, I DON'T KNOW IF WE SHOWED IT TO YOU AND MRS. JONES AT THE TIME RIGHT WHEN WE GOT THERE. ONCE THINGS CALMED DOWN WE MAY HAVE SHOWED THIS.

FEBRUARY 11, 2013          PAGE 82 LINE 17-20

(Q) AGENT NINGLE, WHEN YOU SAID YOU LEFT BEHIND THIS SEARCH WARRANT, WHERE DID YOU LEAVE THE SEARCH WARRANT AT?

(A) I THINK IT WAS ON THE TABLE. I THINK MAYBE LIVING ROOM, DINING ROOM TABLE.

MR JONES WILL PRESENT (EXHIBIT #16) A PHOTO OF

26 /9

THE MOORE STREET SEARCH WARRANT AND FIVE PAGE INVENTORY SHEET MRS JONES SIGNED. THERE IS NO SIGNS OR EVIDENCE OF A SEARCH WARRANT OR AFFIDAVIT IN THE PHOTO.

(EXHIBIT # 17) IS THE FIVE PAGE PROPERTY RECEIPT SIGNED BY DENIECE JONES AND YOU CAN VIEW THE MOORE STREET SEARCH WARRANT RETURNED ON (EXHIBIT #5) THIS WAS ALL ON THE MOORE STREET PHOTO.

(EXHIBIT #18) IS THE SEARCH WARRANT AND THE ATTACH-MENT A.

THESE TWO ITEMS WERE PRESENTED OR LEFT BY AGENT NAUGLE ON THE SEARCH WARRANT SEARCH.

FBI AGENT NAUGLE MENTIONED THE OTHER SEARCHES THAT WAS EXECUTED ON OCTOBER 24, 2005.

MR JONES IS GOING TO MENTION AND POINT OUT SOME CRIME SCENE PHOTO'S FROM OTHERS' SEARCHES ON OCTOBER 24, 2005.

(EXHIBIT # 19A)

PHOTO OF JOHN ADAMS AND HIS WIFE WITH THE SEARCH WARRANT ATTACHMENT A, SEARCH WARRANT RETURNED AND THE PROPERTY RECEIPT BETWEEN THE ADAMS.

'6 20

(EXHIBIT #19B)

CLOSER PHOTO OF JOHN ADAMS CRIME SCENE - SEARCH
WARRANT, ATTACHMENT A, PROPERTY RECEIPT, SEARCH
WARRANT RETURNED.

(EXHIBIT #19C)

CRIME SCENE PHOTO MIKE HUGGINS HOUSE - SEARCH
WARRANT, ATTACHMENT A, PROPERTY RECEIPT AND RE-
TURNED ON TABLE IN THE PRESENTS OF MIKE HUGGINS'
SON SETTING AT TABLE.

(EXHIBIT #19D) CLOSE UP PHOTO OF PROPERTY RECEIPT,
SEARCH WARRANT AND ATTACHMENT A, AT THE POTOMAC
DRIVE HOUSE.

IN THESE CRIME SCENE PHOTOS YOU CAN CLEARLY SEE
THE SEARCH WARRANT AND ATTACHMENT A, WHICH IN THE
MOORE STREET PHOTO YOU DON'T SEE THE PRESENCE OR
ANY EVIDENCE OF THE SEARCH WARRANT OR ATTACHMENT
A DURING THE OCTOBER 24, 2005 SEARCH. MY CONCERN IS,
WHY DIDN'T THE WELL EXPERIENCE AND TRAINED SPECIAL
AGENTS DIDN'T PHOTOGRAPH MRS JONES IN A PICTURE WITH
THE SEARCH WARRANT AND THE RETURN?

(EXHIBIT #   )   MRS JONES TRIAL TRANSCRIPT

FEBRUARY 14, 2013     AM SESSION     Pg 25-35

MR JONES WILL END WITH MRS JONES TESTIFYING ABOUT THE SEARCH WARRANT, ATTACHMENT A, AND THE INVENTORY SHEET SHE SIGNED.

FEBRUARY 14, 2013     AM SESSION     Pg 32 LINE 6-25

(Q) MRS JONES, WHEN HE GAVE YOU THOSE DOCUMENTS TO SIGN, WHAT DID THAT -- THE OFFICER OR AGENT DO ONCE YOU SIGNED THOSE DOCUMENTS?

(A) THIS WAS PRETTY MUCH AT THE END. HE TOLD ME THAT I HAD TO SIGN THESE FOR THE ITEMS THAT HE WAS TAKING -- FOR THE ITEMS THAT HE HAD TAKEN FROM THE HOUSE.

(Q) DID THE AGENT GO OVER THE PROPERTY THAT WAS TAKEN?

(A) NO. THEY JUST TOOK THE HANDCUFFS OFF ME I WAS SITTING IN THE FAMILY ROOM IN THE CHAIR HANDCUFFED. AND THEY TOOK THE HANDCUFFS OF ME, AND HE BROUGHT ME INTO THE DINING ROOM WHERE HE HAD FILLED THESE PAGES OUT, AND HE HAD ME TO SIGN THESE FAKE PAGES.

(Q) "AT THAT TIME, DID HE PRESENT A SEARCH WARRANT TO YOU?"

(A) "I WAS NEVER PRESENTED A SEARCH WARRANT"

; 22

I DIDN'T KNOW WHAT ONE LOOKED LIKE UNTIL I WENT TO MY SISTER'S HOUSE AND SAW THE SEARCH WARRANT THERE. AND "THAT'S WHEN I REALIZED THAT I HAD NEVER BEEN PRESENTED WITH ONE AND NEVER SEEN ONE."

FEBRUARY 19, 2013      AM SESSION      PG 33 LINE 11-15

(Q) ON OCTOBER 29, 2005, DID THE AGENT GIVE YOU THIS?

(A) NO, SIR.

(Q) THIS ATTACHMENT A. DID THE AGENT GIVE YOU THAT?

(A) NO, SIR.

FEBRUARY 19, 2013      AM SESSION      PG 35 LINE 1-6

(Q) DID YOU SPECIFICALLY REMEMBER THE PROPERTY RECEIPT -- DID HE GIVE YOU THIS (INDICATING) IN YOUR HAND?

(A) THEY WERE ON THE DINING ROOM TABLE. THEY TOOK ME OUT -- TOOK THIS HANDCUFF OFF, BROUGHT ME INTO THE DINING ROOM, AND TOLD ME I HAD TO SIGN THOSE FIVE SHEETS FOR PROPERTY THAT THEY TOOK FROM THE HOUSE.

523

## CONCLUSION

MR. JONES HAS SHOWN CLEAR AND CONVINCING EVIDENCE THAT AGENT STEPHEN NAUGLE HAS PERJURED HIMSELF, COMMITTED FRAUD ON THE COURT AND OBSTRUCT JUSTICE VIOLATING 18 U.S.C.S § 1001, 1519, 1621, 1622, 2234, 2236, 3105 AND AGENT STEPHAN NAUGLE AND HIS TEAM OF AGENTS VIOLATED THE JONES' 4TH AMENDMENT RIGHTS, RULE 41 AND THEIR CIVIL RIGHTS ONCE THEY UNLAWFULLY ENTERED AND SEARCHED THE MOORE STREET HOUSE BEFORE 6 AM. THIS OUTRAGEOUS MISCONDUCT SHOULD BE INVESTIGATED TO PROTECT MR. JONES RIGHTS AND TO DETER AGENT NAUGLE'S CORRUPT CONDUCT.

1    A.  1 guess so, yes.

2    Q.  And you have no information as to whether or not Mr.

3    Brown -- excuse me, Mr. Jones sought an extension to file taxes

4    in 2002?

5    A.  I don't have any indication of that, no.

6    Q.  Now, you did indicate that you were the lead -- lead agent

7    in the -- with respect to the search warrant of Moore Street?

8    A.  Yes, team leader.

9    Q.  Team leader.

10       Well, you were in charge of the whole search warrant,

11   basically; right?

12   A.  Yes.

13   Q.  You coordinated who got what assignments, that kind of

14   thing; right?

15   A.  Yes, sir.

16   Q.  And you're familiar with the overall result of the seizure;

17   correct?

18   A.  Yes, sir.

19   Q.  Okay.  Now, it is correct to say that when you went into

20   the house at Moore Street, that was at sometime -- well, what

21   time did you go into the house?

22   A.  Well, it was after 6:00 a.m.

23   Q.  Do you remember what time, specifically?

24   A.  No, not off the top of my head.

25   Q.  You indicated that the door was open.  How was the door

1    permission, once it was 6:00, we received permission to

2    execute the search warrant.  We then got into our vehicles,

3    we drove up to Mr. Jones's residence.  And at approximately

4    6:15 a.m., we entered the residence.  *Perjury #1*

5    Q.  And how was entry made into the residence?

6    A.  Entry was made -- we walked up to the front door.  I

7    knocked and announced.  It's a requirement.  I knocked on

8    the door.  And I identified ourselves as law enforcement,

9    FBI.  We have a search warrant.

10            When I knocked on the floor the second time, the

11   door obviously was unlocked and it opened on its own.  With

12   me knocking on it, the door opened.  At that point we went

13   into the residence and --  *Perjury #2*

14   Q.  And I'll just ask you if you could just describe, then,

15   the interior of the residence once entry was made and what

16   did you see, if anything?

17   A.  Sure.  Approaching the residence it's a very large

18   house.  It's on a nice piece of property.  Beautiful home,

19   two-car garage.  Attached two-car garage.  You go into the

20   front door of the residence.  It's a huge first floor.  If I

21   can remember correctly, the room to your right is a very

22   large office.  Living room, dining room, kitchen area on the

23   first floor.

24            There's a grand staircase.  In other words,

25   there's two staircases that you can walk up, both sides --

1    I knocked on it.  *Perjury*

2    Q.  So you telling the jury that this door wasn't locked?

3    And it just opened after you knocked on it?

4    A.  Yes.  That's what happened.  I knocked on the door twice

5    and it opened up.  *Perjury*

6    Q.  Now, you know in this case they had a wiretap, correct?

7    A.  Yes.

8    Q.  Do you know if Mr. Jones, the weekend before the 24th or

9    the 23rd, was out -- out of town?

10   A.  If you were out of town that weekend?

11   Q.  Yes.

12   A.  I don't recall.  I don't know if I knew that or not.

13   Q.  Okay.  So it's not a fact that Mr. Jones was at church

14   during that weekend.

15           MS. SOLTYS:  Objection, Your Honor.

16           THE COURT:  Sustained.  It's not in evidence.  He

17   doesn't know where he was.

18   BY MR. JONES:

19   Q.  Now, when you came into this house, you said it was

20   after 6:00?

21   A.  Yeah.  It was approximately 6:15 a.m.  *Perjury*

22   Q.  Did alarm go off?

23   A.  I don't recall if alarm went off or not.

24   Q.  So you didn't recall --

25           This is Government Exhibit AJ-SW-24.  Did you

*EXHIBIT #4*

30

```
 1    agents acquire and -- swear out and acquire search warrants
 2    that they have in that case.  And on that day what we do is,
 3    generally everybody stages prior to entering the premises
 4    that you have the search warrant for.  Someone in the
 5    command post at the FBI gives the green light to execute.
 6    And then they're all hit simultaneously throughout the
 7    metropolitan area or wherever they may be.
 8    Q.  And what was the time that this particular search
 9    warrant was executed?
10    A.  You can't execute -- at this particular -- this    Perjury
11    particular event, this takedown, 6:00 in the morning.  Has
12    to be past 6:00 in the morning.
13    Q.  6:00 a.m.?
14    A.  6:00 a.m.
15    Q.  And that's a time that's consistent with the time for
16    the search warrant; is that correct?
17    A.  Yes, ma'am.
18    Q.  Now, did you -- do you have -- did you have a particular
19    role?  Were you assigned a particular role during the
20    execution of this search warrant at Mr. Jones's residence?
21    A.  I did.
22    Q.  And if you could explain to the ladies and gentlemen of
23    the jury how did that come about?  What was your role and
24    how did it come about that that's what you were assigned?
25    A.  There's team assignments.  I believe the team leader on
```

*Exhibit #5*

| RETURN | | CASE NUMBER: |
|---|---|---|
| DATE WARRANT RECEIVED<br>*10/22/05* | DATE AND TIME WARRANT EXECUTED<br>*10/24/05 6:15 AM* | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH<br>*Deniece Jones* |
| INVENTORY MADE IN THE PRESENCE OF<br>*NAUGLE, STEPHEN R.* | | |

INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT

*See attached 597's (Receipt of Property Seized)*

### CERTIFICATION

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

Subscribed, sworn to, and returned before me this date

_____   *11/8/05*
U S Judge or Magistrate          Date

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription   10/24/2005

*This is a lie, it was more 5am*

On 10/24/05, at approximately 6:15 A.M., a federal search warrant was executed at 10870 Moore Street, Waldorf, MD. The search warrant was executed pursuant to a United States District Court search warrant issued on 10/22/05. *It was MD District court.*

*Plus the T.V alarm went off while they was in the hous. It goes off at 6am.*

Special Agent (SA) Stephen R. Naugle knocked and announced. Upon the second knock of the front door, the door opened. Entry was made and ANTIONE JONES and his wife DENIECE JONES were located in the upstairs bedroom. Located in the top left bedroom was JONES's son, ANTIONE JONES. ANTIONE JONES gave consent to search his vehicle, a Jeep Grand Cherokee Laredo, JONES signed a FD-26 (Consent To Search). All subjects were secured and the search revealed the following: *This is a lie - They check the cadilline And Toyota sequoia.*

*this is a lie because I heard the door open. Before I went upstairs no you took the osato ns how inlove*

*They use Amy or Jage to open the door I heard the click.*

1. $69,191.00/Located inside of the Jeep Grand Cherokee. The money was found inside of three separate bags. The bags were located in the rear of the Jeep Grand Cherokee.

*et the iaam if a door as open.*

2. $452.00/Located from the front pants pockets of a male pair of jeans from JONES's bedroom.

3. Numerous personal and financial documents in the name of ANTIONE JONES and DENIECE JONES.

4. Numerous keys which ANTIONE JONES said were his keys.

5. Two (2) cellular telephones

The following two (2) vehicles were seized:

1. 2001, Cream colored Jeep Grand Cherokee, VIN: 1J4GW48S71C683464, MD license plate, M 667480.

2. 2002, Silver Colored Toyota Sequoia, SRS, VIN: 5TDBT44A43S144078, MD, license plate, M 895532. *search*

*This a lie, they only left A Property Receipt - No warrant or Attachment A,*

A copy of the warrant was left with DENIECE JONES along with five (5) FD-597's (Receipt for Property Seized). As SA Naugle was explaining the FD-597's to DENIECE JONES in the presence of SA Kaluzny, SA Wolf, SA Wise and Craig Wallace, (Forfeiture Analyst), SA Naugle asked her if she could hear the agents knocking

---

Investigation on   10/24/05   at   Washington, D.C.

file #   281D-WF-213679                              Date dictated   N/A

SA Stephen R. Naugle:srn

by   SA Craig L. Kaluzny

*Security Secrets, LLC*

2201 Cooperative Way
Suite 600
Herndon, VA 20171

Office: 703-788-6763

Fax: 703-449-0654

January 21, 2013

To: Alonzo Gibson

Re: Polygraph Examination
      Antoine Jones

Dear Mr. Gibson:

Pursuant to your request, the above mentioned examinee was extensively interviewed and afforded a series of polygraph examinations at the Washington, D.C. Detention Center on January 19, 2013. I had been advised the examinee wanted to make certain some statements and facts about his case were true and accurate. The purpose of this examination would be to check the truthfulness of some of those statements made by the examinee.

Prior to the interview and examination the examinee signed the necessary consent forms and voluntarily submitted to the polygraph examination. These forms will become a permanent part of this agency's files.

The examination was conducted on a Stoelting CPS II Computerized Polygraph System, an instrument capable of measuring respiratory, cardiovascular and electrodermal reactions.

During the pretest interview, the examinee was extensively questioned concerning the facts of his case as he remembered and related them. The examinee was advised a polygraph examination may not be what he needs or accepted in this case. The examinee said it was important to him that this test be performed so certain people could see he is telling the truth. The purpose of this examination would be to see if the examinee was being truthful in his recollection and presentation about the following statements involving his case.

During the pretest interview the following questions were formulated, reduced to writing, and reviewed with the examinee prior to administering the test:

1. Is this the year 2013?
Answer: Yes

2. Regarding the facts in your case, do you intend to answer truthfully each question?
Answer: Yes

3. On October 24, 2005, did you enter your residence through your garage door and trigger the alarm?
Answer: Yes

4. Before 6:00 a.m. on October 24, 2005, are you the person that activated and deactivated your alarm to secure your residence?
Answer: Yes

5.  Is this the month of January?
Answer: Yes

6.  Before 6:00 a.m. on October 24, 2005, did you observe the FBI agents trying to unlock your Moore St. door?
Answer: Yes

7.  Before 6:00 a.m. on October 24, 2005, after the FBI agents activated your alarm, did they get the code from your wife to deactivate the alarm?
Answer: Yes

8.  Are you now in the D.C. Jail?
Answer: Yes

9.  On October 24, 2005, did you sign any forms consenting to the search of your Jeep Cherokee?
Answer: No

10.  Did Gregory Wills install a pegboard, tool stand, and window in the Hampton Park warehouse before April 30, 2004?
Answer: Yes

11.  Is your last name Smith?
Answer: No

12.  Is the window and pegboard that were installed in the warehouse in the ICE photos?
Answer: No

13.  Were you told by Lawrence that the personal items in the ICE photos were removed before April 30, 2004?
Answer: Yes

14.  Did you and Lawrence remove your personal items from the warehouse before April 30, 2004?
Answer: Yes

An I/R (Irrelevant/Relevant) format test was used. Subsequent to a series of polygraph examinations, it was the opinion of this licensed state examiner, based upon careful analysis of the tests results that the examinee <u>did not show significant reactions</u> to the majority of the questions asked.

I would like to take this opportunity to thank you for allowing me to be of service.  Should any additional information or clarification pertaining to this interview and/or examination be necessary, please do not hesitate to contact me.

Sincerely,

Danny W. Bragg
Licensed State Polygraph Examiner

( Exhibit #8 )  Direct ...

```
 9          MR. BALAREZO:  Right.  But I would like the jury to
10   know.  I mean, it's not what we talk about here.  They are the
11   ones that's going to have to decide, so they need to hear.
12          THE COURT:  Fine.  That's fine.  The government likes
13   that.  Bring that right up that she doesn't know where the
14   money came from.  Excellent.  The government has no objection
15   to that.  What else?
16          MR. BALAREZO:  I think that might be it.  I will have
17   to consult with Mr. Jones.
18          THE COURT:  The hour is sustained.  But what else is
19   there?  The hour, I have sustained.  Sixty thousand she can
20   explain, she doesn't know about.  What else happened?
21          MISS LIEBER:  Gestapo tactics.
22          THE COURT:  We are not getting into how they executed
23   the whole thing.  I don't see any relevance other than the
24   60,000.  Sustained.  Thank you.
25          (Open court)
```

33

```
 1          THE COURT:  Ma'am, come on back.
 2          MR. BALAREZO:  If I could just have one second, Your
 3   Honor?
 4          THE COURT:  Yes.
 5          MR. BALAREZO:  Thank you, Your Honor.
 6   BY MR. BALAREZO:
 7   Q.  Mrs. Jones, on October 24th, when law enforcement came to
 8   arrest your husband, were you asleep?
 9   A.  Yes, I was.
10   Q.  Do you recall what time it was that they showed up to
11   arrest your husband?
12   A.  4:45 in the morning.
13          MR. BALAREZO:  I have nothing further at this time,
14   Your Honor.
15          THE COURT:  Okay.
16          MR. NORRIS:  I have a few questions.
17          THE COURT:  Fine.  Go right ahead, Mr. Norris.
18                    CROSS-EXAMINATION
19   BY MR. NORRIS:
20   Q.  Good afternoon, Miss Jones.
21   A.  Good afternoon.
22   Q.  Now, Miss Jones, you testified on direct that one of your
23   businesses was as a real estate agent; is that correct?
24   A.  Yes.
25   Q.  And were you actively working as a real estate agent in
```

34

(Exhibit 9)

26

```
 1    Q.  This is an inventory sheet.  Is this your name
 2    (indicating)?
 3              THE COURT:  Signature.
 4    BY MR. JONES:
 5    Q.  Your signature, Mrs. Jones?
 6    A.  Yes, it is.
 7              (NOTE:  Documents provided to the witness.)
 8    Q.  Mrs. Jones, on October 24th, 2005 -- excuse me.
 9    Mrs. Jones?
10    A.  I'm sorry.
11    Q.  On October 24th, 2005, what time did the agents come
12    into the Moore Street house?
13    A.  They came in at 4:45 a.m.
14    Q.  When you and your husband heard a loud knock, what did
15    your husband do?
16    A.  I heard a noise.  I actually thought somebody was
17    breaking in.  And I reached for the phone to call the
18    police.  The phone was on the nightstand beside my side of
19    the bed beside the alarm clock.  That's how I know what time
20    it was.  And we both -- we were in bed.  We were asleep.
21    And we both jumped up.  And I said, Oh, my God, somebody's
22    trying to break in.  I was reaching for the phone to call
23    the police.  You jumped up and went to the bedroom door to
24    see what was going on.
25    BY MR. JONES:
```

```
 1    new church in Newport News, Virginia.  And we had gone there

 2    for that celebration for the weekend.

 3    Q.  Mrs. Jones, when we came back, which way did we enter

 4    the house?

 5    A.  Through the garage, the way we always do.  You had

 6    actually lost -- your key to the front door had disappeared,

 7    and I had been trying to get one made.  But because that

 8    lock was a custom lock I couldn't -- I'd gone like

 9    everywhere and I couldn't get a key made for you.  So you --

10    we always entered through the garage when we were in the

11    cars together.  Go ahead.

12    Q.  Was the front door locked before we went out of town?

13    A.  Yeah, the front door is always locked.

14    Q.  Was the front door -- well, you answered the question.

15         Was the front door locked when we got back in

16    town?

17    A.  Yes, the front door was locked.

18    Q.  Now, when the agents came upstairs, was they pointing

19    guns at you and Mr. Jones?

20    A.  When the light came on, there were many guns pointed at

21    us.  They threw you on the floor in the corner and --

22    Q.  Mrs. Jones, did one of the agents ask for the alarm

23    code?

24    A.  Yeah.  The -- when the noise started going off, they --

25    it was like they were all in shock like, What is that?  What
```

```
1    is that?  And I guess there was somebody downstairs, and

2    they yelled up and said, It's the alarm.  And then they

3    asked for the code.  And I gave them the code to turn off

4    the alarm.

5    Q.  Did the agents cut the alarm off after you gave them the

6    code?

7    A.  They did.

8    Q.  Okay.  Now, you and Mr. Jones was in the nude at the

9    time?

10   A.  That's correct.

11   Q.  Can you tell the jury what did they do to Mr. Jones in

12   terms of did they handcuff him at that time?

13   A.  They actually handcuffed all of us.

14           THE COURT:  Who's "us"?

15           THE WITNESS:  Me, my husband.  And my son was in

16   his bedroom down the hall, but when I saw my son he was in

17   handcuffs.

18           THE COURT:  How old was he?

19           THE WITNESS:  He was -- at that time he had just

20   had his 18th birthday.

21   BY MR. JONES:

22   Q.  Mrs. Jones, did your son, Antoine Jones, Jr., attend

23   college during that time?

24   A.  He did.  That was his first semester at Coppin State.

25           THE COURT:  Where?
```

Exhibit #11

```
 1              THE WITNESS:  Coppin State in Baltimore.
 2     BY MR. JONES:
 3     Q.  Mrs. Jones, what time do the alarm wake Antoine Jones,
 4     Jr., up?
 5     A.  I don't know what time his alarm in his room wakes him
 6     up, but I had set the -- upstairs in the hallway there --
 7     there's a TV -- there was a TV viewing area.  And I had set
 8     the TV to come on at 6:00 every morning so that I could get
 9     up and tell him bye when he left out the house.
10     Q.  Mrs. Jones, isn't it a fact this was over approximately
11     an hour later when this TV came on?  And the officers
12     panicked?
13              MS. SOLTYS:  Objection, Your Honor.
14              THE COURT:  Office --
15              MR. JONES:  Panicked.  They didn't now where --
16     how to cut it off.
17              THE WITNESS:  They didn't know what it was.
18              THE COURT:  Sustained.  Don't answer.
19              THE WITNESS:  Oh, I'm sorry.
20     BY MR. JONES:
21     Q.  Can you explain to the jury what happened when this TV
22     alarm came on?
23     A.  I guess it just took them by surprise and it shocked
24     them, and everybody kind of like panicked.  Like, What is
25     that noise?
```

( ⸨ / ⸩⸩ ⸨ ⸩ )

## AFFIDAVIT OF ANTOINE JONES

Pursuant to 28USC 1746, I Antoine Jones Sr. declare, certify, verify and state under penalty of perjury that the foregoing is true and correct.

### Statement of Facts

On the morning of October 24, 2005, I Antoine Jones entered my home on Moore Street, Waldorf, Maryland through the garage. I parked the Jeep Cherokee inside the garage and entered into my house through the garage door.

I locked the door after entering the house. I turned off the alarm system and then re-activated the alarm system. After the alarm system was activated, I checked the front and back doors to make sure they were locked. [This was my regular routine, a habit I had developed because I get home so late at night.]

After taking a shower and getting in bed to go to sleep... not long after, I heard some loud noises sounding like someone was breaking into my house. I instantly jumped up and ran to the hallway to see who and what was at my front door. The front door is a glass door so I was able to see from the street lights that there was someone trying to open the door with a key or to pick the lock.

I then realized there was a group of people trying to get into the house. This took a few seconds. Special Note: The front door was very hard to open because the original owner of the house who was also the builder had used a unique lock which was very hard to open and it worked differently from traditional door locks. Also, the locking gadget made a very loud noise which can be heard all through the house whenever the door is unlocked.

The FBI and MPD detectives entered the Moore Street house long before 6a.m. They

breaking in the house.  They caught me with my pants off and my wife was totally nude also.

They entered my bedroom with guns pointing at me and my wife.  The turned on the lights and demanded we lay on the floor.

At about this time the alarm started sounding and the officers made my wife give them the code to turn off the alarm.  She gave them the code and they turned off the alarm.

One of the female officers took my wife into the bathroom to put on some clothes.  The other officers allowed me to put on a pair of pants.  Later my son's alarm clock went off and I realized it was 5:00a.m. because my son's alarm clock was set for 5:00a.m.  [My son was attending Coppin University in Baltimore and he got up at 5:00a.m. and left the house at 6:00a.m. each morning and stopped at the metro station to pick up his classmates to get to school in time for his 8:00a.m. class.

They had also entered my son's room.  I could not see what was going on in my son's room but when I saw my son they were bring him out of his room in handcuffs.  They took me and my son downstairs.

They took me downstairs to the family room where I had full view of 2 clocks, the grandfather clock in the hallway and the clock sitting on the fireplace mantle.  It was just past 5:00a.m. at this time.  They brought my wife downstairs much later.

I asked the officers numerous times if they had a Search Warrant and what were they doing in my house.  The officer first ignored my questions and later he remarked there would be plenty of time for me to see a Search Warrant later.  The officers never showed me a Search Warrant, they later took me out of the house and drove me to FBI headquarters in Washington, DC.  Special Note: My Miranda Rights were never read to me and I was never shown a Search Warrant nor an Arrest Warrant.  I was never asked

63

Special Note: The officers testified that they had a Search Warrant before entering the Moore Street house. Therefore, why would they feel a need to ask to search anything… the Search Warrant would have permitted the officers to search… if they really had a Search Warrant. The officers testified that I pointed out bags in the Jeep Cherokee. Special Note: I was handcuffed upstairs in the bedroom when the officers first entered the house and therefore could not possibly point out anything in the Jeep Cherokee in the garage. The "consent" form is a fraud with a forged signature. I did not sign a "consent" form or any other form neither was I asked for my consent to search anything.

When I arrived at FBI Headquarters in Washington, DC, FBI Agent Stephanie Yanta asked me to make a statement or to tell them something. I declined and asked for a lawyer. At that point Agent Yanta gave me a Miranda Card to sign along with a 1-page Inventory Sheet and Return page from Club Levels to sign. Special Note: No Search Warrant or Attachment A was with the Inventory Sheet and Return page that Agent Yanta presented to me on October 24, 2005 at FBI Headquarters.

Special Note: I even asked my lawyer many times for the Search Warrants for the Moore Street house and for Club Levels. It was months after I had been arrested, after many court appearances, and shortly before the start of the first trial before I was given a copy of the Search Warrants along with other Discovery materials. Further, my attorney requested the Search Warrants many times in court.

Signed, Antoine Jones        Date:  7 - 23 - 2011

Antoine Jones
Address: 18600-016, USP Florence, PO Box 7000, Florence, CO 81226-7000

01   ( Exhibit #12 )

Antoine Jones, Sr.

Declaration

I, Antoine Jones, Sr., declare under penalty of perjury (28USC§1746) that this declaration is correct, accurate and true.

On Monday morning October 24, 2005, I came home, arriving in the early morning hours. I went into the house through the side door (garage door). The alarm panel is just in front of the door. The alarm had been set, as we each customarily set the alarm when we leave the house and before we go to bed at night. I entered my code to deactivate the alarm and reset the alarm as soon as I walked in the house. I quickly glanced at the mail on the table (we had been out of town for the weekend so I was checking to see if bills or anything else needed my attention). I then checked to make sure the doors (front and back) were secured and locked and went upstairs. As I routinely do, I check my son's room, he was asleep.

I went into my bedroom. My wife was awake and she got up and got into the shower with me. After taking a shower we got in the bed. Not long after we were relaxing in bed I heard some loud noises at the front door. I jumped up to investigate the noise. I could see someone using a key to open the front door and I heard the lock when it was turned (it makes a very loud noise that echoes through the house). My mind started to run in a thousand directions because my front door key had been missing from my key chain and since the lock was a specialty lock we were having a hard time finding a locksmith to duplicate my wife's front door key.

(Of course, I later realized it was the agents who came through the front door – a violation of "18USC§3109" .)  The agents bum-rushed the house running up the steps, pointing guns in my face. They were inside our bedroom within seconds with guns pointed at us and had cornered me and threw me on the floor. They handcuffed me and eventually let me put on a pair of pants and later they took me downstairs.

It was still dark outside and still very early (not 5:00 a.m. yet) as I could see the clock – a violation of "Rule 41H".

I asked if I could see the search warrant because they were all through my house and I wanted to know what they were looking for and why they were there. They had already asked my wife if there were any weapons in the house and she told them already "no". The agents ignored my request to see a search warrant. The agent took me to the den (my wife's home office) and once we got there I asked to see the search warrant again. The agent got frustrated with me and one of the other agents said "he's a smart ass, take him in". They took me out of the house and put me in a car and took me downtown.

Special note: My wife and I were nude, my son in his boxer underwear. None of us were a threat at any time. None of us resisted their demands. To not show or produce a search warrant after my numerous requests is clearly a Rule 41(f) violation and 18USC§2234 – exceeding their authority.

P63

I will conclude that I never signed a consent form, the signature is a forgery and I am willing to submit to a polygraph exam or handwriting expert. This is a clear violation of <u>18USC§1001 and 18USC§1519</u> along with the false entry time of <u>6:15 a.m.</u> which is clearly obstruction of justice and perjury once Agent Naugle testified under oath that the Moore Street house door was ajar and the agents entered the Moore Street house at 6:07 a.m. (The front door had to be completely closed or the alarm system could not be activated.)


Signed:                                                   Date:

Antoine Jones                                     4-17-2012

(Exhibit #12)

P61

Deniece Jones

Declaration

I, Deniece Jones declare under penalty of perjury (28USC§1746) that this declaration is correct, accurate and true.

On Sunday October 23, 2005, me, my husband, and son Antoine Jones Jr. arrived home from a church event, an out-of-town. We followed our normal routine of parking the vehicle in the garage and entering the house through the garage door.

That evening my son went out for a brief time. He was in college and he returned home before midnight. He followed his routine of entering the house through the garage door. He had a garage door opener in his car and a key to the side-entry door so it was always his routine to come through that door when he came home. When my son returned home that evening, he reset the alarm and came upstairs and went to bed. (I know he reset the alarm because I had already gone upstairs when he got home and I had set the alarm before I went upstairs).

My husband also went out for a little while that evening after we returned home from church. He left in the Jeep Cherokee which had been parked in the garage. He also left the house through the garage (side-entry) door. My husband returned home and he came in through the garage (side-entry) door. I was awakened by the opening of the actual garage door, then I heard him pull the Jeep into the garage and close the garage door. (Our master bedroom was over the

garage so I always heard the garage door when it opened and closed.) When he (my husband) came into the house, I heard him deactivate and reset the alarm before coming upstairs (the alarm control panel is in the downstairs hallway just below the master bedroom and the foyer is an open 2-story foyer so I could easily hear activity going on downstairs).

As he usually does, he checked on my son and then came to our bedroom and took a shower. I got out of bed and went into the bathroom and got into the shower with my husband. After showering, I got in the bed naked. Amongst other things, my husband and I were discussing the sale of the Club Levels which was to take place later that morning. He let me know that he had to leave out early so he could do a final cleaning and walk-through at the club. He mentioned that he and Lawrence (Maynard) would need to be at the club at 6:00 a.m. Monday morning to do the final walk-through and cleaning of the Club before meeting with the buyer and his attorney to sign the sales contract.

Shortly after we got in bed, I remember hearing a loud noise at the front door. (I thought someone was breaking in.) I reached for the telephone which was on my nightstand beside the bed. There was so much going through my mind. It was still dark outside and when I reached for the phone I noticed the clock said 4:45 a.m. I was going to call the police because the noise was clearly someone breaking into our house. (I remember thinking, "it's still dark outside now but soon our neighbors will be getting up and going to work so someone will see that we need help.") Then I heard the sound of the front door being unlocked. (I was confused by

P64

of strange men with guns pointed at me in my bedroom. The house alarm went off and the agents kept asking for the code to turn it off. It took me a minute to get it together because I could not think clearly. The agents disarmed the house alarm.

I was scared so bad that I had to use the bathroom so I asked (again feeling even more degraded and violated now) if I could use the bathroom. The agents had a female agent to come into the room and take me into the bathroom. I asked her if I could put something on so I don't have to go back into the room naked. I was taken back to the bedroom and positioned on the bed in a sitting position after I used the bathroom. At around this time the television in the upstairs hallway loft came on with the volume very loud. I had the alarm set on that television so I could get up and see my son off to school (Coppin State College in Baltimore) each morning. He had to leave the house between 5:45 – 6:00 a.m. to be in class at 8:00 a.m. The sound startled the agents and they asked me what it was. I told them it was the tv.

The agents searched the entire house. They moved all three of us from our bedrooms to the downstairs family room (I saw my son downstairs in cuffs and was really upset by that). The entire ordeal was upsetting to me. My husband started questioning the agents about a search warrant. One of the men said, go ahead and take him "downtown". After they took him out of the house, they asked my son if they could search the black Cadillac. He hesitated and the agent told him if he did not give them permission they would search it anyway but if he cooperated with them and gave them permission then they would finish up and get out of the way.

this because robbers don't use a key but I remembered that my husband's front door key had been mysteriously missing from his key ring – mysterious because it was the only key that was missing from the ring.)  Now, I was really scared, shaken and confused.  I thought I was the only one with a key to the front door since my husband's front door key had mysteriously disappeared off his key ring a few weeks earlier. (The house was custom built by a builder and he had installed very tall custom doors and a specialty lock on the front door.  I could hear the door being unlocked throughout the house because of the specialty lock and the open foyer so the noise very easily could be heard in my bedroom.)  Before I could dial 911, I heard a bunch of footsteps running up the stairs, and someone was (a man's voice) yelling repeatedly "get the son's room, get the son's room".  Thoughts were swirling through my head faster than I could capture them.  I was wondering who was saying "get the son's room, and why.  I was wondering why there were so many (it sounded like an army) people running up the stairs and the next thing I knew there were a bunch of guns pointed at me and my husband.  I was scared and even paralyzed. Someone turned on the light in my bedroom; my bedroom was filled with men (with guns pointed at us) yelling at me and someone pulled me out of bed.  I remember someone snatched the telephone out of my hand and hung it up (before I could dial 911) and yelled "get on the floor, get on the floor".  I was immediately handcuffed, hands behind my back, while on the floor.  (Everything was happening so fast, this occurred over seconds, not minutes.)  I was now feeling really scared, violated and degraded and embarrassed because I was totally naked, and surrounded by a bunch

(Exhibit #12)

Antoine Barrington Jones, Jr.

Declaration

I, Antoine Barrington Jones, Jr., declare under penalty of perjury (28USC§1746) that this declaration is correct, accurate and true.

On Monday morning October 24, 2005, I was awakened before 5:00 a.m. by a loud noise. (I know it was before 5:00 a.m. because my alarm clock had not gone off to wake me up yet.) I got up to see what the noise was and immediately some people (FBI agents) came into my room and threw me on the floor. They had guns pointed at me and were yelling and screaming for me to get down on the floor. Since I was still asleep when they came in, I was wearing my boxers underwear only. I was baffled by their presence and before I knew anything I was thrown on the floor and handcuffed.  Eventually I heard my alarm clock while they were still in my room so I knew it was 5:00 a.m. at that time.

The agents took me downstairs and sat me in the family room. My dad was down there in a chair handcuffed too. They brought my mom down stairs minutes later, I was shocked to see my mom handcuffed.  I was mindful of the time because I would have been on my way to pick up my classmates who rode to school with me. I had no way to call them and let them know I could not pick them up. It was getting later and I would have been on my way by now.

I heard my dad ask the agents can he see the search warrant. (I was comforted for some reason because I believed they were in the wrong house and felt

that the search warrant would clarify everything and I could be on my way to
school) and this nightmare would be over.  However, I noticed they never showed
him the search warrant but just kept ignoring him (this was confusing to me but as
I had never been in a situation like this before I did not know what to think). They
were all through the house, upstairs, downstairs and even in the garage.  I kept
thinking why are all of these people in our house.  After they took my dad out of the
house, one of the agents asked me if he could search the Cadillac. I told him no, it's
not my car, it's my dad's car. He said if I did not cooperate they would just continue
to take their time but if I gave them permission to search the Cadillac then he
would let me leave out so I could go to school. I just looked at him and he said, well,
we're going to search it anyway whether you give us permission or not. They search
the car and he was on the phone with a woman who told him to bring the car in. He
told her that the car was "a piece of shit" and he was not bringing it in. They
continued to search the house and then they eventually left. I just remember feeling
confused, violated and empty, not to mention helpless because we had been
handcuffed and never explained why they were there, what they were looking for or
why they took my dad away in handcuffs.

Antoine Jones                                        3-24-12

Signed:                                             Date:

Then one of the agents (an Asian man) kept asking for the search warrant so he could photograph it. He asked them repeatedly and they kept avoiding the request. When he persisted, they told him to go into the garage and search for evidence there. At the end of the search, the lead agent told me I had to sign off on some Inventory Sheets which outlined what he had taken out of the house. Agent Naugle only gave me the Inventory Sheets. He never gave, showed or produced a Search Warrant or Attachment A, nor did he give me a Search Warrant return to sign.

Special note: The printed name on the Search Warrant Return (Deniece Jones) is a forgery and I am willing to submit to a polygraph exam and testify under oath that I didn't sign that document. Also the entry time was falsified (6:15 a.m.). The agents came into the house at 4:45a.m. as I testified under oath in trial.

Signed: *Deniece Jones*

Date: 4-17-2012

(Exhibit #13)

A. Either myself or someone that was assisting in the counting did.
Q. Okay. And you don't recall if you, yourself, did?
A. No, I don't.
Q. And if you -- if you had, would you have told them that you found the currency in individual bags, or would you have told them that you found it in one bag?
MISS LIEBER: Objection.
THE COURT: Sustained. Totally hypothetical. Do you remember what you told the person?
THE WITNESS: No.
THE COURT: Okay.
THE WITNESS: No, Your Honor.
MR. BALAREZO: I believe that's all I have for the Detective, Your Honor.
THE COURT: Anyone else?
MR. NORRIS: No questions.
THE COURT: Anything else?
MISS LIEBER: Nothing. Thank you very much, Detective.
THE WITNESS: Thank you, Your Honor. Thank you.
THE COURT: Is he taking the bag with him?
MISS LIEBER: The money, yes. And, Your Honor, I'll collect the rest of the exhibits.
The Government calls Special Agent Steve Naugle.

Agent Steve Naugle

(Special Agent Steve Naugle sworn by clerk.)

DIRECT EXAMINATION

BY MISS LIEBER:
Q. Good afternoon, sir.
A. Good afternoon.
Q. In a nice, clear voice, can you please introduce yourself to our jury?
A. Yes, Steve Naugle.
Q. And how are you employed?
A. Employed by the Federal Bureau of Investigation.
Q. How long have you worked for the FBI?
A. Eight years.
Q. And Det -- Special Agent Naugle, where are you currently assigned?
A. Currently assigned to the FBI Washington field office here in Washington, D.C.
Q. And do you have a particular squad that you're assigned to?
A. Yes. I'm currently assigned to a drug squad.
Q. Back in the fall of 2004, October, specifically -- I'm sorry, 2005 -- where were you working within the FBI?
A. I was assigned to a Washington field office, and I was assigned to a save streets gang task force.
Q. Now, Special Agent Naugle, I want to direct your attention specifically to a search that you conducted on October 24th, 2005.

Were you a team leader of a search warrant that was executed that morning?
A. Yes, I was.
Q. And was that at 10870 Moore Street in Waldorf, Maryland?
A. Yes, it was.
Q. Do you know whose house it was that you were searching?
A. Yes.
Q. Who was that?
A. Antoine Jones.
Q. Do you see Mr. Jones here in court today?
A. Yes, I do.
Q. Can you identify him by where he is seated and something that he's wearing?
A. Yes. He's to the far right of the defense table. He is wearing a --
THE COURT: I think he just stood up.
THE WITNESS: That's correct.
THE COURT: All right. Let the record reflect that he has identified Mr. Jones.
MISS LIEBER: Thank you.
BY MISS LIEBER:
Q. And I guess I should ask this, during the course of the execution of the search warrant at Moore Street in Waldorf that morning, did you actually arrest Mr. Jones?
A. Yes.

Q. You said that you were a team -- you were a team leader. Tell the jury what it means to be a team leader in a search warrant.
A. Yes. Basically, it just means that I coordinated the search warrant, I gave out assignments to all the law enforcement personnel that was on our team. And one of the assignments I gave myself, I did the knock and announce, in other words, I knocked on the door, identified ourselves as law enforcement. And as I said, I gave out other assignments for other law enforcement personnel.
Q. And were you actually what's called a "seizing agent" for anything that was recovered that morning?
A. Yes, there was a seizing agent there, yes.
Q. Now, tell the jury about how you all made entry into that location on October 24th.
A. Yes. As I said, I was the knock and announce agent. I knocked on the door on this -- after I knocked on the door, the door was opened; we went inside the dwelling. On the second floor of the house, there's a -- it's the upstairs. The bedrooms are located on the second floor.
We observed a man come out of -- we observed a man come out of a room. He was in the hallway, appeared to be Mr. Jones. We gave him -- I gave him commands to get down on the ground, gave him some other commands. He then went back into the bedroom, the room that he came out of. He didn't follow any of

Steve Naugle was responsible for the search, the illegal seizure of the property and knock and announce

57

1  stickers, maybe --
2  Q.  Right. But the stickers only indicate how many ones, or
3  fives, or 20s there were?
4  A.  Correct.
5  Q.  The stickers don't indicate how much was in each bag?
6  A.  I don't know -- no, they don't.
7  Q.  Okay. Now, so as you sit here today, you can't tell us
8  whether any one of these bags or any of the ones you have
9  before you contained $20,000; right?
10  A.  I can't, someone else could.
11  Q.  But you can't --
12  A.  I can't.
13  Q.  -- you're testifying here?
14  A.  I can't, no.
15  Q.  Now, do you know whether any of the -- any -- do you know
16  whether there are any prints, fingerprints, I mean, on any of
17  these dollar bills or any of this currency that ties it to
18  someone by the name of John Adams?
19  A.  No, I don't.
20  Q.  Do you know if any of the currency was dusted for prints or
21  checked for fingerprints or anything of that nature?
22  A.  I don't know.
23  Q.  And I think the prosecutor showed you this particular bag,
24  and you read the notation "Empty" or "M" something, in 11.5?
25  A.  Yes.

58

1  Q.  All right. You have no idea how that got there; correct?
2  A.  No.
3  Q.  And you have no idea what it means; right?
4  A.  No.
5        MR. BALAREZO:   If I could just have one second, Your
6  Honor.
7  BY MR. BALAREZO:
8  Q.  During the -- do you know what a receipt for property
9  received, returned, released, or seized is?
10  A.  Yes.
11  Q.  Okay. Do you know if one was completed in this particular
12  case?
13  A.  I'm certain there was.
14  Q.  Okay. Did you complete it?
15  A.  No.
16  Q.  Okay. But you know some other agent did?
17  A.  Yes.
18  Q.  Do you have one in front of you, by any chance?
19  A.  No.
20  Q.  Okay. Do you know whether or not that receipt -- or that
21  inventory sheet, let's call it that -- that just lists
22  everything that was seized at Moore Street; correct, at least
23  in this particular case?
24  A.  Yes, everything that was seized and taken out of the house,
25  yes.

59

1  Q.  And when those -- have you completed these before,
2  yourself?
3  A.  Yes.
4  Q.  And when you complete these, you try to be accurate and
5  complete so that they can be used later at a trial, for
6  example; right?
7  A.  Yes.
8  Q.  You don't want to put down incorrect information; right?
9  A.  No.
10  Q.  Do you know whether or not the inventory sheet in this
11  particular case indicated whether or not multiple bags of
12  currency were seized or whether just one bag of currency was
13  seized?
14  A.  I don't know.
15  Q.  I'll show you what I marked as, I think, Jones Number 13.
16        MR. BALAREZO:   Is that right?
17        THE DEPUTY CLERK:   Yes, Jones 13.
18  BY MR. BALAREZO:
19  Q.  Let me show you what I've marked as Jones Number 13.
20        MISS LIEBER:   Objection. He didn't actually prepare
21  this document.
22        THE COURT:   I'm not sure for what purpose you're using
23  it, nor do I know what it is.
24  BY MR. BALAREZO:
25  Q.  What is that --

60

1        THE COURT:   Do you know?
2  BY MR. BALAREZO:
3  Q.  -- Detective Sopata?
4        THE COURT:   Oh, this is the inventory list?
5        MR. BALAREZO:   Yes, Your Honor.
6        THE COURT:   Okay. I'm not sure which one -- do you
7  want to put it into evidence or what?
8        MR. BALAREZO:   Not just yet, Your Honor.
9  BY MR. BALAREZO:
10  Q.  This is the inventory sheet for 10870 Moore Street; is that
11  correct?
12  A.  Yes.
13  Q.  Okay. And does that in -- have you seen that before?
14  A.  No.
15  Q.  And you didn't prepare it?
16  A.  No.
17  Q.  All right. When you -- when you seized the cash, did you
18  speed 21 and let them know what you had found with respect to
19  the --
20        THE COURT:   When you seized the cash, what?
21  BY MR. BALAREZO:
22  Q.  When you seized the cash -- after you seized the cash, did
23  you have the opportunity to speak with another agent or the
24  agent that prepared that inventory to let them know what you
25  had found?

( Exhibit #13 )

**93**

```
1   Q.  How about for 2003, the year that the Social Security
2       administration had him making $334, AJ-SW-31, that W-2 from
3       2003, what was his Social Security -- how much reported income
4       is -- is in that year?
5   A.  Under Social Security wages, would be $51,751.08.
6   Q.  All from the Thomas Brown Agency?
7   A.  Yes.
8   Q.  Thank you.
9           MISS LIEBER:   Court's indulgence.
10  BY MISS LIEBER:
11  Q.  Nothing else, sir. Thank you very much.
12  A.  You're welcome.
13          THE COURT:   Cross.
14          MR. BALAREZO:   Thank you, Your Honor.
15                  CROSS-EXAMINATION
16  BY MR. BALAREZO:
17  Q.  Good afternoon, sir.
18  A.  Good afternoon.
19  Q.  The prosecutor just asked you questions about the -- well,
20      before I go there, let me ask you this, are you familiar with
21      tax law?
22  A.  No.
23  Q.  Do you know that you don't necessarily have to file taxes
24      or report your taxes in the year in which they were earned?
25  A.  I'm not familiar with that.
```

**94**

```
1   Q.  Did you know that you can file an extension to file your
2       taxes for years and years until you're ready to file them?
3   A.  Yes, I know you can file an extension.
4   Q.  Well, with respect to the -- I think Miss Lieber asked you
5       about 2003, where you indicate that this document says that
6       Mr. Jones earned $334 that year?
7   A.  Yes.
8   Q.  Do you know whether or not Mr. Jones filed an extension to
9       file his taxes?
10  A.  No, I do not.
11  Q.  Do you know whether or not Thomas Brown ever reported the
12      amount of his income to the federal government?
13  A.  No.
14  Q.  If Thomas Brown never reported it, then, obviously, it
15      won't appear in the statement; right?
16          MISS LIEBER:   Objection.
17          THE COURT:   If he knows.
18          THE WITNESS:   I don't know that answer. I don't know
19      the answer to that.
20  BY MR. BALAREZO:
21  Q.  I think it stands to follow if it was never reported to the
22      government, the government wouldn't know.
23      Is that fair to say?
24          MISS LIEBER:   Objection.
25          MR. BALAREZO:   It's common sense, Your Honor.
```

**95**

```
1           THE COURT:   Well, it may be, but if he doesn't know
2       the answer, he can't answer it.
3   BY MR. BALAREZO:
4   Q.  Can you answer that question?
5   A.  Well, if something isn't reported, I guess you can't --
6   Q.  Now, you also indicated that you were the --
7           THE COURT:   I don't -- did you finish the answer?
8       If something isn't reported, I guess you can't what?
9           THE WITNESS:   I guess you can't document it. If it's
10      not reported, it's not reported, so you don't know whether he
11      filed it.
12  BY MR. BALAREZO:
13  Q.  Can you speak up so the jury can hear you?
14  A.  If it's not reported, I guess you can't determine if it was
15      filed or not.
16  Q.  Now, you said you were the -- and the questions I just
17      asked you also apply to the other year, I think, 2002, which
18      Miss Lieber asked you about and then showed you a W-2 for that
19      year?
20  A.  Right.
21  Q.  Okay. Again, if Thomas Brown never filed with the IRS or
22      never submitted the information to the IRS, would it
23      be accurate to say that -- excuse me, with Social Security --
24      would it be accurate to say that Social Security won't reflect
25      it on that particular report?
```

**96**

```
1   A.  I guess so, yes.
2   Q.  And you have no information as to whether or not Mr.
3       Brown -- excuse me, Mr. Jones sought an extension to file taxes
4       in 2002?
5   A.  I don't have any indication of that, no.
6   Q.  Now, you did indicate that you were the lead -- lead agent
7       in the -- with respect to the search warrant of Moore Street?
8   A.  Yes, team leader.
9   Q.  Team leader.
10      Well, you were in charge of the whole search warrant,
11      basically; right?
12  A.  Yes.
13  Q.  You coordinated who got what assignments, that kind of
14      thing; right?
15  A.  Yes, sir.
16  Q.  And you're familiar with the overall result of the seizure;
17      correct?
18  A.  Yes, sir.
19  Q.  Okay. Now, it is correct to say that when you went into
20      the house at Moore Street, that was at sometime -- well, what
21      time did you go into the house?
22  A.  Well, it was after 6:00 a.m.          PERJURY
23  Q.  Do you remember what time, specifically?
24  A.  No, not off the top of my head.
25  Q.  You indicated that the door was open. How was the door
```

89

1    THE COURT:  Are you looking for something specific?

2    MR. BALAREZO:  My understanding is all the documents,

3  he wishes to have copies of all the documents.

4    THE COURT:  Maybe there will be a break in the action.

5  What portion did you give him?  Did you take a lot of things

6  you haven't made available to defense counsel?

7    MISS LIEBER:  Your Honor, every single solitary type

8  of paper, rubber band, and miscellaneous seized from his house

9  was made available to counsel.  On at least -- but probably

10  four or five occasions, Mr. Balarezo and I had the distinct

11  pleasure of hanging out at the interview room of Washington --

12    THE COURT:  Well, you can tell your client that he

13  doesn't get copies -- that's not the way it works.  It was made

14  available.  Everything that was taken from his house was made

15  available, and what has been introduced.  Nothing is coming in

16  as a surprise.  So to the extent that he is requesting copies

17  of what was made available to you, the Court denies that

18  request.

19    MR. BALAREZO:  Just so the record is complete, I did

20  send Miss Lieber and Mr. Geise an e-mail sometime yesterday

21  with specific requests from Moore Street and from Levels.  It's

22  not every document, it's mainly the financial documents and

23  records.  His wife ran a business, all those documents were

24  seized and we need them in preparation for the defense.  And

25  Mr. Jones -- and obviously, I think -- we are entitled to those

90

1  documents, so we could at least go through --

2    THE COURT:  That's a Levels question.

3    MR. BALAREZO:  Levels and Moore Street.

4    THE COURT:  No, what I just understood was everything

5  that was seized from Moore street was available.  If you want

6  to go there and designate something that needs to be

7  duplicated, that's fine.

8    MR. BALAREZO:  I spoke with Miss Lieber about this, I

9  think when I went over there, I designated much more than what

10  I got.

11    THE COURT:  You didn't keep records?

12    MR. BALAREZO:  I did for about the first batch, but

13  then it's very tedious, when you are going through thousands of

14  pages of documents to keep a list, but I was told if I put a

15  sticky on it --

16    THE COURT:  What do you want the Court to do?

17    MR. BALAREZO:  I want the Court to --

18    THE COURT:  -- no, no, no, at this point in time, I

19  think you're going to have to go tell them again what you want

20  out of this.

21    MR. BALAREZO:  I did in my e-mail yesterday.

22    THE COURT:  Wait, you're saying all financial records.

23    MR. BALAREZO:  They are not the entire universe of

24  records, it's part of what was seized.  I think over 40 boxes

25  were --

*never copy or gave copy of moorest Discovery.*

91

1    THE COURT:  We are not going to take this up with the

2  jury.  Let's finish some testimony here.

3    MISS LIEBER:  Your Honor, I can add more to the

4  record.

5    THE COURT:  Fine, let's finish the witness.  We don't

6  have to resolve this now.

7    Okay.

8    (Open court.)

9    THE COURT:  All right.  11 is admitted over objection.

10    MISS LIEBER:  Thank you, Your Honor.

11    (Government's Exhibit Number AJ-SW-11 was received

12    into evidence.)

13  BY MISS LIEBER:

14    Q.  Special Agent Naugle, I'm showing you on the projector

15  here, an envelope marked "SW-11."

16    What is this?

17    A.  A Social Security statement.

18    Q.  And who is it in the name of?

19    A.  Antoine Jones.

20    Q.  At what address?

21    A.  12221 Brandywine Road, Brandywine, Maryland.

22    Q.  Now, Special Agent Naugle, I'm going to open to, I guess,

23  what would be the third page, marked Number 3.  And I want to

24  direct your attention to --

25    MISS LIEBER:  Actually, Court's indulgence, if I may

92

1  speak with Mr. Balarezo.

2  BY MISS LIEBER:

3    Q.  Special Agent Naugle, do you see, first of all, this is --

4  is this your earnings records -- "Your earnings record at a

5  glance."

6    Is that what that says?

7    A.  Yes.

8    Q.  Okay.  And I want to focus specifically on the years 2002

9  and 2003.

10    How much Social Security income, reported income, did

11  Mr. Jones have in the year 2002?

12    A.  You're looking at the second -- okay.

13    Q.  Sorry.  Right there, yeah.

14    A.  2002, $13,778.

15    Q.  Okay.  How about 2003?

16    A.  $334.

17    Q.  Okay.  Now, I want to direct your attention to AJ-SW-39,

18  which is already in evidence, the W-2 form.

19    A.  Yes.

20    Q.  For the year 2002, how much does this indicate that he

21  made, Social Security wages?

22    A.  $35,997.67.

23    THE COURT:  What year is that one?

24    MISS LIEBER:  2002.

25  BY MISS LIEBER:

97

```
1    open?
2    A.  I knocked on the door twice, and the second knock, the door
3    came open.  Perjury
4    Q.  So the door just happened to open?
5    A.  It was ajar, I'm assuming.  It wasn't locked.  Perjury
6    Q.  All right.  So you didn't pick the lock?
7    A.  No.
8    Q.  You didn't knock the door down?
9    A.  No.
10   Q.  You knocked, and the door just opened?
11   A.  That's correct.
12   Q.  Now, would it be accurate to say then, that Mr. Jones was
13   not expecting you that morning?
14             MISS LIEBER:  Objection.
15             THE COURT:  Sustained.  How would he know?
16   BY MR. BALAREZO:
17   Q.  Well, did you or any agents tell Mr. Jones:  Hey, we have a
18   search warrant for your house at 6:00 something in the morning
19   on October 24th?
20   A.  No.
21   Q.  All right.  And typically, you do these searches early in
22   the morning to catch people by surprise; correct?
23   A.  There's a host of reasons why we do them at the time, yes.
24   Q.  Well, that's one of them; right?
25   A.  That's one of them, yes.
```

98

```
1    Q.  I mean, you don't want people to destroy evidence, or hide
2    things, or run away, or anything like that; right?
3    A.  Yes.
4    Q.  You want to be able to go into the house and find evidence
5    to make your case; correct?
6    A.  Yes.
7    Q.  Now, do you think Mr. Jones knew you were coming that
8    morning?
9    A.  No.
10   Q.  Okay.  When you came into the house after the door just
11   opened, did you or Mr. Jones resist in any way?
12   A.  He didn't -- he did not follow any of our commands.
13   Q.  Well, he didn't follow your initial command.  And you said
14   he then went back into his bedroom, and then you went up, and
15   he got on the floor, and you arrested him; right?
16   A.  After he placed his hands in a pile of clothes that was on
17   a chair and I could no longer see his hands, then after we
18   physically went over and put handcuffs on him, yes.
19   Q.  All right.  You didn't say that on direct examination,
20   though;
21      You said that he didn't respond.  He went back into the
22   bedroom, and then when you went up, that you gave him some
23   commands, and he got down on the floor, and you arrested him.
24      That's what you said on direct?
25   A.  Well, he -- I'm telling you now, he placed his hands in a
```

How can I do all of this
and they deactivate the alarm in 30 seconds

99

```
1    pile of clothes which were on top of a chair, and I could not
2    see his hands at that point.
3    Q.  Did you just happen to remember that little detail about
4    putting his hands in a pile of clothes?
5    A.  Yes.  Because that is -- when you're in law enforcement, I
6    like to see people's hands at all times, for my safety and the
7    other officers, and their safety, also.
8    Q.  Well, let me ask you this, did Mr. Jones have a weapon in
9    that pile of clothes?
10   A.  No, he did not.
11   Q.  Now, given that you were the team leader and you're aware
12   of all the results of the seizures, no weapon was ever found at
13   Moore Street, was it?
14   A.  No, there wasn't.
15   Q.  No weapon was found in the garage, in the -- in the Jeep;
16   correct?
17   A.  That's correct.  There was no weapon.
18   Q.  No weapon was found, whatsoever, with respect to this
19   particular seizure or search?
20   A.  That's right.
21   Q.  Also there were no drugs found; correct?
22   A.  At that address, yes, there was no drugs found.
23   Q.  Yes, there were drugs found or no, there --
24   A.  No, there was not.
25   Q.  Anywhere with respect to the seizure -- or the search and
```

100

```
1    seizure of Moore Street?
2    A.  No drugs found there, right.
3    Q.  There was no, what you would consider paraphernalia, no
4    scales; right?
5    A.  That's correct.
6    Q.  There were no Ziploc bags, nothing of that nature; correct?
7    A.  Yes, there was not.
8    Q.  There were no cutting agents, nothing that would indicate
9    the presence of drugs in that house; right, at least
10   drug-related?
11   A.  Drug-related, yes.
12   Q.  Yes, there were or no, there --
13   A.  There was not.  There were no drugs or anything related to
14   drugs at that house.
15   Q.  There were none?
16   A.  That's correct.
17   Q.  All right.
18      You have, you have testified about some bank records from
19   Sun Trust Bank.  You didn't find any, any tally sheets?  Do you
20   know what those are?
21   A.  You're referring like drug tally sheets?
22   Q.  Correct.
23   A.  Yes.
24   Q.  And you didn't find any at this location, did you?
25   A.  We did not.
```

No tally sheets

101

1  Q.  You didn't see any records that Mr. Jones might have kept
2  saying such and such person owes me such and such amount of
3  money; right?
4  A.  That's correct.
5  Q.  You didn't find anything saying I gave such and such person
6  such and such amount of drugs; right?
7  A.  Right.  I didn't see any of that.
8  Q.  You also didn't see any records directly related to
9  narcotics trafficking, pay and owe sheets, tally sheets,
10 anything of that nature; right?
11 A.  That's correct.
12 Q.  The records that you found were bank records which come in
13 the mail to anybody who has a bank account; right?
14 A.  Yes.
15 Q.  Now, did you find -- well, you also didn't find any
16 evidence of any sort of large amounts of wire transfers or
17 anything of that nature, did you?
18 A.  No.
19 Q.  Anywhere in that house?
20 A.  That's correct.
21 Q.  And when I say anywhere, I'm also talking about the Jeep or
22 the garage, the premises.
23 A.  Right, I understand.  No, we did not.
24 Q.  You didn't find money orders, evidence of money orders,
25 like large amounts of money orders; correct?

No tally sheets

102

1  A.  Correct.
2  Q.  And you didn't find any evidence of any transfers from
3  Mr. Jones to any other people in large amounts; correct?
4  A.  Yes.
5  Q.  Yes, yes, or yes, no?
6  A.  Correct, we did not find any.
7  Q.  Okay.  And I asked you about weapons.  You didn't find any
8  other dangerous weapons or anything of that nature in
9  Mr. Jones' home; correct?
10 A.  We did not find any weapons.
11 Q.  And my initial question I think was Mr. Jones did not
12 resist in any way?  I mean you said he put his hands in, under
13 a pile of clothes, but he didn't fight with you, he didn't try
14 to run away or anything of that nature; correct?
15 A.  That's correct.  Right.
16 Q.  And he complied fully once you had him in custody
17 basically?
18 A.  Yes.
19 Q.  And did you -- you didn't find also any -- you are familiar
20 with cell phones, they have SIM cards, chips?
21 A.  Fairly familiar with that, yes.
22 Q.  You know what they are; right?
23 A.  Right.
24 Q.  It's the little card that makes the phone work basically?
25 A.  Yes.

103

1  Q.  You didn't find any discarded phone calls or any chips or
2  anything of that nature, did you?
3  A.  No.
4  Q.  You only found those two cell phones that the government
5  introduced in AJ SW-20 and AJ SW-19; right?
6  A.  Yes.
7  Q.  Do you know what numbers go to these phones?
8  A.  The cell phone numbers?
9  Q.  Yes.
10 A.  No, I do not.
11       MR. BALAREZO:  If I could just have one second.
12 BY MR. BALAREZO:
13 Q.  Let me show you what has been marked as or is in evidence
14 as AJ SW-13.  Do you see that?
15 A.  Yes.
16 Q.  Okay.  And this is a, a Sun Trust Banking statement from
17 the period right here, August 1st through August 31st of 2005;
18 is that right?
19 A.  Yes.
20 Q.  And this particular section, talks about deposits -- excuse
21 me -- the account summary.  I can't see where I am on this
22 thing.  There you go.  Do you see that?
23 A.  Yes, I can.
24 Q.  This section here?
25 A.  Yes.

104

1  Q.  All right.  That indicates that the beginning balance in
2  the, as of August 1st was $5,942.22; is that correct?
3  A.  Yes.
4  Q.  And deposits were 9,555; right?
5  A.  Yes.
6  Q.  And the checks were written in the amount of $10,770;
7  right?
8  A.  Yes.
9  Q.  And the ending balance was lower than what it started at,
10 and that was 4695; correct?
11 A.  Yes.
12 Q.  And if you look at the next slide, it says that the average
13 balance was $4,667; correct?  Right here.
14 A.  Yes, that was collected balance.  Yes.
15 Q.  And that would be approximately, what, two months prior to
16 the takedown, to the arrest and the search and seizure?
17 A.  Yeah.  I'm sorry.  What was the date on that again?  Oh,
18 yes, okay.
19 Q.  All right?
20 A.  Yeah.
21 Q.  Did you ever get a chance to review these documents?
22 A.  Briefly, yes.
23 Q.  Okay.  Now, the statements in particular also have copies
24 of checks; right, that were written on the accounts?
25 A.  Yes.

( Exhibit # 13 B )

1    handcuffed him.  And his wife also was in the bed.  And --

2    in the bedroom at that point.

3    Q.  And her behavior?

4    A.  She was -- she was physically upset, screaming.  And

5    once we got everybody calmed down, we took the wife and

6    Mr. Jones downstairs.

7    Q.  And how did Mr. Jones and his wife know that you were

8    members of law enforcement and that you were executing a

9    court-authorized search warrant?

                                            Perjury#3

10   A.  Well, I was knocking on the door and screaming, "FBI,

11   search warrant."  And then once, as I said, the door came

12   open, we went inside.  We had markings on our vests that

13   indicate we were FBI and law enforcement.  We had badges.

14   And I continued to identify ourselves and myself to

15   Mr. Jones as he was looking down at us that we were law

16   enforcement.

17   Q.  How many participants total were there for the search

18   warrant?

19   A.  I'd say approximately 10 to 12 law enforcement

20   personnel.

21   Q.  And was one of those participants an MPD detective who

22   was on the Safe Streets Task Force by the name of Joe

23   Sopata?

24   A.  Yes.

25   Q.  Did he ultimately -- did you assign him a task for what

1   Q.  So you telling the jury that at that time you had

2   approximately how many vehicle parked outside?

3   A.  I don't think everyone was in their own car, so it was

4   less than 12 vehicles, probably.

5   Q.  So less than 12 vehicles at approximately 6:00.  Did

6   they stayed out there parked during the whole time?

7   A.  Yes.

8   Q.  Now, you spoke of this door right here (indicating)

9   being open or -- you said you knocked twice and it just

10  mysteriously opened?  Is that correct?

11  A.  Yes.  After I knocked the second time the door opened

12  up.                                           Perjury

13  Q.  So nobody opened the door.  It just popped open.

14  A.  No one opened it, as far as I know.          Perjury

15  Q.  In '05, how many searches you been on, Agent?

16  A.  My whole career?

17  Q.  In 2005.

18  A.  2005?  I don't know off the top of my head.

19  Q.  A couple hundred?

20  A.  No, not in '05.

21  Q.  Now, usually do y'all have a battering ram to knock the

22  door in?

23  A.  Yes.  We have one.

24  Q.  Did y'all use it on October 24th, 2005?

25  A.  No, there was no need to, because the door opened after

1    Q.   Mrs. Jones, when the officers and agents -- strike that

2    one.

3              Did you hear the door open?

4              THE COURT:   Front door?

5    BY MR. JONES:

6    Q.   The front door.

7    A.   What I heard was I heard the door being unlocked.   The

8    door -- if you look back at the house -- the gentleman that

9    built the house, he's 6 feet 7 inches tall, so he had custom

10   doors and custom doorways and a custom lock on that front

11   door.   And when it's unlocked, you can hear it vibrating or

12   verberating (sic) throughout the house.   So I was really

13   confused because I thought somebody was breaking in; and

14   then when I heard that door, that unlock go, I was like,

15   Well, wait a minute, somebody's breaking in, but whoever's

16   breaking in has a key.   It was -- of course, again, it was

17   dark.   And then I just heard a bunch of feet coming up the

18   steps.

19   Q.   Mrs. Jones, that weekend of October the 23rd, was you,

20   Mr. Jones and I believe --

21             THE COURT:   No.   Where were you and who was there?

22   BY MR. JONES:

23   Q.   Was we out of town, I'm asking?

24   A.   You, me, my mother and my sister had gone out of town

25   that weekend.   We had gone to a -- our church had bought a

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2

 3   THE UNITED STATES OF AMERICA, )
                                   )      File No:  CR 05-386
                       Plaintiff,  )
 4                                 )      Date:  February 11, 2013
     vs.                           )             A.M. Session
 5                                 )
     Antoine Jones,                )      Time:  9:41 a.m.
 6                                 )
                       Defendant.  )
 7

 8   ─────────────────────────────────────────────────────────

 9                  TRANSCRIPT OF JURY TRIAL
                         HELD BEFORE
10          THE HONORABLE ELLEN SEGAL HUVELLE
                UNITED STATES DISTRICT JUDGE
11                        Day 12

12   ─────────────────────────────────────────────────────────

13   APPEARANCES:

14   For the United States:   Ms. Darlene M. Soltys
                              Ms. Courtney Spivey Urschel
15                            Assistant United States Attorneys
                              United States Attorneys Office
16                            555 Fourth Street, NW
                              Washington, DC   20530
17
     For the Defendant:       Antoine Jones, pro se
18
     Also Present:            Mr. Jeffrey B. O'Toole
19                            Ms. Errin Scialpi
                              Attorneys at Law
20                            O'Toole Rothwell
                              1350 Connecticut Avenue, NW
21                            Suite 200
                              Washington, DC   20036
22

23   Court Reporter:          Vicki Eastvold, RMR, CRR
                              United States Courthouse, Room 6722
24                            333 Constitution Avenue, NW
                              Washington, DC   20001
25                            (202) 354-3242
```

1   recall Mr. Jones at this balcony right here at the top of

2   this stairwell, right here where my finger at (indicating),

3   looking at the agents opening his Moore Street house with a

4   key?  Do you recall that?

5   A.   Repeat the question?

6   Q.   Did you use a key to get into the Moore Street house?

7   A.   No, I did not.   *PERJURY*

8   Q.   So you did not use a key to get into the Moore Street

9   house.  Did you see Mr. Jones -- from this AJ-SW-5, it's a

10  glass door.  Did you see Mr. Jones right at the top of the

11  step looking down at y'all?

12  A.   The only time I saw you -- the first time I saw you is

13  when I went through that door that's on the screen here.

14  And I saw you at the top on the second floor looking down at

15  us.  That's the first time I saw you.

16  Q.   First time.  So you couldn't see Mr. Jones when you was

17  down in this position (indicating) trying to open the door,

18  could you?

19         MS. SOLTYS:  Objection, Your Honor, to the motion.

20  The witness has denied that he used a key.  And Mr. Jones is

21  implying by the turning of his hand (indicating) that --

22         THE COURT:  He used a key.

23         MS. SOLTYS:  Yeah.  That he used a key.

24         THE COURT:  Sustained.

25         MR. JONES:  Okay.

```
 1              THE COURT:  There's no evidence that anybody used
 2       a key.
 3       BY MR. JONES:
 4       Q.  So you ran up the step.  Mr. Jones was at the top of the
 5       step.  You seen Mr. Jones looking at you, correct?
 6       A.  Yeah.  As I was going up the steps I was giving commands
 7       to you the whole time, identifying ourselves as law
 8       enforcement, and asking you to come downstairs, which you
 9       did not do.
10       Q.  Was Mr. Jones in the nude?
11       A.  Excuse me?
12       Q.  Was Mr. Jones in the nude?
13       A.  Yes.  You didn't have any clothes on.
14       Q.  So you expected Mr. Jones to walk down the stairs in the
15       nude?
16       A.  Yes, I did.
17       Q.  So did -- isn't it a fact that Mr. Jones walked to his
18       bedroom and grabbed some pants?
19       A.  No.
20       Q.  Is it not your testimony in the first trial that you
21       said Mr. Jones put his hand in a pile of clothes and did not
22       put on -- grab some pants?
23       A.  I believe my testimony was, after I was going up the
24       stairs and also other law enforcement officers, you ran down
25       the hall toward a room which happened to be your bedroom,
```

1    and then you placed your hands in a pile of clothes after

2    you knelt down on the bedroom floor.

3    Q.   This stairwell right here (indicating), do you remember

4    how far that is from the master bedroom's door?  How many

5    feet?

6    A.   No, I don't remember that.

7    Q.   So you don't know if it's two -- two feet away?

8    A.   Oh, it's further than two feet away.  Because you ran.

9    I ran and I chased you down that hallway.

10   Q.   You chased me down which hallway?  Down this hallway

11   (indicating)?

12   A.   The hallway which led to your bedroom.

13   Q.   Okay.  Now, did the agents have their guns out?

14   A.   Yes.

15   Q.   Was the agents pointing the guns at Mr. Jones?

16   A.   I had my gun out and I was pointing at you because you

17   were not obeying any commands.

18   Q.   Did Mr. Jones look like he had a threat to the agents

19   when he was in the nude?

20   A.   No, not at that point.

21   Q.   Okay.  Did the agents point the gun at Mrs. Jones?

22   A.   I don't think I did, no.

23   Q.   So did any -- did anybody point the guns at Mrs. Jones?

24   A.   I don't know.  I know I did not.

25   Q.   Did any of the agents scream at her and say, Give the

```
 1    behavior.  And I handcuffed you at that point.  And then
 2    your wife was -- if I remember correctly -- behind you
 3    standing in the bedroom.  And at that point we -- I think we
 4    handcuffed her and we took you and her downstairs.
 5    Q.  So you handcuffed Mr. Jones and Mrs. Jones and you took
 6    them downstairs.  Then what happened?
 7    A.  Your son was there.  He was brought downstairs, also.
 8    And then we started the process to conduct a search at your
 9    residence.
10    Q.  At this time did you present a search warrant to let him
11    know why you're there?
12    A.  I don't know if we physically showed you or her search
13    warrant at that point.  I verbally told you and her why we
14    were there and explained to both of you what we were doing
15    and what our intent was.
16              THE COURT:  Okay.  I got to explain to the jury.
17    That the legality of any search is decided solely by the
18    Court.  It is -- whether or not somebody thinks this is a
19    proper search, the court has ruled on those matters.  What
20    he has to say about the search may go to his credibility,
21    but there's no issue about the legality of the searches,
22    North Carolina car, the Moore house, any other house that
23    you've heard about, the wiretap.  These have all been
24    covered by a court.  Okay.  Go ahead.
25              (Off-the-record discussion between Mr. Jones and
```

1    Ms. Soltys)

2    BY MR. JONES:

3    Q.  So Mr. -- Agent Naugle --

4          THE DEPUTY CLERK:  This is Defense Exhibit 26.

5    BY MR. JONES:

6    Q.  So you said that you put handcuffs on Mrs. Jones and

7    Mr. Jones, correct?  And you brought them downstairs.  And

8    you're not sure -- you're not for sure when did you show

9    Mr. or Mrs. Jones this search warrant, do you?

10   A.  Yeah, I don't know if we showed it to you and Mrs. Jones

11   at the time right when we got in there.  Once things calmed

12   down we may have showed this.

13         THE COURT:  Do you have any objection to 26?

14   Defense Exhibit 26?

15         MS. SOLTYS:  No, Your Honor.

16         THE COURT:  Okay.  26 is admitted.  All right.

17   You can put it on.

18      (Defendant's Exhibit 26 received into evidence.)

19   BY MR. JONES:

20   Q.  Agent Naugle, did you go over your notes before you got

21   here?  Did you prepare yourself before this testimony?

22   A.  Yes, I did.

23   Q.  Now, you saying "maybe."  Can "maybe" mean you didn't do

24   it at all?

25   A.  Didn't do what at all?

```
 1   Q.  Present this search warrant to Mr. Jones or Mrs. Jones?

 2   A.  No.  When we left we -- we provided a copy of the search

 3   warrant to Mrs. Jones.  Perjury

 4   Q.  You provided a search warrant, meaning this page right

 5   here (indicating)?

 6           THE COURT:  Is the jury seeing it?  It's in

 7   evidence.

 8   BY MR. JONES:

 9   Q.  This front page.

10           THE DEPUTY CLERK:  They should have it.

11           A JUROR:  Can you focus it?

12           THE COURT:  Focus it?  Okay.

13           (Off-the-record discussion between Ms. Soltys and

14   Mr. Jones.)

15           THE COURT:  Okay.  Got it.

16   BY MR. JONES:

17   Q.  Agent Naugle, when you said you left behind the search

18   warrant, where did you leave the search warrant at?

19   A.  I think it was on the table.  I think maybe living room,

20   dining room table.

21           THE COURT:  What did you leave, is what he's

22   asking.

23           THE WITNESS:  Oh, what did I leave?  Copy of the

24   search warrant and Attachment A and the 597, which is a

25   property receipt.  Perjury
```

1    BY MR. JONES:

2    Q.  So that would be -- consist of this first page right

3    here (indicating), correct?

4    A.  Yes.

5    Q.  This second page right here (indicating), correct?

6    A.  Yes.

7    Q.  The inventory sheet, five of them.  Correct?

8    A.  Uh-huh.

9    Q.  Now, isn't it a fact that you never presented, showed,

10   or left the search warrant or Attachment A, at Moore Street.

11   Correct?

12   A.  Well, I didn't have the entire -- I don't have the

13   actual affidavit.

14   Q.  No, it's not affidavit.  Attachment.

15           THE COURT:  This what's in front of you, I think

16   is what he means.  The 597 and the property receipt.

17           THE WITNESS:  That was left there.

18   BY MR. JONES:

19   Q.  That was left there?

20   A.  Yes, sir.  That's what you're asking me.  That was left

21   there.

22   Q.  This right here -- this page right here (indicating) --

23   can you explain to the jury what that page is?

24           THE COURT:  Well, it just says "See attached 597."

25   What is he going to explain?

```
 1                    MR. JONES:  No.  I'm talking about this whole --
 2      this return.  This page right here.  The page we looking at.
 3                    THE COURT:  We're not looking at anything except
 4      it says "See attached 597".
 5                    MR. JONES:  This whole right here, Your Honor.
 6      This is the return.
 7                    THE COURT:  Yeah, I know.  But turn the next page.
 8      Nothing to explain until you see the next page.
 9                    Okay.  What is that?
10                    MR. JONES:  This is -- go ahead, Agent.
11                    THE COURT:  Did you leave this at the house?
12                    THE WITNESS:  Yes, I did.
13                    THE COURT:  Okay.  What's this?
14                    THE WITNESS:  This is the receipt.  Property
15      receipt.  As I explained earlier, it's a 597.  It's an FBI
16      form.  And it lists the items that were seized at that
17      address and what we were taking.
18                    THE COURT:  And how many pages is it?  Let's see.
19                    MR. JONES:  It's five pages.
20                    THE COURT:  Okay.  Do you sign it at the end or
21      anything?  I don't know what it looks like at the end.
22                    THE WITNESS:  Yeah.  I believe -- well, I know
23      Mrs. Jones signed it.
24                    THE COURT:  Show him this document so he can see
25      the whole document.
```



1          Is her signature on the document?

2          THE WITNESS:  On this --

3          (NOTE:  Document being provided to the witness.)

4          THE WITNESS:  Right.  Her signature's on the

5  document.  The bottom.  "Received from."

6          THE COURT:  Where -- what page is that?

7          THE WITNESS:  At the bottom of each page.

8          THE COURT:  Oh.  Of the 597.

9          THE WITNESS:  Right.  I'm sorry.  The 597.

10         THE COURT:  So it says "Received from."

11         THE WITNESS:  Right.

12         THE COURT:  All right.  What do you mean "from"?

13  She signs, then?

14         THE WITNESS:  Yes.

15         THE COURT:  Is it initialed or signed?

16         THE WITNESS:  And then the agent signs the other

17  thing, says "received by."  We would sign that saying that

18  we're taking this.  And then she signs -- all she's doing by

19  signing this -- whoever signs this form -- just

20  acknowledging that, you know, this is the items that we're

21  taking.  That's all they're doing.

22         THE COURT:  Who's "Received by"?  Who's doing

23  that?

24         THE WITNESS:  Special Agent -- it wasn't me.  It

25  was another agent.  I'll tell you in a second his name.



1    It's not going to be here.  I would need to see the FD 302

2    from that search.

3              THE COURT:  Okay.  But it's not you.

4              THE WITNESS:  No.

5              THE COURT:  All right.  And how many pages did she

6    sign?

7              THE WITNESS:  I'm sorry.  How many pages?

8              THE COURT:  Yeah.

9              THE WITNESS:  She signed each -- I believe -- I

10   didn't notice, but I believe she signed each one, each 597.

11             THE COURT:  All right.  Go ahead.

12   BY MR. JONES:

13   Q.  This right here (indicating), is this Deniece Jones, my

14   wife's signature, correct?

15   A.  Yes, sir.

16   Q.  So all five pages she signed her signature, correct?

17   A.  Yes.

18   Q.  Is this not your name (indicating), sir?

19   A.  Yes, it is.

20   Q.  So did my wife sign her signature on this form right

21   here?

22   A.  No, she did not.  She didn't have to.  We didn't ask her

23   to sign that form.

24   Q.  So who signed her name on that form right there?

25   A.  That's my handwriting.

1        MS. SOLTYS:  "Who signed her name on the form,"

2    that's an improper question.

3        THE COURT:  Yes, I agree.

4        MR. JONES:  Okay.

5        THE COURT:  Sustained.  Until you get evidence,

6    you can't keep doing this.  You can bring out evidence, but

7    you don't assume things in evidence by questions.  Ask him

8    questions.

9    BY MR. JONES:

10   Q.  So isn't it a fact that you signed 6:15 a.m.    *Perjury*

11   (indicating)?

12   A.  Yes, that's the time we made entry into your home.  *Perjury*

13   Q.  So isn't it a fact that you print my wife's name right

14   here (indicating), correct?

15   A.  Yes.  I printed her name there.

16       MR. JONES:  This is AJ-SW-65.

17       THE COURT:  65?

18       MR. JONES:  Yes.

19       THE COURT:  Whose signature is below?  It says

20   "witness"?

21       THE WITNESS:  That's mine.  That's mine,

22   Your Honor.

23       THE COURT:  Oh.  Okay.

24   BY MR. JONES:

25   Q.  Now, you just testified that Mrs. and Mr. Jones had

────── 2/11/13 - A.M. ──────

(Exhibit #15A)

1    our commands.

2         He went back into the bedroom area, and I followed him up

3    the stairs, along with some other agents.  And finally, he

4    followed our commands once he was inside the bedroom.  And at

5    that point, we placed him under arrest.

6    Q.  Now, Special Agent Naugle, what was Mr. Jones wearing at

7    the time you made entry into the house?

8    A.  He didn't have any clothes on.

9    Q.  Okay.  Did there come a time once he got back into his

10   bedroom that you all allowed him to put some clothes on?

11   A.  Yes.

12   Q.  All right.

13        MISS LIEBER:  And, Your Honor, actually, I'm going to

14   show it to defense counsel right now, AJ-SW-60 through 64.

15   These are photographs, all at the same time.

16        THE DEPUTY CLERK:  60 through 64?

17        THE COURT:  All right.

18        MR. BALAREZO:  No objection.

19        THE COURT:  They will be admitted, 60 through 64.

20        (Government's Exhibit Numbers AJ-SW-60 through

21        AJ-SW-64 were received into evidence.)

22   BY MISS LIEBER:

23   Q.  Special Agent Naugle, I'm going to show you AJ-SW-60.

24        What is that a picture of?

25   A.  A -- a -- stairwell of the house.





#7 (Rev 8-11-94)                                                    Page _1_ of _2_

## UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property Received/Returned/Released/Seized

File # _281D-WF-213679_

On (date) ___10/24/2005___

item(s) listed below were:
- ☐ Received From
- ☐ Returned To
- ☐ Released To
- ☒ Seized

(Name) _Antoine Jones, aka "Toine"_

(Street Address) _10870 Moore Street_

(City) _Waldorf, Maryland_

Description of Item(s): #1: Bank of America, Visa Statement; Verison Statement; Property Information 2221 Brandy Wine Rd, Brandy Wine, MD, 20613.

#2: Unmarked 3½ computer disk, blue

#3: Real Estate Documents.

#4: Pictures from Club.

#5: Bank documents from Club Levels

#6: Box of documents from Prison addressed to A. Johnson Jones Sr.

#7: Financial Documents in cardboard box

#8: Financial Documents in Blue plastic bin

#9: Financial Real Estate Documents in Gray Plastic Bin

#10: 23 (twenty three) 3½ inch computer disks.

#11: Real Estate print outs, and contracts.

#12: Financial documents, credit card statements, bank statements, mortgage statements, cell phone statements.

#13: Financial documents.

#14: Financial documents, from upstairs bedroom

#15: 2 (two) cellular telephones

#16: Misc. documents from room H, large Bureau.

#17: Financial documents from room H large bureau.

#18: 2 (two) Large rings of Keys

-597 (Rev 8-11-94)                                          Page __2__ of __5__

### UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION
Receipt for Property Received/Returned/Released/Seized

File # _2810 - WF - 213679_

On (date) _____10/24/2005_____

item(s) listed Below were:
- ☐ Received From
- ☐ Returned To
- ☐ Released To
- ☒ Seized

(Name) _Antoine Jones, aka "Toine"_

(Street Address) _10870 Moore Street_

(City) _Waldorf, Maryland_

Description of Item(s):

#19: Real Estate and Financial Documents.

#20: Lowe's Receipts.

#21: 2 (two) Bank of America receipts, 1 American Express business receipt, 1 (one) FTN Consultant Bank Acct.

#22: Personal Papers in the name of A. Jones and Denieue Jones.

#23: Receipts and Wachovia Bank Statement

#24: 1 (one) 3½ inch computer disk with "A. Jones Da 5th Quarter" sign init.

#25: "Offer to Purchase" sheet of paper, ATM receipts.

#28: Black bag with documents, located in Jeep Cherokee.

#29: Bags and rubber bands to package money, located in rear of Jeep Cherokee.

597 (Rev 8-11-94)

### UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION
Receipt for Property Received/Returned/Released/Seized

File # _281D- WF - 213679_

On (date) _10/24/2005_

item(s) listed below were:
- ☐ Received From
- ☐ Returned To
- ☐ Released To
- ☒ Seized

(Name) _Antoine Jones, aka "Toine"_

(Street Address) _10870 Moore Street_

(City) _Waldorf, Maryland_

Description of Item(s):

#26: Cash in amount of $69,191.⁰⁰ (sixty nine thousand dollars and 00/100), located in bag in rear of Jeep Cherokee.

#27: Cash in amount of $452.⁰⁰ (four hundred fifty two dollars and 00/100; 43 × $10; 4 × $5; 2 × $1), located in the pocket of subject's pants.

FD-597 (Rev 8-11-94)

Page _4_ of _5_

## UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION
Receipt for Property Received/Returned/Released/Seized

File # _281D-WF-213679_

On (date) _10/24/2005_

item(s) listed below were:
☐ Received From
☐ Returned To
☐ Released To
☒ Seized

(Name) _Antoine Jones, aka 'Toine'_

(Street Address) _10870 Moore Street_

(City) _Waldorf, Maryland_

Description of Item(s):

#30: 2001 Cream Colored Jeep Grand Cherokee,
VIN: 1J4GW48S71C683464; Maryland license
tag # M667480

FD-597 (Rev 8-11-94)                                                   Page __5__ of __5__

## UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION
Receipt for Property Received/Returned/Released/Seized

File # *281-D-WF-213679*

On (date) *10/24/2005*

item(s) listed below were:
- ☐ Received From
- ☐ Returned To
- ☐ Released To
- ☒ Seized

(Name) *Antoine Jones, aka "Toine"*

(Street Address) *10870 Moore Street*

(City) *Waldorf, Maryland*

Description of Item(s):

*#31: 2002 Silver Colored Toyota Sequoia SRS*
*VIN: 5TDBT44A43S144078, Maryland License*
*plate # M895532.*

# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

In the Matter of the Search of
(Name, address or brief description of person or property to be searched)

**SEARCH WARRANT**

10870 Moore Street
Waldorf, MD

CASE NUMBER: 05-4491 CBD

TO. Special Agent Stephanie Yanta and any Authorized Officer of the United States

Affidavit(s) having been made before me by Special Agent Stephanie Yanta who has reason to believe that ☐ on the person or ☒ on the premises known as (name, description and or location)

A brick single family house with the numbers "10870" on the mailbox post to the right of the driveway

in the District of Maryland, there is now concealed a certain person or property, namely (describe the person or property)

See Attachment A

I am satisfied that the affidavits(s) and any recorded testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant

YOU ARE HEREBY COMMANDED to search on or before ~~October 31, 2005~~

Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making the search (in the daytime - 6:00 A.M. to 10:00 P.M ) ~~(at any time in the day or night as I find reasonable cause has been established)~~ and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to the Honorable Charles B. Day, U.S. Magistrate Judge, as required by law.

~~October 22, 2005~~      at Greenbelt, Maryland
Date and Time Issued

5:57 PM

Charles B. Day
United States Magistrate Judge
Signature of Judicial Officer



DEFENDANT'S EXHIBIT

## ATTACHMENT A

(a)    Drugs, indicia of drug trafficking, including, but not limited to scales, cutting agents, cutting tools, drug paraphernalia for processing, packaging and/or distributing controlled substances.

(b)    Books, records, receipts, notes, ledgers, and other papers including any computerized or electronic records, relating to the transportation ordering, purchase and distribution of any controlled substances.

(c)    Address and/or telephone books and papers reflecting names, addresses and/or telephone numbers.

(d)    Books, records, receipts, bank statements and money drafts, letters of credit, money orders and cashier's checks, receipts, passbooks, bank checks, and any other items evidencing the obtaining, secreting, transfer, and/or concealment of assets.

(e)    Proceeds of narcotics violations including United States currency, precious metals, jewelry and financial instruments, including but not limited to stocks and bonds.

(f)    Photographs, including photographs of co-conspirators, assets, weapons, and/or controlled substances, and other documents identifying associates and co-conspirators.

(g)    Indicia of occupancy, residence and/or ownership of the premises, including but not limited to utility and telephone bills, canceled envelopes, and keys.

(h)    Indicia of travel, including, but not limited to passports, visas, airline tickets, boarding passes, and airline receipts.

(i)    Any and all devices used to store and count money, such as safes (combinations or lock type) and money counting machines.

(j)    Any locked or closed containers believed to contain any of the above listed evidence.

FD-302a (Rev. 10-6-95)

281D-WF-213679

Continuation of FD-302 of _____, On 10/24/05 , Page 2

on the front door.  She said that she could and that she was
getting ready to call the police. (After the first lock) By time I jump out of
the bed, got to the door, I could see them opening the door. They didn't announce FBI until the
                                                                                   reach the
The following law enforcement personnel participated in        steps.
the execution and search of the premise:                    They never
                                                            announce
                                                            they had a
                                                            search warrant
                                                            show or
    SA Steve Naugle-Team Leader/Knock and Announce    presented a
    SA Jon Snow-Searched                              search warrant
    SA Gregg Horner-Rear/Search                       I ask at least
    SA Joseph Lowery-Search                           five time to see
    SA Angela McCravy-Rear/Search/Sketch              a search and a
    SA Brian Mumford-Search                          arrest warrant.
    SA Timothy Pak-Search
    Det.Joseph Sopata (MPDC)-Search
    SA Jared Wise-Search
    SA Serghy Kaluzny-Seized
    SA Kevin Wolf-Search
    SA Kate Beaton (BA)-Search

The FD-26 (Consent To Search), sketch, FD-597 (Receipt
for Property Seized), copy of the search warrant and the photograph
logs were placed into a 1-A envelope.   I want to see the copy of
the search warrant (they should had took a picture of the search
warrant with the money or with the property seize.) I want to see all logs and
listen to all radio calls before entering the house with local police and FBI
agents. I also want to listen to all radio calls with local police and FBI agents
during the search and after the search. I also want to know why they
took me from MD Jurisdiction to DC, crossing Charles county line,
PG line into the District of columbia.

   My Grounds to Suppression        coming in and invading
   ① Knock and Announce Violation.  our privacy with out
              our permission-giving us a chance
              to open the door.
   ② Daytime search violation- It was still complete dark outside
   plus they came in before 6AM. we need to see if they tamper
   with the alarm company to change the time. If so, its misconduct
   and obstruction of Justices.

   ③ They never show, presented or leave a search warrant with
   you or show you the signed and dated ...





1            THE COURT:  But that's not 50 or 51?

2            MS. SOLTYS:  No.

3            (NOTE:  Off-the-record discussion between

4     Mr. Jones and Ms. Soltys.)

5     BY MR. JONES:

6     Q.  Mrs. Jones --

7            THE DEPUTY CLERK:  50 and 51 are in, Judge?

8            THE COURT:  50 and 51 are in, without objection.

9        (Defendant's Exhibits 50 and 51 received in evidence.)

10    BY MR. JONES:

11    Q.  -- I'm going to show you the Moore Street search

12    warrant.  This is right here (indicating), Exhibit No. 49.

13    This is the face (indicating).  This is the attachment

14    (indicating).  Can you see it?

15    A.  Yes.

16    Q.  This is the search warrant return (indicating).

17            THE COURT:  So far we've seen all this.  It was

18    what exhibit, Ms. Soltys?  This -- we're looking at now 49

19    for defense, but what is it for the Government?  It came

20    through the Agent Webb or --

21            MS. SOLTYS:  Naugle.

22            THE COURT:  Naugle.  Sorry.  Do you know what the

23    comparable number is?  Go ahead.  Maybe there's something

24    different.

25    BY MR. JONES:

```
 1    Q.  Mrs. Jones, isn't it a fact that they never --

 2              MS. SOLTYS:  Your Honor, I'm sorry.  I have to

 3    object to the leading questions of this witness.

 4              THE COURT:  Yes.  Sustained.  Just ask her what

 5    happened, who did what.

 6    BY MR. JONES:

 7    Q.  Mrs. Jones, look at what you have in front of you.

 8    A.  Uh-huh.

 9    Q.  This is Exhibit -- Defendant Exhibit No. 51.  Can you

10    see -- can you see this clearly?

11    A.  Yes.  Yes.

12    Q.  Mrs. Jones, is this what the agents left at the Moore

13    Street house that's on this right here (indicating)?  On the

14    TV?  You want to see a closer view?

15              (NOTE:  Exhibit being provided to the witness.)

16    A.  Okay.  They left -- he had me to sign this, pages 1

17    through 5, and --

18              THE COURT:  What -- this is exhibit number what?

19    It's on the bottom.

20              THE WITNESS:  Well, I guess all of it is

21    Exhibit 49, but he only gave me -- he only had pages 1

22    through 5 of the -- listing the items that he took.

23              THE COURT:  Okay.  So 1 through 5 -- pages 1

24    through 5 of 49.

25              THE WITNESS:  The pages that are numbered 1 of 5
```

1    2 of 5, 3 of 5, and 4 of 5, those are the ones that --

2              THE COURT:  Of Exhibit 49.

3              THE WITNESS:  Correct.

4              THE COURT:  He left behind.

5              THE WITNESS:  Correct.

6    BY MR. JONES:

7    Q.  Mrs. Jones, when he gave you those documents to sign,

8    what did that -- the officer or agent do once you signed

9    those documents?

10   A.  This was pretty much at the end.  He told me that I had

11   to sign these for the items that he was taking -- for the

12   items that he had taken from the house.

13   Q.  Did the agent go over the property that was tooken?

14   A.  No.  They just took the handcuffs off of me.  I was

15   sitting in the family room in the chair handcuffed.  And

16   they took the handcuffs off of me, and he brought me into

17   the dining room where he had filled these pages out, and he

18   had me to sign these five pages.

19   Q.  At that time, did he yet presented a search warrant to

20   you?

21   A.  I was never presented a search warrant.  I didn't know

22   what one looked like until I went to my sister's house and

23   saw the search warrant there.  And that's when I realized

24   that I had never been presented with one and had never seen

25   one.

1    Q.  This is Defendant Exhibit 49.

2         THE COURT:  What is it?  Forty what?

3         MR. JONES:  49.

4    BY MR. JONES:

5    Q.  Mrs. Jones, so are you telling the jury that the

6    Government -- or the agents never gave you this

7    (indicating)?

8         MS. SOLTYS:  Objection.  Leading.

9         THE COURT:  Yes.  Sustained.  Have you seen this

10   before?  This is the first page of 49.

11   BY MR. JONES:

12   Q.  On October the 24th, 2005, did the agents give you this?

13   A.  No, sir.

14   Q.  This Attachment A.  Did the agent give you that?

15   A.  No, sir.

16   Q.  Defense Exhibit 51.  So the only thing was left was the

17   inventory sheets that you --

18        MS. SOLTYS:  Objection.  Leading.

19        THE COURT:  Yeah.  You've already asked her this.

20   51 was what was left.

21        (NOTE:  Exhibit being provided to the witness.)

22        THE COURT:  1 through 5.

23   BY MR. JONES:

24   Q.  Was that left at Moore Street house?

25        THE COURT:  What is "that"?

```
 1              THE WITNESS:  No, sir.  Actually doesn't really

 2     say -- it's a certification.

 3              THE COURT:  It's part of 49?  It's the one that

 4     says "Certification"?  Okay.  Put it on the screen so they

 5     can see what it is.  This is part of 49.

 6     BY MR. JONES:

 7     Q.  Mrs. Jones, so are you sure that this wasn't left on the

 8     table?

 9     A.  I'm sure.  The only thing that he gave me were those

10     sheets that he had me to sign.  I never saw a search

11     warrant.  During the search there was an agent that kept

12     asking should he take a picture of a search warrant.  And

13     they never -- I didn't -- I never saw him take a picture of

14     a search warrant, I never knew what a search warrant looked

15     like, until I went to my sister's house a few days later and

16     saw one there.  That's when I called Mr. Balarezo and told

17     him --

18              THE COURT:  Okay.  All right.

19     BY MR. JONES:

20     Q.  So, basically, what he gave you in your hand that you

21     remember is the property receipt.

22              MS. SOLTYS:  Objection.  Leading.

23              THE COURT:  Yes.  Sustained.  And asked and

24     answered three times.

25     BY MR. JONES:
```

1   Q.   Do you specifically remember the property receipt -- did

2   he give you this (indicating) in your hand?

3   A.   They were on the dining room table.  They took me out --

4   took the handcuffs off, brought me into the dining room, and

5   told me I had to sign those five sheets for the property

6   that they took from the house.

7   Q.   Now, you spoke of the Brandywine house.

8   A.   Correct.

9   Q.   Did you and Mr. Jones own the Brandywine house?

10  A.   At that time -- yes.  You and I still owned the

11  Brandywine house.  My mother and my sister were living there

12  at that time.

13  Q.   Mrs. Jones, what time did your sister tell you the

14  agents come into the Brandywine house?

15           MS. SOLTYS:  Objection.

16           THE COURT:  Sustained.

17           MR. JONES:  Your Honor, can I approach on this

18  question right here?

19           THE COURT:  No.  It's what they call hearsay.

20  Okay.

21  BY MR. JONES:

22  Q.   Did your sister tell you -- tell you -- what time did

23  they come into the Brandywine house?

24           THE COURT:  Sustained again.  You can't ask her

25  what her sister told her.

§ 2236.        Searches without warrant

Whoever, being an officer, agent, or employee of the United States or any department or agency thereof, engaged in the enforcement of any law of the United States, searches any private dwelling used and occupied as such dwelling without a warrant directing such search, or maliciously and without reasonable cause searches any other building or property without a search warrant, shall be fined under this title for a first offense; and, for a subsequent offense, shall be fined under this title or imprisoned not more than one year, or both.

This section shall not apply to any person--

(a) serving a warrant of arrest; or

(b) arresting or attempting to arrest a person committing or attempting to commit an offense in his presence, or who has committed or is suspected on reasonable grounds of having committed a felony; or

(c) making a search at the request or invitation or with the consent of the occupant of the premises.

(June 25, 1948, ch 645, § 1, 62 Stat. 803; Oct. 11, 1996, P. L. 104-294, Title VI, § 601(a)(8), 110 Stat. 3498; Nov. 2, 2002, P. L. 107-273, Div B, Title IV, § 4002(d)(1)(C)(iii), 116 Stat. 1809 .)

**HISTORY; ANCILLARY LAWS AND DIRECTIVES**

**Prior law and revision:**

Based on title 18, U.S.C., 1940 ed., § 53a (Aug. 27, 1935, ch. 740, § 201, 49 Stat. 877).

Words "or any department or agency thereof" were inserted to avoid ambiguity as to scope of section. (See definitive section 6 of this title.)

The exception in the case of an invitation or the consent of the occupant, was inserted to make the section complete and remove any doubt as to the application of this section to searches which have uniformly been upheld.

Reference to misdemeanor was omitted in view of definitive section 1 of this title. (See reviser's note under section 212 of this title.)

Words "upon conviction thereof shall be" were omitted as surplusage, since punishment cannot be imposed until conviction is secured.

Minor changes were made in phraseology.

**Amendments:**

**1996. Act Oct. 11, 1996,** in the first undesignated paragraph, substituted "fined under this title" for "fined not more than $1,000".

**2002. Act Nov. 2, 2002,** in the first undesignated paragraph, inserted "under this title" before "for a first offense", and deleted "not more than $1,000" before the semicolon.

USCS                                    1

© 2011 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

### § 2235.        Search warrant procured maliciously

Whoever maliciously and without probable cause procures a search warrant to be issued and executed, shall be  fined under this title or imprisoned not more than one year, or both.

USCS                                            1

© 2011 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

§ 1519.        Destruction, alteration, or falsification of records in Federal investigations and bankruptcy

Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

(Added July 30, 2002, P. L. 107-204, Title VIII, § 802(a), 116 Stat. 800 .)

## RESEARCH REFERENCES

**Cross References**

Sentencing Guidelines for the United States Courts,  18 USCS Appx § 2J1.2

**Research Guide**

**Federal Procedure:**

33A Fed Proc L Ed, Witnesses § 80:354

**Criminal Law and Practice:**

6 Business Crime (Matthew Bender), ch 34, Bankruptcy Fraud ¶ 34.04

**Bankruptcy:**

1 Collier on Bankruptcy (Matthew Bender 16th ed.), ch 7, Bankruptcy Crimes ¶ 7.08

**Corporate and Business Law:**

1 Liability of Corporate Officers and Directors (Matthew Bender), ch 8, Criminal Liability §§ 8.04, 8:08, 8.11

1 Liability of Corporate Officers and Directors (Matthew Bender), ch 13, Federal Securities Laws § 13.14

7 Securities Law Techniques (Matthew Bender), ch 91, Litigation-An Overview § 91.05

7 Securities Law Techniques (Matthew Bender), ch 119, Internal Corporate Investigations §§ 119.01, 119.03, 119.04

**Labor and Employment:**

10 Labor and Employment Law (Matthew Bender), ch 271, Record Keeping and Agency Notice Posting § 271.05A

**Federal Taxation:**

© 2011 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

§ 1621.        Perjury generally

Whoever--

(1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true; or

(2) in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true;

is guilty of perjury and shall, except as otherwise expressly provided by law, be fined  under this title or imprisoned not more than five years, or both. This section is applicable whether the statement or subscription is made within or without the United States.

(June 25, 1948, ch 645, § 1, 62 Stat. 773; Oct. 3, 1964, P. L. 88-619, § 1, 78 Stat. 995; Oct. 18, 1976, P. L. 94-550, § 2, 90 Stat. 2534; Sept. 13, 1994, P. L. 103-322, Title XXXIII, § 330016(1)(l), 108 Stat. 2147 .)

### HISTORY; ANCILLARY LAWS AND DIRECTIVES

**Prior law and revision:**

Based on title 18, U.S.C., 1940 ed., §§ 231, 629 (Mar. 4, 1909, ch. 321, § 125, 35 Stat. 1111; June 15, 1917, ch. 30, title XI, § 19, 40 Stat. 230).

Words "except as otherwise expressly provided by law" were inserted to avoid conflict with perjury provisions in other titles where the punishment and application vary.

More than 25 additional provisions are in the code. For construction and application of several such sections, see Behrle v. United States (App. D.C. 1938, 100 F.2d 714), United States v. Hammer (D.C.N.Y., 1924, 299 F. 1011, affirmed, 6 F.2d 786), Rosenthal v. United States (1918, 248 F. 684, 160 C.C.A. 584), cf. Epstein v. United States (1912, 196 F. 354, 116 C.C.A. 174, certiorari denied 32 S. Ct. 527, 223 U.S. 731, 56 L. ed. 634).

Mandatory punishment provisions were rephrased in the alternative.

Minor verbal changes were made.

**Amendments:**

**1964.** Act Oct. 3, 1964, inserted "This section is applicable whether the statement or subscription is made within or without the United States."

**1976.** Act Oct. 18, 1976, substituted this section for one which read:

"Whoever, having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or

© 2011 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

## § 1622.    Subornation of perjury

Whoever procures another to commit any perjury is guilty of subornation of perjury, and shall be fined under this title or imprisoned not more than five years, or both.

(June 25, 1948, ch 645, § 1, 62 Stat. 774; Sept. 13, 1994, P. L. 103-322, Title XXXIII, § 330016(1)(I), 108 Stat. 2147 .)

### HISTORY; ANCILLARY LAWS AND DIRECTIVES

**Prior law and revision:**

Based on title 18, U.S.C., 1940 ed., § 232 (Mar. 4, 1909, ch. 321, § 126, 35 Stat. 1111).

The punishment prescribed in section 1621 of this title was substituted for the reference thereto.

Minor change was made in phraseology.

**Amendments:**

**1994.** Act Sept. 13, 1994, substituted "under this title" for "not more than $2,000".

### RESEARCH REFERENCES

**Cross References**

Federal retirement benefits, forfeiture upon conviction of offenses described under section,  5 USCS § 8312

Sentencing Guidelines for the United States Courts,  18 USCS Appx § 2J1.3

This section is referred to in  5 USCS § 8332; 30 USCS § 49e

**Research Guide**

**Federal Procedure:**

30 Moore's Federal Practice (Matthew Bender 3d ed.), ch 811, Candor and Confidentiality § 811.04

9A Fed Proc L Ed, Criminal Procedure § 22:1513

33A Fed Proc L Ed, Witnesses §§ 80:354, 379, 380, 383, 384

**Am Jur:**

58 Am Jur 2d, Obstructing Justice § 7

60A Am Jur 2d, Perjury §§ 107, 114, 116

**Criminal Law and Practice:**

3 Criminal Defense Techniques (Matthew Bender), ch 56, Defense of a Securities Case § 56.02

3A Criminal Defense Techniques (Matthew Bender), ch 71, Representing A Witness Before A Congressional Committee § 71.05

USCS                                                    1

© 2011 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

§ 1623.        False declarations before grand jury or court

(a) Whoever under oath (or in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined  under this title or imprisoned not more than five years, or both.

(b) This section is applicable whether the conduct occurred within or without the United States.

(c) An indictment or information for violation of this section alleging that, in any proceedings before or ancillary to any court or grand jury of the United States, the defendant under oath has knowingly made two or more declarations, which are inconsistent to the degree that one of them is necessarily false, need not specify which declaration is false if--
     (1) each declaration was material to the point in question, and
     (2) each declaration was made within the period of the statute of limitations for the offense charged under this section.

In any prosecution under this section, the falsity of a declaration set forth in the indictment or information shall be established sufficient for conviction by proof that the defendant while under oath made irreconcilably contradictory declarations material to the point in question in any proceeding before or ancillary to any court or grand jury. It shall be a defense to an indictment or information made pursuant to the first sentence of this subsection that the defendant at the time he made each declaration believed the declaration was true.

(d) Where, in the same continuous court or grand jury proceeding in which a declaration is made, the person making the declaration admits such declaration to be false, such admission shall bar prosecution under this section if, at the time the admission is made, the declaration has not substantially affected the proceeding, or it has not become manifest that such falsity has been or will be exposed.

(e) Proof beyond a reasonable doubt under this section is sufficient for conviction. It shall not be necessary that such proof be made by any particular number of witnesses or by documentary or other type of evidence.

(Added Oct. 15, 1970, P. L. 91-452, Title IV, § 401(a), 84 Stat. 932; Oct. 18, 1976, P. L. 94-550, § 6, 90 Stat. 2535; Sept. 13, 1994, P. L. 103-322, Title XXXIII, § 330016(1)(L), 108 Stat. 2147 .)

**HISTORY; ANCILLARY LAWS AND DIRECTIVES**

Amendments:

USCS                                        I

© 2011 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



## 1746. Unsworn declarations under penalty of perjury

Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:

(1) If executed without the United States: "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date).

(Signature)".

(2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).

(Signature)".

(Added Oct. 18, 1976, P. L. 94-550, § 1(a), 90 Stat. 2534 .)

### RESEARCH REFERENCES

**Code of Federal Regulations**

Department of Homeland Security-Executive Office for Immigration Review,  8 CFR 3.0 et seq

Executive Office for Immigration Review, Department of Justice-Executive Office for Immigration Review,  8 CFR 1003.0 et seq

Office of Postsecondary Education, Department of Education-Federal Pell grant program,  34 CFR 690.1 et seq

**Research Guide**

**Federal Procedure:**

1 Moore's Federal Practice (Matthew Bender 3d ed.), ch 5, Service and Filing of Pleadings and Other Papers § 5.31

10 Moore's Federal Practice (Matthew Bender 3d ed.), ch 55, Default; Default Judgment § 55.90

20 Moore's Federal Practice (Matthew Bender 3d ed.), ch 304, Appeal as of Right-When Taken §§ 304.01, 304.40

20A Moore's Federal Practice (Matthew Bender 3d ed.), ch 325, Filing and Service §§ 325.01, 325.11

USCS

1

© 2011 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

242.   Deprivation of rights under color of law

Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined  under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both; and if death results  from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.

© 2011 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

§ 241.  Conspiracy against rights

If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured--

They shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, they shall be  fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.

© 2011 Matthew Bender & Company, Inc., a member of the LexisNexis Group  All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    10/24/2005

On 10/24/05,  at approximately 6:15 A.M., a federal search warrant was executed at 10870 Moore Street, Waldorf, MD. The search warrant was executed pursuant to a United States District Court search warrant issued on 10/22/05.

Special Agent (SA) Stephen R. Naugle knocked and announced.   Upon the second knock of the front door, the door opened.  Entry was made and ANTIONE JONES and his wife DENIECE JONES were located in the upstairs bedroom.   Located in the top left bedroom was JONES's son, ANTIONE JONES.   ANTIONE JONES gave consent to search his vehicle, a Jeep Grand Cherokee Laredo,  JONES signed a FD-26 (Consent To Search). All subjects were  secured and the search revealed the following:

1. $69,191.00/Located inside of the Jeep Grand Cherokee. The money was found inside of three separate bags. The bags were located in the rear of the Jeep Grand Cherokee.

2. $452.00/Located from the front pants pockets of a male pair of jeans from JONES's bedroom.

3. Numerous personal and financial documents in the name of ANTIONE JONES and DENIECE JONES.

4. Numerous keys which ANTIONE JONES said were his keys.

5. Two (2) cellular telephones

The following two (2) vehicles were seized:

1. 2001, Green colored Jeep Grand Cherokee, VIN 1J4GW48S71C683464, MD license plate, M 667480.

2. 2002, Silver Colored Toyota Sequoia, SRS, VIN: 5TDBT44A43S144078, MD, license plate, M 895532.

A copy of the warrant was left with DENIECE JONES along with five (5) FD-597's (Receipt for Property Seized).  As SA Naugle was explaining the FD-597's to DENIECE JONES in the presence of SA Kaluzny, SA Wolf, SA Wise and Craig Wallace, (Forfeiture Analyst), SA Naugle asked her if she could hear the agents knocking

---

Investigation on   10/24/05   at  Washington,  D.C.

File # 281D-WF-213679                          Date dictated  N/A

by   SA Stephen R. Naugle:srn
     SA Serghy Kaluzny

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

281D-WF-213679

Continuation of FD-302 of _____ , On 10/24/05 , Page 2

on the front door.  She said that she could and that she was getting ready to call the police.

The following law enforcement personnel participated in the execution and search of the premise:

    SA Steve Naugle-Team Leader/Knock and Announce
    SA Jon Snow-Searched
    SA Gregg Horner-Rear/Search
    SA Joseph Lowery-Search
    SA Angela McCravy-Rear/Search/Sketch
    SA Brian Mumford-Search
    SA Timothy Pak-Search
    Det Joseph Sopata (MPDC)-Search
    SA Jared Wise-Search
    SA Serghy Kaluzny-Seized
    SA Kevin Wolf-Search
    SA Kate Beaton (BA)-Search

The FD-26 (Consent To Search), sketch, FD-597 (Receipt for Property Seized), copy of the search warrant and the photograph logs were placed into a 1-A envelope.

§ 879.  Search warrants

A search warrant relating to offenses involving controlled substances may be served at any time of the day or night if the judge or United States magistrate [United States magistrate judge] issuing the warrant is satisfied that there is probable cause to believe that grounds exist for the warrant and for its service at such time.

(Oct. 27, 1970, P. L. 91-513, Title II, Part E, § 509, 84 Stat. 1274; Oct. 26, 1974, P. L.

USCS                                          1

© 2011 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

§ 1001.         Statements or entries generally

(a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--
   (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
   (2) makes any materially false, fictitious, or fraudulent statement or representation; or
   (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331 [18 USCS § 2331]), imprisoned not more than 8 years, or both. If the matter relates to an offense under chapter 109A, 109B, 110, or 117, or section 1591 [18 USCS §§ 2241 et seq., 2250, 2251 et seq., 2421 et seq., or 1591], then the term of imprisonment imposed under this section shall be not more than 8 years.

(b) Subsection (a) does not apply to a party to a judicial proceeding, or that party's counsel, for statements, representations, writings or documents submitted by such party or counsel to a judge or magistrate [United States magistrate judge] in that proceeding.

(c) With respect to any matter within the jurisdiction of the legislative branch, subsection (a) shall apply only to--
   (1) administrative matters, including a claim for payment, a matter related to the procurement of property or services, personnel or employment practices, or support services, or a document required by law, rule, or regulation to be submitted to the Congress or any office or officer within the legislative branch; or
   (2) any investigation or review, conducted pursuant to the authority of any committee, subcommittee, commission or office of the Congress, consistent with applicable rules of the House or Senate.

(June 25, 1948, ch 645, § 1, 62 Stat. 749; Sept. 13, 1994, P. L. 103-322, Title XXXIII, § 330016(1)(L), 108 Stat. 2147; Oct. 11, 1996, P. L. 104-292, § 2, 110 Stat. 3459; Dec. 17, 2004, P. L. 108-458, Title VI, Subtitle H, § 6703(a), 118 Stat. 3766; July 27, 2006, P. L. 109-248, Title I, Subtitle B, § 141(c), 120 Stat. 603 .)

**HISTORY; ANCILLARY LAWS AND DIRECTIVES**

**Prior law and revision:**

Based on title 18, U.S.C., 1940 ed., § 80 (Mar. 4, 1909, ch. 321, § 35, 35 Stat. 1095; Oct. 23, 1918, ch. 194, 40 Stat. 1015; June 18, 1934, ch. 587, 48 Stat. 996; Apr. 4, 1938, ch. 69, 52 Stat. 197).

Section 80 of title 18, U.S.C., 1940 ed., was divided into two parts.

USCS                                    1

© 2011 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.