PG
1

PERJURY AND OBSTRUCTION OF JUSTICE CHART

18 USCS § 1001, 1519, 1621, 1622, 1623, 2236 VIOLATION

PERJURY UNDER OATH

(EXHIBIT #1)   SKETCH OF HAMPTON PARK BLVD
WAREHOUSE

VIEWING THE C.C.E. SKETCH OF THE WAREHOUSE,
C.C.E. AGENT KANE COMMITTED FRAUD ON THE COURT
AND PERJURY ONCE SHE REPRESENTED THIS
DIAGRAM OF THE C.C.E. SKETCH AS BEING "4/30/04
AT 11:15 PM," DESCRIBING "MOVING BLANKETS, A LOT
OF BOXES OF SHRINK WRAP, INDUSTRIAL SIZE
BOXES, COVERALLS, DEFLATABLE MATTRESSES, STUFFED
ANIMALS." REFER D16 TO (EXHIBIT #2) - C.C.E. AGENT
KANE TRIAL TESTIMONY   JANUARY 30, 2013 AM SESSION
9:43 AM   PAGE 22, 23, 24.

(EXHIBIT #3) C.C.E. AGENT KANE   TRIAL TESTIMONY
1/30/13   PAGE 90, 91   AGENT KANE CONTINUES TO
STICK TO HER PERJURY, TESTIFYING UNDER OATH
THAT THE ITEMS IN THE C.C.E. PHOTOS WERE STILL AT
THE WAREHOUSE AFTER APRIL 30, 2005. (SHE ALSO
STOOD FIRM THAT SHE DIDN'T GO TO THE WAREHOUSE
BEFORE APRIL 30, 2005

PG 2

1/30/13    PAGE 93 LINE 12-16

AGENT KANE: (A) NO, I DIDN'T GO INTO THE WARE-
HOUSE BEFORE APRIL 30TH, UNTIL AFTER YOU VACATED. UNTIL
AFTER YOU VACATED.

(Q) SO YOU'RE TELLING THE JURY THAT YOU NEVER
WENT INTO THAT WAREHOUSE BEFORE APRIL THE 30TH?

(A) CORRECT

SPEAKING OF THE INFLATTABLE MATTRESS SEEN IN
CLUB LEVELS OFFICE CLOSET IN THE OCTOBER 24, 2005
CLUB LEVEL'S PHOTOS

PAGE 97 LINE 23.24

(A) THAT WAS THERE ON APRIL 30TH SIR. I SAW
IT WITH MY OWN EYES.
THE COURT: SHE DOESN'T KNOW --
THE WITNESS: I TOOK A PICTURE OF IT.

(EXHIBIT #4) IS THE ICE AGENTS PHOTOS WITH MR JONES'
AND MR MAYNARD'S PERSONAL ITEMS. AGENT KANE
TESTIFIED THAT THE ITEMS WERE ABANDONED AND LEFT
IN THE WAREHOUSE ON APRIL 30, 2005.

P6
3

## OBSTRUCTION OF JUSTICE

(EXHIBIT #6)   REPORT NUMBER 005 - PAGE 4

  I.C.E. AGENT KANE VIOLATED 18 USCS, 1001, 1519
WHEN SHE FALSEFIED A FEDERAL REPORT IMPEDING
A FEDERAL INVESTIGATION.


  ON THIS I.C.E. REPORT AGENT KANE WROTE: A
WHITE BOX THAT CONTAINED ROLLS OF PLASTIC SHRINK
WRAP.
  A PAIR OF BROWN COVERALLS THAT ARE HANGING ON
THE WALL.
  BLUE MOVING BLANKETS, THAT WERE STORED ON TOP
AND BELOW TABLE.
  PHOTOGRAPHS WERE TAKEN OF THESE ITEMS IN THE
WAREHOUSE, INCLUDING THESE NARCOTICS ALERT AREAS.
BUT NOTHING WAS TAKEN FROM THE PREMISE.


(EXHIBIT #6)  I.C.E. AGENT LUKAS - KANE GRAND JURY
TESTIMONY.   PAGE 41 LINE 24, 25,  42 LINE 1-8,  43 LINE 5-11


PAGE 43 LINE 24, 25
  THE LANDLORD ALLOWED US, ALLOWED ME, HE GAVE ME
THE KEY AND ALLOWED ME TO GO ON WITH A FEW
OTHER AGENTS AND A CUSTOMS INSPECTOR WITH A
DOG.

P6
3

PAGE 42 LINE 1

(Q) OKAY. AND REMARKABLY, WHAT DID YOU FIND
INSIDE THE SECURITY STORAGE FACILITY?

(A) IN THE DEPOT AREA, THE GARAGE AREA, THERE WERE
SEVERAL CRATES, BOXES OF SHRINK WRAP. THERE WERE
ALSO SEVERAL INFLATTABLE MATTRESSES, I MEAN, SEVERAL
INFLATABLE MATTRESSES, SOME COVERALLS.

PAGE 43 LINE 5-13

(Q) WHEN THE DRUG DOG WENT THROUGH, WHAT, IF
ANYTHING DID THAT DOG DO?

(A) THE DRUG DOG ALERTED TO THE PRESENCE OF
NARCOTICS IN SEVERAL AREAS IN THE DEPOT AREA
OF THE WAREHOUSE. HE ALERTED CLOSE TO THE SHRINK
WRAP BOXES, HE ALERTED CLOSE TO THE COVERALLS
WHICH WERE CERT BEHIND KIND OF HANGING ON
HOOKS, AND NEAR A TABLE WHERE THE DEFLATED
INFLATTABLE MATTRESSES WERE NEAR.

FRAUD ON THE COURT

(EXHIBIT #7) DOCUMENT #88 FILED 3-16-06 PAGE 5.

EVEN THIS OBSTRUCTION OF JUSTICE AND FRAUD
ON THE COURT EXTENDED TO MR JONES CRIMINAR
PROCEEDINGS.

ON OR ABOUT APRIL 30, 2004, A SEARCH OF

Pb 4

JONES' WAREHOUSE SPACE, LOCATED AT THE HAMPTON PARK BLVD STORAGE FACILITY, 400 HAMPTON PARK BLVD, CAPITOL HEIGHTS MARYLAND, WHICH HE RENTED FROM NOVEMBER 17, 2003 UNTIL HE BROKE THE LEASE ON APRIL 30, 2004, "REVEALED SEVERAL BOXES OF HEAT SEALING WRAPPINGS AND AIR MATTRESSES AS WELL AS SCENT OF COCAINE, WHICH WAS DETECTED BY A NARCOTICS - SNIFFING CANINE"

IT'S ESTABLISHED FROM THE FIRST TWO TRIALS THAT MR SCHAEFFER TESTIFIED HE DIDN'T RECALL ANY OF THE ITEMS MR BALAREZO POINTED OUT ON THE ICE PHOTOS AND THAT MR SCHAFFER DIDN'T SEE ANY LEASE VIOLATION DURING THE WALK THROUGH.

SPECIFICLLY ON THE LAST PAGE OF THE LEASE WHERE IT STAYS "BROOM SWEPT" THERE WAS NO VIOLATION.

MR JONES BRINGS DCG ATTENTION TO THE TRIAL TRANSCRIPT MR ◯ ANDREW SCHAFFER MONDAY NOVEMBER 9, 2007, 1:40 PM PAGE 25 LINE 5-25, PAGE 26 LINE 1-7, PAGE 26 LINE 16-19

MR BALAREZO: (Q) WHEN YOU RECEIVED THAT LETTER FROM MR JONES SAYING THAT HE WANTED TO TERMINATE THE LEASE, DID YOU ALLOW HIM TO TERMINATE THE

PG 5

LEASE?

(A) I DID.

(Q) AND DID MR JONES JUST GIVE YOU A KEY AND YOU SAID ALL RIGHT, GOODBYE, YOU'RE OUT OF THE LEASE?

(A) NORMALLY I WOULD GO AND INSPECT THE PROPERTY. I DON'T REMEMBER IF I DID IN THIS CASE BUT "I BELIEVE I DID."

(Q) WELL I MEAN, THAT'S YOUR NORMAL PRACTICE IS IT NOT?

(A) "THAT'S MY NORMAL PRACTICE"

(Q) THERE'S NO REASON WHY YOU WOULD NOT HAVE INSPECTED THE PROPERTY THIS TIME WHEN MR JONES WANTED TO VACATE CORRECT?

(A) CORRECT

(Q) ALL RIGHT. AND IT IS YOUR PRACTICE THEN THAT SOMEONE VACATES THE PREMISES THAT THEY LEAVE THE PREMISES EMPTY BASICALLY?

(A) AS LONG AS THEY'RE CURRENT ON THE RENT AND THEY DON'T LEAVE ALOT OF DEBRIS, I RETURN THE SECURITY DEPOSIT.

(Q) DO YOU REMEMBER EXACTLY WHEN MR JONES QUOATE UNQUOATE VACATE THE PREMISES MEANING WHEN THE LEASE WAS TERMINATED?

(A) END OF APRIL, I BELIEVE.

P6
6

(Q) AND YOU DON'T RECALL DOING A WALK THROUGH OF THE PROPERTY WITH MR. JONES?

(A) "I PROBABLY DID A WALK THROUGH"

MR SCHAFFER TESTIFIED THAT I.C.E. AGENT GIAKAS-KANE WAS INTERESTED IN GAINING ACCESS TO THE WAREHOUSE

MONDAY, NOVEMBER 9, 2007 1:40 PM PAGE 28 LINE 13-18

(Q) HOW DID YOU GIVE HER ACCESS TO THE WAREHOUSE.

(A) SHE HAD CONTACTED ME, SHE WANTED SOME INFORMATION ABOUT THE TENANT. I TOLD HER THAT SHE WOULD HAVE TO SUBPOENA THE INFORMATION WHICH SHE DID. THEN SHE ASKED TO GAIN ACCESS AND I TOLD HER THAT IT WAS NOT POSSIBLE UNTIL THE SPACE WAS VACANT.

(EXHIBIT #8) APRIL 3, 2012   PAGE 18

MR BALAREZO ARGUES THE I.C.E. AGENTS ENTERED THE WAREHOUSE BEFORE MR JONES VACATED THE WAREHOUSE. MR BALAREZO: WE WERE TRYING TO DEMONSTRATE THROUGH VARIOUS PHOTOGRAPHS THAT WERE PROVIDED THAT THE ENTRY HAD TO HAVE BEEN PRIOR TO MR JONES VACATING THE PREMISES, AND SHE DID NOT HAVE A WARRANT, SO, THEREFORE, IT WOULD HAVE BEEN AN ILLEGAL SEARCH.

THE COURT: IS THIS --

MR BALAREZO: IT'S OUR POSITION THAT THIS WOULD BE

P6
7

HAVE BEEN IN KEEPING WITH AGENT BOKAS' PRACTICE,
BECAUSE, REMEMBER THE COURT DID SUPPRESS HER
ILLEGAL ENTRY INTO THE SUMMIT CIRCLE APARTMENT,
WHICH SHE EFFECTUATED WITHOUT A WARRANT.
THE COURT: OKAY. THIS HAS TO DO WITH BOKAS, AND
THIS IS THE LADY FROM I.C.E..
MR. BALAREZO: CORRECT
THE COURT: AND YOUR ARGUMENT WAS BECAUSE OF THE
PICTURES, SHE HAD TO HAVE ENTERED BEFORE HE ABANDONED
THE PREMISES.?
MR. BALAREZO: RIGHT BECAUSE THERE WERE -- I'LL JUST
SAY THERE WERE ITEM DEPICTED ON THE PHOTOGRAPHS
THAT WERE -- WERE THERE BEFORE MR. JONES LEFT AND THAT
WERE NOT THERE AFTER LEFT, SO THEREFORE, IF THEY WERE
ON THE PHOTOGRAPHS THAT WERE TAKEN, THE ENTRY MUST
HAVE BEEN BEFORE HE LEFT AND WOULD HAVE BEEN ILLEGAL.

(EXHIBIT #9) LAWRENCE MAYNARD TRIAL TRANSCRIPT
FEBRUARY 14, 2013    9:18 AM   PAGE 73 - 97,   2:18 PM
PAGE 2 - 5

MR. MAYNARD TESTIFIED ON FEBRUARY 14, 2013 UNDER
OATH, MR. MAYNARD DETAILS CLEAR AND CONVINCING
EVIDENCE THAT THE PERSONAL ITEMS OF MR. JONES AND
HIMSELF WAS TAKEN FROM THE HAMPTON BLVD WAREHOUSE
BEFORE APRIL 30, 2005.

Pg 8

ITEMS SUCH AS DRYWALL COMPOUND, INFLATTABLE MATTRESS WITH NEW BATTERIES, LIGHT BLUE BLANKETS, MOVING PADS, SHRINK WRAP, VALENTINE'S GIFT BASKETS, GLASS TABLETOP, COVERALLS, JACKET, SHIRTS, CITHER ARE ITEMS THAT MR MAYNARD TESTIFIED THAT MR JONES AND HIMSELF TOOK OUT OF THE WAREHOUSE BEFORE APRIL 30, 2005.

PAGE 73 LINE 25, PAGE 74 LINE 1-5

(Q) DID THERE COME A TIME THAT WE VACATED THE WAREHOUS ON APRIL THE 30TH?

(A) YEAH. WE GOT RID OF EVERYTHING AND PUT IT ON THE TRUCK. WHATEVER WE DIDN'T NEED WE TRASHED AND SWEPT THE -- ACTUALLY, WE WASHED THE FLOORS BECAUSE I USED TO SPILL OIL PULLING THE TRUCK ON THERE.

PAGE 74 LINE 9-15

(Q). MR MAYNARD, YOU JUST TOLD THE JURY THAT WE VACATED THE WAREHOUSE APRIL 30TH?

(A) YES, WE DO DID

(Q) AND YOU JUST TOLD THE JURY YOU CLEANED THE WAREHOUSE OR POWER WASHED THE WAREHOUSE BEFORE APRIL THE 30TH?

(A) YEAH. I HAD TO. THERE WAS ALOT OF OIL ON THE GROUND -- ON THE FLOOR.

P6q

PAGE 74    LINE 23-25

(Q) MR MAYNARD, IF POSSIBLE CAN YOU READ TO THE
COURT AND THE JURY THE LAST PARAGRAPH OF THE LEASE?
(A) "TERMINATION OF LEASE". LANDLORD MAY AT ITS
SOLE OPTION TERMINATE THIS LEASE IN ITS ~~ENTIRE~~ ENTIRETY
AT ANY TIME BY GIVING THE TENANT 60 DAYS WRITTEN
NOTICE, AT WHICH TIME THIS LEASE SHALL BECOME NULL
AND VOID. TENANT SHALL THEN VACATE AND LEAVE THE
PREMISES IN "BROOM CLEAN CONDITION"

PAGE 78 LINE 5-10

(Q) OKAY MR MAYNARD, THESE BLUE BLANKET OR
SOMETHING THAT'S ON THE TABLE - -
(A) MOVING ~~BLANKETS~~ - -
(Q) DID YOU LEAVE THAT BEHIND AT THE WAREHOUSE?
(A) NO, THEY'RE MOVING PADS. ACTUALLY THAT ONE ON
THE BOTTOM ISA "BRAND NEW PAD"

PAGE 78 LINE 14-22

(Q) WHY WOULD YOU TAKE THAT WITH YOU?
(A) YOU COVER MERCHANDISE, WHETHER IT'S ~~OFFICE~~
COFFEE TABLE, SOFAS, YOU CAN COVER IT UP AND THEN
YOU SHRINK WRAP IT, AND THEN YOU CAN STORE IT ON
THE TRUCK, YOU CAN STAND IT UP, YOU CAN PILE THEM
ON TOP OF EACH OTHER. BUT NINE TIMES OUT OF TEN
WITH THE SHRINK WRAP PAD THE MOVING PADS YOU DON'T

P6
10

DAMAGE IT OR SCRATCH IT OR ANYTHING LIKE THAT, AND
YOU CAN STRAP IT TO THE INTERIOR OF THE TRUCK. AND YOU
GOT THE STRAP SITTING NEXT TO IT, A PILE OF THEM.


PAGE 79 LINE 23-25 , PAGE 80 LINE 1-6
(Q) DID YOU LEAVE THIS BOX OF GIFT- - YACINTONEGIFT
WRAP BEHIND?

(A) NO, I TOOK THEM WHEN WE LEFT THE PREMISES.
(Q) WHAT ABOUT THE BRAND NEW BOX OF GLASS TABLE?
(A) THAT GLASS TABLE TOP WAS USED LATER ON AN THE
CLUB.

(Q) WHAT ABOUT THE JACKET THAT'S NEXT TO THE BROWN
COVERALLS?

(A) THAT JACKET I END UP TAKING IT AND GIVING IT
TO SOMEBODY LATER ON AT THE CLUB. BUT I END UP
TAKING IT WITH ME.


PAGE 81 LINE 3-14
(Q) CAN YOU TELL THE JURY THAT IS?
(A) IT WAS A NICE SHIRT. SHIRT THAT I - - I HAD FOR
A MINUTE, AND I TOOK IT HOME WITH ME.

(Q) SO YOU TOOK THIS HOME WITH YOU BEFORE APRIL 30TH
(A) YEAH, I. TOOK IT APRIL THE 30TH I'M NOT SURE IF
I LEFT IT ON THE TRUCK OR TOOK IT STRAIGHT HOME, BUT IT
WAS ON THE TRUCK WHEN WE LEFT.

P6
11

PAGE 81 LINE 22-25, PAGE 82 LINE 1-3

(Q) MR MAYNARD, THIS GLASS TABLE ON THIS PICTURE, DO YOU RECOGNIZE THAT GLASS TABLE.

(A) THAT'S THE TABLE TOP THAT WE SAW ON THE PREVIOUS PICTURE, AND THAT'S THE STAND THAT IT SET ON AT THE BOTTOM

(Q) SO YOU TELLING THE JURY MR MAYNARD, YOU TOOK THIS GLASS TABLE BEFORE APRIL THE 30TH TO CLUB LEVELS?

(A) YES.


PAGE 83 LINE 5-18

(A) I CAN SEE IT. THAT CHAIR WAS ONE OF THE CHAIRS I USED TO USE ON THE TRUCK OR LOADING AND UNLOADING. THERE'S A RADIO, BOOM BOX. YOU CAN SEE IT PLUGGED UP STILL RIGHT THERE (INDICATING) AND UNDER IT -- I'M SORRY. THIS AT THE BOTTOM (INDICATING) IS A CONTAINER OF CONCRETE OR DRIVEWAY CLEANER BECAUSE I KNEW FROM TIME TO TIME I HAD TO DO THE FLOOR.

(Q) NOW, MR MAYNARD, THIS CHAIR AND THIS CONCRETE SOLUTION YOU JUST SPOKE OF, DID YOU LEAVE THAT AT THE CLUB -- I MEAN AT THE WAREHOUSE?

(A) "NO." THE BOOM BOX WE USED AT THE CLUB, WHILE WE WAS WORKING WE ALWAYS HAD THE MUSIC PLAYING, SO THAT WENT WITH US, THE CHAIR DEFINITELY GOT TAKEN. AND THE CONCRETE CLEANER I THINK I USED ALL THAT UP. WASN'T BUT A GALLON.

P6
12

PAGE 84 LINE 25, PAGE 85 LINE 1-4

Q) NOW THIS IS -- IS THIS WHAT YOU TALKING ABOUT?

(A) RIGHT. SHRINK WRAP. THE SMALL ONES ARE FOR THE LITTLE THINGS AND THE BIG ONES ARE JUST THAT, FOR THE SOFAS, THE ARMOIRES OR WHATEVER.

(Q) DID YOU LEAVE BEHIND AT THE WAREHOUSE?

(A) NAH, IT'S REAL USEFUL, I NEED THAT.

Q) WHY DID YOU NEED THAT, MR MAYNARD?

(A) IT JUST WAS NECESSARY TO HAVE SHRINK WRAP TO KEEP THE MERCHANDISE FROM FROM GETTING DAMAGED, BECAUS ALOT OF STUFF DON'T COME IN BOXES.


PAGE 86 LINE 10-15

(Q) SO THIS INFLATTABLE MATTRESS, THAT YOU THINK THAT'S GREEN, DID YOU TAKE IT WITH YOU WHEN YOU LEFT --

(A) YEAH, THE ONE AT CLUB LEVELS, NEW BATTERIES IF IT WAS NEW BATTERIES, DEFINATELY TOOK IT WITH ME -- AND THE MATTRESS TOO -- OUT OF THE WAREHOUSE HAMPTON PARK BLVD.


FEBRUARY 19, 2003   2:18 PM   PAGE 3 LINE 9-19


(Q) CAN YOU SEE IT ON THAT PICTURES?

(A) YEAH, A LITTLE BIT. THERE'S A CHAINSAW, GREB WELLS HAD A CHAINSAW, IT'S ACTUALLY A CASE, IT'S A BLACK CASE AND A CHAIN SAW RIGHT THERE, IF YOU

PG
13

COULD BLOW BLOW IT UP.

(Q) DO YOU KNOW OF ~~DID PRESSED~~ MR WELLS LEFT HES CASE, WE DON'T KNOW WHAT'S IN IT, BUT DO YOU KNOW OF MR WELLS LEFT THAT CASE THERE?

(A) NO

THE COURT: WAS IT GONE BEFORE 30TH IS THIS QUESTION, DOES HE KNOW?

THE WITNESS: "YES IT WAS GONE BEFORE THE 30TH"

(EXHIBIT #10) IS A PHOTO OF THE C.C.E. PHOTOS WITH THE WINDOW MISSING IN THIS PHOTO

(EXHIBIT #11) AS SOME PHOTOS MR JONES TOOK OF THE SAME WAREHOUSE BUT YOU CAN CLEARLY SEE THIS WINDOW MR GREG WELLS INSTALLED BEFORE APRIL 30, 2005 BEFORE MR JONES VACATED THE LEASE OF THE WAREHOUSE

(EXHIBIT #12) IS MR GREGORY K. WELLS SWORN DECLARATION UNDER PENALTY OF PERJURY (28 USC §1746)

MR WELLS WRITES: I COMPLETED ALL WORK IN FOUR DAYS IN FEBRUARY. I ALSO REMOVED MY SKILL SAW AND TOOLS AND WENT TO WORK ON ANOTHER JOB. AFTER THE WAREHOUSE I BEGAN WORKING INSIDE THE CLUB. FIRST PROJECT WAS BUILDING A VIP ROOM, FRAMED IT, USING SKILL SAW TO CUT 2X4s AND STUDS TO FRAME OUT

P6
14

THE VIP ROOM ALSO USING THE SKULL SAW TO PUT SUB-
FLOOR DOWN, AND HAD HARDWOOD FLOORS BECAUSE IT WAS
A BRICK FLOOR, AFTER COMPLETING THAT JOB I STARTED
TO BUILD A BAR WHICH REQUIRED THE USE OF MY SKULL
SAW. AFTER THE ENTRANCE OF THE CLUB I BUILD THE HARD-
WOOD FLOORS AND PANELING AS WELL AS THE DOOR IN THE
LOUNGE AREA. ALL THE DOOR HEIGHTS HAD TO BE CUT TO
76 X 77 INCHES BECAUSE EACH DOOR WAS THE STANDARD
79 X 80 INCHES HIGH WHICH REQUIRED ME TO USE MY SKULL
SAW AS WELL. "THERE IS NO DOUBT IN MY MIND THAT WHEN
I FINISHED MY WORK IN THE WAREHOUSE IN FEBRUARY I
TOOK MY SKULL SAW WITH ME AND USED IT ON OTHER
PROJECTS."

(EXHIBIT #13) IS MR GREG WILLS TRIAL TESTIMONY
FEBRUARY 12, 2013   AM SESSION  PAGE 80 LINE 20-25
PAGE 81   PAGE 82 LINE 1-7 PAGE 89

IN MRWILLS TESTIMONY HE POINTED OUT THE SPACE
IN THE G.C.E. PHOTO WHERE THE WINDOW HE INSTALLED
WAS MISSING AND MR WILL TESTIFIED THAT HE
INSTALLED THIS WINDOW SOME TIME IN FEBRUARY.

LAWRENCE MAYNARD TRIAL TESTIMONY
FEBRUARY 19, 2013   2:18 P.M  PAGE 3 LINE 22-25

P6
15

(Q) ONE LAST QUESTION ON THE WAREHOUSE. THIS IS GOVERNMENT EXHIBIT I.C.E. 10 ON THIS DIAGRAM, YOU SEE TWO TRASH CANS CORRECT?

(A) YES

(Q) AND YOU SEE  4-30-04   11:15 PM

(A) YES

(Q) IF YOU COULD SEE ON THE PHOTO RIGHT HERE - - THE COURT: ICE 12

(Q)- - THE TRASH CANS?

(A)  YOU CAN SEE TRASH CANS OVER HERE TO THE LEFT.

(Q)  DO YOU SEE ANYTHING ON THE TRASH CANS?

(A) THERE'S ACTUALLY DEBRIS ON ONE OF THEM. YOU'VE GOT TO MOVE THE PICTURE OVER A LITTLE BIT THOUGH.


FEBRUARY 14, 2013   2:18PM   PAGE 4  LINE 15-19


(A) IF YOU LOOK AT THIS TRASH CAN HERE, THERE'S A TRASH CAN NEXT TO A JEWELRY CASE. "THERE'S DEBRIS STICKING OUT OF IT.

IT'S LIKE CARD BOARD STICKING UP OUT OF THE TRASH CAN.  YOU CAN SEE THE FLAT OF THE OPENING OF THE TRASH CAN AND DEBRIS STICKING OUT OF IT.


FEBRUARY 14, 2013   2:18 PM   PAGE 5  LINE 7-12


(Q) THE TRASH CAN, WHAT DID YOU DO WITH THE TRASH

P6
16

CAN BEFORE MARCH 30TH?

(A) WE USED THEM IN THE CLUB, WE ALWAYS HAD
TO HAVE EXTRA TRASH CANS AT THE CLUB, ALL KIND OF BEER
BOTTLES, ALL KIND OF DEBRIS, FOOD EVERYTHING, WE NEEDED
ALL THE TRASH CANS WE COULD GET.

OBSTRUCTION OF JUSTICE - FRAUD ON THE COURT.

(EXHIBIT #14) PAGE 90 LINE 2, 3 PAGE 91- 96

HERE THE GOVERNMENT APPROACH THE BENCH TO OPPOSE
SOME OF THE FEDERAL DOCUMENTS MR JONES WAS PRESENT-
ING AS FALSIFYING FEDERAL DOCUMENTS. JUDGE HUVELLE
DISMISSED THE JURY SO AS TO HEAR THE GOVERNMENT'S
ARGUMENT.

MS URSHELL: YOUR HONOR, THERE'S A NUMBER OF
DOCUMENTS MR JONES HANDED ME. I BELIEVE THEY'RE
FROM THE FILE OF SPECIAL AGENT KATERINA KANE. ONE
IS INDICATING A LIST OF PHOTOGRAPHS, AS WELL AS
SOME WRITING. ONE IS THE SKETCH OF THE WAREHOUSE,
WHICH IS FINE, IT'S BEEN ADMITTED.

THE NEXT IS A DOCUMENT FROM US. CUSTOMS BORDER
PATROL REGARDING THE K-9 THAT ASSISTED IN THE SEARCH
OF THE WAREHOUSE.

PG 17

THE NEXT ARE THE Q.C.E. REPORT - - PIECE OF THE Q.C.E REPORT RELATED TO THE WAREHOUSE. THES AS GRAND JURY TESTIMONY.

LINE 16-25

THE COURT: ALL RIGHT. HERE, LET'S START WITH THE BORDER PATROL MEMORANDUM OF APRIL 3RD

MR JONES: EVERY DOCUMENT THAT YOU HAVE IN FRONT OF YOU SAY APRIL 30TH. MR JONES ASKED Q.C.E. AGENT KANE WAS THES STUFF AT THE WINE HOUSE.

THE COURT: RIGHT

MR JONES : Q.C.E. AGENT KANE WAS SAYING AT TWO TRIAL -- NOW THREE -- THAT THEY WENT IN THE WAREHOUSE.

THE COURT: ON APRIL 30TH

MR JONES : AT APRIL THE 30TH

LINE 13,14,16

MR JONES : "IF THEY PUT APRIL THE 30TH THAT THEY TOOK THOSE PHOTO'S, THAT AS OBSTRUCTION OF JUSTICE"

MR JONES GOING TO REFER O.I.G. TO HIS POLYGRAPH EXAMINATIONS.

QUESTION #14. DID YOU AND LAWRENCE REMOVE YOUR PERSONAL ITEMS FROM THE WAREHOUSE BEFORE APRIL 30, 2004 ? ANSWER: YES

Pg 18

THIS POLYGRAPH EXAMINATIONS TRUTHFUL ANSWER CORROBORATE WITH THE TRIAL TRANSCRIPTS OF MR MAYNARD PLUS IT SUPPORTS THE SWORN AFFIDAVITS OF MR JONES AND MR MAYNARD SWORN DECLARATIONS.

(EXHIBIT # 15) MR JONES SWORN AFFIDAVIT

(EXHIBIT # 16) MR MAYNARD SWORN AFFIDAVIT

(EXHIBIT # 17) MR MAYNARD SWORN DECLARATION UNDER PENALTY OF PERJURY (28 U.S.C.S. § 1746)

(EXHIBIT # 18) IS LEYVANCE HOWARD'S SWORN DECLARATION UNDER PENALTY OF PERJURY.

MR LEYVANCE HOWARD SWEARS THAT MR MAYNARD GAVE HIM THE JACKET THAT WAS SEEN IN THE ICE PHOTOS.

## CORRECTION

MR MAYNARD TESTIFIED THAT HE GAVE THE JACKET TO A CLUB LEVEL'S EMPLOYEE, BUT HE SAID GREG WILLS' NAME. WHAT MR MAYNARD MEANT TO SAY WAS LEYVANCE HOWARD WHO IS A CLUB LEVEL'S EMPLOYEE NOT GREG WILLS WHO ISN'T A CLUB LEVEL'S EMPLOYEE. HE DID CONTRACT WORK AROUND CLUB LEVELS.

P6
19

    I REFER OIL TO MR MAYNARD'S SWORN AFFIDAVITS PAGE 8
5: "THE JACKET WAS GIVEN TO AN EMPLOYEE NAMED LEVVANCE
HOWARD (AKA SKINNY) AT CLUB LEVELS, THE FBI'S SURVEILLANCE
TAPE WILL CONFIRM THAT LEVVANCE HOWARD WORE THIS
JACKET ~~GREEN~~ ALMOST DAILY.

### CONCLUSION

    THIS OBSTRUCTION OF JUSTICE CHART OUTLINES ~~THE~~ AND
POINTS OUT CLEAR AND CONVINCING EVIDENCE THAT
THE I.C.E. AGENTS OBSTRUCT JUSTICE, FALSIFIED FEDERAL
DOCUMENTS, TESTIFIED FALSELY ON THE GRAND JURY
AND ON THREE TRIALS, CLEARLY AN 18 USCS § 1001,
1519, 1621, 1622, 1623, 2236 - SEARCH ~~WARRANT~~
WITHOUT A WARRANT VIOLATION.

    MR ANTOINE JONES AND MR LAWRENCE MAYNARD
CHALLENGE THE GOVERNMENT BY TESTIFYING UNDER OATH
AND SUBMITTING SWORN AFFIDAVITS WHICH BOTH
CAN GET US EXTENSIVE TIME IN PRISON.

    IF THE GOVERNMENT DOESN'T CHALLENGE MR JONES
OR MR MAYNARD AND IF THEY ~~DONT~~ DON'T CONCEDE
TO THESE SERIOUS CLAIMS OF IMPEDING A FEDERAL
INVESTIGATION, O.I.G. SHOULD INVESTIGATE TO SEE
IF THE OUTRAGES MISCONDUCT WARRANTS DISMISSAL

OF THE CRIMINAL CASE OF MR ANTOINE AND MR
LAWRENCE MAYNARD.

(EXhibit #1)

OVER Head DooR — DooR

BAth Room
OFFice

TRASH Cans

METAL CArt

Box Shrink WRAP

②

①

③ BRown Coveralls Hanging up

③ ③ TRAsh CAN — CHAIN SAW

BLUE Moving BLANkETS under TABLE lot on top

TABLE — R-BoB?

Ice
Bill
KAT
FRed.

④/30/04  11:15 PM

① * LiTE Blue moving BLANKETS       OBSTRUCTION
② * White Box - Shrink wrap          O/ JUSTICE
③ * BRown Coveralls - Hanging on wall  18 USC 1337)
                                      18 USC 1574

K9 Scented Real Close to FLOOR (concRete) And
DRywall

1        IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA

2

THE UNITED STATES OF AMERICA, )

3                                )      File No:  CR 05-386
                Plaintiff,       )
4                                )      Date:   January 30, 2013
vs.                              )              A.M. Session
5                                )
Antoine Jones,                   )      Time:   9:43 a.m.
6                                )
                Defendant.       )
7

8    ─────────────────────────────────────────────────

9              TRANSCRIPT OF JURY TRIAL
                   HELD BEFORE
10       THE HONORABLE ELLEN SEGAL HUVELLE
            UNITED STATES DISTRICT JUDGE
11                    Day 4

12   ─────────────────────────────────────────────────

13   APPEARANCES:

14   For the United States:   Ms. Darlene M. Soltys
                              Ms. Courtney Spivey Urschel
15                            Assistant United States Attorneys
                              United States Attorneys Office
16                            555 Fourth Street, NW
                              Washington, DC   20530
17
     For the Defendant:       Antoine Jones, *pro se*
18
     Also Present:            Mr. Jeffrey B. O'Toole
19                            Ms. Errin Scialpi
                              Attorneys at Law
20                            O'Toole Rothwell
                              1350 Connecticut Avenue, NW
21                            Suite 200
                              Washington, DC   20036
22

           :porter:          Vicki Eastvold, RMR, CRR
                             United States Courthouse, Room 6722
                             333 Constitution Avenue, NW
                             Washington, DC   20001
                             (202) 354-3242

           ──────────  1/30/13 - A.M.  ──────────

1

I N D E X

2

3

KATERINA KANE
4    (*Continuing*)  Direct Examination by Ms. Urschel.....   3
    Cross-Examination by Mr. Jones.....................  28
5    Redirect Examination by Ms. Urschel...............  99
    Recross-Examination by Mr. Jones.................. 106
6
ANDREW BENNETT
7    Direct Examination by Ms. Urschel................. 108
    Cross-Examination by Mr. Jones.................... 115
8    Redirect Examination by Ms. Urschel............... 124
    Recross-Examination by Mr. Jones.................. 125
9
Sealed Defense *Ex Parte* Conference (*Redacted*).......... 126
10

11

E X H I B I T S

12
                                                        <u>ADMITTED</u>
13
GOVERNMENT EXHIBIT:
14
      PHOTO-14...................................   8
      PHOTO-22................................... 111
15
      ICE-10 through ICE-20......................  22
16      ICE-21....................................  21
      ICE-22....................................  19
17      ICE-23(a)(b) and (c)......................  18
      ICE-24....................................  18
18      ICE-25....................................  12
      ICE-29....................................  12
19      ICE-27 and ICE-28.........................  14
20      MISC-11...................................  25
21      DMV-4..................................... 115
22

23
DEFENDANT EXHIBIT:
24
      3.........................................  80
25

1          THE COURT:  Morning, ladies and gentlemen.  Please

2     be seated.

3          Are we ready to resume?

4          MS. URSCHEL:  We are, Your Honor.

5          (Witness Katerina Kane resuming the witness

6     stand.)

7          THE COURT:  All right.  You're still under oath.

8          DIRECT EXAMINATION   (Continuing)

9     BY MS. URSCHEL:

10    Q.  Good morning.

11    A.  Good morning.

12    Q.  Since we broke for the night, if you could just go ahead

13    and remind the jurors your name and the organization you

14    work with.

15    A.  Katerina Kane, Homeland Security Investigations here in

16    headquarters in Washington.

17    Q.  Before I pick up exactly where we left off, I'd like to

18    go through and make sure that I asked you to put some dates

19    relevant in your investigation on the record for the jury.

20         First of all, what was the date that you first

21    observed Javier arrive at the airport, BWI, for the first

22    time?

23    A.  February 6th, 2004.

24    Q.  And you mentioned that there was surveillance overnight.

25    So the following morning, just to be clear, what was that

1           MS. URSCHEL:  Your Honor, the Government requests

2    admission, and there's no objection from the defendant, of

3    Government's Exhibit ICE-10, 11, 12, 13, 14, 15, 16, 17, 18,

4    19 and 20, so that's ICE-10 through 20.

5           THE COURT:  Okay.  No objection, subject obviously

6    to the prior motion.  Okay.  Admitted.  10 through 20.

7           (Government's Exhibits ICE-10 through ICE-20

8                  received in evidence.)

9    BY MS. URSCHEL:

10   Q.  I'm showing you Government's Exhibit ICE-10.  What is

11   this?

12   A.  It's kind of a sketch of 400 Hampton Park Boulevard.

13   Q.  And if you could just describe to the ladies and

14   gentlemen of the jury what's depicted on that sketch.

15   A.  The -- at the very top right where it says "door,"

16   that's the walk-in door where you had a little office area.

17   And then you'd walk into, basically, the big -- the biggest

18   area which was the garage area.  The bay area.  And, you

19   know, there was very little stuff left, but there was some

20   junk left, some stuff left.  And there were some moving

21   blankets, a lot of boxes of shrink wrap, like almost

22   industrial-size boxes of shrink wrap, some coveralls, and --

23   what I also saw -- I'm not sure if it's noted on here, but

24   what I also saw was deflated inflatable mattresses.  There

25   were some deflated inflatable mattresses left in there.

1   A.  It shows that there was something covering -- again, the

2   garage door had a natural little window, but it was covered

3   up by this towel-type thing.

4   Q.  Next is ICE-15.  What do you see there?

5   A.  Just some coveralls.  There was a box of like -- looked

6   like stuffed animals -- like Valentine stuffed animals --

7   and some coveralls just hanging on the wall.

8   Q.  Next is ICE-16.  What does that show?

9   A.  Those are moving blankets.

10   Q.  How about ICE-17?

11   A.  Are -- an inflatable mattress.

12   Q.  How does this inflatable mattress compare to the air

13   mattress you found during your search at Myrtle Avenue?

14   A.  It was the same type.  It looked like the same type.

15   Q.  Next is ICE-18?

16   A.  Those are big boxes -- that's a big giant box of -- it

17   has four rolls, like industrial size sheets, of shrink wrap,

18   basically.

19   Q.  ICE-19?

20   A.  Yeah.  And there they are.  The shrink wrap.

21   Q.  And ICE-20?

22   A.  More shrink wrap.

23        (NOTE:  Off-the-record discussion between

24   Ms. Urschel and Mr. Jones.)

25        MS. URSCHEL:  Without objection, the Government

1    a subpoena?

2    A.   No.   I asked Mr. Schaeffer if once you vacated I could

3    go into the warehouse.

4    Q.   So you never asked before April the 30th.

5    A.   Are you asking me when I asked Mr. Schaeffer if I could

6    at some point go into the warehouse?  Yeah, that was before

7    April 30th.   I mean, it was Mr. Schaeffer who called me and

8    told me that your -- of your intention to vacate early.

9    Q.   Do you remember what Mr. Schaeffer told you when you

10   asked him before April the 30th can you go into the

11   warehouse?  Do you remember what Mr. Schaeffer said?

12   A.   He said once you vacated, yeah, you could be -- just

13   like a prospective renter.

14   Q.   So he never told you to get a subpoena?

15   A.   He might have, but I said, Well, do I need one?  He

16   might have.   I don't remember.

17   Q.   Okay.   This is ICE No. 17.   Government ICE Exhibit

18   No. 17.   Now, when you went into that warehouse, was it

19   empty?

20   A.   Pretty much, except for some stuff left behind.   Not

21   much.

22   Q.   So it was kind of junky.   Do you consider it kind of

23   junky?

24   A.   Well, just some items left behind.

25   Q.   Some items left behind.

1  A.  I think I referred to it as "junk" earlier.  I didn't

2  mean junk as in worthless, but obviously wasn't worth

3  taking.

4  Q.  So in this picture right here, ICE No. 12, Government

5  Exhibit ICE No. 12, this is how the warehouse was left after

6  I vacated the warehouse?

7  A.  Yes.

8  Q.  And this was -- you saying to the jury April the 30th.

9  A.  Yes.

10  Q.  After I vacated.

11  A.  Yes.

12  Q.  You said on ICE No. 20, Government Exhibit ICE No. 20,

13  Mr. Jones left this box of wraps.

14  A.  That was left in the warehouse, yes.

15  Q.  April the 30th, this is what you seen in the warehouse.

16  A.  Yes.

17  Q.  ICE No. 19.  Is this a different box or the same box of

18  wraps?

19  A.  Can you put the other picture back?  Please?  It might

20  be the same box, it might be a different box.  I can't

21  remember.

22  Q.  So do you know what this wrap was used for?

23  A.  Do I know what it was used for?

24  Q.  Yes.

25  A.  It could have been used to wrap drugs or money.

1    Q.  So did you know that the warehouse, Mr. Maynard was

2    actually doing the delivery service?

3    A.  I would find that hard to believe because I watched for

4    35 --

5            THE COURT:  "Do you know" is the question.

6            THE WITNESS:  No.

7            THE COURT:  You're not to argue.

8            THE WITNESS:  No.

9            THE COURT:  So, ladies and gentlemen, his

10   question's not evidence.  You got to remember that.  Either

11   you know or you don't know.  You can't quibble with him.

12   BY MR. JONES:

13   Q.  This box right here, a hand film wrap, is that a

14   different box?

15   A.  It may or may not be.  I think there were a couple

16   boxes.  I think there were two boxes.  That's the side of

17   the box.

18   Q.  So you telling the jury that Mr. Jones and Mr. Maynard

19   left that box of wrap at the warehouse?

20   A.  It was left behind, yes.

21   Q.  Okay.  Now, did you know at that time or during your

22   investigation Mr. Jones had a club?

23   A.  Yes.

24   Q.  So you don't think Mr. Jones could use that wrap at the

25   club.

1    A.  No.

2    Q.  So you assumed that Mr. Jones was selling drugs, right?

3    Or you believed Mr. Jones was selling drugs, right?

4    A.  Yes.

5    Q.  And you thought this was for wrapping drugs?

6    A.  Yes.

7    Q.  Not wrapping furniture?

8    A.  Yes.  I never saw any furniture there.

9    Q.  Did you know -- did you ever go into the warehouse and

10   see that they had furniture stored in the warehouse during

11   that time?

12   A.  No, I didn't go into the warehouse before April 30th,

13   until after you vacated.  Until after you vacated.

14   Q.  So you're telling the jury that you never went into that

15   warehouse before April the 30th.

16   A.  Correct.

17   Q.  Do you know what this is?

18   A.  Yes.  Moving blankets.

19   Q.  And did you know Mr. Maynard used that with the delivery

20   business?

21   A.  No.

22   Q.  So you're telling the jury that Mr. Maynard and

23   Mr. Jones left this at the warehouse?

24   A.  It was left behind at the warehouse.  For all I know,

25   that could have been there before you rented it.  It was

1     there.

2     Q.  Just like that.  The boxes laying there just like that.

3     A.  No, the moving blankets, I'm saying.  They're still

4     packed.  They haven't been used.

5     Q.  Good point.

6            ICE Exhibit No. 15.  Now, this blue jacket, you

7     said this blue jacket was left at the warehouse?

8     A.  That was left at the warehouse, yes.

9     Q.  So, you ever surveil Club Levels?

10           THE COURT:  Surveil?

11           MR. JONES:  Yeah, been down Club Levels.

12           THE COURT:  You personally.

13           MR. JONES:  Yes, you --

14           THE WITNESS:  Yes.

15           MR. JONES:  -- or anybody -- agents.

16           THE WITNESS:  Yes.

17     BY MR. JONES:

18     Q.  Now, while you were down surveilling Club Levels, you

19     never seen any of Club Levels's workers wearing that jacket.

20     A.  No.

21     Q.  These coveralls.  Did you -- you saying that these

22     coveralls were left behind.  These work coveralls.

23     A.  Yes.  I already stated that that stuff was left behind.

24     Q.  These Valentine baskets.  Gift baskets.  Can you see

25     them?

1    A.   Uh-huh.

2    Q.   Box of Valentine gift baskets.  So you're saying that

3    Mr. Jones and Mr. -- and Mr. Maynard left this box of

4    Valentine gift baskets.

5    A.   That stuff was left behind.

6    Q.   So you didn't know or investigate that Mr. Maynard was

7    selling those gift baskets around about February.

8    A.   No.

9    Q.   You didn't know that Mr. Maynard took them boxes that

10   was left home with him.

11   A.   No.

12   Q.   This box right here (indicating).  When you went into

13   the warehouse, did you check this box to see if it was a

14   brand new glass table?

15   A.   No.

16   Q.   So you just took a picture of the box and you didn't

17   look in there see if any drugs was in it?

18   A.   (No response.)

19   Q.   Did you look in this box -- this brand new box of glass

20   table -- did you look to see if there was any drugs in it?

21   A.   No.

22   Q.   So you're saying that Mr. Jones and Mr. Maynard left

23   this behind.

24   A.   Yes.

25   Q.   Now, you said that the door was covered up.

1    A.   Yes.

2    Q.   Because you seen the door covered up, you thought there

3    was some type of illegal activity going on?

4    A.   The door was covered up just like all the doors and

5    windows were covered up at Myrtle Avenue. So, yes, I

6    suspected that that was covered up to hide what was going on

7    inside.

8    Q.   So you didn't ever check and see if it was covered up to

9    conceal and hide the furniture that was in there.

10   A.   No.

11   Q.   You never even asked the next door neighbor or anybody

12   on -- or anybody that work around there, Did you see any

13   Mexicans coming into the warehouse?

14   A.   No.

15   Q.   You never investigate with none of those people and say,

16   Do these guys down here, they doing suspicious activity?

17   A.   No.

18   Q.   You just had a camera for 35 days. Did you see any

19   drugs going in and out?

20   A.   No.  Nor any furniture, though, either.

21   Q.   This right here (indicating).  You say this blow-up

22   mattress is the same type of mattress that the Hispanics was

23   using in whatever houses?

24   A.   That were in your houses, yes.

25   Q.   In my houses.  So do you know what that blanket -- this

──────────── 1/30/13 - A.M. ────────────

1    mattress was used at the warehouse for?

2    A.  No.

3    Q.  Did you know that sometime Mr. Maynard take a nap and

4    stay at the warehouse?

5    A.  No.

6    Q.  So did you know that this same blanket, the same

7    inflatable mattress, could be seen in October of 24th at

8    Club Levels?

9    A.  No.

10   Q.  So if this is seen in October the 24th at Club Levels,

11   and this is April -- the what?  Or April the 30th?

12   A.  30th.

13   Q.  There's no way possible that this could have been April

14   the 30th.  Left behind.

15   A.  Well, that doesn't make any sense.

16   Q.  It makes sense is -- the point I'm saying is, is no way

17   possible that this could have been left behind if it's at

18   Club Levels.

19   A.  You mean if you have another mattress at Club Levels?

20   Q.  No.  I'm saying --

21   A.  Yeah, you could have another one.

22   Q.  I'm saying --

23   A.  That was there on April 30th, sir.  I saw it with my own

24   eyes.

25           THE COURT:  She doesn't know --

```
 1                  THE WITNESS:  I took a picture of it.

 2      BY MR. JONES:

 3      Q.  These compounds --

 4                  THE COURT:  Sorry.  Wait a minute.  She doesn't

 5      know whether it was at Club Levels on the 24th.

 6                  MR. JONES:  I think, Your Honor --

 7                  THE COURT:  So you can't keep asking these

 8      questions that assume a bunch of facts that are not in

 9      evidence.  That's the problem.

10                  MR. JONES:  Your Honor, I would have witnesses

11      that will testify about this.

12                  THE COURT:  Well, you'll get to that when you get

13      to that.  But right now --

14      BY MR. JONES:

15      Q.  Compound.  So you say that these compounds was left

16      behind?

17      A.  That the what?

18      Q.  These compounds right here (indicating).

19      A.  Compounds?

20      Q.  These compounds that you use for -- for the wall.

21      A.  All that stuff in the pictures was left behind.  That's

22      what was in the warehouse when you vacated.

23      Q.  So one last --

24      A.  According -- when the landlord said you vacated and gave

25      me the key to go in.  Yes, all that stuff was left behind.
```

1    Q.  All this stuff was left behind.

2          Agent, how long you say you've been an agent?

3    A.  Since 1996.  17 years now.

4    Q.  You understand what obstruction of justice is?

5    A.  Oh, yes.

6    Q.  So if evidence is shown that this evidence right here --

7    this -- this chair right here (indicating), these trash cans

8    right here (indicating), all this evidence right here is

9    found somewhere else in photos after April the 30, is that

10   obstruction of justice?

11          THE COURT:  Well, she can't answer that.  Only I

12   can.

13          MR. JONES:  Okay.  Well, I leave it at that,

14   Your Honor.

15          THE COURT:  Thank you.

16          MR. JONES:  Thank you very much.

17          THE COURT:  All right.  Miss -- can you finish up

18   with this witness, please?

19          MS. URSCHEL:  Yes, Your Honor.

20          THE COURT:  Thank you.

21          (Off-the-record discussion between Ms. Urschel and

22   Mr. Jones.)

23                    REDIRECT EXAMINATION

24   BY MS. URSCHEL:

25   Q.  Agent Kane, do you remember when Mr. Jones asked you



DEFENDANT'S
EXHIBIT





PENGAD-Bayonne, N. J.

DEFENDANT'S
EXHIBIT

Rolls of shrink wrap.



(Exhibit 1)



Lawrence
Shirt

Lawrence
Jacket

Coverall



Found in warehouse
office

Name _____ KENDON
Telephone ( __443). 340 5936 ___
Fax No. ( _____) _____
E-mail _____
Address _____
Emory Hawwws Aus ahas taumt-
MSX calis mumd Darmu    443-652-7355

**ROLODEX**

Found in ware house
office





( Cα μιδιη ΙΨ۶ )

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | 1. PAGE    4 |
|---|---|
| | 2. CASE NUMBER  BA02BR04BA0012 |
| | 3. REPORT NUMBER: 005 |

* a white box that contained rolls of plastic shrink wrap;
* a pair of brown coveralls that were hanging on the wall and       18015J
* blue moving blankets that were stored on top of and below a table.   1001-(1519

Photographs were taken of the warehouse, including the narcotics alert areas,
but nothing was removed from the premises. Agents and officers departed the
warehouse without incident and your writer returned the keys to the landlord
the next business day on May 3, 2004.

This investigation continues.

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY
OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR
DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED
TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

( Exhibit # 6 )

1  them.  Mrs. Jones, or Denise Jones never appeared there.

2  Antoine a handful of times.  Maynard not every day, but most

3  frequently he would show up.

4      Q.    And did he ever actually take that Isuzu box truck

5  all the way into the storage facility and shut the door?

6      A.    He did on two occasions.  But unfortunately, when he

7  did pull it into the garage, the door was closed behind him

8  and, you know, nothing could be observed as to what was

9  happening on the inside.

10     Q.    Did you or did the surveillance ever pick up anybody

11 making any legitimate deliveries to that place, supplies for

12 some sort of consulting service business or anything like

13 that?

14     A.    No, apart from the sparse comings and goings of

15 Maynard and Antoine Jones, no legitimate business activity

16 could be discerned from watching this place 24/7 for a period

17 of 35 days.

18     Q.    Okay.  And by the way, did there come a time that

19 Mr. Jones broke the lease early on that Hampton Park Boulevard

20 warehouse facility and you actually got consent to search it?

21     A.    Yes.  He, in writing, notified the landlord that he

22 was vacating by April 30th.  And on that same day, when he

23 turned the keys in to the landlord, the landlord -- so he had

24 vacated the premises.  The landlord allowed us, allowed me, he

25 gave me the key and allowed me to go in with a few other

1  agents and a customs inspector with a drug dog.

2      Q.   Okay.  And remarkably, what did you find inside the

3  security storage facility?

4      A.   In the depot area, the garage area, there were

5  several crates, boxes of shrink wrap.  There were also several

6  inflatable mattresses.  I mean, they were deflated, but there

7  were the inflatable mattresses, I mean, several inflatable

8  mattresses, some coveralls.

9      Q.   How about the windows.  Were there any windows in

10  this warehouse space?

11      A.   Yes.  The garage windows had just, you know, small

12  windows.  You probably wouldn't be able to see much in those,

13  but true to form with all their other locations, they had

14  those covered up with like pieces of carpet.  They had the

15  windows covered.  Another interesting thing, the landlord told

16  me that he thought it was odd, soon after Antoine had leased

17  this place, he had ordered a very expensive overhead door,

18  like, you know, the warehouse had locks and, you know, its own

19  locks on both the office door and the garage door, but he

20  ordered this extra -- the company is Overhead Door, and they

21  sell security doors.

22         The landlord just thought it was odd because these

23  doors are very -- he thought they were several thousand

24  dollars and he just thought it was odd that he had paid for

25  this at his own expense to secure the office area, which

1 connected to the warehouse area, because what he had been told

2 was that they were a delivery service, you know, not that they

3 would be housing or keeping any expensive merchandise at the

4 warehouse.  So he just thought that was odd.

5     Q.   When the drug dog went through, what, if anything,

6 did that dog do?

7     A.   The drug dog alerted to the presence of narcotics in

8 several areas in the depot area of the warehouse.  He alerted

9 close to the shrink wrap boxes, he alerted close to the

10 coveralls which were left kind of hanging on hooks, and near a

11 table where the deflated inflatable mattresses were near.

12     Q.   Okay.  Were any drugs actually found in that

13 warehouse space?

14     A.   No.

15     Q.   After this -- after your investigation of this

16 warehouse facility, did your personal investigation of Jones

17 sort of come to a close for the time?

18     A.   Yes.  Unfortunately, I was assigned to another

19 detail, and then subsequently, I was transferred to another

20 office.  So I was -- I had to leave the case behind because I

21 was transferred to another geographic location.  And the agent

22 who had been my group member who was also very familiar with

23 the case was slotted to get the case, and she did get it, but

24 she went out on maternity leave for almost a year, for like

25 ten months.

ᒎ*Zᴀᴨ*ᴎᴵᴓᴵᴛ ᴺᵛ ᵛ*/*

7. The suppliers often used large trucks to transport large shipments of cocaine, often in excess of 200 kilograms, to the Washington, D.C., area, where they unloaded it into smaller vehicles and transported it to the stash locations for storage for as much as a month at a time.

8. **JONES** also rented warehouse facilities for the same purpose. For example, on or about April 30, 2004, a search of **JONES's** warehouse space, located at the Hampton Park Storage Facility, *False Statem* 400 Hampton Park Boulevard, Capitol Heights, Maryland, which he rented from November 17, 2003, until he broke the lease on April 30, 2004, revealed several boxes of heat sealing wrappings and air mattresses, as well as the scent of cocaine, which was detected by a narcotics-sniffing canine.

9. **JONES** periodically collected money from some of his co-conspirators, including **JOHNSON, JACKSON, HUGGINS, HOLLAND, CARTER,** and others known and unknown to the Grand Jury. **JONES** then visited a storage location, and met with **BREMEA** and others, known and unknown to the Grand Jury, to deliver quantities of cash, and pick up multiple-kilogram quantities of cocaine for distribution to these co-conspirators. For example, on September 28, 2005, **JONES** met with **HUGGINS** at his residence in Suitland, Maryland, where he remained for *GPC* approximately 20 minutes. From there, **JONES** drove directly to the residence of a co-conspirator not indicted herein, but who is known to the Grand Jury, and remained for approximately 20 minutes. After another similar meeting with an individual unknown to the Grand Jury, at 9:35 p.m., **JONES** drove to a stash location, 9508 Potomac Drive, Ft. Washington, Maryland, where he met with **BREMEA** for approximately 45 minutes.

10. From at least some time in 2003, the exact date being unknown to the Grand Jury, through October 24, 2005, **JONES** supplied a number of unindicted co-conspirators, who are known to the grand jury, with kilogram and half-kilogram quantities of cocaine. **JONES** regularly

Exhibit #8

18

```
 1              MR. BALAREZO:  We were trying to demonstrate

 2   through various photographs that were provided that

 3   the entry had to have been prior to Mr. Jones's

 4   vacating the premises.  And she did not have a

 5   warrant, so, therefore, it would have been an illegal

 6   search.

 7              THE COURT:  Is this --

 8              MR. BALAREZO:  It's our position that this

 9   would have been in keeping with Agent Gikas' practice,

10   because, remember, the Court did suppress her illegal

11   entry into the Summit Circle apartment, which she

12   effectuated without a search warrant.

13              THE COURT:  Okay.  This has to do with

14   Gikas, and this is the lady from ICE?

15              MR. BALAREZO:  Correct.

16              THE COURT:  And your argument was because of

17   the pictures, she had to have entered before he

18   abandoned the premises?

19              MR. BALAREZO:  Right.  Because there were --

20   I'll just say there were items depicted in the

21   photographs that were -- were there before Mr. Jones

22   left and that were not there after he left, so

23   therefore, if they were in the photographs that were

24   taken, the entry must have been before he left and

25   would have been illegal.
```



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE UNITED STATES OF AMERICA, )
                              )    File No:  CR 05-386
               Plaintiff,     )
                              )    Date:  February 14, 2013
vs.                           )           A.M. Session
                              )
Antoine Jones,                )    Time:  9:48 a.m.
                              )
               Defendant.     )

_____

TRANSCRIPT OF JURY TRIAL
HELD BEFORE
THE HONORABLE ELLEN SEGAL HUVELLE
UNITED STATES DISTRICT JUDGE
Day 15

_____

APPEARANCES:

For the United States:    Ms. Darlene M. Soltys
                          Ms. Courtney Spivey Urschel
                          Assistant United States Attorneys
                          United States Attorneys Office
                          555 Fourth Street, NW
                          Washington, DC   20530

For the Defendant:        Antoine Jones, *pro se*

Also Present:             Mr. Jeffrey B. O'Toole
                          Ms. Errin Scialpi
                          **Attorneys at Law**
                          O'Toole Rothwell
                          1350 Connecticut Avenue, NW
                          Suite 200
                          Washington, DC   20036

Court Reporter:           Vicki Eastvold, RMR, CRR
                          United States Courthouse, Room 6722
                          333 Constitution Avenue, NW
                          Washington, DC   20001
                          (202) 354-3242

1    THE COURT:  So what?  It talks about a whole lot

2    of things, but this doesn't relate to your question.

3    MR. JONES:  It's part of --

4    THE COURT:  Sustained.  Go.

5    (End of discussion at the bench.)

6

7    THE COURT:  Yeah.  Mark it.  57.  For

8    identification only.

9    (NOTE:  Off-the-record discussion between

10   Mr. Jones and Ms. Urschel and Ms. Soltys.)

11   BY MR. JONES:

12   Q.  Mr. Maynard, was it a time that Mr. Jones had a

13   warehouse?

14   A.  Warehouse on Hampton Boulevard.

15   Q.  Can you tell the jury exactly what position you played

16   in this warehouse?

17   A.  I was a driver.  I've been a driver since 1985.  A CDL

18   since '92 when they first started CDLs.

19   Q.  Mr. Maynard, before we left that warehouse -- as a

20   matter of fact, let me show you Government Exhibit No. 12.

21   Do you recognize this warehouse?

22   A.  That's the interior of the warehouse from the far back.

23   Q.  I'm sorry.

24   A.  The far back side interior of the warehouse.

25   Q.  Did there come a time that we vacated the warehouse on

```
 1    April the 30th?

 2    A.  Yeah.  We got rid of everything and put it in the truck.

 3    Whatever we didn't need, we trashed.  And swept the --

 4    actually, we washed the floors because I used to spill oil

 5    pulling the truck in there.

 6    Q.  In this photo right here --

 7              (NOTE:  Off-the-record discussion between

 8    Mr. Jones and Ms. Regan Gibson.)

 9    Q.  Mr. Maynard, you just told the jury that we vacated the

10    warehouse April the 30th?

11    A.  Yes, we did.

12    Q.  And you just told the jury you cleaned the warehouse or

13    power-washed the warehouse before April the 30th?

14    A.  Yeah, I had to.  There was a lot of oil on the ground --

15    on the floor.

16    Q.  Now, in the lease --

17              MR. JONES:  This is, Your Honor, Government

18    ICE-22.

19              THE COURT:  Okay.

20              (NOTE:  Off-the-record discussion between

21    Ms. Urschel and Mr. Jones.)

22    BY MR. JONES:

23    Q.  Mr. Maynard, if possible, can you read to the Court and

24    the jury the last paragraph of the lease?

25    A.  "Termination of lease.  Landlord may at its sole option
```

1    terminate this lease in its entirety at any time by giving

2    the tenant 60 days' written notice, at which time this lease

3    shall become null and void.  Tenant shall then vacate and

4    leave the premises in broom clean condition."

5    Q.  Mr. Maynard, as the person who was running that

6    warehouse, what did you -- what interpretation did you get

7    out of that paragraph?

8    A.  Can't leave any trash or any equipment that wasn't there

9    prior to us moving in.

10   Q.  Mr. Maynard, when you left that warehouse before April

11   the 30th, did you take this item -- these two items right

12   here (indicating)?

13          THE COURT:  What two items?

14          MR. JONES:  Right down under the table.

15          THE COURT:  Oh, those two with the blue arrows?

16   They look like big vats and a little vat.

17          THE WITNESS:  It's actually drywall compound.  And

18   it was some type of adhesive that Greg used to use for the

19   molding around the window and some kind of -- well, I know

20   the big one was caulking, but I'm not sure about the little

21   one because we used a variety of paints, too.

22   BY MR. JONES:

23   Q.  Mr. Maynard, picture kind of dark.  Can you recognize

24   what this is (indicating), the first item on top of the

25   table?

1    A.   Yeah.   That's inflatable mattress.   It was used from

2    time to time.   That one I think still had batteries, brand

3    new packs of batteries sitting on top in this picture.   But

4    at the time -- I mean, we used them.   Brand new packs of

5    batteries.

6              MR. JONES:   Make this an exhibit.

7              THE DEPUTY CLERK:   Your Honor, this is

8    Defense Exhibit 58, it's a photo.

9              THE COURT:   Any objection to 58?

10             MS. URSCHEL:   No, Your Honor.

11             THE COURT:   All right.   58's admitted.

12             (Defendant's Exhibit 58 received in evidence.)

13             THE COURT:   Gwen, do you have any more pieces of

14   paper?   Oh, no, I got one.

15   BY MR. JONES:

16   Q.   Mr. Maynard, is this a --

17             (NOTE:   Off-the-record discussion between

18   Mr. Jones and Ms. Regan Gibson.)

19   BY MR. JONES:

20   Q.   Is this a better picture?

21   A.   You can see -- you can see the mattress.   And like I

22   said before, there's brand new packs of batteries sitting on

23   top.   Two.

24   Q.   Can you point to the jury where the batteries -- the

25   brand new packs?

1           THE WITNESS:  Touch the screen?

2           THE COURT:  Touch the screen.

3           THE WITNESS:  (Indicating).

4           THE COURT:  Okay.  Got it.

5    BY MR. JONES:

6    Q.  Now, before April the 30th, did you take this mattress

7    or inflatable mattress and --

8           (NOTE:  Off-the-record discussion between

9    Ms. Urschel and Mr. Jones.)

10   BY MR. JONES:

11   Q.  Let me show you a color copy so the jury can see.  Is

12   that a better shot?

13   A.  Yes, it is.

14   Q.  Did you take this inflatable mattress and the compound

15   that you just spoke of to anywhere?

16   A.  I put everything back on the truck.  That was only place

17   we had at the time.

18   Q.  Why would you take the compound with you?

19   A.  Because we needed it at the club.

20   Q.  Why?

21   A.  All the drywall we were doing and windows replacing.

22   Set up the VIP that we made, new stage, a lot of molding we

23   did at the club.

24   Q.  Now --

25           MR. JONES:  Can we switch back to the picture?

1            THE DEPUTY CLERK:  What you need?  The Elmo or the

2    laptop?  Which you need, Regan?  Elmo or laptop?

3            MS. URSCHEL:  Laptop, please.

4    BY MR. JONES:

5    Q.  Okay.  Mr. Maynard, these light blue blankets or

6    something that's on the table --

7    A.  Moving --

8    Q.  -- did you leave that behind at this warehouse?

9    A.  No, they're moving pads.  Actually, that one on the

10   bottom's a brand new pad.

11   Q.  Now, why would you take those moving -- you say moving

12   pads?

13   A.  Moving pads.

14   Q.  Why would you take that with you?

15   A.  You covered merchandise, whether it's coffee tables,

16   sofa, you cover it up and then you shrink wrap it, and then

17   you can store it on truck, you can stand it up, you can pile

18   them on top of each other.  But nine times out of ten with

19   the shrink wrap and the moving pads you don't damage it or

20   scratch it or anything like that, and you can strap it to

21   the interior of the truck.  And you got the strap sitting

22   next to it, a pile of them.

23   Q.  Mr. Maynard, I don't have a color version.  But --

24            THE DEPUTY CLERK:  Has that been marked,

25   Mr. Jones?

```
 1              (NOTE:  Off-the-record discussion between
 2    Mr. Jones and Ms. Urschel.)
 3    BY MR. JONES:
 4    Q.  Mr. Maynard --
 5              MR. JONES:  This is Government Exhibit ICE-15,
 6    Your Honor.
 7              THE COURT:  It's in evidence.  Yeah.  ICE-15.
 8    BY MR. JONES:
 9    Q.  This box, can you tell the jury what's in that box?
10    A.  Made up some Valentine baskets that I was selling for
11    Valentine's.
12    Q.  You and who else?
13    A.  I had a friend of mine help me, and I was trying to sell
14    them up northwest, different spots around the city, out of
15    my car.
16    Q.  Mr. Maynard, this box right here (indicating) that's
17    right in front of that box of Valentine's gift, can you tell
18    the jury what that is?
19    A.  Down here (indicating)?
20    Q.  Yeah, down -- yeah, right there where you just pointing.
21    A.  That was a glass tabletop.  It was a brand new glass
22    tabletop.
23    Q.  A glass tabletop.  These coveralls -- first, did you
24    leave this box of gift -- Valentine gift wraps behind?
25    A.  No, I took them when we left the premises.
```

1    Q.  What about that brand new box of glass table?

2    A.  That glass tabletop was used later on in the club.

3    Q.  What about the jacket that's next to the brown

4    coveralls?

5    A.  That jacket, I end up taking it and giving to somebody

6    later on at the club.  But I end up taking it with me.

7    Q.  Did you remember who did you give that jacket to?

8    A.  I think it was Greg Willis.  Greg Wills.  I'm sorry.

9    Last name.

10   Q.  Let me show you --

11           (Pause.)

12           THE DEPUTY CLERK:  This is Defense Exhibit 59, and

13   it's a photo, Your Honor.  Any objections from the

14   Government?

15           MS. URSCHEL:  No, Your Honor.

16           THE COURT:  All right.  59.

17           Gwen will like that:  "No, Your Honor."

18           No objection.  Received into evidence.

19       (Defendant's Exhibit 59 received in evidence.)

20           MR. JONES:  This is, Your Honor, Exhibit 59.

21           THE COURT:  It's in evidence.  Can you clear the

22   screen by -- you got it.

23           MR. JONES:  Can I clear it?

24           THE COURT:  No, he did it.

25   BY MR. JONES:

1    Q.   Now, this next item right here (indicating) --

2    A.   Yes.

3    Q.   -- can you tell the jury what that is?

4    A.   It was a nice shirt.  Shirt that I -- I had for a

5    minute, and I took it home with me.

6              THE COURT:  Which one?

7              THE WITNESS:  The one on the left.

8              THE COURT:  Oh, the green line.

9              THE WITNESS:  Yeah.

10   BY MR. JONES:

11   Q.   So you took this home with you before April the 30th?

12   A.   Yeah, I took it home before April the 30th.  I'm not

13   sure if I left it in the truck or took it straight home, but

14   it was in the truck when we left.

15             THE DEPUTY CLERK:  This is Defense Exhibit 60.

16   It's a photo, Your Honor.

17             THE COURT:   60.  Any objection?

18             MS. URSCHEL:  No objection, Your Honor.  Thank

19   you.

20        (Defendant's Exhibit 60 received in evidence.)

21   BY MR. JONES:

22   Q.   Mr. Maynard, this glass table right here (indicating) in

23   this picture, do you recognize that glass table?

24   A.   That's the tabletop that we saw in the previous picture,

25   and that's the stand that it set on at the bottom.

1    Q.   So you telling the jury, Mr. Maynard, you took this

2    glass table before April the 30th to Club Levels?

3    A.   Yes.

4              THE COURT:  Where was that picture taken?  60.

5              THE WITNESS:  Room -- I think it was room --

6              MR. JONES:  This one right here --

7              THE COURT:  I'm asking him, not you.

8              MR. JONES:  Oh, I'm sorry.

9              THE WITNESS:  According to that, it was our

10   office.  We had a downstairs office and a upstairs office.

11   The upstairs office on the second floor had a fax machine, a

12   couple TV monitors, a couch, a lot of the flyers and -- what

13   we used for advertising, the VIP list with email addresses

14   and text message addresses.

15   BY MR. JONES:

16   Q.   Now --

17              (Pause.)

18              (NOTE:  Off-the-record discussion between

19   Ms. Urschel and Mr. Jones.)

20              THE DEPUTY CLERK:  This is Defense Exhibit 61 and

21   62, which are photos.

22              THE COURT:  Any objection to 61, '2?

23              MS. URSCHEL:  No, Your Honor.

24              THE COURT:  Okay.  They're in.

25       (Defendant's Exhibits 61 and 62 received in evidence.)

BY MR. JONES:

Q.  If you could see this picture.  Can you see the chair right here?  Can you see that chair (indicating)?  You want to look at the picture closer?

A.  I can see it.  That chair was one of the chairs I used to use when I was up under the car or working on the truck or loading and unloading.  There's a radio, boom box.  You can see it plugged up still right there (indicating.)  And under it -- I'm sorry.  This at the bottom (indicating) is a container of concrete or driveway cleaner because I knew from time to time I had to do the floor.

Q.  Now, Mr. Maynard, this chair and this concrete solution you just spoke of, did you leave that at the club -- I mean, at the warehouse?

A.  No.  The boom box we use at the club.  While we was working we always had the music playing, so that went with us.  The chair definitely got taken.  And the concrete cleaner, I think I used all that up.  Wasn't but a gallon.

Q.  Mr. Maynard -- excuse the writing --

THE COURT:  Well, wait a minute.  What is the writing?

MR. JONES:  Right here (indicating).

THE COURT:  You've got to have a picture without writing on it.

MR. JONES:  They said they don't have one,

1    Your Honor.

2              THE COURT:  Well, what do you mean they don't have

3    one?  Is that your writing from some other time?  That's

4    your writing?

5              MR. JONES:  Yeah.

6              THE COURT:  We got to get that off.  We can't put

7    it in with your writing on it.

8              MR. JONES:  We can come back to that, Your Honor.

9              THE COURT:  All right.  Don't use it.

10             MR. JONES:  We'll come back to that.

11             THE DEPUTY CLERK:  What was that?  Exhibit No. 61?

12    Was that 61?

13             MR. JONES:  (Indicating).

14             THE DEPUTY CLERK:  Is that No. 61?  Okay.  I'll

15    make a note it need to be cleaned up.  Okay.  Thanks.

16    BY MR. JONES:

17    Q.  Real quick, Mr. Maynard.  These are Government's Exhibit

18    ICE-18.  Do you recognize this box?

19    A.  It's shrink wrap.  Shrink wrap is used -- like I said,

20    once you put the blankets on, you don't have tape or

21    anything to hold it in place.  So you put the shrink wrap on

22    it.  And once you put the shrink wrap on with the type of

23    gloves you used, you use grab hold of it and lift it up.

24    It's very easy to handle.

25    Q.  Now, this is -- is this what you talking about?

1    A.   Right.   Shrink wrap.   The small ones are for the little

2    things, and the big ones are just that, for the sofas, the

3    armoires or whatever.

4    Q.   Did you leave that behind at the warehouse?

5    A.   Nah, it's real useful.   I need that.

6    Q.   Why did you need that, Mr. Maynard?

7    A.   Because I was doing -- time to time I was still doing

8    deliveries.   At one point we found a freight broker and we

9    used him -- or he used us, rather.   And small moving jobs.

10   Any type of appliance deliveries.   It just was necessary to

11   have shrink wrap to keep the merchandise from getting

12   damaged, because a lot of stuff don't come in boxes.

13   Q.   Mr. Maynard, I'm going to show you --

14            (Pause.)

15            THE COURT:   The numbers?

16            THE DEPUTY CLERK:   This is Defense Exhibit 63.

17   That's a photo, Your Honor.

18            THE COURT:   Admitted.

19       (Defendant's Exhibit 63 received in evidence.)

20   BY MR. JONES:

21   Q.   Mr. Maynard, do you recognize this photo right here?

22   A.   It was a closet space behind the office.   At one time it

23   was an soundproof booth.   You can see on the right where

24   they have the sound boards, or whatever you call it.   The

25   noise reducers, or whatever.   There's several boxes.   Shoes

1    (indicating).  Flyers.  Got a mattress here (indicating).

2    You got bags of clothes here (indicating).

3    Q.  Mr. Maynard, right here you have marked (indicating) --

4    can you recognize what this is, this blue thing right here?

5    A.  That's an inflatable mattress.

6    Q.  Now, can it be the inflatable mattress that's at the

7    warehouse?

8    A.  I think -- I thought that was the one, but it looks like

9    the other one was green.  This one's blue.

10   Q.  So this inflatable mattress, that you think that's

11   green, did you take it with you when you left --

12   A.  Yeah, the one at Club Levels, new batteries.  If it was

13   new batteries, definitely took it with me -- and the

14   mattress too -- out of the warehouse, Hampton Park

15   Boulevard.

16            MR. JONES:  Your Honor --

17            (NOTE:  Off-the-record discussion between

18   Mr. Jones and Ms. Urschel.)

19   BY MR. JONES:

20   Q.  Now, Mr. Maynard, if you -- can you tell the jury --

21            MR. JONES:  This Government Exhibit 54,

22   Your Honor.

23            THE COURT:  54.

24            THE WITNESS:  Two rack pegboard.

25            MR. JONES:  This is 53, Your Honor.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------------X

THE UNITED STATES OF AMERICA        Criminal Case No. 05-386

                v.

ANTOINE JONES,

             Defendant,

------------------------------X   Washington, D.C.
                                  Thursday, February 14, 2013
                                  2:18 P.M.

TRANSCRIPT OF JURY TRIAL - DAY 15 - P.M. SESSION
BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: Darlene Michele Soltys, AUSA
                    Courtney Urschel, AUSA
                    U.S. ATTORNEY'S OFFICE
                    555 Fourth Street, NW, Room 4110
                    Washington, DC 20530
                    (202) 252-7685


For the Defendant:  Antoine Jones, Pro Se

                    Jeffrey Brian O'Toole
                    Errin Rae Scialpi
                    O'TOOLE, ROTHWELL, NASSAU & STEINBACH
                    1350 Connecticut Avenue, NW, Suite 200
                    Washington, DC 20036
                    (202) 775-1550


Court Reporter:           Lisa Walker Griffith, RPR
                          U.S. District Courthouse
                          Room 6507
                          Washington, D.C.  20001
                          (202) 354-3247

1                    **AFTERNOON SESSION**

2              THE COURT:  We're bringing back the witness and the

3       jury.

4              (Jury Present.)

5              THE COURT:  Welcome back, ladies and gentlemen.

6       Hope you all had a good lunch.  You haven't heard anything in

7       the halls?  No conversation?

8              Okay, very good.

9              We're ready to resume.  Mr. Maynard, you're still

10      under oath.

11             (Lawrence Maynard, witness for the

12         defendant, previously sworn)

13             THE COURT:  Go ahead, Mr. Jones.

14                    **DIRECT EXAMINATION (Cont'd)**

15      BY MR. JONES:

16      Q   Mr. Maynard, we left talking about the warehouse.  Do you

17      remember if Greg Wills installed a window in the warehouse?

18      A   Yes.

19      Q   Now, that window, where is it at in the warehouse or

20      which way, if you look through the window, what would you be

21      seeing?

22      A   If you walked to the garage, the overhead door, which is

23      where I usually pull the truck in, it's about four or five

24      feet on the left-hand side, looking into the office.  There's

1    Q    Now, this exhibit --

2              MR. JONES:  Your Honor, this is Government's Exhibit

3    ICE 12.

4    BY MR. JONES:

5    Q    If you could see this area right here where I'm pointing

6    at, do you see anything over there that belongs to someone

7    that had been in that club, I mean, in that warehouse?

8    A    There's a --

9    Q    Can you see it in that picture?

10   A    Yeah, a little bit.  There's a chainsaw, Greg Wills had a

11   chainsaw, it's actually a case, it's a black case and a

12   chainsaw right there, if you could blow it up.

13   Q    Do you know if Mr. Wills left his case, we don't know

14   what's in it, but do you know if Mr. Wills left that case

15   there?

16   A    No.

17             THE COURT:  Was it gone before the 30th, is the

18   question, does he know?

19             THE WITNESS:  Yes, it was gone before the 30th.

20             THE COURT:  All right.

21   BY MR. JONES:

22   Q    One last question on the warehouse.  This is Government's

23   Exhibit ICE 10.  In this diagram, you see two trash cans;

24   correct?

1   Q    And you see 4-30-04, 11:15 P.M.

2   A    Yes.

3   Q    If you could see in this photo right here --

4        THE COURT:   ICE 12.

5   BY MR. JONES:

6   Q    -- the trash cans?

7   A    You can see trash cans over here to the left.

8   Q    Do you see anything in the trash cans?

9   A    There's actually debris in one of them.  You've got to

10  move the picture over a little bit, though.

11       THE COURT:   What do you mean, can you see anything

12  in the trash cans?  You can't see in the trash cans.

13       MR. JONES:   I mean, you can't see on the picture

14  unless you come in --

15       THE WITNESS:   If you look at this trash can here,

16  there's a trash can next to a jewelry case.  There's debris

17  sticking up out of it.  It's like cardboard sticking up out

18  of the trash can.  You can see the flat of the opening of the

19  trash can and debris sticking out of it.  And behind it was a

20  display case, it was about five and a half, almost six feet,

21  almost as tall as I am.  Maybe not that tall, maybe about

22  five feet, five and a half feet tall, a display case with a

23  wooden base and a fiberglass top.  That's the case right

24  there behind the trash can.  You can see how big it is in

25

1    BY MR. JONES:

2    Q    Before you left, or before you and Mr. Jones vacated this

3    lease, what did you do with this big item you just -- this

4    case?

5    A    We had to remove them.   If we didn't remove them, we

6    wouldn't have got the security deposit back.

7    Q    The trash can, what did you do with the trash can before

8    April the 30th?

9    A    We used them in the club.   We always had to have extra

10   trash cans at the club, all kinds of beer bottles, all kinds

11   of debris, food, everything.   We needed all the trash cans we

12   could get.

13   Q    Mr. Maynard, you had testified you was the operational

14   manager at Club Levels?

15   A    Yes, I did operations at Club Levels.

16   Q    Did you handle the money at Club Levels?

17   A    No, I don't handle the money, I didn't.

18   Q    What was your duties at Club Levels?

19   A    Basically accept deliveries, make sure employees were

20   there on time.   Make sure the place was kept.   Promotions was

21   part of it, signing contracts or arranging contracts.

22   Q    What was your hours at Club Levels?

23   A    It varied.   It would start at seven in the morning and

24   two or three o'clock, I'm not really a heavy sleeper, so four

25



HAMPTON PARK WAREHOUSE





### Declaration of Gregory K. Wills

I, Gregory Wills, swears under penalty of perjury (28 U.S.C. § 51746) that this sworn declaration is correct, accurate, and true.

In February of 2004, I was contacted by Lawrence and Antoine about doing some work in a warehouse that they had in Capitol Heights, Maryland, on Hampton Park Boulevard. They wanted me to install a window between the office and the warehouse so they could see what was going on in the warehouse while they were in the office. They also wanted a board hung in the warehouse so they could hang things on it. While I was there and doing work, I hung my tools on the pegboard that I had installed. I initially installed the window. It was a sliding window (2x3) I used a drywall knife with snips to cut the hole in the wall because it had metal studs. I had my skill saw to install the pegboard. I also used the skill saw to build the shelves that were under the pegboard. I completed all work in four days in February. I also removed my skill saw and tools and went to work on another job. After the warehouse I began working inside the Club, first project was building a VIP Room, framed it, using skill saw to cut 2 x 4's and studs to frame out the VIP Room also using the skill saw to put subfloor down, and has hardwood floors because it was a brick floor. After completing that job I started to build a bar which required the use o my skill saw. After the entrance of the Club I build the hardwood floors and paneling as well as the doors in the lounge area. All the door heights had to be cut to 76 x 77 inches because each door was the standard 79x80 inches high which required me to use my skill saw as well. There is no doubt in my mind that when I finished my work in the warehouse in February I took my skill saw with me and used it on other projects. Additionally, I went to Net 's house in Maryland to work on her hardwood floors. I used my skill saw on that job in April 2005 to work on her floors and I also did additional work like installing a door and windows using my skill saw in April 2005.

_Gregory K Wills_  04-16-12

Gregory K. Wills

```
1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
2
    THE UNITED STATES OF AMERICA, )
3                                 )      File No:  CR 05-386
                    Plaintiff,    )
4                                 )      Date:  February 12, 2013
    vs.                           )             A.M. Session
5                                 )
    Antoine Jones,                )      Time:  9:43 a.m.
6                                 )
                    Defendant.    )
7
   _____
8
9                    TRANSCRIPT OF JURY TRIAL
                          HELD BEFORE
10             THE HONORABLE ELLEN SEGAL HUVELLE
                  UNITED STATES DISTRICT JUDGE
11                        Day 13
   _____
12
13  APPEARANCES:

14  For the United States:   Ms. Darlene M. Soltys
                             Ms. Courtney Spivey Urschel
15                           Assistant United States Attorneys
                             United States Attorneys Office
16                           555 Fourth Street, NW
                             Washington, DC   20530
17
    For the Defendant:       Antoine Jones, pro se
18
    Also Present:            Mr. Jeffrey B. O'Toole
19                           Ms. Errin Scialpi
                             Attorneys at Law
20                           O'Toole Rothwell
                             1350 Connecticut Avenue, NW
21                           Suite 200
                             Washington, DC   20036
22
23  Court Reporter:          Vicki Eastvold, RMR, CRR
                             United States Courthouse, Room 6722
24                           333 Constitution Avenue, NW
                             Washington, DC   20001
25                           (202) 354-3242
```

1    A.   I put in hardwood floor.  I also put on a deck on the

2    back of his house.  And I did some ends and odds.  Put in a

3    handicap access rail.  And that was, basically, it.

4    Q.   Mr. Wills, did you do any work at Mr. Jones's warehouse?

5    A.   Yes, I did.

6              THE COURT:  Can I have the address where you did

7    the work?

8              (NOTE:  Off-the-record discussion between

9    Mr. Jones and Ms. Soltys.)

10   BY MR. JONES:

11   Q.   Mr. Wills, this is --

12             MR. JONES:  Your Honor, this is Government Exhibit

13   ICE-12.

14             THE COURT:  Okay.  ICE-12.  It's already in

15   evidence, I assume.

16             Okay.  Where did you do the work, by the way?

17   What was the address?

18             THE WITNESS:  The address?  I --

19   BY MR. JONES:

20   Q.   Do you know the address?  Do you remember the address?

21   A.   I don't remember the address.  I don't remember the

22   address.

23   Q.   Now, can you tell the jury the things you have done at

24   this warehouse?

25   A.   Yeah.  Yeah.  I put in a sliding window, a 2-by-3

1    sliding window.  And a wall so they could see in, in and

2    out, to see what was going on in the warehouse.  And I also

3    put in a toilet, sink.  I built shelves.  And I also

4    installed a pegboard where I would hang tools on.  And I did

5    little ends and odds in there.  I just -- I did, basically,

6    repairs into the drywall.  And that was, basically, it.

7    Q.  Mr. Wills --

8              (Pause.)

9              THE DEPUTY CLERK:  Is this a new exhibit for you,

10   Mr. Jones?  Okay.  This is Defense Exhibit 33.

11             THE COURT:  Show it to the Government.  Pictures?

12             THE DEPUTY CLERK:  This is also Defense Exhibit

13   34.  Are these in evidence, Your Honor?  33 and 34?

14             THE COURT:  I don't know.  Does the Government

15   have any objection?

16             MS. SOLTYS:  No objection.

17             THE COURT:  All right.  33 and 34 are admitted.

18      (Defendant's Exhibits 33 and 34 received in evidence.)

19   BY MR. JONES:

20   Q.  Mr. Wills, can you take a look at this window right here

21   (indicating).  Can you see this window right here

22   (indicating)?

23   A.  Yes.

24   Q.  And also Defense 33?

25   A.  Yes.

```
 1    Q.   Do you see that window right there (indicating)?

 2    A.   Yes.

 3    Q.   Is this the window that you installed?

 4    A.   Yes, that's the window I installed.

 5    Q.   Do you remember the time you installed that window?

 6    What year or month?

 7    A.   It was -- it was cold.  It was around February.  It was

 8    cold.

 9    Q.   Mr. Wills --

10    A.   Yeah.

11              THE COURT:  Did we see both 33 and 34?  Or just

12    33?

13              MR. JONES:  This is 33, Your Honor (indicating).

14    That side.

15              THE COURT:  Turn it up -- that's the window.

16              Okay.  Did we see 34 yet?

17              MR. JONES:  Yeah, this is 34.  The opposite side.

18    That's inside the bay area.

19              THE COURT:  You can't testify.  Okay.

20              MR. JONES:  Can you see it?

21              THE DEPUTY CLERK:  This is Defense Exhibit 35.

22              THE COURT:  Any objection to 35?

23              MS. SOLTYS:  Could I have the Court's indulgence

24    for a moment?

25              THE COURT:  Yes.
```

```
 1              (Pause.)
 2              MS. SOLTYS:  Like to see if we have a better color
 3      picture.
 4              MR. JONES:  Thank you.
 5              THE JUROR:  (Indicating).
 6              THE COURT:  You need a recess?  Sorry.  We'll take
 7      a 10-minute recess.
 8              Sorry.  Thank you, sir.  I didn't see.
 9              (NOTE:  The jury exiting the courtroom at
10      11:51 a.m.)
11
12              (NOTE:  The following proceedings were held
13      outside the presence of the jury:)
14              THE COURT:  Okay.  Okay, sir, you can step down.
15      Don't discuss your testimony with anyone.  We'll resume in
16      about ten minutes.
17              Do we have any other logistical problems to
18      address?  Do we have anybody after this gentleman?  Or
19      nobody now?
20              MR. O'TOOLE:  I think, yeah, we have at least --
21      we have one and maybe two.
22              THE COURT:  For today or this morning?
23              MR. O'TOOLE:  Maybe both.  I mean, they're both
24      here for this morning.  And that maybe we'll have them
25      today.
```

```
 1              THE COURT:  Okay.  Got it.

 2    BY MR. JONES:

 3    Q.  Mr. Wills, is this the warehouse that you said

 4    Mr. Jones?

 5    A.  Yes.  Yes.

 6    Q.  Can you -- do you see this window that you installed or

 7    built in this photo?

 8    A.  No.  No.

 9    Q.  Mr. Wills -- can I --

10              (NOTE:  Photograph put back on the screen.)

11    Q.  Mr. Wills, in this photo can you point where the window

12    should be at?

13    A.  (Indicating) right there where the drywall is at.

14              MR. JONES:  Thank you very much.

15              THE COURT:  Is that a window -- I mean, is that a

16    wall that goes out to the outside?

17              THE WITNESS:  Yes.  Yes.

18              THE COURT:  I see.  So you're the one that put

19    that green spot there?

20              THE WITNESS:  Yes.  That's where the window was

21    at.

22    BY MR. JONES:

23    Q.  Mr. Wills, this is --

24              MR. JONES:  Thank you.  This is Government's

25    Exhibit ICE-12.  As a matter of fact, let me put these in
```

1   a break.

2          MS. URSCHEL:  Your Honor, we're going to need to

3   approach on these documents.

4          THE COURT:  Okay.  Then, ladies and gentlemen, we

5   will break at this time for lunch.  We will resume at

6   quarter past 2, please.  And I have candy for you to have

7   for dessert.

8          Here we go, Gwen.  Help yourselves.  And this is

9   for you and Vicki.

10          Have a nice Valentine lunch.  Don't discuss the

11   case.  We'll see you back here at 2:15.

12          One second.  Yeah, ladies and gentlemen -- I want

13   the people in the audience to understand -- sit down and be

14   quiet now, please.  The jury is leaving, you're going off to

15   lunch.  There's too much noise out in the hall, it's been

16   reported to me, and it's from people sitting in here.  And

17   jurors can overhear what's being said.  So they're getting

18   out of here.  The rest of the people stay put for awhile.

19          I warn you that you are not to be discussing the

20   case out in the halls.

21          (NOTE:  The jury exiting the courtroom at

22   12:26 p.m.)

23

24          (NOTE:  The following proceedings were held

25   outside the presence of the jury:)

— 2/14/13 - A.M. —

```
 1                 THE COURT:  Okay.  We can excuse the witness,

 2       correct?

 3                 MS. URSCHEL:  Yes, Your Honor.

 4                 THE COURT:  Okay.

 5                 (NOTE:  Witness exiting the courtroom.)

 6                 THE COURT:  Also, ladies and gentlemen, some of

 7       these jurors are eating in the dining room.  You could cause

 8       a mistrial if they overhear any conversation by anyone in

 9       this courtroom discussing this case.  And I will proceed to

10       hold anyone in contempt if they talk about the case in front

11       of anyone that turns out to be a juror.

12                 Okay.  What's the exhibit, please?

13                 MS. URSCHEL:  Your Honor, there's a number of

14       documents Mr. Jones handed me.  I believe they're from the

15       file of Special Agent Katerina Kane.  One is (indicating) a

16       list of photographs, as well as some writing.  One is the

17       sketch of the warehouse, which is fine, it's been admitted.

18                 THE COURT:  It's been admitted.  Well, you're not

19       going to mark things that are already in evidence.  So just

20       give him the Government's number.

21                 MS. URSCHEL:  The next is a document from U.S.

22       Customs Border Control regarding the K-9 that assisted in

23       the search of the warehouse.

24                 The next are ICE report -- pieces of the ICE

25       report related to the warehouse.
```

```
 1              This is grand jury testimony --

 2         THE COURT:  Yeah, I don't know -- what is all this

 3    about?  If you hand it up to me, it's much more efficient,

 4    I'm sure.

 5         MR. JONES:  Your Honor?

 6         MS. URSCHEL:  Should I approach, Your Honor?

 7         THE COURT:  He's never seen these things before.

 8         MR. JONES:  Yeah, he's been in the case.  He read

 9    the pleadings, Your Honor.  He seen it plenty of times.

10         THE COURT:  Well, that doesn't help getting them

11    into evidence.

12         MR. JONES:  Yeah, I'm -- right now --

13         THE COURT:  All right.  One of these is already

14    in.  This is the sketch, right?

15         MR. JONES:  Right.

16         THE COURT:  All right.  Here, let's start with the

17    border patrol memorandum of April 3rd.

18         MR. JONES:  Every document that you have in front

19    of you say April 30th.  Mr. Jones asked ICE Agent Kane was

20    this stuff at the warehouse.

21         THE COURT:  Right.

22         MR. JONES:  ICE Agent Kane was saying at two

23    trials -- now three trials -- that they went in the

24    warehouse --

25         THE COURT:  On April 30th.
```

1          MR. JONES:  -- at April the 30th.

2          THE COURT:  I know that.

3          MR. JONES:  And we're not arguing that.  But we're

4     arguing that those photos --

5          THE COURT:  I know what you argued.  Believe me.

6     I heard this.  So, what's this got to do with it?

7          MR. JONES:  This is what Kellie O'Brien said on

8     this stand that she would put her -- I believe daughter or

9     son up that these people wouldn't obstruct justice.

10          THE COURT:  Fine.  But this doesn't tell me that

11     they have obstructed justice.  This just tells me that they

12     said the 30th.

13          MR. JONES:  If they put April the 30th that they

14     took those photos, that is obstruction of justice.

15          We have a problem.  We never had a hearing on the

16     Hampton Boulevard warehouse --

17          THE COURT:  Yeah, we did.

18          MR. JONES:  -- and we never had --

19          THE COURT:  I take issue with that.  We had it in

20     the trial while it was going on.  It came out.  But that's

21     neither here nor there.  But --

22          MR. JONES:  Your Honor?

23          THE COURT:  -- we're not having a hearing now

24     about it.  I am not ruling on it again.  I know what you

25     said before.  What does this have to do with the jury?  How

```
1     does this impeach --

2          MR. JONES:  Because Agent Kane said under oath

3     that those photos that she took, and everything in there --

4     I asked her -- she said they was there on April the 30th.

5          THE COURT:  Correct.

6          MR. JONES:  There's no way possible there was --

7          THE COURT:  Sir, that's your argument.  These

8     things just say April 30.

9          MR. JONES:  Right.

10         THE COURT:  They have no relevance to him.  You

11    have to argue to the jury that what his testimony tells us

12    is they didn't do it on the 30th.  Her testimony before a

13    grand jury, an indictment that says the 30th, it is

14    uncontested in this trial that Kane said they went in there

15    on the 30th.  This has no relevance to helping the jury

16    determine what Kane said.  She's already said it.

17         MR. JONES:  I should be able to go after her

18    credibility, Your Honor.

19         THE COURT:  That's what you're doing.  We're

20    sitting here waiting for you to go after her credibility in

21    your closing argument.  This has nothing to do with her

22    credibility other than to say she said it before.  You don't

23    put in prior consistent testimony to prove that she said it

24    three times or four times.  If you were -- there's a long

25    evidentiary issue that they might be able to do it, but you
```

1    can't do it.

2           Sorry for the evidence rulings, but they're real

3    and they're right.

4           MR. JONES:  There's one exhibit you said that was

5    in.  I can speak of that, correct?

6           THE COURT:  The drawing is in, right?  So you can

7    use it.

8           MR. JONES:  Yes.

9           MS. URSCHEL:  Yes, Your Honor.  The sketch.  We're

10   happy to --

11          THE COURT:  Right.  This sketch -- give him the

12   number so he knows.  Okay?

13          The other exhibits are marked 64 for ID only, and

14   they're statements by Kane having to do with April 30.

15   There's no issue.  The Government can't contest you on this.

16   You don't prove a fact by proving it ten times.  You prove

17   it once.

18          All right.  April 30 is the day.  I don't -- is

19   that the only thing that this is going in for is that she

20   wrote April 30 four times or --

21          MR. JONES:  I was trying to go after her

22   credibility, but --

23          THE COURT:  I know.  But that's not the way you do

24   it.  You have to impeach it.

25          MR. JONES:  This is my first time.

1           THE COURT:  You don't have to bolster it.

2           All right.  Thank you.

3           We'll take up with the jury instructions when we

4      finish the evidence.

5           Are you still going with your rebuttal?  Or have

6      we heard it already?  No?  Okay.  It will be awhile.

7           64, and what have you got in your hand?  Yeah, but

8      they're not going into evidence.

9           Are there any more exhibits for this guy?  This is

10     taking up a lot of unnecessary time.

11          Sorry.  Can you show them to the Government?

12     We'll take a few minutes now.  We'll move a lot quicker.

13          MR. JONES:  Yes.

14          THE COURT:  There's so many --

15          MS. URSCHEL:  Your Honor, the sketch is admitted.

16     It's ICE-10.

17          THE COURT:  Okay.  But you can give that to

18     Mr. Jones, please.

19          MS. URSCHEL:  Yes, Your Honor.

20          THE COURT:  If we got more exhibits for him, it

21     would make it a lot easier.

22          MR. JONES:  I'm looking, Your Honor.

23          THE COURT:  Okay.  Let's take one minute.

24          MR. JONES:  We're almost finished with the

25     warehouse, Your Honor.

1          THE COURT:  I can tell that.  But that's not the

2    last of our issues.

3          MR. O'TOOLE:  Prophetic.

4          MR. JONES:  Your Honor, the other exhibits going

5    to be the Government, the gun, and I will probably put in

6    something like flyers from the club that I don't think they

7    going to -- we going to Club Levels next.

8          THE COURT:  All right.  And then the gun?

9          MS. URSCHEL:  We didn't bring over the gun.  We

10   have photographs of the gun he's welcome to use.

11         MR. JONES:  Yeah, okay.

12         MS. URSCHEL:  Okay?

13         THE COURT:  All right.  Just try to use the same

14   exhibit numbers, please, that are in evidence so we don't

15   clutter up the record with things that we don't --

16   duplicates.

17         So, thank you.

18         (Break in the proceedings at 12:33 p.m.)

19

20

21

22

23

24

25

                    2/14/13 - A.M.

1

2             **CERTIFICATE OF OFFICIAL COURT REPORTER**

3

4

5

6             I, VICKI EASTVOLD, do hereby certify that the

7    above and foregoing constitutes a true and accurate

8    transcript of my stenographic notes and is a full, true and

9    complete transcript of the proceedings to the best of my

10   ability.

11        Dated this 14th day of February, 2013.

12

13                              _____s/Vicki Eastvold_____
                                Official Court Reporter
14                              United States Courthouse
                                Room 6722
15                              333 Constitution Avenue, NW
                                Washington, DC   20001
16

17

18

19

20

21

22

23

24

25

CEAM 15781 #7139
P 61

Unlawful SEARCH of Hampton
BIVD WARE House

## Antoine Jones sr. sworned Declaratio
## under Penalty of Perjury (28 uscs 9174

I Antoine JONES SWEARS under
Penalty of Perjury (28 u.s.c.s § 1746)
that this sworned declaration is
correct, accurate And true.

I Antoine Jones is volunteering
And willing to submit to a polygraph
examination And Ready to tell the
truth in an evidentiary Hearing
or suppression Hearing to complete
the Record.

### Statement of Facts

I Want to put on Record that a
couple of days before And up to
April 30 2009, me and Mr lawrence
Maynard cleaned And I power
Wash the Hampton PK BIVD Ware House

Me And Mr lawrence Maynard
threw Away items and dump the
trash in the dumpster filling up
the dumpster And without our
Personal Property we even stored
it on the white box truck to take it
to the club or we took some of our
Personal Property Home but we
competely cleaned up And cleaned
out the Ware House with All of our
Personal Property And no items
Was left behind.
The L.C.E Surveillance tape will confirm

P 02

US cleaning up and cleaning out the
ware House before April 30 2004 the
day I updated my lease.

It's impossible that the I.C.E Photo's
was taken on April 30 2004 at 11:AM
because All the items and personal
property tooken in the I.C.E Photo's
was taken from the ware House and
nothing was left behind.

I will detailed and point out those
items showing in the I.C.E Photo's
Are the same items and personal
property in the club levels Photo's
that was taken on october 24 2005
by agent Nelie OBrien over a year and
A half later. This is clearly a
(18 USC S 2236 - search without
warrant) And A 4th Amendment
violation.

The I.C.E Photo's consisted of 32
Photo's And I will point out some
of the items that is seen in the
club levels Photo's

The LARGE OFFICE CHAIR in the
I.C.E Photo was taken to club levels
with Another office chair that
Cant be seen in the I.C.E Photo's
because the I.C.E Agent didn't take
Photo's of the fully furnish office,
[illegible]

P 63

office chair can be seen in Room H in the club levels office.

The small black table chair with the plug of radio on it was taken to club levels and you could see this small black chair in the club levels Photo's in the upstairs office.

The small old-black radio was taken from my Brandywine Rd House so the Handy Man Gregory Wills could listen to the radio while He did His carpetry worked at the Ware House And I took this same radio to club levels After I vacated the ware House so club levels employee's could listen to it while we clean up and do work around the club.

The inflatable mattress with the battery pack attached to it in the I.C.E Photo's also was taken to club levels And you could see this same inflatable mattress in Room J, a storage room in club levels office.

The Brand new Bed with a Brand new complete Glass table in the I.C.E Photo's is the complete built Glass table in the upstairs office in club levels.

The trash cans in the I.C.E Photo's was taken to club levels, you can see

P 04

these trash cans near the dumpster
and when the club levels employees
clean up in front of the club, the
F.B.I surveillance tapes will confirmed
that.

The long sleeves shirt and the sports
jacket, Lawrence Maynard told me
they were His and that He took
the long sleeves shirt home and the
sports jacket He gave to Lavance
Howard and Skinny one of club levels
employee. The F.B.I surveillance tape
will confirmed that Lavance Howard
wore this sport jacket almost daily

The skill saw in the I.C.E Photo's
was Gregory Wills skill saw and He
took the skill saw with Him after He
completed the work at the ware House.
This could be confirmed when defense
witness Gregory Wills in the Second
trial testified under oath the saw
was His and He took the skill saw
with Him.
I personally seen Greg Wills use
the same skill saw at club levels and
at Carolyn the Woodill House after
I vacated the ware House

The Valentine's Gift basket seen
in the I.C.E Photo's belong to Lawrence
Maynard, mr maynard ...

P 65

Warn House and He told me that Him
and His daughter sold the Valentine's
Gift Basket during the Valentines and
on Valentines day Feb 14, 2004.

The numerous of Blue-Furniture
blankets and Boxes of Plastic furniture
wraps in the I.C.E Photo's was stored
on the white box truck.
Some of these Blue Blanket and
Plastic wrap was Brand new and we
stored them at the club because we
Had some use ones on the white box
truck. me and lawrence maynard
place both the blue blankets and the
Boxes of Plastic wrap on the white box
trucks and later use them on property
and Furniture delivery to the club, plus
Maynard use the blue blankets
and Plastic wrap in His side-furniture
delivery service.

The two Rolodex cards in the I.C.E
Photo's was not left behind because
one I power wash the entire club and
swept and mop the entire floor.
These Rolodex cards was still in
the Rolodex when it was at club level.

There are two crucial evidence
that show and prove the I.C.E agents
Photo's was taken some time before
I vacated my lease is:
(1) The I.C.E Photo's don't show
a large white Persian cat litter

P & b

Where Gregory Wills and MR Maynard
Assisted Him to place a large Peg
Board on the Ware House wall, and Greg
painted it white the color of the wall.
   Gregory Wills testified under oath
that He place this Large Peg Board
up on the Ware House wall sometime
February 2004, and ~~on this~~ Howard Scott
Peacock testified that the Peg Board
was still up when He took over the
Ware House lease a month later. MR
Peacock also testified that none of
the items seen in the I.C.E photo's
was present or still there we He
took over the Ware House lease a
month later.

   I want to put on record I see
Greg Wills place the Peg Boards up
in Feb 2004 and at that time MR
Wills put His tools on it while He
done carpetry work at the Ware
House and on April 30 2004 the
Peg Board was still Hanging on the
Ware House wall.

   (2) The I.C.E photo's is missing
a large window I ask Greg Wills
to built and cut in to the wall
connecting the office to the
Ware House - Bay Area.
   This window was built and
cut in before I vacated the

P 7

On April 30 2004 the agent/Z vacated my lease.

It was very obvious why the I.C.E agents had the office light off and didn't take any crime-scene or entry photo's of the Ware House Office, is because the Ware House office was fully furniture with office furniture (two large office chairs, two office desk, and a lounge couch All you could see in the club levels office.

## Conclusion

Every time agent binns falsifies, conceal and cover the facts the I.C.E agents unlawfully enter and unlawfully search the ware House (with out a warrant) before April 30 2004, is clearly An 18USC 2236, 18USC 1001, 18USC 1519 violation.

Also, when N.Y. officer Michael Sharpe false entry date (April 30 2004 is an 18USC 1001 and 18USC 1519 violation.

When agent binns testified in the Grand Jury and in both trial that the I.C.E agent enter the ware House on April 30 2004 and took those I.C.E photo's is clearly perjury and a violation of (18USC 1621, 1622, 1623)

I swear under penalty of perjur (18USC 1746) that every thing I

ZJ/MAR/ZUIZ/WED UJ ZJ PM          FAX No               P. 009/009

P 08

Stated in this sworned declaration
is accurate, correct and true.

I am willing to submit to a
Polygraph examination that none
of these items in the I.C.E Photo's was
left behind And the P.c Boards and
large window was still present on
April 30 2004 the day I went on a
expection-walk through with mr
Andrew schaeffer and the same day
I turn the key in And vacated the
ware house

         Respectfully submitted

Antoine Jones Sr
241912
1901 D St SE
W.D C 20003
Date 3-23-2012
Signature : Antoine Jones

Teresa Washington
Notary Public, District of Columbia
My Commission Expires 8/14/2013

(EXHIBIT #3)

UNDER PENALTY OF PERJURY

AFFIRMATION

HAMPTON BLVD. WAREHOUSE                    ①

THE SEARCH THAT THE ICE AGENTS CONDUCTED WAS BEFORE

THE MONTH OF APRIL 2004. THE ITEMS THAT ARE SEEN IN THE

PHOTOS WERE NOT LEFT IN THAT BUILDING BUT ARE REMOVED

AND IN MY POSSESSION AT THE TIME OF THE CLUB LEVEL SEARCH. (2005)

THE SHIRT (BLUE), OVERALLS (BROWN), MOVING PADS (BLUE), VALENTINE'S

DAY GIFTS (WHITE BEARS & ROSES), ELECTRIC CHAIN SAW (W/CASE), STRAPS,

BOOM BOX (RADIO), OFFICE CHAIR (BLACK), BATTERIES, AIR MATTRESSES,

TRASH CANS (FULL OF DEBRIS) ETC, ETC, ETC WERE ALL ITEMS THAT

WERE REMOVED BEFORE WE VACATED THE WAREHOUSE. GREG

WILLIS INSTALLED A PEG BOARD IN WHICH WAS USED TO STORE

TOOLS IN THE MONTH OF FEBRUARY 2004. DURING THAT SAME

MONTH HE (GREG) INSTALLED A WINDOW ON THE OFFICE GIVING

ACCESS TO THE WAREHOUSE. NEITHER THE PEG BOARD OR

(WINDOW) ARE VISIBLE IN THE ICE PHOTOS.

UNDER PENALTY OF PERJURY

AFFIRMATION

②

HAMPTON BLVD WAREHOUSE

THE ICE AGENTS HAD TO HAVE TAKEN THOSE PHOTOS

PRIOR TO THE APRIL 2004 DATE. SOME OF THE ITEMS

WERE USE IN CLUB LEVELS, OTHERS ON THE DELIVERY

TRUCK THAT I WORKED WITH DAILY AND TO MY KNOWLEDGE

GREG WILLIS HAD IN HIS POSSESSION AFTER OUR ARREST.

THERE IS NOT A NOTARY AVAILABLE

LAWRENCE MAYNARD

(EXHIBIT # 18)

Sworned Declara
LeyVANCE Howard

Pg

I, LeyVANCE Howard swears under Penalty of
perjury (28 U.S.C.1746) That This sworn
declaration is correct accurate and true.

On Saturday, June 23 2012, I was shown two Photo's
one where it's Three significant items, a Long Sleeves-
shirt, some work coverall and, a H+M. sport jacket
which was given to me Lawrence Maynard
some time after February, 2004 but before June 30, 2004
The reason, I remember This Time because it was
Club Levels Grand Opening in, February 2004 and it
was very cold out side.

I also view another Photo with The same sport Jacket
Lawrence Maynard gave me in the Mid 2004, The work-
coverall and a box with Valentine's gift baskets

I sign and initials both Photos and dated Them,
I want to note That, I was employed by Club levels
from day one, Antoine Jones allow me to live in the
Club Levels and during my Stay at Club levels Lawrence
gave me The sports jacket some time mid 2004 and
until today, I have That same sport jacket Lawrence

also as an employee at club level, I work as Security inside The club and at the Front door, I would do Handyman work and pass out Club Level's and Scoopie Soul Food Cafe Flyers, during Morning of Scoopie Cafe Hours of operation

I LeyVance Howard, willing to take a polygraph Examination and Testified under oath in a Hearing that everthing, I mentioned in This sworned Declaration Under Penalty of Perjury, is correct Accurate and True

Respectfully Submitted by
6-23-12
LeyVance S Howard
1104 Queen st NE #1
Washington DC 20002
02

2245 16 st NE
Washington DC 20018

Joy Thomas
Notary Public, District of Columbia
My Commission Expires 8/2013

1          THE COURT:  Government Exhibit 53 and '4.

2    Pegboards.

3    BY MR. JONES:

4    Q.  Do you recognize this right here (indicating) where I'm

5    pointing my finger?

6    A.  The hooks.

7    Q.  What about these two things (indicating), what are they?

8    A.  Yeah, the outlet.  The wall outlet.  And that was a

9    light switch.  There's an overhead just above that area.

10   That was actually a little workbench.  You could see the

11   shadow where you couldn't see if you didn't turn the light

12   on.

13   Q.  Now, let me show you Government Exhibit ICE-12.  You was

14   in the second trial, correct?

15   A.  Yes.

16   Q.  Now, from where you at, can you see the -- that pegboard

17   you just looked at?

18   A.  The pegboard should be in this area right here

19   (indicating) where that little tag is hanging down.  It was

20   like a strap.  I don't see it on this picture.

21          THE COURT:  Can you get the -- yeah.

22          MR. JONES:  You got to change it.

23   BY MR. JONES:

24   Q.  Now, Mr. Maynard, in this picture, can you see the

25   pegboard?

                        —— 2/14/13 - A.M. ——

1    A.  You can see the hook on both sides (indicating).  And I

2    can see the light switch (indicating).

3    Q.  Now, after seven years, is this the first time you seen

4    this pegboard in this picture?

5    A.  In the Government's photo, this is the first time I've

6    seen where you can see the pegboard.

7    Q.  Now --

8          THE COURT:  That's which number?  ICE what is it?

9    What number?  12?

10         MR. JONES:  This is ICE-12 -- no -- yeah, ICE-12.

11    BY MR. JONES:

12    Q.  Now, let me show you Government Exhibit 55.

13         MR. JONES:  She's got to --

14    BY MR. JONES:

15    Q.  Can you see the yellow hooks in this picture?

16    A.  Yeah, that's the yellow hooks here (indicating).

17    Q.  You see the yellow hooks in this picture?

18    A.  Yes.

19         THE COURT:  What?

20         MR. JONES:  The yellow hooks.

21         THE COURT:  I didn't hear your answer.

22         MR. JONES:  The pegboards.

23         THE COURT:  I can hear your question.

24         THE WITNESS:  The yellow hooks, yes, I see them.

25    I drew circles around them.

1              THE COURT:  All right.

2    BY MR. JONES:

3    Q.  Mr. Maynard, this is not the warehouse where Mr. Jones

4    have it, is it?

5    A.  No.  Scott Peacock moved in after we left.

6    Q.  Mr. Maynard, have you ever heard of Photoshop?

7    A.  Yes, I have.

8    Q.  Can you tell the jury what is Photoshop?

9    A.  I guess it's -- I'm not too technological, but it's to

10   implant a picture into another picture.  A man's head on a

11   dog's body.  I guess overlapping, I guess that's what you

12   would call it, from one picture to another.

13   Q.  So, Mr. Maynard, you telling Mr. Jones that you could

14   take this picture that they took in 2012 and put it in

15   another picture?

16   A.  It's possible.

17              MS. URSCHEL:  Objection, Your Honor.

18              THE COURT:  Oh, yeah.  Sustained.  Come on.

19              MR. JONES:  I'm asking the question, Your Honor.

20              THE COURT:  I know, and I'm sustaining their

21   objection.  Move on.  He doesn't have any evidence that

22   happened, and so you can't ask him could it be.

23   BY MR. JONES:

24   Q.  Do you recognize -- I'm sorry.

25              THE COURT:  Okay.  After this question we'll take

P6

CLERK OF COURT OFFICE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA D CIRCUIT


UNITED STATES

            V                    CR NO - 05-386 (ESH)

ANTOINE JONES


DEFENDANT'S MOTION TO RECONSIDER MOTION
TO SUPPRESS EVIDENCE RELATED TO SEARCH OF 400
HAMPTON PARK BOULEVARD WAREHOUSE


DEFENDANT ANTOINE JONES PURSUANT TO THE
FOURTH AMENDMENT TO UNITED STATES CONSTITUTION
AND APPLICABLE CASE LAW (RULE 41, 18 USC § 2236)
HEREBY RESPECTFULLY MOVES THIS HONORABLE COURT
TO RECONSIDER IT'S DENIAL OF JONES' MOTION TO
SUPPRESS EVIDENCE AND INFORMATION RELATED TO
THE SEARCH BY FEDERAL AGENTS OF THE 400 HAMPTON
PARK BOULEVARD WAREHOUSE.


IN SUPPORT OF THIS MOTION, DEFENDANT JONES
STATES AS FOLLOWS:


THE ICE AGENTS UNLAWFULLY ENTERED THE HAMPTON
PARK BOULEVARD WAREHOUSE BEFORE APRIL 30, 2005 THE
DAY MR. JONES VACATED THE WAREHOUSE LEASE.

EVIDENCE THAT THE I.C.E. AGENTS TOOK THE I.C.E. PHOTOS
BEFORE APRIL 30, 2005.

## 18 USC § 2236 - SEARCHES
## WITHOUT A WARRANT

WHOEVER, BEING AN OFFICER, AGENT OR EMPLOYEE
OF THE UNITED STATES OR ANY DEPARTMENT OR AGENCY
THERE OF, ENGAGED IN THE ENFORCEMENT OF ANY LAW
OF THE UNITED STATES "SEARCHES OF ANY PRIVATE DWELL-
ING USED AND OCCUPIED AS SUCH DWELLING WITHOUT
A WARRANT DIRECTING SUCH SEARCH OR MALICIOUSLY
AND WITHOUT REASONABLE CAUSE SEARCHES ANY OTHER
BUILDING OR PROPERTY WITHOUT A SEARCH WARRANT
SHALL BE FINED UNDER THIS TITLE FOR THE FIRST
OFFENSE AND FOR A SUBSEQUENT OFFENSE SHALL BE
FINED UNDER THIS TITLE OR IMPRISONED NOT MORE
THAN ONE YEAR OR BOTH.

AS THIS COURT KNOWS THAT THE COURT HAS ALREADY
RULED ON A SEARCH WITHOUT A WARRANT IN THE SUMMIT
CIRCLE APARTMENT.

IN THIS 3RD TRIAL DEFENSE WITNESS LAWRENCE
MAYNARD SHOWED AND PROVED THAT THE WAREHOUSE
SEARCH WAS UNLAWFUL WHEN HE POINTED OUT
PERSONAL PROPERTY SUCH AS, OFFICE CHAIR, DRY WALL

COMPOUND, UNFLATTABLE MATTRESS, MOVING BLANKETS, HIS SHIRT, HIS JACKET, THE COVERALLS, THE TWO TRASH CANS LARGE SHRINK WRAP ROLLS, BLACK BOOM BOX RADIO, BLACK CHAIR, VALENTINES GIFT BASKETS, DISPLAY CASE, NEW TABLE TOP (GLASS) ON THE BOX AND GREG WELLS SKILL SAW WAS TAKEN FROM THE WAREHOUSE BEFORE APRIL 30, 2005.

(EXHIBIT #1) ARE I.C.E. PHOTOS OF THE PERSONAL PROPERTY THAT WASN'T LEFT AT THE WAREHOUSE.

(EXHIBIT #2) IS MR. JONES' SWORN AFFIDAVIT ON THE UNLAWFUL SEARCH OF THE HAMPTON BLVD WAREHOUSE.

(EXHIBIT #3) IS GREG WELLS SWORN DECLARATION WHERE MR. GREGORY WELLS MENTIONED HE REMOVED HIS SKILL SAW AND TOOLS FROM THE WAREHOUSE AND CONTINUED TO DO WORK FOR OVER A YEAR AT OTHER LOCATIONS AFTER APRIL 30, 2004 WITH THOSE SAID TOOLS AND SAW.

(EXHIBIT #4) IS LEYVANCE HOWARD'S SWORN DECLARATION THAT HE RECEIVED LAWRENCE MAYNARD'S JACKET ON THE WAREHOUSE PHOTO FROM LAWRENCE MAYNARD.

(EXHIBIT #5) IS APRIL 3, 2013 - 12:13 PM STATUS HEARING PG 18 WHERE THE ATTORNEY

CONFIRMED THE ICE PHOTOS WERE TRUE.

4

WAREHOUSE SEARCH

AFTER THE EXTENSIVE EXAMINATION OF LAWRENCE MAYNARD THE GOVERNMENT HAD TO CONCEED THAT THE GOVERNMENT DIDN'T CROSS OR ASK MR MAYNARD ONE QUESTION ON THIS UNLAWFUL SEARCH OF THE WAREHOUSE.

NOT ONLY DID MR. ANDREW SCHAEFFER TESTIFIED HE DIDN'T RECALL ANY OF THE PERSONAL ITEMS ON THE L.C.E. PHOTOS WHEN MR. SCHAEFFER AND MR. JONES DID A FINAL WALK THROUGH INSPECTION MAKING SURE THE WAREHOUSE WAS "BROOM CLEAN" MR HOWARD SCOTT PEACOCK TESTIFIED WHEN HE LEASED THE WAREHOUSE A MONTH LATER, NONE OF THE PERSONAL PROPERTY WAS LEFT BEHIND.

(EXHIBIT #6) AS A COPY OF MR JONES POLYGRAPH EXAMINATION.

ON MR. JONES' POLYGRAPH EXAMINATIONS ANSWER #14 (Q): DID YOU AND LAWRENCE REMOVE YOUR PERSONAL ITEMS FROM THE WAREHOUSE BEFORE APRIL 30, 2004? (A): YES

BOTH MR. LAWRENCE MAYNARD AND MR. GREGORY WELLS ARE WILLING TO ALSO TAKE POLYGRAPH EXAMINATIONS ON THIS UNLAWFUL SEARCH OF THE WAREHOUSE

PG
5

BLVD WAREHOUSE.

_____

# 18 USC § 1001, 18 USC § 1519, 18 USC § 1621, 1622, 1623 VIOLATIONS BY THE I.C.E. AGENT KANE

AGENT KANE PERJURED HERSELF ON THE GRAND JURY, ON THREE TRIALS AND MADE THINGS WORSE. AGENT KANE FALSIFIED FEDERAL DOCUMENTS ALONG WITH OTHER I.CE. AGENTS (EXHIBIT #6)

18 USC § 1001

(1) FALSIFIES, CONCEALS OR COVER UP BY ANY TRICK, SCHEME OR DEVICE A MATERIAL FACT

(2) MAKES ANY MATERIALLY FALSE, FICTITIOUS, OR FRAUDULENT STATEMENT OR REPRESENTATION OR

(3) MAKES OR USES ANY FALSE WRITING OR DOCUMENT KNOWING THE SAME TO CONTAIN ANY MATERIALLY FALSE, FICTIOUS OR FRAUDULENT STATEMENTS OR ENTRY SHALL BE FINED UNDER THIS TITLE, ~~CONSTITUTE~~ IMPRISONED NOT MORE THAN 5 YRS.

18 USC § 1519: WHOEVER KNOWINGLY ALTERS, DESTROYS, MUTILATES, CONCEALS, COVERSUP, FALSIFIES OR MAKES A FALSE ENTRY ON ANY ~~THAT~~ RECORD, DOCUMENT ~~OR GOOD~~ OR TANGIBLE OBJECT WITH THE INTENT TO IMPEDE, OBSTRUCT OR INFLUENCE THE INVESTIGATION SHALL BE FINED UNDER

18 USC § 1621 - PERJURY GENERALLY, 1622 - SUBORNATION OF PERJURY, 1623 - FALSE DECLARATION BEFORE GRAND JURY OR COURT, ALL THESE THREE STATURE CARRIES A FINE UNDER THIS TITLE OR IMPRISONED NOT MORE THAN FIVE YEARS OR BOTH.

## STATEMENT OF FACTS

IT CLEARLY SHOWS IN THE ICE PHOTOS THAT THE PERSONAL PROPERTY IN THE ICE PHOTOS THAT WAS LEFT BEHIND WASN'T "BROOM CLEAN" AS MENTIONED IN THE LEASE AGREEMENT.

THE ICE AGENTS SOME HOW UNLOCKED THE OVER HEAD DOOR, THE SECURED LOCKED FRONT DOOR AND DISCONNECTED THE ALARM SYSTEM TO UNLAWFULLY ENTER THE WAREHOUSE WITHOUT A SEARCH WARRANT BEFORE APRIL 30, 2005 A CLEAR VIOLATION OF 18 USC § 2236 SEARCH WITHOUT A WARRANT

ICE AGENTS CONCEALED AND IMPEDED THIS UNLAWFUL SEARCH WITHOUT A WARRANT BY FALSIFYING FEDERAL DOCUMENTS AND FURTHER COVERING UP THIS UNLAWFUL SEARCH AND THEIR OBSTRUCTION OF JUSTICE BY MAKING PERJURING STATEMENTS IN THE GRAND JURY AND IN THREE TRIALS ON THE HAMPTON PARK BOULEVARD WAREHOUSE SEARCH. WHICH INFLUENCED THE COURT MIND

Pᴏ 7

THE JURY TO CONVICT DEFENDANTS JONES AND MAYNARD

AGENT KANE AND HER ACE AGENTS TEAM DISREGARDED
THE LAW AND DEFENDANT JONES' FOURTH AMENDMENT
RIGHTS.

THESE WELL SEASONED AGENTS ARE PLACED WITH
SOCIETIES HIGHEST TRUST AND STANDARDS TO ENFORCE
AND UPHOLD THE LAW.

WHEN THESE ACE AGENTS CHOSE TO DEPRIVE DEFENDANT
JONES OF HIS FOURTH AMENDMENT RIGHTS AND CHOSE
TO BREAK THE LAW THAT THEY SWORE TO OBEY, PROTECT
AND UPHOLD, CONDUCT SHOULD BE DETERRED SO OTHERS
DON'T CHOOSE TO TAKE THAT PATH AND ALSO THINK THEY
COULD GET AWAY WITH UNLAWFUL SEARCHES AND OBSTRUCTION
OF JUSTICE BY LAW ENFORCEMENT.

## EXCLUSIONARY RULE

THE TEST TO CONSTITUTIONAL REASONABLENESS SEARCHES
BY THESE ACE AGENTS SHOULD BE COMPARED TO THE
LANGUAGE IN 18 USC § 2236 SEARCH WITHOUT A WARRANT
AND THE LANGUAGE IN THE FOURTH AMENDMENT.

THE COURT MUST APPLY THE EXCLUSIONARY RULE

P6
8

MISCONDUCT.

HONORABLE JUDGE HUYELLE RULED IN THE FAVOR OF
THE DEFENDANT BY SUPPRESSION OF THE EVIDENCE AND
INFORMATION ON THE SUMMIT CIRCLE APT, THE
APPLICATION OF THE EXCLUSIONARY RULE DEFINITELY
IS WARRANTED IN THIS PRESENT ISSUE.

THE EXCLUSIONARY RULE IS BELIEVED TO BE A
NECESSARY RESTRAINT ON THE ADVERSARIAL ZEAL
OF LAW ENFORCEMENT OFFICIALS.

AS IT SERVES THE FUNCTION TO UPHOLD THE LAW AND
DETER LAW ENFORCEMENT, THE EXCLUSIONARY RULE IS
NEEDED IN SITUATIONS LIKE THIS.

IN THIS CASE THE ICE, AGENT'S BAD DECISIONS
UNLAWFULLY
TO SEARCH THE WAREHOUSE WITHOUT A
SEARCH WARRANT, AND TO BREAK THE LAW BY OBSTRUCTION
OF JUSTICE IS SUBJECT TO FEDERAL PENALTIES AND
THE SEARCH OF THE WAREHOUSE IS DEEMED ILLEGAL.

THE ICE AGENTS' TAINTED INVESTIGATION AND ICE
AGENT KANE'S PERJURY TESTIMONY WERE HIGHLY
PREJUDICIAL TO DEFENDANTS JONES AND MAYNARD
IN THE GRAND JURY AND IN ALL THREE TRIALS.

P6
9

WITH THIS EVIDENCE OF OUTRAGEOUS ~~DELIBERATE~~ MISCONDUCT BY AGENT KANE AND HER D.C.E. AGENT TEAM, DEFENDANT JONES IS HUMBLY AND RESPECTFULLY REQUESTING THIS HONORABLE COURT TO USE HER SUPERVISORY POWER TO DISMISS THIS CASE DUE TO THE EXTRAORDINARY CIRCUMSTANCES OF 18 USC § 1519, 18 USC § 1621, 1622, 1623 BY SPECIAL AGENT KANE, OR THE VERY LEAST GRANT THE SUPPRESSION OF EVIDENCE OF THE HAMPTON PK BLVD WARE HOUSE AS WARRANTED.

## RESPECTFULLY SUBMITTED

ANTOINE JONES
241 912
1901 D ST SE
WASH DC 20003
SIGN:
DATE:

P6,

## LAWRENCE MAYNARD'S SWORN DECLARATION UNDER PENALTY OF PERJURY (28 U.S.C.S. §1746)

I LAWRENCE MAYNARD SWEARS UNDER PENALTY OF PERJURY (28 U.S.C.S. §1746) THAT THIS SWORN DECLARATION IS ACCURATE AND TRUE.

I LAWRENCE MAYNARD AM VOLUNTEERING AND WILLING TO SUBMIT TO A POLYGRAPH EXAMINATION AND READY TO TELL THE TRUTH ON AN EVIDENTIARY HEARING OR SUPPRESSION HEARING TO COMPLETE THE RECORD.

## STATEMENT OF FACTS

I WANT TO PUT ON RECORD THAT DAYS BEFORE, (A WEEK) APRIL 30, 2004, ANTOINE JONES, DERRICK GORDON AND MYSELF CLEANED AND POWER WASH-ED THE HAMPTON BLVD, WAREHOUSE.

DERRICK GORDON, ANTOINE JONES AND I REMOV-ED ITEMS AND DUMPED THEM INTO THE DUMPSTER ON FRONT OF THE WAREHOUSE. FILLING THAT DUMPSTER WITH DEBRIS, AND OLD EQUIPMENT AS WELL

P6
3

WITHOUT A WARRANT) AND A FOURTH AMENDMENT
VIOLATION.

THE I.C.E. INVESTIGATION CONSISTED OF 32 PHOTOS
AND TAPES (VIDEO). I WILL POINT OUT SOME OF THE
ITEMS THAT ARE SEEN ON THE CLUB LEVELS PHOTOS
THAT WERE REMOVED FROM THE HAMPTON PARK BLVD
WAREHOUSE. (SEE ATTACHMENTS)

THE LARGE OFFICE CHAIR SEEN ON THE I.C.E. PHOTO
WAS TAKEN TO THE CLUB AND USED BY ANTOINE JONES
AT HIS DESK. ALONG WITH ANOTHER OFFICE CHAIR
THAT CAN'T BE SEEN ON THE I.C.E. INVESTIGATION
PHOTOS BECAUSE THE I.C.E. AGENTS DIDN'T TAKE PHOTOS
OF THE FULLY FURNISHED OFFICE, AND THE LIGHTS WERE
OUT. THIS LARGE OFFICE CHAIR CAN BE SEEN ON ROOM
H ON THE CLUB LEVELS SEARCH WARRANT PHOTOS ON
OCTOBER 24, 2005. 17 MONTHS AFTER THE I.C.E. INVESTI-
GATION PHOTOS. (SEE ATTACHMENTS)

THE SMALL BLACK CHAIR WITH THE PULLED IN RADIO
ON IT WAS TAKEN TO CLUB LEVELS AND YOU CAN ALSO
SEE THIS SMALL BLACK CHAIR ON THE CLUB
LEVELS PHOTO'S IN THE UPSTAIRS OFFICE.

THE SMALL BLACK RADIO/CASSETTE PLAYER WAS TAKEN

ENTRANCE OUTSIDE, AS OUTSIDE AND NEAR THE DUMP-
STER OF CLUB LEVELS. THE FBI SURVEILLANCE TAPES
WILL CONFIRM THAT. (SEE ATTACHMENTS)

THE LONG SLEEVE SHIRT AND THE JACKETS, SHOWN
ON THE I.C.E. INVESTIGATION PHOTOS AT THE HAMPTON
PARK BLVD WERE MINE. I HAVE THE LONG SLEEVE
SHIRT IN MY POSSESSION AT MY HOME AND THE
JACKET WAS GIVEN TO AN EMPLOYEE NAMED,
LEVANCE HOWARD (AKA SKINNY) AT CLUB LEVELS. THE
FBI SURVEILLANCE TAPE WILL CONFIRM THAT LEVANCE
HOWARD WORE THIS JACKET ALMOST DAILY.

...THE ELECTRIC SKIL SAW IN THE I.C.E. INVESTI-
GATION PHOTOS TAKEN AT THE HAMPTON PARK BLVD
WAREHOUSE WAS GREGORY WILLS' SKIL SAW AND HE
TOOK THAT SKIL SAW WITH HIM AFTER HE COMPLETED
THE WORK AT THE HAMPTON PARK BLVD WAREHOUSE.

THIS CAN BE CONFIRMED WHEN DEFENSE WITNESS
GREGORY WILLS TESTIFIED IN THE SECOND TRIAL, UNDER
OATH THAT THE SAW WAS HIS AND THAT HE TOOK THE
SAW WITH HIM FROM THE HAMPTON PARK BLVD WAREHOUSE.

I PERSONALLY HAVE SEEN MR GREGORY WILLS USE
THE SAME ELECTRIC SKIL SAW AT CLUB LEVELS AS

THE TWO ROLODEX CARDS, IN THE I.C.E. INVESTIGATION PHOTOS AT THE HAMPTON PARK BLVD WAREHOUSE, WERE NOT LEFT BEHIND, BECAUSE WE POWER WASHED THE ENTIRE WAREHOUSE, AFTER SWEEPING AND MOPPING THE ENTIRE FLOOR.

THESE TWO ROLODEX CARDS WERE STILL IN THE ROLODEX WHEN WE OCCUPIED CLUB LEVELS.

THERE ARE TWO VERY CRUCIAL PIECES OF EVIDENCE FROM THE I.C.E. INVESTIGATION PHOTOS TAKEN ON APRIL 30, 2004, THAT SHOW AND PROVE THAT THE I.C.E. AGENT'S PHOTOS WERE TAKEN SOME TIME BEFORE THE LEASE WAS VACATED. (● APRIL 30, 2004)

1) I.C.E. INVESTIGATION PHOTOS OF THE HAMPTON PARK BLVD WAREHOUSE EXCLUDE THE LARGE WHITE PEG-BOARD ON THE WALL WHERE GREG WELLS AND I INSTALLED AND PAINTED THAT WAS USED TO HOLD TOOLS AND OTHER EQUIPTMENT.

GREG WELLS TESTIFIED UNDER OATH THAT HE INSTALLED THE LARGE PEGBOARD ONTO THE WAREHOUSE WALL AT THE HAMPTON PARK BLVD ADDRESS, SOMETIME IN FEBRUARY 2004. HOWARD SCOTT PEACOCK TESTIFIED THAT THE PEGBOARD

P6
9

IT WAS STILL IN PLACE ON APRIL 30, 2009 THE DAY
THAT WE VACATED THE HAMPTON PARK BLVD WAREHOUSE.

IT IS VERY OBVIOUS WHY THE I.C.E. AGENTS HAD THE
OFFICE LIGHTS OFF AND DIDN'T TAKE ANY ENTRY
PHOTOS OF THE WAREHOUSE OFFICE. REASON BEING IS
THAT THE OFFICE WAS FULLY FURNISHED WITH A SOFA
SEVERAL DESKS, LAPTOP, FAX/COPIER, OFFICE CHAIRS
ALL WITH THE EXCEPTION OF THE LAPTOP CAN BE SEEN
ON THE CLUB LEVELS SEARCH WARRANT PHOTOS. (SEE ATTACHMENTS)

## CONCLUSION

EVERY TIME AGENT KANE OF I.C.E. FALSIFIES, CONCEALS
AND COVERS THE FACTS THAT SHE AND I.C.E. AGENTS UN-
LAWFULLY ENTER AND UNLAWFULLY SEARCH THE WAREHOUSE
(WITHOUT A WARRANT) BEFORE APRIL 30, 2009, IS CLEARLY
AN 18 U.S.C.S § 2236 , 18 U.S.C.S §1001, 18 U.S.C.S §1519
VIOLATION.

ALSO, WHEN K-9 OFFICER MICHAEL SHARPE FALSIFIED
THE ENTRY DATE (APRIL 30, 2004) IS AN 18 U.S.C.S.
§ 1001 AND 18 U.S.C.S. § 1519 VIOLATION.

WHEN AGENT KANE TESTIFIED UNDER OATH IN THE GRAND