P6,
1

SUMMIT CIRCLE APARTMENT

VIOLATION OF 18 U.S.C.S. § 2236 - SEARCH WITHOUT
A WARRANT CHART

WHOEVER BEING AN OFFICER, AGENT OR EMPLOYEE
OF THE UNITED STATES OR ANY DEPARTMENT OR
AGENCY THERE OF ENGAGED IN THE ENFORCEMENT
OF THE UNITED STATES "SEARCH ANY PRIVATE DWELLING
AND OCCUPIED SUCH DWELLING WITHOUT A WARRANT
DIRECT SUCH SEARCH, OR MALICIOUSLY SEARCH
ANY OTHER BUILDING OR PROPERTY WITHOUT A
SEARCH WARRANT" VIOLATES 18 USCS § 2236

DURING THE FIRST TRIAL I.C.E. AGENT KATRINA GIKAS
TESTIFIED THAT HER I.C.E. AGENTS UNLAWFULLY ENTERED
AND UNLAWFULLY SEARCHED MR JONES' SUMMIT
CIRCLE APARTMENT.

I C E SUPERVISOR WILLIAM WINTERS

DURING THE EVIDENTIARY HEARING I.C.E. AGENT
BILL WINTER TESTIMONY TUESDAY, NOV 6, 2007
9:30 AM   PAGE 170 - 195

PAGE 189 LINE 8 - 19

P6
2

(Q) "WHY DID YOU NOT GET A SEARCH WARRANT FOR THE APARTMENT?"

(A) MOST OF IT WAS ON LOGISTICS. IT WAS A SATURDAY NIGHT. AND I WOULD HAVE HAD TO KEEP PEOPLE OUT ALL THE REST OF THE WEEKEND UNTIL MONDAY TO OBTAIN A SEARCH WARRANT. SO I WAS TRYING TO, I WANTED TO GET BASICALLY CONSENT TO SEE WHAT WAS IN THE APARTMENT.

DURING I.C.E. AGENT BILL WINTER'S TESTIMONY HE WAS FULL OF EXCUSES AND BAD FAITH CONDUCT, IT WAS SO OUTRAGEOUS HONORABLE JUDGE HUVELLE STOPPED HIS TESTIMONY.

PAGE 188 LINE 15-25, PAGE 190 LINE 1-20

(Q) IN YOUR 17 YEARS OF LAW ENFORCEMENT AGENT YOU BECOME AWARE THAT THERE ARE MEANS BY WHICH YOU CAN GET AN EMERGENCY WARRANT OR SEARCH WARRANT, RIGHT?

(A) I WASN'T AWARE OF THEM, BEING ABLE TO GET ONE OVER THE WEEKEND.

THE COURT: IN YOUR YEAR'S EXPERIENCE THOUGH, WHEN YOU SAY YOU WANTED A CONSENT, YOU GOT A CONSENT FROM WHOM?

THE WITNESS: FROM THE APARTMENT COMPLEX.

P6
3

THE COURT: WELL I DON'T WANT TO BE SARCASTIC BUT THE APARTMENT COMPLEX DOES NOT TALK, WHOEVER YOU GETTING QUOTE "CONSENT" FROM

PAGE 190 LINE 1-20

THE WITNESS: IT WAS AN INDIVIDUAL WHO MR EICHBURG PUT ME IN CONTACT WITH, REPRESENTED AS SOMEONE WHO WAS THE APARTMENT MANAGER, COMPLEX MANAGER.

THE COURT: I WOULD LIKE TO TAKE A BREAK RIGHT NOW AND EXCUSE THE WITNESS. COULD YOU STEP OUTSIDE.
        (WITNESS EXCUSED)

THE COURT: I DON'T WANT TO SPIN WHEELS IF I CAN HELP IT.

YOU MAY HAVE WITNESSES ON THIS. I DON'T SEE YOUR LEGAL ARGUMENT ON SUMMIT CIRCLE. I CAN RULE NOW IF YOU WANT. I DON'T SEE IT AT ALL. I AM NOT PREPARED TO HOLD THAT THEY CAN GO TO QUOTE, A LANDLORD OR RESIDENT MANAGER AND GET CONSENT UNDER THESE CIRCUMSTANCES FOR A SEARCH.

I DON'T THINK THE LEASE SUPPORTS YOUR ARGUMENT. "I DON'T THINK THE LAW SO IN MARYLAND SUPPORT YOUR ARGUMENT" "I'M TROUBLE BY IT"

HONORABLE JUDGE HUVELLE WAS HOT AND UPSET WITH I.C.E. AGENT BILL WINTER'S TESTIMONY.

P6
4

### NATE RICHBURG

NATE RICHBURG WAS THE MAINTENANCE MAN WHO A WEEK
LATER LET THE ICE AGENTS IN SUMMIT CIRCLE APARTMENT.

(EXHIBIT #2) NATE RICHBURG  NOVEMBER 29, 2006  1:55 PM
PAGE 33, 34, 71, 72

PAGE 71 LINE 16, 17
(Q) SIR. DID THEY SHOW YOU A WARRANT?
(A) ~~BEFORE THEY CONFISCATED ANYTHING~~ THEY DIDN'T SHOW ME ONE.

PAGE 33 LINE 5, 6
THE COURT: DID THEY PAY YOU $50? DID YOU RECEIVE
THAT?

THE WITNESS: YES, I THINK IT WAS 250.

THIS CLEAR VIOLATION OF 18 USCS §2236 SEARCH
WITHOUT A WARRANT CAME OUT IN THE FIRST TRIAL
NOV 2006 AND WAS SUPPRESSED IN THE SECOND TRIAL.
MR. JONES HAS FILED A COMPLAINT AND NEITHER O.I.G.
O.P.R. OR THE OFFICE OF ATTORNEY GENERAL HAS GIVEN
ANY SANCTION, DISCIPLINE OR DETER THESE BAD AGENTS.

NATE RICHBURG
NOV 29 2006 1:55 PM        (EXHIBIT #2)

33

```
1    A.    I guess, yes.

2    Q.    Well, did they pay you $250?

3          MR. BALAREZO:  Asked and answered.

4          THE COURT:  Overruled.  I'm not sure what the answer is.

5          Did they pay you 250?  Did you receive that?

6          THE WITNESS:  Yes, I think it was $250.

7    BY MS. LIEBER:

8    Q.    Okay.  Do you remember them paying you some money?

9    A.    Yes.  I definitely remember that, yeah.

10   Q.    Okay.  Sorry.

11         Now, Mr. Richburg, did there come a time when you

12   actually went into that apartment in the company of some agents?

13   A.    Yes.

14   Q.    Okay.  Tell the jury how that happened, that you went

15   into the apartment with agents.

16   A.    Well, actually, one -- I think it was -- I'm not sure

17   what time it was.  They had came to the rental office and they

18   spoke to my manager and my manager called me over the radio and

19   she asked me to come to the office.

20         And I went to the office and she said you need to let

21   them in the apartment.  And I went up there into the apartment,

22   you know, opened the door and everything, went in the apartment

23   with them.  And they basically was, you know, searching the

24   apartment and stuff like that.

25         THE COURT:  Can you give us a date?
```

1        THE WITNESS:  I'm not sure what really, date-wise, you

2    know.

3    BY MS. LIEBER:

4    Q.    Do you remember generally, was it around the same time

5    frame that we've been talking about, February of 2004?

6    A.    Yeah, yeah.  Uh-huh.

7    Q.    Okay.  And did you go in with them at that time?

8    A.    Yes.

9    Q.    Okay.  What did you see when you went in with them at

10   that time?

11   A.    The only thing I saw was the blow-up mattress and the

12   candle -- a candle on the breakfast bar.  That was it.

13   Q.    Okay.  Again, was there any other furnishing in that

14   apartment?

15   A.    No, there wasn't.

16   Q.    And how many bedrooms was that apartment?

17   A.    A two-bedroom.

18   Q.    Now, in the course of your duties as the maintenance

19   supervisor during that time frame, did you see anybody coming

20   from or going to apartment 3B in 9719 Summit Circle?

21   A.    Yeah.  I saw a Spanish guy and a black guy.  That was it.

22        THE COURT:  On one occasion or you saw this happen on

23   different occasions?  In other words, were the two people

24   together and you saw them once?

25        THE WITNESS:  Well, I never saw them together.  I would

1  other agent at that time did not have a warrant to enter the

2  apartment, correct?

3          MS. LIEBER:  Objection.

4          THE COURT:  Sustained.

5          MR. BALAREZO:  Can we approach, Your Honor?

6          THE COURT:  No.

7          MR. BALAREZO:  Your Honor, I need to approach so I can --

8  BY MR. BALAREZO:

9  Q.     Did they show you a warrant?

10         MS. LIEBER:  Objection.

11         THE COURT:  He can ask that.

12         Did they show you one?

13         THE WITNESS:  Well, they thought -- they talked to my

14  manager.

15  BY MR. BALAREZO:

16  Q.     Sir, did they show you a warrant?

17  A.     They didn't show me one.  They talked to my manager, and

18  my manager called me over the radio, and that's the reason she

19  told me to go ahead and give them -- you know, let them into the

20  apartment.

21  Q.     Did your manager mention to you anything about a warrant?

22         MS. LIEBER:  Objection.  We're calling for hearsay in any

23  event.

24         MR. BALAREZO:  It goes to his state of mind.

25         THE COURT:  No.  His state of mind is not at issue.

1    Sustained.

2    BY MR. BALAREZO:

3    Q.    Well, you said that one of those agents paid you money,

4    correct?

5    A.    Yes.

6          MR. BALAREZO:  And, Your Honor, the government will

7    stipulate that Mr. Richburg was paid $250 at that time.

8          THE COURT:  Okay.  So we know.

9          MR. BALAREZO:  Well, he wasn't sure.  That's why I wanted

10   to get the amount.

11         THE COURT:  All right.

12   BY MR. BALAREZO:

13   Q.    Were you paid that $250 before or after you let the

14   agents into the apartment?

15   A.    I'm sorry.  It was so long, and I'm trying to think back,

16   you know.

17   Q.    You don't remember that?  Let me ask you this while you

18   think:  Were you often paid $250 by federal agents to be let

19   into the apartment?

20   A.    Just that one time.

21   Q.    And you don't recall?

22   A.    That one time.

23   Q.    And you don't recall whether or not you were paid that

24   before or after you let them in, right?

25   A.    Uh, I believe it was after, I believe, if I'm not

William Winters  T-8, Nov 6 2007 4:36 PM
(Exhibit #1)

169

1   A   I'm sorry.

2   Q   To the premises, I'm talking about Myrtle Avenue

3   now.

4   A   Okay.

5   Q   The lady said well, I'm going to have to check

6   with the tenant.  You indicated in effect, the tenant

7   is not available.  Well I'm going to have to check with

8   the owner.  You checked with the owner and got the

9   owner's permission?

10   A   I believe I had checked with the owner first.  And

11   the owner directed me to the real estate agent and

12   told, I had tracked down the owner first.  I had

13   already talked to the owner.  And the owner directed

14   me to the real estate agent.

15   Q   It is your testimony that Bill Kelly or the

16   resident manager or whoever it was that let you in,

17   that he was the one that came up with initially this

18   business about the lease?

19   A   Yes, of course.

20           MR. LYONS:  No further questions.

21           THE COURT:  Thank you.

22           Would you wait outside.

23           (Witness excused)

24           (William Winter, witness for the government,

25   was sworn.)

---

170

1                   DIRECT EXAMINATION

2   BY MS. LIEBER:

3   Q   Good afternoon, sir.

4   A   Good afternoon.

5   Q   Would you please introduce yourself to the Court.

6   A   My name is William Winter, W. I. N. T. E. R.

7   Q   Sir, how are you employed?

8   A   I'm employed by U.S. Immigration and Customs

9   Enforcement.

10   Q   What is your current position title?

11   A   I'm on temporary duty to the Department of Justice

12   as the Associate Director of OCDETF program, OCDETF

13   executive office.

14   Q   Can you give the letters?

15   A   Organized Crime Drug Enforcement Task Force.

16   Q   How long have you been a law enforcement agent?

17   A   More than 20 years.

18   Q   Specifically back in the winter say February

19   specifically of 2004, where were you assigned?

20   A   I was assigned in Baltimore.

21   Q   Was that also for Immigration and Customs

22   Enforcement?

23   A   Yes.

24   Q   How long had you worked for ICE in Baltimore as of

25   February of 2004?

171

```
 1              THE COURT:  Or its predecessor?
 2              THE WITNESS:  I worked in Baltimore since
 3    1996, I think, January of '96.
 4    BY MS. LIEBER:
 5    Q    In February of 2004, did you have a particular
 6    leadership position for ICE in Baltimore?
 7    A    Yes, I was a group supervisor.
 8    Q    What does that mean?
 9    A    Basically, you are supervisor of a group of agents
10    and at the time I had the airport narcotics group.
11    Q    The Baltimore Washington International Airport --
12              MR. BALAREZO:  Objection.
13              THE COURT:  Because it's leading?
14              MR. BALAREZO:  It is, Your Honor.
15              THE COURT:  It is not objectionable to talk
16    about the Baltimore Washington Airport.  Overruled.
17    BY MR. GEISE:
18    Q    Special Agent Winter, let me direct you
19    specifically to a premises, an apartment, 9719 Summit
20    Circle, apartment 3-B in Largo, Maryland.  Are you
21    familiar with that property?
22    A    Yes.
23    Q    I want to specifically direct your attention to
24    the weekend of February 6, 7 and 8 of 2004.  Were you
25    part of a team that investigated potential illegal
```

172

```
 1    happenings in that apartment?
 2    A    Yes.
 3    Q    Specifically, did you, did there come a time --
 4    well, first of all, tell the Court, did you actually
 5    do any surveillance of that property?
 6    A    Yes, I was involved in some surveillance of that
 7    property.
 8    Q    Give the Court a sense of what the surveillance
 9    team was like in the hours from February 6 to
10    February 8 of 2004?  Was it around the clock
11    surveillance?  Give the Court a sense of what the
12    surveillance was like.
13    A    It was armed the clock surveillance.  And it was
14    for multiple groups, from the SAC Baltimore.
15    Q    You say SAC, S. A. C?
16    A    Yes, Special Agent in Charge that would be the
17    Baltimore field office of ICE.
18    Q    In the course of that surveillance, did you
19    yourself personally take part in some stint
20    surveillance on that apartment?
21    A    Yes, I did.
22    Q    I'm going to fast forward to a particular point in
23    time.  Were you part of a decision about, that was
24    made trying to investigate what was going on inside
25    the apartment as opposed to outside?
```

173

```
 1   A   Yes.
 2   Q   Tell the Court how that determination was made.
 3   A   Well, we decided that we wanted to see inside the
 4   apartment.  So we had contacted the maintenance, the
 5   person that was responsible for the maintenance.  At
 6   the time, I'm not sure that we actually had identified
 7   the apartment as 3-B.  We went into the rental office
 8   and he showed, I think Kevin Butts was with me also.
 9   He showed us some of the property records.  We were
10   trying to determine what apartment actually these
11   people were in.
12   Q   Did there come a time that you figured out that it
13   was apartment 3-B?
14   A   Yes.
15   Q   How was that determination made?
16   A   We saw Mr. Jones' name as the lessee on the
17   apartment 3-B.
18   Q   What if any significance did the name Antoine
19   Jones have to you based on your recent investigation?
20   A   I think the only way we knew Mr. Jones at that
21   time was that the Cadillac that came and picked up one
22   of the individuals that was staying in the apartment
23   was registered to him.
24   Q   At that point, did you express an interest in
25   investigating the interior of that apartment?
```

174

```
 1   A   Yes.
 2   Q   Who did you talk to about that?
 3   A   We spoke to the maintenance person first, he put
 4   us in contact with someone who represented the
 5   apartment complex.
 6   Q   I want to break that down a little bit.  Where
 7   were you, well, first of all, did you personally have
 8   a conversation with the apartment complex rental
 9   manager?
10   A   Over the phone, yes.
11   Q   Where were you when that telephone conversation
12   took place?
13   A   In the rental office at Summit Circle.
14               THE COURT:  Who did you talk to over the
15   phone?
16               THE WITNESS:  It was someone who was involved
17   in the building, I guess management, the properties
18   manager for Summit Circle.
19   BY MS. LIEBER:
20   Q   Sitting here today, do you recall the name of the
21   person you spoke to on the phone on February 7?
22   A   No, I do not.
23   Q   Prior to your speaking with this rental manager
24   person, did the maintenance person have a
25   conversation, do you know?
```

175

1   A   I believe he did, yes.

2   Q   Could you hear the conversation?

3   A   No.

4   Q   Could you see the maintenance person having a

5       conversation on the phone?

6   A   I think he had a conversation before, at several

7       point during the night. But I think at some point,

8       yes, he had a conversation in my presence. But it was

9       in the office. I didn't really hear what he was

10      saying.

11  Q   Who gave you the telephone, who handed you the

12      phone to talk to the rental manager?

13  A   The maintenance person, Mr. Richburg.

14  Q   Is it Nate Richburg?

15  A   Yes, Nate Richburg.

16  Q   Specifically, what did you tell the rental manager

17      about your intention for that property?

18  A   I told him as little as possible.  I told him that

19      there was a criminal investigation and there was a

20      drug investigation and that I wanted to see if we

21      could get consent to get into the apartment.

22  Q   Okay.  Why would you tell the rental manager as

23      little as possible?

24  A   For the security of the investigation.

25  Q   What does that mean?


176

1   A   I didn't want the people that we were

2       investigating to know that we were investigating them.

3   Q   Based on what you told the rental manager about

4       your suspicions about illegal activity, did you say

5       drugs, money, what specifically did you tell him?

6   A   We told him it was a drug investigation.

7   Q   Based on what you told him, what did the rental

8       manager tell you about whether or not you could be

9       allowed into the apartment?

10  A   I don't remember the exact conversation but I

11      believe it went back and forth.  In the end, I told

12      him that we would just look for contraband.  We

13      wouldn't remove any items in the apartment.  I think

14      the word "contraband" is what I used, meaning drugs.

15  Q   Have you ever actually yourself seen the lease to

16      9719 Summit Circle apartment 3-B?

17  A   No.

18  Q   Did the rental manager talk to you about the

19      lease?

20  A   He mentioned if there was illegal activity going

21      on in the apartment that they could be voided a lease.

22      THE COURT:  They could be what?

23      THE WITNESS:  Void.

24      THE COURT:  I don't understand.

25      THE WITNESS:  They would be in violation of

177

1   the lease.
2   BY MS. LIEBER:
3   Q   Was that the authority that he cited to you in
4   allowing you to actually go in and look around for
5   contraband in that apartment?
6   A   Yeah, that was what he said.  I don't recall if he
7   actually told me that we could go in the apartment or
8   whether, I know that he, the phone went back to
9   Mr. Richburg, and then, shortly thereafter he let us
10  into the apartment.
11  Q   When you went into that apartment, did you take
12  anything from the apartment?
13  A   No.
14  Q   What was your intent when you went into that
15  apartment?
16  A   The intent was to look for drugs.  We were on the
17  apartment for a long period of time.  I didn't want to
18  leave there without, I was concerned that there was a
19  large amount of drugs in there.
20  Q   What was this concern based on?
21  A   Based on information that I had received from,
22  during the investigation.
23  Q   Just so we all know which search scene we're
24  talking about, first of all, did you see any drugs or
25  weapons in the apartment?

178

1   A   No, there were no drugs, no weapons.  We saw empty
2   weapons boxes and some ammunition.
3   Q   Did you see anything else in the apartment of
4   note?
5   A   There was air mattresses.  And there was, in one
6   of the closets, there were several duffle bags.
7   Q   Were they empty or full?
8   A   Empty.
9   Q   Anything else that you recall being in there?
10  A   There was one of the rooms had some rubber bands
11  and some plastic wrapping.
12          MS. LIEBER:  That's all I have, thank you.
13          THE COURT:  Mr. Balarezo.
14              CROSS EXAMINATION
15  BY MR. BALAREZO:
16  Q   Good afternoon, agent.
17  A   Hi, how are you?
18  Q   I'm fine thank you.
19  You know Agent Gikas, right, or Karousos now?
20  A   Yes.
21  Q   You were her supervisor back at that time?
22  A   At the time, yes.
23  Q   The time I'm talking about is February 2004,
24  right?
25  A   Yes.

1 Q You said you had been with the Baltimore office
2 since 1996; is that right?
3 A That is correct.
4 Q How long had you been a law enforcement officer?
5 A Since 1987.
6 Q 1987 to 2004, that's about 17 years?
7 A Yes.
8 Q So in 2004 then it's accurate to say that you
9 were familiar with the process for obtaining a search
10 warrant?
11 A Yes.
12 Q And what it took to get search warrant?
13 A Yes.
14 Q Just to cut to the chase, at no point did you
15 obtain a search warrant for the apartment known as 97
16 something Summit Circle, I forget.
17 THE COURT: The Summit Circle apartment.
18 BY MR. BALAREZO:
19 Q The Summit Circle apartment that we're talking
20 about.
21 A No.
22 Q At the time that you personally were involved
23 in physical surveillance of the apartment, right?
24 A Some of the time, not all of the time.
25 Q So the answer is yes, you were involved?

1 A Yes.
2 Q When did your involvement in the actual physical
3 surveillance of that apartment begin?
4 A It would have been late Friday night, which would
5 have been the fifth.
6 Q Now, let me ask you this before we go down that
7 route. Are you more certain of the day as in the
8 Saturday, Sunday? What are you more certain of?
9 A It was the evening that the gentlemen arrived into
10 town and we followed them to the Summit Circle
11 address.
12 Q That's nice, but answer my question. Are you more
13 certain --
14
15 MS. LIEBER: Objection.
16 THE WITNESS: I believe it was Friday night.
17 MR. BALAREZO: My question again, in case you
18 didn't understand, was are you more certain of the --
19 THE COURT: He said he was more certain that
20 it was Friday night.
21 MR. BALAREZO: He did not answer my question,
22 Your Honor. I would like to have the question
23 answered if I could.
24 BY MR. BALAREZO:
25 Q Are you more certain that it was the day of the

181

1   week, as in Friday, Saturday, Sunday, Monday, Tuesday,
2   Wednesday, Thursday? Or are you more certain of the
3   date as in the number?
4   A   I believe it was Friday the 5th.
5   Q   So you are more certain of the day; is that what
6   you're saying?
7   A   I know it was Friday.
8   Q   Okay. Friday the fifth.
9              Now, how did you become involved with
10  surveillance on Friday the 5th? And we're talking
11  about Friday, the 5th, 2004, right?
12  A   Yes.
13  Q   How did you become involved in the physical
14  surveillance?
15  A   We got information from our office in Texas. We
16  did a surveillance at the airport. They gave us
17  information about a certain individual that was flying
18  into the Baltimore Washington International. We
19  followed them. I picked them up at the airport. I
20  think we followed them up to Arundel Mills Mall. And
21  then, to the Summit Circle address.
22  Q   The information that you got from the McAllen
23  office was that an individual wearing ostrich boots
24  and ostrich belt-- do you remember that?
25  A   I believe it was ostrich boots was mentioned, yes.

182

1   Q   Let's talk about him. The information you got
2   from McAllen was that that individual was coming from
3   Texas to Maryland to pick up money, correct?
4   A   I don't know if it was definitely money. There
5   was talk about a truck that was loaded with drugs that
6   was, had left a couple days prior to that.
7   Q   Would you have any reason to know why Agent Gikas
8   testified that --
9              MS. LIEBER: Objection.
10             THE COURT: Sustained.
11  BY MR. BALAREZO:
12  Q   You were Agent Gikas' supervisor, right?
13  A   Yes.
14  Q   You were familiar with the information she
15  received back in February regarding what the
16  individual in Texas was going to do in Maryland,
17  right?
18  A   I'm familiar with the information.
19  Q   You've read her reports of investigation, right?
20             MS. LIEBER: Objection, you can't cross-
21  examine this witness with what the other agent --
22             THE COURT: He may have read them, I don't
23  know.
24             Are you arguing the probable cause for this
25  search or what? I don't get it. That's the problem.

183

1         MR. BALAREZO: There is none. I don't think
2    there is any question about that, Your Honor.
3         THE COURT: I don't know that that is the
4    government's position here.
5         MR. BALAREZO: Of course not.
6         THE COURT: But maybe we want to ask him
7    whether he --
8         MR. BALAREZO: I asked him if he had read her
9    reports of investigation.
10        THE COURT: Before the search here or after?
11        MR. BALAREZO: Let me get to this and make
12   this easy for everyone.
13   BY MR. BALAREZO:
14   Q    During the periods that you personally conducted
15   surveillance, you, Agent Winter, you never saw any
16   narcotics, right?
17   A    No.
18   Q    You never saw any large amounts of money, did you?
19   A    No.
20   Q    You never saw Antoine Jones hand off anything to
21   anybody else, correct?
22   A    No, I never did.
23   Q    You never saw anyone hand off anything to Antoine
24   Jones, right?
25   A    No.

184

1    Q    Besides perhaps some shopping bags from some store
2    in Arundel Mills, you never saw any of the individuals
3    that you were observing going into the apartment,
4    bring in any large duffle bags, correct?
5    A    I don't believe there was any.
6    Q    Let me back up.
7    A    I didn't witness it, no.
8    Q    Did you personally see anybody go into that
9    apartment?
10   A    No.
11   Q    Were you told that other people were going into
12   the apartment?
13   A    There was, yes, I was told there were people going
14   in and out of the apartment.
15   Q    Who told you?
16   A    At the time, who ever was on points of the
17   surveillance.
18   Q    Was Agent Gikas one of those people who told you?
19   A    No, I don't believe she was ever on point.
20   Q    Wasn't she the lead agent at that time?
21   A    Yes.
22   Q    But she wasn't on point?
23   A    No, not necessarily.
24   Q    What were you told about the apartment as far as
25   people coming or going? Were you told anything like

185

```
 1   that?
 2   A    No.  I know there was just some people had gone
 3   in.  They had gone back to Arundel Mills Mall.  They
 4   went back into the apartment.  Some people had come
 5   out and used the cell phone.
 6   Q    Those people, who ever came out to use the cell
 7   phone, there was never any information provided to you
 8   that a truck had come and unloaded at the apartment,
 9   right?
10   A    No.
11   Q    There was no information provided to you about
12   anyone coming into the apartment with large duffle
13   bags of any kind, right?
14   A    No.
15   Q    Or anyone coming out of the apartment with large
16   duffle bags of any kind, right?
17   A    No.
18   Q    In fact, you never received any information from
19   any source saying that anyone in that apartment was
20   bringing out drugs, or money, correct?
21   A    No.
22   Q    Now, at some point you indicated that you decided
23   that you wanted to see inside the apartment, right?
24   A    Right.
25   Q    This was because you were conducting a drug and
```

186

```
 1   money laundering investigation and you wanted to
 2   obtain evidence; is that correct?
 3   A    No, I think -- no, that's not correct.
 4   Q    You didn't go in there just because you had
 5   nothing else to do, right?
 6   A    No, I went in there because we were on
 7   surveillance and there was information that there was
 8   a large amount of drugs coming to that area.  We
 9   didn't have continuous surveillance on that apartment
10   prior to the fifth.  And the truck had left a few days
11   before that.  And I was concerned that there was a
12   large amount of drugs in there.
13   Q    Right.  So my point again, the question is, the
14   reason you wanted to go see the inside of the
15   apartment was because you wanted to find some evidence
16   of either large amounts of money or drugs, right?
17   A    I wanted to find a large amount of drugs is what I
18   was looking for, yes.
19   Q    The reason you wanted to go into the apartment was
20   because you either wanted to find evidence of drugs
21   and/or money related to the drugs.  Is that correct?
22   A    I think at the time that I was in the apartment, I
23   was looking for drugs, sir.
24   Q    So you were not concerned about money at that
25   time?
```

187

```
 1              MS. LIEBER: Objection, asked and answered,
 2    three times.
 3              MR. BALAREZO: If he could answer the
 4    question I won't ask it a fourth.
 5              THE COURT: You were looking for drugs. Go
 6    ahead and answer it.
 7              THE WITNESS: At the time we went into the
 8    apartment, we were looking for drugs.
 9    BY MR. BALAREZO:
10    Q    My question was, prior to your going to the
11    apartment, at the time that you decided, in your
12    words, that you wanted to see inside the apartment.
13    Do you remember you testified to that a few minutes
14    ago?
15    A    Well, we were doing surveillance at the apartment
16    to gain evidence, yes.
17              THE COURT: I would like to see exhibit three
18    from her testimony please.
19    BY MR. BALAREZO:
20    Q    Let me back up a little. Before going into the
21    apartment, you had no direct evidence of narcotics, of
22    drugs, right, I mean, you had not seen any, you hadn't
23    seized any, right?
24    A    Only the information that we received.
25    Q    Talking about direct, like physical evidence,
```

188

```
 1    right?
 2    A    No.
 3    Q    You didn't have any physical evidence relating to
 4    the money or anything that you had heard about, right?
 5    A    No.
 6    Q    So the reason you wanted to go into the apartment
 7    was to see if you could find, in your words, drugs?
 8    A    Correct.
 9    Q    So you wanted to look for evidence, right?
10    A    Drugs are the evidence, yes.
11    Q    So the answer is yes?
12    A    Yes.
13    Q    At no time did you go to a magistrate or to a
14    judge in any court --
15              THE COURT: That we know, everybody agrees.
16    That is uncontested.
17              MR. BALAREZO: Very well.
18              THE COURT: We wouldn't be here if that was
19    the case.
20    BY MR. BALAREZO:
21    Q    Why did you not go to a judge or a magistrate to
22    get a search warrant for the apartment?
23              MS. LIEBER: Objection.
24              MR. BALAREZO: Goes to bad faith, Your Honor.
25              THE COURT: I don't think I care about bad
```

1  faith.  They didn't have a warrant.
2           MS. LIEBER:  Why is it relevant?  What is his
3  rationale for not going to the magistrate judge is not
4  relevant.
5           THE COURT:  Probably not.  But I'll let him
6  answer it if he can.
7           BY MR. BALAREZO:
8  Q   Why did you not get a search warrant for the
9  apartment?
10 A   Most of it was on logistics.  It was a Saturday
11 night.  And I would have had to keep people out all
12 the rest of the weekend until Monday to obtain a
13 search warrant.  So I was trying to, I wanted to get
14 basically consent to see what was in the apartment.
15 Q   In your 17 years as a law enforcement agent, you
16 become aware that there are means by which you can get
17 an emergency warrant or search warrant, right?
18 A   I wasn't aware of them, being able to get one over
19 the weekend.
20          THE COURT:  In your year's experience though,
21 when you say you wanted a consent, you got a consent
22 from whom?
23          THE WITNESS:  From the apartment complex.
24          THE COURT:  Well, I don't want to be
25 sarcastic but the apartment complex does not talk.

189

1  Who were you getting quote "consent" from?
2           THE WITNESS:  It was an individual who
3  Mr. Richburg put me in contact with, represented as
4  someone who was the apartment manager, complex
5  manager.
6           THE COURT:  I would like to take a break
7  right now and excuse the witness.
8           Could you step outside.
9           (Witness excused).
10          THE COURT:  I don't want to spin wheels if I can
11 help it.
12          You may have witnesses on this.  I don't see
13 your legal argument on Summit Circle.  I can rule now
14 if you want.  I don't see it at all.  I am not
15 prepared to hold that they can go to quote, a landlord
16 or resident manager and get consent under these
17 circumstances for a search.
18          I don't think the lease supports your
19 argument.  I don't think the law in Maryland supports
20 your argument.  I'm troubled by it.  And we're
21 spending a lot of time.  I don't see what more
22 testimony I need on that.  I've heard what I heard.
23          And Myrtle Avenue there is a warrant, a sneak
24 and peek.  Frankly, he could have done that here.
25 There is no exigency whatsoever.

190

191

1    I'll give you a tentative ruling but there is
2  no more.  You can tell me why I'm legally wrong but I
3  don't need any more.  I understand what happened here.
4  I think it is uncontested.
5        As to Summit Circle, there are observations
6  in there.  The law is very clear and you would agree,
7  I'm sure, that a landlord cannot consent.
8        MS. LIEBER:  Unless.
9        THE COURT:  Well, unless, but the law does
10  not say just because the landlord thinks that, he is
11  given some information by some agent.  And we don't
12  know who the quote, "landlord" is here.  That there
13  could be drug activity that the Fourth Amendment goes
14  out the door.  I won't hold that.
15        If you want me to be more explicit about it
16  and write about it at all, I will.  I think that
17  cannot be the law.  Just because the lease says, I
18  think this is a legal analysis of the agents premised
19  on an erroneous view of the law.  You cannot now say
20  that they relied on the landlord.  For instance, under
21  all law, and Maryland law for instance, you can't just
22  go in and find somebody without any notice in
23  violation of the lease, and basically seize the
24  tenancy or open it up.  That's what you are saying
25  here.  He could have gotten a warrant.

192

1        I am very bothered by this.  You can sit on
2  it.  But I don't see I need any more testimony.  It is
3  exactly what he says.  He wanted consent.  It was not
4  logistically impossible, for one thing, we all know
5  that.  But that is not important.  What is important
6  here is, they go to a maintenance person who puts them
7  in touch with, I'm not even sure whether we have
8  somebody who is, quote, really in the position to give
9  consent under the lease.
10        But I also don't agree that that is possible
11  under the lease in the provisions that you've cited to
12  me.
13        I think it's an erroneous view of the law to
14  say under the lease, I can consent as long as I, the
15  landlord, let's assume that's who we're talking to and
16  I don't even know that, believe based on what I'm
17  told, there could be drug activity going on.  That
18  means any agent can go to any landlord and say drug
19  activity, you have a standard lease, I go in.
20        So I'm prepared to grant that motion.  You
21  can sit on it.  I don't want any -- I don't know.
22  Do you have any other testimony?
23  Do you, Mr. Lyons?
24        The government can think about it and argue
25  some more.  I've told them what I think about this.

193

1   But he is not going to say anything, his facts are the
2   facts.
3        MS. LIEBER:  Your Honor, it may be that I can
4   get a witness here from the rental company to say this
5   is what I knew.  There is more to it than they knew.
6        THE COURT:  Look at the lease.  Where does it
7   say that if you think there is drug activity going on,
8   you can let in any old officer at all?
9        MS. LIEBER:  Provision 19, lessor's right of
10  entry.
11       THE COURT:  "The lessor reserves the right to
12  enter the premises at reasonable times--" whatever
13  that is, "--for purposes of inspecting the conditions
14  and making repairs."  That didn't happen.
15       So we have to go to the next one.  "Reserves
16  the right to enter the premises to protect life and
17  prevent damage to the premises."
18       That in my view does not allow the agents to
19  say drug activity going on.  The landlord has rights
20  to terminate the lease, but he has to give notice to
21  the guy.  You don't cite, the one case you cite
22  doesn't have much to do with that.  I think that if
23  the law says you can't rely on a landlord to give
24  consent, it does not change by virtue of those two
25  lease provisions, 19.

194

1        So, Mr. Lyons, do you have any more witnesses
2   on the Myrtle?  That's a different situation.
3        MR. LYONS:  No, not on Myrtle.  Just for the
4   record, I believe that Your Honor's analysis and
5   ruling would be equally applicable to what happened at
6   Myrtle.
7        THE COURT:  No, we got the warrant.  That
8   makes all the difference in the world.
9        MR. LYONS:  I'm talking about the next day
10  when they went in supposedly --
11       THE COURT:  Nothing happened, there is no
12  suppression.
13       MR. LYONS:  That's what I'm saying.  We
14  didn't move to suppress because the government didn't
15  put any evidence in on the 28th.  I'm assuming that
16  they're not going to try to put that in, in this
17  trial.
18       THE COURT:  No, but everything they saw that
19  was relevant to the trial came out on the 27th.  So I'm
20  not worried about the 28th.  Whether they went in or
21  didn't go in, you can only suppress if they got
22  something and they didn't.
23       The 27th, they got a warrant.  They certainly
24  don't have any problem with that.  I can rule on that,
25  too.

195

1    But have we concluded the testimony? That's
2    really what I want to know.
3        Ms. Lieber, you can think about it over
4    night.  I don't read the lease the way you read it.
5    You are giving a carte blanche to somebody.  Even
6    assuming it is a party to the lease, who I assume
7    would be the only person who really has any authority
8    here, but otherwise you could take over a lease any
9    time, any where and any place.
10       That's not state law.  So, I don't know why I
11   should interpret the lease to allow them to basically
12   say, okay, anybody I want to let in who says there is
13   drug activity, I'll let you in, law enforcement.  I'll
14   give you tonight to come up with some better law.
15       But there is a tentative ruling on Myrtle, I
16   have no problem upholding it.  I think any facial
17   deficiency in that is not attributable to the agents
18   here.  So any argument that Grimm didn't put in enough
19   information in the warrant I find, it will be covered
20   by Leon.  And she got a warrant, a sneak and she got
21   an extension.  And by the time she got the extension,
22   she, one, had very good reason to believe that Maynard
23   had abandoned it.
24       So, therefore, so I hold factually I credit
25   her that she had a basis to think he had abandoned.

196

1    Moreover, even when that's legally the right
2    conclusion, i.e., I can go in there under an extension
3    when I learn that he has abandoned it.  She relied in
4    good faith on her conversation with chambers.  I think
5    that's totally proper.
6        But I think it is sufficient, the fact that she
7    has reliable information at the time of the, before the
8    second 30-day requirement or if the 30-day notice had
9    expired.  She has good information that he has abandoned.
10       And that is uncontradicted.
11       And two, when she goes to the magistrate's
12   chambers, I think that's, I would agree entirely with the
13   legal conclusion and advice that she was given.  And she is
14   entitled under Leon to rely on it.  So, I will not,
15   we'll take up the North Carolina tomorrow morning.
16       If you have anything to add on this.  I've
17   looked at this very carefully.  I looked at the lease.
18   You start with the premise you can't, the landlord
19   can't consent.  The only thing that could get you out
20   of that is the lease itself.  And I don't think that
21   we can do it the way they did it here.
22       But I don't also, I don't see that it has any
23   taint effect on anything that the government -
24       You can address that as well, Mr. Balarezo.
25   I don't see that it taints anything.  There was all

197

1  kinds of independent information that was available
2  all the way up the line, which includes they never
3  used the mattresses and the duffle bags to get any
4  other affidavits.
5       You can look but I've carefully considered
6  it.  I think we'll have to resume tomorrow.  We'll
7  have argument on North Carolina which is a more
8  complicated legal issue.
9       Subject to the government coming up with a
10  better argument than they have managed to do so far,
11  Mr. Jones' motion on Summit in terms of what they
12  quote "saw," i.e., seized, that doesn't mean the
13  comings and goings of the surveillance.  That's not
14  suppressed.  They saw people come and go out of there.
15  They knew who rented the place.  They knew the guy
16  with the ostrich.  But that's different.  But what
17  they saw inside the apartment, I will preclude them
18  from testifying about.
19       I will deny Mr. Maynard's motion as to
20  Myrtle.
21       MR. BALAREZO:  Your Honor, you raised an
22  issue with that.
23       THE COURT:  You can look tonight and tell me
24  about it.
25       MR. BALAREZO:  I will with that, but there is

198

1  one that comes to mind right now.  That's the - I'm
2  sure the government will correct me, Nate Richburg, I
3  think testified at trial that he went in and saw
4  certain things.  My understanding is that he went in
5  with these agents at the time that the, quote, rental
6  manager allowed entry.
7       THE COURT:  I don't know factually, but the
8  government will have to address that.  If he is there
9  as part of what I suppressed, he can't get in there
10  any better than, I mean, he could have gone by
11  himself.  But if he's there hand in hand with the
12  police, I don't think they're going to argue that
13  Richburg can come in and say what the police can't
14  say.
15       MS. LIEBER:  No.
16       MR. BALAREZO:  Right, that's -- So I would
17  again amend my motion to include suppression or
18  exclusion of whatever Richburg has to say regarding --
19       THE COURT:  The contents of this place, if it
20  is part and parcel.  He had no independent information
21  other than walking in there with the police.  I would
22  agree.
23       MS. LIEBER:  He went in twice.  He went in
24  independently.
25       THE COURT:  Before?

1  MS. LIEBER: I think it was before. He was

2  changing a filter. I forget what it was. He had been

3  in twice.

4  THE COURT: He testified, right?

5  MS. LIEBER: He did.

6  THE COURT: He is from North Carolina.

7  MR. BALAREZO: Michael Bob?

8  THE COURT: He is free to testify as to any

9  independent observations, but not the ones that were

10  made on that weekend.

11  MR. BALAREZO: Your Honor, I'm still unclear as

12  to the letter from the jail cell.

13  THE COURT: No, I'm saying I'm going to wait.

14  I don't quite get their probative -- I don't see it is

15  probative. Then I have to weigh whether it is too

16  prejudicial. But until I hear these two confidential

17  informants and your cross examination, I can't judge

18  its probativeness.

19  MR. BALAREZO: Should I address the issue of

20  the 16th tomorrow?

21  THE COURT: Tell me now. That's the date,

22  Friday.

23  MR. BALAREZO: Yes.

24  THE COURT: Thank you.

25  We'll excuse everybody, we'll resume tomorrow

1  at quarter to 10:00 for argument on North Carolina.

2  You are welcome to tell me anything else you have but

3  I'll make a formal ruling. Thank you.

4  (Whereupon, at 4:26 P.M., the hearing

5  recessed.)

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EX PARTE BENCH CONFERENCE WITHIN

------------------------------X

THE UNITED STATES OF AMERICA    Criminal Case No.

v.                              05-386

ANTOINE JONES, et al,

           Defendants,

------------------------------X
                        Washington, D.C.
                        Tuesday, November 6, 2007
                        9:30 A.M.

TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
UNITED STATES DISTRICT JUDGE

APPEARANCES:
For the Government:      JACK GEISE, ESQUIRE
                        RACHEL LIEBER, ESQUIRE
                        Office of the U.S. Attorney
                        555 4TH Street, N.W.
                        Washington, D.C. 20560
                        (202) 616-9116

For Defendant Jones:    EDUARDO BALAREZO, ESQUIRE
                        400 Fifth Street, N.W.
                        Suite 500
                        Washington, D.C. 20001
                        (202) 639-0999

Court Reporter:         Lisa Walker Griffith, RPR
                        U.S. District Courthouse
                        Room 6507
                        Washington, D.C. 20001
                        (202) 354-3247

Proceedings recorded by mechanical stenography,
transcript produced by computer.

---

132

 1        MR. GEISE:  He has a flight to make, Your
 2   Honor.
 3             (Witness excused).
 4        THE COURT:  I think we ought to finish up the
 5   testimony.
 6             (A brief recess was taken.)
 7             (KATERINA KAROUSOS, witness for the
 8   government, sworn)
 9
10   BY MS. LIEBER:
11        Q    Good afternoon, ma'am.
12        A    Good afternoon.
13        Q    Would you please introduce yourself to the Court
14   and spell your first and last names?
15        A    Katerina Karousos.  K. A. T. E. R. I. N. A.
16   K.A.R.O.U.S.O.S.
17        Q    How are you employed?
18        A    I'm a special agent with the Immigration and
19   Customs Enforcement.
20        Q    Where are you currently assigned?
21        A    At Immigration and Customs Enforcement or ICE
22   headquarters in Washington.
23        Q    How long have you worked for ICE?
24        A    For ICE over four years.
25        Q    What is your current duty assignment at

DIRECT EXAMINATION

133

1    headquarters?
2    A    I'm a national program manager for human
3    trafficking investigations nationwide.
4    Q    Prior to your stint at headquarters were you
5    actually working out of the Baltimore Washington
6    International Airport?
7    A    Yes.
8    Q    How long were you there?
9    A    About three years.
10   Q    Prior to your time as an immigration and customs
11   agent, where were you employed?
12   A    Internal Revenue Service, Criminal Investigation
13   Division.
14   Q    How long did you work for the IRS?
15   A    Since 1996, for approximately six years.
16   Q    Just, if you will briefly give the Court a sense
17   of your educational background as well?
18   A    I hold a Bachelor's degree in economics and a
19   masters in business administration.
20   Q    Special Agent Karousos, I would like to direct
21   your attention to a particular investigation that you
22   were part of in February and March and April of 2004.
23   In the course of your duties as an ICE agent with the
24   Baltimore Washington International Airport component
25   were you part of a team that investigated possible

---

134

1    narcotics trafficking of someone named Francisco
2    Javier Gonzalez Ruan?
3    A    Yes.
4    Q    I want to direct your attention to two specific
5    aspects of that investigation. First, in the course
6    of your investigation --
7         THE COURT:  Do you know where he is now by
8    the way?
9         MS. LIEBER:  Don't answer that please.
10        THE COURT:  Sorry. He disappeared on us.
11   Thanks to the jail this case has had those kinds of
12   problems. Sorry.
13        I did hear her testify at the trial. So you
14   can probably speed along a little bit.
15        MS. LIEBER:  I just wanted to give Mr. Lyons
16   some more background.
17        THE COURT:  Only one of these motions does he
18   have standing in.
19   BY MS. LIEBER:
20   Q    Now, what I want to do is to shift your attention
21   to two specific aspects of that investigation. First,
22   in the course of your investigation, did you locate an
23   apartment at 9719 Summit Circle, apartment 3-B in
24   Largo, Maryland--
25   A    Yes.

1 Q --as relevant to your investigation?

2 A Yes.

3 Q Did you obtain the lease for that apartment in the

4 course of your investigation?

5 A Yes, I did.

6 MS. LIEBER: I'm going show to Mr. Balarezo

7 what I've marked as Government's Exhibit One for

8 purposes of this hearing.

9 THE COURT: This is the lease that shows that

10 Mr. Jones is the lessee?

11 MS. LIEBER: Yes.

12 THE COURT: What is the term of the lease

13 please? I guess I have it right here. It is a six

14 month or, and it goes from November 11 '03 to May 10,

15 '04. Okay.

16 BY MS. LIEBER:

17 Q Special Agent Karousos, is that a copy of the

18 lease that you obtained from the Summit Circle

19 Apartment complex?

20 A Yes.

21 MS. LIEBER: Your Honor, I would move at this

22 time, Government's Exhibit One into evidence.

23 MR. BALAREZO: No objection for the hearing,

24 Your Honor.

25 THE COURT: Admitted.

---

1 (Government's Exhibit Number One was admitted

2 into evidence.)

3 MR. LYONS: Your Honor, I apologize to

4 interrupt the prosecutor. But out of an abundance of

5 caution I want to make sure that I'm on the record in

6 moving my exhibits into evidence that I previously

7 marked for identification.

8 THE COURT: Any objection?

9 MR. GEISE: No objection, Your Honor.

10 THE COURT: That's true. They're in, the

11 ones from the last.

12 MR. GEISE: To the extent I didn't move mine

13 in, although I think I did, I would move them in.

14 THE COURT: And the one that I asked for, the

15 picture of the dog, that is in too. Okay. I have the

16 lease. I think it was attached to one of your

17 pleadings.

18 BY MS. LIEBER:

19 MS. LIEBER: I think it was.

20 Q Special Agent Karousos, I am going to skip to

21 another aspect of your investigation of possible

22 narcotics trafficking by Mr. Gonzales Ruan.

23 Specifically draw your attention to a property located

24 at 8550 Myrtle Avenue in Bowie, Maryland. Are you

25 familiar with that residence?

137

1   A   Yes.
2   Q   In the course of your investigation, in February
3   of 2004, who was the lessee of that particular rental
4   property?
5   A   Lawrence Maynard.
6   Q   In the course of your investigation, did you
7   develop a lot of information about Lawrence Maynard
8   and someone named Antoine Jones?
9   A   Yes.
10  Q   Specifically, with respect to the Myrtle Avenue
11  location, did there come a time that you sought and
12  obtained a search warrant for that residence?
13  A   Yes.
14      MS. LIEBER:   Your Honor, at this time I am
15  going to show to Mr. Lyons what I've marked as
16  Government's Exhibit Two.
17      THE COURT:   That's the, was that attached?
18      MS. LIEBER:   Your Honor, just for the record,
19  what I'm showing to Special Agent Karousos is the
20  warrant return.
21      THE COURT:   That was attached to
22  Mr. Maynard's motion, I think, as exhibit one,
23  perhaps.
24      MS. LIEBER:   I think it was.
25      Special Agent Karousos, is you will, is that

138

1   a copy of the search warrant itself for that location
2   along with the search warrant return that you
3   completed and filed with the magistrate?
4       THE WITNESS:   Yes.
5   BY MS. LIEBER:
6   Q   What is the date of the search warrant?
7   A   February 27, 2004.
8   Q   When did you and your team actually execute that
9   search warrant?
10  A   February 27, 2004.
11  Q   When did you do the search warrant return to the
12  magistrate in that matter?
13  A   It was March 5, 2004.
14  Q   Now, let's talk a little bit about the information
15  that you developed with respect to the Myrtle Avenue
16  house.  First of all, tell the Court what kind of
17  search warrant was this.  Was there a particular
18  special aspect to it?
19  A   It was the type of warrant that in common language
20  we call sneak and peek.  Basically, you can go in and
21  search.  If you don't seize anything, you can delay
22  notice of the warrant.
23  Q   Is that pursuant to the USA Patriot Act that was
24  passed in the fall of 2001?
25  A   Yes.

139

1  Q   With respect to that particular warrant, did
2  Magistrate Judge Grimm in Baltimore actually
3  specifically authorize the delay of notice for that
4  particular warrant?
5  A   Yes, for 30 days.
6  Q   Now, were you part of the team that actually
7  executed the sneak and peek warrant at 8550 Myrtle
8  Avenue on February 27, 2004?
9  A   Yes.
10  Q   Again, the Court has heard this.  So just briefly
11  give the Court and counsel a sense of how easy it was
12  to make entry into that property.
13  A   It was a little difficult.  Actually, we had hired
14  a locksmith who could not unlock the door.  So we had
15  to go, we entered through a basement window which we
16  had to break to enter.
17  Q   Let's talk about the next day, February 28, 2004.
18  Did you or members of your team observe any people
19  going back to that particular property after you had
20  executed that warrant?
21  A   Yes.
22  Q   Who went back to that property?
23  A   Mr. Gonzalez Ruan, Daniel Zintura and three
24  others.
25  Q   Did they eventually leave that house?

140

1  A   Yes, they went there early in the morning and
2  approximately 45 minutes later they left in a hurried
3  fashion.
4  Q   They left in what sort of fashion?
5  A   In a hurried fashion.
6  Q   Based on that, the fact that you had to break into
7  the house and the high rate of speed with which
8  Mr. Gonzalez Ruan and company fled the scene, what was
9  your impression of whether or not you were burned in
10  that house?
11  A   There was no doubt in my mind that they knew that
12  we had been in the house, that somebody had been in
13  the house.
14  Q   I want to talk just for a moment about, first of
15  all, did you seize anything from the property?
16  A   No, we did not.
17           THE COURT:  Did you take pictures?
18           THE WITNESS:  Yes.
19           MS. LIEBER:  I want to show to defense counsel
20  what I've marked as Government's Exhibit Number Three
21  for purposes of this hearing.
22           THE COURT:  Just to make sure I understand,
23  you had nothing to do with the entry into the Summit
24  Circle, all you did was obtain the lease?
25           THE WITNESS:  Correct.

141

```
 1   BY MS. LIEBER:
 2        Q     Special Agent Karousos, I'm now giving you
 3   Government's Exhibit Number Three.  I want to talk
 4   about that document for a minute.  First of all, what
 5   is that document?
 6        A     It's an application to extend the non-disclosure
 7   of the search warrant, the sneak and peek warrant.
 8        Q     Is that a document that you personally swore out
 9   and obtained from another magistrate in Baltimore,
10   Maryland?
11        A     Yes.
12        Q     Your Honor, at this time, I would move Government's
13   Exhibit Three into evidence?
14              THE COURT:  Any objection?
15              MR. LYONS:  No objection.
16              (Government Exhibit No 3 was admitted into
17   evidence.)
18   BY MS. LIEBER:
19        Q     Special Agent Karousos, before we actually get to that
20   document, let me ask this.  In the course of your
21   investigation into the Myrtle Avenue property, did you come
22   to learn in the days following the search warrant, so the
23   days following February 27 of '04, that Mr. Maynard had
24   actually vacated those premises?
25        A     The day after, I believe it was March 1,
```

142

```
 1   Mr. Maynard gave notice that he was going to vacate.
 2        Q     Was that notice effective immediately?
 3              MR. BALAREZO:  Objection to the leading
 4   nature of the entire examination.
 5              THE COURT:  But actually it's not your
 6   motion, is it?
 7              MR. BALAREZO:  No, but I still, there is
 8   mention of 9719 Summit Circle, it is a conspiracy that
 9   involves Mr. Jones.  I think I do have standing to
10   make an objection.
11              THE COURT:  I think your objection has to do
12   with Summit Circle.  Okay.
13   BY MS. LIEBER:
14        Q     What was the effective date of Mr. Maynard's
15   relinquishing the lease on that property, to the best
16   that you recall?
17        A     It was fairly quickly.  I can't remember the exact
18   date.
19        Q     Was it within a week of the execution of the
20   search warrant?
21        A     I honestly can't remember.  It was very quick, but
22   I can't remember exactly.
23              THE COURT:  Who told you about it?  How did you
24   learn about Maynard?
25              THE WITNESS:  The real estate company.
```

143

BY MS. LIEBER:

2  Q  Getting to Government's Exhibit number three.

3  Towards the ends of the 30 day delay of notice period

4  that was authorized by Magistrate Grimm, did you do

5  anything to extend that notice?

6  A  Yes.

7  Q  Tell the Court what you did.

8  A  Asked for an extension of non-disclosures.

9  Q  Was that granted by a magistrate judge in

10  Baltimore?

11  A  Yes, it was.

12  Q  So now we're talking about towards the end of

13  March of 2004?

14  A  Yes.

15  Q  And the end of that 30-day period would be what?

16  A  Approximately, April 26, 27 of 2004.

17  Q  At that time, say late April of 2004, were you

18  ready to give notice to Mr. Maynard about your entry

19  into that property?

20  A  Yes.

21  Q  Tell the Court what, if anything, affected your

22  giving notice to Mr. Maynard?

23  A  I had never come across in my almost 10 years as

24  an agent the situation where the property had been

25  vacated.  So, I went to the judge to ask how to serve

---

144

1  notice.  Do I just leave it at the vacant house or do

2  I deliver it to where Mr. Maynard really lived or, at

3  that point, I was informed that notice didn't need to

4  be given since he had vacated.

5  THE COURT:  Who informed you?

6  THE WITNESS:  The judge's chambers.

7  BY MS. LIEBER:

8  Q  Sitting here today, do you remember specifically

9  which magistrate judge it was in Baltimore?

10  A  Quite honestly I don't remember.  I would imagine

11  I went to Judge Gessner's chambers since she had

12  authorized the extension.  But I think that she wasn't

13  available but her clerk asked, relayed my question to

14  her and the answer was relayed back from the judge to

15  me.

16  Q  At the point that you consulted with the judge in

17  Baltimore, what was your intention with respect to

18  giving notice?

19  A  How to do it.  I just didn't know how notice was

20  to be given to again, a vacant property.

21  Q  Finally, Special Agent Karousos, in recent months

22  have you and I had a conversation about what happened

23  in terms of the delay of notice and the subsequent not

24  ever giving of notice?

25  A  Yes.

145

1    Q   When we initially talked, did you have a slightly
2    different recollection of how that all happened, sort
3    of step by step?
4    A   Yes.  First of all, I didn't remember asking for
5    the extension.  But I may have said initially that,
6    when I did the return of warrant, I had asked about
7    the notice.  But that wouldn't have made any sense.
8    Q   Since that time, have you reviewed the extension
9    and did that help jog your memory?
10   A   Yes.
11           MS. LIEBER:  Court's indulgence.
12           That's all I have Special Agent Karousos,
13   thank you.
14                    CROSS EXAMINATION
15   BY MR. LYONS:
16   Q   Now agent, you testified about going into the
17   premises on February 27 of 2004 and taking a few
18   photographs?
19   A   Yes.
20           THE COURT:  Which premise now?
21           MR. LYONS:  I'm sorry, we're talking about
22   8550 Myrtle Avenue.
23           THE COURT:  That's the one that we just,
24   okay.
25   BY MR. LYONS:

146

1    Q   Then you observed the following days some
2    individuals leaving that premise; is that correct,
3    that is the 28th?
4    A   Entering and leaving.
5    Q   Actually, you went back into the premises on that
6    same day, the 28th, did you not?
7    A   Yes.
8    Q   And that was you and some brother ICE agents or
9    brother or sister ICE agents?  Did you go by yourself
10   or did you have --
11   A   No, with other agents and with the real estate
12   manager.
13   Q   He let you in?
14   A   Yes.
15   Q   The real estate manager.  And before going in on
16   the 28th, did you explain why it was to the real estate
17   manager that you were going in, needed to go in?
18   A   We didn't disclose the details of the
19   investigation, but yes, we told him that we suspected
20   that there was drug smuggling activity going on in
21   that premises.
22   Q   You were in there what 15, 20 minutes or so?
23   A   Approximately, on the 28th, approximately.
24   Q   Did you take any photographs at that time?
25   A   No.

147

1    Q    Did you notice anything that was different from
2    the apartment on the 28th than it was on the 27th, or
3    the premises rather?
4    A    A few shopping bags full of new clothing were
5    taken.
6    Q    But no drugs, no guns?
7    A    No.
8    Q    Nothing of that sort.
9         You asked the resident manager to, you would
10   appreciate it if he kept it confidential the fact that
11   you went in on the 28th, did you not? And not advise
12   Mr. Maynard, the tenant?
13   A    We probably had a conversation, yes, to that
14   effect.
15   Q    When you went on the 28th you knew that the tenant
16   was Mr. Maynard, did you not?
17   A    The lessee, right.
18        THE COURT:   You said at some point you
19   learned that he had left the premises.  When did that
20   happen?
21        THE WITNESS:   The day after, the March 1 was
22   when he gave, he gave notice that he was breaking the
23   lease early.
24   BY MR. LYONS:
25   Q    That was a request to break the lease.  I believe

148

1    your testimony in answer to the question was that he
2    intended to leave the premises.  Isn't that fair to
3    say?
4    A    Yes.
5    Q    You don't know in fact whether he actually left
6    the premises on March 2, do you?
7    A    No.
8    Q    You don't know whether he was released from the
9    premises as of March 2, that's fair to say, released
10   from his obligations over the lease?
11   A    I don't remember the exact date.  But I confirmed
12   that at some point he had vacated the premises.
13        THE COURT:   With the real estate manager?
14        THE WITNESS:   Yes.
15   BY MR. LYONS:
16   Q    But when you applied for your application for the
17   extension, you state in the application, do you not,
18   that as of March 23, that there was activity at that
19   premises which seemed to indicate that Mr. Maynard had
20   not given up the premises.
21        I'll refer you to the government exhibit that
22   you have there, your extension.  Page four which
23   reads, does it not, "This recent activity is
24   inconsistent with the declared intention of Maynard to
25   vacate the premises."

149

1    A    Yes.   There was a van that was parked in the yard
2    that was still there.   And other vehicles were
3    observed coming and leaving.   I don't believe
4    Mr. Maynard lived there, but there was activity
5    related to the activity that was going on there.
6    Q    You didn't have any discussions with the resident
7    manager, I take it, that, is there a new tenant in
8    there or what have you.   You assumed, did you not,
9    that the premises was still under the lease of
10   Mr. Maynard with this suspected illegal activity?
11   A    Yes, since a vehicle -- yes.
12        THE COURT:  Did that understanding change I
13   think is the point.   That's at the time you moved for
14   an extension, which is March something in exhibit
15   three.   You think that maybe Maynard is still there
16   doing what he was doing before.
17        THE WITNESS:  I don't believe Maynard was
18   ever there but, scratch that.   I don't believe
19   Mr. Maynard lived there.
20        THE COURT:  I understand that.   But did there
21   come a point in time subsequent to that extension
22   where you confirmed with somebody, whether it be the
23   real estate agent or the landlord or management agent
24   that no one was there anymore?
25        THE WITNESS:  Yes.

150

1        THE COURT:  That the time, whatever you
2    thought was happening as of the 23rd of March had now
3    ceased?
4        THE WITNESS:  Yes.
5        THE COURT:  Then, you went back to some
6    magistrate judge's chambers to figure out what to do.
7    Is that what you're telling me?   I'm trying to get the
8    chronology.
9        THE WITNESS:  Time-wise, when the second 30-
10   day period was getting close, yes, I went, I confirmed
11   that the residence was vacant.   The van had been
12   removed.
13   BY MR. LYONS:
14   Q    Now, you don't make any reference to the fact that
15   you went on the 28th, the day after you went in on,
16   pursuant to the search warrant, you don't make any
17   detail reference to that in your application for the
18   extension, do you?
19   A    No, because it was irrelevant to why we wanted to
20   extend --
21   Q    Do you think it was relevant to Judge Grimm that
22   you go through this process of getting a specific
23   sneak and peek warrant under the Patriot Act to allow
24   you to go into the premises?   And you do go into the
25   premises, and you go in the following day without the

151

1   authority of the warrant?  And then, you go to get an
2   extension of the initial warrant and you don't say
3   anything about going in there on the 28th?
4   A   No, it's irrelevant.  The extension, we requested
5   the extension for the same reasons we requested the
6   sneak and peek to begin with.
7   Q   You got the extension from Magistrate Judge
8   Gessner; is that correct?
9   A   Gessner.
10  Q   Was there any particular reason that you didn't go
11  back to Judge Grimm?
12  A   I think she was the duty -- I have no influence as
13  to which judges sign these orders, sir.
14  Q   You were the one that made the application and
15  actually swore out the request for the extension
16  before Judge Gessner; is that correct?
17  A   Yes.
18  Q   Now, you get the extension for 30 days which was
19  going to commence on March 26, which would give you an
20  additional 30 days, and you are coming towards the --
21  strike that.
22      When do you go speak with the magistrate
23  judge about giving notice to Mr. Maynard?
24  A   Towards the ends of the 30-day period.
25  Q   Was the 30 day period still in existence to the

152

1   best of your recollection before you went to the
2   judge?
3   A   Yes.
4       THE COURT:  Towards the end of the 30-day period
5   meaning the second 30-day period?
6       MR. LYONS:  The second 30-day period.
7       THE COURT:  Okay.
8   BY MR. LYONS:
9   Q   Is it your testimony that you were going to
10  notify -- first of all, did you have suspicions of
11  Mr. Maynard being involved with this drug operation
12  that was working out of 8550 Myrtle Avenue according
13  to your beliefs at the time?
14  A   Yes, I believe he was renting the house to
15  facilitate their activities.
16  Q   From the information that you developed that there
17  were substantial amounts of drugs and monies
18  associated with that particular premise from
19  February 27 up to the end of April when you got that
20  second extension?
21  A   Potentially there could have been, yes.
22  Q   Wasn't that the reason to get the warrant in the
23  first place because you said there were probabilities
24  of drug activity in that place?
25  A   Yes.

153

1    Q    There was more than a possibility, correct?

2    A    Yes.

3    Q    It's your testimony that you were going to

4    actually advise Mr. Maynard the fact that the ICE

5    officials had been to that premises on February 27 and

6    give notice of the warrant to search for drug

7    activities?

8    A    Yes.

9    Q    All right.  Now, to find out how to give that

10   notice, if I understand your testimony correctly,

11   that's one of the reasons or that is the reason that

12   you went to speak with the magistrate judge?

13   A    Yes.

14   Q    Now, first of all, did you actually go to the

15   chambers of the judge and speak with the judge face to

16   face?

17   A    I honestly don't remember if I spoke to the judge.

18   I don't think I spoke to the judge face to face.  I

19   went to the judge's chambers to speak to the judge.

20   Q    Do you know what judge's chambers we're talking

21   about for sure?

22   A    Judge Gessner.

23   Q    It was Judge Gessner, to the best of your

24   recollection?

25   A    Yes.

---

154

1    Q    You are not 100 percent sure of that, are you?

2    A    No, it was either Judge Gessner or Judge Grimm.

3    One of the two who had signed.

4    Q    Who were you seeking this advice and relaying the

5    problem to?  Is this the judge's secretary or the

6    judge's law clerk?

7    A    I went to speak to the judge but the judge was

8    unavailable.

9    Q    You spoke with whom?

10   A    The individual who sits right outside of his

11   chambers, his or her chambers and expressed my need to

12   ask a specific question.  I didn't have a return.  So

13   I didn't need the judge to sign anything, I just

14   needed to ask that question.

15   Q    How many Patriot Act warrants, these so-called

16   sneak and peek warrants had you been involved with

17   prior to February 27, 2005?

18   A    This was my first one.

19   Q    What was it that you told this person sitting

20   outside of the judge's office?

21   A    That per the sneak and peek warrant regulation,

22   service -- notice had to be served.  And I had a

23   couple of days to do that, but I didn't know how to do

24   that because the individual no longer resided at the

25   residence.  So, do I serve notice on the residence or

155

1 do I serve it at the residence of the previous renter?

2 I didn't know how to do it.

3 Q All right. Did you get a response to that inquiry

4 right then and there or did that come later after you-

5 -

6 A No, right then and there. The clerk or whomever

7 that individual was went and actually spoke to the

8 Judge.

9 Q Went into the judge's, went into the room?

10 A Behind the door, yeah. I'm not exactly sure.

11 THE COURT: Did the person say I've spoken to

12 the judge, magistrate judge and they say this?

13 THE WITNESS: Yes.

14 THE COURT: How was it communicated to you?

15 THE WITNESS: Yes, the judge stated that

16 notice didn't need to be served.

17 BY MR. LYONS:

18 Q There was no court reporter there at the time

19 obviously from the way you recall the events?

20 A Court reporter?

21 Q Yes.

22 A There was one individual.

23 Q There was nobody taking notes about your inquiry

24 to the judge what have you?

25 A No.

156

1 Q When you got back to the office, you've done a lot

2 of detailed reports in this case, reports one through

3 five, details of your activities, what have you,

4 correct?

5 A Yes.

6 Q And in one of those reports you mention that you

7 go and get this extension from Judge Gessner; is that

8 correct?

9 A Yes.

10 Q Do you have a report in which you formalize the

11 fact that you went to the judge's chambers to get

12 instruction on this notice issue and what was, what

13 you were told?

14 A No, it's not in any of my reports.

15 Q Did you discuss it with any United States

16 Attorney?

17 A Yes.

18 Q After the judge gave you, or after you received

19 that notification from chambers?

20 A With the Assistant U.S. Attorney, yes.

21 Q Did you discuss it with general counsel, of ICE?

22 A No.

23 Q What, if anything --

24 THE COURT: What do you mean you discussed it

25 with the United States Attorney? At the time that you

157

1    were getting the information from the magistrate judge

2    you also were in touch with an Assistant United States

3    Attorney?

4         THE WITNESS:  I believe I asked the AUSA

5    first.

6         THE COURT:  So somebody suggested you go back

7    and --

8         THE WITNESS:  Yes, the laws, those sneak and

9    peeks are a relatively new animal.  So, no one knew

10   off the top of their head what to do in this

11   situation.

12   BY MR. LYONS:

13   Q    And you knew, I take it at that point in time,

14   Mr. Maynard's address, family address was 7711

15   Greenleaf Road, Hyattsville, Maryland?  You were aware

16   of that from the documentation you had?

17   A    Oh, yes.

18   Q    You were aware of phone number (301)773-5916?

19   A    I don't recall whose number that is right now.

20   Q    The bottom line is you did not leave a copy of the

21   notice or send a copy of the notice to Mr. Maynard,

22   did you?

23   A    No, because I was advised by the judge that that

24   was not necessary.

25        MR. BALAREZO:  Your Honor, I would like to

---

158

1    inquire on this.

2         THE COURT:  You don't have any standing.  You

3    are only available for Summit Place, you can do that.

4         MR. BALAREZO:  If I could just have the agent

5    available for that portion.

6         THE COURT:  She is available right now for

7    Summit.  She is available for cross on Summit now.

8         MR. BALAREZO:  That's what I wanted to do.

9         THE COURT:  Yeah.  Okay.

10        MR. LYONS:  Your Honor, no further questions

11   on this point.

12        THE COURT:  All right.

13        MS. LIEBER:  Your Honor, all I asked her

14   about Summit Circle is the lease.

15        THE COURT:  That's it.  She doesn't have

16   anything about the actual search.

17        MR. BALAREZO:  Can I ask?

18        THE COURT:  Go ahead, you can ask.  Depends on

19   what you are asking.

20        MR. BALAREZO:  I will call her as a witness

21   in the portion of my motion then.

22        THE COURT:  On Summit?

23        MR. BALAREZO:  Yes.

24        THE COURT:  Go ahead and get it over with

25   now.  We're not going to hold her up here.

159

```
 1                MR. BALAREZO:  Good afternoon, agent.
 2
 3                      CROSS EXAMINATION
 4   BY MR. BALAREZO:
 5   Q    First of all, you gave your name today as Katerina
 6   Karousos?
 7   A    Yes.
 8   Q    Just so the record is complete, you are formerly
 9   known as Katerina Gikas?
10   A    Yes.
11   Q    You testified at a grand jury on March 14, 2006 in
12   this case under the name of Katerina Gikas?
13   A    Yes.
14   Q    You previously testified at trial in this case
15   last year, which began October 6 through December
16   something or other under the name of Katerina Gikas?
17   A    Yes.
18   Q    You indicated that you subpoenaed records relating
19   to 9719 Summit Circle?
20   A    Yes.
21   Q    When did you subpoena those records?
22   A    I don't remember the exact date.
23   Q    Did you make any notes?
24   A    I probably have a copy of the subpoena.  I just
25   don't have it with me.
                MR. BALAREZO:  Your Honor, I would make a
```

160

```
 1   request that the government provide that.  I don't
 2   recall seeing any subpoena.
 3                THE COURT:  Why would you subpoena?  That's
 4   what I don't understand.  What would you be doing
 5   subpoenaing anything.  You mean before you went there?
 6                THE WITNESS:  Are you asking before?
 7                MR. BALAREZO:  I'm asking you when you
 8   subpoenaed the records.
 9                THE COURT:  Wait.  Can we please focus on
10   what happened up to the time of the going into Summit
11   Circle.  She didn't subpoena anything I suspect.
12                MR. BALAREZO:  That's my simple question.
13   When did she subpoena the lease, the information that
14   she said she --
15                THE COURT:  How did you get the lease?  You
16   assume it came by subpoena.  I don't know that.
17                Do you know?  Did you do that?
18                THE WITNESS:  Yes, Your Honor.  I subpoenaed
19   and went to the management office and requested the
20   records.  But it would have been the week after the
21   weekend of February 6, 7, 2004.
22   BY MR. BALAREZO:
23   Q    How do you know that?
24   A    Because that's when we first became aware of that
25   property and we, that's when we first became aware of
```

161

1  that property. So I would have subpoenaed the
2  information after that.
3        THE COURT: I'm confused by the notion of
4  subpoenaing here.
5        MR. BALAREZO: I believe she testified that
6  she subpoenaed the lease. I'm only trying to find out
7  when she subpoenaed the lease.
8        THE COURT: I know.
9        You don't have subpoena power. What am I
10  missing here? Was there a grand jury going on at the
11  time?
12        MS. LIEBER: Admin subpoenas in drug cases.
13  You can do administrative subpoenas.
14        THE COURT: Okay, so after the sixth and
15  seventh, you issued an administrative subpoena?
16        Okay. Sorry.
17        MR. BALAREZO: Your Honor, may I make a
18  request? Just to keep this record absolutely clear
19  because I think there are some issues that will be
20  important, can we finish whatever is going on right
21  now?
22        THE COURT: We're finishing today.
23        MR. BALAREZO: Can we do this all in one
24  sector, in one part, the 9717 Summit Circle motion?
25  Let Myrtle Avenue finish and then I'll call her as a

162

1  witness.
2        THE COURT: No, just finish up.
3        MR. BALAREZO: I don't want to be constrained
4  by what's been said.
5        THE COURT: You are not constrained.
6        MR. BALAREZO: Very well.
7        THE COURT: But I have to see what the
8  relevance is to the motion. They're constrained by
9  the motion. This is not a fishing expedition. But
10  that's fine. She got the lease some way or another.
11  It came by way of a subpoena. Go ahead. I want to
12  finish hearing the witnesses.
13        MR. BALAREZO: I'm trying, Your Honor.
14  BY MR. BALAREZO:
15  Q   So you can't give me a date that you subpoenaed
16  the lease for 9719 Summit Circle; is that right?
17  A   An exact date, no.
18  Q   Have you reviewed the subpoena recently?
19        MS. LIEBER: Objection, relevance.
20        MR. BALAREZO: I can't tell. Go ahead.
21  Your Honor, that's why I need to ask.
22        THE COURT: I know, that's why I'm letting
23  you.
24  
25  BY MR. BALAREZO:

163

1   Q   Have you reviewed the subpoena recently?

2   A   No.

3   Q   Do you have any notes that relate to your

4   subpoenaing of that document?

5   A   Not with me here, no.

6   Q   What prompted the subpoena of the records from

7   9719 Summit Circle?

8       MS. LIEBER:  Objection of the relevance to

9   the motion at issue.

10      THE COURT:  I can't tell.  When did the

11  agents go in there and take pictures at Summit?

12      MR. BALAREZO:  They did not take pictures at

13  Summit.  Maybe it changed this time around but last

14  time there were no pictures taken.

15      THE WITNESS:  Your Honor, are you asking me?

16      THE COURT:  Let's get a date.  I know it was

17  in February, '04.  When did the people who worked for

18  you, if you know, go into this apartment?

19      THE WITNESS:  The people I worked with went

20  in, it was either late February 7th or early

21  February 8th early in the morning.  I'm not exactly

22  sure what time.

23      THE COURT:  Had you or anybody that worked

24  for you seen the lease by this point in time?

25      THE WITNESS:  No, I don't believe so.  The

---

164

1   actual lease?

2       THE COURT:  Yeah.

3       THE WITNESS:  No, I don't believe so.

4       THE COURT:  So, when they entered, nobody you

5   know of that worked for you, had seen the lease?

6       THE WITNESS:  I don't think so.

7       THE COURT:  All right.  So, when you went in,

8   but you don't know, you didn't go in.  All you did in

9   what you testified to is -- all we know from your

10  testimony before is you got a lease, exhibit one.

11      THE WITNESS:  That was after that weekend,

12  yes.

13      THE COURT:  Okay.  And that came by

14  administrative subpoena.

15      So, what do you want to know now?  This is

16  after they did whatever it is you want to suppress.

17  That's what I'm confused about.  That much we have

18  established.  So, she nor her agents as far as the

19  record is going to be at the moment, did not review

20  the lease--

21      Correct me if I'm wrong.

22      --prior to going into the Summit Circle

23  apartment 3-B.

24      MR. BALAREZO:  Can I approach, Your Honor, ex

25  parte so I can just make a brief proffer as to what

165

1    I'm trying to do here?

2         THE COURT: Yes, I guess you can.

3         (Ex Parte Bench Conference)

4         MR. BALAREZO: First of all, I'm just trying

5    to clarify something because there was testimony at

6    trial. And I've just come into possession of several

7    reports of investigation that this agent made.

8         I think that there is a real problem with the

9    time line that they established here before because I

10   have reason to believe that these agents entered the

11   apartment at Summit Circle on another occasion besides

12   the one where they said that the, besides the time

13   that is the subject matter of the motion to suppress.

14   I'm trying to find out if it was before or after so

15   that I can move to suppress either whatever is before

16   or after. I just don't know.

17        THE COURT: You are wasting a lot of time.

18   You can ask her whether she knows. Right now, I'm

19   trying to focus on -- if I suppress it once you don't

20   have to worry about it coming in a second time.

21        MR. BALAREZO: It depends on when it was.

22        THE COURT: No, they're not going to come

23   through back door if I said it was wrong on the 7th, it

24   be wrong thereafter.

25        All right.

---

166

1         (Open Court)

2         THE COURT: Do you know, did you or anybody

3    else enter that apartment any other time besides late

4    February 7 --

5         MR. BALAREZO: Your Honor, I object.

6         THE COURT: Overruled.

7         --or the eighth of February. Do you have any

8    knowledge of anybody entering that apartment on behalf

9    of law enforcement at any other time?

10        THE WITNESS: No.

11        THE COURT: I'm not going to spend forever

12   here.

13        MR. BALAREZO: Your Honor, I'll take that and

14   I'll sit down and wait for my motion to question her.

15   And I'll ask that the agent be on call for me to call

16   her.

17        THE COURT: You can be on call. I want to

18   hear the last person now on this.

19        You are finished. You don't have anything

20   else. Can you wait outside while I hear the other

21   person?

22        Can I clarify a thing or two here?

23        Can she sit outside just a minute? We're

24   going to finish the evidence if I can help it.

25        MS. LIEBER: I have one redirect question

167

1 based on Mr. Lyons' question about Myrtle Avenue.

2 THE COURT: Quick, yes.

3 REDIRECT EXAMINATION

4 BY MS. LIEBER:

5 Q Mr. Lyons, Mr. Maynard's attorney, asked you

6 questions about entering the Myrtle Avenue property

7 the day after the sneak and peek in the company of the

8 resident manager. Do you remember that?

9 A Yes.

10 Q What did that resident property manager say to you

11 about why he was doing a walk-through with you?

12 A There is apparently something in the lease, I

13 suspect in all Maryland leases, that states that if

14 there is any suspicion of criminal activity that the

15 lessee is in violation of the lease.

16 Q Did that particular rental manager explain that to

17 you?

18 A Yes. He was explaining that's how, that's why he

19 was allowing us to walk through with him.

20 THE COURT: But you didn't see or do anything

21 different that day than the day before? All your

22 observations were the same except that some things

23 were not there anymore?

24 THE WITNESS: Yes, Your Honor.

25 THE COURT: Just for clarification here, on

---

168

1 the time that they entered Summit, she does not know

2 what was seen or not seen anyway. The subject of the

3 suppression is they took some pictures and made some

4 observations.

5 MS. LIEBER: Observations only.

6 THE COURT: But that is what would be

7 suppressed.

8 MS. LIEBER: Right. No photos.

9 THE COURT: Thank you.

10 Could you step down. Don't discuss your

11 testimony.

12 MR. LYONS: I have a couple of questions as a

13 result of this last question by the prosecution.

14 MS. LIEBER: Your Honor, that was redirect

15 tied specifically to an area that I didn't go into the

16 first time around.

17 THE COURT: I know. Let's go ahead. You can

18 ask.

19 RECROSS EXAMINATION

20 BY MR. LYONS:

21 Q You are talking about the resident manager. Is

22 that Mr. William Kelly at Remax?

23 A It was Remax.

24 Q Isn't it a fact that you asked when you went in there

25 and said you had to get into the apartment --

169

1    A    I'm sorry.

2    Q    To the premises, I'm talking about Myrtle Avenue

3    now.

4    A    Okay.

5    Q    The lady said well, I'm going to have to check

6    with the tenant.  You indicated in effect, the tenant

7    is not available, well I'm going to have to check with

8    the owner.  You checked with the owner and got the

9    owner's permission?

10   A    I believe I had checked with the owner first.  And

11   the owner directed me to the real estate agent and

12   told, I had tracked down the owner first.  I had

13   already talked to the owner.  And the owner directed

14   me to the real estate agent.

15   Q    It is your testimony that Bill Kelly or the

16   resident manager or whoever it was that let you in,

17   that he was the one that came up with initially this

18   business about the lease?

19   A    Yes, of course.

20        MR. LYONS:  No further questions.

21        THE COURT:  Thank you.

22        Would you wait outside.

23        (Witness excused)

24        (William Winter, witness for the government,

25   was sworn.)

United States v Antoine

PG1

Attn: O.P.R - I.C.E
    PO Box 14475
    Washington DC 20044

C.C: Inspector General Office
    950 Pennsylvania Ave NW
    Investigation Division
    Washington DC 20530

C.C: Office of Attorney General
    950 Pennsylvania Ave NW
    Department of Justice
    Washington DC 20535

Dear: O.P.R - I.C.E

    This complaint is Relating From
My Criminal Investigation in
Criminal case (05-0386-ESN).

    The complaint is on I.C.E
Supervisor William (Bill)
Winters and His Unknown
name I.C.E Agents team For
Violating My 4th Amendment
Rights and ...

In Petitioner criminal trial Honorable Judge Huvelle Grante a supression in the favor of th defendant (Jones's) because I.C supervisor William (Bill) Winter and his I.C.E Agents team unlawfully enter the summit Circle apartment without a search warrant violating 18 USCS 2236 (search without a warrant)

18 U.S.C.S 2236 - Search without a warrant.

Whoever, being an officer, Agent or employee of the United States or any department or agency there of engaged in the enforcement of the United States "search any private dwelling and occupied such dwelling without a warrant direct such search, or maliciously search any other building or property without a search warrant" violates 18 USCS 2236.

On Tuesday November 6 2007-
9:30 AM. I.C.E Supervisor Bill
Winters testified And Admitted
He And His I.C.E Agents Went
into summit circle Apartment
Without A Warrant.

Page 174 Line 14-21.
(Q) Just to cut to the chase At
no point "did you obtain A search
warrant" For the Apartment Known
As 97 something Summit circle? I
Forget

The court: The summit circle
Apartment.

Mr Balarezo: (Q) The summit
Apartment that we're talking About
(A) (Bill winters): No

In Honorable Judge Huvelle
Opion, she writes: Winter
explained that it was Logistically
Seemed impossible over the
weekend to get A warrant.

The court cant credit that
testimony. We All Know you can
get A warrant under circumstances
of emergency over the

P.4

ever be recognized as an excuse for not abiding by the Fourth Amendment and it's prescription against unreasonable searches an seizures.

(Later in her opion) Honorable Judge Huvelle stated; Therefore, to the extent that the police made observation, or the agents, I should say, made observation "when they entered the apartment at summit circle" that weekend, the "first weekend" in February the court will grant the motion.

## Conclusion

There's clear and convincing evidence that Bill Winters and His I.C.E agents team unlawfully enter the summit circle apartment with out a search warrant on Sunday night February 8 2004 and a week later Bill Winters "Returned," paid Nate Richburg, summit circle maintenance

POS

APARTMENT without A search
WARRANT, A clear violation of
my 4th amendment Rights ( twice)
And A violation of 18USCS 2236 -
search without A warrant (twice).

I am Humbly Asking O.P.R - I.C.E
to investigate this complaint And
whom found Guilty of the
Unlawful Entry of the Summit
circle Apartment without A
WARRANT, be Sanction or be
Reprimanded for their misconduct.

Respectfully Submitted

Antoine Jones
241-912
D.C. Jail
1901 D St SE
Washington D.C. 20003
sign: Antoine Jones