## PERJURY - FRAUD ON THE COURT AND OBSTRUCTION OF JUSTICE CHARTS

DEFENDANT JONES WILL SHOW CLEAR AND CON-VINCING EVIDENCE THAT FBI AGENTS KELLIE O'BRIEN AND M.P.D. DETECTIVES MISREPRESENTED THE CLUB LEVEL'S "GUN" PHOTOS AS A GUN IN THE CLUB LEVEL'S OFFICE AND PLANTED SOME HOTEL RECEIPTS AND SOME HOTEL KEY CARDS IN CLUB LEVEL'S OFFICE, VIOLATING 18 U.S.C.S. § 1001, 1519

M.P.D. DETECTIVE PERJURIED HERSELF ON THE GRAND JURY, BOTH NORMA HORNE AND FBI AGENT KELLIE OBRIEN PERJURIED THEMSELVES IN MR JONES' CRIMINAL TRIAL VIOLATING 18 U.S.C.S. § 1621, 1622, 1623

### OBSTRUCTION OF JUSTICE

(EXHIBIT #1)   PHOTO LOG SKETCH

PHOTO NO. 21 - POINT OUT GUN, PHOTO NO. 22 - GUN WITH MAGAZINE, PHOTO NO. 23 - CLOSE-UP OF THE GUN.

(EXHIBIT #2)   3 CLUB LEVEL'S PHOTOS OF GUN
KELLIE OBRIEN PHOTOGRAPHER

P6 2

<u>SPECIAL NOTE</u> : IT'S AN 18 U.S.C.S. § 1001, 1519
VIOLATION .WHEN SHE WROTE 10-21-05, RUGER P94
9mm. PISTOL, SERIAL # 308-07610 RECOVERED FROM
1960 MONTANA AVE NE, WASHINGTON, D.C. ... THIS IS
CLEARLY A MISREPRESENTATION OF THE GUN BEING
AT CLUB LEVELS ON OCTOBER 24, 2005.

(EXHIBIT #3)  FD-302  DATE OF TRANSCRIPTION 11-21-2005

SPECIAL AGENT KELLIE OBRIEN, ALSO FALSIFIED THIS
FEDERAL DOCUMENT VIOLATING 18 U.S.C.S. § 1001, 1519

(EXHIBIT #4)   CLUB LEVELS PROPERTY RECEIPT.

HERE  MPD DETECTIVE NORMA HORNE FROM THE SAFE
STREET TASK FORCE FALSIFIED THIS FEDERAL DOCUMENT
WHEN SHE WROTE "RUGER P94 9mm SERIAL NO.
308-07610  ROOM 11" ON LINE 5 AND WROTE
"MAGAZINE W/AMMO TAKEN ITEM" ON LINE 5 A

(EXHIBIT #5)  TWO PHOTOS OF CLUB LEVELS, PHOTOGRAPH BY
AGENT KELLIE O'BRIEN.

<u>FRAUD ON THE COURT</u> - <u>PERJURY</u>

(EXHIBIT #6)  JANUARY 26, 2006 GRAND JURY OF M.P.D.

DETECTIVE NORM HORNE    PAGE 2-4,5

NORMA HORNE PERJURED HERSELF TO THE GRAND
JURY WHEN SHE TESTIFIED SAYING "WE" RAISED
THAT UP AND THE GUN WAS UNDERNEATH AND
YOU'LL SEE THAT PHOTO OF THE GUN WITH THAT RAISED.
PAGE 5 LINE 9, 10

NORMA HORNE TRIAL TESTIMONY
2-8-13    PAGE 39-140

IN 2-8-13 AM SESSION PAGE 44 LINE 10-25, PAGE 45
LINE 1-7
MR JONES: (Q) DID YOU HEAR ANY OF THE AGENTS SAYING
GUN, GUN, GUN TO INFORM THE OTHER AGENTS THAT THEY
FOUND A GUN?

(A) "ALL THEY DO IS CALL OUT SIR. THEY
MIGHT SAY KELLIE, COME SEE THIS. NORMA, YOU NEED
TO COME CHECK THIS OUT"

THE COURT: DID YOU HEAR SOMEBODY SAY THAT?
THAT'S ALL.

THE WITNESS: NO BECAUSE --
THE COURT: "YES" OR "NO"
THE WITNESS: NO
THE COURT: WHATEVER IT IS THAT -- SHE DIDN'T
HEAR ANYTHING

PG 4

(Q) SO WHEN THESE AGENTS FOUND THAT GUN OR NOTICED THIS GUN, WAS YOU IN THAT OFFICE?

THE COURT: WHEN IT WAS FIRST FOUND?

MR JONES: YES

THE WITNESS: NO, I WASN'T STANDING IN THERE AT THAT TIME.

(Q) SO YOU COULDN'T SEE THROUGH THE OFFICE SO YOU DON'T KNOW WHO FOUND THAT GUN, DO YOU?

(A) IT SAY WHO LOCATED THE GUN ON THE BOX ON WHO SEIZES. WE DO A SEIZURE LIST SIR... THE BOTTOM LINE IS DETECTIVE NORMA HORNE MISLED THE GRAND JURY BECAUSE SHE WASN'T IN CLUB LEVEL'S OFFICE WHEN THIS ALLEGED ~~ALLEGED~~ GUN WAS SUPPOSED TO BE FOUND.

NORMA HORNE COULDN'T EVEN DESCRIBE WHO FOUND THE GUN.

PAGE 47 LINE 11-14

(Q) DETECTIVE HORNE, CAN YOU DESCRIBE THIS PERSON WHO FOUND THE GUN TO THE JURY?

(A) OTHER THAN BEING AN FBI AGENT AND HAVING ON GLOVES, NO. IT WAS A MALE. LIKE I SAID, HE WAS A WHITE MALE.

PAGE 53 LINE 20-25

(Q) DETECTIVE HORNE, IS THIS THE GENTLEMAN THAT YOU SPOKE OF?

THE COURT: WHO? WAIT A MINUTE. I'M LOOKING

AT A GUN.

MS. URSCHEL: YOUR HONOR, THE ELMO KEEPS -- NO THIS TIME IT'S RIGHT IT'S THE GUN.

MR. JONES: YEAH, IT'S THE GUN

THE WITNESS: IT'S A GENTLEMAN'S ARM IN THE PHOTO HOLDING THE WEAPON, YES.

(Q) SO YOU BEEN AT TWO TRIALS AND YOU CHECKED YOUR NOTES. AND THE SAME QUESTIONS ABOUT WHO IS THIS PERSON WITH THIS MYSTERIOUS HAND, YOU DON'T HAVE THE NAME YET?

THE COURT: SHE DOESN'T REMEMBER


PAGE 55 LINE 8-24

THE COURT: DOES THAT REFRESH YOUR RECOLLECTION AS TO WHO THE SEIZING WAS FOR THE GUN, THE PERSON WITH THIS HAND?

THE WITNESS: NO, THE SEIZING AGENT-- I DON'T KNOW WHO ACTUALLY -- I DON'T -- IT DOESN'T SAY WHICH AGENT ACTUALLY LOCATED THE GUN. DOESN'T HAVE THE GENTLEMAN'S NAME.

THE COURT: SO NOTHING ABOUT THAT PAPERWORK THAT HAS JUST BEEN BROUGHT IN BY THE GOVERNMENT HELP REFRESH YOUR RECOLLECTION OF WHO WAS IN THAT ROOM BEFORE YOU GOT THERE?

THE WITNESS: CORRECT

THE COURT: WELL THAT WAS A WASTE OKAY. SHE STILL DOESN'T KNOW.

MR. JONES: (Q) IT'S NOT IN YOUR NOTES, DETECTIVE?

PG
6

(A) IT WOULDN'T BE IN MY NOTES. "I DIDN'T LOCATE THE GUN"

THE COURT AGREE WITH MY CLAIMS.

PAGE 57 LINE 1-3
THE COURT: YOU CAN'T TELL ANYBODY WHAT HAPPENED
BEFORE YOU GOT THERE. THAT'S WHAT HE'S ASKING. RIGHT?
THE WITNESS: I THINK IT'S ABSURD. BUT OKAY.

MR JONES SHOWS NORMA HORNE A PHOTO OF EXHIBIT
#21 THE GUN - UNLOADED WITH CLIP NEXT TO THE GUN.

PAGE 58 LINE 18-25, PAGE 59 LINE 1-25   PAGE 60 LINE 1-8
NORMA HORNE DODGED THE QUESTION WAS EXHIBIT NO #21
THE GUN THAT WAS AT CLUB LEVELS. NORMA HORNE DOUBLE
TALKED BY SAYING SHE CAN'T SEE THE SERIAL NUMBER
BUT AS ANYONE CAN SEE CLEARLY THE SERIAL NUMBER IN
EXHIBIT NO 21

DETECTIVE HORNE CONCEEDED THAT SHE DOESN'T KNOW
ANYTHING ABOUT EXHIBIT NO 21, ON WHERE IT WAS
TAKEN AT.
(Q) THIS IS DEFENDANT PHOTO (INDICATING) FROM THAT
OFFICE IF YOU REMEMBER
(A) "I DON'T KNOW WHERE ~~DOING ADDRESS STATE IT'S STATED~~

P.
7

THAT PHOTO WAS TAKEN "

(Q) SO, YOU DON'T KNOW WHERE THIS ONE IS TAKEN?

THE COURT: WHAT IS THIS?

MR. JONES: THIS IS DEFENDANT EXHIBIT 21

THE COURT: OKAY

MR. JONES: (Q)  YOU DON'T KNOW WHERE THAT PHOTO WAS TAKEN?

(A) "I DON'T KNOW -- I DON'T KNOW WHO'S PHOTO OR WHAT THAT PHOTO IS

NOW, MR. JONES GOING TO SHOW NORMA HORN PERJURY AND IMPEACH HER WITH HER TESTIMONY WEDNESDAY NOVEMBER 8, 2006 1:55 PM (EXHIBIT #7)

PAGE 31 LINE 16-25, PAGE 32, PAGE 33

NORMA HORNE TESTIFIED ON GOVERNMENT'S LEVELS SWNO.5
PAGE 32 LINE 1-15

(Q) AND WHERE WAS THIS PHOTO -- WHERE IS THE GUN LOCATED ON THIS PHOTOGRAPH?

(A) WHAT DO YOU MEAN, WHERE WAS IT --

(Q) YEAH, THE PHOTOGRAPH IS BEING TAKEN. DO YOU WHERE THE GUN IS AT THE TIME THAT THIS PHOTOGRAPH WAS BEING TAKEN?

(A) IT'S STILL IN THE OFFICE, BUT THEY HAVE PULLED THE MAGAZINE OUT AND MADE -- AS WE CALL IT, MADE

8

THE WEAPON SAFE.

(Q) OKAY. WELL, IT APPEARS LIKE THERE'S SOME SORT OF BACKGROUND UNDERNEATH IT OR BEHIND, IT IS THAT CORRECT?

(A) YES, SIR

(Q) OKAY. WHAT IS THAT BACKGROUND DO YOU KNOW?

(A) I THINK IT MIGHT BE THAT BLACK THING SIMILAR TO THIS. IT WAS SQUARE.

(Q) OKAY. WERE YOU --

(A) -- LIKE STAND

PAGE 32 LINE 19-23

THE COURT: IT WAS A BLACK BACKGROUND, I'M SORRY, SIMILAR TO WHAT?

THE WITNESS: THE OBJECT THAT WAS ON TOP OF THE WEAPON, IT'S LIKE A BLACK BOX-TYPE STAND, AS I DESCRIBED BEFORE, AND I BELIEVED THEY PUT IT ON TOP AND PHOTOGRAPHED IT.

WHEN MR JONES ASK NORMA HORNE ABOUT EXHIBIT NO. 20, SHE TESTIFIED SHE DIDN'T KNOW WHERE OR WHEN THE PHOTO WAS TAKEN.

PAGE 68-70

$f^{\circ}{}_{q}$

PAGE 68 LINE 13, 14

(Q) ISN'T IT A FACT THAT THIS PHOTO RIGHT HERE LOOK LIKE IT'S IN A BLACK ROOM.

PAGE 68 LINE 24, 25

(Q) THIS PHOTO HERE (INDICATING) DEFENSE EXHIBIT NO. 20. ISN'T IT A FACT THAT THIS NOT EVEN CLUB LEVEL'S

PAGE 69 LINE 1

(A) I DON'T KNOW WHERE - - I DIDN'T TAKE THE PHOTO SIR.

PAGE 69 LINE 9-16

THE COURT: WELL, YOU DON'T KNOW WHERE THE PHOTO WAS TAKEN, IN OTHER WORDS. IS THAT WHAT YOU'RE SAYING? WHAT ROOM OR WHEN OR WHAT?

THE WITNESS: RIGHT. BECAUSE THIS COULD HAVE BEEN LATER ON, BUT I DON'T - -

THE COURT: OKAY. YOU DON'T KNOW, THEN YOU SAY, "I DON'T KNOW WHEN IT WAS TAKEN."

PAGE 70 LINE 1-

(Q) SO, BASICALLY, YOU DON'T KNOW IF THIS PICTURED WAS TAKEN LATER ON AFTER OCTOBER THE 24TH CORRECT?

(A) I DON'T KNOW WHEN - - THIS PARTICULAR PICTURE

PG 10

HERE, I DON'T KNOW WHEN IT WAS TAKEN.

(Q) YOU TELLING THE JURY TODAY YOU DON'T KNOW WHERE -- YOU DON'T KNOW IF YOU EVER SEEN THIS PICTURE RIGHT HERE BEFORE, CORRECT?

(A) I HAVEN'T SEEN THAT PICTURE.

(Q) YOU NEVER SEEN THIS PICTURE IN NEITHER TRUNKS?

(A) I DON'T BELIEVE I'VE EVER SEEN THE PHOTO, NO

THE COURT: WHAT NO. IS THAT? 21?

MR JONES: THIS IS DEFENDANT EXHIBIT NO. 21

THE COURT: OKAY

NOW MR JONES WILL POINT OUT AGENT KELLIE OBRIEN OUTRAGEOUS MISCONDUCT.

PAGE 120 LINE 5-16   NORMA HORNE TESTIFIED

LET ME GO IN A LITTLE MORE DETAIL. THEY'LL START PHOTOGRAPHING, AND THEN EACH ROOM THEY PHOTOGRAPH THEN OKAY. THEY MOVE ON TO THE NEXT ROOM. THEY START PHOTOGRAPHING. OKAY YOU CAN START SEARCHING THERE.

(Q) OH. OKAY

(A) SO. FURTHER DOWN, CLEARLY SHE HAD TAKEN A PICTURE OF -- THE LAST PICTURE OF 6. AND I DO REMEMBER SOMEBODY YELLING "PHOTO", AND SHE WENT BACK TO IT AND TOOK THE PHOTO.

(Q) SO YOU TELLING THE JURY THAT SHE WASN'T THE AGENT IN THE CLUB OFFICE WHEN THE GUN WAS FOUND

7₋
11

BEFORE YOU GOT THERE?

(A) "I DON'T KNOW WHERE SHE WAS BEFORE I GOT THERE, SIR.

EVEN WHEN MR JONES TRIED TO REMIND NORMA HORNE THAT AGENT OBRIEN WAS IN ROOM H WHEN THIS ALLELE GUN WAS FOUND, SHE STILL SAID SHE DIDN'T KNOW WHERE AGENT OBRIEN WAS AT.

PAGE 121 LINE 2-19

(Q) THEN IT DON'T SAY WHERE THE GUN AT. SHE TOOK THREE SHOTS OF THE GUN.

(A) CORRECT. THAT'S WHAT IT SAYS HERE.

(Q) ISN'T IT A FACT THAT IN THE SECOND TRIAL THAT THE INFORMATION IS THAT AGENT O'BRIEN WAS IN THERE BEFORE YOU WHEN THE GUN WAS FOUND? IS THAT A FACT?

(A) I -- I DON'T KNOW SIR. I DON'T KNOW WHAT SHE SO TESTIFIED TO I DON'T KNOW WHERE SHE WAS. I KNOW WHERE I WAS.

(Q) DETECTIVE HORNE, YOU INVESTIGATED THIS CASE AND YOU WENT TO TWO TRIALS. AND YOU TELLING THE JURY THAT YOU DON'T KNOW THAT AGENT KELLIE OBRIEN WAS IN THAT OFFICE WHEN THE GUN WAS FOUND?

(A) I DON'T KNOW WHERE KELLIE OBRIEN WAS WHEN THE GUN WAS FOUND, SIR. YOU'D HAVE TO ASK HER THAT. IT LOOKS TO ME LIKE SHE WOULD HAVE BEEN

Pg
12

ON ROOM G

THE COURT: YOU'RE JUST SPECULATING. YOU DON'T KNOW
WHERE SHE WAS.

THE WITNESS: CORRECT


PAGE 122 LINE 5-20

(Q) DO YOU KNOW IF AGENT OBRIEN ADDED WHERE
IT SAYS "GUN" NOTHING ELSE BESIDE NUMBER 21, 22
IT SAYS WITH MAGAZINE, 23, CLOSE-UP OF GUN. YOU
DON'T KNOW IF AGENT OBRIEN PUT THAT IN THERE AND THEN
PUT THIS IN DISCOVERY. DO YOU?

(A) I DON'T KNOW - -

(Q) DO YOU KNOW IF AGENT OBRIEN OBSTRUCT JUSTICE?

(A) NO, SHE - - I DON'T KNOW WHAT AGENT OBRIEN - -

BUT I WOULD - - NO, SHE WOULD NOT DO THAT.

(Q) SO WAS YOU THERE WITH HER WHEN SHE TOOK ALL
THESE PHOTOS? THESE ENTRY PHOTOS

(A) I WASN'T STANDING BESIDE HER WHEN SHE WAS
TAKING PHOTOGRAPHS, NO.

(Q) SO YOU DON'T KNOW WHEN SHE TOOK THIS PHOTO
OF THE GUN DO YOU?

(A) THE TIME? I DON'T KNOW WHAT TIME IT WAS, NO.


(EXHIBIT #9) PAGE 61 KELLIE OBRIEN TRIAL TESTIMONY

11-30-07   PM SESSION   LINE 1-14

PG
13

(Q) YOU IN ROOM H, AN OFFICE, WHEN THE HANDGUN WAS FOUND IN THAT LOCATION?

(A) YES

(Q) OKAY. TELL THE JURY HOW YOU FIRST LEARNED OF THE FACT THAT A GUN HAD BEEN LOCATED IN THE OFFICE?

(A) "MY RECOLLECTION IS AS I WAS OVER AT THE DESK LOOKING THROUGH SOME DESK STUFF, DOCUMENT AND THINGS AND THERE'S SEVERAL AGENTS BEHIND ME BUT I HEARD ONE OF THEM SAY OH"

MR GALAZZO: OBJECTION

THE COURT: NO, THIS IS NOT HEARSAY OVERRULED. OKAY.

THE WITNESS: I HEARD ONE OF THEM SAY OH, LOOK WHAT WE HAVE HERE AND I TURNED AROUND AND I COULD SEE THAT THERE WAS A GUN LAYING ON THE FLOOR.


HERE WE HAVE SPECIAL AGENT KELLIE O'BRIEN TESTIFIED UNDER OATH THAT SHE WAS SEARCHING CLUB LEVELS OFFICE WHEN THE GUN WAS FOUND, SHE DIDN'T TESTIFY OR MENTION THAT SHE WAS ROAMING AROUND PHOTOGRAPHING.


(EXHIBIT #10) KELLIE OBRIEN TRIAL TRANSCRIPT MONDAY, DECEMBER 3, 2007   9:30 AM   PAGE 19 - 32


PAGE 20   LINE 11-17

(Q) OKAY. NOW REGARDING THIS GUN THAT WAS SUPPOSEDLY FOUND IN ROOM H. YOU PERSONALLY DID

PG
14

NOT FUND THAT GUN. IS THAT RIGHT?

(A) THAT'S CORRECT

(Q) YOU WERE IN THE ROOM DOING WHATEVER YOU WERE DOING. WERE YOU SEARCHING?

(A) ~~SEARCHING~~ YES

NOW THAT MR JONES HAS ESTABLISHED THAT SPECIAL AGENT KELLIE OBRIEN TESTIFIED UNDER OATH THAT SHE WAS IN THE OFFICE WHEN THE GUN WAS FOUND, AS A MATTER OF FACT SHE TESTIFIED SHE WAS SEARCHING AT THE TIME.

## PERJURY

NOW THAT MR JONES HAS CHALLENGED M.P.D. DETECTIVE NORMA HORNE AND SPECIAL AGENT KELLIE OBRIEN WITH OBSTRUCTION OF JUSTICE THE BOTH DECIDE TO CHANGE THEIR TESTIMONY AND COMMIT PERJURY.

2-8-13 AM SESSION PAGE 139   LINE 24,25 PAGE 1-8

(Q) SPECIAL AGENT OBRIEN, DID YOU PLANT THE GUN THAT WAS FOUND AT THE LEVELS NIGHT CLUB WHEN THE SEARCH WARRANT WAS EXECUTED ON OCTOBER 24, 2005?

(A) ABSOLUTELY NOT

(Q) WERE YOU THERE WHEN IT WAS LOCATED?

PG
15

(A) AT LEVELS? YES, I WAS AT LEVELS
THE COURT: "NO. WERE YOU IN THE ROOM?"

THE WITNESS: I DON'T - - YOU KNOW, I DON'T REMEMBER,
BECAUSE I WAS IN AND OUT. BASED ON MY PHOTO LOG, "I
COULD HAVE BEEN THERE, I COULD HAVE NOT BEEN THERE"
(EXHIBIT #11)


(EXHIBIT #12) 2-11-13 AM KELLIE O'BRIEN TESTIMONY  PAGE-37


PERJURY #1 - PAGE 9 LINE 3-8, PERJURY #2 - LINE 13-15


PAGE 9 LINE 3-8
(Q) YEAH. DID YOU PERSONALLY FOUND THE GUN?
(A) NO
(Q) YOU WERE IN A ROOM DOING WHATEVER
YOU WAS DOING. YOU WAS SEARCHING. CORRECT?
(A) NO. I THINK AT THE TIME I WAS STILL TAKING
PHOTOGRAPHS OF LEVELS.


LINE 13-15


(Q) SO LAST YEAR WHEN YOU TESTIFIED UNDER OATH,
DID YOU TELL THE JURY THAT YOU WERE SEARCHING AT
THE TIME?
(A) I DO NOT BELIEVE I DID

Pg
16

MR JONES IMPEACHED AGENT OBREEN AND
READ HER 2007 TRIAL TESTIMONY AND AGENT OBREEN
STILL CONTINUED HER PERJURY TESTIMONY.

PAGE 11 LINE 5-18

THE COURT: OKAY, NOW, READ IT TO YOURSELF AND
SEE IF IT REFRESHES YOUR RECOLLECTIONS ABOUT WHAT
YOU SAID ABOUT WHAT YOU WERE DOING WHEN THE
GUN WAS FOUND?

THE WITNESS: YES

THE COURT: DID YOU, IN FACT, SAY YOU WERE SEARCH-
ING AT THE TIME THAT THE GUN WAS FOUND?

THE WITNESS: NO

THE COURT: DID YOU, IN FACT, SAY YOU WERE SEARCH-
AT THE TIME THAT THE GUN WAS FOUND.

THE WITNESS: NO. I THINK WHAT I WAS SAYING IS THAT--
KIND OF THE COURSE OF THE QUESTIONS WAS IS THAT I WAS TAKING
PICTURES, I'D BEEN IN AND OUT OF THAT ROOM SEVERAL TIMES.
I'D COME BACK IN BECAUSE I BELIEVED SOMEBODY HAD ASKED
ME A QUESTION.

NOT ONLY DID SPECIAL AGENT KELLIE OBREEN PERJURE
HERSELF, SHE OBSTRUCT JUSTICE BY CONCEALING HER AND
NORMA HORNE'S PERJURY WHEN SHE TOLD THE COURT THAT
FBI AGENT "MARTIN E. HELLMER" FOUND THE GUN"

PG
17

PAGE 13 LINE 14-25 , PAGE 1,2

THE COURT: DO YOU KNOW WHO FOUND IT?

THE WITNESS: I BELIEVE HIS NAME IS MARTIN HELLMER,
OR SOMETHING ALONG THOSE LINES.

THE COURT: IS THERE SOMETHING THAT WOULD HELP YOU
REFRESH YOUR RECOLLECTION ABOUT THAT?

THE WITNESS: YES, ACTUALLY, I COULD LOOK AT THE
BAG THAT IT WAS PACKAGED IN AT THE TIME, GET HIS
NAME CORRECT. "IT'S MARTIN E. HELLMER. H -E-L-L-M-E-R"

THE COURT: AND WHO DOES HE WORK FOR?

THE WITNESS: ~~ABOUTHALF DOES~~ HE'S ~~A SPECIAL~~ SPECIAL
AGENT WITH THE FBI.

THE COURT: HE STILL THERE?

THE WITNESS: HE'S ACTUALLY ASSIGNED TO THE PHOENIX
DIVISION CURRENTLY, BUT, YES, HE'S STILL WITH THE F.B.I.


THIS IS A BOLD FACE LIE, AGENT OBRIEN KNOWS THAT
THERE WASN'T A FBI MAN "MARTIN E. HELLMER" FOUND
THE GUN IN THE CLUB LEVEL'S OFFICE. AS A MATTER OF
FACT BESIDES THE FALSIFIED INFORMATION AGENT KELLIE
OBRIEN PRESENTED IN THE 3RD TRIAL ON F.B.I. AGENT MARTIN
HELLMER, THERE WAS NO DOCUMENT ON WHO FOUND THE GUN IN
CLUB LEVEL'S OFFICE.


(EXHIBIT #13) DOCUMENT THAT SHOWS WHO FOUND THE GUN IN

P6
18)

CLUB LEVEL'S OFFICE.

THE PERSONELL WHO ON RECORD FOR BEING IN CLUB
LEVEL OFFICE (ROOM H) IS "RENALDA SHAW" AN ASSET
FORFEITURE EMPLOYEE" AND SPECIAL AGENT OBRIEN THE
SEIZING AGENT.

(EXHIBIT#14)   2-7-13 AM  PAGE, 20, 21
      TALKS ABOUT RENALDO SHAW BEING THE "WOMAN"
WHO SEARCHED THE CLUB LEVELS AND WORKED FOR
THE ASSET FORFEITURE DEPARTMENT OF JUSTICE.

      MR. JONES WANTS TO BRING OLB'S ATTENTION TO
(EXHIBIT #3) FD-302 DATE TRANSCRIPTION 11-21-2005
WHERE IT READS: THE FOLLOWING LAW ENFORCEMENT
PERSONNEL ASSISTED IN THE SEARCH OF 1960 MONTANA
AVE NE   WDC
 1  SA   KELLIE OBRIEN
 2  SA   GEOFFREY S. MASON
 3  SA   CHRIS FIORITO
 4  SA   WILLIAM MCDERMOTT
 5  SA   JAMES MALLUCH
 6  SA   WILLIE BOB JOHNSON
 7  SA   CHAD GALLAGHER
 8  SABC   MARIA DELANEY
 9  SO DET   NORM HORNE
 10  PS   RENALDA SHAW

CROSSEXAMINATION ON 10-31-2005

<u>LAWRENCE MAYNARD</u> 2-14-2015 PAGE 9 LINE 23-25,
PAGE 10 (EXHIBIT #15)


LAWRENCE MAYNARD GIVES FACTUAL EVIDENCE
OF THE CLUB LEVEL'S GUN PHOTOS.


PAGE 9 LINE 23-25


NOW THE PICTURES, I'M GETTING READY TO SHOW YOU,
THIS IS DEFENDANTS EXHIBIT 21, ON THE TWO PHOTOS I
JUST SHOWED YOU, CAN YOU POINT AT POINT OUT THE
SURFACE AT ALL IN THAT ROOM?

(A) NO

(Q) I'M GOING TO SHOW YOU LEVEL'S GOVERNMENT'S
EXHIBIT LEVEL'S SW-5 CAN YOU SEE WHAT'S IN THE
GENTLEMAN'S HAND?

(A) IT'S A RULER, THEN YOU HAVE A MAGAZINE WITH A
COUPLE BULLETS IN IT.

(Q) LOOKING AT THE TWO PHOTOS THAT YOU JUST SEEN THE
CLUB LEVELS, DO YOU SEE THIS GUN IN THAT ROOM, RIGHT

(A) NO SIR

(Q) WHAT ABOUT THIS BACKGROUND?

(A) THAT BACKGROUND IF YOU MOVE TO THE RIGHT A
LITTLE BIT --

(Q) THAT'S ENOUGH

Pc
20

(A) THAT'S GOOD. THERE'S A CIRCULAR LIGHT. THEY WERE HOLDING THE GUN UP. THERE'S NO CIRCULAR LIGHT IN THAT ROOM.

(Q) DO YOU SEE THIS TRASH BAG OR THIS BOX BEHIND ANY OF THE DOORS OR IN THAT ROOM AT ALL ?

(A) NO, THEY GAVE A FULL VIEW OF THE ROOM, THERE'S NO BOX, THERE'S NO BLACK BOX. I MEAN THERE'S NO BLACK BAG EITHER, TRASH BAG IN THAT ROOM.

MR. JONES WILL CONCLUDE THIS CLUB LEVELS GUN CLAIM BY REFERRING O.C.G TO PAGE 31,32, AND 33 OF 2-11-13 AM KELLIE O'BRIEN'S TESTIMONY WHERE SHE ACTS LIKE SHE DIDN'T TAKE DEFENSE EXHIBIT NO 21. I REMIND O.C.G. THAT THIS PHOTO WAS TESTIFIED TO BY NORMA HORNE IN THE FIRST TRIAL AND THE GOVERNMENT WAS AWARE OF THIS PHOTO AND THIS GUN PHOTO. MR. JONES RECEIVED FROM HIS DISCOVERY BUT MR. BALAREZO GAVE ME BLACK AND WHITE PHOTO'S INSTEAD OF COLOR PHOTOS.

PAGE 31 LINE 1-10   (EXHIBIT #16)

(Q) OKAY. FOR THE JURY, WHAT TYPE OF GUN IS THIS (INDICATING)
(A) THAT'S A RUGER
THE COURT: WHAT'S THAT PICTURE, PLEASE? EXHIBIT WHAT?
MR. JONES: THIS IS LEVEL'S - SW- 5
THE COURT: AND THE ONE BEFORE THAT ?

P.
21

MR. JONES: AS DEFENSE EXHIBIT NO. 21

LINE 1375
(Q) SO YOU DON'T REMEMBER TAKING THAT PHOTO?
(A) I DON'T REMEMBER TAKING THAT PHOTO ON --

THE COURT: 21, 21
THE WITNESS: THAT BACKGROUND DOESN'T LOOK RIGHT TO ME
FOR ONE. AND I DIDN'T TAKE A BLACK AND WHITE
PHOTO OF ANYTHING.

(Q) IS IT BECAUSE THAT BACKGROUND IS NOT ON CLUB
LEVELS? NO WHERE ON THOSE PHOTOS?

(A) WELL, I DON'T KNOW, BECAUSE LIKE I SAID, I DIDN'T
TAKE THAT PHOTO. SO I DON'T KNOW WHETHER THAT BACKGROUND'S
ON CLUB LEVELS OR NOT.

(Q) ISN'T IT A FACT THAT BACKGROUND IS NOT ON CLUB LEVELS
AND YOU AND NORMA HORNE DON'T RECOGNIZE THAT PHOTO
BECAUSE YOU REALIZE THAT BACKGROUND IS NOT AT THE
THE OFFICE AT ALL?

MS. URSVELL: OBJECTION, YOUR HONOR
THE COURT: SUSTAINED, SUSTAINED

MR JONES: AGENT O'BRIEN DID YOU LOOK AT ANY OF
THE DISCOVERY THAT MR JONES RECEIVED ON 06 DEALING
WITH THIS GUN?

THE COURT: THE ONES THAT YOU'VE JUST BEEN SHOWING
HER?

MR JONES: YES

PG 22

THE WITNESS: YES & TOOK THE PHOTOGRAPHS

MR JONES: SO YOU TELLING THE JURY THAT YOU DON'T
REMEMBER THAT RUGER RIGHT THERE (INDICATING), AND
YOU CAN'T SAY OF THAT'S CLUB LEVELS OR NOT?

MS URSCHEL: OBJECTION, YOUR HONOR SHE SAID
SHE DIDN'T REMEMBER THE PHOTOGRAPH. SHE MADE NO
REFERENCE TO THE GUN, SHE DIDN'T TAKE THE PHOTOGRAPH.

THE COURT: WAIT A MINUTE. & DON'T UNDERSTAND
THAT. DO YOU KNOW WHETHER THAT'S THE SAME GUN THAT
WAS FOUND?

THE WITNESS: & CAN'T REALLY TELL BY THE SERIAL ON IT.


PAGE 33 LINE 13-16

THE COURT: BUT YOU DON'T KNOW OF THAT'S THE SAME
GUN AND YOU DON'T KNOW WHERE THAT PICTURE WAS
TAKEN OR BY WHOM?

THE WITNESS: NO. & DON'T

THE COURT: OKAY, THAT'S DEFENSE EXHIBIT 21


AGENT O'BRIEN MUST THINK THAT THE JURY, THE COURT
AND THE DEFENSE IS BLIND BECAUSE SHE IS THE ONLY ONE
WHO CAN'T SEE THE SERIAL NO IN DEFENSE EXHIBIT NO 21.
BLACK OR WHITE, OR COLOR SHE SHOULD KNOW THAT THAT
IS WAS THE GUN SHE SUPPOSED TO HAVE TAKEN ON OCTOBER 24, 2005.

Pg
23

## SUMMARY OF GUN ISSUE

SPECIAL AGENT KELLIE OBRIEN TESTIFIED THAT SHE TOOK ENTRY PHOTOS OF ALL THE CLUB BEFORE SOME ONE FOUND THE GUN IN THE OFFICE WHILE SHE WAS SEARCHING.

SHE SWITCHED HER TESTIMONY IN THE THIRD TRIAL AND TESTIFIED SHE WASN'T SEARCHING THE OFFICE WHEN THE GUN WAS FOUND.

EVEN THOUGH THE CLUB LEVELS SEARCH DOCUMENTS SHOWS "MS RONALDA SHAW" WHO SEARCHED CLUB LEVELS OFFICE, AGENT OBRIEN THREW IN FBI AGENT MARTIN HELLMER AS THE PERSON WHO FOUND THE GUN, WHERE THERE IS NO DOCUMENTATION THAT AGENT MARTIN EVEN EXIST MORE LESS WAS IN CLUB LEVELS SEARCH.

M.P.D. DETECTIVE NORMA HORNE TESTIFIED UNDER OATH IN THE GRAND JURY "WE" FOUND THE GUN. IN NONE OF THE THREE TRIAL SHE COULDN'T NAME WHO FOUND THE GUN AND SHE ADMITTED THAT SHE WASN'T IN THE CLUB OFFICE WHEN THE GUN WAS FOUND.

THE TRUTH AND FACTS IS NORMA HORNE DIDN'T SEARCH ROOM H, DOCUMENTATION SHOWS NORMA HORNE SEARCHED ROOM 6, FAR FROM ROOM H.

ALL OF THESE CONTRADICTIONS AND THE FABRICATED STORIES WARRANT A COMPLETE AND FULL INVESTIGATION

P6
24

PLANTING OF HOTEL RECEIPTS AND HOTEL KEY CARDS

(EXHIBIT #17)  COMFORT SUITES GWINNETTE MALL HOTEL RECEIPTS
              HOLIDAY INN EXPRESS HOTEL RECEIPTS

(EXHIBIT #18)  ONE: HOLIDAY INN EXPRESS KEY CARD
              TWO: HOLIDAY INN EXPRESS DULUTH GEORGIA
                   KEY CARD

(EXHIBIT #19)  NORMA HORNE TRIAL TESTIMONY
              PAGE 123-126


    DETECTIVE HORNE MISLEAD THE JURY AND COURTS WHEN
SHE TESTIFIED THAT THE HOTEL KEYS AND HOTEL RECEIPTS
WERE FOUND ON CLUB LEVELS.


   PAGE 123 LINE 8-22


     (Q) YOU TESTIFIED YESTERDAY ABOUT THOSE (INDICATING)
-- THEY LIKE KEYS THAT YOU GET INTO A HOTEL
     (A) CORRECT
     (Q) WHERE DID YOU FIND THESE KEYS -- OR WHERE DID
ANYBODY, AGENTS, FIND THOSE KEYS AT ON OCTOBER 24?
     (A) I WOULDN'T KNOW RIGHT OFF THE TOP OF MY
HEAD. I HAVE TO LOOK AT SOMETHING.
     (Q) DID YOU TESTIFY ROOM H? OR -- DID YOU TESTIFY TO

P6
25

A ROOM YESTERDAY WHERE THESE KEYS WAS FOUND?

THE COURT: YESTERDAY?

THE WITNESS: I DID

(Q) AND WHAT ROOM WAS THAT?

(A) I BELIEVE IT WAS ROOM H, WHERE THE FILES AND ANYTHING WERE

## CONCLUSION

M.P.D. DETECTIVE NORMA HORNE PERJURED HERSELF WHEN SHE TESTIFIED UNDER OATH THAT THE HOTEL KEY CARDS AND HOTEL RECEIPTS WAS FOUND IN ROOM H. THERE IS NO CRIME SCENE EVIDENCE THAT THE HOTEL KEY CARD OR HOTEL RECEIPTS WERE IN CLUB LEVELS.

THIS VERY IMPORTANT - RELEVANT EVIDENCE WASN'T MENTIONED IN THE GRAND JURY BY NORMA HORNE OR KELLIE OBRIEN, NOR WAS THIS CRUCIAL EVIDENCE ON THE PROPERTY RECEIPTS OR MENTIONED IN ANY GOVERNMENT DOCUMENTS, IT ONLY POPPED UP IN THE DISCOVERY. THIS IS CLEARLY OBSTRUCTION OF JUSTICE AND AN 18 U.S.C.S § 1001, 18 U.S.C.S § 1519 VIOLATION

(EXHIBIT #20) IS A CLUB LEVELS DIAGRAM THAT SHOWS ROOM H - CLUB LEVELS OFFICE, ROOM 6 - IS WHERE NORMA HORNE SEARCHED

P6
2

## 18 U.S.C.S. § 2234 – EXCEEDING THEIR AUTHORITY

FBI AGENT KELLIE OBRIEN EXCEEDED HER AUTHORITY WHEN SHE ILLEGALLY CONFISCATED MR JONES LIQUOR LICENSE WITHOUT ANY TYPE OF COURT AUTHORITY. THE ABC LIQUOR LICENSE WASN'T ON THE ATTACHMENT A AS PROPERTY TO BE SEIZED NOR WAS THE ABC LIQUOR LICENSE ON THE CLUB LEVELS PROPERTY RECEIPTS AS PROPERTY THAT WAS TAKEN FROM THE CLUB.

(EXHIBIT # 21) IS MR JONES LIQUOR LICENSE THAT WAS ILLEGALLY SEIZED BY KELLIE OBRIEN.

(EXHIBIT # 22) IS SPECIAL AGENT KELLIE OBRIEN SWORN AFFIDAVIT WHERE SHE CONCEDED AND ADMITTED THAT THE AGENTS CONFISCATED MR JONES' LIQUOR LICENSE.

## CONCLUSION

SPECIAL AGENT KELLIE OBRIEN DELIBERATELY DISREGARDED MR JONES' 4TH AMENDMENT AND THE THEFT OF MR JONES'S LIQUOR LICENSE CAUSED HIM GREAT HARM AND IT IS FRAUD ON THE COURT TO CONCEAL THIS OUTRAGEOUS MISCONDUCT.

ALL OF THESE CLAIMS WARRANT A FULL AND COMPLETE INVES-
TIGATION BECAUSE THESE BAD LAW ENFORCEMENTS USED THIS

INFORMATION TO HELP CONVICT MR JONES WHO AS EVERYONE
KNOWS IS FACING LIFE IN PRISON.

THIS CLEAR AND CONVINCING EVIDENCE GOES BEYOND
COMMON SENSE THAT THESE OFFICERS HAD SOMETHING TO
BE CONCEALED, THIS IS WHY THE CHANGED THEIR TESTIMONY.

ALL SHOULD HAVE PARTICULAR CONCERN ABOUT THESE
OFFICERS PLANTING A GUN OR MISREPRESENTING THE CLUB
LEVELS GUN PHOTOS AS CLUB LEVELS OFFICE. THESE UNETHICAL
STANDARDS AND OUTRAGEOUS BEHAVIOR GOES BEYOND EXTRA-
ORDINARY CIRCUMSTANCES AND NOT ONLY SHOULD DETECTIVE
HORNE AND AGENT KELLIE OBRIEN SHOULD BE INVESTIGATED
THEY SHOULD BE DETERRED AND DISCIPLINED.

(Exhibit #1)

FD-674 (1-17-85)

**PHOTOGRAPHER** O'Brien

**DATE** 10 / 24 / 2005 **ROLL #** 1
Month   Day   **Year**

**LOCATION** 1960 Montana Ave NE

**CASE FILE** 281D-WF-213679

**AGENCY** SSTF

CAMERA _____

FILM : ASA _____

ROLL No. _____

LENS - Normal - N
Wide - W
Macro - M
Tele. - T

LIGHT - Available - A
Elec.Strobe - E
Flashbulb - F

Photo Log Sketch

DEFENDANT EXHIBIT

| Photo No. | Lens | Light | SS | f-stop | Description | REMARKS |
|---|---|---|---|---|---|---|
| 1 | | | | | Front Door - Entry | |
| 2 | | | | | Front Door Entry | |
| 3 | | | | | Room A Entry | |
| 4 | | | | | Room A Entry | |
| 5 | | | | | Room B - Entry | |
| 6 | | | | | Room B - Entry | |
| 7 | | | | | Room B - Entry | |
| 8 | | | | | Placard | |
| 9 | | | | | Bathroom - Entry | |
| 10 | | | | | Bathroom - Entry | |
| 11 | | | | | Room E - Entry | |
| 12 | | | | | Room E - Entry | |
| 13 | | | | | Room F Storage | |
| 14 | | | | | Room F Storage | |
| 15 | | | | | Room F Storage | |
| 16 | | | | | Room A office | |
| 17 | | | | | office | |
| 18 | | | | | Room E Closet | |
| 19 | | | | | Room G Storage | |
| 20 | | | | | Shelf w/ magazine | |
| 21 | | | | | Close up of Safe | |
| 22 | | | | | Room K Entry | |
| 23 | | | | | Room K Entry | |
| 24 | | | | | Room K Bed | |
| 25 | | | | | Room K Hallway | |
| 26 | | | | | Room K Bathroom | |
| 27 | | | | | Room L Kitchen | |
| 28 | | | | | Room L Storage | |
| 29 | | | | | Room L Hallway | |
| 30 | | | | | Room J Office | |

10/24/05
Ruger P94 9mm. pistol
Ser#308-07610
recovered from 1960 Montana
Ave NE Washington, D.C.



SW-00004





DEFENDANT'S
EXHIBIT



DEFENDANT'S
EXHIBIT

(5 y 1/, ι, ) } , ( "? )

|:     ·    ·   .

-1-

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription   11/21/2005

On October 24, 2005, approximately 6:00 AM, members of the
FBI SWAT Team executed a District Court Search Warrant at 1960 Montana
Ave., NE Washington, D.C. at a club known as "Levels". The premises
were cleared and secured by FBI SWAT members. A team of search agents
entered the premises once it was secured. There were no occupants in
the building at the time the warrant was executed.

All the rooms in the club were labeled with a letter and then
photographed in pre and post search conditions by SA Kellie R. O'Brien.
A sketch of the club was also completed by SA Geoffrey S. Maron.

18 U S C 5 1001, 1519 Violation

Items seized included but not limited to a 9mm Ruger P94
serial #308-07610 with magazine and rounds, photographs, mail
documents, business documents, phone numbers, receipts, and a money
machine.

SA Kellie O'Brien seized the evidence at the club and
transported the items back to the Washington Field Office of the FBI.
These items were submitted to the Evidence Control Room. A copy of the
search warrant and a seizure list was taken to Antoine JONES at the FBI
Field Office. Det. Norma Horne advised JONES of the seizure list and
had him sign a copy. A copy was also given to JONES.

Agents and detectives cleared the residence at approximately
8:50 AM.

Attached is a copy of the FD-597, photo log, and sketch.

The following law enforcement personnel assisted in the
search of 1960 Montana Ave., NE, WDC.

1. SA Kellie O'Brien
2. SA Geoffrey S. Mason
3. SA Chris Fiorito
4. SA William McDermmitt
5. SA James Mollica
6. SA Willie Johnson
7. SA Chad Gallagher
8. ABC Maria Delaney
9. Det. Norma Horne
10. PS Renalda Shaw

102405.302



Investigation on   10/24/2005   at Washington, D.C.

File #  245D-WF-213679-302                    Date dictated   11/21/2005

by   SA Kellie R. O'Brien

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;

( *S.XH.I., 1 10 4* )

UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF INVESTIGATION
Receipt for Property Received/Returned/Released/Seized

File # __2810 WF 213679__

On (date) __October 24, 2005__

item(s) listed below were:
☐ Received From
☐ Returned To
☐ Released To
☒ Seized

(Name) __ANTOINE JONES__

(Street Address) __1960 MONTANA AVE    NE__

(City) __WDC__

Description of Item(s):

1) Business License  Tax License    Room A
2) Receipts  invoice's  daytimer      Room J
3) Bills  receipts  invoices  record book   Room J
4) False Bottom Can    Room B
5) ~~Assy~~ Ruger P94  9mm  serial # 308-07610   Room H
5a) magazine w/ ammo  Taken from item (5)  Room H
6) Ph #'s  record book        Room J
7) Club Levels Shirt
8) Money Machine
9) Misc  receipts, bills  cell phone  Room D      | NOT TAKEN
10) ~~Sharp  DEO  MONITOR~~  S/No  46 234486  Room A  | Removed
11) Misc  keys  photo  DISK  misc receipts  telephone #
12) Club Jouane  ownership doc. cert of occ.  Room H
13) Misc  Photos  Two  photo Albums    Room H
14) Copies  of  checks,  SUNTRUST ACCOUNT
15) Cell phone, Verizon samsung, business doc  fold w/ Tax return  Room A
16) Misc.  receipts, (2)  journal record books  Room H
17) Black  brief case  w/ various document    Room (H)

Received By: _____      Received From: _____
(Signature)                          (Signature)

EXHIBIT



(EXHIBIT 19)  ORIGINAL  (PBS Case 19)

1                      UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA

2

3  - - - - - - - - - - - - - - -x
                            :

4  UNITED STATES OF AMERICA    :
                            :

5  VS.                       :
                            :

6  ANTOINE JONES, et al.     :
                            :

7  - - - - - - - - - - - - - - -x

8

9

10                           Grand Jury No. 04-1
                           3rd and Constitution Avenue, N.W.

11                           Washington, D.C.  20001

12

                           January 26, 2006

13

14       The testimony of NORMA HORNE was taken in the

15  presence of a full quorum of the Grand Jury, commencing at

16  1:52 p.m., before:

17

18              JOHN V. GEISE
              Assistant United States Attorney

19

20

21

22

23

24

25

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947


DEFENDANT'S
EXHIBIT

1              P R O C E E D I N G S

2    Whereupon,

3                   NORMA HORNE

4    was called as a witness and, after first being affirmed by the

5    Foreperson of the Grand Jury, was examined and testified as

6    follows:

7                    EXAMINATION

8         BY MR. GEISE:

9         Q.   Detective Horne, I'm going to ask you just for the

10   record, please, to identify yourself?

11        A.   Norma Horne, H-o-r-n-e.

12        Q.   And how are you employed, Detective Horne?

13        A.   Metropolitan Police Department, currently assigned

14   to the Safe Streets Gang Task Force.

15        Q.   And how long have you been with the Metropolitan

16   Police?

17        A.   A little less than 16 years.

18        Q.   And now, on the Safe Streets Task Force, you're one

19   of the co-agents, co-investigators, in the Antoine Jones, et

20   al., case.  Is that correct?

21        A.   Yes, sir.

22        Q.   And today I'm going to ask you to review with the

23   members of the Grand Jury a number of seizures that occurred

24   on October 24th of last year as far as the execution of search

25   warrants in that investigation.  If you would give just a

1  the night before the execution of all these warrants and he

2  basically let them know that -- I think he referred to it as

3  Arthur's in town, or he used different phrases, but he also

4  let them know that he was getting ready to make his rounds.

5  Based on that conversation, knowing that he was back, we put

6  together our operations plan, which we already had in the

7  works for what we call a take down on the morning of the 24th,

8  which was the execution of all these warrants, trying to do

9  them at the same time, several different agencies.

10      Q.   And that was a search warrant based on the wiretap

11  and other investigative techniques?

12      A.   Yes, sir.  What I'll do, we'll start with the first

13  one on the list which is 1960 Montana Avenue, northeast, which

14  is the Levels Nightclub, which is the business of Mr. Jones.

15  That's actually the search warrant -- I actually was at this

16  search warrant.  What I'm going to do is I'm going to pass

17  around -- I have five pictures reference to this search

18  warrant and I can pass them around.

19          I'm sorry, should I give them to your first?

20          GRAND JUROR.   No, that's --

21          GRAND JUROR.   I'll just --

22          WITNESS.   Okay.

23          BY MR. GEISE:

24      Q.   Let's call them 2-A through F.

25      A.   Okay.

5

```
 1            COURT REPORTER.   They're just one sticker?
 2            MR. GEISE.   Why don't we just do one sticker.   That
 3   would probably be easier.
 4            WITNESS.   And it says on the list we recovered a
 5   9mm Ruger.  And as you -- as the pictures come around, it's
 6   going to be the black room that looks like an office.  It's
 7   black.  And you'll see the picture of the Ruger.  It's -- an
 8   example would be -- if this was the black box, it was over top
 9   of that.  We raised that up and the gun was underneath, and
10   you'll see the photo of the gun with that raised.  And
11   photographs, mail matters, phone numbers, receipts, a money
12   counting machine and cell phones.  Also, as I go through some
13   of these search warrants, this is not everything that we
14   seized.  We limited the list down to what we thought were
15   items of interest and pertaining to what we were -- the
16   wiretap and the -- and criminal matters.  I'll stop there.  Do
17   you want me to just move onto the next one and pass the
18   pictures or how do you all --
19            MR. GEISE.   Do any members of the Grand Jury have
20   any questions at what was found at Levels?
21            (No oral response by the Grand Jury.)
22            BY MR. GEISE:
23       Q.   Now, just for reference, what time did these
24   pictures occur, approximately in the morning?
25       A.   Approximately 6:00 a.m., 6:30 a.m.  Wake up call.
```

1   BY MR. NORRIS:

2   Q.  And you are familiar with that call as well; correct?

3   A.  Correct.

4   Q.  And in that call they're talking about the liquor license

5   for the club; correct?

6   A.  One of the license, yes, sir.

7   Q.  Okay.  Do you know whether it's the liquor license or some

8   other license?

9   A.  I don't know which license it actually is.

10  Q.  Okay.  And when you were being questioned by Mr. Balarezo,

11  he showed you a number of the checks that were written for the

12  purchasing of liquor for the club; is that correct?

13  A.  Correct.

14  Q.  The Washington Wholesale Liquor checks; is that correct?

15  A.  Yes, sir.

16  Q.  Okay.  Now, I would like to ask you a little bit about your

17  search of the club.  Now, you testified on direct about a

18  firearm that was found in the club; is that correct?

19  A.  Yes, sir.

20  Q.  And that firearm is depicted in Government's Levels SW

21  No. 5; correct?

22  A.  That's after it's been moved, but yes, sir.

23  Q.  Okay.  Well, you mentioned that in this particular

24  photograph, SW-5, it's after it's been moved; is that correct?

25  A.  Yes.



1   Q.  And where was this photo -- where is the gun located in

2   this photograph?

3   A.  What do you mean, where was it --

4   Q.  Yeah.  The photograph is being taken.  Do you know where

5   the gun is at the time that this photograph was being taken?

6   A.  It's still in the office, but they have pulled the magazine

7   out and made -- as we call it, made the weapon safe.

8   Q.  Okay.  Well, it appears like there's some sort of

9   background underneath it or behind it; is that correct?

10  A.  Yes, sir.

11  Q.  Okay.  What is that background, do you know?

12  A.  I think it might be that black thing, similar to this.  It

13  was a square --

14  Q.  Okay.  Were you --

15  A.  -- like stand.

16          THE COURT:  Wait, wait, wait.

17  BY MR. NORRIS:

18  Q.  I'm sorry, I didn't mean to interrupt you.

19          THE COURT:  It was a black background, I'm sorry,

20  similar to what?

21          THE WITNESS:  The object that was on top of the

22  weapon, it's like a black box-type stand, as I described

23  before, and I believe they put it on top and photographed it.

24  BY MR. NORRIS:

25  Q.  Okay.  Were you present when it was photographed?

33

```
 1   A.  Yes, sir.

 2   Q.  Okay.  Now, let me show you Levels SW-4.  This is the

 3   photograph where you are referring to the gun being found

 4   under; is that correct?

 5   A.  Correct.

 6   Q.  Okay.  And according to your direct testimony, in this

 7   picture, SW-4, the gun is actually on the ground or on the

 8   carpeting in the office; is that correct?

 9   A.  It's on the carpet, yes, sir.

10   Q.  Okay.  And there is an item sort of in the top center

11   portion, looks like maybe three sides of a box.  Is that what

12   you're referring to?

13   A.  Yes, the box is being held up.

14   Q.  Okay.  And you actually saw that box; is that correct?

15   A.  Yes, sir.

16   Q.  And where was that box located?

17   A.  In the office, which is Room H.

18   Q.  Okay.  And the office is depicted in Government's Levels

19   SW-2; is that correct?

20   A.  That's part of it, yes, sir.

21   Q.  Okay.  Do you see the black box in this photograph?

22   A.  It would be behind the photographer.  There is another

23   photo they took showing the backside of the office --

24   Q.  Okay.

25   A.  -- that I was shown on direct.  If you have that one, I
```

34

1    can --

2              MR. BALAREZO:  Okay.  Court's indulgence.

3    BY MR. NORRIS:

4    Q.  I believe I have the photographs that were used on direct.

5    Let me show you what's been marked as Government's Levels SW-3.

6    Is this the photograph to which you're referring?

7    A.  Yes.  If you -- behind the door --

8    Q.  Okay.

9    A.  -- is the -- the black box is behind the door, the door is

10   open and obstructing that part of the view.

11   Q.  Okay.  Well, if I may, let me put side-by-side Government's

12   SW-2 on the left side of the Elmo and Government's SW-3 on the

13   right side of the Elmo.  It's fair to say they both show the

14   door.  In SW-2 it's in the middle of the right side where I'm

15   pointing; is that correct?

16   A.  It's to the right of the photo, yes, sir.

17   Q.  Okay.  And in SW-3 it's middle left?

18   A.  To the left of the photo, yes, sir.

19   Q.  Okay.  And when I refer to "it," I'm referring to the door;

20   is that correct?

21   A.  Yes.

22   Q.  Okay.  Fair to say neither of those photographs show the

23   black box where you say the gun was recovered; is that correct?

24   A.  No, sir.

25   Q.  Okay.  And you weren't shown any other photo --



1     THE COURT:  You mean yes, it's correct, you can't see

2  it in the picture?

3     THE WITNESS:  Correct.

4  BY MR. NORRIS:

5  Q.  Okay.  And you weren't shown any other photographs on

6  direct that actually showed where the black box was in that

7  room; correct?

8  A.  No, I know where the box was.

9  Q.  Okay.  But, Detective, you would agree with me if you're

10 documenting a crime scene where contraband is recovered, you'd

11 want to take a photograph showing where in the room that

12 contraband is; is that correct?

13 A.  Correct.

14 Q.  And there's no photograph of that black box oriented in the

15 room that you're aware of; is that correct?

16 A.  Correct.

17 Q.  The only photograph of the black box is SW-4, and you can't

18 really tell where that box is in that photograph; correct?

19 A.  That's fair.

20 Q.  Okay.  And there is no evidence connecting that gun to any

21 one individual, is that fair to say?

22 A.  That's fair.

23 Q.  There's certainly nothing connecting it to my client,

24 Mr. Jackson; correct?

25 A.  That's fair.

29

1   Q   You're not the one that uncovered the gun?

2   A   No, sir.

3   Q   You just got there and you saw a picture being taken?

4   A   Correct.

5   Q   And somebody else told you what they did or what

6   happened.  And you testified yesterday as if you were the one

7   that located it, right?

8                 MS. LIEBER:  Objection.

9                 THE COURT:  Sustained.

10  BY MR. BALAREZO:

11  Q   And although it was somebody else who told you what

12  happened, you're testifying here with the same certainty as

13  when you testified that that was Mr. Jones, correct?

14  A   Correct.

15  Q   Now, that particular weapon was found in Room H of the

16  nightclub?

17  A   I believe that's, yes, sir.

18  Q   All right.  And Room H is, was on the first floor of the

19  nightclub; is it not?

20  A   Correct.

21  Q   It's in a location right as you come in through one of

22  the doors to the right I believe?

23  A   Back past the stage on the left through a walkway.

24  Q   And the Room H wasn't locked in any way, was it, when

25  you went in?

---

1   A   Several doors had to be breached by the SWAT team.

2   Q   I'm not talking about several doors.  I'm talking

3   Room H.

4   A   I'm not sure if it was locked or not.

5   Q   And you don't know -- well, given that it was a

6   nightclub, it was obviously the location was opened to t

7   public at certain times, correct?

8   A   The nightclub you're asking me if it's open?

9   Q   Yes.

10  A   Sure, yes.

11  Q   And people came and went to the nightclub, correct?

12  A   Correct.

13  Q   But you have no idea who may have come and gone int

14  that Room H and put the gun there, correct?

15  A   Yes.

16  Q   Besides the fact that it was just found at the Level

17  Night Club, you have absolutely no evidence tying that g

18  Antoine Jones; is that right?

19  A   Correct.

20  Q   You have no fingerprints, right?

21  A   No.

22  Q   You don't have a picture of Mr. Jones holding that g

23  or anything of that nature?

24  A   No, sir.

25  Q   Because we would have heard about it already, right?

---

31

1   A   Correct.

2   Q   Now, you actually went into the Club during the search

3   warrant, correct?

4   A   Yes, sir.

5   Q   This was what, a little after 6.00 in the morning?

6   A   Yes, sir.

7   Q   And the reason you went in a little after 6:00 in the

8   morning was because, in part, not the total reason but in

9   part, you want to have the element of surprise, correct, when

10  you do a search?

11  A   Actually, that's the time that we slotted.  There were

12  so many people to organize and so many warrants at that time

13  in the morning to do, that's what we picked as a time to do

14  it.

15  Q   Well, the Club wasn't open at that time, right?

16  A   Correct.

17  Q   I mean, you're not going to just go and do the search at

18  11:00 at night on a Friday, correct?

19  A   Correct.

20  Q   Six o'clock in the morning on a Monday, I believe,

21  right?

22  A   Yes, sir.

23  Q   There was nobody at the Club?

24  A   Correct.

25  Q   Mr. Jones wasn't there?

---

1   A   Correct.

2   Q   And to the best of your knowledge, he wasn't expecti

3   you to come to the Club and search the premises, correct?

4   A   To the best of my knowledge, I'm sorry?

5   Q   He wasn't expecting you to come and search the prem

6   right?

7   A   I don't know what he was expecting, sir.

8   Q   Do you think that he was expecting you that morning?

9   A   I don't know --

10                MS. LIEBER:  Objection.

11                THE COURT:  Sustained   She doesn't know

12  BY MR. BALAREZO:

13  Q   When you got to the Club, there were several rooms i

14  the Club that were basically a mess; is that right?

15  A   What's a mess?

16  Q   They weren't tidy.  There was stuff all over the pla

17  that kind of thing, right?

18  A   I don't know if I would say it was messy.

19  Q   That's fine   Now, Ms. Lieber asked you a couple

20  questions about documents that you found or that were fou

21  and you testified about relating to F.T.M., the movers an

22  consultant   Do you remember those?

23  A   Yes, sir.

24  Q   And I'll just put these up just as a point of refere

1        THE COURT:  All right.  So you were served with

2    the lawsuit after you testified the first time?  Or the

3    second?

4        THE WITNESS:  I'm not -- I'm not sure when -- the

5    actual date that I was actually served and notified that we

6    were being sued.  I can't remember.  It was after the first

7    -- I don't remember the date.  Because it's handled by our

8    legal --

9        MS. URSCHEL:  No further questions.

10        THE COURT:  Okay.  Mr. Jones, your turn.

11        (NOTE:  Off-the-record discussion between

12    Ms. Urschel and Mr. Jones.)

13                    CROSS-EXAMINATION

14    BY MR. JONES:

15    Q.   How you doing, Detective Horne?

16    A.   Good morning.

17    Q.   The Government just asked you about the civil complaint

18    that you was named in by Mr. Jones.  Now, the question is,

19    was you named in the civil complaint after the first trial

20    and the evidence that came after the first trial?

21    A.   I -- I said I don't know what date that I was notified

22    that I was being sued.  I know you were already arrested and

23    we had already gone through -- it was some months after you

24    were arrested.  Or it could have been a year.  I just don't

25    know the exact date.

1    Q.   Well, the first trial was in 2006, correct?

2    A.   Correct.

3    Q.   Did you get served after 2006?  Like 2007?

4    A.   I said I don't remember when I was served, Mr. Jones.

5    Q.   Detective, have you been served in any other complaints?

6              THE COURT:  Since then?

7              MR. JONES:  Any other civil complaints.

8              THE COURT:  Brought by you?

9              MR. JONES:  No.  By anybody.

10             THE WITNESS:  No, I have not.

11             MS. URSCHEL:  Objection, Your Honor.

12             THE COURT:  Well, she answered.  The answer's

13   "no."

14   BY MR. JONES:

15   Q.   Detective, in 2005, how long have you been an officer

16   and MPD detective?

17             THE COURT:  I think you asked this before, but go

18   ahead.

19             MS. URSCHEL:  Court's brief indulgence.

20             (NOTE:  Off-the-record discussion between

21   Ms. Urschel and Mr. Jones.)

22             MS. URSCHEL:  Your Honor, at this time the

23   Government and Mr. Jones will stipulate that the lawsuit

24   we're discussing is a 2007 lawsuit.

25             THE COURT:  Okay.  But we don't know when she was

1    served.  It was just brought in 2007 is what we know.

2             MS. URSCHEL:  Yes, Your Honor.

3             THE COURT:  Okay.  That's not in this court.  Not

4    before this judge.

5    BY MR. JONES:

6    Q.  Now, Detective, now that you know that during the

7    stipulation that the lawsuit was served in 2007, was it

8    after the first trial?

9    A.  Yes.

10   Q.  Detective, approximately how many searches have you

11   participate in?

12             THE COURT:  In her lifetime?  Forever?

13             MR. JONES:  As an officer and a detective.

14             THE WITNESS:  I'm sorry, how many what?  I didn't

15   hear you.

16   BY MR. JONES:

17   Q.  Searches.

18   A.  Probably in excess of 500.  You talking about search

19   warrants?

20   Q.  Yes, ma'am.

21   A.  Uh-huh.

22   Q.  So it's fair to say that you're very experienced

23   relating to searches and search warrants?

24   A.  Yes.

25   Q.  Detective Horne, you testify at two trials already,

34

1    correct?

2    A.   Correct.   You're talking about for you.   You're not --

3    Q.   Yes, this is -- these questions that I'm talking about

4    is relating to United States versus Antoine Jones.

5    A.   Okay.

6    Q.   On numerous time in both trial -- correct me -- before

7    the third trial did you review your notes before each trial?

8             THE COURT:   You okay?

9             A JUROR:   Yes.

10            THE COURT:   Would you like a lozenge?   Oh,

11   somebody's ahead of me on that.   Thank you very much.

12            Water?   Got it?   I had the same problem a moment

13   ago.   Okay.

14            Sorry.   Go ahead.

15   BY MR. JONES:

16   Q.   Have you reviewed your notes before this trial?

17   A.   I reviewed my prior testimony, yes.

18   Q.   Detective Horne, have you ever had any allegation of

19   planting a gun?

20   A.   No.

21   Q.   Isn't it a fact in the Cory Moore case you had an

22   allegation of planting a gun?

23   A.   No.

24   Q.   Was you the detective who found the gun in the Cory

25   Moore case?

1    A.   Yes.  It was on a search warrant.  Actually, not a case.

2    Q.   Oh, I'm talking about the whole investigation.

3    A.   Well, I wasn't involved in the investigation.  I was

4    there for a search.

5    Q.   And you found the gun.

6    A.   Correct.

7    Q.   And you testified about that gun.

8    A.   Correct.

9    Q.   Have you ever had -- heard any rumors about Detective

10   Horne outside or inside the jail that Detective Horne is

11   a --

12            MS. URSCHEL:  Objection, Your Honor.

13            THE COURT:  Let him finish the question.

14   BY MR. JONES:

15   Q.   Have you heard any rumors that Detective Horne is a

16   dirty cop?

17            THE COURT:  Yeah.  Sustained.  Doesn't matter.

18   It's irrelevant.

19   BY MR. JONES:

20   Q.   You wouldn't plant a gun in Club Levels, would you?

21   A.   I wouldn't plant a gun in any case, sir.  That's not

22   what I do.

23   Q.   Now, you've been in two trials.  You listened -- you

24   looked at your notes.  In this trial right here you looked

25   at your notes.  So you prepare to testify about this gun

1    because you did it this morning, correct?  Or you did it

2    yesterday, correct?

3              THE COURT:  The gun at Levels, you mean.

4              MR. JONES:  Yes.

5              THE WITNESS:  Okay.  Uh-huh.

6    BY MR. JONES:

7    Q.  Let's talk about the entry.  On October 24th, 2005, how

8    did y'all enter to Club Levels?

9    A.  The entry was actually in the -- the breach was

10   conducted by the SWAT team.  We came in after they secured

11   it and made sure there were no other threat -- there were no

12   threats within the location.

13   Q.  How long did that take?

14   A.  I don't know.  There's a lot of rooms in Levels, or

15   areas.  I couldn't give you an estimation.

16   Q.  After they entered the club, what was the next step that

17   the agents and the detectives do?

18   A.  Once entry was made and SWAT clears out, and the actual

19   search team moves in, you start labeling rooms in them, in

20   the location.

21   Q.  So when you mean you start labeling the rooms, do you

22   take any photos as you label or you just go around each room

23   and put up the labels?

24   A.  They put up a letter in each room, and then there are

25   photographs taken in each room with the letter in the

1    photograph.

2    Q.  So is it a group or a team or one person do this -- does

3    this?

4    A.  I mean, it's various people -- various people will go in

5    and do it.  It's part of a team.  The team has several

6    duties.

7    Q.  Can you tell the jury how long did that take?

8    A.  I don't know.  Like I said, Levels had a lot of little

9    rooms and stuff.

10   Q.  Now, after you put up these letters in every room, what

11   was the next step?

12   A.  Okay.  Then like I said, it's photographed, and then the

13   search starts.

14   Q.  Okay.  Let's get to the photograph.  Who was the agent

15   who did the photographing, if you remember?

16   A.  That's listed on -- you should have a copy of it -- it's

17   an actual photo log.  And the agent's name is listed who

18   takes the pictures.

19   Q.  Do they show this photo log this morning?

20   A.  I didn't see it this morning.

21   Q.  Or yesterday?

22   A.  No.

23           (NOTE:  Off-the-record discussion between

24   Mr. Jones and Ms. Urschel.)

25   BY MR. JONES:

1    Q.  So isn't it a fact that Kellie O'Brien was the agent who

2    did all the photoing?

3    A.  I don't think Kellie took the photographs.  I think

4    Kellie was actually the seizing person.

5    Q.  So she didn't take the photographs.  Okay.  But there

6    was someone who photoed every room or did the entry photo

7    like every room before y'all start searching?

8    A.  There is someone who takes photographs, correct.

9    Q.  Right.  So the procedure is the SWAT team came in,

10   everybody put in the letters in every rooms, then someone

11   went and photographed everything -- or every room before you

12   start searching.  Correct?

13   A.  Correct.  Now, you said "the procedure."  The procedure

14   isn't always that SWAT hits the door, either.  So the

15   procedure isn't always that SWAT hits the door.

16   Q.  Yeah, I'm talking about October the 24th, 2005, at Club

17   Levels.

18   A.  Okay.

19   Q.  This is where -- what you discussed yesterday, Club

20   Levels and Mr. Kirk Carter house.  Those are the questions

21   that's -- these questions are related to.

22        Now, after you took the pictures, what was the

23   next step?  You started searching, correct?

24   A.  Correct.

25   Q.  Did y'all break up in teams or was it one person per

1    room?  Can you tell the jury what happened when you started

2    searching?

3    A.  Agents go to different areas and start searching.

4    Q.  Detective Horne, what area did you start searching at?

5    A.  Initially I was out in the open area, and then into the

6    office.

7    Q.  Let's go to the open area.  Is that downstairs or

8    upstairs?

9    A.  Main level.

10            (NOTE:  Off-the-record discussion between

11   Mr. Jones and Ms. Urschel.)

12            MR. JONES:  Your Honor, this is SW-51.  Government

13   Exhibit Levels --

14            THE COURT:  SW?  Okay.

15   BY MR. JONES:

16   Q.  Is this area that you're speaking of?

17   A.  Can you move -- slide the photograph over?

18   Q.  To the left or up or --

19   A.  I guess move it to the side.

20   Q.  This is where you come in.  This is the front door right

21   here (indicating).  You come in where the security at

22   (indicating.)  And is this the area you speaking of?

23   A.  I actually can't tell in that -- I can't tell the way

24   that picture is.  Because you come in -- I do know there

25   were tables there.  And then you go up and around to the

1     right down a little hallway to where the office wa

2     Q.  Okay.  The office is -- the office is this area going up

3     here (indicating).  This area up here, that's where the

4     office at.  So when you come in the door, was this the

5     area --

6     A.  I can tell you when you come in the door it's an open

7     area, sir.  There's a stage.  Off to the left of the stage

8     is a hallway.  Down that hallway was an office.  The office

9     had a small narrow closet.  And then there was a storage

10    area behind the office, like where they just stack stuff,

11    looked like, in the back area there.  Which would be I think

12    down this hallway (indicating.)

13    Q.  This is a stage (indicating) --

14            THE COURT:  Wait, wait, wait.  You can't testify.

15    You can't even make these statements.

16    BY MR. JONES:

17    Q.  Okay.  Now, the area you was at, can you see into the

18    office?

19    A.  If I'm standing in the hallway I can see in the office,

20    yes.  Is that what you're asking me?

21    Q.  So did you search in the hallway or -- do you remember

22    what room it was?  See, she showed you a sketch --

23    A.  Room H is the actual office.

24    Q.  Yes.

25    A.  Okay.  And that's off to the right when you go down that

1    little hallway past the stage.

2    Q.   Right.

3    A.   And there's a little closet in there that's I, and then

4    back behind H is a little storage area.

5    Q.   So my question is, was you in a hallway or was you in a

6    big area with, you say, tables and all that when you start

7    searching?

8    A.   Like I said, I went through, walked through the

9    location, then I came back and I went into H.

10   Q.   Okay.  So you didn't stay there and search for anything.

11   A.   No.

12   Q.   So that wasn't your area -- your responsibility.

13   A.   Everybody searches.  And I'm actually -- like myself and

14   Agent O'Brien, we kind of floated on that.

15   Q.   I'm sorry.  What was --

16   A.   We float.  Other people search, and sometimes we'll

17   search.  It's a huge area.  But at the time they had already

18   gone and started searching towards the office area and

19   located some items, and then we went to the office area.

20   Q.   So you were like a floater.  You just go anywhere you

21   want?

22   A.   Well, everybody can go anywhere, sir.  It's not like

23   you're designated to a certain spot to go to, okay?

24   Because, number one, is you don't know how many rooms you're

25   going into initially when you go in there.  So the search is

1   conducted by all the people on the search team

2   Q.  So the first initial spot you went to, how long did you

3   stay there before you went to the office?

4   A.  I walked through the whole location, sir.  Okay?  So I

5   couldn't give you a time frame.  I don't know what you want

6   me to tell you.

7   Q.  Well, you know, you're a well-experienced detective.

8   You did over five -- close to 500 searches.  I figure that

9   maybe you could give me approximate time for the jury to

10  know whether one minute, or was it ten minutes, was it 20

11  minutes.

12          What I'm trying to get -- the focus is when you

13  said you went to a spot and start searching, and I'm trying

14  to find out where you started at.  And you said that it was

15  tables, correct?  That you seen where you started at.

16  Correct?

17  A.  No.  I said I floated.  I said when I first came in, the

18  tables were there, then the stage, then you go down a

19  hallway to the office.  That's what I said.  And so on.

20  Q.  Let's start with the tables.  At that area, how long did

21  you stay in terms of seconds, minutes?

22  A.  I can't give you an estimation, sir.  Once we got in and

23  the location was secured, I walked through -- I walked

24  through the location.

25  Q.  Okay.  I'm speaking of Detective Horne.  How long did

1    that take you?

2    A.  I can't give -- I don't know what you want me to tell

3    you.

4    Q.  Approximately.  Give me approximately.

5           THE COURT:  No, if you can't, you can't.  I mean,

6    you can't --

7    BY MR. JONES:

8    Q.  Was it more than two minutes?

9    A.  Yes.  It's a very large location, sir.

10   Q.  Was it more than five minutes?

11   A.  Probably.

12   Q.  Was it probably more than ten minutes?

13   A.  Like I said, I can't estimate for you, sir.  I don't

14   know -- I don't know what you want me to say.  But, yes, it

15   would have been more than two minutes because it's two

16   levels that we went through.

17   Q.  I said "ten minutes."

18   A.  And I said, sir, that I don't know.  I don't know

19   what -- you want me to make up a time?

20   Q.  No, I'm just trying to --

21          THE COURT:  Okay.  It's probably more than five.

22   That's what --

23   BY MR. JONES:

24   Q.  More than five.  We got that.

25          Now, someone was in this office, correct?

```
 1    A.  Correct.
 2              THE COURT:  Which office?
 3              MR. JONES:  The office where she spoke of finding
 4    the gun.
 5              THE COURT:  Someone?  You mean some policemen?
 6              MR. JONES:  Agents.
 7              THE COURT:  Okay.
 8              THE WITNESS:  Room H.  Yes.
 9    BY MR. JONES:
10    Q.  Did you hear any of the agents saying, "Gun, gun, gun,"
11    to inform the other agents that they found a gun?
12    A.  All they do is call out, sir.  They might say, "Kellie,
13    come see this."  "Norma, you need to come check this out."
14              THE COURT:  Did you hear somebody say that?
15    That's all.
16              THE WITNESS:  No.  Because --
17              THE COURT:  "Yes" or "no."
18              THE WITNESS:  No.
19              THE COURT:  Whatever it is that -- she didn't hear
20    anything.
21    BY MR. JONES:
22    Q.  So when these agents found that gun or noticed this gun,
23    was you in that office?
24              THE COURT:  When it was first found?
25              MR. JONES:  Yes.
```

1          THE WITNESS:   No, I wasn't standing in there at

2    that time.

3    BY MR. JONES:

4    Q.   So you couldn't see through the office so you don't know

5    who found that gun, do you?

6    A.   It says who located the gun on the box in who seizes.

7    We do a seizure list, sir.

8    Q.   It says it?

9    A.   A seizure list is done and it says which agent located

10   it and which agent actually seizes it.   Seized it.

11   Q.   You eventually went into that office, right?

12   A.   That's correct.

13   Q.   Can you tell the jury what agent located that gun?

14   A.   No.   Like I said before, agents came from different

15   areas.   I don't -- I don't know which agent actually located

16   right off the top of my head.

17   Q.   How many agents was in that office with you when you

18   walked in there with that gun?

19   A.   I don't know how many agents were in there, sir.

20   Q.   Was it more than two?

21   A.   I don't know how many agents were in the office, sir.

22   Q.   Can you tell the jury did you recognize any of the

23   agents in that office?

24   A.   I -- I don't know how many agents were in there, and I

25   don't recognize -- I don't know who was actually in there.

1    I don't know -- if you handed me a piece of paper that says

2    the gun box that says who located it, I could tell you that,

3    if that's what you want.

4    Q.  Did the Government have something that says that?  That

5    -- who found the gun?

6    A.  It's located on the gun box right there by the marshal.

7           MR. JONES:  Oh, I'm sorry.  Yeah, you can give her

8    the box.

9           (NOTE:  Ms. Urschel providing an item to the

10   witness.)

11          THE COURT:  Okay.  What are you looking at?  What

12   exhibit number, please?

13          THE WITNESS:  And I need the -- do you have the

14   list?  Sorry.

15          THE COURT:  What list?

16          THE WITNESS:  There's a list, a seizure list,

17   that's filled out by the seizing agent.

18          (NOTE:  Off-the-record discussion between

19   Ms. Urschel and Mr. Jones.)

20          THE COURT:  You're looking at what number, please?

21   For the record.

22          THE WITNESS:  This is No. 6, the box with the gun.

23          THE COURT:  Levels 6?  We have a seizing list

24   somewhere that could help her refresh her recollection?

25          MR. JONES:  While we're waiting on that,



1    Your Honor.

2    BY MR. JONES:

3    Q.   This person who found the gun, is it a female or male?

4    A.   White male that found it.

5    Q.   A white male.   Okay.

6         MS. URSCHEL:   And, Your Honor, to assist Mr. Jones

7    we're going to get copies of additional documents.   He has,

8    but we're happy to get our copies to give him this list.

9         THE COURT:   That's fine.   Okay.   Thank you.

10   BY MR. JONES:

11   Q.   Detective Horne, can you describe this person who found

12   the gun to the jury?

13   A.   Other than being an FBI agent and having on gloves, no.

14   It was a male.   Like I said, he was a white male.

15        THE COURT:   Okay.   But we're going to be able to

16   refresh her recollection as soon as we get the paperwork.

17   So why don't you come back to this in a minute.

18   BY MR. JONES:

19   Q.   Okay.   Let's go to Kirk Carter house while we waiting.

20        On October 24th, 2005, when the agents went into

21   Kirk Carter house, was he there?

22   A.   It was actually the 25th.   Not the 24th.

23   Q.   25th?

24   A.   For Kirk Carter's location.   And, no, he was not there.

25   Q.   So can you tell the jury why they did not go into his

```
1    eventually get arrested weeks later?

2    A.  He was arrested sometime later, indicted, and --

3            THE COURT:  Never mind.  That's it.

4    BY MR. JONES:

5    Q.  And the agents or detectives spoke to him before he got

6    arrested?

7    A.  Correct.

8    Q.  Let's go back to Club Levels.

9            MR. JONES:  Your Honor?  I'm going to use the

10   photos that I have, because the Government didn't give me

11   the exhibits that they used yesterday.  But it's the same

12   photo, but they going to name --

13           THE COURT:  Well, let them give you the ones that

14   are in evidence, please.

15           MS. URSCHEL:  And, Your Honor, unfortunately, we

16   are looking and we cannot locate the two photographs he's

17   referring to.  The two photographs are of the gun.

18           THE COURT:  Yes.

19           MS. URSCHEL:  We can represent that I have another

20   photograph -- I believe Mr. Jones has another photograph --

21   that we could use.  Is the exact same photo.

22           THE COURT:  Well, what exhibits are they?  He can

23   use the -- what were they?

24           MS. URSCHEL:  They're 4 and 5.

25           THE COURT:  4 and 5?  So now he's going to --
```

53

```
 1    defense exhibit -- what number, Gwen?

 2              THE DEPUTY CLERK:  Defense exhibit is 19.

 3              THE COURT:  19 is the same thing as Government's

 4    4, and 5 is same thing as Defense 20?

 5              (NOTE:  Off-the-record discussion between

 6    Ms. Urschel and Mr. Jones.)

 7              THE COURT:  Okay.  What have we done?

 8              MS. URSCHEL:  So the record's clear, Your Honor,

 9    Defense Exhibit 19 is the same as LEVELS-SW-4.  And

10    Defense Exhibit 20 is the same as LEVELS-SW-5.  And then the

11    defendant has chosen to mark another photo that is not in

12    evidence, is not the Government's, but he has marked another

13    one 21.

14              THE COURT:  Do you have any objection to 21?

15              MS. URSCHEL:  No, Your Honor.

16              THE COURT:  Okay.  So 19, 20 and 21, defense

17    exhibits, are admitted.

18    (Defendant's Exhibits 19, 20 and 21 received in evidence.)

19    BY MR. JONES:

20    Q.  Detective Horne, is this the gentleman that you spoke

21    of?

22              THE COURT:  Who?  Wait a minute.  I'm looking at a

23    gun.

24              MS. URSCHEL:  Your Honor, the Elmo keeps -- no,

25    this time it's right.  It's the gun.
```

1           MR. JONES:  Yeah, it's the gun.

2           THE WITNESS:  It's a gentleman's arm in the photo

3    holding the weapon, yes.

4    BY MR. JONES:

5    Q.  So you been at two trials and you checked your notes.

6    And the same question about who is this person with this

7    mysterious hand, you don't have the name yet?

8           THE COURT:  Well, I thought we were getting the

9    paperwork to help her refresh her recollection.

10          MS. URSCHEL:  Mr. Jones has paperwork.  We gave

11   him the paperwork associated with the search.

12          THE COURT:  Do you want to mark it just to see if

13   she can refresh her recollection so we don't sit here and

14   continually ask the same questions?  She doesn't remember.

15          (NOTE:  Off-the-record discussion between

16   Mr. Jones and Ms. Urschel.)

17          THE COURT:  You mark it and show it to her and see

18   if it refreshes her recollection, if you want.

19          (NOTE:  Off-the-record discussion between

20   Ms. Urschel and Mr. Jones.)

21          (NOTE:  Items being provided to the witness.)

22          MS. URSCHEL:  Your Honor, for the record those

23   are, for identification purposes, Defendant's Exhibits 22

24   and 23.

25          THE COURT:  And those are the seizing lists.  Both

1    of them?  Or -- I know it's just for ID, but -- how do you

2    describe it?

3              MS. URSCHEL:  They are the property receipt list

4    and a 302, an FBI document related to the search.

5              THE COURT:  All right.  The question -- you got

6    them now?  Have you seen them?

7              THE WITNESS:  Yes.

8              THE COURT:  Does that refresh your recollection as

9    to who the seizing person was for the gun, the person with

10   this hand?

11             THE WITNESS:  No.  The seizing agent -- I don't

12   know who actually -- I don't -- it doesn't say which agent

13   actually located the gun.  Doesn't have the gentleman's

14   name.

15             THE COURT:  So nothing about that paperwork that

16   has just been brought in by the Government helps refresh

17   your recollection of who was in that room before you got

18   there?

19             THE WITNESS:  Correct.

20             THE COURT:  Well, that was a waste.  Okay.  She

21   still doesn't know.

22   BY MR. JONES:

23   Q.  It's not in your notes, Detective?

24   A.  It wouldn't be in my notes.  I didn't locate the gun.

25   Another -- someone else located --

```
 1              THE COURT:  Okay.  But you said before that the
 2    property list or something would have helped you.  They
 3    brought you in some papers, and it doesn't have the needed
 4    information, is what you're saying.
 5              THE WITNESS:  Correct.  I didn't fill -- I didn't
 6    fill out any of this.  I just -- they normally put a tag on
 7    the gun and put it in the box.  I didn't seize it, I didn't
 8    located it -- I didn't locate it.
 9              THE COURT:  I know.  But there's nothing on the
10    tag or the papers we've given that you tells you who did.
11              THE WITNESS:  Correct.  Correct.
12              THE COURT:  All right.  Okay.  Go on.
13    BY MR. JONES:
14    Q.  So you're testifying you didn't seize it, you didn't tag
15    it, you didn't see when they found it.  You just walked in
16    the room and you seen a gun.  Correct?
17    A.  The gun was on the floor, and the box was up as depicted
18    in one of the other pictures we had the other day.  That's
19    when I saw the gun.  The gun was then picked up by the
20    agent, and it's actually seized by -- the seizing officer
21    was Special Agent O'Brien.
22    Q.  So you can't tell the jury if someone who was in that
23    office decided to plant the gun to use it in this case for
24    later on.  Correct?
25    A.  I can -- nobody would plant a gun, Mr. Jones.
```

```
 1            THE COURT:  You can't tell anybody what happened

 2   before you got there.  That's what he's asking.  Right?

 3            THE WITNESS:  I think it's absurd.  But okay.

 4            THE COURT:  Okay.  Are we finished yet?

 5   BY MR. JONES:

 6   Q.  Is this the gun that you speaking of?

 7            THE COURT:  What number?

 8            MR. JONES:  This is Exhibit No. 19.

 9            THE WITNESS:  That's how it was, yes.  And the box

10   is being held up by someone.

11   BY MR. JONES:

12   Q.  Can you even put -- or point at some -- how big this box

13   was?

14            THE COURT:  The box -- I thought we had the box.

15            MR. JONES:  That was the last trial.

16            THE WITNESS:  That's a black thing that was

17   covering the gun.  The gun was on the floor.  And it was a

18   -- they're basically tilting it back so you can see the gun

19   on the floor.

20   BY MR. JONES:

21   Q.  So this is the box or -- can you describe to the jury

22   exactly what you talking about?

23   A.  The upper frame of the photograph here is the square box

24   and somebody has it tilted back.

25   Q.  And can you explain to the jury what this is?
```

```
1    A.   What what is?

2    Q.   This right here (indicating).

3    A.   I can't tell what that is, sir.

4    Q.   Isn't it a fact that you or Kellie O'Brien said that was

5    a bag?  A trash bag?

6    A.   It could be a bag.  I don't know, sir.

7    Q.   Didn't you say you -- you seen the gun but you didn't

8    notice that black bag right there?

9    A.   If -- it looks -- it could be a black bag, sir.  What I

10   was looking at was the gun.  That's -- that's what I'm

11   looking at.  The bag has no significance, or whatever that

12   piece of plastic is right there has no significance to me.

13   Q.   As a crime scene, and relating to a gun, how do they

14   take the pictures, do you know?

15   A.   I'm not -- I'm not a crime scene photographer, and I

16   didn't take these photographs.  So I don't know what you

17   want me to tell you.

18   Q.   This is Defense Exhibit No. 21.  Is this the gun that

19   you just said that you seen when you went into this office

20   on October the 24th, 2005?

21   A.   I can only make out the last four of the serial numbers.

22   The serial numbers here and on the box, I can't actually

23   read the first three, so I can't definitively tell you that.

24   Q.   Do it look like the gun that you believe was at Club

25   Levels on October the 24th, 2005?
```

59

```
 1      A.   Like I said, sir, I can make out the last four on the
 2      serial number.   I can't make out the first few.   So I can't
 3      tell you definitively, yes, it is.
 4      Q.   When you came into that office, could you see the serial
 5      number when you seen that gun?
 6      A.   I'd have to look at the picture again, sir.
 7             I believe the gun is turned the other way and the
 8      serial number would be down on the carpet.
 9      Q.   Like this (indicating)?
10      A.   No.
11      Q.   Not like that?
12      A.   If you -- why don't you get the picture that you had
13      with the box in it with the gun laying underneath it.   The
14      serial number I believe is on -- the gun is turned around.
15      The serial --
16      Q.   This one right here (indicating)?
17      A.   This gun is turned around, yes, as opposed to --
18             THE COURT:   What number exhibit?
19             MR. JONES:   This is Defendant's Exhibit 19.
20      BY MR. JONES:
21      Q.   So --
22             THE COURT:   Can you get the blocks off the screen?
23             THE WITNESS:   How do you do that?
24             THE DEPUTY CLERK:   Down in the lower left corner,
25      "clear."
```

— 2/8/13 - A.M. —

60

1          THE WITNESS:   Oh, okay.

2    BY MR. JONES:

3    Q.   Do you recognize this as being the gun?

4    A.   No.   You asked me if I -- you asked me about the serial

5    number, if I could recognize it.   The serial number is on

6    the box.   It's on the gun.   And I said, the serial number of

7    the gun was turned differently than the way you had it in

8    your picture.

9    Q.   This box right here (indicating), where was this box

10   located in that office?

11   A.   I believe it was behind the entry door to the office.

12   Q.   The entry doors.

13   A.   The office door.

14   Q.   This is Government's Exhibit LEVELS-SW-3.   Do you

15   recognize this picture as being the office?

16   A.   That's part of it, yes.

17   Q.   And it's behind this door (indicating)?

18   A.   There were a couple of doors there.   I'm not sure if

19   that's the entrance to the -- because the desk and

20   everything would be over to the right when you came in.

21   Desk to the right, couch that way.   That probably is the

22   door, yes.

23   Q.   So you telling the jury it was a couple of doors there?

24   A.   Because there was a closet, as well, which is Room I.

25   Q.   Can you tell in this picture which door it is that this

1    box was behind.

2    A.   No, I can't tell in that picture.

3    Q.   Detective, can you put up by hands how big this box was

4    (indicating)?

5              THE COURT:  Give us an estimate.

6              THE WITNESS:  I don't know.

7              THE COURT:  You say a foot, two feet?

8              THE WITNESS:  I don't know.  How wide is this?

9              THE COURT:  Give her a ruler.

10             (NOTE:  Ruler being provided to the witness.)

11             THE COURT:  Thank you, Gwen.

12             THE WITNESS:  This is probably about -- a couple

13   more -- 21 inches.  And probably -- maybe 21 by 21.  It was

14   a square box.  I don't know the exact dimensions it was.  I

15   can't tell you that.

16   BY MR. JONES:

17   Q.   And it was behind the door, correct?

18   A.   Correct.

19   Q.   Now, when you looked at Club Levels photos -- or let's

20   be specific.  The photos in this office, did you review

21   these photos to say which door this box was behind?

22   A.   I didn't -- I don't know.

23   Q.   This is LEVELS-SW-2.  Do you -- can you say that this is

24   the office?

25   A.   That's part of it.

1    Q.   So LEVELS-SW-3, can you say this is the office?

2    A.   That's part of it.

3    Q.   Now, is it any other photos that you view of Club Levels

4    and that office besides the gun photos?

5    A.   There's --

6    Q.   This is the photos from that office (indicating.)   This

7    is the Photo SW-2 from that office (indicating.)   Correct?

8    The Government showed you this (indicating) and you said

9    it's from the office, correct?

10   A.   Correct.

11   Q.   This is defendant photo (indicating) from that office,

12   if you remember.

13   A.   I don't know where that photo was taken.

14   Q.   So you don't know where this one is taken?

15               THE COURT:   What is this?

16               MR. JONES:   This is Defendant Exhibit 21.

17               THE COURT:   Okay.

18   BY MR. JONES:

19   Q.   You don't know where that photo was taken?

20   A.   I don't know -- I don't know who's photo or what that

21   photo is.   The photos that came on our log, they have --

22   they're listed on the photo log and they have -- and there's

23   also a picture with the letter in it.   There's another

24   photograph like that in the office.

25   Q.   Now, do you remember which way the door opened looking

63

1    at this picture.

2    A.   Looks like it opens in, looking at the picture.

3    Q.   In.   So when you come in, was it closer to where -- was

4    this box closer to the chairs or on the other side of this

5    door right here (indicating)?

6    A.   On the other side.

7            THE COURT:   Of what, the door?

8            THE WITNESS:   Yes.

9            THE COURT:   You mean on the close side near you on

10   the screen?

11           THE WITNESS:   Well, it's not on -- it's not by the

12   desk and all that stuff, no.

13   BY MR. JONES:

14   Q.   It's on the opposite side of these two chairs right here

15   (indicating).

16           THE COURT:   When you say "opposite side" --

17           THE WITNESS:   No, I'm not saying -- it's not

18   depicted in this photograph.   Let me say it that way.

19   BY MR. JONES:

20   Q.   So you cannot tell the jury or show in this picture

21   (indicating) or this picture (indicating) of this office any

22   box, can you?

23   A.   Like I said, it was behind the door, sir.   If you move

24   the picture over you can still see -- you've got it so you

25   can't see the door in that picture.

1    Q.  which picture?

2         Now, you saying not this picture (indicating)?

3    A.  No.  Can you move -- because part of the picture's not

4    showing where you got the --

5    Q.  Let me see if I could do it like this.  No, you can't

6    see it like that.

7         We only have two picture here, Detective.  Is it

8    this picture (indicating)?

9    A.  I asked --

10        THE COURT:  What is "this"?  For the record.

11        MR. JONES:  LEVELS-SW-2.  And the other one is

12   LEVELS-SW-3.  These are the pictures of the office of Club

13   Levels that the Government took that day.

14        THE WITNESS:  I asked the picture that was up

15   there before, I asked you to slide it over.  Not put that

16   one up.

17   BY MR. JONES:

18   Q.  Okay.  This one right here (indicating)?

19   A.  Yes.  Now you can see the door right there.

20        THE COURT:  What's this one now, please?

21        MR. JONES:  SW-3.

22        THE COURT:  SW-3 has some chairs stacked in the

23   right corner that are pink.

24   BY MR. JONES:

25   Q.  Can you see it in this picture, Detective?

1    A.   Like I said, sir, it was behind that door.

2    Q.   This photo right here is behind that door.  It's the

3    same door but it's on the other side.  This is the same door

4    that you speaking of.

5              MS. URSCHEL:  Your Honor, we object to testimony

6    provided by the defendant.

7              THE WITNESS:  It's two different angles.

8              THE COURT:  Wait a minute.  When she objects, you

9    have to stop.

10             What's the -- huh?  What's the objection?

11             MS. URSCHEL:  Mr. Jones is testifying.

12             THE COURT:  The what?

13             MS. URSCHEL:  Mr. Jones is testifying.

14   BY MR. JONES:

15   Q.   Isn't it a fact that the photo I just showed you, SW-3

16   and SW-2, is the same office?

17   A.   It's the same office.

18   Q.   Isn't it a fact that SW-3 and SW-2, this black door

19   right here (indicating), is the same door?

20   A.   There's no door in the photo I'm looking at.

21             THE COURT:  There's no door in that -- okay.  Here

22   we go.  There's the door.

23   BY MR. JONES:

24   Q.   This door right here (indicating), is it the same door?

25             THE COURT:  As in the other photograph --

1          MR. JONES:  Yes.

2          THE COURT:  -- which would be SW-3?  What's --

3    what one is that?  2 or 3?  What's that?

4          MR. JONES:  This is SW-2 right here.

5          THE COURT:  So is the same door depicted in 3?

6          THE WITNESS:  Okay.

7          THE COURT:  Yes?

8          THE WITNESS:  Yes.

9          THE COURT:  Okay.

10   BY MR. JONES:

11   Q.  So these two chairs, these tables over here

12   (indicating), the office tables, it's on that side of the

13   room?

14   A.  What is?

15   Q.  This right here, these two chairs right here

16   (indicating).  You see these two chairs?

17   A.  Yeah.

18   Q.  Was it on that side of the door?

19   A.  I keep saying, sir, it's on the other side of the door.

20         THE COURT:  The near side of the door.  Not near

21   the desk.

22   BY MR. JONES:

23   Q.  Okay.  Let me make sure you see this right.

24   A.  Behind the -- push the photo over some more.  Sorry.

25         THE COURT:  Go the other way.  This is SW-3.

```
 1              THE WITNESS:  If you could go behind that door.

 2   See, the office chair's here (indicating).  Behind that

 3   door.  So you can't see it in the photo, sir.

 4   BY MR. JONES:

 5   Q.  So this black door right here (indicating), it's behind

 6   this black door, correct?

 7   A.  Correct.

 8   Q.  This is the picture.  Behind the black door.  It's the

 9   opposite --

10              THE COURT:  Well, you can't testify.  You can't

11   testify in your answers -- your questions.  Sorry.

12   BY MR. JONES:

13   Q.  Isn't this the picture -- behind the black door -- you

14   talking about?

15   A.  No.

16   Q.  It's not?  It's not?

17   A.  No.

18              THE COURT:  Okay.  Move on.  She says "no."

19   BY MR. JONES:

20   Q.  Now, Detective O'Brien --

21              THE COURT:  No, sir.  It's Horne.

22   BY MR. JONES:

23   Q.  I mean, Detective Horne.

24              THE COURT:  Horne.

25   BY MR. JONES:
```

1    Q.   Yeah.   Detective Home Home.   The picture right here,

2    you could see clearly these white gloves and a Caucasian man

3    holding this gun, correct?

4    A.   I can't see his arm, but you probably have a better --

5    but, yes, I knew it was -- there you have it.

6    Q.   How about that?

7    A.   Okay.   Yes.

8    Q.   You could see this, right?

9    A.   Uh-huh.

10   Q.   Can you tell the jury where this black background -- or,

11   where was this picture taken at?

12   A.   I can't tell you from right there.

13   Q.   Isn't it a fact that this photo right here look like

14   it's in a black room?

15   A.   That room was black where the office is.

16   Q.   So you saying this is a black room?

17          THE COURT:   What does that mean?   "Black room."

18          MR. JONES:   I mean a room where you -- like a

19   photo room where it's dark.

20          THE COURT:   Oh.

21          THE WITNESS:   Oh, I'm not calling it a -- I'm

22   sorry.   You tell me what -- what are you asking me?

23   BY MR. JONES:

24   Q.   This photo here (indicating), Defense Exhibit No. 20,

25   isn't it a fact that this not even Club Levels?

1    A.  I don't know where -- I didn't take the photo, sir.

2    Q.  But you said to the jury that it was a white Caucasian

3    FBI agent.  You came into the room and seen the photo --

4    seen them taking the photos.

5    A.  I saw him pick the gun -- I saw the gun laying there, I

6    saw him pick the gun up.  This one he's holding the gun,

7    correct.  Other than that, I don't know what you want me to

8    tell you.

9          THE COURT:  Well, you don't know where the photo

10   was taken, in other words.  Is that what you're saying?

11   What room or when or what?

12         THE WITNESS:  Right.  Because this could have been

13   later on, but I don't --

14         THE COURT:  Okay.  You don't know, then you say,

15   "I don't know when it was taken."

16         THE WITNESS:  Right.

17   BY MR. JONES:

18   Q.  Do you know what this is right here (indicating)?  I'm

19   sorry, let me -- this right here (indicating)?

20         THE COURT:  The little white thing?

21         THE WITNESS:  The white spot?

22   BY MR. JONES:

23   Q.  Yeah.  Is that a light?

24   A.  I don't know what it is.  It's a white spot.

25   Q.  So, basically, you don't know if this picture was taken

1    later on after October the 24th.  Correct?

2    A.  I don't know when -- this particular picture here, I

3    don't know when it was taken.

4    Q.  You telling the jury today you don't know where -- you

5    don't know if you ever seen this picture right here before,

6    correct?

7    A.  I haven't seen that picture.

8    Q.  You never seen this picture in neither trials?

9    A.  I don't believe I've ever seen that photo, no.

10            THE COURT:  What number is that?  21?

11            MR. JONES:  This is Defendant Exhibit No. 21.

12            THE COURT:  Okay.

13   BY MR. JONES:

14   Q.  Can you explain to the jury what surface is this?  Or do

15   you know if this was taken at Club Levels?

16   A.  That's when the box is being held up.  Like I said, the

17   gun was under the box.

18            THE COURT:  I know.  But was this taken at Club

19   Levels?

20            THE WITNESS:  Yes.

21            THE COURT:  And it's being -- it's in a box or

22   it's what?

23            THE WITNESS:  The box is being tilted up by an

24   agent while it's being photographed.

25            THE COURT:  And is this the way it was found?  Or

1    you don't know?

2            THE WITNESS:  This is -- when I came into the

3    room, this is how it was found and the box is up.

4    BY MR. JONES:

5    Q.  So you're telling the jury this is Club Levels, this

6    picture right here (indicating)?

7    A.  Yes.

8            THE COURT:  That number is again?

9            MR. JONES:  19.

10           THE COURT:  19 was taken in the office.  Is that

11   correct?

12           THE WITNESS:  Correct.

13   BY MR. JONES:

14   Q.  Now, in SW-3, LEVELS-SW-3, the Government exhibit, do

15   you see the lighting (indicating)?  Is that light bright?

16   A.  It's in a picture.  I don't know what you mean is it

17   bright.

18   Q.  Is it dark like the picture with the hand?  Or is it

19   bright that you could see, basically, everything in that

20   picture?  That you could see the couch, correct?

21   A.  Correct.

22   Q.  You could see these pink chairs, correct?

23   A.  Correct.

24   Q.  You could see this red (indicating), correct?

25   A.  Correct.

72

```
1    Q.  So taking a picture, isn't it true that you should see
2    that background?
3    A.  Depends on how you're -- what angle you're taking the
4    picture at.
5    Q.  Did you take the picture with the lights out?
6    A.  I didn't take the picture, Mr. Jones.
7    Q.  Did the agents that worked with you that day that was in
8    that office take the picture with the lights out?
9              THE COURT:  Do you know?
10             THE WITNESS:  It appears that the lights are on,
11   Mr. Jones.
12   BY MR. JONES:
13   Q.  The picture with the gun that you were not sure about,
14   did they take that picture with the lights out?
15             THE COURT:  19.  19.
16             THE WITNESS:  (No response.)
17   BY MR. JONES:
18   Q.  You don't know?
19   A.  I don't know what you're talking about.
20             THE COURT:  He wants to know whether
21   Defense Exhibit 19 with the gun, when they took the picture
22   did they turn off the lights?
23             THE WITNESS:  No, I'm sure they didn't turn the
24   lights off.
25   BY MR. JONES:
```

1    Q.  This photo right here, 'I mean at Exhibit SW-2.  Isn't

2    it a fact that this light is so bright that you could see

3    almost everything on this floor?

4    A.  I don't know.  It could be a flash, sir.

5    Q.  So when you came into Club Levels office, did you see

6    them take any pictures at all after you seen the -- the gun

7    down on the floor?

8    A.  Did -- did --

9    Q.  After you seen the gun on the floor -- you walked in,

10   you said you seen the gun on the floor, correct?

11   A.  Correct.

12   Q.  Was anybody taking photos at that time?

13   A.  I don't know when -- they did take a photo.  And I don't

14   -- if you're asking me what time they took the photo, I

15   can't tell you what time they took the photo.

16   Q.  You walked into the room.  You seen this picture.  You

17   say you seen the gun down.

18   A.  Correct.

19   Q.  Were they all just looking at the gun?  Or was somebody

20   getting ready to take photos of that picture?

21   A.  The photographer comes in and takes a photograph.  Once

22   -- they take a photograph of what is found in place.

23   Q.  Was the photographer in that office before you got there

24   taking photos?

25   A.  Photos were taken prior to on the entry, if that's what

1    you're trying to talk about.

2    Q.  No.

3           THE COURT:  No.  Listen to him.

4    BY MR. JONES:

5    Q.  This is afterwards.  Prior to --

6           THE COURT:  Before you walked in, did anybody on

7    behalf of the law enforcement take photos, if you know?

8           THE WITNESS:  I don't know if a photo was taken

9    before I walked in.  The box was up, the gun is still on the

10   carpet or the ground there when I walk in, and --

11          THE COURT:  And somebody took a photo then.

12          THE WITNESS:  Right.  And then whoever our

13   photographer was, which is on the photo log, would take the

14   photographs.  I'm not the photographer.

15   BY MR. JONES:

16   Q.  Okay.  After the gun was found, Detective Horne, how

17   long was you in this office?

18   A.  I don't know.  I was all over Levels.  What do you mean?

19   Q.  I'm asking about this office.  After the gun was found

20   and you seen somebody take the photo, how long did you stay

21   in that office before you went somewhere else?

22   A.  I came in and out of that office several times, so I

23   couldn't give you an exact time, sir.  It's a search

24   warrant.  You go in all the rooms and you go back and forth.

25   Q.  Yeah, I'm just speaking of the gun.  When you seen that

1    gun with your eyes -- that you seen this gun. -- did you

2    stand there five minutes or more?

3    A.  I can't answer that, sir.

4    Q.  Okay.

5            THE COURT:  Okay.  How much longer?  Because we

6    have to take a break to take up another witness.

7            MR. JONES:  I'm just going to do these two

8    documents.

9            THE COURT:  Fine.  Okay.  Finish it up.  We have

10   to take the witness who --

11           MR. JONES:  You want to take a break?

12           THE COURT:  No, I want you to finish this up so we

13   can then interrupt for a few minutes, and then we have to

14   take a witness who needs to board a car or train back to New

15   York City.

16           (NOTE:  Off-the-record discussion between

17   Mr. Jones and Ms. Urschel.)

18           THE COURT:  Everybody okay?  Yeah.

19           MR. JONES:  Last two documents, Your Honor.

20           THE COURT:  Very good.  Are we marking them as

21   defense exhibits?  Sir?

22           MR. JONES:  Yes.

23           THE COURT:  Yes?

24           MR. JONES:  Yes, this one 24.  The Government is

25   objecting to the next one.

```
 1              THE COURT:  Now, wait a minute.  Which one's
 2      which?
 3              MR. JONES:  This is --
 4              THE COURT:  Should be 25.  We got a 302 for
 5      identification as 24.  So we're at --
 6   .          THE DEPUTY CLERK:  No, no, no, Judge.  23 is the
 7      302.
 8              THE COURT:  Okay.  Which one's the property
 9      receipt?
10              THE DEPUTY CLERK:  The property receipt is
11      Defense Exhibit 22.  24, that he just marked, he marked as
12      the photo log.
13              THE COURT:  24 is the photo log.
14              THE DEPUTY CLERK:  Right.  And we have Defense
15      Exhibit 25 here which is a docket sheet.
16              THE COURT:  And which one do you object to?  22's
17      the property receipt or the 302?  I'm sorry.
18              THE DEPUTY CLERK:  23 --
19              THE COURT:  Two.
20              THE DEPUTY CLERK:  -- is the 302.
21              THE COURT:  Okay.  Very good.
22              MS. URSCHEL:  We do not object to Defendant's 24.
23      We do object to Defendant's 25.
24              THE COURT:  Okay.  24's in.
25              (Defendant's Exhibit 24 received in evidence.)
```

```
 1              THE COURT:  25, let me see it, please.  I don't
 2     know what it is.
 3              What's the basis of your objection for 25?
 4              MS. URSCHEL:  Can we approach, Your Honor?
 5              THE COURT:  Yup.
 6
 7              (Discussion at the bench on the record with all
 8     parties present except Ms. Soltys:)
 9              THE COURT:  Okay.  This doesn't say anybody's been
10     served yet.  This only says that a summons was issued.  That
11     doesn't mean -- that means that the summons is in their
12     possession of -- not the defendants.  So this has no
13     relevance to anything.
14              MR. JONES:  Your Honor --
15              MR. O'TOOLE:  Excuse me.  I would suggest he's
16     entitled to ask her whether or not she knows it's been
17     filed.
18              THE COURT:  She can ask that -- well, yeah, yeah.
19     But this can't go in.
20              MR. O'TOOLE:  No, I think it can go in as to
21     whether it's been filed.  Whether it's been served is
22     another issue.
23              THE COURT:  No.  So what if it's been filed?  If
24     she doesn't know about it, it has no relevance.
25              MR. O'TOOLE:  Well, but the question, does she
```

```
 1   know about it?  Has it been filed and does she know about

 2   it?  Being served is -- I'm sorry.

 3          THE COURT:  This is not going into evidence.  25.

 4   It's a docket sheet that doesn't prove anything.  You can

 5   ask if she knows if she's been sued again, and she'll say

 6   "yes" or "no."  That's all you can do.  Move on.

 7          MR. JONES:  Your Honor --

 8          THE COURT:  Let's get going here.

 9          MR. JONES:  I said the two documents, but I didn't

10   ask her a question about the --

11          THE COURT:  Oh, no.  You can.

12          MR. JONES:  Not the two documents.  I ain't

13   talking about this.  I'm talking about the question about

14   the keys that was found -- the keys that she said was found.

15          THE COURT:  Go ahead.  I don't know about that.

16   But I'm just saying the -- 25, the objection is sustained.

17   It's not going to the jury.

18          (End of discussion at the bench.)

19

20   BY MR. JONES:

21   Q.  Detective Horne, you testified that once the SWAT team

22   came in, they came in and they put the letters up.  And the

23   next step -- that's not correct?

24   A.  The SWAT team didn't put the letters up.

25   Q.  No, I said once the SWAT team came in, then the agents
```

1    or officers put the letters up in the hit and room?

2    A.  Correct.

3    Q.  Then after that, somebody went around and took photos.

4    Entry photos they call, correct?

5    A.  Correct.

6    Q.  Then after the entry photos, y'all teams got together

7    and people start searching, correct?

8    A.  Correct.

9    Q.  This is Defense Exhibit No. 24.  Did you recognize this,

10   Agent O'Brien -- I mean, Detective Horne?  I don't know why

11   I keep saying -- Detective Horne.

12   A.  If you -- it's a copy of a photo log filled out by

13   somebody.  But the reverse side of it actually has what

14   you're not showing me.

15   Q.  This right here (indicating)?

16   A.  No, the reverse side lists the -- would list the case

17   number and it would have a date and who the -- I think it

18   has who the seizing agent is.  It's -- like if that paper,

19   if you could flip it over, there's something on the back of

20   those two pieces.

21   Q.  These papers (indicating)?

22   A.  If they were the original, there's something on the back

23   of each of them.

24   Q.  This is a photo log that was in the discovery.  And

25   it's, basically, like entry pictures that the person who's

1    taking the photo log -- is this --

2              THE COURT:  "What is it," why don't you ask.

3    BY MR. JONES:

4    Q.  Can you tell the jury what this photo log or photo

5    sketch is?

6    A.  What I'm looking at right here is a copy of one side of

7    a photo log, and it lists front door, Room A, B, and it

8    lists the room numbers going down.

9    Q.  Okay.  So, for example, when the person took this photo,

10   what was the first spot that they take a photo?  Can you see

11   it?

12   A.  What --

13   Q.  Can you see this?

14   A.  What are you asking me?

15   Q.  This right here (indicating), what did the person do?

16   They went through the front door and took a photo of the

17   entry, correct?

18   A.  Correct.  Entry, front door.

19             THE COURT:  In other words, is this in the order

20   that they took photos?

21             THE WITNESS:  Yes.

22   BY MR. JONES:

23   Q.  Okay.  Now, then they went to the front door and took

24   another photo?

25   A.  I guess -- I guess so.  Like I said, I didn't do this.

                              ─ 2/8/13 - A.M. ─

```
 1    And I actually have to see the reverse side to know.

 2             THE COURT:  Well, we don't have it at the moment.

 3    Where is the reverse side?  We have to take a recess, ladies

 4    and gentlemen.  We have a witness problem.  So we will

 5    resume at quarter of.  We have to do something in the

 6    courtroom, a legal matter.  Thank you.  Be patient, and be

 7    back in the jury room at quarter of.

 8             You stay here.

 9             (NOTE:  The jury exiting the courtroom at

10    11:24 a.m.)

11

12             (NOTE:  The following proceedings were held

13    outside the presence of the jury.)

14             THE COURT:  Okay.  We have to take up the other

15    matter because this witness is not going to get on the road

16    before lunch.

17             MS. URSCHEL:  Yes, Your Honor.

18             THE COURT:  Okay.  Finish up with her.  If you

19    answer the question and not fight the questioner, we'll move

20    a lot faster, believe me.  This happened in prior trials,

21    too.  Just answer the question.  Don't worry about whether

22    you know or don't know.

23             All right.  Let's finish up the matter of

24    Demetrius Johnson immediately because we're going to have to

25    interrupt this witness and take up the guy from New York.
```

1           THE COURT:  Ladies and gentlemen, today we're

2      going to finish Detective Horne, and there will be one

3      fairly short witness after lunch or -- maybe after lunch or

4      before lunch.  But we will finish in the early afternoon.

5      And then the Government projects another three witnesses on

6      Monday.  So -- and then we'll begin Mr. Jones's case

7      probably the day after.

8           Everybody okay?

9           (Off-the-record discussion between Ms. Urschel and

10     Mr. Jones.)

11          (NOTE:  Witness Horne resuming the witness stand.)

12          THE COURT:  Okay.  It's -- Mr. Jones is still

13     doing the cross.

14          Have a seat.

15          MS. URSCHEL:  Your Honor, if I could just put on

16     the record.  We now have the Government's 4 and 5.  They

17     were stuck behind one of the other pieces of evidence.  So

18     Mr. Jones is able to use either one.

19          He also -- he also has the back of the document

20     that Detective Horne was asking for.  We've now provided

21     that.  We can mark this.

22          THE COURT:  Can you mark that now, Mr. Jones, so

23     that -- that would be -- let me see.  We had -- the photo

24     log was 24.  So just include that as 24(a) and (b).  Is 24

25     the two pages, the front side, and then (a) and (b) are the

1    back side.

2            MS. URSCHEL:  For the record, what was on the back

3    had been provided.  It's just this has the front and back on

4    the same piece of paper.

5            THE COURT:  All right.  So we got 24 and 24(a) and

6    (b) with the -- all in evidence.  25 is not.

7            CROSS-EXAMINATION (continuing)

8    BY MR. JONES:

9    Q.  Detective Horne --

10           MR. JONES:  This is, Your Honor, Exhibit 24(a).

11           THE COURT:  Okay.

12           MR. JONES:  And this is Exhibit 24(b).  It's the

13   second page of 24.  It's the second page.  I can move on?

14           THE COURT:  Huh?

15           MR. JONES:  I'm just showing it to you.

16           THE COURT:  What's this?

17           MR. JONES:  This is the back side of Exhibit

18   24(a).  This is the back --

19           THE COURT:  24(a).

20           MR. JONES:  -- that Detective Horne was speaking

21   of.  This is the back side.

22           THE COURT:  Okay.

23   BY MR. JONES:

24   Q.  Detective Horne, do you recognize, was this you were

25   speaking of earlier?

116

```
 1    A.   Yes.  Because it will give you your address and the

 2    date.  So I didn't want to say, yes, without having all

 3    that.  Uh-huh.

 4    Q.   So who took the photos -- who did the entry photos, by

 5    looking at this?

 6    A.   The photographer was Kellie O'Brien.

 7    Q.   Was she also the seizing agent, too?

 8    A.   Yes.

 9    Q.   This is 24(b).  This is the second page.  So, basically,

10    this is the second page of the first one that we showed you.

11    A.   Yes.  It says she's on her second roll.

12    Q.   Okay.  Second row, first row.  So let's go over the

13    first row of the entry pictures.

14    A.   Okay.

15    Q.   Can you see it clearly?

16    A.   Uh-huh.  Yes.  I'm sorry.

17    Q.   Can you read where the first shot is there's a scratch

18    through it.  Can you read the second shot of this entry

19    photo?

20    A.   Number 2 is front door entry.

21    Q.   Can you read 3?

22    A.   Front door entry.

23    Q.   Can you read 4?

24    A.   Room A entry.

25    Q.   Can you read 5?
```

1     A.   Did you want me to read the whole sheet?

2     Q.   I'm sorry?   What did you say?

3     A.   Room A entry.   I said, did you want me to just go ahead

4     and read it?

5     Q.   Yeah.   6?

6     A.   Room B entry.

7     Q.   7?

8     A.   Room B entry.

9     Q.   8?

10    A.   Room B entry.

11    Q.   9.

12    A.   Placard.

13    Q.   10.

14    A.   Bathroom entry.

15    Q.   11.

16    A.   Bathroom entry.

17    Q.   12.

18    A.   Room E entry.

19    Q.   13.

20    A.   Room E entry.

21    Q.   14.

22    A.   Room F storage.

23    Q.   15.

24    A.   Room F storage.

25    Q.   16.

```
 1    A.   Room F storage.

 2    Q.   17.

 3    A.   Room H office.

 4    Q.   18.

 5    A.   Room H office.

 6    Q.   19.

 7    A.   Room I closet.

 8    Q.   20.

 9    A.   Room G storage.

10    Q.   21.

11    A.   Gun.

12    Q.   22.

13    A.   Gun with ammo.

14    Q.   23.

15    A.   Close-up of gun.

16    Q.   Now, the last three that you read, looking at this photo

17    log, what room is this gun in?

18    A.   The gun was removed from H.

19    Q.   Looking at this photo log.

20    A.   It doesn't tell you what room it came out of.  It's on

21    the 597 where it came from.  Plus, I was there.

22    Q.   So you was there when?  When she did this photo log?  Or

23    was you --

24    A.   No.

25    Q.   -- there when she did the entry pictures?
```

1    A.   No.   I was in room H.   The gun was found in room H.

2    Q.   This photo log, is it this row right here, the first

3    row, when she come in and take pictures?  The order that she

4    took the pictures?

5    A.   That's -- this is her order of pictures, correct.

6    Q.   Now, if this is the order of pictures, and you testified

7    that when she came into this club, you testified that they

8    do the entry pictures first.   Correct?

9    A.   That's normal procedure, yes.

10   Q.   And Agent O'Brien took pictures of all these entries in

11   order, right?

12   A.   I'm sorry.   I -- she did what?

13   Q.   When she did these entry pictures on this first row of

14   pictures --

15   A.   Uh-huh.

16   Q.   -- Agent O'Brien came into the club and started taking

17   pictures.

18   A.   Correct.

19   Q.   You testified that the agent -- you didn't know the name

20   at the time -- came in and took pictures, she did entry

21   pictures first.

22   A.   I said -- no.   That's -- normal procedure is to take

23   entry photos, label the room, and take photos, correct.

24   Q.   So that's normal procedures.

25   A.   Uh-huh.

120

1   Q.   And the photodays with Club Levels, what procedure did

2   you use?

3   A.   Well, Club Levels was huge.   This happens on a lot of

4   search warrants; what happens is they yell "photo."

5            Let me go in a little more detail.   They'll start

6   photographing.   And then each room they photograph, then

7   they'll let you know:   Okay, you can start searching here.

8   Okay.   They move on to the next room.   They start

9   photographing.   Okay, you can start searching there.

10   Q.   Oh, okay.

11   A.   So further down, clearly she had taken a picture of --

12   the last picture of G.   And then I do remember somebody

13   yelling "photo," and she went back to H and took the photo.

14   Q.   So you telling the jury that she wasn't the agent in the

15   club office when the gun was found before you got there?

16   A.   I don't know where she was before I got there, sir.

17   Q.   Go to No. 17.

18   A.   Okay.

19   Q.   This is room H office, correct?

20   A.   Correct.

21   Q.   Then you go to 18.   Room H office, correct?

22   A.   Correct.

23   Q.   Then she took room I closet, right?

24   A.   Correct.

25   Q.   Then she went to room G storage, correct?

1    A.   Correct.

2    Q.   Then it don't say where the gun at.  She took three

3    shots of the gun.

4    A.   Correct.  That's what it says here.

5    Q.   Isn't it a fact that in the second trial that the

6    information is that Agent O'Brien was in there before you

7    when the gun was found?  Is that a fact?

8    A.   I -- I don't know, sir.  I don't know what she testified

9    to.  I don't know where she was.  I know where I was.

10   Q.   Detective Horne, you investigated this case and you went

11   to two trials.  And you telling the jury that you don't know

12   that Agent Kellie O'Brien was in that office when the gun

13   was found?

14   A.   I don't know where Kellie O'Brien was when the gun was

15   found, sir.  You'd have to ask her that.  Looks to me like

16   she would have been in room G.

17            THE COURT:  You're just speculating.  You don't

18   know where she was.

19            THE WITNESS:  Correct.

20   BY MR. JONES:

21   Q.   So you don't know a fact if Agent O'Brien took this

22   document right here and say -- let me put --

23            THE COURT:  Exhibit 24(a).

24            MR. JONES:  Yeah.  This is 24(a).

25   BY MR. JONES:

```
1    Q.  Took this document and:  Let me just add gun, gun, gun,

2    to make it look like it was a gun in Club Level.  Correct?

3    A.  I'm sorry, I didn't understand -- did you ask a

4    question?

5    Q.  Do you know if Agent O'Brien added where it says "gun."

6    Nothing else beside.  Number 21.  22 it say "gun with

7    magazine."  23, "close-up of gun."  You don't know if Agent

8    O'Brien put that in there and then put this in discovery.

9    Do you?

10   A.  I don't know --

11   Q.  Do you know if Agent O'Brien obstruct justice?

12   A.  No, she -- I don't know what Agent O'Brien -- but I

13   would -- no, she would not do that.

14   Q.  So was you there with her when she took all these

15   photos?  These entry photos?

16   A.  I wasn't standing beside her when she was taking

17   photographs, no.

18   Q.  So you don't know when she took this photo of the gun,

19   do you?

20   A.  The time?  I don't know what time it was, no.

21   Q.  So only thing you could tell this jury is you walked in

22   there and you seen a gun on the floor.  Correct?

23   A.  The agent -- like I said, the agent was holding up the

24   box, and the gun is laying on the floor.  Correct.

25   Q.  You spoke -- you -- you testify about some Holiday Inn
```

1    MS. URSCHEL:  Brief redirect, Your Honor.

2                    REDIRECT EXAMINATION

3    BY MS. URSCHEL:

4    Q.  In those 500 search warrants that you've done, is it

5    common practice to take a picture of every single document

6    that is seized from a location?

7    A.  No.  We generally go back to the office and start going

8    through the documents.  Because we don't know what we have.

9    Q.  In the grand jury were you asked to identify every

10   single piece of evidence that was seized from Levels?

11   A.  No, I was not.

12   Q.  Do you remember being asked about the lawsuit from 2007

13   by Mr. Jones?

14   A.  Yes.

15   Q.  And the testimony that you've given during this trial,

16   is it consistent with the testimony you gave in 2006 before

17   that lawsuit?

18   A.  Yes, it is.

19   Q.  And is it consistent with the testimony you gave in 2007

20   after the lawsuit?

21   A.  Yes, it is.

22            MS. URSCHEL:  No further questions.

23                    RECROSS-EXAMINATION

24   BY MR. JONES:

25   Q.  Detective Horne, is that complaint consistent with

1  planting a gun in Club Levels?

2          THE COURT:  What complaint?

3          MR. JONES:  The complaint she just mentioned.

4          THE COURT:  Oh, no, no, no.  It's just

5  allegations.  It's a complaint.

6          Never mind.  Don't answer.

7          MR. JONES:  No further questions.

8          THE COURT:  All right.  You're excused.  How long

9  is your next witness?  People haven't eaten.  But if it's

10 very short, we can do it.  Your next witness very quick?

11         MS. SOLTYS:  Well, we would think so, but it does

12 depend on the cross.

13         THE COURT:  Well, put the direct on.  Let's see.

14 Is everybody ready -- I mean the question is whether we

15 could try to get it done in the next 20 minutes.

16         Sorry?

17         (Various jurors speaking.)

18         THE COURT:  Keep going.  Call the witness.

19         MS. URSCHEL:  Yes, Your Honor.  We plan now to

20 call very briefly Special Agent Kellie O'Brien.

21         THE COURT:  Oh.  Well, then, we're not going to --

22 no way.  That's --

23         MS. URSCHEL:  It will literally be two questions,

24 Your Honor.

25         THE COURT:  It doesn't matter.  It's not going to

```
 1  you in Room H, an office, when the handgun was found in that
 2  location?
 3  A.   Yes.
 4  Q.   Okay.  Tell the jury how you first learned of the fact
 5  that a gun had been located in the office?
 6  A.   My recollection is as I was over at the desk looking
 7  through some desk stuff, documents and things, and there's
 8  several agents behind me but I heard one of them say oh.
 9           MR. BALAREZO:  Objection.
10           THE COURT:  No, this is not hearsay.
11       Overruled.  Okay.
12           THE WITNESS:  I heard one of them say oh, look what
13  we have here and I turned around and I could see that there was
14  a gun laying on the floor.
15  BY MS. LIEBER:
16  Q.   I'm going to show you Levels Search Warrant Number 4.  Do
17  you see that?
18  A.   I do.
19  Q.   What is that a picture of?
20  A.   The gun we seized.
21           THE COURT:  Is the tape on Gwen?
22           THE DEPUTY CLERK:  Yes, it is.
23  BY MS. LIEBER:
24  Q.   Where is that located?
25  A.   Are you -- I'm not sure.  The room or actually where this
```

O'BRIEN
PP. 3-88

1           UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF COLUMBIA

3    -------------------------------X

4    THE UNITED STATES OF AMERICA        Criminal Case No. 05-386

5                  v.                    *VOLUME 13 - A.M. SESSION*

6    ANTOINE JONES, et al,

7                 Defendants,

8    -------------------------------X   Washington, D.C.
                                         Monday, December 3, 2007
9                                        9:30 A.M.

10                   TRANSCRIPT OF TRIAL
              BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
11          UNITED STATES DISTRICT JUDGE, and a jury

12   APPEARANCES:

13   For the Government:         JACK GEISE, ESQUIRE
                                 RACHEL LIEBER, ESQUIRE
14                               Office of the U.S. Attorney
                                 555 4TH Street, N.W.
15                               Washington, D.C.  20560
                                 (202) 616-9156
16

17   For Defendant Jones:       EDUARDO BALAREZO, ESQUIRE
                                 400 Fifth Street, N.W.
18                               Suite 500
                                 Washington, D.C.  20001
19                               (202) 639-0999

20

21   Court Reporter:            Lisa Walker Griffith, RPR
                                 U.S. District Courthouse
22                               Room 6409
                                 Washington, D.C.  20001
23                               (202) 354-3247

24   Proceedings recorded by mechanical stenography, transcript

```
1
2       Mr Linden ...
3       MR. BALAREZO  May I, Your Honor?
4       THE COURT:  Yes
5       MR. BALAREZO:  Thank you.
6                    CROSS EXAMINATION
7  BY MR. BALAREZO:
8  Q  Good morning, Agent.  How are you?
9  A  Good.
10 Q  Now, I'm going to stir things up a little bit by talking
11 about a gun.  Now, you were the, at the Levels Night Club
12 search warrant, you were the seizing agent, right?
13 A  That's correct.
14 Q  Which means that any time anyone found something of
15 evidentiary value, they came to you and gave it to you so that
16 you could seize it, right?  Is that how that works?
17 A  I'm not sure what you're referring to as came to me, but.
18 Q  All right.  What was your role as the seizing agent?
19 Let's say it that way.
20 A  To seize all the evidence relating to, in this instance,
21 Levels
22 Q  Now, you personally didn't go in every single room and
23 look through everything and take control of everything, right?
24 A  I did take control of everything.
25 Q  Well, after somebody else found it?
```

```
1
2       ... right  that every body did ...  We ... but I
3  something of evidentiary value -- when somebody found
4  something of evidentiary value, they'd come to you as the
5  seizing agent and you'd take control, right?
6  A  Correct.
7  Q  That was the first question I asked.
8  A  Okay.
9  Q  So the answer is yes?
10 A  The answer is yes.
11 Q  Okay.  Now, regarding this gun that was supposedly found
12 in Room H, you personally did not find that gun; is that
13 right?
14 A  That's correct.
15 Q  You were in the room doing whatever you were doing.  Were
16 you searching?
17 A  Yes.
18 Q  Okay.  But you didn't look under this box I assume,
19 right?
20 A  No, I did not.
21 Q  And do you know where the box is, by the way?
22 A  Do I know where it is?
23 Q  Yeah, where was the box?
24 A  It was kind of, as you walk into the office, there is a
25 door that swings in and to your left I guess.  And it was kind
```

**Column 3 (page 21)**

```
1  of on the other side of that door.
2  Q  I'm going to show you Levels Search Warrant Number 2.
3  Levels Search Warrant Number 3.  They're both in evidence.
4        You see that, right?
5  A  I do see that.
6  Q  And you see the door right here?
7  A  Yes.
8  Q  So I'm going to put them right next to each other so you
9  kind of get some sort of weird panoramic view.  Where was the
10 box?  I'm just trying to see.
11 A  Well, if you're orientating yourself based on where I am
12 taking the picture from.
13 Q  And you took this picture?
14 A  I took this picture.
15 Q  Okay.
16 A  So, from the picture on the left, I am standing --
17 Q  This one?
18 A  Yes.  I am standing kind of behind the door in the corner
19 and the box is really essentially at my feet.
20 Q  Right here?
21 A  Somewhere in this area, kind of at my feet.
22       THE COURT:  You mean where the sign is that says
23 Government's Exhibit, I can't read the number?  Is that what
24 you mean by it your feet?
25       THE WITNESS:  Yeah, I'm kind of trying to stand in
```

**Column 4 (page 22)**

```
1  the corner to get the perspective.  These are entry photos,
2  meaning that they're used to just kind of document what the
3  room looked like before we started searching.
4  BY MR. BALAREZO:
5  Q  Right.  Now, I hope the Government doesn't get upset.
6  I've lifted up the little tag.  You don't see the box by any
7  chance in this picture, do you?
8  A  I don't know that I would based on where I remember it
9  being.
10       THE COURT:  You're saying because it was too close
11 to your feet?
12       THE WITNESS:  Right.  I mean I'm not taking a
13 picture, you know, there's a standard lens.  So I'm not going
14 to get a panoramic view of the room and, you know, you're kind
15 of getting what you're shooting out in front of you.  You're
16 not getting what you're shooting at your feet.
17       THE COURT:  Was the box, did you, were you there
18 when the box was found?
19       THE WITNESS:  I was in the room when the box, when
20 they turned the box over, yes, I was in the room.
21       THE COURT:  Okay.
22 BY MR. BALAREZO:
23 Q  Now, my simple question was, Agent, do you see the box in
24 this picture.  Nothing else
25 A  No, I do not
```

1
2
3  A   It is behind the door, not in that picture, no.

4  Q   Do you see the box in the picture?

5  A   No, in the picture, no.

6  Q   So in Government's Exhibit Number Levels Search Warrant 2

7  and 3, the box does not appear in the picture, right?

8  A   That's correct.

9  Q   So these are entry pictures meaning that when you walk

10  into this room you took a picture?

11  A   Yes.

12  Q   And you didn't take any other close-up pictures, right,

13  of each item for example, this table over here with what

14  appears to be a bucket or something? That's the only picture

15  you have basically, right?

16  A   The only picture of -- I'm not sure what you're asking

17  me.

18  Q   All right. Strike that.

19  A   These are the only pictures that I have of the entry of

20  that particular room when we walked into it before we started

21  searching.

22  Q   You don't have a picture for the jury of this box before

23  the gun was supposedly found under it, do you?

24  A   I wish I would have had the forethought to know that

25  there was a gun there.

---

1  Q   So
2  A   the
3  Q   Okay. Now, when you take pictures, there's this thing

4  called the photo log, is that correct?

5  A   That's correct.

6  Q   And the photo log is basically a chart that you guys use

7  which has numbers one to whatever, and then you basically fill

8  in numbers indicating what the first picture is, second

9  picture, third picture; is that correct?

10  A   Yeah, the numbers are already there, 1 through 36, for a

11  standard roll of film. And then you just, you know, picture

12  number one, whatever you took the picture of, picture number

13  two, what the picture is.

14  Q   Let me show you what's been marked --

15      MR. BALAREZO:  May I approach, Your Honor?

16      THE COURT:  Mm hmm.

17  BY MR. BALAREZO:

18  Q   What's been marked as Jones 37. Point your specific

19  attention to the second page. Do you see that?

20  A   Mm hmm.

21  Q   Is that the photo log we're talking about?

22  A   Yes.

23  Q   And basically, it's already prenumbered, right?

24  A   Yes, it's prenumbered.

25  Q   And the numbers one through -- at least on this page,

---

1  which is the second page of the exhibit, 1 through 36, that

2  refers to the number of pictures, correct?

3  A   Correct.

4  Q   So when you go in, when you take the first picture of the

5  front door of Levels, let's say as an example, you would list,

6  you know, front door entry, right? In fact, that's what you

7  did, right?

8  A   Sure, yes, front door entry.

9  Q   So the first picture you took was the front door of

10  Levels?

11  A   Right.

12  Q   That's what you wrote, front door entry?

13  A   Right.

14  Q   And then you basically take pictures and you go

15  sequentially?

16  A   We try to, yes.

17  Q   You go through Room A, then you put picture Room A,

18  picture Room B, whatever, whatever order you went in, right?

19  A   Yes, depending on the photographer, some people are

20  different, but --

21  Q   Now, from the time that, were you -- when you personally

22  went into Room H, were there people in there already or were

23  you the first one to go into Room H?

24  A   There had been people in there when they made entry

25  Q   Okay. All right.

---

1  A   And there had been people in there to put the placard up

2  on the wall.

3  Q   Okay, the placard with the letter H?

4  A   Yes, the letter, and basically a letter in all the rooms.

5  And then I go in and take pictures and then the agents that

6  are searching come in behind and will start searching.

7  Q   Now, when you -- you say you went in and took the

8  pictures, you took those two entry pictures that we just

9  showed the jury, right?

10  A   Correct.

11  Q   Did you leave then or did you continue in the room?

12  A   I left and continued on taking the pictures. It's a big

13  location.

14  Q   Right. I mean your job was basically to take the

15  pictures, right?

16  A   Correct.

17  Q   And in fact, after you --

18  A   Well --

19  Q   And the seizing agent?

20  A   At that juncture, my job was to get the entry pictures

21  taken so we could start searching.

22  Q   Right. Now, after you took those entry pictures of Room

23  H, you went and took some other pictures; is that right?

24  A   I took the rest of the room.

25  Q   Now, how long after you

27

1   pictures, which are Government's Search Warrant Levels 2 and
2   3, how long after these pictures were taken was that gun
3   found?
4       A   I couldn't even begin to tell you how long.
5       Q   Well, you said you were in the room when the gun was
6   found, right?
7       A   Right.
8       Q   Well, when the gun was found, had you returned to the
9   room or had you left by that time, or what?
10      A   I had gone through taking all the pictures.  We got
11  everybody together, kind of put a plan together on how we were
12  going to search this location because it's pretty immense.
13  And there's only, I think there was 10 or 12 of us.
14      Q   Right.
15      A   And we started searching.  And people kind of just broke
16  up into these teams and go, likewise, I don't -- so likewise,
17  I had been in and out of that room.  And there was only a
18  couple of people in it initially.
19      Q   Right.
20      A   So there were a lot of documents that they were going
21  through and things along those lines.  I don't think it would
22  be fair to give you a timeframe of like how long or whatever.
23      Q   I mean I'm not looking for a specific moment in time.
24  I'm just trying to get the sequence of events.  And you went
25  into the room.  You took the two pictures, then you went and

28

1   took pictures of the rest of the room?
2       A   That's correct.
3       Q   So, you took all the pictures and then at some point you
4   came back into the Room H, and you were there when the gun was
5   found; is that correct?
6       A   That's correct.
7       Q   Okay.  Now, and all along, as you're taking pictures,
8   you're kind of notating which pictures you're taking; is that
9   right?
10      A   Trying to, yes.
11      Q   Okay.  Well, let me just show you Jones 37 again.  You
12  said you took those pictures, and you went and took a picture
13  of the rest of the Club, came back into Room H, and then the
14  weapon was found, is that right?  That's what you said two
15  second ago.
16      A   Right, that's my recollection of it.
17      Q   Now, looking at the second page, which is the photo log,
18  do you see where you have Room H office?
19      A   Uh-huh.
20      Q   That's one of the pictures I just showed you, right?
21      A   Yes.
22      Q   And the next picture is Room H again, which is the other
23  depiction, the other perspective, correct?
24      A   Uh-huh.
25      Q   And then it appears that you go out to Room I; is that

29

1   right?
2       A   Mm-hmm.
3       Q   And Room I is a closet; is that correct?
4       A   I'd have to -- I mean, that's what I noted on there, but
5   I'd have to take a look at where it was.
6       Q   Let me show you what's been marked into evidence as
7   Government's Number 7 and 8, Levels Search Warrant.
8           Now Room H, looking at Number 7, Room H is here; is
9   that right?  Room H is here, correct?
10      A   Yes
11      Q   And then the next room you go to, according to your photo
12  log, is Photo I, is that right?  I mean, excuse me, Room I, do
13  you see Room I anywhere?
14      A   (Perusing the document.)  I don't see it noted on here,
15  but I don't know that that's --
16      Q   Well, you have Room I listed as a closet.  Do you see a
17  closet anywhere that could be Room I?
18      A   The only closet that is noted on here is this closet off
19  of H, which I believe there is a picture for.  Whether that is
20  I, I don't know
21      Q   So we know what we're talking about, Room H is here,
22  right?
23      A   That's correct
24      Q   You took the two pictures.  Then you went to Room I.  And

30

1   closet here, right?
2       A   I wouldn't even -- to be honest with you, I wouldn't call
3   it a closet.  But for lack of a better word for it, I'd --
4   it's kind of like a sound proof room.  But there is --
5       Q   I'm going to show you Government's Number 2, is that the
6   room that's behind this --
7       A   Yes.
8       Q   That's the one, right?
9       A   Yeah.
10      Q   So that's Room I.  So that's what you took a picture of
11  next, correct?
12      A   Correct.
13      Q   And then you took a picture of Room G, which was storage.
14  Do you remember that?  And Room G is right here.
15      A   Room G, yeah, I believe that's actually above, you'll see
16  he's got kind of the circular staircase.  I think what he's
17  noting is G is the lofts above the bar.
18      Q   That's fine, but according to your photo log, you
19  indicate that the next picture you took was Room G, is that
20  right.  You went H, H, I and then G; is that right?
21      A   Uh-huh.
22      Q   And then the very next pictures, after you go to Room G,
23  indicates gun, gun with magazine, close up of the gun; is that
24  right?

Q And then you go on to finish, according to your log, to photograph the rest of the Club; is that right?
A That's right.
Q So when you said a few minutes ago that you took these pictures and then photographed the rest of the Club and came back when the gun was found, that wasn't correct, right?
A I think what I was saying is I was in and out of that room It's a combination of things. This is a big place. And I'm the seizing agent, which then I'm obviously responsible for what people are doing. So, I'm not necessarily going sequentially because of the nature of having to take photographs.
And I'm trying to answer your question the best I can having to do with my recollection of what I did that day because I had several hats I was wearing. That's kind of my recollection of where I was at. I was interested -- I can tell you, as a seizing agent, I was interested in that office because I figured, as far as documents and stuff, that's where we would find what we were looking for
Q I asked you that question twice. If you took these pictures and then went to take the pictures of the rest of the Club and then came back to Room H and both times you said yes?
A No, I think I said yes. And I said I also said that I was in and out of that office.
Q So both times I asked you that question, you misunderstood my question?
A I don't know that I answered yes definitively without that caveat of saying, yes, I did take photos of the rest of the Club, but I was in and out of that office.
Q And, in fact, what you testified to Friday was that you were doing something else in the room when you heard somebody say --
A I think we found something
Q I think we found something, right?
A Something to that effect.
Q And when you turned around to look, there was a gun on the floor, right?
A I believe that that's --
Q Right?
A Yes
Q I mean you didn't see someone actually lift the box, right?
A No.
Q You don't know if somebody lifted the box and put a gun in there, right?
A No
Q All you saw was you heard, oh, we have a gun here and you went over there and you took these pictures?
A I did.
Q Now, let's move on to another bit of your testimony that

33

dealt with monitoring the wiretap and then performing actual eye ball surveillance. The wiretap itself was running 24-7, 24 hours a day, 7 days a week for the life of the wiretap; is that correct?
A No, I don't think that is correct.
Q Well --
A I think initially it was running 24 hours a day. And then, for some reason, I recall there was a period of time in the evening that we didn't have monitors. At some point during the wire, we had made that determination.
Q Just so we all understand. Monitoring, somebody was not listening to the wiretaps live 24-7, correct?
A Correct.
Q Okay. What period of the day was the wiretap being monitored live by somebody? That means if Mr. Jones --
THE COURT: Simultaneously you mean?
BY MR. BALAREZO:
Q As Mr. Jones, Maynard received a call, that they could hear what was being said?
A I don't recall what the shifts were, but I do recall at some point we made a determination that the early hour mornings we weren't going to monitor because we weren't having any, there weren't any phone calls or activity to have somebody sit there over night But I don't remember what the

34

BY MR. BALAREZO:
Q But those calls were recorded, correct?
A No, they were not.
Q None of those calls were recorded?
A None of those calls were recorded.
Q So basically, you were wiretapping Mr. Jones's phone during business hours, what? I don't understand?
A His business hours
Q Which was what?
A I don't recall off the top of my head.
Q Now, do you remember your testimony Friday when you said you went out to the Fort Foote area?
A Yes.
Q Now, what day was that, do you remember?
A October 4th, I believe
Q October 4, 2005?
A Correct
Q Now, you obviously were listening to that call live because you heard it and you went out you there, right?
A There was a monitor there I was in the room as the call came in.
Q Did you hear the call?
A I did hear the call.
Q Okay That's all I'm asking
[illegible]

1    *[illegible] morning?*

2    MR. JONES:  Yes, I can do that, Your Honor.

3    THE COURT:  Yes.  There's no way that you're going

4    to -- I'm not going to have them all sit here and starve.

5    So what we'll do is you'll be excused.  We have matters we

6    have to work on this afternoon, anyway.  Legal matters.  So

7    if you would return at 9:30.

8    Do we have anything -- What's going on?

9    THE DEPUTY CLERK:  Nothing.

10   THE COURT:  We'll have breakfast at 9, and 9:30

11   we'll resume, on Monday.  As I said, the Government has got

12   three witnesses.  Monday at lunch hour I have to go to a

13   training session from 12:30 to 2 okay?  Go ahead.

14   MS. URSCHEL:  United States calls Special Agent

15   Kellie O'Brien.

16   (NOTE:  Witness O'Brien resuming the stand.)

17   THE COURT:  All right.  You're still under oath,

18   Agent.

19   THE WITNESS:  Yes, ma'am.

20                    DIRECT EXAMINATION

21   BY MS. URSCHEL:

22   Q.  Please state your name.

23   A.  Kellie O'Brien.

24   Q.  Special Agent O'Brien, did you plant the gun that was

25   found at the Levels Nightclub when the search warrant was

1   e rented on October 24, 2005.

2   A.   Absolutely not.

3   Q.   Were you there when it was located?

4   A.   At Levels?  Yes, I was at Levels.

5         THE COURT:  No.  Were you in the room?

6         THE WITNESS:  I don't -- you know, I don't

7   remember, because I was in and out.  Based on my photo log,

8   I could have been there, I could have not been there.

9         MS. URSCHEL:  No further questions.

10        THE COURT:  Sir, can you do it in two minutes or

11  not?

12        MR. JONES:  (Nod negatively.)

13        THE COURT:  No.  Okay.  You'll be back on Monday.

14  All right.  Thank you.

15        All right, ladies and gentlemen.  Please do not

16  discuss the case.  Avoid all press.  Leave everything here.

17  Remember, just put it out of your mind and don't read

18  anything about it.  Breakfast at 9 on Monday; and 9:30 if

19  you want to skip breakfast.  And have a good weekend

20  everybody.

21        (NOTE:  The jury exiting the courtroom at

22  12:54 p.m.)

23

24        (NOTE:  The following proceedings were held

25  outside the presence of the jury.)

8

```
 1              (NOTE:  Off-the-record discussion between
 2    Mr. Jones and Ms. Urschel.)
 3                   CROSS-EXAMINATION
 4    BY MR. JONES:
 5    Q.  Good morning, Detective O'Brien.
 6    A.  Morning.
 7    Q.  How you doing?
 8    A.  Good.
 9    Q.  If I remember correct, I think the Government asked you
10    whether you obstruct justice Friday.  Was that the question?
11              MS. URSCHEL:  Objection, Your Honor.
12              THE COURT:  I don't remember the question, but --
13    or something like that.  Well, they asked you if you planted
14    a gun.
15              MR. JONES:  Oh, okay.
16              THE COURT:  I think was the actual --
17    BY MR. JONES:
18    Q.  I'm sorry.  I think the question was, whether you
19    planted a gun?  Whether you plant a gun.  That was the
20    question Friday?
21              THE COURT:  Did you plant a gun?
22              THE WITNESS:  Did.  And I said, "Absolutely not."
23    BY MR. JONES:
24    Q.  Okay.  Now, regarding this gun that supposedly found in
25    Room H, did you --
```

9

```
1              THE COURT:  At Levels, ladies and gentlemen.

2    BY MR. JONES:

3    Q.  Yeah.  Did you personally found that gun?

4    A.  No.

5    Q.  You were in a room doing whatever you was doing.  You

6    was searching, correct?

7    A.  No.  I think at the time I was still taking photographs

8    of Levels.

9    Q.  So you saying at the time when you -- when they found

10   the gun, you was taking photograph or you was searching?

11   A.  I was taking photographs still at the time I took the

12   photos of the gun.

13   Q.  So last year when you testify under oath, did you tell

14   the jury that you was searching at the time?

15   A.  I do not believe I did.

16              (Pause.)

17              THE COURT:  Tell us the page, please.

18              MR. JONES:  I'm going to show it to Agent O'Brien.

19   See if she recognize --

20              THE COURT:  But what is it you're showing her?  We

21   have to mark it for ID.

22              MR. JONES:  It's the transcript from 2007.

23              THE WITNESS:  The first tab or the second?

24   BY MR. JONES:

25   Q.  Yeah, the first tab.  Do you recognize -- you can look
```

1        MS. URSCHEL:  Thank you.

2        THE COURT:  Line what, page what?

3        THE WITNESS:  Page 61 starting at the top of the

4    page.

5        THE COURT:  Okay.  Now, read it to yourself and

6    see if it refreshes your recollection about what you said

7    about what you were doing when the gun was found.

8        THE WITNESS:  Yes.

9        THE COURT:  Did you, in fact, say you were

10   searching at the time that the gun was found?

11       THE WITNESS:  No.  I think what I was saying is

12   that -- kind of the course of the questions was, is that I

13   was taking pictures, I'd been in and out of that room

14   several times.  I'd come back in because I believed somebody

15   had asked me a question.  And I was looking through some

16   things with that person who had a question.  That's kind of

17   the gist of what I was saying there.  I was not actually

18   searching.

19   BY MR. JONES:

20   Q.  So you telling the jury that in 2007 you didn't tell the

21   jury then that you were searching.  You was taking photos.

22   A.  I think that testimony says at the time that the gun was

23   found I was looking through some things, but I was not

24   implying that I was actually doing the search.

25   Q.  Well, let me read this for you.  This is from the

```
 1    Government, Ms. Lieber.  It says, question at line 20:

 2    "Before Mr. Geise asked you a series of questions about the

 3    telephone, I want to ask you about the Levels search

 4    warrant.  Were you actually the seizing agent at Levels on

 5    October the 24th of 2005?"

 6            Your answer was:  "Yes.  Specifically with respect

 7    to the gun that was found."

 8            "Were you in Room H in office when the handgun was

 9    found in that location?"

10            Your answer is:  "Yes."

11            Question:  "Okay.  Tell the jury how you first

12    learned of the fact that the gun has been located in the

13    office."

14            THE COURT:  Okay.  I don't know you have to read

15    any more.  You can ask her now:  What do you recollect about

16    where you were when the gun was found?

17            THE WITNESS:  That was my --

18            THE COURT:  What happened?

19            THE WITNESS:  That was my recollection.  I was

20    still in the process of photographing.  So my recollection

21    of it was, is that I had come back for some reason, and I

22    was --

23            THE COURT:  But were you in the room when the gun

24    was found?

25            THE WITNESS:  I thought I was at the time.  I
```

1    can't be certain that I was.  Based on the order of the

2    photographs, they just show the order that I took the

3    photographs.  But in between taking photographs, I was back

4    and forth into that room.  So the photo log doesn't really

5    represent where I was, it just shows that I took them in

6    that order.

7            THE COURT:  Okay.  Let's try this:  So you do not

8    recall whether you were in the room or not when the --

9            THE WITNESS:  I don't recall, to be honest.  I

10   remember, obviously, somebody would have had to told me

11   there was a gun.  I thought I was in there.  I don't know

12   whether I was or not.  I didn't see it being found, I guess

13   is really the --

14           THE COURT:  Do you know who found it?

15           THE WITNESS:  I believe his name is Martin

16   Hellmer, or something along those lines.

17           THE COURT:  Is there something that would help you

18   refresh your recollection about that?

19           THE WITNESS:  Yes.  Actually, I could look at the

20   bag that it was packaged in at the time.  Get his name

21   correct.

22           It's Martin E. Hellmer.  H-E-L-L-M-E-R.

23           THE COURT:  And who does he work for?

24           THE WITNESS:  He's a special agent with the FBI.

25           THE COURT:  He still there?

1          THE WITNESS:  He's actually assigned to the

2     Phoenix division currently, but, yes, he's still with the

3     FBI.

4     BY MR. JONES:

5     Q.  Agent O'Brien, in 2006 and 2007, did the Government had

6     that box with that name on it that says who found the gun?

7     A.  I believe it's always been with the gun, yes.

8     Q.  In 2007 did -- you and Detective Horne didn't know who

9     found that gun?

10    A.  I did not remember.  I don't know this gentleman at all,

11    so I did not remember at the time who found that gun.  And I

12    don't believe this package was with -- I don't believe the

13    bag was with the gun when it was brought into the courtroom.

14    Q.  Agent O'Brien, didn't you tell the jury in 2007:  "My

15    recognition (sic) is I was over at the desk looking through

16    some desk stuff, documents and things, and there several

17    agents behind me, but I heard one of them say, Oh" --

18          Mr. Balarezo object.

19          Then you came down.  Did you not say:  "I heard

20    one of them say, Oh, look, what we have here.  And I turned

21    around and I could see that there was a gun laying on the

22    floor."

23          Did you not tell the jury that last -- in 2007?

24          THE WITNESS:  I did.  I did.

25    BY MR. JONES:

1    Q.   So you telling the jury something totally different or

2    you lied back there in 2007?

3    A.   I don't know that I'm telling them something totally

4    different, Mr. Jones.  It's just a recollection having to do

5    with finding of the gun.  Like where I was each specific

6    moment on that search, it's not -- it's not exact.  We don't

7    write those things down.  So, yeah, that was my

8    recollection.  I can't say for certain I was in that room,

9    but I believe I was.

10   Q.   So now this is the third trial.  Did you take notes in

11   2006 and 2007?

12   A.   Having --

13   Q.   Did you take notes in 2007 when you testify under oath?

14   A.   Did I take notes?  No.

15   Q.   You didn't take notes.  Did you prepare yourself for

16   your testimony in 2007?

17   A.   Yes.

18   Q.   So when you told that jury you was confident that you

19   was in that office at that time, correct?

20   A.   I don't know that I told them I was confident.  I said I

21   believed I was in and out of that room several times in the

22   course of taking photographs.

23   Q.   So did you not tell the jury that you testify under oath

24   that you was the seizing agent --

25   A.   Uh-huh.

------- 2/11/13 - A.M. -------

1    Q.  -- and you was the photographer?

2    A.  That's correct.

3    Q.  And you went and took pictures of every room where all

4    the letters was at before you started searching.  Did you

5    not tell the jury that?

6    A.  I don't think I told them exactly that.  If you're

7    asking if I started searching after I photographed, then my

8    answer would be yes.  If you're asking me if people started

9    searching after I photographed and moved on, then the answer

10   is yes.  Some people started searching as I was still going

11   and photographing Levels.

12   Q.  So you're telling this jury that you never told the jury

13   in 2007 that you went and completed your photos before the

14   team started searching?

15   A.  No.  I think what the question had to do with,

16   Mr. Jones, is -- is like how normally the course of a search

17   warrant goes.  In a location like that, people started --

18   when I photographed Room A, which was your office, people

19   started searching that.  And I moved on and started

20   photographing everything else.  That's -- that's what I was

21   telling the jury.

22   Q.  That's what you was telling the jury.  So can you give

23   the facts exactly what happened when they came in -- the

24   night the FBI agents came in first?

25   A.  Who came in first?  I'm sorry.

1    Q.   FBI SWAT team.

2    A.   Yes.   They went in first, yes.

3    Q.   Once the FBI SWAT team came in, what was the next step

4    that the agents took after the SWAT team --

5    A.   Well, once --

6    Q.   -- secured the building?

7    A.   Once they cleared and made sure that there was nobody

8    there and it was safe, we went in, got our equipment out,

9    went around labeled the rooms alphabetically.   Started with

10   A.   Once -- I think it was A.   I started photographing.

11   There was a person who sketched.   I did the photo log.   And

12   people started searching in that initial room, which was

13   your office.

14   Q.   So you telling the jury that you told the 2007 jury that

15   when you went to Club Levels you was taking the entry

16   photos, this is when you found the gun?

17   A.   When I was taking -- yes.   There's what, 20-some-odd

18   rooms, I think, in your club.

19   Q.   We focusing on the office where the gun was at.   That's

20   what we focusing on.

21   A.   Right.

22   Q.   Not the 20 other rooms.

23   A.   Right.   But you're asking about my entry photos.

24   Q.   Yes.

25   A.   Correct.

1    Q.  So when you walked into Club Levels office room, when

2    you found the gun, was the gun laying there?  Was somebody

3    holding the gun?  How did you become to see this gun?

4    A.  Well, if you put the picture up on the screen, that

5    first picture is of it on the floor.  That's where I saw it.

6    Q.  Was you searching or you walked in and the gun was

7    laying there?

8    A.  I was still photographing, Mr. Jones.

9    Q.  What was you photographing?

10   A.  The rest of Club Levels.

11           THE COURT:  So the first time you went into the

12   office, you were in the process of taking photographs.

13           THE WITNESS:  I was taking entry photographs the

14   first time.

15           THE COURT:  And that's when you -- the gun was

16   brought to your attention.

17           THE WITNESS:  No.  I take entry photographs before

18   anything's touched.  So that -- we're talking about that

19   specific room.  The office.  I went in, I took several

20   photographs of that room, came out, people went in and

21   started searching.

22           THE COURT:  The first time in you didn't see a

23   gun.

24           THE WITNESS:  No, I did not.

25   BY MR. JONES:

1    Q.  So, when you went into the --

2           MR. JONES:  Your Honor, this is Government's

3    Exhibit LEVELS-SW-3.

4           THE COURT:  Okay.  I think the light's not on.

5           THE WITNESS:  Yeah, can you move that light a

6    little bit so --

7           THE COURT:  Hit the light, will you?

8           Gwen, is the light on?  It's very dark.

9           THE WITNESS:  It's dark.  I mean, it's black

10   walls, black carpet.

11          (Pause.)

12          THE WITNESS:  Can you do something with that glare

13   there?  I think that's from the over -- there, that's

14   better.

15   BY MR. JONES:

16   Q.  Can you see that?

17   A.  Yeah.

18          (NOTE:  Off-the-record discussion between

19   Mr. Jones and Ms. Urschel.)

20          THE WITNESS:  I think those glares are from the

21   overhead lights.

22   BY MR. JONES:

23   Q.  Is this the office that you speaking of?

24   A.  Yes.

25   Q.  Now, can you explain to the jury exactly what you did

```
 1      that day on October 24 when you came into this room right

 2      here?

 3      A.   I don't know that I can speak to exactly.  But generally

 4      what I did was is -- you see the door, it's kind of sticking

 5      out from that position.  So if you're standing in the

 6      doorway, to your left is probably another three or four feet

 7      before you hit the wall.  And then to your right is --

 8      there's a desk immediately there to the right.

 9      Q.   Let me put this one up.

10      A.   Okay.  And so if I'm standing in the door right now

11      taking this photograph, it's diagonal to that far corner.

12      So, basically, I went and tried to capture generally what

13      that room looked like with the entry photos.

14      Q.   So how many photos do you remember you took when you

15      walked in that room?

16      A.   Probably at least three or four.

17      Q.   Three or four.

18      A.   Yeah.

19      Q.   So how long --

20               THE COURT:  Entry photos.

21               THE WITNESS:  Entry photos.  Yes, entry photos.

22      BY MR. JONES:

23      Q.   How long did you stay in this office room?

24      A.   As long as it took me to take three or four photos, and

25      then photograph -- if you see that -- it looks like a mirror
```

```
 1    back in the back corner, but there's a -- I think they

 2    labeled it as a closet, but it's actually like a soundproof

 3    room.  So as long as it took me to take those photographs.

 4    Q.  So once you took these two photographs, or three

 5    photographs, what did you do next?

 6    A.  Can I take a look at my photo log?  Because that will

 7    tell you where I went next.

 8    Q.  This is Exhibit 24(a) -- Defendant's Exhibit 24(a).  Can

 9    you see that, Agent O'Brien?

10    A.  Yes.

11    Q.  Now, looking at your photo log, you telling the jury you

12    walked into that office and you took two or three photos.

13    Then what was the next step?

14    A.  And then I took a photograph of the closet.  And then I

15    took a photograph of the storage room, which was I believe

16    off -- let's see.  I can't even read my own handwriting.

17    Can you focus that a little bit for me?  I believe that says

18    "storage."

19    Q.  I think I got an extra one so you can see.

20    A.  Mr. Jones, can you slide a piece of paper back behind

21    that so we're not seeing the --

22              (NOTE:  Document provided to the witness.)

23              (NOTE:  Off-the-record discussion between

24    Ms. Urschel and Mr. Jones.)

25    BY MR. JONES:
```

1   Q.   Where did you stop at?

2   A.   After -- okay.  So after the office I took the closet.

3   And then I took a picture of the storage.

4   Q.   Room G.

5   A.   Room G.

6   Q.   Can you tell the jury where --

7              MR. JONES:  Can you see?

8              (NOTE:  A juror making a comment.)

9              THE COURT:  What line do you want to look at?

10  Room G?

11             MR. JONES:  Yes, she stopped at Room G.

12             THE COURT:  Goes H, I, G, storage.

13             MR. JONES:  Oh, where did you stop at?  Room F?

14             THE COURT:  F is storage, H is office.  Closet.

15  Storage.   Gun.   Gun with magazine.   Close-up of gun.

16             What are you asking?

17  BY MR. JONES:

18  Q.   I'm asking, do you remember what you did that day?

19  A.   So I remember what picture I took next.  I can't tell

20  you what I did next.

21  Q.   Okay.  You can remember what picture by looking at the

22  photo log?

23  A.   Yeah, I took a picture of Room G.

24  Q.   So last year in your testimony -- Monday, December 3,

25  2007 -- you didn't testify under oath that you completed the

```
 1   photo log or the photo entry before you start searching?

 2   A.  Say that question -- say that question again?  I

 3   completed the photo log before -- me personally started

 4   searching?

 5   Q.  Did you completed taking the photos of the club before

 6   the team start searching?

 7   A.  No, the team started searching before I completed the

 8   log -- or, the photographs.

 9          MS. URSCHEL:  Ask for the page number on that,

10   please.

11          MR. JONES:  I'm going to show her page 26 and 27.

12          (NOTE:  Document provided to the witness.)

13   BY MR. JONES:

14   Q.  Can you look at that and see if you could recall what

15   you testified last year?

16   A.  Yes.

17   Q.  Did you not testify and told the jury last year:  "The

18   letter and basically a letter in all rooms, and then I go in

19   and take pictures, and then the agents that are searching

20   come behind and will start searching"?

21   A.  Right.

22   Q.  Okay.  Did you not say:  "I left and continued on taking

23   the pictures.  It's a big location"?

24   A.  Right.  And I think I also said further on that I was in

25   and out of that room.  It was not a sequential taking of
```

1    photographs.

2    Q.   On these two pages?

3    A.   Not on those two pages, but further on in my testimony

4    that's what I had said.   Is, is that -- my testimony --

5    you're taking it out of context -- is my job as a

6    photographer is to take the pictures so people could start

7    searching.   Not necessarily or always in every circumstance

8    do you take all the pictures and then people start

9    searching.   You can take photographs, and as you clear each

10   room, people start searching.

11   Q.   Isn't it a fact you changed your testimony after

12   Mr. Balarezo, my lawyer, pointed out that you had a photo

13   log right here that seemed like it was tampered with?   This

14   photo log right here (indicating)?

15   A.   You've got two questions there.   Photo log, one, has not

16   been tampered with.   Absolutely not.   And, two, I think I

17   may have corrected my testimony because what I had said was

18   I couldn't remember where and when I went back to the

19   office.   So if you want to say I changed my testimony, I

20   think I corrected it.

21   Q.   So you corrected it after he pointed to the photo log

22   and you went over the photo log and you realized that it was

23   impossible to go and take pictures and at the same time

24   follow this photo log.   Correct?

25   A.   What?   That's the order I took the pictures in.   That's

1   the order.  If you want -- if you want to see the negatives,

2   that's the order you'll see the pictures in.

3   Q.  So is this photo log just like this that anybody can

4   actually put a gun, gun -- the three entries of "gun," it

5   don't say what room it's in.  Can anybody just put that down

6   there?  This piece of paper right here?

7            THE COURT:  Wait a minute.  Who wrote that?

8            THE WITNESS:  Me.

9            THE COURT:  Yeah, it's her handwriting, so don't

10   say that anybody.

11   BY MR. JONES:

12   Q.  Well, isn't this the type of piece of paper that you

13   just could come and add anything on whenever you want to?

14   A.  Sure.  It's a piece of paper.

15   Q.  Agent O'Brien, did you not tell the jury "I took the

16   rest of the pictures."  "Yes."

17            And didn't Mr. Balarezo say:  "How long after you

18   entered that room and took these pictures with the

19   government search warrant, level 2 and 3, how long after

20   these pictures was taken was the gun found?"

21            "I couldn't even begin to tell you how long."

22   A.  I don't -- I don't -- is there a question?

23   Q.  The question is, you telling the jury now after

24   Detective Horne testify that you don't know if you was in

25   there searching or you don't know if you was going around

```
 1   photographing.

 2              THE COURT:  When the gun was first found.

 3              MR. JONES:  Yes.

 4              THE WITNESS:  I was not searching, Mr. Jones.  I

 5   was taking photographs.  You can tell by the photo log I am

 6   taking photographs when the gun was found.

 7              THE COURT:  But you don't know where you were

 8   when --

 9              THE WITNESS:  No, I don't know where I was.

10              THE COURT:  That's all.  Thank you.  Thank you.

11              THE WITNESS:  This is just a representation of the

12   order that I took the pictures.

13              THE COURT:  Yeah.  Just -- but you don't know

14   where you were when the gun was found.

15              THE WITNESS:  No,

16              THE COURT:  Okay.  Move on now, Mr. Jones.

17   Anything else?

18              MR. JONES:  Yes.

19   BY MR. JONES:

20   Q.  This room right here (indicating), this lighting, you

21   see the light -- what type of light it is in this room?

22   A.  Yes.

23   Q.  Can you see clearly these two chairs and the items

24   that's on the table, the couch, the studio?  Can you see

25   that clearly?  The background?
```

```
 1    A.  Yeah.

 2    Q.  Same here.  You can see the chairs, the pink chairs, the

 3    red cloth, the picture.  You could see everything clearly,

 4    correct?

 5    A.  For the most part, yes.

 6    Q.  Now, what was the agent name that you say found this?

 7            THE COURT:  Martin Hellmer.

 8    BY MR. JONES:

 9    Q.  Now, Mr. -- you say Hellmer?

10    A.  Hellmer.  H-E-L-L-M-E-R.  Hellmer.  I believe that's how

11    you pronounce it.

12    Q.  In this photo Government Exhibit LEVELS-SW-5, can you

13    see that same background that I just showed you in the last

14    two pictures?

15    A.  Well, I'm shooting to the floor.  That's why you can't

16    see that background.

17    Q.  So you shooting to the floor?

18    A.  So somebody has their hand holding something, camera's

19    up here, I'm taking a picture down.

20    Q.  To the floor?

21    A.  To the floor.

22    Q.  So this right here -- which way is this picture you

23    shooting?  Like this (indicating)?  Like this (indicating)?

24    A.  That would be how the camera was oriented, like that.

25    Q.  Like this (indicating)?
```

```
 1    A.  Yeah.

 2    Q.  So his hand is down on the floor?

 3    A.  No, his hand is not down on the floor.  He's holding the

 4    gun.  Like if you were standing there and I'm taking the

 5    picture, above his hand.

 6    Q.  So in these pictures right here (indicating) --

 7    something like a rubber band or whatever.  You can see items

 8    on the floor.

 9    A.  Uh-huh.

10    Q.  This right here, can you see any items on the floor at

11    all?

12    A.  You wouldn't be able to based on how I had the settings

13    on the camera.  It's focusing in on the gun.  It's not

14    focusing in on the floor.

15            THE COURT:  Where's the gun?

16            THE WITNESS:  The previous picture.  I'm sorry.

17    BY MR. JONES:

18    Q.  (Indicating.)  So --

19            THE COURT:  No, no.  But you can't see the gun in

20    the next picture.  What's the number that was just up?

21            THE WITNESS:  No, no.  That was just an overall --

22            THE COURT:  What was the picture you just showed

23    her?  You got to use --

24            MR. JONES:  LEVELS-SW-2.

25            THE COURT:  2.  You can't see the gun.
```

1          THE WITNESS:  No.  No.  There's actually another

2     picture of the gun that was on the floor.  It's not a very

3     good picture, but it's on the floor.  And if you see this

4     right here (indicating), this is some sort of box that's

5     tipped, basically.  And that's -- that's where the gun was

6     when I took the picture of it.

7     BY MR. JONES:

8     Q.  Agent O'Brien, what is this right here (indicating)?

9     A.  What is what?

10    Q.  This (indicating).  It look like a bag or something.

11    A.  Yeah, it looks like a plastic bag.

12    Q.  Now, you've been at two trials.  And we try to found

13    this mysterious box and bag.  And the two pictures that you

14    took, the entry pictures, can you show the jury where that

15    bag or box is at in this picture?

16    A.  Well, it wouldn't be on that side of the room.  So it

17    would be the other picture.

18          THE COURT:  What picture did you just show her?

19    You have to call it by the number.

20    BY MR. JONES:

21    Q.  LEVELS-SW-2.

22    A.  So keep in mind, these are entry photos -- overall

23    photos -- to be able to document the state that the room was

24    in, not to document evidence.  It's just to document what

25    the room looked like when we started.  So if you put up the

1    other photo of the other side of the room --

2            THE COURT:  SW --

3            MR. JONES:  SW-3.

4            THE COURT:  That's 3?

5            THE WITNESS:  So my -- when I came into the room,

6    or I was there, they had -- people were already searching.

7    So there were things that were moved.  The room did not look

8    like this when I took that picture of the gun on the floor.

9            So if you're standing in the doorway, if you were

10   to -- you couldn't push the door up against the wall because

11   there was some piece of furniture back behind there, but if

12   you were to shut the door, somewhere over here (indicating)

13   back against the wall to the left of this TV was where that

14   box was.

15   BY MR. JONES:

16   Q.  So you can't show to the jury the box in either picture

17   or the bag in either picture.  So you don't have any

18   evidence --

19   A.  Well, the box is in the picture of the gun on the floor.

20   You just can't see it in its state in this overall photo.

21   Q.  Agent O'Brien, this is Defense Exhibit 21.  Is this one

22   of the photos that you took on that day?

23   A.  No.

24   Q.  This is not one of the photos that you took on that day?

25   A.  I do not believe so.

                      ——— 2/11/13 - A.M. ———

(16)



10/24/2005

Room H

Misc Keys
Photo Disc
Misc Receipts
Telephone #'s

LEVEL 3
1960 Montana
Washington, DC
20

⑪

Renelda Shaw        K. OBrie

'irings for Montly Meeting

Communication - I think there is n't a lot of
comm with us. Like as promoting night, or
Just show nights I think we need push hard
with flyer. If you out of _____ comm

Room H: LEVELS Night
1960 MONTANA
WASHINGTON, DC

DeskTop
Misc. Phone                    Read 2000
Receipts/Invoces
Journal

H

Committee: Ready to go _____ round,
_____ by TANYA R _____ to _____ that
TANYA _____ or DeeDee to know that know
one _____ out ticket. So job _____
TANYA and the taff Know that _____ one
to _____ _____ lakes agust R _____
and _____ _____ 30 minutes

Renelda Show
K. O'Brien          2810 WF 213679

There's _____ problem with the club or just
period, you are the spoke person. Ivi or PooK wish
You're pay people at the night, let everybody else.



LEVELS Night Club
1960 Montana AVE, N
WASHINGTON, DC 20002

## Room H:

1) LG Silver Cellular Telephone

2) VERIZON SAMSUNG
Silver Cellular Telephone in case

3) Misc "Level" Business Doc

4) Folder w/Tax Returns for Employees



Renelda Shaw
Kellie O'Brien

281D WF 213679

```
1            THE COURT:  Who are the names again?

2            MR. JONES:  Renalda Shaw.  This lady is -- I

3    believe her -- her first name is R-E-N-A-L-D-A.

4            THE COURT:  Shaw.  And where's she from again?

5            MS. SOLTYS:  ABRA.

6            THE COURT:  And she's part of the search of

7    Levels?

8            MS. SOLTYS:  (Nod affirmatively.)

9            THE COURT:  Okay.  And who's the other one?

10           MR. JONES:  It's director -- ABR director Delaney

11   -- Maria Delaney.

12           THE COURT:  She's from the ABRA, too?

13           MR. JONES:  Yeah, she's the director.

14           MS. SOLTYS:  The first woman that you named is the

15   FBI asset forfeiture paralegal, I think.

16           MR. JONES:  Yes.  That's Renalda Shaw.

17           THE COURT:  So she's not related to Levels.

18           MS. SOLTYS:  Yes.  Those two women are related to

19   Levels.  The search.  And that deals with the motion to --

20           THE COURT:  That's your motion in limine.

21           MS. SOLTYS:  Well, that's -- yes.  Correct.  That

22   deals with the issue of the presence of non-law enforcement

23   personnel during the execution of the search warrant.

24           THE COURT:  Okay.  That's fine.  I understand.  If

25   that's the issue, then that doesn't have any relevance to
```

LAWRENCE MAYNARD testimony   (Exhib. #15)  9

1    A    That's -- I'm sorry, okay, that's the red room.  The pool

2    tables, yeah, that was the red room.  The other was the small

3    VIP room, I'm sorry.

4    Q    So you said this is --

5    A    The small VIP room.

6    Q    Do you recognize -- can you tell the jury where this is

7    at?

8    A    That's the rear bar, the largest room we had, which was

9    the live entertainment, most of the bands played in this

10   room.  That's the rear bar.

11   Q    What about this one?

12   A    That's the smaller bar that was in the red room in the

13   front end of the red room.

14   Q    So, the small VIP, did it have a bar in there too?

15   A    Right, small VIP had a bar in there as well.

16   Q    This part, what was that used for?

17   A    That's the smaller stage for like, we had poetry or what

18   they call the spoken word, poetry and comedy shows, you could

19   have a jazz band fit there.  The younger, some of the younger

20   kids played there during, like, talent shows.

21   Q    Now, one more look at this Government's Exhibit SW-2.

22   And look one more time at Government's Exhibit SW-3.

23       Now, the pictures I'm getting ready to show you, this is

24   Defendant's Exhibit 21.  In the two photos I just showed you,

25   can you point at, point out this surface at all in that room?

1    A    No.

2    Q    I'm going to show you Levels, Government's Exhibit Levels

3    SW-5.  Can you see what's in the gentleman's hand?

4    A    It's a Ruger, then you have a magazine with a couple

5    bullets in it.

6    Q    Looking at the two photos that you just seen of Club

7    Levels, do you see this gun in those photos as that room?

8    A    It wasn't a gun in that room, no, sir.

9    Q    What about this background?

10   A    That background, if you move it to the right a little

11   bit --

12   Q    That's enough?

13   A    That's good.  There's a circular light.  They were

14   holding the gun up.  There's no circular light in that room.

15   Q    Now, in that picture of Club Levels, do you see --

16            THE COURT:  What number?

17            MR. JONES:  This is Government's Exhibit Levels

18   SW-4.

19   BY MR. JONES:

20   Q    Do you see this trash bag or this box behind any of the

21   doors or in that room at all?

22   A    No, they give a full view of the room, there's no box,

23   there's no black box.  I mean, there's no black bag either,

24   trash bag in that room.

1   Q.  Okay.  For the jury, what type of gun is this

2   (indicating)?

3   A.  That's a Ruger.

4   Q.  For the jury, what type of gun is that (indicating)?

5   A.  That's a Ruger.

6          THE COURT:  What's that picture, please?  Exhibit

7   what?

8          MR. JONES:  This is LEVELS-SW-5.

9          THE COURT:  And the one before that?

10         MR. JONES:  Is Defense Exhibit No. 21.

11         THE COURT:  Okay.

12  BY MR. JONES:

13  Q.  So you don't remember taking that photo?

14  A.  I don't remember taking that photo on --

15         THE COURT:  21.  21.

16         THE WITNESS:  That background doesn't look right

17  to me, for one.  And I didn't take a black and white photo

18  of anything.

19  BY MR. JONES:

20  Q.  Is it because that background is not in Club Levels?

21  Nowhere in those photos?

22  A.  Well, I don't know.  Because like I said, I didn't take

23  that photo.  So I don't know whether that background's in

24  Club Levels or not.

25  Q.  Isn't it a fact that that background is not in Club

1    Levels, and you and Norma Horne don't recognize that photo

2    because you realize that background is not at the office at

3    all?

4                MS. URSCHEL:  Objection, Your Honor.

5                THE COURT:  Sustained.  Sustained.

6    BY MR. JONES:

7    Q.  Agent O'Brien, did you look at any of the discovery that

8    Mr. Jones received in '05 dealing with this gun?  Or '06?

9    Did you ever look at any of these pictures of the gun?

10               THE COURT:  The ones that you've just been showing

11   her?

12               MR. JONES:  Yes.

13               THE WITNESS:  Yes.  I took the photographs.

14   BY MR. JONES:

15   Q.  So you telling the jury that you don't remember that

16   Ruger right there (indicating), and you can't say if that's

17   Club Levels or not?

18               MS. URSCHEL:  Objection, Your Honor.  She said she

19   didn't remember the photograph.  She made no reference to

20   the gun.  She didn't take the photograph.

21               THE COURT:  Wait a minute.  I don't understand

22   that.

23               Do you know whether that's the same gun that was

24   found?

25               THE WITNESS:  I can't really tell by the serial on

```
 1    it.  I mean, we can compare serials, but I didn't take a

 2    black and white photo, so it's not my photo.

 3              THE COURT:  Well, there's two black and white

 4    photos.  Can I look at that again?  Defense 21 and

 5    Government's 5, aren't they both black and white?

 6              MR. JONES:  This one -- this is the black and

 7    white.  But other one is, like, more in color.

 8              THE COURT:  All right.  This is 21.  And so you

 9    don't know who took that or where it was taken?

10              THE WITNESS:  We wouldn't -- I mean, at that time

11    when you're taking pictures of evidence, it was film and it

12    was color.  You didn't take --

13              THE COURT:  But you don't know if that's the same

14    gun and you don't know where that picture was taken or by

15    whom?

16              THE WITNESS:  No, I don't.

17              THE COURT:  Okay.  That's Defense Exhibit 21.

18    BY MR. JONES:

19    Q.  Can you explain to the jury on your photo log why,

20    basically, every room have a letter, and the three spots

21    where the gun don't have a letter?

22    A.  Because the gun isn't a room.  It's a piece of evidence.

23    Q.  It wasn't in Room H?

24    A.  It was in Room H.

25    Q.  So the question is, as you go down the photo log, every
```

```
 1    room have, basically, H, I, G.  Then when it get to the gun

 2    it don't say where the gun was found.

 3    A.  I think if you look at probably the 597 and probably the

 4    bag that it was packaged in, it says Room H.

 5             THE COURT:  Okay.  What are you looking at, just

 6    for the record?

 7             THE WITNESS:  I'm sorry.  This is the bag that we

 8    would have packaged it in at the time in Levels.  When it

 9    comes to our office we have to put -- for evidence purposes

10    we have to put it in this box so we can secure it and make

11    it safe.  So this is not the box that we had it in at

12    Levels.  We come back to the office.  But this is the bag

13    that was filled out --

14             THE COURT:  And is that part of what exhibit?

15             THE WITNESS:  This is Levels Search Warrant 6.

16             THE COURT:  6.  So part of 6 includes a baggie

17    that has whose writing?

18             THE WITNESS:  It would have been Mr. Hellmer's.

19             THE COURT:  Hellmer indicates Room H for the --

20             THE WITNESS:  Says: "Room H, Ruger P94

21    9-millimeter handgun, found beneath the end table to the

22    left of the television.  Locating agent: SA Martin Hellmer.

23    The handgun was loaded with 9-millimeter -- nine rounds in

24    the magazine, which is included in a separate bag."

25             THE COURT:  Okay.
```

```
 1                MR. JONES:  Is it possible that the defense could
 2       see that writing?
 3                THE COURT:  Sure.
 4                Do you mind, Marshal?
 5                It's not your writing?
 6                THE WITNESS:  No, it's -- this -- I think I wrote
 7       this so we could see it a little bit more clearly, but --
 8                THE COURT:  What did you write?
 9                THE WITNESS:  The serial number on it.
10       BY MR. JONES:
11       Q.  This writing, is this writing from '05 or is this
12       writing is new?
13       A.  That's from '05.
14       Q.  '05.  Okay.  Agent O'Brien --
15                (NOTE:  Off-the-record discussion between
16       Mr. Jones and Ms. Urschel.)
17                MS. URSCHEL:  Your Honor, if we could maybe just
18       approach for a moment?
19                THE COURT:  Sure.
20
21                (Discussion at the bench on the record with all
22       parties present:)
23                MS. URSCHEL:  I wanted to approach because
24       Mr. Jones had sort of asked me if he could use this page
25       from the detention hearing to ask this witness a question.
```

1  And I asked him if Agent O'Brien was the person who

2  testified at this detention hearing.  And he said no, but he

3  wanted to ask this question.  So I told him I would have an

4  objection to him presenting something that wasn't her

5  testimony.

6          MR. JONES:  In the beginning they said it was in a

7  drawer.

8          THE COURT:  Who's "they," though?

9          MR. JONES:  Rachel Lieber.

10          THE COURT:  He can ask whether it's found in the

11  desk of the drawer.  He can't cite this.

12          MR. JONES:  Okay.

13          MS. URSCHEL:  I just want to clarify.

14          THE COURT:  He can ask whether -- once again, she

15  was not there when it was found.  That much we got.  So it's

16  a useless question.

17          All right.  Finish it up.

18          (End of discussion at the bench.)

19

20  BY MR. JONES:

21  Q.  Agent O'Brien, was you aware that in 2006 early on in

22  this case that the gun was alleged in the drawer?

23          THE COURT:  No, no, no.  That's just not what I

24  said.

25          Do you know whether or not it was in the drawer in

1        the desk?

2               THE WITNESS:  No.  My knowledge of it is, is it

3        was on the floor underneath that box.

4               THE COURT:  Oh, okay.  You can't ask her about it.

5               MR. JONES:  No further questions.

6               THE COURT:  Anything else?

7               MR. JONES:  That's it.

8               THE COURT:  Thank you.

9               For redirect?

10              MS. URSCHEL:  Court's brief indulgence.

11              (Pause.)

12              MS. URSCHEL:  Your Honor, the Government at this

13       point would just, in abundance of caution, add a new exhibit

14       number to the bag inside the box.

15              THE COURT:  That's a good idea.  It came out of

16       what again?

17              THE WITNESS:  Out of 6.  Levels Search Warrant 6.

18              THE COURT:  6(a) we're going to mark now to add to

19       the Government's list as the bag in which the gun was

20       placed.  I think is fair description, is it not?

21              THE WITNESS:  It is.

22              THE COURT:  6(a) is admitted.

23              MS. URSCHEL:  Thank you, Your Honor.

24       (Government's Exhibit LEVELS-SW-6(a) received in evidence.)

25              THE COURT:  Okay.  You can step down.

Sell ?
Records

RM ?



**COMFORT SUITES GWINNETT MALL**
3700 SHACKLEFORD ROAD
DULUTH, GA  30096 USA
(770) 931-9299



Account. 166715
Date 02/18/05   Fri
Page:  1  of  1
Room: 130    RACK
Arrival Date: 02/18/05  09:50
Departure Date:
Frequent Traveler ID:
You were checked out by:
You were checked in by: CZ

MAYNARD, LAWRENCE

7711 GREEN LEAF RD.
HYATTSVILLE, MD 20785

| 02/18/05 | CASH | CASH PAYMENT | -89.27 |

FRIDAY
SAME day of MADOFLOW contract

Balance Due:    -89.27   ?

If payment by credit card, I agree to pay the above total charge amount according to the card issuer agreement.

x _____

. No signature

---



**COMFORT SUITES GWINNETT MALL**
3700 SHACKLEFORD ROAD
DULUTH, GA  30096 USA
(770) 931-9299
BY CHOICE HOTELS

Room: 130   ?
Arrival Date: 02/18/05  Fri
Departure Date:
Account: 166715
Frequent Traveler ID:

Merchant Number:
Approval Number:
Card Type:
Date: 2/18/2005  Fri
Card Number:
Total:

If payment by credit card, I agree to pay the above total charge amount according to the card issuer agreement.

LAWRENCE MAYNARD
GREEN LEAF RD. .
HYATTSVILLE, MD 20785

?
. x _____

No signature





*Subpoena Records*

| Lawrence Maynard | | Membership No. | | RM-3 |
|---|---|---|---|---|

7711 Greenleaf Rd
Hyattsville
MD 20785

A/R Number

Group Code

Folio/Invoice No.    17807

| | | | |
|---|---|---|---|
| Room No. | 219 | Page No. | 1 of 1 |
| Arrival | 02-23-05 *WED* | Cashier No. | 102 |
| Departure | 02-24-05 *THUR* | User ID | CRATLIFF |

*CHECK PARTY - SURVEILLANCE*

www.holidayinnexpress.com

| Date | Description | Charges | Credits |
|---|---|---|---|
| 02-23-05 | Cash | | 89.27 |
| | Total | 0.00 | 89.27 |
| | Balance | -89.27 | |

**Guest Signature:** _____

I have received the goods and / or services in the amount shown hereon. I agree that my liability for this bill is not waived and agree to be held personally liable in the event that the indicated person, company, or association fails to pay for any part or the full amount of these charges. If a credit card charge, I further agree to perform the obligations set forth in the cardholder's agreement with the issuer.



Holiday Inn Express Atlanta-Gwinnett Place Mall
3670 Shackleford Rd.
Duluth, GA 30096
Telephone: (770) 935-7171  Fax: (770) 806-1691

RM J



( ୧ ✗ ／任い୨チ仜／℔ )



DIAMOND
301  380 6188

(Exhibit #19)

```
 1    keys.

 2              THE COURT:  What's the exhibit number?

 3              MR. JONES:  Exhibit -- it's Levels SW-12.

 4    Government Exhibit 12.

 5              THE COURT:  You just took it out of the bag?

 6              MR. JONES:  Yes.  I'm going to --

 7    BY MR. JONES:

 8    Q.  You testified yesterday about those (indicating) -- they

 9    like keys that you get into a hotel?

10    A.  Correct.

11    Q.  Where did you find these keys -- or, where did anybody,

12    Agent, find those keys at on October 24?

13    A.  I wouldn't know right off the top of my head.  I'd have

14    to look at something.

15    Q.  Did you testify room H?  Or -- did you testify to a room

16    yesterday where these keys was found?

17              THE COURT:  Yesterday?

18              THE WITNESS:  I did.

19    BY MR. JONES:

20    Q.  And what room was that?

21    A.  I believe it was room H where the files and everything

22    were.

23    Q.  So you believe it was room H.  Can you tell the jury

24    where at in room H that you or anybody find those keys?

25    A.  I would have to look at the 597 or --
```

2/9/13 - A.M.

1    Q.  Isn't it a fact you went to the grand jury January 26,

2    2006?

3    A.  I'm not sure when I went.  I don't know the date right

4    offhand.  If you have something that says I did.

5              (NOTE:  Document provided to the witness.)

6              THE COURT:  This refresh your recollection as to

7    the date you appeared before the grand jury?

8              THE WITNESS:  It says January 26.  Yes.

9    BY MR. JONES:

10   Q.  Did you mention in your grand jury that you found

11   something -- mention these hotel key cards at all in your

12   grand jury (indicating)?

13   A.  I don't know, sir.

14   Q.  You don't know?

15   A.  I don't know -- I don't know if -- you're asking me if I

16   mentioned the keys in the grand jury.  I wouldn't know

17   unless I reviewed my grand jury.

18   Q.  If I let you review your testimony, can you answer then?

19   A.  Okay.

20             (NOTE:  Documents being provided to the witness.)

21             (Pause.)

22   Q.  Reviewing your -- reviewing your January 26, 2006, grand

23   jury, isn't it a fact you never mentioned these hotel

24   receipts?  I mean, key cards?

25   A.  I said in the -- correct.  I didn't say that.  I said

1    that we seized other items, but I didn't list everything we

2    --

3    Q.  So you're telling the jury that this right here that you

4    used in three trials (indicating) wasn't significant in the

5    grand jury, correct?

6    A.  No.  I said the list -- we didn't go over every item

7    seized from there.

8    Q.  Did you mention it at all in the grand jury?

9    A.  No, I did not.

10           MR. JONES:  This is Levels-SW-13, Your Honor.

11           THE COURT:  Okay.  SW-13.

12   BY MR. JONES:

13   Q.  Detective Horne, can you tell the jury what this is?

14   A.  It's a Comfort Suites.  Has address of Shackleford Road.

15   Has Lawrence Maynard's name.  It's in Duluth, Georgia.  And

16   it's a copy of a bill.

17   Q.  Can you tell the jury what this is?

18   A.  It's a copy of a Holiday Inn Express bill.  I think down

19   at the bottom it says Duluth, Georgia, but it's not showing

20   on my screen.

21   Q.  Did you mention these two items in the grand jury?

22   A.  No, I did not.

23   Q.  Did you think that those two items were significant to

24   even mention to the grand jury?

25   A.  Yes.  They would be significant.

1    Q.  Detective Horne, isn't it a fact that these four items

2    popped up before the trial, and they never was in Club

3    Levels?  Correct?

4    A.  No, that's not true, sir.

5    Q.  Isn't it a fact in front of this jury you cannot find

6    one photo -- crime scene photo -- of a Holiday Inn or

7    Comfort Suite inn, or these two key cards (indicating), no

8    where in the crime scene photos?

9    A.  Correct.  We seized a lot of paperwork that day, sir.

10   Q.  You done over 500 searches.  You been listening to the

11   wire for two months.  And these items right here you can't

12   tell the jury that you could point out in a crime scene

13   photos, correct?

14   A.  I can't -- I'm sorry --

15   Q.  Can you point them out in any photos in Club Levels

16   crime -- which is crime scene photo.  Can you describe to

17   the jury what's a crime scene photo?

18            THE COURT:  No, that's okay.  We know.

19   BY MR. JONES:

20   Q.  Now, only thing we have is your word that these items

21   was in Club Levels, correct?

22   A.  Correct.

23            MR. JONES:  Thank you, Your Honor.

24            THE COURT:  Okay.  Anything further for the

25   Government?



Copy

★ ★ ★    GOVERNMENT    **ALCOHOLIC BEVERAGE REGULATION ADMINISTRATION**
OF THE
DISTRICT OF COLUMBIA    **ALCOHOLIC BEVERAGE CONTROL BOARD**
P.O.BOX 37200
WASHINGTON, D.C. 20013-7200

| Office Use Only |
|---|
| Issue Date |

**N O B I L L I C O E N S L E Y**

CONTROL NUMBER    71388    APPLICATION NUMBER    50153

APPLICANT'S NAME & ADDRESS
ANTOINE JONES
LEVELS ENTERTAINMENTT
1960 MONTANA AVENUE, NE
WASHINGTON DC 20018

PREMISE    FIRST AND SECOND FLR

STORAGE    FIRST AND SECOND FLR

This Bill For Period    9/14/2004 To 9/30/2005

| | $3,250.00 | 34505/6017/3234 |
| | $346.00 | 34505/6017/3234 OTHER FEES |
| | $3,596.00 | TOTAL |

| | FILE DATE | LICENSE NUMBER | CLASS OF LICENSE |
|---|---|---|---|
| ☐ Cashiers # ☐ Cer. C∗ # ☐ Money Order # | 9/14/2004 | 60444 | RETAIL CLASS CNC3 |

Copy

★ ★ ★    GOVERNMENT
OF THE
DISTRICT OF COLUMBIA    **ALCOHOLIC BEVERAGE REGULATION ADMINISTRATION**
**ALCOHOLIC BEVERAGE CONTROL BOARD**
941 North Capitol Street, NE, Suite 7200
Washington, DC 20002    ABRA 300-

| APPLICATION NUMBER | 60860 | LICENSE NUMBER | 71484 | LICENSE CLASS | Retailer CN 03 |
|---|---|---|---|---|---|

Antoine Jones
Levels Entertainment
1960 MONTANA AVE NE,
WASHINGTON , DC 20018

**Layout and Endorsements:**
1st Floor On-site Storage
2nd Floor On-site Storage

Copy

Voluntary Agreement: No

| **LICENSE IS VALID FROM 11/19/2004 TO 9/30/2006** | **ISSUE DATE: 11/19/2004** |
|---|---|

**THE LAW REQUIRES THIS LICENSE TO BE POSTED IN A CONSPICUOUS PLACE ON THE PREMISES**



P6
1

SUPPLEMENT COMPLIANT TO THE OBSTRUCTION
OF JUSTICE CHART FOR CLUB LEVELS

MR JONES HAS FOUND MORE INFORMATION THAT
RELATES TO A 18 USCS § 2234 VIOLATION

MR JONES ARGUES THAT FBI AGENT KELLIE OBRIEN
VIOLATED "18 USCS§2234 WHEN SHE EXCEEDED HER AUTHOR-
ITY WHEN SHE ILLEGALLY CONFISCATED MR JONES' ABC
LIQUOR LICENSE SO THAT HE COULDN'T CONTINUE TO KEEP
OPEN HIS ESTABLISHMENT FOR BUSINESS.

SPECIAL AGENT OBRIEN TESTIFIED THAT SHE WAS THE
SEIZING AGENT ON OCTOBER 24, 2005 THE MORNING,
THAT THE FBI AGENTS SEARCH CLUB LEVELS.

(EXHIBIT #1) IN THE GOVERNMENT'S RESPONCE THE
GOVERNMENT CONCEDED AND WRITES: MOREOVER, THE
AGENT TOOK PHYSICAL POSSESSION OF THE LIQUOR
LICENSE DURING THE EXECUTION OF THE WARRANT.
(IN FOOTNOTES #38, IT READS) THE LIQUOR LICENSE WAS
SEIZED BECAUSE UNDER THE ABRA REGULATIONS, THE
DEFENDANT NEVER SHOULD HAVE RECEIVED A LIQUOR
LICENSE IN THE FIRST PLACE. - HE WAS A CONVICTED
FELON AN ON HIS APPLICATION, FALSELY CLAIMED
HE HAD NO CRIMINAL RECORD.

PG
2

THIS FRAUD ON THE COURT AND A POTENTIAL 18 U.S.C.S. 8 1001 VIOLATION - FALSE STATEMENT, BECAUSE THE DISCOVERY FROM CLUB LEVELS CLEARLY SHOWS THAT MR JONES DIDN'T FALSIFY ANY INFORMATION ON HIS LIQUOR LICENSE APPLICATION. AS A MATTER OF FACT THIS INFORMATION THAT MR JONES HAD DONE NO WRONG PERTAINING TO HIS LIQUOR LICENSE, IT ALL CAME OUT DURING THE SECOND TRIAL.

(EXHIBIT #2) 6-28-04 CRIMINAL HISTORY REQUEST
  IT READS: I HEREBY AUTHORIZED THE RELEASE OF
MY ADULT RECORD REVEALING CONVICTIONS AND
FORFEITURES "WITHIN THE PAST TEN (10) YEARS "

(EXHIBIT #3) ALSO MR JONES REQUESTED MARYLAND CRIMINAL
RECORD ON 7-9-2009

(EXHIBIT #4) IS AN AUTHORIZED RELEASE FORM PAGE 2
SIGNED BY MR JONES ON 8-10-04, AND NOTARIZED ON
AUGUST 16, 2004. THE PAGE 2 OF THIS APPLICATION READS:
HAVE YOU EVER BEEN CONVICTED OF A MISDEMEANOR
DURING THE LAST (5) FIVE YEARS OR A FELONY DURING
THE LAST TEN (10) YEARS ( ) YES (NO) . MR JONES CHECKED
NO BECAUSE IT HAD BEEN PASSED 10 YEARS CONVICTED.

P6
3

SPECIAL NOTE: THE ABC LIQUOR LICENSE WASN'T
WASN'T ON THE SEARCH WARRANT ATTACHMENT A, AS ITEMS
TO SEIZE FROM CLUB LEVELS NOR DID FBI AGENT KELLIE
O'BRIEN NOTATE ON CLUB LEVELS PROPERTY RECEIPT
THAT SHE CONFISCATED MR JONES' ABC LIQUOR LICENSE
VIOLATING MR JONES' 4TH AMENDMENT.

## CONCLUSION

ILLEGAL CONFISCATION OF MR JONES' PERSONAL
WITHOUT COURT AUTHORITY AS A CLEAR VIOLATION
OF 18 USCS §2234 AND MR JONES IS REQUESTING
A FULL AND COMPLETE INVESTIGATION WHY AGENT
O'BRIEN ILLEGALLY CONFISCATED MR JONES ABC
LIQUOR LICENSE.

Id. Here, an officer from ABRA aided in the execution of warrant. ABRA is a regulatory agency

in the District of Columbia government tasked with issuing liquor licenses and enforcing the laws

regarding sale of liquor, and other licensing regulations. The agency had previously inspected the

establishment and, through photos, was familiar with its layout. Moreover, the agent took physical

possession of the liquor license during the execution of the warrant.[38] The paralegal specialist from

the FBI (who was assigned to the asset forfeiture section) aided in the execution of the warrant by

being able to examine the night club for forfeiture potential and to identify documents relevant to

a money laundering investigation. This argument should be summarily denied.[39]

_____

[38] The liquor license was seized because under the ABRA regulations, the defendant
never should have received a liquor license in the first place – he was a convicted felon and on
his application, falsely claimed he had no criminal record.

[39] Even the supplemental attachment from Lawrence Maynard adds nothing to the
analysis. Maynard's chief complaint seems to be that he never found a copy of a search warrant
or Attachment A when cleaning up Level's. Defense counsel fails to suggest the relevance of
this claim.

23

PD 70 REV. 01/93

| Date of Request | METROPOLITAN POLICE DEPARTMENT Washington, D. C. CRIMINAL HISTORY REQUEST | MP PD Number |
|---|---|---|
| 6-28-CY | | |

**Request Record of:** (Last,First,Middle Name)

Jones Antune

**Address**

| Sex | Race | Birthdate | Place of Birth |
|---|---|---|---|
| M | Black | | Wash D C |

**Requesting Agency** | **Call-Back Number**

**Signature of Agent** | **Badge No.**

**Purpose of Request** (check one)

☐ Law Enforcement Purposes (not for employment)

☐ Visas*

☐ Employment*/Licensing*

☐ Challenge*

**Method of Request** (Check One)

☐ Mail

☐ In Person

☐ NLET

☐ Telephone

---

IDENTIFICATION AND RECORDS DIVISION USE ONLY-(Check if applicable)

☐ SUBJECT UNDER ARREST     ☐ CORRECT COLOR CODE

| Request Received By | Date and Time Received | Date and Time Returned |
|---|---|---|
| | | |

---

## D.C. CODE §1-2530 IS QUOTED HERE FOR YOUR INFORMATION

It shall be an unlawful practice, punishable by a fine of not more than three-hundred dollars ($300.) or imprisonment for not more than ten (10) days, or both, for any person to require the production of an arrest record or any copy, extract, or statement thereof, at the monetary expense of any individual to whom such record may relate. Such "arrest records" shall contain only listings of convictions and forfeitures of collateral that have occurred within ten (10) years of the time at which such record is requested. *(Dec. 13, 1977, D.C. Law 2-38, Title II, §266, 24 DCR 6038).*

*I hereby authorize the release of my adult arrest record revealing convictions and forfeitures within the past ten (10) years.

Signature     6-28-0Y / Date

---

RESULTS OF CRIMINAL HISTORY FILE SEARCH

TO:   Criminal History Users     ☐ Name Search   ☐ Fingerprint Search

This request concerns information whose collection, dissemination, and use are conditioned and restricted by applicable federal and District of Columbia statutes, and policy of the Metropolitan Police Department. Continued assistance from this department is conditioned upon your strict adherence to these regulations.

WARNING TO APPLYING AGENCIES: The Metropolitan Police Department does not guarantee either the accuracy of the record or that the individual whose record is furnished is actually the same individual whose record was requested. To obtain accuracy, the record of the Court involved should be examined. Positive identification can only be determined by comparable fingerprints. Records of arrests obtained from the Metropolitan Police Department as detailed on this form are for convictions and forfeitures for the past 10 years prior to the date of request of this record, exclusive of periods of imprisonment, if any. This record does not reflect any cases which may be currently pending before the Courts or cases where convictions have been set aside pending appeals.

CHIEF OF POLICE

| Date of Arrest | Charge(s) | Disposition |
|---|---|---|
| | | |

---

Documents Released:

☐ Criminal History Record      ☐ Photograph       ☐ Other: _____
☐ Prosecution Report           ☐ Fingerprints     ☐ Other: _____

| Record Search | Record Searched By | Release Authorization |
|---|---|---|
| | | |

**State of Maryland**
**Department of Public Safety and Correctional Services**
**CJIS Central Repository**
**P.O. Box 32708**
**Baltimore, MD 21282-2708**



013022755513-4

Customer assistance: 888-795-0011
410-764-4501

July 13, 2004



Received : 7/9/2004
Reference: 013022755513

To: ANTOINE   JONES

Your request for a criminal history record check of Maryland's
Criminal Justice Information System has been completed. This record
check was based upon the identification information as follows:

ANTOINE   JONES
Sex: M      Race: B      Date of Birth:

The Maryland Criminal Justice Information System is operated under
the authority of the Secretary of the Department of Public Safety
and Correctional Services and does not contain data prior to 1978.

*Carole Shelton*

Carole Shelton, Director
Criminal Justice Information Systems
Central Repository

(Exhibit #4)

**Personal History**
**Page 2**

5. What is the total amount of capital you have contributed to the business?
   $ 4,000 ⁰⁰.

6. Have you ever been convicted of a misdemeanor during the last five (5) years or a felony during the last ten (10) years? ( ) Yes  (✓) No

   *An individual with a misdemeanor or felony conviction must submit a copy of the court disposition with the application.*

# INFORMATION RELEASE AUTHORIZATION

CAREFULLY READ THIS AUTHORIZATION TO RELEASE INFORMATION ABOUT YOU, THEN SIGN AND DATE IN INK.

I authorize any agent from the Alcoholic Beverage Regulation Administration, to obtain any information, relating to my activities, from employers, criminal justice agencies, financial or lending institutions, credit bureaus, consumer reporting agencies and retail business establishments, or individuals. This information may include, but is not limited to, my residential, personal, or criminal history record, and financial and credit information.

I further authorize release of my criminal history from criminal justice agencies for the purpose of determining my eligibility for a liquor license as either a licensee and/or investor. I understand that the information released is for official use by the Alcoholic Beverage Regulation Administration, and that these users may redisclose this information as authorized by law.

I release any individual, including records custodians, from all liability for damages that may result to me because of compliance, or any attempts to comply, with this authorization. This release is binding, now and in the future, on my heirs, assignees, associates and personal representative(s) of any nature. Copies of this authorization that show my signature are as valid as the original release signed by me.

Failure to complete this form may result in delays of obtaining your license and may result in the license being denied if this information cannot otherwise be obtained.

Antoine Jones
Signature

ANTOINE JONES.
Full name type or printed

Other names used                     Social security number [redacted]

Other names used                     Other names used [redacted]        8/10/04

Current address                      Home Telephone          Date

I hereby certify under penalty of perjury that the foregoing information is true and correct to the best of my knowledge and belief. I further, hereby, authorize the Alcoholic Beverage Control Board or its employees to investigate any and all of the information provided by me in this application for an ABC license.

Signature Antoine Jones                Title OWNER

Print Name & Title Antoine Jones

SUBSCRIBED AND SWORN TO BEFORE ME THIS 16ᵗʰ DAY OF Aug, 200 7

NOTARY PUBLIC

My Commission expires on: DEC 1, 2009

Copy

★ ★ ★   **ALCOHOLIC BEVERAGE REGULATION ADMINISTRATION**
GOVERNMENT   **ALCOHOLIC BEVERAGE CONTROL BOARD**
OF THE   P.O.BOX 37200
DISTRICT OF COLUMBIA   WASHINGTON, D.C. 20013-7200

Office Use Only

Issue Date 9/14/2004

N B O L I C E N S L E Y

CONTROL NUMBER   71388   APPLICATION NUMBER   50153

APPLICANT'S NAME & ADDRESS
ANTOINE JONES
LEVELS ENTERTAINMENTT
1960 MONTANA AVENUE, NE
WASHINGTON DC 20018

PREMISE   FIRST AND SECOND FLR

STORAGE   FIRST AND SECOND FLR

This Bill For Period   9/14/2004 To 9/30/2005

$3,250 00   34505/6017/3234

$346.00   34505/6017/3234   OTHER FEES

$3,596.00   TOTAL

| | FILE DATE | LICENSE NUMBER | CLASS OF LICENSE |
|---|---|---|---|
| Cashiers #  Cer. C #  Money Order # | 9/14/2004 | 60444 | RETAIL CLASS CN03 |

Copy

★ ★ ★   ALCOHOLIC BEVERAGE REGULATION ADMINISTRATION
GOVERNMENT   ALCOHOLIC BEVERAGE CONTROL BOARD
OF THE   941 North Capitol Street, NE, Suite 7200
DISTRICT OF COLUMBIA   Washington, DC 20002

APPLICATION NUMBER   60860   LICENSE NUMBER   71484   LICENSE CLASS   Retailer CN 03

Antoine Jones
Levels Entertainment
1960 MONTANA AVE NE,
WASHINGTON , DC 20018

Layout and Endorsements:
1st Floor On-site Storage
2nd Floor On-site Storage

Copy

Voluntary Agreement: No

**LICENSE IS VALID FROM 11/19/2004 TO 9/30/2006** | **ISSUE DATE: 11/19/2004**

**THE LAW REQUIRES THIS LICENSE TO BE POSTED IN A CONSPICUOUS PLACE ON THE PREMISES**

