CLERK of the COURT for
UNITED STATES DISTRICT COURT
For the DISTRICT OF COLUMBIA

*[handwritten]* Let this
be filed
ESH 4/22/14

*[handwritten]* 1:05 cr 00386 (ESH)

United States

-V-

Antoine Jones
  (defendant)
18600-016
Currently housed at:
USP Atlanta
P.O. Box 150160
Atlanta, GA 30315
    *Pro se*

Ineffective Assistance of Counsels Claims and *28 U.S.C.S. 2255* Claim

*28 U.S.C.S. 2255* Federal Custody, Remedies on Motion Attacking Sentence

COVER PAGE

**RECEIVED**

APR 16 2014

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

Now comes Antoine Jones *pro se*, defendant – appellant in the above caption motion request pursuant to *28 U.S.C. §§2255*, that this honorable court grant the requested relief remedy on motion attacking sentence.

*28 U.S.C.S. 2255* Federal Custody, Remedies on Motion Attacking Sentence.

(a) A person in custody under sentence of a court establish by act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or Law of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

(f) A 1-year of limitation shall apply to a motion under this section. The limitation period shall run from the latest of – (1) the date on which the judgment of conviction become final. Defendant filed this *pro se* motion to vacate, set aside, or correct his sentence under *28 U.S.C.S. 2255* and ineffective of assistance of counsel claims.

A claim that ineffective assistance of counsel has deprived a defendant of his Sixth Amendment right to counsel is controlled by the standards stated in ***Strickland v Washington, 466 US 668 104 S.Ct 2052 80.ed 674 (1984).***

To demonstrate deficient performance by counsel, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonable id at *668, 104 S.Ct at 2064.* A Court considering a claim of ineffective assistance must apply a

2 |

strong presumption that counsel's representation was within the wide range of reasonable professional assistance. [STRICKLAND, 466 U.S.] at 689, 466 U.S. 668, 104 S.Ct 2052, 50 l.ed 2d 674. The challenger burden is to show that counsel made errors so serious that counsel was not functioning as the counsel guarantee the defendant by the Sixth Amendment, id at *687, 104 S.CT 2054 Harrington v Richter U.S. 131 Ct 770, 178 L.Ed 2D 624 (2011).*

To demonstrate prejudice, a person must establish a reasonable probability that, but for counsel's unprofessional error, the results of the proceeding would have been different. *Strickland, 466 U.S. at 644, 104 S.Ct 2068*: A reasonable probability sufficient to undermine confidence in the outcome, id at *694, 104 S.Ct at 2068*. It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding. Strickland 466 U.S. at 693,466, 104 S.Ct 2042, 80 l.ed. 2d 674. Counsel's error must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable, id at 687,104 S.Ct 2052. Richter U.S. at 131 S.Ct at 787-88; see also id at 131 S.Ct at 791-92 (in assessing prejudice under Strickland, the question is not whether a Court can be certain counsel performance had no effect on the outcome or whether it is possible a reasonable different result might have been established if counsel acted differently. . . The likelihood of a different result must be substantial, not just conceivable.) citation omitted; WONG v BELMONTES 588 U.S. 15,27, 130 S.Ct 383,3 90-91, 175 l.ed. 2d 328, 2009 (percurian), (but Strickland places the burden on the defendant, not the states, to show a reasonable probability that the result would have been different.)

PREJUDICE

To succeed on ineffective assistance of counsel claims a defendant must demonstrate that counsel's choice were not strategic because they were outside the wide range of professional competent assistance, and that there is a reasonable probability that, but for counsel unprofessional error, the result of the proceeding would have been different.

Defendant Jones argues that his conviction should be vacated under grounds of:

(1) INEFFECTIVE OF COUNSEL BY MR. BALAREZO AND MR. O'TOOLE

(2) BOTH MR. BALAREZO AND MR. O'TOOLE FAILED TO PROPERLY PREPARE FOR A CRUCIAL EVIDENTIARY HEARING

(3) FAILURE TO PROPERLY INVESTIGAE CRUCIAL AND ESSENTIAL EVIDENCE THAT WOULD HAVE PROVIDED SUPPORT AND ASSIST IN WINNING THE EVIDENTIARY HEARING

(4) BOTH MR. BALAREZO AND MR. O'TOOLE FAILED TO INTERVIEW AND SUBPOENA DEFENSE WITNESSES TO SUPPORT FACTS AND EVIDENCE IN THE EVIDENTIARY HEARING

(5) MR. O'TOOLE FAILED TO INVESTIGATE JURY TAMPERING AND OBSTRUCTION OF JUSTIVE BY GOVERNMENT COOPERATOR JASON McNAIR AFTER MR. McNAIR BROUGHT $100,000 CASH INTO JUDGE HUVELLE'S COURTROOM DURING DEFENDANT'S CRIMINAL TRIAL PROCEEDINGS

(6) MR. O'TOOLE WAS INEFFECTIVE BY REFUSING TO REQUEST AN INVESTIGATION INTO WHO WAS RESPONSIBLE FOR HAVING JASON McNAIR BRING $100,000 CASH INTO JUDGE HUVELLE'S COURTROOM

(7) MR. O'TOOLE PROVED INEFFECTIVE WHEN HE REFUSED TO
REQUEST A CONTINUANCE AFTER REALIZING THAT THE FEDERAL
AGENTS, DETECTIVES AND MS. LIEBER'S TESTIMONIES WERE
CONTRADICTORY, UNTRUTHFUL, AND UNRELIABLE

(8) MR. BALAREZO PROVED TO BE INEFFECTIVE COUNSELOR WHEN HE
DELIBERATELY NEGLECTED AND SABATOGED DEFENDANT'S PRE-
TRIAL MOTIONS.

In order to determine the competence of counsel, A.B.A. applies a professional
standard that determines in ineffective of assistance of counsel. The standard is firmly
grounded in the belief that counsel plays a role that is critical to the ability of the
adversarial system to produce just results.

The Strickland court further explained the meaning of deficient performance in the
first prong of the test in the following way:

FACTUAL BACKGROUND

On May 10, 2010, a three judge panel gave a strong opinion ruling in favor of
defendant Jones (see (U.S. v Maynard) the Court of Appeals reversed defendant Jones'
conviction, (later affirmed in the U.S. Supreme Court, see United States v Antoine
Jones).

In Maynard, the Court of Appeal stated "evidence certainly showed there was a
conspiracy to distribute and possess with intent to distribute drugs based out of 9508
Potomac Drive, Ft Washington, Maryland, where police found $850,000 cash and 97
kilograms of cocaine and one kilogram of cocaine base. Further down, the court stated in

5 |

paragraph (5) physical and photographic surveillance showing Jones' Jeep Cherokee visited the Potomac Drive house a few times.

The above mentioned evidence prejudiced defendant Jones I his third trial, and would have strongly supported a conviction in a fourth trial, forcing defendant to take a plea offer.  During the trial, the government physically placed almost 100 kilos of cocaine along with $850,000 cash on the table in front of the jury which highly prejudiced the defendant.

All evidenced presented and mentioned should have been suppressed during the evidentiary hearing.  Absent the drugs and money along with any other evidence tied to the Potomac Drive house, a jury reasonable might have inferred that defendant Jones was not involved in the alleged conspiracy.  Further, without the Potomac Drive evidence, defendant Jones could better argue insufficient evidence on defendant Jones being convicted on a five kilogram drug conspiracy.  Defendant Jones reminds the court that they already had two mistrials; the first with 34-count indictment and the second mistrial came in the third trial when defendant Jones relieved Mr. O'Toole after a rogue performance on day-one of trial and represented himself, resulting in a 6-6 hung jury.

During the questioning of the jury, Mr. O'Toole stated to defendant Jones that some jurors mentioned to him, that the money and drugs from the Potomac Drive house was enough to find the defendant guilty.  There's a greater than reasonable possibility that the Potomac Drive house unlawfully obtained evidence will contribute to a conviction in the fourth trial or further contribute to more mistrials.  With this illegally obtained evidence from the Potomac Drive house, it's clearly a Sixth Amendment Right violation because it denies defendant a fair trial.

INEFFECTIVE ASSISTANCE FO COUNSEL BY MR. BALAREZO AND MR.
O'TOOLE

Grounds one through four, and number seven will be consolidated in this argument. . .
Defendant Jones pointed out multiple Constitutional violations that came to light during
the investigations and trials. It's a lawyer's professional code of conduct, his duty and
obligation to investigate and inform the Court of Constitutional violations as he is made
aware there were any committed. These Constitutional violations are a vital part of the
defense. It is the duty and obligation of the defense attorney to assist his client's defense
and point out these violations.

Defendant Jones discussed on many occasions with both Mr. Balarezo and Mr.
O'Toole the issue of suppression of all evidence relating to the G.P.S., and in particular
the drugs and money from the Potomac Drive house.

Specifically, Defendant Jones' goal and objective was to thoroughly investigate the
issue of the September 26, 2005 pinging of Reyna's cellphone to see if there was an
actual pinging of that cellphone on September 26, 2005 by the FBI Agents and to have
the paperwork that resulted from the required court order submitted into evidence. To
date, no evidence of a paper trail has been turned over to defendant nor submitted as
evidence. There is no protocol, no chain of command, and no paper trail by the
government relating to the September 26, 2005 call to Nextel. Further, the government
presented no evidence that a named person called or presented any type of paper trail
from Nextel relating to the government's September 26, 2005 pinging claim.

Defendant Jones strongly stands on the information obtained from Nextel which
outlines the requirement for a court order and a subsequent paper trail for each and every

request for cellphone pinging. Defendant Jones' position: if there was a court order obtained why has it not been presented as requested multiple times by defendant; and if not, then the "pinging" was conducted without a warrant or court order. Nextel responds to a court order in requests for cellphone pinging. Without a court order, Nextel states it is impossible for anyone to just call Nextel phone service and get that kind of confidential information without proof of a warrant or exigent circumstances. Defendant Jones refers the Court to case (United States v Frank Caballo, August 7 2013 – US Dist Lexis 112739 and United States v Richard Anthony Wilford US Dist Lexis 80898 June 7 2013).

Caballo focuses on the chain of command and facts on how the "pinging" process works. . . It's impossible for the Agents to get one ping and that ping place that phone in the Potomac Drive driveway. Caballo points out in order to get a ping on a cellphone is to serve a warrant on the cellphone company or exigent circumstances. In this case there was neither a warrant nor exigent circumstances, so Nextel would never provide any confidential information without proof of authority or an emergency.

Special Note: Defendant is not at this time challenging the legality of the pinging. Defendant is just pointing out the protocol and chain of command to get a pinging on a cellphone.

Caballo further states to get any information from the cellphone company the law enforcement agency must contact the corporate security and provide information that would have to be faxed such as agency cover sheet, identification of law enforcement agency requesting the information, its address, phone number, fax number as well as requesting agent's name, title, email address and his or her supervisor's name and phone

number. The Agent must certify "under penalty of perjury" that he or she has been granted authority by the identified law enforcement agency.

Not until this protocol and chain of command is met, will the cellphone company provide any confidential information such as the pinging of someone's cellphone. . . The bottom line is the government never provided or produced the chain of command proof or a paper trail relating to the September 26, 2005 pinging of cellphone (678-332-7712) and Nextel will never give a pinging over the phone without proof of authority and the requestor not paying the pinging fee.

The government knew for sure that without this September 26, 2005 INDEPENDENT PINGING from the September 26, 2005 GPS evidence, the government couldn't execute the search warrant on the Potomac Drive house and the drugs and money and all other information would have to be suppressed. . .

April 3 2012 Thurs 2:15pm page 77 lines 15-19:

The court: Yeah, but, you see, under the law, if you could have gotten to the location independent of the GPS, you can execute the warrant.

Mr. Geise: That's absolutely correct.

With this stated by the Court and agreed to by AUSA Jack Geise, both Mr. Balarezo and Mr. O'Toole should have investigated the alleged pinging on 678-332-7712 on September 26, 2005.

GOVERNMENT LEGAL AUTHORITY WAS SUSPICIOUS AND NOT RELIABLE

Defendant Jones points out the testimony that wasn't reliable and Mr. O'Toole should have further investigated these facts.

12-12-12 Evidentiary hearing page 121 lines 14-25, page 122 lines 1-10, page 123 lines

11-16, and page 124 lines 1-19

Q: you decided when you got to work – I'm sorry, who decided to call Nextel

A: I don't –

Q: It's important

A: I think there was more of a discussion of how we could find the phone.

Q: Who was the discussion with?  Think back

A: I would venture to say it was Stephanie, myself, maybe Rachel was on the phone.

We talked to Rachel.  She said that we had legal authority to do it.

The Court:  What authority?

Page 122 lines 1-11

Q:  What was her basis – I'm sorry.  I interpreted the Judge go ahead

A:  Legal authority

Q:  What was your legal authority?

A: The court order for the phone for 678-330-7712

Q:  and that order allowed you to get cell data, right?

A:  UH-HUH

Q:  Didn't allow you to get ping data it?  Didn't allow you to ping phone, did it?

A:  I don't know how it read.

Page 123 lines 11-16

Q:  Right. And it allow you to get pen register, right?  And it allow you to get tracing –

tracing captures function, right?  To find out who's calling into that number, right?

A:  Correct.

Q: What is about that order that you thought you had the capability to ping that number.

A: Correct.

Page 124 lines 13-19

I'm curious about is whether that order – and I don't think that order even allow them to ping a number. I think it allow to look a t cellsite data, either historically as it says on it, or – or – I don't think it even allow – if that perspective, but I don't think it allow pinging.

Mr. O'Toole and Mr. Balarezo were both ineffective in that neither investigated the legal authority on pinging warrant versus a penregister – cellsite order and also for not issuing a subpoena for an expert on pinging, and especially for not interviewing and issuing a subpoena form someone from Sprint / Nextel Security Office.

12-13-12

Page 174 lines 1-25, page 175 lines 1-25, and page 177 lines 1-14

(Line 14) Mr. O'Toole:  Your Honor, we served a subpoena on the corporate office of Sprint in their office of Corporate Security, and we asked for – in the subpoena, we asked for records of any inquiry about the phone number 678-330-7712

(Lines 12-15) Mr. O'Toole:  Your Honor, we submitted a subpoena for inquiries of that telephone made on or about September 26, 2005, and we received a response from Sprint just today over the lunch period.

Page 17 Lines 19-25

The Court:  but you subpoena – what did the subpoena ask for?

Mr. O'Toole:  The subpoena asked for – and I'll quote it – any and all written and electronic records and notes produces in response to a request for information related to

**11 |**

Sprint Nextel number 678-330-7712 made on or before September 26, 2005. This is to include, but not limited to the Sprint Nextel employee that took the request call, the documentation produced by the requester for the information, the name and title of the person making the request, and any and all information rendered by Sprint Nextel to the requester. (Verbal, written notes, electronic) on September 26, 2005.

Please include name of all Sprint Nextel employees that rendered any assistance in this request, along with their contact information and title.

Mr. O'Toole was clearly ineffective for not calling an available witness from the Sprint Nextel Security Department to testify regarding the information mentioned in the subpoena.

PINGING CELL PHONE 678-330-7712 was crucial to the government's case and damaging to the defense case. . . Defendant reminds the court that prior to September 26, 2005 the government had no idea that Potomac Drive house existed. As a matter of fact, AUSA Rachel Lieber testified: page 18 lines 14-25 and page 19 lines 1-9:

Q: and there's a lot jourisdiction, Virginia, D.C., there's Maryland and you didn't know where the stash house was, if it ever existed. But you thought it did exist.

A: We thought it existed. We **did not know where it was.**

Q: and that was true on the 16th of September?

A: Right

Q: Alright and that was also true on the date that you said you had this conversation on the telephone call generally about calling Nextel.

A: Right.

Q: Alright, and –

12 |

A: Well, let me say this. That I think on the 16th we certainly did not. We just didn't

know. We were thinking possibly "Virginia" because – I do remember a cell tower – We

were getting some cell tower information that made us think down "Route 1 in Virginia"

and we spend a lot of time trying to piece together what was down there, and I know the

Agents went out and rode around looking, trying to identify – get neighborhood down.

The question should have been, "How could the Agents think the alleged stash

house was Potomac Drive, while all along the Agents were miles away in Virginia riding

along Route 1 searching? It's impossible to find the cellphone with just one pinging!

Defendant Jones asserts this point by referring the Court to ICE

Agent Kane's testimony during the third trial, on pinging Javier's cellphone. With

numerous pinging on Javier's cellphone it took the special Agents days and weeks to just

come close to the cellphone. They were in the Bowie area but to locate the cellphone it

took a sophisticated Triggerfish device to specifically locate the cellphone in the Myrtle

Avenue house.

To further support this argument, defendant refers the court to United States v

Caraballo. . . Caraballo outlines how Sprint Nextel pings a cellphone. . . When Sprint

Nextel pings a cellphone it uses a tool on its computer that permits it to insert a cellphone

number, click a button, and initiate a request through its network to the cellphone to

identify the GPS coordinates. The communication takes place through the control

channel and can only occur in areas where Sprint Nextel's surveillance analyst. The

analyst then relays that location data to law enforcement. The person who owns or

possesses the pinged cellphone typically received no signal or other communication that

pinging has occurred. If the pinging process fails the analyst is still able to determine the

location of the cell tower with which the cellphone is communicating as that process takes place automatically and continuously if the CELLPHONE IS ON. The pinging process occurs in the same manner regardless of whether the cellphone is on a prepaid or post plan. Cellphone pinging is more likely to be successful and more accurate when the pinged cellphone is not in a building because the cellphone needs access to GPS satellites in order to "get the good ping". If it cannot, it will default to the "4999 meter cellphone tower radius."

Defendant Jones also refers the court to case (United States v Richard Anthony Wilford, June 7 2013 US dist lexis 80898). It states according to the evidence, when a cellular phone was turned on, ping occurred every fifteen minutes on, with the service provider for the cellular phone sending an email to law enforcement with latitudinal and longitudinal coordinates. These coordinates could locate a phone with a radius of 3,000 to 5,000 meters. This radius of area is equal to thirty to fifty football fields. It will be impossible to find a one-time pinging of any phone in that radius. The Agents didn't know if that phone was in a private house or public if it was pinged one time on September 26, 2005. The only location determined by satellite on the location would be within a 3,000-5,000 meter radius of the nearest cellphone tower.

In both Caraballo and Wilford cases, continuous pinging by the law enforcement was required to get an accurate precise location. Defendant Jones' investigator Robin Bradshaw provided both Mr. Balarezo and Mr. O'Toole with this information along with the cost law enforcement is required to pay ($500) for pinging requests from Nextel. (The government never produced that payment.)

**Exhibit 1** is a report from Ms. Robin Bradshaw outlining the protocol for pinging requests from the Sprint Nextel Communication Company. In this report Ms. Bradshaw writes "I was told that there is always a paper trail and that they (Sprint/Nextel) would never give that information over the phone. It was explained that not only would there need to be a court order, there need to be an exigent request form." This supervisor also stated that he was with the company when the merger between Sprint and Nextel took place and that he never knew the company to comply with any requests with simply a phone call.

This was on 12-12-12 the day of the very important evidentiary hearing. With this eye-opening information reported by Ms. Bradshaw, Mr. O'Toole was ineffective by not calling this Sprint/Nextel supervisor in as a defense witness to testify about the protocol and the chain of command and paper trail required prior to giving out pinging information. At the very least, Mr. O'Toole, as appointed counsel, should have requested a continuance and personally verified this information with the Sprint/Nextel supervisor.

Special Note: Ms. Robin Bradshaw was (and still is) prepared to testify regarding her discovery about the Sprint/Nextel protocol as it relates to the September 26, 2005 pinging of cell number 678-330-7712. Ms. Bradshaw has submitted a sworn affidavit detailing her communications with Sprint/Nextel. Defendant Jones also puts on record that Ms. Bradshaw, as an investigator, was preparing to subpoena the witnesses from Nextel to testify during the evidentiary hearing about the pinging protocol and paper trail. during the evidentiary hearing. Ms. Bradshaw then alerted defendant Jones that Mr. O'Toole ordered her to not communicate with Sprint/Nextel and Mr. O'Toole told the Sprint/Nextel employees not to give Ms. Bradshaw any more information.

INEVITABLE DISCOVERY AND INDEPENDENT SOURCE

The government argues that they found the Potomac Drive house with a one-time pinging on September 26, 2005, the day before the GPS went up on September 27, 2005.

The government also stated that they pulled some public records on September 26, 2005, also went to Potomac Drive, took a seven minute video of the Potomac Drive area, saw a house they believe was crummy, and want the court to believe they found the alleged stash house.

Mr. O'Toole was ineffective by not properly challenging the government on this. The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation. Nix 467 US at 433, see Muray v United States, 487 US 533, 537,108 S.Ct 2529, 101 1.ed 2d 472 (1988) Segur, 468 US at 814. The government bears the burden of providing inevitable discovery by a preponderance of evidence Nux v William 62 f. 3d 470, 472-73, (2d cir 1995). We have made clear, however that "proof of inevitable discovery involved o speculative elements but focus on demonstrated historical facts capable ready verification or impeachment," United States v Eng, 971 f2 d 845, 859 (2d cir 1992).

It was ineffective that Mr. O'Toole didn't attempt to show evidence that the September 26, 2005 call to Nextel didn't exist, because if he had presented evidence that the pinging never happened before September 27, 2005, the court has no other choice but to rule in favor of defendant Jones on the suppression of the evidence in the Potomac Drive house.

O'TOOLE & BALAREZO'S INVESTIGATION ON THE SEPT 26, 2005 LACKED SUFFICIENCY

Neither Mr. Balarezo nor Mr. O'Toole took time out to properly investigate if there was a pinging on September 26, 2005. After defendant Jones requested both Mr. Balarezo and Mr. O'Toole to use their subpoena powers, neither took the time to subpoena the FBI phone records to see if that FBI phone called Nextel on September 26, 2005. Nor did they subpoena Nextel or the FBI to see if there was a payment receipt for the pinging request.

Neither Mr. Balarezo nor Mr. O'Toole subpoenaed FBI records (timecards, passcard, time key, etc.) of agents Kirschner, O'Brien, Yanta, or AUSA Lieber to see if any of them worked on September 26, 2005. Agents Kirschner and O'Brien testified they did not make the call to Nextel; however, Yanta testified that she was not sure if it was herself or O'Brien that called Nextel. Since the admission of the Potomac Drive house hangs on the pinging, it was ineffective for both Balarezo and O'Toole to allow the Nextel issue to go on record without fully investigating who was responsible for calling Nextel and requesting the pinging, and investigating the absence of a paper trail for the pinging request.

UNRELIABLE TESTIMONY

In his closing argument, Mr. O'Toole stated he believes the witness' testimonies were not credible or believable. However, Mr. O'Toole still did not request a continuance so he could properly challenge and impeach the witnesses. The unreliable testimonies were perpetuated by the agents' repeated responses of: "I don't recall" or "I don't remember".

12-12-12 Evidentiary Hearing

Agent Kelly O'Brien page 121 lines 7-16

**17 |**

Q:  You decided when you got to work – I'm sorry.  Who decided to call Nextel?

A:  I don't –

Page 129 lines 21-25, page 130 lines 1-5

Q:  But if you don't know who made the call, because you may not have been there, How
do you know it was somebody on the team?  What we're trying to find out –

The Court:  She said she was there

Page 130

She said she might have – she think she was there and if she was there, I want to know
who made the call if it was not you.

The Witness:  I do not know with any certainty who made the call.

Page 132 lines 13-17

The Court:  you mean – you're now saying you didn't call Nextel on the 26th?  I'm lost.

The Witness:  I don't know that I ever said we called it on the 26th.

Agent Stephanie Yanta's testimony – Page 202 lines 23-25, page 203, line 1

Q:  All right.  Do you recall there being a time when you or other members of your team
actually decided to find out where a certain telephone was at that point in time through a
pinging and data called from Nextel?

A:  Yes.

Q:  All right, do you recall by chance when that was?

A:  No, sir.

Page 204 lines 13-19

Q:  Okay.  Do you recall that the affidavit it talks about contacting Nextel to ping a phone
and then find out where it was at the moment?

A:  Yes sir.

Q:  Who made the call, do you recall?

A:  I don't recall sir.

Agent Kellie O'Brien Page 159 lines 12-16

Q:  and you don't remember who made the telephone call to Nextel, because either you

weren't there or you just don't remember who made the call.  But you know it wasn't you

correct?

A:  I don't have the recollection.  I know I didn't call.  I don't have a recollection of who,

clearly enough, to say the person who called.

Agent Stephanie Yanta Page 210 lines 2-4, lines 12-15

Q:  Do you recall getting a product back from Nextel?

A:  I'm sure we did.  I don't recall the format was.

Q:  They said to you number 3, 46, whatever number, and you wrote them down on the –

as you were talking on the telephone?

A:  I would assume so sir.

Q:  What did you do with those coordinates:

A:  I don't know that I did anything with them sir.

Q:  Do you know if anybody did?

A:  Sir, I believe we provided them to one of our technical agents who was able to plug

them into a google map application and provided them to. . .

A:  I don't recall.

12-13-2012   AUSA Rachel Lieber's testimony Page 16, lines 12-18

Do you recall – I'm going to ask you a specific date and see if you can remember this. Do you recall there being a telephone call in which you were involved with Agent O'Brien and Agent – perhaps Agent Yanta or maybe others – on the morning of September 26 regarding the Nextel coordinates and inquiring Nextel if they had coordinates for the telephone?

A:  Sitting here today, I can't tell you date I had most of the conversation that we had. So I can't tell you what date it was.  I do remember discussing at some point that – you know, that they were going to call Nextel, and that they got the results that, they dis… But I can't tell you what the date was.

Q:  Who was it that – do you recall who it was that call was with?

A:  I don't and honestly I don't know for sure that it was a call versus an – in-person meeting.

The Witness:  This was on the 26th of September

Mr. O'Toole:  How do you – you told us before you didn't remember what date – I asked you when the call to Nextel was you said –

A:  I don't know.

Throughout the evidentiary hearing, the witnesses which include an experienced US Assistant Attorney, two trained FBI special agents and a seasoned veteran detective who all testified they could not remember when the call was made to Nextel, could not produce a paper trail, were not sure what was done with the information given from Nextel, gave no information regarding who (name, title or position) they spoke with at Nextel, and were unsure themselves which of them actually made the call to Nextel regarding the pinging of cellphone 678-330-7712.

RULE 3.8, RULE 16, BRADY VIOLATION

If this crucial information, the pinging of codefendant Reyna's cellphone existed during the first and second pretrial proceedings, AUSA Rachel Lieber, the government prosecutor was obligated under ABA and the D.C. Bar Counsel to produce Rule 16 and Brady material. Under professional conduct Rule 3.8, it is a must to abide by disclosure of any Brady material. Mr. O'Toole should have demanded to know why the government did not produce this information in neither the first nor the second trial.

CONCLUSION

Defendant Jones concludes this argument stating both Mr. Balarezo and Mr. O'Toole were ineffective for not pursuing a proper investigation in the event that is alleged to have happened September 26, 2005 especially since both attorneys had concerns about the government's credibility [Mr. Balarezo stated].

FBI 302's . . . other events, surveillance or photo's the agents recorded 302s, but when it came to this September 26, 2005 pinging incident, there were no 302s recorded nor any type of paper trail to show or prove the event ever happened. In one of the status hearings Mr. Balarezo stated: (page 63, lines 1-5): I'd like to see whatever 302s there are pertaining to what house they investigated when they went out there. I mean, the FBI writes a 302 when they go to the bathroom, so there has to be documentation about these things."

Page 166 lines 9-20 – By Mr. O'Toole:

Q: If this video – this six minute video – was instrumental in your investigation, I'm going to ask you two questions about the video. Tell me again in light of the – and the video does not have a date on it, correct?

A: Correct.

Q: And those photos you took on 10/4 did have date on correct?

A: Yes.

Q: Nonetheless --- nonetheless, you wrote a 302 about them correct?

A: Correct.

    7-minute video of Potomac Drive area . . . video cameras automatically record dates on a video camera unless someone takes the date off it by setting the camera on manual. Both counselors raised suspicion but failed to push for inadmissible when they saw there was not a date on the surveillance of the Potomac Drive houses. (This video could have been taken at any time prior to being shown in court – even the morning of.) Page 178 lines 3-18

Mr. O'Toole: Your Honor, I want to make a request. I made a request of the government. I think I was turned down. I would like to have access to the envelope and to the label on the case of the mini tape. And I'd like to have access to it for the purpose of giving it to an "expert" that I use. And I want to test that ink.

The Court: I think you can – I don't have any objection to you testing it.

Original Video Tape: Agent O'Brien testified on page 63, lines 7-9 that the original tape bears 9-26-2005 on it.

The Court: Is there a date on it?

The Witness: The original has 9-26-05. And the copy also has

Lines 15-16

The Witness: The actual is a mini cassette. And it was copied onto the CDs, which is what the US Attorney has right now.

The Court:  Does the copy bear the date, too?  Is what you're telling me?

The Witness:  Yes.

Q:  Do you have the original?  Did you actually bring the original with you today?

A:  Yes.

Q:  And does it contain the date 9-26-2005, in your own handwriting?

A:  Yes.

Mr. O'Toole was ineffective by not getting the original tape and having an expert test to see if the original handwriting print 9-26-2005 was years old or was the writing fresh (2012).  Mr. O'Toole boasted about his expert but he didn't produce by following up and using the services of the expert to verify the date stamp information.

It was very important to the case to see if the writing on the original tape and on the original storage package was fresh from 2012 or if the ink was old from 2005. Defendant Jones asserts that Mr. O'Toole failed him by not even trying to authenticate the 7-minute video.  He should also have given the video to an expert to see if the video matched the time of year, time of day, weather conditions (rainy, cloudy or sunny) for September 26, 2005.

Defendant refers the Court to the Evidentiary Hearing 12-13-12, page 192 lines 19-25, page 193 lines 1-25, page 194 lines 1-4. . . in these transcripts, once again Agent O'Brien realizes what Mr. O'Toole wants to accomplish with the ink on the envelope, she stated that Mr. O'Toole needs the DVD:

Page 194 lines 3-4

The Witness:  So what Mr. O'Toole need to do is he really need a DVD to be able to do that.

Mr. O'Toole was given permission by the court to use his expert, he had access to the original envelope and Agent O'Brien told him he need to use the DVD to get what he needed accomplished.

Special Agent Tim O'Neil: There was testimony that Agent O'Neil was significant to the finding of Potomac Drive. But the testimony was questionable and Mr. O'Toole should have subpoenaed Agent Tim O'Neil to testify about the assistance he provided relating to the September 2005 pinging coordinates. Even the coordinates and his initials were questionable. Agent O'Neil works in the Washington field office and should have been called in as a witness. His testimony is vital to determining the truth about the pinging that is alleged to have happened on September 26, 2005.

12-12-12 Page 120 lines 14-21

Q: All right. And O'Neil, what's his story? Who does he work for?

A: He works for the FBI.

Q: And what is his title?

A: He's a special agent?

Q: But is he more involved in the technology stuff? Or he just happens to know technology?

A: No, he's a technically trained agent.

Page 212 lines 5-16

Q: Do you recall the event of actually at the google map with the coordinates having been put ion in and a location being identified on that google map? Do you recall?

A: Not until I receive the google map.

Q:  But you can't remember seeing – whatever the specifics are, you can't remember

seeing . . . saying this is where we think – this is where the pinging is

A:  No sir. I don't recall that.

Q:  Did you do anything after the coordinates were put onto a google map by Tim – by

somebody on your tech team?

A:  I don't recall what I did.

Note:  None of the agents specifically testified that they saw agent Tim O'Neil write the

coordinates on paper.  When Mr. O'Toole questioned Agent O'Brien about going to

Agent O'Neil, she denied that she went to him.

Page 131 lines 1-7

Q:  All right, why don't you have an idea?

A:  Because there's eight hundred- some odd agents at WFO.

Q:  But you only went to one.

A:  I did not go to him.

Q:  Who did go to him?

A:  I don't know.

Stephanie Yanta testimony:  Page 210 lines 19-21

The Witness:  I believe, ma'am, it was just relayed via the telephone.

By Mr. O'Toole:

Q:  They said you number 33,46, whatever number, and you wrote them down on the – as

you were talking on the phone.

A:  I assume so sir.

Q:  What did you do with the coordinates?

A:  I don't know that I did anything with them sir.

Q:  Do you know if anybody did?

A:  Sir I believe we provided to one of our technical agents who was able to plug them into a google map application and provided with a map.

Q:  Who was it that provided them to, do you recall?

A:  I don't recall however based on the piece of paper that part of Agent O'Brien's affidavit, the initials "Tim O" are documented.

Tim O'Neil's Handwritten Document:

Page 40 lines 8-13, lines 18-19

The witness:  Actually what I should say is what – I'm looking at the Tim O'Neil – or, it just say "Tim O" right here on my copy that AUSA Soltys gave me, was a copy.  So – if I could see that I would be able to say. . . because the original has "Tim O" my copy has he "O" cut off.

The Court:  your copy meaning the original.

The witness:  Not the original correct.  So this appears to be, based on the fact that I can see the entire.

Q:  that is the original.

The Court:  whose handwriting

The witness:  I'm assuming that's Tim.

12-12-12 page 119, lines 1-7

Couldn't figure it out and Kirschner couldn't figure it out, so you went to Tim O'Neil, right? And he figured it out for you.

Q:  Who did go to him?

A  I don't recall.

Total demonstration of ineffective counsel on both Mr. Balarezo and Mr. O'Toole for not calling Tim O'Neil to testify since his role in the September 26, 2005 pinging was vital to relating the information to the agents who alleged found the Potomac Drive house using this information.

AGENTS AND DETECTIVES WHEREABOUTS ON SEPT 26 2005

12-12-12 Page 125 lines 2-18

By Mr. O'Toole:

Q: So what time did you get to work? On the 26th.

A: I have no idea.

Q: What time do you normally get to work?

A: You're talking about a very different circumstance.  When you're up on a wire, it really depends on what's going on and –

Q: What happened on that day?

A: I'm not sure of the question. What do you mean?

Q: I'm asking you – and we're going to ask you some questions about the 26th of September what time did you get to work that morning?

A: I don't know.

Q: What time does Stephanie get to work?

A: I have no idea.

Q: What time did Kirschner get to work?

A: I have no idea.

Mr. O'Toole and Mr. Balarezo were ineffective when neither took the time to check the

FBI field office log sheet, timecards, pass keys, or any document that Yanta, O'Brien,

Kirschner, or Tim O'Neil were present in the FBI field office the morning of September

26, 2005.

MORE UNSURE TESTIMONIES. . .

Detective Kirschner Page 68 lines 2-14

Q:  Did you have a 302 that they created that talked about the event of the day?  The 26th

of September?

A:  I have no idea.

Q:  "yes or no"?

A:  I don't –

Q:  You don't recall?

A:  I can't tell you.  I don't know.

Q:  Do you have any — do you have any handwritten notes that they might have written,

notes that they might have given you to say we had this aha! Moment?

A:  I have no idea.  I may have taken notes.  I have no idea.  I don't have any idea if I had

handwritten notes.

Based on the testimonies, no one on the prosecution team (agents, detectives,

AUSA) knows who made the call to Nextel.  Defendant Jones points to Mr. O'Toole's

statement in the oral argument:

Page 199 lines 19-25, page 200 lines 1-12

Mr. O'Toole:  Is simpler than that.  I think if – we can lump together the illegal use of the

GPS.  The independent source I think is – lacking credibility that you're giving – they're

giving the event of the 26th more important today than they ever gave them back then.

They never mentioned it to two juries, they never produced in discovery, they never even

told the defendant about it.  In fact, I'm not sure they told each other about it and it

because, basically a not – a big deal.

So that's their independent source.  And I think now they have tried to rise from the dead,

trying to bring it up and pump the dead, trying to bring it up and pump life into it, and

say, this was amazing.

When Lieber told us today that she didn't give it a second thought to produce it.  If it was

so critical, how could she possibly – as a prosecutor of esteem that she was – not even

consider mentioning it to the jury on giving it to defense for their use?

It doesn't – it just doesn't – it's not credible.  It's simple not credible as they not credible

as much as they want it to be the truth.

Line 22-25, Mr. O'Toole:

And we've been informed by an individual there, Lucy Cox, who is a subpoena specialist

and she is in the subpoena compliance Sprint Corporate Security Office and I've actually,

spoken to her supervisor, who's the Head of. . .

Page 175 lines 1-5

. . . the whole unit by the name of Ryan Hunter, and we have been informed that pursuant

to the above-referenced case a thorough search has been completed and no records were

found for the requested during the time period.

There's no excuse.  Mr. O'Toole should have issued a subpoena to have someone

from Sprint / Nextel to testify at the evidentiary hearing regarding the issue of an FBI

request to ping the cellphone.

**Claim 5 and Claim 6 – Mr. O'Toole**

**Claim 5**:  Mr. O'Toole's failure to investigate jury tampering and obstruction of justice

by government cooperator Jason McNair after discovery that Mr. McNair brought

$100,000 cash into the courtroom of the Honorable Judge Huvelle during the criminal

trial proceedings.

**Claim 6**:  Mr. O'Toole was ineffective counsel when he didn't request an investigation or

request a Remmer Hearing relating to the Jason McNair bringing $100,000 cash into the

courtroom (allegedly to influence jurors).  This argument is crucial because the

government cooperator was allowed to obstruct justice and tamper with the jury.

Mr. O'Toole is a 39-year experienced veteran lawyer who must have seen the red

flags once a government cooperation for Special Agent Bevington was allowed to bring

$100,000 cash into the courtroom during a criminal trial.  It was ineffective of Mr.

O'Toole not to demand a Remmer Hearing or request a complete investigation to

discover where the $100,000 cash came from, why it was brought into the courtroom, and

where it finally ended up.

Exhibit 2  is a sworn affidavit detailing that defendant Jones requested Mr. O'Toole to

ask for a hearing and a full investigation into the matter of Jason McNair and the

$100,000 cash.

FACTUAL BACKGROUND

On Wednesday, January 30, 2013, pm session, Honorable Judge Huvelle addresses the jury (as a whole) asking did anyone over hear anything, did anybody talk to the jury or did anything happen in the last four hours. The jury gave no response. The Judge stated "if anything strikes you as being the least bit out of the ordinary, don't talk with each other about it, tell Ms. Franklin or one of the Marshals."

Defendant Jones refers the court to page 5 lines 21-25, page 6 lines 1-9 after Judge Huvelle's inquiry to the jury. AUSA Soltys spoke her concerns during the bench conference. Page 14 lines 7-25, page 15 lines 1-15, page 26 lines 1-20.

Ms. Soltys: You know we've had some conversation with supervisions over the course of the break, and we are very concerned about the events that we described to the court this morning. The Marshals are looking into it.

The Court: I just spoke to the head of the Marshal Service.

Ms. Soltys: But it is our feeling right now that there should be an individual voir dire of each Juror in a closed courtroom.

Just ask the same question in a closed setting so that if anybody is – I think that under those circumstances, people would have been very hesitant to make any sort of acknowledgement to the Court.

Mr. O'Toole: Can we get a proffer?

The Court: Yeah, I don't know enough facts. Let's wait, let's get through the witnesses and then take it up. I don't know the facts of when they were here and when the jury was floating around, but do you think they were here during lunch hour? There all kind of things. If you start doing that to jurors, and they'll worry about the future, not so much about him necessarily.

I think you need a little more investigation before we start doing each person

individually. All I know is that -- I don't even know who -- you know -- from that

$100,000 was carried by two people into this courtroom. Who told you?

Ms. Soltys: Well, I've heard it third-hand and fourth-hand.

The Court: Well I think that –

Ms. Soltys: I've heard it from Marshals and I've heard it from detectives.

The Court: But somebody must have let them in and know that. So I think somebody

ought to investigate that before we decide.

Ms. Soltys: and that is what's happening, and the Court told the government to do it.

The police and the FBI have been told to stand back the Marshals are going to take care

of it.

The Court: That's beyond my – I just talked to the US Marshal and if he know about

taking care of it, he didn't let on, okay. He said he'd look into it. That's the way I left it.

I didn't get the sense that he had been fully informed. But he will be. So that's between

you and the Marshals. I'm not going to get involved in this jurisdictional mess.

Ms. Uschel: If we could just add, we have concerns because the courtroom had many

people in it with the court it's made inquiry of the jurors, we had concerns that perhaps if

one of the jurors had something to share, they would have not been willing to do it in an

open court room.

The Court: Well I understand that, I'm not prepared yet because I don't know enough.

Besides that, we out to get – where is the Marshal? I don't, as far as I know turn off the

tape.

Deputy Marshal: It should be running daily. We will look into it.

**32** |

The Court: So let's just sit tight for a little bit. If you've got a bad apple there, it doesn't matter if you find out today or tomorrow.

February 4, 2013 a.m. session – Defendant expresses his concerns

Mr. Jones: This last concern, it goes back to Wednesday about $100,000 that was brought into this courtroom. Sources had told me that the person who had that money was working for the government. So the defense team asking maybe they could provide a still photo of this person to see if that's the person that the sources' saying that's working for the government that brought that money in last Wednesday.

The Court: Oh, I'm not getting involved in that. I'm sorry. That isn't –

Mr. Jones: Well, that's part of my defense your Honor.

The Court: Well, I can't understand why in the world it's part of your defense.

Mr. Jones: If that source is working for the government, that's part of my whole theory in this whole case.

The Court: Well, I'm not getting involved in that. What basis do you have to say that – you mean the people that carry the cash worked for the government?

Mr. Jones: Is a cooperating source for the government.

The Court: Those two people in the courtroom

Mr. Jones: The male

The Court: The male is working for the government?

Mr. Jones: Yes. As a matter of fact

The Court: You got to come up with something better than that.

Mr. Jones: As a matter of fact, he's working for some of the Agents – I'm not saying the prosecutors, but some of the Agents what was on this case.

The Court:  You better make a written proffer before I'm going to go down that road.

Exhibit  3   is Defendant Jones' written proffer.  It goes in detail on the incident relating to the $100,000 cash brought into the courtroom.

February 8, 2013 a.m. session Page 5 lines 22-25, page 6 lines 1-25, page 7 lines 1-14

Mr. O'Toole put on record that the surveillance video that the Marshal Service turned over didn't work. . . During that session AUSA Urschal stated:  Your Honor, I can tell that we do not have a copy of a video that we could turn over to the defendant.

Mr. O'Toole:  Is that – that's not really the question.  Do you have a copy that works?

Ms. Urschel:  What I can say is if we have any videos regarding any investigation they would be subject to a grand jury, and, therefore, we cannot comment on whether we have it or not.

The Court:  All right.  Then you get your own.  You go talk to the Marshal.

Mr. O'Toole:  All right.  If we were in a cross examination mode, that would not be an acceptable answer.

The Court:  Well, I understand it.

Mr. O'Toole:  You understand it, but it's not acceptable.  What she says is she's not going to tell us whether her's works or not.

The Court:  No.  If I were to read between the line, it's 6(e) and therefore it must work.

Mr. O'Toole:  So it does work and she's not turning it over.

The Court:  Yes.

Mr. O'Toole:  and mine doesn't work from the same source.

The Court:  Yeah, no, that doesn't seem right but that can be worked out.

Mr. O'Toole:  It doesn't seem right.

Ms. Urschel:  To be clear, the government – if we have anything pursuant to 6(e), by law we would not be allowed to turn it over.

The court was instructing Mr. O'Toole to do something as simple as go to the Marshal's office (which is in the same building) to obtain another "working" copy of the surveillance video since the government won't share their copy.  Mr. O'Toole was ineffective because he never accomplished that simple task.  He allowed this argument to fall by the wayside.  As counsel, Mr. O'Toole was equipped with the tools to pursue this issue and should have done so.  Defendant Jones requested multiple times for Mr. O'Toole to get a working copy of the disk.  Defendant Jones also sent investigator Robin Bradshaw to the Marshal Service to get a working copy after the trial since Mr. O'Toole declined to get a working copy.

Mr. Jones:  Your Honor?  I am asking can you order the government to give us, if they have a copy – the disk about the person coming in?

The Court:  No.  You can get it yourself from – what?  Oh, into the courtroom?  No. You can get it from the Marshals.  I authorize you to subpoena the Marshals.  I authorize you to subpoena the marshals.  They've already done it, so –

Mr. Jones:  The disk don't work.

The Court:  I know that

Page 145 lines 13-25

Mr. O'Toole:  We would like the court's assistance in getting a copy that does work.  It does not seem –

The Court:  Can you give me a hint of what this is about?  Why does this have to do with anything?  You think the government planted a person in my courtroom?

**35 |**

Mr. O'Toole: You really don't want me to answer that question. I really don't want to answer that question. I really want to get a disk that we subpoenaed that's the same disk that the government got with their subpoena. That's what I want.

The Court: Then ask the Marshal Service. Tell them what they gave you –

Mr. O'Toole: I've asked

The Court: You gave – you subpoenaed them, and they gave you something effective. I would think they would listen to you if you go back to them.

Mr. O'Toole: Really? Okay. I'll do that and I'll report back after lunch.

The Court: Yes, but I'm not wasting – we're trying to try a case. I'm not worrying about people wandering into this courtroom carrying cash.

The Court (to Mr. O'Toole): you can always subpoena some other disk

Mr. O'Toole never did this. During trial, Judge Huvelle did take time to investigate Ms. Robin Bradshaw a professional investigator for Mr. Balarezo. Ms. Bradshaw was instructed by Mr. Balarezo to interview Mr. Daniel Zintura and she was brought in front of the court to be questioned about this. Also, Judge Huvelle was told that Mr. Gibson opened the door for a juror and spoke to the juror. Judge Huvelle instructed the Marshal to arrest him for obstruction of justice. However, Judge Huvelle refused to investigate the incident (which was on tape) of Jason McNair bringing $100,000 cash into her courtroom after defendant requested an investigation into the incident multiple times. Mr. O'Toole's not pressing this issue is a clear demonstration of ineffective counsel.

Monday February 11, 2013

Mr. Jones: Yes, I'd like to put the whole tape before the jury as part of my defense.

Page 6 lines 17-18

The Court:  What is Jason's last name?  We can at least find out if he's a cooperator.

Page 7 line 3-5

The Court:  If you want me to even think about any of this we need a name so we can ask the government to look into it.

(Twice the court asked Mr. O'Toole to get Jason's full name)

Exhibit ⁻\|⁻  - Is the note that was given to Mr. O'Toole.  The note reads:  "Jason McNair, arrested 12-8-12, transferred to the district 1-14-13, 4-kilos of cocaine, 1 brick of dope."  This note was put in Mr. O'Toole's hand.  As counsel, Mr. O'Toole now had the information to request (or demand) a full investigation or a Remmer Hearing 347 US 227, 98 led 54, 74 SCt 45(1954).  Remmer reads:  In a criminal case any private communication, contact, or tampering, direct or indirectly, with a juror during a trial about the matter pending before jury is deemed presumptively prejudicial.  Reading United States v Paul Corrado 227 f3d 528 2000 US app. Lexis 21401, outcome reads:  on appeal the court vacated the convictions and sentence of two defendants and remanded for a REMMER HEARING in order to determine whether these defendants were prejudiced.

This harmful allegation that someone could have influenced the jurors deprived defendant of a fair trial violating Sixth Amendment.  All parties have to concede that the investigation (or lack of) by the district court in this case falls far short of the procedure set forth in a REMMER HEARING.  Instead the district court only slightly questioned the jury panel as a group in open court.  (Even the government noted in open court their dissatisfaction with this process.)

Exhibit _5_ is the transcripts relating to the $100,000 cash.

Defendant Jones notes that there is potential USCS 11503 and 18 USCS 201 violations BRIBERY.

*Pro se* LITIGATOR

Defendant Jones reminds the court that a pleading prepared by a *Pro se* plaintiff must be held to less stringent standards than formal pleadings drafted by lawyers. Citing Haines v Kerner 404, US 519, 520, 92 S Ct 594, 301 ed 2d 652 (1972).

In representing a criminal defendant, counsel owes the client a duty of loyalty, a duty to avoid conflict of interest, a duty to advocate the defendant cause, a duty to consult with the defendant on important decisions, a duty to keep defendant informed of important developments in the course of the prosecution and duty to bring to bear such skill and knowledge as well render the trial a reliable adversarial testing process. Counsel's performance, practice and standards are under the guide of the American Bar Association and the D.C. Bar Counsel.

This last argument will point out Mr. Balarezo's ineffective assistance of Counsel when he deliberately sabotaged defendant Jones' pre trial motion that he had chosen to preserve and strengthen his defense.

Defendant Jones will point out where he diligently stressed the importance of preserving his rights on numerous crucial issues that support his defense and his arguments. Defendant requested Mr. Balarezo, his professional attorney to litigate these issues in the evidentiary hearing and in the third trial. The Court was aware of these issues.

Emergency Hearing 4-3-2012 2:13pm – Defendant Jones speaks in open court

Page 3 line 7-10

The Court:  and, Mr. Jones – I don't know – your counsel says you have some motions

you want to file.  I don't know what those motions are, but I don't know why we can't

have a trial.

(Defendant Jones put on record that he waived his speedy trial right to have an

opportunity to properly argue the essential motions.  Defendant knew it would take time

to argue the government's illegal searches as was his game plan.)

Page 4 lines 4-8

Mr. Jones:  Your Honor, I explained this to my lawyer from the beginning.  I never

wanted a speedy trial.  What I wanted is a fair trial.

Pages 4-34 outline Defendant Jones preserving his rights on what he wants to argue or

submit in as motions:

The illegal text messages and the illegal wiretap were two of the main issues that

defendant Jones wanted to revisit because it highly prejudiced the defendant in his 3rd

trial and would devastated defendant in the 4th trial, potentially forcing a plea instead of

another trial.

The suppression of the wiretap evidence in this case would either get this case

thrown out or will lead to insufficient evidence in the case.  Not having the GPS and the

wiretap evidence, with the circumstantial evidence left, the government will have no

choice but to dismiss the conspiracy charge.

In the 3rd trial the government's evidence consisted largely on defendant's wiretap

conversation, which played a key role in the government's presentation to the jury during

trial and in closing.  Besides the Potomac Drive evidence (drugs and money) the wiretap

was the strength of the government's case presented to the jury and likelihood the jury afforded substantial weight in the layman's interpretation of Agent O'Brien and Detective Horne just because of their level of experience and training.

The wiretap conversations, the opinions and their interpretation of these wiretap conversations highly prejudiced defendant Jones. This is why it was very important to get the wiretap information suppressed and deemed inadmissible.

Page 22 lines 1-25, page 23 lines 1-25, page 24 lines 1-25, page 25 lines 1-6

Defendant Jones mentioned and point out the illegal text messages, which plainly if the August 2005 test messages were deleted, the September 2, 2005 wiretap wouldn't stand, it will also be deemed illegal.

In the same emergency hearing on April 3, 2012, Mr. Balarezo basically conceded that he either compromised defendant Jones' position or he was ineffective.

Page 80 lines 8-11

Mr. Balarezo: To the extent that I have either "compromised Mr. Jones' position or have been ineffective, I would request the Court appoint new counsel for him. That is my position."

ORDER to MR. BALAREZO

Page 82 lines 17-18

The Court: I want you to file the motion "we" wants to file. I don't want them coming in a *pro se* fashion.

Page 86 lines 5-12

The Court: and if you find any like the sufficiency of the evidence, that you feel does not pass Anders, because it's either gone up to the Court of Appeals or has been decided

already and there's nothing else to talk about, you just have to write it – why you didn't

do it, and the record will be complete. You have to do that, though. That's what the

Supreme Court says.

Page 86 lines 20-21

The Court: He has said, here today saying you didn't properly represent him

Page 87 lines 22-24

The Court: You have no complaints with his representation as of today.

Defendant: Only if he don't put the motion in.

The bottom line Defendant Jones put on record he need and wanted these issues argued

properly by Mr. Balarezo.

April 19, 2012 11:39a.m. Status Hearing

Page 23 lines 7-15

The Court reiterates her order: "I've issued an order it's because I think it's very

important here. One reason that we can't pay attention and get our work done is because

Mr. Jones is now represented by counsel. Counsel has to file the motion. They can't

come from anyone else. The law says just that. He has representation. If there's some

motion that Mr. Jones wants file, I've told Mr. Balarezo that he can raise it and say why

not why he's not filing a motion.

Page 33 lines 21-22

The Court: I'm not going to consider *pro se* motions.

Page 34 lines 1-7

The Court: I issued an order saying that.

Mr. Balarezo: I'm sorry

The court:  I issued an order saying he is represented and he does not have a right to file *pro se* motions.

Under the ABA Standards and the DC Bar standards, as a professional Attorney and an Officer of the Court, Mr. Balarezo should have followed the court's instruction and her order to file defendant Jones' motion so he would not have been forced to file *pro se* motions.  Once Mr. Balarezo ignored and disregarded the Court's instruction and her order, he violated is code of professional conduct, violated Defendant Jones' Fifth and Sixth Amendment Rights and clearly was ineffective assistance of counsel.  Mr. Balarezo's performance fell below standards of reasonableness.

Defendant Jones refers the Court to (Exhibit ___6___ ).  Defendant Jones' reply to Mr. Balarezo's motion to withdraw as counsel, and defendant refers the Court to Status Hearing Friday August 10, 2012 11:10a.m. pages 15 through 42. . .

Note to Clerk of the Court:  Please add the defendant's complaint on Mr. Balarezo sabotaging his motion as Defendant does not have that complaint – motion at his disposal.  Defendant Jones stands firm on Mr. Balarezo's ineffectiveness.

Page 37 lines 3-25, page 38 lines 1-18

Ms. Soltys:  Now.  I'm just going to point out a couple of the statement sthat Mr. Jones has leveled against counsel,  that's all and I would like for the court to then ask him whether or not he's capable of dissolving those right now.

The Court:  Why don't you just try two, we'll get our answer pretty quickly.

Ms. Soltys:  Mr. Jones is fed up with counsel's ineffective, unprofessional litigation and is fed up with begging counsel to represent him.

Counsel has neglected his clients matters, procrastinated Jones' best interest, failed to

follow client's instruction, failed to provide competent representation and is clearly

violating his professional responsibilities of rules of conduct (rule 1.1 competence and

rule 1.3 diligence and zeal). He's made – a lot of other things he said in here as well.

The Court: lots, lots. See, what are going to do? You put us in an untenable position

here. How can we have you have counsel on which – who you have labeled ineffective,

lackadaisical, lacking in professionalism, violating professional responsibility.

Mr. Jones: Your Honor, me and Mr. Balarezo went over that. He read that we discussed

that. We – yeah, he seen what you seen. I showed it to him. We discussed that. So right

now, that's my opinion, this is what I feel about the issues that – with the *pro se*. He

focused on what he thought was best, which was a PS and cellsite. I disagree with that.

I'm the one that have to do life, what I said in there, it – I would call it ineffective

counsel.

The Court: Thanks heaven.

Mr. Jones: Right now I'm not taking anything back. We can move forward with Mr.

Balarezo if he want to, if he don't want to, then I will learn what a lawyer need to do to

win, and I will go *pro se.*

Page 41 lines 19-25, page 42 lines 1-2

Ms. Soltys: Before we retire, could the government put something on record, then, which

is simply that we would like for the court to be aware of the last few things that came out

of Mr. Jones mouth was – after I read the excerpt of the complaints he's listed against

Mr. Balarezo, that he said, number one I'm not taking anything back, and number two, he

said, I would call Mr. Balarezo ineffective. So that's where the record stand right now.

Defendant Jones will conclude with adding a sworn declaration under penalty of perjury (exhibit ___7___). This exhibit will detail the ineffectiveness of Mr. Balarezo and Mr. O'Toole.

Defendant Jones is requesting the Court to vacate or set aside defendant Jones' conviction on ineffective assistance of counsel or very least remand back for a full and complete evidentiary hearing on these serious issues outlined here.

Respectfully Submitted,

Signed: *Antoine Jones*

Antoine Jones                                              Date: 1 - 14 - 2014
18600-016
USP Atlanta
P.O. Box 150160
Atlanta GA 30315

Re: US v. Antoine Jones, 1:05 CR 00386(ESH)


On December 12th 2012, The Sprint / Nextel Wireless Communications Company were subpoenaed for records that involved a target number that was key in the FBI investigation in this case. I had several conversations with a Sprint/ Nextel subpoena compliance specialist in reference to the protocol by which a Federal agent could call them and get instantaneous cell site information in an effort to get the location of a cellular device. I was told that there was always a paper trail and that they (Sprint /Nextel) would never give that information over the phone. It was explained that not only would there need to be a court order, there needs to be an exigent request form.

The subpoena requested the carrier to provide all recorded, written, and electronic data for the target phone number. The subpoena returned a report of no records.

The supervisor reported that the court orders had to be specific and that if a court order did not specify something that was requested, another court order detailing the new request would have to be sought. He also stated that he was with the company when the merger between Sprint and Nextel took place and he has never known the company to comply with anything with simply a phone call. He went on to state that this would have entailed an operator verbally giving coordinates of longitude and latitude over the phone. He says that Nextel was a bit archaic and believed in the paper, and that if the requestor had the court order they would also have the paperwork of the phone request if it existed.

This witness is needed for credibility.

Robin Bradshaw

P61        (Exhibit #2a)

I Antoine Jones SWEAR under Penalty of Perjury (28 USCS 1746) that these statement ARE Accurate, correct And true.

In Preparation For the crucial Evidentiary Hearing, Defendant Jones Had thoroughly went over the defense strategy He thought would Had won in the suppression of Potomac Drive House. I Asked both MR Ballarego And MR O'Toole to thoroughly investigate the Pinging of Reyna cell Phone, on September 26 2005 because Lacking this Allege September 26 2005 Pinging can cause the Potomac Drive evidence to be Inadmissible in the third trial,

I Requested both MR Balarego And MR O'Toole to use their subpoena power, I Requested both Attorney to subpoena the F.B.I Field office Phone to see if there were A call dialed From that Phone to Nextel Phone on September 26 2005, subpoena Nextel Phone to see if there was A called From the F.B.I Field office on September 26 2005. I even Ask them to subpoena the G.P.S. on the vehicle

P62 and Agent Tim O'Neil to me
Cars, sign in sheets, pass cars, any
thing to determine if they worked
on September 26 2005 and if they
were presence in the F.B.I field
office on the morning of September
26 2005,

To show that the September 26
2005 pinging never existed, I ask
Mr O'Toole to subpoena and called
in to testified, someone from
Sprint/Nextel to testified about
the chained of command relating
to pinging a cell phone and to
testified that no one from the
F.B.I field office called Nextel
on September 26 2005, further
to testified it's impossible to get
a pinging over the phone with out
proper protocol or paying a
pinging fee.

Mr Balarezo and Mr O'Toole seen
the signs of me getting frustrated
and upset for their half stepping
to prepared for a crucial evidentiary
– suppression Hearing that could
Get the case dismiss or very
Least strengthen Defendant Jones
defense for the third trial.

I also ask Mr O'Toole to called
Ms Robin Bradshaw the investigator
who communicate with someone

that to get information on a
Pinging, (since Pinging is considered
confidential information), there's
Always, a chained of command,
protocol and a paper trail, plus
A process fee to get a Pinging.

Ms Bradshaw told me that the
Sprint/Nextel employee was
very supporting and centained
that there wasnt a called to
Nextel on September 26 2005, But
Later decline to provide further
support or information to Her
because Mr O'Toole instructed
Sprint/Nextel personel to
discontiued communicating with
Ms Bradshaw and don't provide
Ms Bradshaw with any of the
Pinging information from the
Subpoena she supplied to Nextel,
All information was to be sent to
their Office.

I will conclude that this Potomac
Drive evidence that should Had been
suppress was very damasing and
Prejudice me in the third trial
Forcing me to take the Plea offer to
Avoid this illegal evidence in the
Fourth trial.
                    Respectfully Submitted
Antoine Jones        sign Antoine Jones
Reg No - 01L         Date 1-14-2017

(EXHIBIT #5)

UNITED STATES

v.                    CR NO - 05 - 386 (ESH)

ANTOINE JONES

## WRITTEN PROFFER FROM DEFENDANT JONES

ON FEBRUARY 4, 2013 AM SESSION HONORABLE
JUDGE HUVELLE GAVE DEFENDANT ANTOINE JONES
INSTRUCTIONS (PAGE 9 LINE 19, 20) TO MAKE A WRITTEN
PROFFER BEFORE THE COURT WILL PURSUE THE OBSTRUCTION
OF JUSTICE RELATING TO THE $100,000°° THAT WAS
BROUGHT INTO THE COURTROOM BY A GOVERNMENT
INFORMER.

DEFENDANT JONES PROFFER THAT SOME WEEKS AGO
MR. JASON MCNAIR CAME THROUGH THE INTAKE UNIT
WHERE JONES WORKED, WITH IN HOUSE DETAIL, THEN ONE
DAY MR. MCNAIR WENT OVER TO DISTRICT COURT, THIS
WAS BEFORE THE TRIAL, SO MR. MCNAIR AND MR. JONES
WERE DISCUSSING HIS PLANS OF HIS DEFENSE WITH MR.
MCNAIR. SOME HOW MR. KEVIN HOLLAND CAME UP IN
THE CONVERSATION IN WHICH MR. JONES TOLD MR.
MCNAIR THAT HE WILL CALL ADRIAN JACKSON AND
KEVIN HOLLAND AS MR. JONES KEY WITNESSES.

ON THIS CONDITION WHEN HE GAVE ME A COUPLE OF NOTICE-ABLE NODS WHEN I ARRIVED IN THE COURT ROOM.

ALSO LATER ON THAT EVENING SOMEONE TOLD MR. JONES THAT THIS GUY _JASON MCNABB_ TOLD THEM THAT HE WAS MR. JONES' COUSIN UNTIL PEOPLE ASKED MR. JASON MCNABB WHAT WAS MR. JONES' AUNT'S NAME. THEN MR. JASON MCNABB TOLD THE PEOPLE THAT HE WAS KEVEN HOLLAND'S COUSIN.

WHILE _MR. JASON MCNABB_ WAS ON THE HALL HE GAVE PEOPLE BUSINESS CARDS, ALSO HE PULLED OUT A WAD OF MONEY STACKS OF MONEY IN A BRIEF CASE MAKING SURE PEOPLE SAW THE MONEY.

WHEN THIS INFORMATION HIT THE STREETS, SOURCES MENTIONED THAT _JASON MCNABB_ HAD BEEN ARRESTED IN BALTIMORE ON 12/8/12 AND TRANSFERRED TO D.C. DISTRICT COURT 1/14/13, ALSO INFORMATION SHOWS THAT HE WAS IN POSSESSION OF 9 KILOS OF COCAINE AND 1 KILO OF HEROINE.

SEVERAL SOURCES HAVE SAID THAT _MR. JASON MCNABB_ IS A GOVERNMENT INFORMANT WHO SET UP MR. KEVEN HOLLAND. SO THAT MR. HOLLAND COULDN'T TESTIFY ON MR. JONES BEHALF,

SOURCES ALSO SAY THAT MR. JASON PRUDELL IS WORKING FOR THE FBI AGENT REGISTERED JOHN BEVINGTON AS A CONFIDENTIAL SOURCE.

THE $100,000 THAT WAS BROUGHT INTO THE COURT ROOM BY MR. JASON MCNAIR WAS ON BEHALF OF THE FBI AGENT, NOT MR. JONES.

MR. JONES' CONCERNS ARE THAT $100,000 WAS NEVER CONFISCATED FROM JASON MCNAIR AND HE COULD HAVE ACCOMPLISHED HIS GOAL OR OBJECTIVE IN OBSTRUCTION OF JUSTICE BY PAYING OFF THE JURY.

MR. JONES IS HUMBLY REQUESTING THE COURT TO QUESTION MR. JASON MCNAIR TO SEE WHY HE BROUGHT THE $100,000 INTO THE COURTROOM, WHO GAVE HIM THE $100,000, AND WHAT DID HE DO WITH THE $100,000. MOST IMPORTANTLY IS HE A GOVERNMENT WITNESS OR INFORMANT FOR ANY FBI AGENT RELATING TO THIS CASE.

I AM REQUESTING ALSO FOR THE COURT TO QUESTION AGENT JOHN BEVINGTON TO SEE WHAT HE KNOWS ABOUT JASON MCNAIR AND THE $100,000.

THE COURT OR THE GOVERNMENT CANNOT TAKE THIS

CRIMINAL DEFENSE AND THANKED THE JURY.

MR JONES THINKS IT WILL BE LESS PREJUDICE TO QUESTION MR JASON MCNIBER AND AGENT JOHN BEVINGTON THAN QUESTIONING THE JURY WHICH WOULD DEFINITELY PREJUDICE MR JONES MORE THAN THE GOVERNMENT.

RESPECTFULLY SUBMITTED

ANTOINE JONES
241 919
1901 D ST SE
WASH DC 20003
SIGN:
DATE:

(Exhibit # 4)

Jason McNair

Arrested 12-8-12

→ osfound →

distru... ... 1-14-13

4 Kilo's of cocain
1 Brick of Dope

(EXHIBIT #5 )

FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

THE UNITED STATES OF AMERICA          Criminal Case No. 05-386

          v.

ANTOINE JONES,

          Defendant,

- - - - - - - - - - - - - - - - - - - - - - - - - - -X     Washington, D.C.
                                              Wednesday, January 30, 2013
                                              2:15 P.M.

          TRANSCRIPT OF JURY TRIAL - DAY 4 - P.M. SESSION
          BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
          UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:   Darlene Michele Soltys, AUSA
                      Courtney Urschel, AUSA
                      U.S. ATTORNEY'S OFFICE
                      555 Fourth Street, NW, Room 4110
                      Washington, DC 20530
                      (202) 252-7685


For the Defendant:    Antoine Jones, Pro Se

                      Jeffrey Brian O'Toole
                      Ehrin Rae Scialpi
                      O'TOOLE, ROTHWELL, NASSAU & STEINBACH
                      1350 Connecticut Avenue, NW, Suite 200
                      Washington, DC 20036
                      (202) 775-1550


Court Reporter:            Lisa Walker Griffith, RPR
                           U.S. District Courthouse
                           Room 6507
                           Washington, D.C.   20001
                           (202) 354-3247


Proceedings recorded by mechanical stenography, transcript
produced by computer.
                           Page 54 of 90

2          THE DEPUTY CLERK:  This is criminal case 05-386-1.

3     United States of America versus Antoine Jones.

4          THE COURT:  We'll take this up at the bench.  This

5     is under seal.

6               (Whereupon, bench conference under seal and

7     redacted per Court Order. )

(Open Court.)

THE COURT:  Okay.  Swen, bring in the jury, please.
Everybody sit down and get ready.

I take it the witness does not speak English.  The
witness's lawyer is over there.  Okay.

SPANISH INTERPRETER SWORN

(Pause.)

(Jury Present.)

THE COURT:  Good afternoon, ladies and gentlemen.

JURORS IN UNISON:  Good afternoon.

THE COURT:  Ladies and gentlemen, before we begin
sorry for the delay.  I just want to make inquiry.  Did you

 of the ordinary?

3              (No response.)

4              THE COURT:  No?  You've just been sitting in there

5  eating breakfast, lunch, whatever?

6              Okay, good.  Thank you.  Just wanted to make sure.

7  If anything strikes you as being the least bit out of the

8  ordinary, don't talk with each other about it.  Tell

9  Ms. Franklin or one of the marshals.

10             Okay.  We're ready -- I think we've sworn the

11  interpreters?

12             THE DEPUTY CLERK:  Yes.

13             THE COURT:  We're ready to swear the witness.

14        DANIEL ZINTURA, GOVERNMENT WITNESS, SWORN

15                   DIRECT EXAMINATION

16  BY MS. SOLTYS:

17  Q   Mr. Zintura, would you please look at the ladies and

18      gentlemen of the jury, would you please tell them your

19      name, your full name, and would you please spell your last name

20      for the benefit of the Court Reporter?

21  A   (Through the Interpreter.)  My name is Daniel Zintura.  My

22      last name is spelled  Z-I-N-T-U-R-A.

23  Q   Mr. Zintura, are you currently incarcerated?

24  A   (Through the Interpreter.)  Yes.



2        THE COURT:  Anything further?  Okay.  We'll break

3   for ten minutes.

4            (A brief recess was taken.)

5            THE COURT:  Do you want to approach the bench?

6            (Bench conference.)

7        MS. SOLTYS:  You know, we've had some conversations

8   with supervisors over the course of the break.  And we are

9   very concerned about the events that we described to the

10   Court this morning.  The marshals are looking into it.

11        THE COURT:  I just spoke to the head of the Marshal

12   Service.

13        MS. SOLTYS:  But it is our feeling right now that

14   there should be an individual voir dire of each juror i  a

15   closed courtroom, and that we appreciate the fact that the

16   Court asked, but the Court asked sort of generally amongst

17   all of 16 at once in an open courtroom, and I --

18            THE COURT:  What would you ask?

19            MS. SOLTYS:  Just ask the same question in a closed

20   setting so that if anybody is -- I think that under those

21   circumstances, people would have been very hesitant to make

22   any sort of acknowledgment to the Court.

23            MR O'TOOLE:  Can we get a proffer?

24        THE COURT:  Yeah, I don't know enough facts. Maybe




2   was floating around, but do you think they were here during

3   the lunch hour?  There are all kinds of things.  If you start

4   doing that to the jurors, and they'll worry about the future,

5   not so much about him necessarily.

6          I think that they were being honest when I asked

7   them if anything, anything came to their attention.  I think

8   you need a little more investigation before we start doing

9   each person individually.  All I know is that, I don't even

10  know who you know from that $100,000 was carried by two

11  people into this courtroom.  Who told you?

12         MS. SOLTYS:  Well, I've heard it third hand and

13  fourth hand.

14         THE COURT:  Well, I think that --

15         MS. SOLTYS   I've heard it from marshals and I've

16  heard it from detectives.

17         THE COURT:  But somebody must have let them in and

18  known that.  So I think somebody ought to investigate that

19  before we decide --

20         MS. SOLTYS:  And that is what's happening, and the

21  Court told the Government to do it.  The police and the FBI

22  have been told to stand back, the marshals are going take

23  care of it.

24         THE COURT:  That's beyond my -- I just talked to the




1     ...

2     look into it.  That's the way I left it.  I didn't get the

3     sense that he had been fully informed.  But he will be.  So

4     that's between you and the marshals.  I'm not going to get

5     involved in this jurisdictional mess.

6         MS. URSCHEL:  If we could just add, we have concerns

7     because the courtroom had many people in it when the Court

8     its made inquiry of the jurors, we had concerns that perhaps

9     if one of the jurors had something to share, they would have

10     not been willing to do it in an open courtroom.

11         THE COURT:  Well, I understand that, but I'm not

12     prepared yet because I don't know enough.  Besides that, we

13     ought to get -- where is the marshal?  I don't, as far as I

14     know, turn off the tape.

15         THE DEPUTY MARSHAL:  It should be running daily.  We

16     will look into it.

17         THE COURT:  So let's -- let's just sit tight for a

18     little bit.  If you've got a bad apple there, it doesn't

19     matter if you find out today or tomorrow.  I'm not sure if

20     they're really bad they would tell us.

21         Okay.  Thank you.

22         (Open Court.)

23         (Jury Present.)

24         THE COURT:  Okay, ladies and gentlemen, we're ready,

1                  IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
2

3       THE UNITED STATES OF AMERICA, )
                                      )          File No:  CR 05-386
                    Plaintiff,        )
4                                     )          Date:   February 4, 2013
        vs.                           )                  A.M. Session
5                                     )
        Antoine Jones,                )          Time:   9:41 am.
6                                     )
                    Defendant.        )
7

8       _____

9                         TRANSCRIPT OF JURY TRIAL
                                HELD BEFORE
10              THE HONORABLE ELLEN SEGAL HUVELLE
                        UNITED STATES DISTRICT JUDGE
11                              Day 7
        _____

12

13      APPEARANCES:

14      For the United States:   Ms. Darlene M. Soltys
                                 Ms. Courtney Spivey Urschel
15                               Assistant United States Attorneys
                                 United States Attorneys Office
16                               555 Fourth Street, NW
                                 Washington, DC    20530
17
        For the Defendant:       Antoine Jones, pro se
18
        Also Present:            Mr. Jeffrey B. O'Toole
19                               Ms. Errin Scialpi
                                 Attorneys at Law
20                               O'Toole Rothwell
                                 1350 Connecticut Avenue, NW
21                               Suite 200
                                 Washington, DC    20036
22

23      Court Reporter:          Vicki Eastvold, RMR, CRR
                                 United States Courthouse, Room 6722
24                               333 Constitution Avenue, NW
                                 Washington, DC    20001
25                               (202) 354-3242

1    called.

2              MS. SOLTYS:  2703(d).

3              THE COURT:  Oh, yeah.  Okay.  That's for the cell

4    site data for those three -- 24, 25, 26 and October 4 for

5    two people and the check-in for two people.  Okay?  You can

6    get the check-in.

7              What's the other thing, Mr. Jones?  They're lined

8    up at the moment.

9              MR. JONES:  This last concern, it goes back to

10   Wednesday about the $100,000 that was brought in this

11   courtroom.  Sources had told me that the person who had that

12   money was working for the Government.  So the defense team

13   is to confirm that, the defense team asking maybe they could

14   provide a still photo of this person to see it that's the

15   person that the sources saying that's working for the

16   Government that brought that money in last Wednesday.

17             THE COURT:  Oh, I'm not getting involved in that.

18   I'm sorry.  That isn't --

19             MR. JONES:  Well, that's part of my defense,

20   Your Honor.

21             THE COURT:  Well, I can't understand why, in the

22   world it's part of your defense.

23             MR. JONES:  If that source is working for the

24   Government, that's part of my whole theory in this whole

25   case.

1          THE COURT:  Well, I'm not getting involved in

2    that.  What basis do you have to say that -- you mean the

3    people that's carrying the cash worked for the Government?

4          MR. JONES:  Is a cooperator source.

5          THE COURT:  You mean a cooperating source for you.

6          MR. JONES:  No.  It's a cooperating source for the

7    Government.

8          THE COURT:  Those two people in the courtroom?

9          MR. JONES:  The male.

10          THE COURT:  The male is working for the

11    Government?

12          MR. JONES:  Yes.  As a matter of fact --

13          THE COURT:  You got to come up with something

14    better than that.

15          MR. JONES:  As a matter of fact, he's working for

16    some of the agents -- some of the agents -- I'm not saying

17    the prosecutors, but some of the agents that was on this

18    case.

19          THE COURT:  You better make a written proffer

20    before I'm going to go down that road.

21          MR. JONES:  Okay, I will do that, Your Honor.

22          THE COURT:  That sounds like the world of

23    conspiracy thought.

24          MR. JONES:  Yes.  We have one more issue,

25    Your Honor.

```
  1                 IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
  2

  3     THE UNITED STATES OF AMERICA, .
                                            File No:  CR 05-386
  4                    Plaintiff,
                                            Date:  February 8, 2013
  5     vs.                                        A.M. Session

  6     Antoine Jones,                      Time:  9:40 a.m.

  7                    Defendant.

  8
        _____
  9                    TRANSCRIPT OF JURY TRIAL
                            HELD BEFORE
 10          THE HONORABLE ELLEN SEGAL HUVELLE
                 UNITED STATES DISTRICT JUDGE
 11                        Day 11
        _____
 12

 13     APPEARANCES:

 14     For the United States:  Ms. Darlene M. Soltys
                                Ms. Courtney Spivey Urschel
 15                             Assistant United States Attorneys
                                United States Attorney's Office
 16                             555 Fourth Street, NW
                                Washington, DC  20530
 17

        For the Defendant:      Antoine Jones, Pro Se
 18

        Also Present:           Mr. Jeffrey B. O'Toole
 19                             Ms. Errin Scialpi
                                Attorneys at Law
 20                             O'Toole Rothwell
                                1050 Connecticut Avenue, NW
 21                             Suite 1000
                                Washington, DC  20036
 22

 23     Court Reporter:         Vicki Eastvold, RMR, CRR
                                United States Courthouse, Room 6718
 24                             333 Constitution Avenue, NW
                                Washington, DC  20001
 25                             (202) 354-3242
```

```
1    instruction plus?

2              MR. JONES:  No.  I'm sorry.  What was that

3    question?

4              THE COURT:  I'm trying to come up with some draft

5    jury instructions.  Do you expect to have any calls played

6    for which there are no transcripts?

7              MR. JONES:  No, not in my defense.

8              THE COURT:  I didn't hear.

9              MS. URSCHEL:  He said, no, he would not be using

10   calls that don't have --

11             MR. JONES:  You say playing calls?

12             (Off-the-record discussion between Ms. Urschel and

13   Mr. Jones.)

14             THE COURT:  Remember I said you could ask the

15   Government to play calls and they just -- they can pull them

16   out?  They're all in evidence.  So any one you want to be

17   played can be played.

18             MR. URSCHEL:  He says right now he has no plans to

19   do that.

20             THE COURT:  Okay.  That's fine.  You can change

21   your mind.

22             And there's no one here to play the video that he

23   put up to work?

24             MR. O'CONIT:  Your Honor, we start at ten tomorrow

25   because we may wrap out that.  We're going to -- I think the
```

1          ... ... ... ... ... ... ... ... ... ... There may

2     be damaged as well.  I thought I would stop by during a

3     break and talk to the marshal's office and see if we can get

4     one that does work.

5          THE COURT:  You don't both have to bother the

6     marshal's.  The Government's been interested as well.  What

7     do you know?

8          MS. URSCHEL:  Your Honor, I can tell you that we

9     do not have a copy of a video that we could turn over to the

10    defendant.

11         MR. O'TOOLE:  Is that -- that's not really the

12    question.  Do you have a copy that works?

13         MS. URSCHEL:  What I can say is if we have any

14    videos regarding any investigation, they would be subject to

15    a grand jury, that we would have gotten them pursuant to the

16    grand jury, and, therefore, we cannot comment on whether we

17    have it or not.

18         THE COURT:  All right.  Bet you get your own.

19    You go and talk to the marshals.

20         MR. O'TOOLE:  All right.  If we were in a

21    cross-examination mode, that would be not an acceptable

22    answer.

23         THE COURT:  Well, I understand it.

24         MR. O'TOOLE:  I understand it, and it's not

25    important.  That one says that's not going to tell us ...

1   A ...

2          THE COURT:  No.  If I were to read between the

3   lines, it's f(e), and therefore it must work.

4          MR. O'TOOLE:  So it does work and she's not

5   turning it over.

6          THE COURT:  Yes.

7          MR. O'TOOLE:  And mine doesn't work from the same

8   source.

9          THE COURT:  Yeah.  No, that doesn't seem right.

10  But that can be worked out.

11         MR. O'TOOLE:  It doesn't seem right.

12         MS. URSCHEL:  To be clear, the Government -- if we

13  have anything pursuant to 6(e), by law we would not be

14  allowed to turn it over.

15         THE COURT:  I understand.  Okay.  I'm not sure

16  that this is an issue that's going to impact this case

17  anyways.

18         All right.  The last time in the instructions --

19  I'm just trying to figure out -- his prior convictions came

20  in through the Government for one limited purpose.  I

21  don't know.  Id that turns out again?

22         MR. O'TOOLE:  Well, Your Honor, I'm going to

23  defer to my colleague on this issue, because we do -- that we

24  and he and we would like to address you, if appropriately.

25         THE COURT:  I don't whether in context, but I

 1            ... ....... we have to decide later because we're

 2    taking up motions afterwards about -- we have certain things

 3    still hanging.  One has to do with the Government's motion

 4    in limine.  So I want to know who's on your list.  How many

 5    people you got?

 6            MR. JONES:  It's 23, Your Honor.

 7            THE COURT:  Will, Sara, can you just make a couple

 8    of copies so that we can have an intelligent discussion?

 9    Maybe we start up at 2:30.  We need to take up that and the

10    stipulation issue 404,b .

11            MR. JONES:  Your Honor?  I'm asking can you order

12    the Government to give us, if they have a copy of the disk,

13    that we can't -- the disk about the person coming in?

14            THE COURT:  No.  You get it yourself from -- what?

15    On, into the courtroom?  No.  You can get it from the

16    marshals.  I authorize you to subpoena the marshals.

17    They've already done it, so --

18            MR. JONES:  The disk don't work

19            THE COURT:  I know that.

20            MR. JONES:  The disk that we have do not work.

21            THE COURT:  What could we possibly have to -- it's

22    all irrelevant to what we're doing here.

23            MR. JONES:  The list -- the list that you're

24    copying, Your Honor, has on it person that's missing a

25    Minster, or, since we all belive a horror.  Document 1 -- and I

affidavit which is subject to the motion, that's number 12,

13, 14, 15 and 20.  I can say the names if you'd like.

THE COURT:  No.  I got it.  Okay.  Some of them

testified before.  Okay.  All right.  2:15 please.

MR. O'TOOLE:  Your Honor, before the Court leaves.

On the issue that you asked us to address earlier.

This disk that we got from the marshals service.

And we tried to ask the Government, Ms. Urschel, about it.

And apparently they have a copy that works.  And the marshal

service gave us a copy that doesn't work.

THE COURT:  I understand.

MR. O'TOOLE:  We would like the Court's assistance

in getting a copy that does work.  It does not seem --

THE COURT:  Can you give me a hint of what this is

about?  Why does this have to do with anything?  You think

the Government planted a person in my courtroom?

MR. O'TOOLE:  You really want me to answer that

question?  I really don't want to answer that question.  I

really want to get a disk that we subpoenaed that's the same

disk that the Government got with their subpoena.  That's

all I want.

THE COURT:  It was the marshal service.  Tell

them that they gave you --

MR. O'TOOLE:  I subpoenaed.

they gave you something defective.  I would think that they
would listen to you if you go back to them.

        MR. O'TOOLE:  Really?  Okay.  I'll do that, and
I'll report back after lunch.

        THE COURT:  Yes.  But I'm not wasting -- we're
trying to try a case.  I'm not worrying about people
wandering into this courtroom carrying cash.  And if you
think that the reason might be that the Government is
planting people in the courtroom, I find that we're involved
-- it's not your thinking, I realize -- in fantasy.  Thank
you.

        MR. O'TOOLE:  Well -- well -- have a good lunch,
Your Honor.

        THE COURT:  Thank you.  You can always subpoena
some other fund.

        (Proceedings concluded.)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

THE UNITED STATES OF AMERICA,        Criminal Case No. 15-386

          V.                                    *REDACTED*

ANTOINE JONES,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X   Washington, D.C.
                                      Monday, February 11, 2013
                                      2:21 P.M.

TRANSCRIPT OF JURY TRIAL - DAY 12 - P.M. SESSION
BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:  Darlene Michele Soltys, AUSA
                     Courtney Urschel, AUSA
                     U.S. ATTORNEY'S OFFICE
                     555 Fourth Street, NW, Room 4710
                     Washington, DC 20530
                     (202) 252-7685

For the Defendant:   Antoine Jones, Pro Se

                     Jeffrey Brian O'Toole
                     Errin Rae Scialpi
                     O'TOOLE, ROTHWELL, NASSEM & KLEINBACH
                     1350 Connecticut Avenue, NW, Suite 700
                     Washington, DC 20036
                     (202) 775-1550

Court Reporter:              Lisa Walker Griffith, RPR
                             U.S. District Courthouse
                             Room 5507
                             Washington, D.C.  20001
                             (202) 354-3247

2

1                    AFTERNOON SESSION

2          MR. JONES:  Your Honor, I finally got to look at,

3    Mr. O'Toole showed me the picture of the person who allegedly

4    brought the hundred thousand dollars in this courtroom.  And

5    yes, I do know him.  And yes, he used to be a promoter for

6    me.  And yes, that Wednesday, that when the Government said

7    that they thought somebody would maybe be obstruction of

8    justice, he was here that day.  He gave me a nod.

9          And this is also the person that when I put out that

10   Kevin Holland and Adrian Jackson was going to be my witness,

11   this is the person that sources believe that's setting these

12   guys up so they won't testify for me.  And he's the person

13   that's working for the Government agents that's relating to

14   this case.  I believe John Bivens, and I believe that the

15   agent, guy that came into to my search -- to search the Moore

16   Street, but this guy is basically not working for me, but I

17   really believe that he brought that money up here for the

18   Government, for whatever reason, I don't know.

19         THE COURT:  I wouldn't know either.  But it

20   wasn't -- he didn't go up to the jurors.  So I'm not worried

21   about it.

22         Okay.  Let move on.

23         MR. JONES:  I would like to use that right, I'd like

1          MR. JONES:  Yes, I'd like to put that whole tape

2    before the jury as part as my defense.

3          THE COURT:  Okay.  Denied.  You can't do it.  It is

4    so speculative that we're not going to get into another trial

5    over what he's doing in here and whether he's working for

6    so-and-so.  You can ask any of your guys, Jackson or Holland,

7    we can't find Jackson, whether anybody from the Government

8    tried to prevent them from testifying, you're welcome to do

9    it.  I've ruled.

10         Bring in the jury.

11         You are so far in outer space with some of your

12   theories that we're not going to go running around after them

13   forever and ever.

14         MR. JONES:  But it's obstruction of justice, Your

15   Honor.  This would be a great misjustice to keep going with

16   this case right here if it is.  Somebody needs to investigate

17   that situation.

18         THE COURT:  Well, you can investigate it later on.

19         MR. O'TOOLE:  As stand-by counsel, I don't think

20   Mr. Jones has articulated this as clearly as it needs to be

21   articulated.  I don't want to get in the middle of it.  If the

22   Court doesn't -- or -- he doesn't want me to.  But I think

23   the Court may have missed part of the import of what

                  Mr. Jones is saying.

1   for the Government to obstruct justice by keeping some of his

2   witnesses from testifying.  My understanding is these

3   witnesses, despite good judgment and common sense, are going

4   to testify.  So I don't think there's any reason to think

5   that anyone has obstructed anything, so

6            Why do we have to chase every one of Mr. Jones's

7   thoughts?  I've ruled on this one.  And you've articulated it

8   as well as he does.  He usually articulates things quite

9   well, but I don't buy into it.  And so I'm not going to keep

10  on chasing around after it.  You've got the tape, you saw it.

11  He has no basis to believe that the guy is working for the

12  Government.  You can send --

13           MR. O'TOOLE:  I don't know if that's true.  I don't

14  think -- I don't think that the Court can say that with --

15  and I'm not --

16           THE COURT:  He didn't offer any.

17           MR. O'TOOLE:  -- a conspiratorial type theorist

18  type I, actually.

19           THE COURT:  Did he offer any?

20           MR. O'TOOLE:  Actually he did.

21           THE COURT:  What did he say?

22           MR. O'TOOLE:  I'm not sure, and that's why I said to

23  the Court that I'm not sure he articulated to you as well as

24  he -- or related to it.

1          MR. O'TOOLE.  I think the basis is that if this

2    individual, whose name I don't necessarily know the last

3    name, I know the first name.

4          THE COURT:  What's his first name?

5          MR. O'TOOLE.  His first name is Jason.

6          THE COURT:  Jason.

7          MS. SOLTYS:  If Jason is a cooperating witness for

8    the United States, and he has - either he has a case or he's

9    worked for the Government to his own benefit in other matters

10   unrelated or related to Mr. Jones.  And if he set up the

11   arrest of Holland and/or Jackson for --

12         THE COURT:  Jackson apparently --

13         MR. O'TOOLE:  Let's forget Jackson.

14         THE COURT:  You got that one wrong.

15         MR. O'TOOLE:  And/or so let's just say Holland,

16   that if Jason learned that Holland was going to testify

17   against Jones, and then for his own benefit said, well, if I

18   can keep Holland from testifying on behalf of Jones, then

19   perhaps I'll do that.  And then?  I'm not sure what the

20   $100,000 is or what --

21         THE COURT:  Why would he come here with it?  Why

22   does that make sense?

23         MR. O'TOOLE:  I think if there was some -- if there

     is some reason, some real reason, some important, like the

1    said we think there's a reason to believe that perhaps

2    Mr. Jones orchestrated these people coming to the courtroom

3    with money.

4            THE COURT:  Right, and now Mr. Jones says the same

5    thing.  I frankly didn't believe either side of it  and I

6    wouldn't bite their --

7            MR. O'TOOLE:  I know you didn't, and to your credit,

8    but I think that -- I think there's a better nexus over here

9    than there was over there because there was just more

10   speculation.

11           THE COURT:  Tell the Government -- well, tell the

12   Government, if you think that, why don't you convince them to

13   stop investigating.  They're wasting a lot of taxpayer money

14   investigating the same thing you seem to be.

15           MR. O'TOOLE:  My understanding, then one last thing

16   and I don't want to --

17           THE COURT:  What is Jason's last name?  We can at

18   least find out if he's a cooperator.

19           MR. O'TOOLE:  I don't know.  Well, apparently he

20   works for some guy at the jail.

21           THE COURT:  That?

22           MR. O'TOOLE:  He worked for some individual at the

23   jail in some capacity.  But apparently, just before this

24   event he showed up in yield us would go and so ran the ...

1   through the intake section where Mr. Jones, as Your Honor

2   knows --

3        THE COURT:  If you want me to even think about any

4   of this, we need a name so we can ask the Government to look

5   into it.

6        MR. O'TOOLE:  We'll get you a name, we'll get a

7   name.  Believe me, I am not trying to buy anything that's -

8   I'm not trying to extend this trial.  I promise you.

9        THE COURT:  It's not a question of extending the

10   trial.  Mr. Jones has a, quote, defense based on the

11   Government's planted evidence, the Government has falsified

12   evidence  He's presenting a lot of this to the jury.  I have

13   no idea whether it has any merit whatsoever.

14        Mr. Holland is testifying, as far as I know.  So why

15   should I spend time chasing this at this point in time given

16   all the other butterflies that have been set up here.  So far

17   I've heard this at least three times and have never agreed

18   that there's any evidence of falsification, planting of guns,

19   of going in there until six o'clock.  But he's telling the

20   jury he's waiting to tell the jury  So I have ruled.

21        on that you.

22        THE COURT:  There's one more thing I want to put

23   on the record for  as far as he said, and I -- believe me, I

24   

1    because it hasn't been said to the Court very articulately,

2    is that this guy Jason picked up a charge and then spent,

3    when he -- he spent a long period of time in the jail or on

4    the bus on the way over here --

5            THE COURT:  I understand.

6            MR. O'TOOLE:  -- talking to Jones about his case, so

7    that he knew a lot about the case so that he could then do

8    something, who knows what.  Also Woody Allen said, just

9    because I'm paranoid doesn't mean they're not after me.

10           THE COURT:  Get me his name and we'll find out if

11   he's a cooperator even.

12           All right.  Let's go.  Bring in this witness.

13           MS. SOLTYS:  So, I have not seen the e-mails yet and

14   I've asked for the e-mails regarding Robin Bradshaw.

15           THE COURT:  The stipulation?

16           MS. SOLTYS:  And Mr. Balarezo.

17           THE COURT:  Where is the e-mail?

18           MS. SOLTYS:  Mr. O'Toole said he was going to ask

19   Mr. Jones whether Mr. Jones wished to call Robin Bradshaw

20   still.  If he doesn't, then obviously --

21           THE COURT:  Right.

22           MR. JONES:  Yes, I will be calling Robin Bradshaw.

23           THE COURT:  Then give her the e-mail so we can see

24   if it's a stipulation.  I need then to bring Mia Mitchell

# UNITED STATES DISTRICT COURT

for the

District of Columbia

United States of America

Antoine Jones

Case No.  Case No. 05-cr-386-1, ESH

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To:   U. S Court Security Officer for the Prettyman Courthouse located at 333 Constitution Avenue, N.W. Washington DC 20001

**YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance | U S District Court for the District of Columbia, 333 Constitution Avenue N.W. Washington, DC 20001 | Courtroom No.  23A |
|---|---|---|
| | | Date and Time:  12 08 2015 9 30 am |

You must also bring with you the following documents, electronically stored information, or objects *(leave blank if not applicable)*

Still photographs and/or video tapes of the male individual, who, accompanied by a female individual, entered the Prettyman Courthouse on Wednesday morning, February 10, 2013 with a large amount of cash and proceeded to Courtroom 23A, and who was followed to that courtroom by a Court Security Officer. That male individual subsequently left the building without being interviewed

*(SEAL)*

Date: _____

_____
*CLERK OF COURT*

_____
*Signature of Clerk or Deputy Clerk*

The name, address, email, and telephone number of the attorney, who requests this subpoena, are:
Antoine Jones Pro Se _____

Antoine Jones, Pro Se, and Attorney, Charles Stimac Stimac, Bruce Friedman and associates, 1629 K Street N.W. Suite 300, Washington, D.C., 20006
email (202) 449-2001, (703) 475-3762

PG1   (EXHibit #■■ 7(a)

I SWEAR under penalty of
perjury (28 U.S.C.S 1746)
that the following statements
ARE ACCURATE, CORRECT And true.

THE truth of the matter is
ONCE the Government put on
RECORD someone brought
$100,000 in Judge Huvelle court
Room, DEFENDANT Antoine Jones
HAS ask stand by counsel MR
O'TOOLE to investigate the
matter by obtaining video
footage of the two individuals
with the large sum of money.

WHen DEFENDANT Jones RAN
into Kevin Holland in District
court Holding cell (After His
Arrest) MR Holland mentioned
to DEFENDANT Jones that Government
cooperator JASON McNAiR set
Him up, And I like to Add, WHen
MR Gibson And others mentioned
that JASON McNAiR was in the
District court Hallway, deliber-
Ately SHowing cASH money, And
on the same day; in court JASon
McNAiR gave DEFENDANT Jones
three Mysterious Nods, I knew
then JAson McNAiR was PLANNing

RECEIVED
APR 16 2014
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

Defendant Jones even detail
that JASON McNAIR was in
District court Holding cell,
Questioning me.

When MR O'TOOLE couldn't get
the video tape to PLAY. I put
the full court press on MR O'TOOLE
to get Another copy that works,
or Least some still pictures of
JASON McNAIR on JAN 30 2012.

I ask MR O'TOOLE to Request
An investigation or a Hearing on
the sensitive issue of obstruction
of Justice by JASON McNAIR.

MR O'TOOLE ignored my Request
And decline to Request A Hearing.

The day that MR O'TOOLE pointed
out that Agent Bevington was
in the court Room, I Ask Him
Again to Ask the court to call
Agent Bevington to the bench to
confirm if JASON McNAIR was
one of His cooperator.

I knew that since MR O'TOOLE
was on the court pay roll And
He was An Officer of the court
in the Administration of Justice,
it would be more Lawful than
He Request An investigation or

PG3

in Judge Huvelle court Room
And there was no Hearing or
investigation where that $100,000
went And if Jason McNair has
gotten away with obstruction
of Justice and Jurors Tampering,
there was no way possible I
would Go to a fourth trial,
when Government cooperators
get away with bringing in large
Sum of money And get away
with Potential tampering with
the Jurors. This is one of the
Reason I took a Plea offer.

Respectfully Submitted

Antoine Jones          sign Antoine Jones
18600-016              Date. 1-14-2014
U.S.P-Atlanta
Po Box 150160
Atlanta GA 30315

P61                    ( Exhibit # 7(B) )

I Antoine Jones swear
under penalty of perjury
these statements are true,
accurate and correct,

From day one of my meeting
Mr Balarezo during Pretrial
for the third trial, Mr
Balarezo express that He didn't
want to Represent me in the
third trial And His Laxadasical
conduct and non-actions confirmed
it when He sabotage my motion
Requested to strengthen my
defense, especially the text
messages, wiretap, moore street
and the Hampton Blvd ware House
Argument.

Mr Balarezo on a couple of
occassion express and told me
that "I was going to Hard"
Never explaining what going
to Hard mean.

To strengthen the illegal Text
messages, Illegal wiretap, Illegal
moore street House searched and
the illegal search of Hampton
Blvd ware House, I Had my

and the Hampton Blvd Ware House
Argument.

MR Balarezo on A couple of
occassion express and told me
that "I was going to Hard",
Never explaining what going
to Hard mean.

To strengthen the illegal Text
messages, Illegal Wire Tap, Illegal
moore street House searched and
the illegal search of Hampton
Blvd Ware House, I had my
family and friends to Assisted
Invistigator Robin Bradshaw
to find some of the Wire Tap

P62 Court of Appeals to Review,

By Mr Balarezo Knew that the Wire Taps Affidavits was crucial and if He has properly and professionally added the Wire Tap and Him as an officer of the court who get paid for being the Litigator Argue the target Affidavits correctly I would Had a better change at the above mentioned motion I was force to go pro se.

By Mr Balarezo declining to Argue and submitting the target Affidavits, it put me to a Disadvantage and prejudice me because once again, in the third trial, the Government was allow to use damaging wire tap conversation, illegal evidence from the Moore St House and Hampton Blvd Warehouse, which is another Reason why I was force to take a Plea Bargained to avoid a Life conviction in the Fourth trial or Another stressful mistrial.

Respectfully Submitted

Antoine Jones                    Sign: Antoine Jones
18600-016                        Date 1-14-2014
U.S.P - Atlanta

# Inmate Inquiry

PRINT

| | | | |
|---|---|---|---|
| Inmate Reg #: | 18600016 | Current Institution: | Atlanta USP |
| Inmate Name: | JONES, ANTOINE | Housing Unit: | ATL-B-C |
| Report Date: | 04/08/2014 | Living Quarters: | B05-502L |
| Report Time: | 4:04:55 PM | | |

General Information  |  Account Balances  |  Commissary History  |  Commissary Restrictions  |  Comments

## General Information

| | |
|---|---|
| Administrative Hold Indicator: | No |
| No Power of Attorney: | No |
| Never Waive NSF Fee: | No |
| Max Allowed Deduction %: | 100 |
| PIN: | 1144 |
| PAC #: | 578754673 |
| FRP Participation Status: | Participating |
| Arrived From: | LEE |
| Transferred To: | |
| Account Creation Date: | 7/10/2008 |
| Local Account Activation Date: | 10/17/2013 3:19:43 AM |
| | |
| Sort Codes: | |
| Last Account Update: | 4/3/2014 6:01:30 AM |
| Account Status: | Active |
| Phone Balance: | $6.97 |

### Pre-Release Plan Information

| | | |
|---|---|---|
| Target Pre-Release Account Balance: | $0.00 | |
| Pre-Release Deduction %: | 0% | |
| Income Categories to Deduct From: | Payroll | Outside Source Funds |

### FRP Plan Information

| FRP Plan Type | Expected Amount | Expected Rate |
|---|---|---|
| | | |

## Account Balances

| | |
|---|---|
| Account Balance: | $0.19 |
| Pre-Release Balance: | $0.00 |
| Debt Encumbrance: | $0.00 |
| SPO Encumbrance: | $0.00 |
| Other Encumbrances: | $0.00 |
| Outstanding Negotiable Instruments: | $0.00 |



RECEIVED
Mail Room

APR 16 2014

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

4/8/2014

Administrative Hold Balance: $0.00
Available Balance: $0.19
National 6 Months Deposits: $1,090.00
National 6 Months Withdrawals: $1,233.60
Available Funds to be considered for IFRP Payments: $640.00
National 6 Months Avg Daily Balance: $128.25
Local Max. Balance - Prev. 30 Days: $355.74
Average Balance - Prev. 30 Days: $184.36

## Commissary History

### Purchases

Validation Period Purchases: $0.00
YTD Purchases: $577.70
Last Sales Date: 3/18/2014 6:53:06 PM

### SPO Information

SPO's this Month: 0
SPO $ this Quarter: $0.00

### Spending Limit Info

Spending Limit Override: No
Weekly Revalidation: No
Bi-Weekly Revalidation: No
Spending Limit: $320.00
Expended Spending Limit: $0.00
Remaining Spending Limit: $320.00

## Commissary Restrictions

### Spending Limit Restrictions

Restricted Spending Limit: $0.00
Restricted Expended Amount: $0.00
Restricted Remaining Spending Limit: $0.00
Restriction Start Date: N/A
Restriction End Date: N/A

**Item Restrictions**

| List Name | List Type | Start Date | End Date | Active |
|-----------|-----------|------------|----------|--------|

## Comments

Comments:

ViewAllTransCombined

Page 1 of 1

# All Transactions



| Inmate Reg #: | 18600016 | Current Institution: | Atlanta USP |
|---|---|---|---|
| Inmate Name: | JONES, ANTOINE | Housing Unit: | ATL-B-C |
| Report Date: | 04/08/2014 | Living Quarters: | B05-502U |
| Report Time: | 4:05:23 PM | | |

| Date/Time | Transaction Type | Amount | Ref# | Payment# | Balance |
|---|---|---|---|---|---|
| 4/3/2014 6:01:30 AM | TRUL Withdrawal | ($5.00) | TL0403 | | $0.19 |
| 4/2/2014 10:14:52 AM | Phone Withdrawal | ($10.00) | TFN0402 | | $5.19 |
| 4/2/2014 10:13.28 AM | TRUL Withdrawal | ($5.00) | TL0402 | | $15.19 |
| 4/2/2014 6:29.18 AM | Trugram | ($104.95) | TG0402 | | $20.19 |
| 4/1/2014 9:11:36 PM | Trugram | ($104.95) | TG0401 | | $125.14 |
| 4/1/2014 9:06:54 PM | TRUL Withdrawal | ($5.00) | TL0401 | | $230.09 |
| 3/29/2014 6:08:25 AM | TRUL Withdrawal | ($5.00) | TL0329 | | $235.09 |
| 3/28/2014 12:05:54 PM | Western Union | $100.00 | 33314087 | | $240.09 |
| 3/26/2014 11:27:30 AM | Phone Withdrawal | ($6.00) | TFN0326 | | $140.09 |
| 3/23/2014 8:26:14 AM | TRUL Withdrawal | ($5.00) | TL0323 | | $146.09 |
| 3/19/2014 6:31:28 AM | TRUL Withdrawal | ($5.00) | TL0319 | | $151.09 |
| 3/18/2014 6:53:06 PM | Sales - Fingerprint | ($184.65) | 46 | | $156.09 |
| 3/16/2014 11:39:01 AM | TRUL Withdrawal | ($5.00) | TL0316 | | $340.74 |
| 3/14/2014 9:01:52 PM | TRUL Withdrawal | ($5.00) | TL0314 | | $345.74 |
| 3/13/2014 3:12:50 PM | TRUL Withdrawal | ($5.00) | TL0313 | | $350.74 |
| 3/8/2014 3:34:56 PM | TRUL Withdrawal | ($5.00) | TL0308 | | $355.74 |
| 3/5/2014 1:21:36 PM | Phone Withdrawal | ($10.00) | TFN0305 | | $360.74 |
| 3/4/2014 9:19:37 PM | TRUL Withdrawal | ($5.00) | TL0304 | | $370.74 |
| 3/3/2014 1:30:59 PM | TRUL Withdrawal | ($5.00) | TL0303 | | $375.74 |
| 2/28/2014 4:51:15 PM | TRUL Withdrawal | ($5.00) | TL0228 | | $380.74 |
| 2/27/2014 9:05:07 PM | Western Union | $100.00 | 33314058 | | $385.74 |
| 2/26/2014 5:02:39 PM | TRUL Withdrawal | ($5.00) | TL0226 | | $285.74 |
| 2/25/2014 6:07:26 AM | TRUL Withdrawal | ($5.00) | TL0225 | | $290.74 |
| 2/21/2014 1:48:52 PM | TRUL Withdrawal | ($5.00) | TL0221 | | $295.74 |
| 2/19/2014 8:14:31 AM | TRUL Withdrawal | ($5.00) | TL0219 | | $300.74 |
| 2/16/2014 9:35:36 AM | TRUL Withdrawal | ($5.00) | TL0216 | | $305.74 |
| 2/15/2014 6:52:24 PM | Phone Withdrawal | ($10.00) | TFN0215 | | $310.74 |
| 2/15/2014 5:56:13 PM | TRUL Withdrawal | ($5.00) | TL0215 | | $320.74 |
| 2/14/2014 5:08:42 AM | Lockbox - CD | $55.00 | 70152201 | | $325.74 |
| 2/13/2014 1:26:35 PM | TRUL Withdrawal | ($5.00) | TL0213 | | $270.74 |
| 2/12/2014 4:06:12 PM | Western Union | $60.00 | 33314043 | | $275.74 |
| 2/12/2014 7:08:10 AM | TRUL Withdrawal | ($5.00) | TL0212 | | $215.74 |
| 2/12/2014 7:06:27 AM | Western Union | $200.00 | 33314043 | | $220.74 |
| 2/9/2014 6:18:11 PM | TRUL Withdrawal | ($5.00) | TL0209 | | $20.74 |
| 2/9/2014 1:08:06 PM | TRUL Withdrawal | ($5.00) | TL0209 | | $25.74 |
| 2/9/2014 1:04:42 PM | Western Union | $30.00 | 33314040 | | $30.74 |
| 2/6/2014 4:32:01 PM | Phone Withdrawal | ($1.00) | TFN0206 | | $0.74 |
| 2/5/2014 11:28:45 AM | TRUL Withdrawal | ($2.00) | TL0205 | | $1.74 |
| 2/5/2014 10:21:07 AM | Phone Withdrawal | ($5.00) | TFN0205 | | $3.74 |
| 2/1/2014 6:48:55 AM | Phone Withdrawal | ($10.00) | TFN0201 | | $8.74 |
| 1/30/2014 12:59:33 PM | TRUL Withdrawal | ($5.00) | TL0130 | | $18.74 |
| 1/28/2014 10:44.17 AM | TRUL Withdrawal | ($5.00) | TL0128 | | $23.74 |
| 1/26/2014 8:13:10 PM | TRUL Withdrawal | ($5.00) | TL0126 | | $28.74 |
| 1/24/2014 6:03:54 AM | TRUL Withdrawal | ($5.00) | TL0124 | | $33.74 |
| 1/22/2014 6:12:23 AM | TRUL Withdrawal | ($5.00) | TL0122 | | $38.74 |
| 1/18/2014 6:06:35 AM | TRUL Withdrawal | ($5.00) | TL0118 | | $43.74 |
| 1/18/2014 5:10:06 AM | Lockbox - CD | $45.00 | 70150301 | | $48.74 |
| 1/14/2014 8:41:01 AM | TRUL Withdrawal | ($2.00) | TL0114 | | $3.74 |
| 1/12/2014 4:35:46 PM | Phone Withdrawal | ($10.00) | TFN0112 | | $5.74 |
| 1/12/2014 11:42:45 AM | TRUL Withdrawal | ($5.00) | TL0112 | | $15.74 |

1 2

ViewAllTransCombined                                                              Page 1 of 1

# All Transactions



| Inmate Reg #: | 18600016 | Current Institution: | Atlanta USP |
| Inmate Name: | JONES, ANTOINE | Housing Unit: | ATL-B-C |
| Report Date: | 04/08/2014 | Living Quarters: | B05-502L |
| Report Time: | 4 05:37 PM | | |

| Date/Time | Transaction Type | Amount | Ref# | Payment# | Balance |
|---|---|---|---|---|---|
| 1/12/2014 5:07:52 AM | Lockbox - CD | $20.00 | 70149802 | | $20.74 |
| 1/3/2014 6:14:51 AM | Phone Withdrawal | ($5.00) | TFN0103 | | $0.74 |
| 12/26/2013 6:03:06 AM | TRUL Withdrawal | ($5.00) | TL1226 | | $5.74 |
| 12/24/2013 10:36:28 AM | Phone Withdrawal | ($5.00) | TFN1224 | | $10.74 |
| 12/22/2013 11:18:00 AM | TRUL Withdrawal | ($5.00) | TL1222 | | $15.74 |
| 12/21/2013 12:09:07 PM | Phone Withdrawal | ($5.00) | TFN1221 | | $20.74 |
| 12/21/2013 9:01:08 AM | Sales - No FP (Non-FP Session) | ($44.60) | 13 | | $25.74 |
| 12/18/2013 8:38:04 PM | TRUL Withdrawal | ($5.00) | TL1218 | | $70.34 |
| 12/18/2013 4:48:10 PM | Phone Withdrawal | ($5.00) | TFN1218 | | $75.34 |
| 12/16/2013 1:25:15 PM | TRUL Withdrawal | ($5.00) | TL1216 | | $80.34 |
| 12/12/2013 1:03:30 PM | Phone Withdrawal | ($8.00) | TFN1212 | | $85.34 |
| 12/10/2013 2:29:02 PM | TRUL Withdrawal | ($5.00) | TL1210 | | $93.34 |
| 12/9/2013 6:58:05 PM | Sales - No FP (Non-FP Session) | ($22.05) | 60 | | $98.34 |
| 12/9/2013 10:16:32 AM | Phone Withdrawal | ($10.00) | TFN1209 | | $120.39 |
| 12/7/2013 5:11:57 AM | Lockbox - CD | $90.00 | 70147601 | | $130.39 |
| 11/29/2013 11:10:24 AM | Phone Withdrawal | ($8.00) | TFN1129 | | $40.39 |
| 11/29/2013 6:24:10 AM | TRUL Withdrawal | ($10.00) | TL1129 | | $48.39 |
| 11/28/2013 7:15:25 AM | TRUL Withdrawal | ($5.00) | TL1128 | | $58.39 |
| 11/27/2013 12:52:35 PM | Sales - No FP (Non-FP Session) | ($102.50) | 124 | | $63.39 |
| 11/23/2013 11:10:10 AM | TRUL Withdrawal | ($5.00) | TL1123 | | $165.89 |
| 11/22/2013 5:05:07 PM | TRUL Withdrawal | ($5.00) | TL1122 | | $170.89 |
| 11/18/2013 2:11:03 PM | Phone Withdrawal | ($5.00) | TFN1118 | | $175.89 |
| 11/18/2013 6:20:08 AM | TRUL Withdrawal | ($5.00) | TL1118 | | $180.89 |
| 11/13/2013 5:05:37 PM | Western Union | $40.00 | 33313317 | | $185.89 |
| 11/12/2013 10:25:58 AM | Phone Withdrawal | ($5.00) | TFN1112 | | $145.89 |
| 11/12/2013 9:36:56 AM | TRUL Withdrawal | ($5.00) | TL1112 | | $150.89 |
| 11/10/2013 12:14:00 PM | TRUL Withdrawal | ($5.00) | TL1110 | | $155.89 |
| 11/7/2013 8:26:35 AM | TRUL Withdrawal | ($5.00) | TL1107 | | $160.89 |
| 11/6/2013 2:56:49 PM | Phone Withdrawal | ($5.00) | TFN1106 | | $165.89 |
| 11/5/2013 4:06:07 PM | Western Union | $100.00 | 33313309 | | $170.89 |
| 11/5/2013 11:02:00 AM | Phone Withdrawal | ($8.00) | TFN1105 | | $70.89 |
| 11/5/2013 6:20:38 AM | TRUL Withdrawal | ($5.00) | TL1105 | | $78.89 |
| 11/4/2013 6:07:36 PM | Sales - No FP (Non-FP Session) | ($92.05) | 39 | | $83 89 |
| 11/1/2013 9:32:43 PM | TRUL Withdrawal | ($5.00) | TL1101 | | $175.94 |
| 10/29/2013 1:05:31 PM | Western Union | $100.00 | 33313302 | | $180.94 |
| 10/29/2013 5:08:52 AM | Lockbox - CD | $50.00 | 70145001 | | $80.94 |
| 10/28/2013 2:17:15 PM | Phone Withdrawal | ($5.00) | TFN1028 | | $30.94 |
| 10/26/2013 8:25:47 PM | TRUL Withdrawal | ($5.00) | TL1026 | | $35.94 |
| 10/26/2013 9:37:32 AM | TRUL Withdrawal | ($5 00) | TL1026 | | $40.94 |
| 10/26/2013 9:13:18 AM | Phone Withdrawal | ($5 00) | TFN1026 | | $45.94 |
| 10/24/2013 5:01:13 PM | Phone Withdrawal | ($5 00) | TFN1024 | | $50.94 |
| 10/24/2013 10:24:28 AM | TRUL Withdrawal | ($5.00) | TL1024 | | $55.94 |
| 10/22/2013 5:24:15 PM | Phone Withdrawal | ($14.00) | TFN1022 | | $60.94 |
| 10/21/2013 6:30:50 PM | Sales - Fingerprint | ($131.85) | 33 | | $74.94 |
| 10/18/2013 5:05.36 PM | Western Union | $100.00 | 33313291 | | $206.79 |
| 10/17/2013 3:19:43 AM | Transfer - In from TRUFACS | $106.79 | TX101713 | | $106.79 |

1 2